FILED
2020 Aug-20  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ALABAMA
2                      SOUTHERN DIVISION

3

    HAMAN, INC. d/b/a KNIGHTS INN,)
4                                )
                     Plaintiff,  )
5                                )
          -vs-                   )  Civil Action File No.
6                                )  2:18-CV-01534-JHE
                                 )
7   CHUBB CUSTOM INSURANCE       )
    COMPANY,                     )
8                                )
                Defendant.       )
9                                )

10

11

12        The videotape deposition of CHARLES W. HOWARTH, a

13   witness in the above-entitled cause, taken before

14   Cynthia Odom, Licensed Court Reporter and Notary

15   Public in and for Davidson County, Tennessee, at 137

16   Third Avenue North, Franklin, Tennessee, on the 8th

17   day of January, 2020, commencing at 9:22 a.m.,

18   pursuant to the Alabama Rules of Civil Procedure.

19

20

21

    Job No. CS3838328

22

23

24

25

Page 2

```
 1      APPEARANCES:
 2        CONCHIN, COLE & JORDAN
             2404 Commerce Court , SW
 3           Huntsville, Alabama 35801
             For the Plaintiff
 4           BY:  GARY V. CONCHIN, ESQ.
             (256) 705-7777
 5           gary@alainjurylaw.com
 6        MOZLEY, FINLAYSON, LOGGINS, LLP
             1050 Crown Pointe Parkway, Suite 1500
 7           Atlanta, Georgia 30338
             For the Defendant
 8           BY:  WAYNE D. TAYLOR, ESQ.
             (404) 845-1944
 9           wtaylor@mfllaw.com
10      ALSO PRESENT:
11           Legal Video Service of Tennessee
12                          INDEX
13      Witness                                         Page
14      Charles W. Howarth
15      Direct Examination. . . . . . . . . . . . . . . 5
16
17                        EXHIBITS
18      No.  Description                                Page
19      37   Notice of Videotape Deposition             10
20      38   Exhibit A to Haman, Inc.'s Rule 26 A(2)
             Expert Disclosures                         19
21
        39   Appraisal Employment Agreement             68
22
        40   2-25-15 Letter To Brent Perich             80
23
        41   Appraisal Employment Agreement             95
24
        42   7-6-15 Letter to Randy Wilburn            113
25
```

Page 3

1                        EXHIBITS - continued
2       No.  Description                                      Page
3       43   The Howarth Group Website Screen Shot            120
4       44   Plaintiff's Designation of Expert
             Witnesses                                        130
5
        45   Belfor Property Restoration Document             155
6
        46   Brookstone Restoration Document                  157
7
        47   The Howarth Group's Estimate of Damages
8            Document                                         167
9       48   The Howarth Group's Estimate of Damages
             Document                                         175
10
        49   The Howarth Group's Estimate of Damages
11           Document                                         175
12      50   7-23-15 E-Mail Documents String                 189
13      51   E-Mail Documents String                         192
14      52   1-11-16 E-Mail with Declaration of
             Appraisers Attachment                            198
15
        53   E-Mail Document                                  202
16
        54   Declaration of Appraisers                        204
17
        55   2-9-15 Letter                                    206
18
        56   3-17-15 Letter                                   207
19
        57   9-10-15 Letter                                   208
20
21
22
23
24
25

1                    S T I P U L A T I O N

2          The videotape deposition of CHARLES W. HOWARTH

3     taken by agreement at 137 Third Avenue North,

4     Franklin, Tennessee, beginning at 9:22 A.M., January

5     8, 2020, on behalf of the Defendant pursuant to the

6     provisions of the Alabama Rules of Civil Procedure.

7          Formalities as to notice, caption, certificate,

8     reading and signing by the witness, and filing are

9     waived.

10         All objections, except as to the form of the

11    question, are reserved to the hearing.  The reporter,

12    being a notary public, may swear the witness.

13                          * * *

14              THE VIDEOGRAPHER:  This is the

15    videotape deposition of Mr. Charles W. Howarth in the

16    matter of Haman, Inc. d/b/a Knights Inn versus Chubb

17    Custom Insurance Company.

18              The case number is 2:18-CV-01534-JHE,

19    being heard before the United States District Court

20    for the Northern District of Alabama, Southern

21    Division, being taken on January 8, 2020, at 9:22 a.m.

22              Counsel, if you'll please state your

23    appearance for the record and whom you represent.

24              MR. CONCHIN:  Gary Conchin for Haman.

25              MR. TAYLOR:  Wayne Taylor for Chubb.

Page 5

```
 1                    THE VIDEOGRAPHER:  Madam court
 2     reporter, if you'll please swear in the witness.
 3        (Whereupon, the witness was administered the oath.)
 4                    MR. TAYLOR:  Thank you.  This will be
 5     the deposition of Mr. Charles Howarth, being taken by
 6     agreement of counsel and a notice of deposition served
 7     in this case.  The deposition is being taken for
 8     purposes of discovery, cross-examination and any other
 9     purpose permitted by the Federal Rules of Civil
10     Procedure.
11                    Before we get started I think the last
12     three digits may be incorrect, we have to double check
13     that because I think you said JAH, which is what's on
14     the notice, but I actually think that that last three
15     initials are KOB because the case is pending before
16     Judge Bowdre, so we may have that incorrect, and I
17     just wanted to put that on the record just in case of
18     anything.
19                    CHARLES W. HOWARTH,
20     having first been duly sworn, testified as follows:
21                    DIRECT EXAMINATION
22     BY MR. TAYLOR:
23        Q.   Mr. Howarth, we met for the first time when
24     we were waiting for the offices to be opened up this
25     morning.  My name is Wayne Taylor, and I represent
```

1      Chubb in connection with a lawsuit that's been brought

2      by Haman, Inc. in connection with both a fire loss and

3      a wind claim, and you are here in your capacity as a

4      disclosed expert witness in this case and also in

5      connection with your involvement in the two claims as

6      I guess a lay witness as well.

7              I've seen your CV, and it's pretty clear that

8      you've given depositions in the past.

9      A.     Correct.

10     Q.     So do I need to go through the ground rules

11     or do you understand that we need to have a verbal

12     response and that type of thing?

13     A.     I understand the ground rules, but I'll

14     accommodate you if you want to go through them.

15     Q.     Well, I don't see a need to go through them

16     if you feel comfortable with doing it.  If we come

17     across something that we need to address I guess we'll

18     just address it as we go along; how is that instead?

19     A.     Sure, sounds good.

20     Q.     And I understand that at approximately ten

21     o'clock we will need to take a break in order to

22     accommodate Mr. Conchin, who has a telephone status

23     conference with the Court in another case, and so

24     we'll be taking a break right around then.  I

25     typically try to go a little longer than an hour,

Page 7

1    maybe an hour to an hour-and-a-half before breaks, and
2    that's what we'll do the rest of the day.
3                    MR. CONCHIN:  And he likes to eat lunch
4    too.
5    BY MR. TAYLOR:
6        Q.    And I do like to eat lunch.
7                    MR. CONCHIN:  And he always for some
8    reason gets hungry around 12:00 or one o'clock, I
9    don't know why, but, you know.
10       A.    That's my kind of lawyer.
11   BY MR. TAYLOR:
12       Q.    All right.  If you could please state your
13   full name for the record.
14       A.    Charles Howarth.
15       Q.    And do you have a middle initial?
16       A.    W.
17       Q.    What does the W stand for?
18       A.    West.  I go by Chuck.
19       Q.    Is that the only nickname?
20       A.    Yes.
21       Q.    And your date of birth?
22       A.    8-28-54.
23       Q.    And that makes you how old?
24       A.    65.
25       Q.    And I was looking at your CV and I saw that

Page 8

1     you were born in Florida?

2         A.     Correct.

3         Q.     There are not a lot of us natives out there,

4     most people are transplants to that state.

5         A.     That's right.

6         Q.     Where are you from?

7         A.     I grew up in Orlando.

8         Q.     Oh, did you?  I grew up in Cocoa Beach.

9         A.     Oh, did you?  Good.

10         Q.     Born in Rockledge, grew up in Cocoa Beach.

11         A.     You know the right side of a surfboard I

12     would imagine.

13         Q.     I certainly do, I certainly do.  All right.

14     Has your company your -- company is The Howarth Group;

15     is that right?

16         A.     Correct.

17         Q.     Has your company ever been involved in a

18     lawsuit as a party before?

19         A.     Yes.

20         Q.     As a plaintiff or a defendant?

21         A.     When we have collection issues it would be as

22     a plaintiff.  I can't think of a --

23         Q.     Let me ask it this way, other than a

24     collection lawsuit has your company ever been involved

25     in a lawsuit?

1    A.    As I sit here I can't remember one other than

2    collection issues, but as I said, I'm 65, if I think

3    of any as we go through this I'll be glad to disclose

4    it.

5    Q.    Fair enough.  Have you ever been involved

6    personally in a lawsuit?

7    A.    I can't think of -- I can't think of a time

8    at the moment.  I'm going through health insurance

9    issues, car, I've never had a litigation on car

10   insurance, I haven't had litigation involving a

11   property claim, I'm still married to my original wife

12   of 40 -- almost three years ago.

13   Q.    That makes you and I rare --

14   A.    Another oddity.

15   Q.    Another oddity.

16              MR. CONCHIN:  And 40 for me.

17              MR. TAYLOR:  How about that, 34 years.

18              MR. CONCHIN:  Chuck punted his

19   coverage, you might say, when he married.

20              MR. TAYLOR:  I married up; are you

21   telling me you didn't?

22              MR. CONCHIN:  Well --

23   A.    In other words the credit goes to her, not to

24   me.

25              MR. TAYLOR:  I got that.

Page 10

```
 1                    MR. CONCHIN:  My wife's not here, so I
 2      don't have to answer that; do I?
 3                    THE REPORTER:  We're on video.
 4                    MR. TAYLOR:  Exactly.
 5          A.    I can't remember any.
 6      BY MR. TAYLOR:
 7          Q.    Okay.
 8          A.    If you know of any refresh my memory.
 9          Q.    No, I'm just asking.
10          A.    I just can't remember any as I sit here.
11          Q.    Fair enough, fair enough.  So your
12      involvement in lawsuits then has been as a witness,
13      either as an expert or a lay witness, or both?
14          A.    Again, other than collections issues --
15          Q.    No, no, no, no, no, not as a party,
16      involvement in lawsuits in the past has been as a
17      witness, not as a party?
18          A.    That's correct.
19          Q.    Okay.  Let me just show you for the record
20      what's been marked as Defendant's Exhibit 37 for
21      identification, this is an amended notice of
22      deposition, which actually got served yesterday
23      because the place for your deposition was changed from
24      what it was originally scheduled.
25                    (Reporter marks document as
```

1              Defendant's Exhibit No. 37 for

2              identification.)

3        Q.    Has anybody ever shown this to you?

4        A.    I think I got this by e-mail yesterday.

5        Q.    Okay.  From Mr. Conchin's office?

6        A.    But it was a busy day, so I didn't -- I

7     scanned it but I did not -- yes, it came from Mr.

8     Conchin's office.

9        Q.    And then nothing in it other than saying that

10     your deposition was here.  My office had previously

11     subpoenaed your file that we got long ago, so there

12     was no reason to add that to the deposition notice in

13     this case.  Fair enough.

14              What did you do in order to prepare to give

15     your deposition here today?

16        A.    I read through all the e-mail history on this

17     -- for both claims, the fire and the wind, I reviewed

18     all the documents that I have in my digital file, I

19     read through the two previous depositions I've given

20     in this case.

21        Q.    You mean examinations under oath?

22        A.    I'll let you call them whatever, they were

23     like a deposition, but whatever they were.

24        Q.    Prior testimony that you've given in

25     connection with the claims?

Page 12

1       A.      Correct.

2       Q.      Okay.

3       A.      And that pretty much summarizes what I've

4    done.

5       Q.      Did you review anybody else's depositions in

6    this case?

7       A.      No, I don't think I have anybody else's

8    depositions in the case presently.

9       Q.      Did you review anybody else's reports in

10   connection with this case?

11      A.      Yes, in my digital file I have the FBS

12   reports.  Any other reports I have in there I would

13   have reviewed.

14      Q.      How much time did you spend preparing or

15   reviewing these documents to prepare for your

16   deposition?

17      A.      All combined, probably eight hours, eight to

18   ten hours.

19      Q.      Eight hours of document review?

20      A.      You wanted to know the aggregate time --

21      Q.      Right.

22      A.      -- that it took for me to do everything I

23   just told you I did?

24      Q.      Right.

25      A.      And that's my answer.

Page 13

1      Q.    Did any of that eight to ten hours include
2   discussions with anybody?
3      A.    Not that I can remember.
4      Q.    Beyond the eight to ten hours to review the
5   various documents that you -- that are contained
6   within your file and e-mail history and your prior
7   testimony given in connection with the fire and wind
8   claims, have you met or spoken with anybody in order
9   to prepare for your deposition?
10      A.    No, not really.
11      Q.    Did you have a conversation with Mr. Conchin
12   in preparation for your deposition?
13      A.    Not really because I didn't need him to help
14   me prepare.  We talked briefly upstairs while he was
15   waiting for his coffee to get ready.
16      Q.    This morning you mean?
17      A.    Yes, uh-huh, but that was more
18   conversational, not preparation.  When I showed up
19   this morning without my key I was prepared.
20      Q.    Does your company have any time records of
21   time spent either by you or others who may have been
22   either independent contractors or employees of The
23   Howarth Group in connection with the fire and wind
24   claims that are at issue here?
25      A.    Not a formal time sheet that's kept

1    progressively day by day or week by week.  I will have

2    time records in my e-mails that will help me know the

3    amount of time I'm spending on a file, how many trips

4    I've made to the site.  I will have -- probably will

5    have, or at one time had, time sheets from Arthur

6    Grandinetti, who helped me prepare the estimate on

7    this one.

8             I may have gotten time information from Sarah

9    on the inventory, but I'm not sure that I did.

10        Q.   Okay.  I'm going to ask when we take a break

11   in about, oh, 25 minutes, so that Mr. Conchin can take

12   his call, to see if you can pull those time records

13   for Arthur Grandinetti and, if you have, for Sarah

14   Grandinetti, also those, because when we did serve a

15   subpoena on you for your file I will tell you that

16   there were no time records in there, so to the extent

17   that you have that I would appreciate you getting

18   that, and is it your testimony that there are no time

19   records for you in connection with your involvement in

20   this claim?

21        A.   No, no, what I just told you, I have time

22   records, so that would be incorrect.

23        Q.   Is there a button you can press that tells us

24   exactly how much time you spent working on this matter

25   --

1        A.    No.

2        Q.    -- and the dates that you worked on it?

3        A.    No, no.

4        Q.    So you would have to go back and recreate

5    that?

6        A.    Correct.

7        Q.    So the records that you have as to Arthur

8    Grandinetti and possibly Sarah Grandinetti, those are

9    actual time records that don't have to be recreated,

10   whereas your time put into the two claims would

11   actually have to be recreated; is that right?

12       A.    The way I do business is when I invoice for a

13   client for an appraisal or for a job it's at the end

14   of the process, it's just the way I do it all the time

15   in every case, and at that point I recreate using the

16   very documents that I just described for you.

17            The records for time for Arthur I don't have

18   a button I can push to give them to you.  I would have

19   to find out which payroll company I was using four

20   years ago.  I don't know that I could even find that

21   information for you, the exact hours that Arthur put

22   into it, I'm not sure where I would go.  It's not in

23   the file, so those would be just payroll records.

24       Q.    And we'll talk about Arthur and Sarah

25   Grandinetti in a little while and kind of the

Page 16

```
1     arrangement that you had with them in terms of their
2     compensation and that type of thing.  So if I were to
3     then ask you -- so there's no way that even during a
4     break that you could provide me with any time records
5     of how much time the Grandinettis or you have actually
6     put into the fire claim and the wind claim?
7          A.    Correct.
8          Q.    So if I asked you how many hours have you put
9     into the wind claim as of today would you be able to
10    give me even a ballpark?
11         A.    No, I'm not going to guess, I'd rather finish
12    the actual calculation, especially when I'm under
13    oath, and give you an accurate number.
14         Q.    Well, could you ballpark if I asked you to?
15         A.    I don't want to ballpark, no, this has been
16    going on now for what, four years, be impossible for
17    me to ballpark.
18         Q.    Do you know how much time Arthur Grandinetti
19    has spent working on this claim?
20         A.    A lot of time, but, no, I can't give you even
21    a ballpark.
22         Q.    So you couldn't quantify even a range of how
23    much time Mr. Grandinetti has spent on this?
24         A.    I could give you a range, it would be a
25    pretty extreme gap, if that's what you're asking me,
```

Page 17

1    sure.
2        Q.    When you say an extreme gap there would be a
3    few hundred hour difference from bottom to top?
4        A.    Yes.
5        Q.    How about Ms. Grandinetti?
6        A.    I don't know.
7        Q.    Okay.  Fair enough.  Has The Howarth Group
8    sent any bills to Haman, Inc. or someone on behalf of
9    Haman, Inc. in connection with this matter?
10       A.    I don't believe so.
11       Q.    Has The Howarth Group sent any invoices to
12   Mr. Conchin in connection with its work in this
13   matter?
14       A.    Not that I can remember because that's the
15   way we do business.
16       Q.    Because you bill it when it's over?
17       A.    That's right.  Always have and always will.
18       Q.    Where do you currently live, sir?
19       A.    Gallatin, Tennessee.
20       Q.    And your street address?
21       A.    1538 Wrights Lane.
22       Q.    Is that with a W?
23       A.    Correct.
24       Q.    How long have you lived in Gallatin?
25       A.    About ten years.  That's a ballpark.

Page 18

```
1         Q.    I understand.  And who do you live there
2    with?
3         A.    My wife and our son.
4         Q.    And your wife's name?
5         A.    Ann.
6         Q.    And you said your son lives there as well?
7         A.    Correct.
8         Q.    What is his name?
9         A.    Maddox.
10        Q.    And how old is he?
11        A.    11.
12        Q.    Do you have any relatives that live in
13   Alabama?
14        A.    Not that I know of, or can think of.
15        Q.    Or on your wife's side maybe?
16        A.    Not that I know of, or can think of.
17        Q.    And all my communications will go through Mr.
18   Conchin if I ever need to reach you, but if for some
19   reason I had to get you what would be the best
20   telephone number to reach you at?
21        A.    My cell, 615-406-0834.
22        Q.    And I suppose I should explain to you,
23   because I didn't start at Exhibit No. 1, I tend to
24   just go wherever I left off from the last deposition,
25   it's just easier for me to do that, so let me show you
```

Page 19

1       what has been -- I've now marked as Defendant's

2       Exhibit 38 for identification.

3                    (Reporter marks document as

4                    Defendant's Exhibit No. 38 for

5                    identification.)

6       Q.    And I will state for the record that this was

7       Exhibit A to Haman, Inc's. Rule 26 A(2) Expert

8       Disclosures that were served in this lawsuit, and

9       Exhibit A concerns you and your involvement, and if we

10      turn -- the first page, it says Exhibit A right on the

11      top; right?

12      A.    Right.

13      Q.    And then second page says Valuation of Loss

14      and Proper Claims Practices; right?

15      A.    Right.

16      Q.    And then the third page is the beginning of

17      your CV, which is the next four pages; is that right?

18      A.    Right.

19      Q.    And could you take a minute and just look at

20      the four pages of your CV that are pages I guess 3

21      through 7 of Exhibit 38 that we've marked for

22      identification, and let me know if that is still

23      accurate and current.

24                   (Whereupon, the witness

25                   reviewed the document.)

1      A.    It appears to be.  I think we would change

2     The Howarth Group date to 2020 now.

3      Q.    Okay.  The Howarth Group is still --

4      A.    We would change the married to 40 --

5      Q.    2 years?

6      A.    2 years.

7      Q.    So other than the length of time that you

8     have operated The Howarth Group and the amount of time

9     you've been married to Ann --

10     A.    Those are the only -- as I sit here, only

11    things I would change or update in it that I can think

12    of.

13     Q.    And according to this you have a bachelor's

14    degree; is it a bachelor's degree in theology?

15     A.    Correct.

16     Q.    Is that your only college degree that you

17    have?

18     A.    Yes.

19     Q.    And that is from Holmes Bible College in

20    Greenville, South Carolina?

21     A.    Correct.

22     Q.    Is that a bachelor of arts or bachelor in

23    theology?

24     A.    It's a bachelor of theology.

25               MR. TAYLOR:  Are you doing okay on

```
                                                    Page 21

 1      time, Gary?

 2                     MR. CONCHIN:  Yeah, they're going to

 3      buzz me five minutes before.

 4      BY MR. TAYLOR:

 5           Q.    What year did you get that degree, sir?

 6           A.    I think it was '77.

 7           Q.    Since graduating from Holmes Bible College do

 8      you have any other college education where you've

 9      taken courses from a university or a college?

10           A.    Not that I can think of.

11           Q.    Then I see you're also a chartered property

12      and casualty underwriter?

13           A.    Correct.

14           Q.    When did you receive that designation?

15           A.    I don't remember, I think sometime in the

16      late 70's or early 80's.

17           Q.    You were working in the insurance industry at

18      the time?

19           A.    Yes.

20           Q.    The only job listed on your CV -- well,

21      actually you've got three jobs listed on your CV, one,

22      your current position as the owner and president of

23      The Howarth Group; correct?

24           A.    Correct.

25           Q.    And before that you were the branch manager
```

Page 22

```
 1      for Howard Wehnes, W-E-H-N-E-S, Jr. & Company?
 2           A.    Correct.
 3           Q.    And then before that you were a
 4      re-inspector/trainer and claims adjuster for State
 5      Farm?
 6           A.    Correct.
 7           Q.    And that goes back as far as 1980?
 8           A.    Correct.
 9           Q.    And if you got your CPCU -- did I hear you
10      correctly, did you say the late 1970's you got your
11      CPCU designation?
12           A.    No, I said I didn't know.
13           Q.    Okay.
14           A.    And then I guessed.
15           Q.    Okay.  Fair enough.
16           A.    Late 70's, early 80's.
17           Q.    Early 80's.  Okay.  Would it have been while
18      you were working for State Farm?
19           A.    I started it while working for State Farm, I
20      think I finished it when I was with the Wehnes
21      Company.
22           Q.    Fair enough.
23           A.    I had most of it done I think that first
24      year, so with Wehnes Company I completed it.
25           Q.    Fair enough.
```

Page 23

1      A.     It was ten parts back then.

2      Q.     And you also have an associate in claims

3  designation?

4      A.     Correct.

5      Q.     And when did you receive that designation?

6      A.     While with State Farm.

7      Q.     Sometime between 1980 and 1986?

8      A.     Right, and even these dates are ballparks.

9      Q.     Fair enough.  What is involved in obtaining

10  an associate in claims designation?

11      A.     I don't remember, I think it was

12  correspondence mostly.

13      Q.     Like a correspondence course?

14      A.     At the time I think I was using cassette

15  tapes in large booklets, and I think this is the one I

16  got just mostly in office listening to tapes, taking

17  tests, best I can remember.

18      Q.     Okay.  Other than your CPCU and associate in

19  claims designations and your bachelor in theology from

20  Holmes Bible College, do you have any other degrees or

21  certifications?

22      A.     No other degrees, insurance-related

23  certifications, no, none other than these.

24      Q.     I saw that you indicated that you're a

25  chartered property casualty underwriter, you got your

1      CPCU; is that a designation or a certification or is

2      it actually a degree?

3           A.    I don't know, it's one of the three probably,

4      maybe all three, I just don't know.

5           Q.    And what about an associate in claims, is

6      that actually a degree that you earned or is that a

7      certification or some other -- or a designation?

8           A.    I would use all three, but I'll let you

9      decide which of the three it should be.

10          Q.    Well, the only reason I ask is because when I

11     think degree I think, you know, something like what

12     you got from Holmes Bible College, that bachelor's

13     degree, that type of thing.

14          A.    They give you a nice certificate, and it may

15     use the word "degree" on the certificate, I just can't

16     remember.

17          Q.    Fair enough.  Was State Farm the first job

18     that you had in the insurance industry?

19          A.    Yes, but not -- my first job with State Farm

20     was with an agency in Port Orange, Florida, an agent

21     by the name of Mack Ballard.

22          Q.    Is that after graduating from college?

23          A.    Yes.

24          Q.    So you went to work --

25          A.    Before I took this position with State Farm

Page 25

1      as an adjuster.

2          Q.    So you worked for an agent for how long after

3      you graduated from Holmes Bible College?

4          A.    I'm going to guess I worked for this agent

5      between one and two years, before I applied for and

6      got the job to be a State Farm adjuster.

7          Q.    Did you work in claims when you worked for

8      this agent?

9          A.    Back then agents had claims authority, and,

10     yes, I helped with handling of claims and processing

11     claims for his policyholders, small ones.

12         Q.    When you say agents had claim authority, they

13     had claim authority in connection with smaller claims?

14         A.    They could write a check, they could pay off

15     a claim, they could settle a claim up to a certain

16     amount of money, I think it was somewhere around

17     $2,500, I can't remember exactly.  That was a long

18     time ago.

19         Q.    And I know that we're sitting in the offices

20     of The Howarth Group, which headquarters I guess are

21     located in Franklin, Tennessee?

22         A.    Correct.

23         Q.    These are the headquarters.  How long has The

24     Howarth Group been located in Tennessee?

25         A.    Since we -- well, The Howarth Group, the

1      corporation The Howarth Group, was started I think

2      sometime around '07.  Prior to that it was by another

3      name because I had partners, so The Howarth Group

4      itself, which is what you've been asking me about so

5      far, is since '07.

6              We moved here in '98, so I moved to Tennessee

7      in '98, my company had an office here -- we moved here

8      from Tampa, and my company opened an office here

9      sometime around I think '95, if that answers your

10     question.

11         Q.   Do you still have that Tampa office?

12         A.   No, I closed the offices in Florida when we

13     moved here in '98.

14         Q.   Before you said you previously -- or I guess

15     that you previously had partners and so that you then

16     incorporated when that all changed and you

17     incorporated The Howarth Group, became The Howarth

18     Group, Inc.; right?

19         A.   Correct.

20         Q.   Up until that time what was the company known

21     as?

22         A.   Prior to that -- and I'm not sure I'm giving

23     you the exact order, it was Howarth, Keyes, Manley.

24     Prior to that it was Howarth Keyes, and prior to that

25     it was Howarth, Keyes, McCrory, and prior to that it

Page 27

1     was Chuck Howarth & Associates, Inc.

2          Q.    And then who is Mr. Keyes?

3          A.    George Keyes.

4          Q.    And Mr. Manley?

5          A.    Clay Manley.

6          Q.    Was that a corporation or just a partnership?

7          A.    It was a corporation, I think it was a -- was

8     always a corporation each time.

9                     MR. CONCHIN:  Wayne, I apologize.

10                    MR. TAYLOR:  No, that's okay.  Let's go

11    off the record.

12                    MR. CONCHIN:  I didn't have anything to

13    do with scheduling this.

14                    THE VIDEOGRAPHER:  Off the record at

15    9:54.

16                    (Discussion off the record at

17                    9:54 a.m.)

18                    THE VIDEOGRAPHER:  Back on the record

19    at 10:19.

20    BY MR. TAYLOR:

21         Q.    All right.  Mr. Howarth, we're back now that

22    Mr. Conchin has been able to have his telephone

23    conference status meeting with the Court in another

24    case, and so I want to pick up kind of where we left

25    off, I guess.  Do you have any degree -- do you have a

1      degree in any science field?

2          A.    No, sir, I mean I've answered your question

3      that I don't have any other degrees in here.  Are you

4      now asking about some other unusual degree that --

5          Q.    I'm just asking do you have a degree in a

6      science field.

7          A.    Yeah, well, the reason is that's kind of a --

8      you're asking me the same question you did before, and

9      I'm concerned that you may be thinking something other

10     than what I've already answered for you.

11         Q.    No, no, just do you have a degree in a

12     science field.

13         A.    No, sir, not like you describe where it's

14     like a university degree, like you asked me before.  I

15     don't have any other university degrees than the ones

16     that are listed here.

17         Q.    Are you a professional engineer?

18         A.    No.

19         Q.    Do you have any education in engineering?

20         A.    No.

21         Q.    Are you a general contractor?

22         A.    No.

23         Q.    Have you ever been a general contractor?

24         A.    No.

25         Q.    Have you ever held a license as a general

Page 29

```
 1    contractor?
 2        A.    No.
 3        Q.    Are you an industrial hygienist?
 4        A.    No.
 5        Q.    Have you ever had any training as an
 6    industrial hygienist?
 7        A.    No.
 8        Q.    Okay.
 9        A.    Well, I guess in claims there are a lot of
10    courses that are required of or offered to adjusters
11    related to the field of mold and fungi and losses
12    associated with that, but I answered your question no
13    because I understood you were asking have I been to an
14    industrial hygienist sort of school or taken courses
15    toward a degree like that, and the answer is no.
16        Q.    Do you have a certification as an industrial
17    hygienist?
18        A.    No.
19        Q.    Have you ever heard of the American Board of
20    Industrial Hygiene?
21        A.    I have.
22        Q.    Would you agree that they set education and
23    experience standards for industrial hygienists?
24        A.    I'm take your word for it, I don't know that.
25        Q.    Do you know whether your experience or
```

1      training would meet any of the requirements of the

2      American Board of Industrial Hygienists?

3          A.    Probably not.

4          Q.    Do you hold yourself out as a scientist?

5          A.    No.

6          Q.    Are you a microbiologist?

7          A.    No.

8          Q.    Do you have any specialized training or

9      credentials in sampling and analysis of mold and soot?

10         A.    No.

11         Q.    Are you a licensed mold consultant in any

12     state?

13         A.    No.  I guess if I could go back to the

14     previous question, I do have training, again, over 40

15     years of claims experience and seminars, you learn

16     about sampling, so I've been to courses and classes

17     that discuss the process of sampling for mold or soot.

18     I don't perform that work but just to make sure I'm

19     answering your question clearly.

20         Q.    Fair enough.  Other than the chartered

21     property and casualty underwriter and associate in

22     claims designations that you obtained, do you have any

23     other professional licenses or designations?

24         A.    I think you asked that already and I answered

25     it no.  If a pilot's license is a professional license

1      in your opinion then that would be included, but, no,

2      not in the claims business.

3           Q.    Are you a licensed public adjuster?

4           A.    Yes.

5           Q.    In what states?

6           A.    States of Tennessee, Kentucky, Mississippi,

7      and Florida.

8           Q.    Are you a licensed public adjuster in the

9      state of Alabama?

10          A.    Alabama does not offer licensing for public

11     adjusters, one of I think four states that don't offer

12     that license.

13          Q.    Do you have any kind of adjusting license for

14     the state of Alabama?

15          A.    No.

16          Q.    Describe what a public adjuster is.

17          A.    A public adjuster in general is a licensed

18     individual who handles insurance property damage

19     insurance claims on behalf of policyholders, he works

20     in a representative capacity of the policyholder and

21     he negotiates the entire claim to a final resolution

22     with the carrier's adjusters.

23          Q.    When you say serves in a representative

24     capacity for the policyholder did you mean to say you

25     represent the policyholder, is that what you meant?

Page 32

1      A.   I meant exactly what I said, sounds like

2   you're saying the same thing I said.

3      Q.   I just want to make sure I understood what

4   that meant.

5      A.    Representative capacity means once a

6   policyholder employs a public adjuster all

7   communications from the carrier stop going to the

8   policyholder but go through the public adjuster, he

9   becomes their representative in the claim.  That's

10  what I meant.

11     Q.   Have you ever had any professional licenses

12  or designations that have -- you've allowed to lapse?

13     A.   Not that I can think of as I sit here.

14     Q.   Have you ever had any professional licenses

15  or designations that have been revoked?

16     A.   No.

17     Q.   Have you ever had any type of disciplinary

18  action taken against you in connection with your

19  profession?

20     A.   No, not that I can think of.

21     Q.   According to your CV, that we have marked as

22  Defendant's Exhibit 38 for identification, you're a

23  member of the National Society of CPCUs; is that

24  right?

25     A.   That's my understanding, I am a CPCU.

1          Q.    And then there is an organization, you just
2     have to pay yearly dues once you get that designation?
3          A.    I don't pay yearly dues.
4          Q.    No?  Okay.  And are you a member of the
5     Tennessee Association of Public Adjusters?
6          A.    There is not a Tennessee Association of
7     Public Adjusters anymore, doesn't exist.
8          Q.    There used to be?
9          A.    Used to be.
10         Q.    And until when it existed you were a member?
11         A.    Yes.
12         Q.    And you were a past president?
13         A.    Yes.
14         Q.    What happened to the Tennessee Association of
15    Public Adjusters?
16         A.    Just lost interest in it and it dissolved.
17         Q.    When you say lost interest, the membership
18    that it had, there just wasn't any interest to keep
19    the organization going?
20         A.    Correct.
21         Q.    Or was it -- were you behind that and you
22    just had other things to deal with because you weren't
23    interested, there really wasn't any more organization?
24         A.    Everything rises and falls with leadership,
25    and there wasn't any interest in leading that

Page 34

1      organization by anyone really other than me, so it

2      became something that I had no interest in preserving

3      myself so it essentially just disappeared.

4           Q.    It says here that you're a past president of

5      the Florida Association of Public Adjusters.

6           A.    Correct.

7           Q.    Public Insurance Adjusters, excuse me, I said

8      that incorrectly.  Are you still a member of the

9      Florida Association of Public Insurance Adjusters?

10          A.    I think I am a member by virtue of the fact

11     that I hold a public adjuster's license in Florida.

12     I'm trying to remember if we're still paying dues to

13     that, I may or may not be.

14          Q.    When were you the president of that

15     organization?

16          A.    I was the second president actually, so it

17     was a long, long time ago, sometime in the 80's is my

18     guess.

19          Q.    In the 1980's?

20          A.    Yes.

21          Q.    And are you currently a member of the

22     National Association of Public Insurance Adjusters?

23          A.    Yes.

24          Q.    And are you -- at one time it says you were a

25     member of its board of directors; are you still on its

Page 35

```
 1    board of directors?
 2         A.    No.
 3         Q.    When were you on the board of directors for
 4    the National Association of Public Insurance
 5    Adjusters?
 6         A.    I don't remember, it was years ago.
 7         Q.    Other than being a member of its board of
 8    directors have you ever held an office, in other words
 9    president, vice president, what have you, of the
10    National Association of Public Insurance Adjusters?
11         A.    No.
12         Q.    Explain what is The Howarth Group.
13         A.    The Howarth Group is an insurance claims
14    consulting company, and we do mostly appraisal work
15    utilizing the appraisal provision in insurance
16    policies to resolve property damage claim disputes.
17         Q.    So you do that more than serving as a public
18    adjuster on behalf of a policyholder?
19         A.    Yes.
20         Q.    Is that how you would describe your role in
21    this case?
22         A.    That was my role in this case.  I was
23    employed as the appraiser for the appraisal process by
24    Knights Inn.
25         Q.    What percentage of The Howarth Group's work
```

1    is as a public adjuster as opposed to other types of

2    work that you-all do?  And we'll get to those in a

3    minute.  What percentage is a public adjuster?

4         A.    Right now, zero, we don't have any open

5    public adjusting files, haven't had any for years.

6         Q.    Let me just do it this way, over the last

7    five years what's been the average percentage?

8         A.    Probably between zero and one percent of

9    public adjusting work.

10        Q.    And over the past five years what percentage

11   has been work as an appraiser for the policyholder?

12        A.    90 to 95/6 percent.  The other -- what's left

13   over would be expert witness work, that sort of thing.

14        Q.    If we turn to the third and fourth pages of

15   your CV, which would be pages 5 and 6 that we've

16   marked as Exhibit 38 for identification --

17        A.    I don't see any page numbers; what page do

18   you want me on?

19        Q.    It's the page -- actually it says page 3 of

20   CV, Prior Expert Testimony (Partial) Federal and State

21   Courts, that next page-and-a-half.

22        A.    Got you.

23        Q.    Does that list all of the cases in which

24   you've given prior testimony?

25        A.    No, it would go on for many more pages if I

Page 37

```
 1      gave them all.
 2          Q.    Does it list everything -- all of your prior
 3      expert testimony for the last four years?
 4          A.    I believe so, that's the intent.
 5          Q.    Are most of these depositions that were given
 6      or are these trial testimony?
 7          A.    Both are included.
 8          Q.    Is it mostly deposition or trial testimony?
 9          A.    I don't know as I sit here.  My guess is
10      there would be probably more depositions, but I'd have
11      to take time to go through it and tell you that.
12          Q.    I take it you're being compensated for your
13      time here today?
14          A.    Correct.
15          Q.    As well as the prep time that you already
16      testified about?
17          A.    Correct.
18          Q.    And when we're done are you going to be
19      sending Mr. Conchin a bill, or is this one where you
20      won't be sending a bill until the case is over?
21          A.    No, my way of doing business is the bill
22      doesn't get sent until the case is over, primarily
23      because my clients are hurting, the people that I help
24      through a claim have suffered a major catastrophe, and
25      that's the way I do business.  I'm not going to become
```

1      an added burden to them.  If I bill Mr. Conchin or any

2      other legal representative of my client's typically

3      those invoices get passed on as expenses, so that's

4      what I decided to do many, many years ago, and that's

5      the way I do business.

6          Q.    And when you send your bill in connection

7      with this matter when the case is over will you be

8      sending that bill to Mr. Conchin?

9          A.    Yes.

10         Q.    And will that bill include all of the time

11     you have spent in connection with this matter or only

12     since the lawsuit has been filed?

13         A.    All of the time in connection with this

14     matter.

15         Q.    From the day that your firm was hired?

16         A.    Correct.

17         Q.    Could you just kind of go -- because it's

18     really not that many, the page-and-a-half that's

19     listed here, could you identify which -- since I

20     assume that it's mostly deposition testimony here,

21     just identify which ones were actual trial testimony.

22         A.    Alexander Properties, trial.

23         Q.    That's the thirst one that's listed, the

24     third case that's listed?

25         A.    Yes.

Page 39

1      Q.     Okay.

2      A.     Carneal may have gone -- maybe it was a

3  mediation, not sure about Carneal.

4      Q.     Which one is Carneal?

5      A.     I'm going down the list; you see it?

6      Q.     I see it.

7      A.     J.T. Carneal there.  I think I testified in

8  Jinil Corporation, if I'm remembering that case right.

9      Q.     Would you have given both deposition and

10  trial testimony in that case?

11      A.     I don't remember.

12      Q.     How about the Alexander Properties case,

13  would you have given both testimony and --

14      A.     Yes.

15      Q.     In deposition and at trial?

16      A.     I think so.

17      Q.     And Carneal?

18      A.     I'm just not sure about Carneal, I think

19  Carneal was a mediation so I don't think I was ever

20  deposed in Carneal.  Cullman.  Union versus Blakeney

21  Palmer, trial.

22      Q.     Only or both?

23      A.     Well, it's pretty rare I go to trial and

24  testify that I haven't been deposed.

25      Q.     Fair enough.

Page 40

1      A.    So I'm going to guess, if I tell you that I

2   was in trial I probably was deposed at the same time

3   as well.   Central Baptist, trial, that's the second to

4   last.   I think that covers the trials, best I can

5   remember.

6      Q.    And everything else would just be deposition

7   only?

8      A.    Yes, best I can remember.

9      Q.    Now, I understand that you were retained by

10  Haman, Inc. doing business as the Knights Inn in

11  connection with both the fire and wind claims in this

12  matter; is that right?

13     A.    I was hired as their appraiser.

14     Q.    And the individual that you worked with or

15  who retained your company, was that Zarin Visram?

16     A.    Yes.

17     Q.    Was there somebody else at Haman, Inc. that

18  you-all worked with?

19     A.    Not that I can remember.

20     Q.    Is this the -- have you had any other

21  occasions to be retained in any capacity by either

22  Haman, Inc. or Ms. Visram?

23     A.    No.

24     Q.    How about Mr. Conchin, does -- have you

25  worked with Mr. Conchin in the past?

1      A.    Yes.

2      Q.    On how many occasions?

3      A.    It's impossible to give you an accurate

4    number.  I think I provided a guesstimate in an

5    earlier deposition on this case, I'll just refer you

6    to that.  I don't even remember what I said.

7      Q.    Are all of the matters that you have worked

8    with Mr. Conchin on in the state of Alabama or have

9    any of them been outside the state of Alabama?

10     A.    I think they were all in the state of

11   Alabama.

12     Q.    Do you think you have worked on more than 20

13   matters with Mr. Conchin's firm?

14     A.    I don't know.

15     Q.    You don't know whether it's more or less than

16   20?

17     A.    It's probably a -- I'm going to guess, it's

18   wild guessing because it's been years -- around that

19   number is probably a good number, but I would refer

20   you to my previous deposition.  I think I guessed in

21   there as well.

22     Q.    And since all of the matters that you have

23   worked with Mr. Conchin have been in the state of

24   Alabama is it fair to say then that your company does

25   business in the state of Alabama?

Page 42

1          A.    Yes.

2          Q.    Does your company have a registered agent for

3    service of process in the state of Alabama?

4          A.    I think so.

5          Q.    Would the registered agent for service of

6    process for your company, The Howarth Group, be Mr.

7    Conchin?

8          A.    I don't know, I haven't looked at those

9    documents in years.

10         Q.    Well, do you have a relationship with another

11   lawyer or some other person that would be serving in

12   that capacity?

13         A.    I've worked with a number of law firms in the

14   state of Alabama, but I use registered agents in --

15   like in Kentucky with a law firm that I've never

16   worked with, I've never been involved with, so I don't

17   know.

18              Somewhere in the archives those records

19   exist, and as I sit here I just can't pull that out of

20   the top of my head.

21         Q.    So you don't know who your registered agent

22   in the state of Alabama is for The Howarth Group?

23         A.    That's correct.

24         Q.    Are you the sole shareholder of The Howarth

25   Group?

Page 43

1      A.    My wife and I.

2      Q.    And how is the ownership split up between

3   your wife Ann and you?

4      A.    I think it's 50/50.

5      Q.    How many employees does The Howarth Group

6   have?

7      A.    Four.

8      Q.    Do you consider you and your wife, Ann,

9   employees of The Howarth Group, in that four?

10     A.    Yes.

11     Q.    So that's two of the four?

12     A.    Yes.

13     Q.    And who are the other two employees?

14     A.    Dory Howarth and Dennis Rowe.

15     Q.    In addition to being a 50/50 or 50 percent

16   owner of The Howarth Group what else does your wife,

17   Ann, do for the business?

18     A.    She's my admin assistant.

19     Q.    Does she get involved in handling claims or

20   performing inspections?

21     A.    No.

22     Q.    And what about Dory Howarth?

23     A.    Dory is the office manager, she is involved

24   in claims, preparing estimates.

25     Q.    When you say preparing estimates does she

Page 44

1       actually go out to a site and prepare estimates or

2       does she do it administratively?

3           A.    No, you've got to go to the site to prepare

4       an estimate on a building loss.

5           Q.    Is Dory the person that opened up the door

6       for us this morning to get into the building?

7           A.    Yes.

8           Q.    How long has Dory worked for your company?

9           A.    It will be getting close to 20 years, might

10      be 26ish -- I mean 16, something like that, 17.

11          Q.    Is Dory a licensed public adjuster in

12      Tennessee?

13          A.    I don't think so.

14          Q.    Is she a licensed contractor?

15          A.    No.

16          Q.    Does she have any professional designations?

17          A.    Not that I'm aware of.

18          Q.    Did Dory have any involvement in this matter,

19      the Haman, Inc. wind and fire claims?

20          A.    I don't remember that she did have any

21      involvement in either of these two.

22          Q.    And Dennis Rowe is I guess the final

23      employee?

24          A.    He's one of the four.

25          Q.    One of the four.  There's you, your wife,

Page 45

```
1      your daughter Dory, and then --
2          A.    Maybe the last guy on your list, I'll let you
3      call him final if you want to.
4          Q.    Okay.  The final one we'll talk about; how's
5      that?
6          A.    Okay.
7          Q.    What does Mr. Rowe do?
8          A.    Mr. Rowe runs the marketing arm of The
9      Howarth Group.
10         Q.    And where does he work out of?
11         A.    He works out of this office.
12         Q.    Here in Franklin?
13         A.    Yes.
14         Q.    Does Mr. Rowe get involved in performing
15     inspections, creating estimates, that type of thing?
16         A.    Yes.
17         Q.    Is he a licensed public adjuster in any
18     state?
19         A.    Yes.
20         Q.    In which states?
21         A.    I think multiple states, but I'd have to let
22     him give you that list instead of me.
23         Q.    Did Mr. Rowe have any involvement at all in
24     the wind and fire claims at issue in this case?
25         A.    Nothing material, you may see e-mails from
```

Page 46

1      him in our e-mail history, Mr. Rowe is the supervisor

2      for Bruce Bodor, who was the marketing individual that

3      met with Zarin initially, best I can remember, and so

4      there may -- there's nothing material that Mr. Rowe

5      did in the claim.

6          Q.   So is Mr. Bodor still with -- he's no longer

7      with the company?

8          A.   Mr. Bodor is not active with the company, he

9      still assists with open files but he's not actively

10     marketing at the level that he was back when we

11     acquired this particular loss, but Mr. Bodor is an

12     independent contractor, so he may bring another loss

13     to us next week so I just don't know.

14         Q.   Has Mr. Bodor ever been an employee of the

15     company?

16         A.   No.

17         Q.   And what's his full name?

18         A.   Bruce Bodor.

19         Q.   Could you spell his last name, please?

20         A.   B-O-D-O-R, I think.

21         Q.   And it's Mr. Bodor that brought the Haman

22     wind and fire claims to The Howarth Group?

23         A.   Yes, sir.

24         Q.   And he's an independent contractor, not an

25     employee?

Page 47

1          A.    Correct.

2          Q.    How is Mr. Bodor compensated when he brings a

3      claim to The Howarth Group?

4          A.    Ultimately he gets paid 20 percent of our

5      actual fee.  Initially he gets paid a signup bonus, so

6      he has received partial payment.

7          Q.    Is that signup bonus in addition to the 20

8      percent or that's inclusive?

9          A.    Inclusive.

10         Q.    So he just gets that up front and then when

11     it's all over with the net that he would receive is 20

12     percent?

13         A.    Correct.

14         Q.    And what is the signup bonus that Mr. Bodor

15     receives when he brings you a claim?

16         A.    At the time that the claim is acquired we

17     come up with some guesstimate as to how much the fee

18     is likely to be and then try to pay the marketing

19     people somewhere around 30, 40 percent of what the

20     projected full 20 percent would be on that projected

21     fee.

22         Q.    Okay.  And was Mr. Bodor the individual who

23     brought you the fire claim in this matter?

24         A.    Best I can remember, yes.

25         Q.    And what was the up-front bonus that he

Page 48

1       received to bring the fire claim here?

2            A.    I don't remember that.

3            Q.    But he was paid something to bring it in to

4       the company?

5            A.    He was paid something when it arrived, yes,

6       once they became -- this company became a client he

7       was paid the signup bonus.

8            Q.    Are there any -- is there a calculation that

9       is performed in order to get an idea of what the claim

10      may be worth in order to know how much to give to Mr.

11      Bodor as that up-front or that signup bonus?

12           A.    Yes.

13           Q.    Where is that calculation?

14           A.    Right up in my head.

15           Q.    So it's not reduced to writing?

16           A.    Well, it's different for every file.

17           Q.    I understand that, that's my -- well, let me

18      ask you this question, is there reduced to writing the

19      amount you determined the fire claim was worth in

20      order to determine the signup bonus that you were

21      going to be giving Mr. Bodor?

22           A.    I don't know that there is a place where it's

23      written down what -- way back when we got the Knights

24      Inn file what we expected the ultimate outcome would

25      be.  There's a lot of guesswork involved, we have

1      discussions, we talk about it, ultimately I'm the best

2      one to figure out about where this claim is likely to

3      settle, and it's done in my head and Bruce then gets a

4      check, like everybody gets paid every two weeks, so

5      that's kind of the way it works.

6          Q.    Is there a record that -- when Mr. Bodor is

7      given a check is he given a check for each claim

8      separately or is he given -- if he say brings you four

9      claims he'll get one check for whatever the signup

10     bonus is on all four claims?

11         A.    They're paid every two weeks, if during a

12     period of two weeks we have two new files from Bruce

13     then what he gets will be itemized by file because

14     it's calculated per customer.

15         Q.    But it's on one check?

16         A.    But he only gets one check every two weeks.

17         Q.    And is there a record that you can access

18     that indicates the amount of the signup bonus Mr.

19     Bodor received when he brought the fire claim to The

20     Howarth Group?

21         A.    Probably could find that, that would have

22     occurred I think back in 2015.

23         Q.    But there's a record of that?

24         A.    Probably is.

25         Q.    And is that record kept with this particular

Page 50

1   file or is that kept separately?

2        A.    I don't think there's any record of it in the

3   file, ordinarily there wouldn't be, it's kept in

4   payroll records.

5        Q.    And as you sit here today -- well, is there

6   any way to find out on a break how much the signup

7   bonus was paid to Mr. Bodor for bringing the claim to

8   you?

9        A.    No, I'd need to get back to my office.

10       Q.    You'd have to do it -- your home office in

11  Gallatin?

12       A.    Correct.

13       Q.    And would the testimony that you've just

14  given in connection with the signup bonus that was

15  paid to Mr. Bodor in connection with the fire claim be

16  the same in connection with the wind claim?

17       A.    Yes, same general process happens.

18       Q.    As you sit here today how much was Mr. Bodor

19  paid as a signup bonus to bring you the wind claim?

20       A.    I don't know.

21       Q.    Okay.

22       A.    Or I should say I don't remember, I just

23  don't have that kind of memory.

24       Q.    When the deposition is over I'm going to ask

25  you to please look up the information on the signup

Page 51

1    bonuses paid to Mr. Bodor for both the fire and the

2    wind claims and provide those to Mr. Conchin, who in

3    turn will then send them to me; okay?

4        A.    Okay.

5        Q.    Thank you.  How long has Mr. Rowe worked for

6    your company as an employee?

7        A.    I think somewhere around ten years.

8        Q.    Has he always worked in the capacity as an

9    employee or has he ever been an independent

10   contractor?

11       A.    I think he's always been an employee.

12       Q.    Now, other individuals that you have a

13   relationship with, are they always on an independent

14   contractor basis other than the four people we've just

15   discussed, or have you had other employees in the

16   past?

17       A.    I can't think of any other employees for The

18   Howarth Group other than the four I've given you, as I

19   sit here.

20       Q.    So everyone else then would have been serving

21   as an independent contractor?

22       A.    Correct.

23       Q.    Beside you who else on behalf of The Howarth

24   Group was involved in the fire claim?  And you don't

25   have to list Mr. Bodor because we already know that

1     he's the one that brought the claim to the Howarth

2     Group.

3          A.    Yeah, and obviously my wife sends out the

4     letters, Dennis may or may not have been involved in

5     the acquisition of this with Bruce.

6          Q.    Who is Dennis?

7          A.    What?

8          Q.    Oh, I'm sorry, Dennis Rowe, I apologize.

9          A.    Right.  Arthur Grandinetti and Sarah

10    Grandinetti were involved.  I think that covers it

11    best I can remember.

12                    MR. TAYLOR:  Gary, you're writing on an

13    exhibit, you know.

14                    MR. CONCHIN:  I'm just writing a name

15    on it, on the back of it.

16    BY MR. TAYLOR:

17         Q.    Arthur -- was Arthur Grandinetti ever an

18    employee?

19         A.    No.

20         Q.    Did he serve only as an independent

21    contractor?

22         A.    Yes.

23         Q.    To The Howarth Group?

24         A.    Yes.

25         Q.    How long was Mr. Grandinetti's affiliation

Page 53

1    with The Howarth Group?

2         A.    I'm going to guess about eight to ten years.

3         Q.    Is Mr. Grandinetti still affiliated in any

4    way with The Howarth Group?

5         A.    He doesn't have any -- he doesn't have an

6    active role right now in estimating, but that can

7    change at any time.  I still communicate with him, I

8    still need documents from files that he worked on,

9    which he'll send me, but he is not an active estimator

10   right now like he was at the time of Knights Inn.

11        Q.    Has he changed his affiliation so that he's

12   doing either all or most of his work with someone else

13   now?

14        A.    Yes, he does estimating still for the most

15   part with other companies.

16        Q.    Is there a main company that he works for

17   now?

18        A.    Probably is but I wouldn't know what it is.

19        Q.    So the only involvement right now that you

20   have with Mr. Grandinetti is in connection with

21   currently pending claims that he worked on before he

22   essentially moved on?

23        A.    I think that's accurate.

24        Q.    How was Mr. Grandinetti compensated by you

25   for the work that he performed?

Page 54

```
 1          A.     He was paid by the hour.

 2          Q.     How much was he paid by the hour?

 3          A.     I think he was getting $65 an hour, and that

 4     included his wife as -- because they worked together.

 5          Q.     You paid them jointly $65 an hour?

 6          A.     Correct.

 7          Q.     So not 65 for her and 65 for him?

 8          A.     It was 65 for him and that included his

 9     wife's assistance when he needed her or wanted her

10     with him.

11          Q.     Would Ms. Grandinetti engage in any type of

12     work that Mr. Grandinetti would not be doing?

13          A.     Yes.

14          Q.     And when that happened how was she

15     compensated I guess?

16          A.     She was either compensated by the hour or a

17     percentage of our fee.

18          Q.     Was Mr. Grandinetti ever given a percentage

19     of your fee as opposed to hourly?

20          A.     If it happened I could count it on one hand,

21     and it would be only if he assisted in the acquisition

22     of a file.  I can't think of any other -- which was

23     rare -- so almost all the time Mr. Grandinetti was

24     compensated on an hour basis.

25          Q.     And in connection with the fire and wind
```

Page 55

1      claims Mr. Grandinetti was paid strictly on an hourly
2      basis?
3          A.    Yes.  Now, I think he assisted -- if I
4      remember right he assisted with the acquisition of the
5      wind claim, so he would be entitled to a part of Mr.
6      Bodor's percentage at 20 percent percentage.
7          Q.    He would get a portion of that 20 percent
8      when it's over?
9          A.    Yes.
10         Q.    Of whatever your company's fee was?
11         A.    Correct.
12         Q.    So Mr. Bodor wouldn't necessarily get the
13     entire 20 percent?
14         A.    On the wind claim.
15         Q.    On the wind claim.
16         A.    Best I can remember, yes.
17         Q.    Where does Mr. Bodor live?
18         A.    Where does he live now?
19         Q.    Yes.
20         A.    I don't know, I don't know what his address
21     is.  I'm thinking he lives here in middle Tennessee.
22         Q.    The last time you knew where he lived where
23     did he live?
24         A.    Right here in middle Tennessee.
25         Q.    Okay.  Now, I understand that Mr. Grandinetti

1   prepared or assisted in preparing the estimates of

2   repair in connection with the fire and the wind

3   claims; is that right?

4       A.    Correct, at Knights Inn.

5       Q.    And he would have been paid $65 an hour, and

6   then as to the wind claim he will share in the 20

7   percent that would be paid to Mr. Bodor as part of the

8   intake?

9       A.    Correct, he was paid for all of his time,

10  inspecting, photographing and scoping and preparing

11  the estimates for both the fire and the wind claim.

12      Q.    With regard to the fire claim, which was just

13  one building of three that are out there, how many

14  hours did Mr. Grandinetti spend at the site

15  inspecting, if you know?

16      A.    I don't know, it was days, they were there

17  for multiple days, but I can't tell you the exact

18  number of hours.

19      Q.    How much has Mr. Grandinetti been paid to

20  date for his work in connection with the fire claim?

21      A.    I don't have that memorized off the top of my

22  head.

23      Q.    How much time has Mr. Grandinetti spent at

24  the site performing an inspection in connection with

25  the wind claim?

Page 57

1      A.    If this is a memory test I don't have all
2      those numbers memorized.
3      Q.    It's okay, if you don't know just say you
4      don't know.
5      A.    He spent a lot of time but I can't tell you.
6      Q.    How much has Mr. Grandinetti been paid to
7      date in connection with his work on the wind claim?
8      A.    I don't remember.
9      Q.    Those are records that you can access so that
10     you know exactly how much has been paid in connection
11     with the fire and the wind claims to Mr. Grandinetti;
12     is that right?
13     A.    I believe so, yes.
14     Q.    Now, I understand that Sarah Grandinetti was
15     involved in connection with the contents damages in
16     connection with both the wind and the fire claims; is
17     that right?
18     A.    In addition to her assistance of Arthur with
19     the estimates and photographs.
20     Q.    Was Ms. Grandinetti paid separately for her
21     work in connection with the contents damages for the
22     wind and the fire claims?
23     A.    She would be, yes, she would be paid for her
24     work on the contents claims separate from her
25     assistance of Arthur with the building claims.

Page 58

1      Q.    And for her work on the contents in

2    connection with the fire and the wind claims was your

3    agreement with her on an hourly basis or was it to

4    give her a percentage of whatever the fee was?

5      A.    I don't remember.

6      Q.    Is there a written document that would

7    indicate what that arrangement is?

8      A.    I could find the answer to that from the

9    documents, yes.

10     Q.    Okay.  I do not recall in reviewing your file

11   that was produced in response to the subpoena if there

12   was anything in there that indicated a fee arrangement

13   or fee agreement with Mrs. Grandinetti, Sarah

14   Grandinetti, in connection with her work on the

15   contents for the fire and the wind claims.

16     A.    Yeah, it would be in payroll records, it

17   wouldn't be in the file.

18     Q.    So in addition to what I've already asked you

19   to access I'm also going to ask you to please access

20   -- well, let me also ask this, in connection with Mr.

21   Grandinetti's work on the fire and the wind claims

22   would there be a separate written agreement that would

23   reflect his compensation, or did you just --

24     A.    Like an employment agreement?

25     Q.    Well, yeah, or did you just have a general

Page 59

1        agreement that for the work you do for me you get $65

2        an hour?

3            A.    Yeah, it was an ongoing general agreement,

4        and I think that was his rate back in 2015, you know,

5        I'm doing my best -- doing a lot of guessing.

6            Q.    Is there any specific agreement for Mr.

7        Grandinetti to work on the wind or fire claims that

8        are at issue in this case?

9            A.    Not that I can think of, we don't do a

10       separate agreement for every file.

11           Q.    Okay.  So I'm going to ask also when the

12       deposition is over if you could please obtain the

13       records about the payments made to Mr. Grandinetti for

14       his work on the fire and the wind claims, and I'm also

15       going to ask you to do the same thing in regard to

16       Sarah Grandinetti for her work in connection with the

17       contents claim, contents portion of the fire and wind

18       claims, and because you said you had two ways of

19       potentially compensating Sarah Grandinetti I'd like

20       any document where the agreement in connection with

21       the fire and the wind claims was reduced to writing;

22       okay?

23           A.    (No response.)

24           Q.    And I do need a verbal response to my

25       question, sir.

Page 60

1      A.    It's okay that you asked me that, yes, sir.

2      Q.    I'm asking you to please provide that; will

3    you do that?

4      A.    Oh, I will, but you're going to send me a

5    list.

6              MR. CONCHIN:  Why don't you send me --

7              MR. TAYLOR:  I'll send -- yeah, I will.

8    BY MR. TAYLOR:

9      Q.    And what I'm asking is you don't send it to

10   me directly, you send it to Mr. Conchin who will then

11   send it to me; okay?

12             MR. CONCHIN:  And you'll send me what

13   you -- just send me a letter of what you're asking for

14   and we'll go from there.

15             MR. TAYLOR:  Will do.

16             MR. CONCHIN:  I have CRS disease; do

17   you know about that?

18             MR. TAYLOR:  I've heard of it but I

19   don't remember what it stands for.

20             MR. CONCHIN:  Can't remember stuff.

21   BY MR. TAYLOR:

22     Q.    Have you presented or been a presenter at any

23   seminars in say the last five to ten years?

24     A.    Not in the last five years that I can

25   remember.

Page 61

1        Q.    How about the last ten years?

2        A.    I don't remember any probably in the last ten

3    years.

4        Q.    Have you written or co-written any

5    publications on any topic that would relate to

6    insurance claims?

7        A.    No, none that I can remember.

8        Q.    If you had I would assume they would be on

9    your CV?

10       A.    It's not something I do, I spend time doing,

11   my time is taken up handling these appraisals.  I

12   don't remember doing it, it's not something I would

13   add to the CV unless it was something I did more

14   regularly.

15       Q.    Do you remember ever writing an article that

16   was published somewhere, even if it's just like an

17   electronic newsletter, that discusses some aspect of

18   insurance policy coverage or claim handling or the

19   appraisal process or anything along those lines?

20       A.    I don't remember doing that for publication.

21       Q.    I have to ask you this, have you ever been --

22   have any criminal convictions?

23       A.    No.

24       Q.    Have you ever been arrested for anything

25   other than a traffic violation?

Page 62

1      A.    No.

2      Q.    If you would look again at the list of your

3   prior expert testimony, could you identify which ones

4   were on anything other than damages, even in part?

5      A.    Anything other than damages?

6      Q.    Right, since you -- and maybe it's wrong of

7   me to make an assumption, but since you indicated that

8   the vast majority of your work is as an appraiser it

9   seems to me that most of your testimony would be in

10  the realm of damages, so I just want to know of the

11  listed cases here did you provide any expert testimony

12  on any topic other than the amount of damages or the

13  scope of damages.

14     A.    I got you now.  Yes, for many of these I

15  provided testimony on the subject of claims handling,

16  proper claims procedures, proper estimating

17  procedures, the proper procedures related to the

18  appraisal process and those sorts of things.

19          MR. TAYLOR:  And, Gary, I understand

20  based on your representation to the Court at our last

21  status conference he's not giving that type of

22  testimony as an expert in this case; is that right?

23          MR. CONCHIN:  No, that's not -- what we

24  represented to the Court was that -- my understanding

25  was the Court would not accept people such as Mr.

Page 63

1      Howarth or a lawyer or anybody else coming in and

2      testifying to, quote, bad faith, end quote, but Mr.

3      Howarth will testify concerning conduct of what he

4      thought was the appraisal process, specifically here

5      termination of or killing the appraisal process

6      midstream, he has that knowledge.

7                    I don't think that this Court is going

8      to allow Mr. Howarth or anybody else, a lawyer or any

9      expert to testify what is bad faith and that's not

10     what we're proposing that he do, but he does have

11     comments about the appraisal process here and how the

12     appraisal process should work under this contract.  Is

13     that clear enough?

14                    MR. TAYLOR:  That's not my

15     understanding, but we'll deal with it.

16     BY MR. TAYLOR:

17         Q.    Have you ever had a Court that has refused to

18     allow you to testify as an expert witness on any

19     topic?

20         A.    No.

21         Q.    Have you ever been excluded, at least in

22     part, from testifying as an expert witness?

23         A.    Not that I know of.

24                    MR. TAYLOR:  Gary, this will save a lot

25     of time then, Mr. Howarth is not being offered as an

 1      expert on causation, what caused the damages; is that

 2      right?

 3                  MR. CONCHIN:  Well, I think that's a

 4      bleed-over question.  I don't know that appraisers can

 5      testify -- can do a claim and come up using Xactimate

 6      or any estimation amount without looking at what

 7      caused it.  I mean if it's a fire --

 8                  MR. TAYLOR:  That's not what I mean.

 9                  MR. CONCHIN:  -- then their job is to

10      look at damages resulting from a fire.

11                  MR. TAYLOR:  That's not my question.

12                  MR. CONCHIN:  He's not a C&O, he's not

13      a cause and origin expert, but --

14                  MR. TAYLOR:  Is he going to give expert

15      testimony that says this damage was caused by this?

16                  MR. CONCHIN:  Well, I think his

17      estimate may include that subject to the rules, you

18      know.  I suppose -- we always get into this argument

19      in every case, you know, defense counsel wants the

20      appraisers limited to testifying to damages only, but

21      you can't testify to damages without obviously being

22      cognizant of what the claim is, what's it about, is it

23      fire, is it wind, so his job was to determine damages

24      and do an appraisal of fire damage first and then

25      secondly wind damage.  I don't know how you can ignore

Page 65

1    the causation issues.  If he were on the roof and he

2    saw a paint splotch that had nothing to do with it,

3    with the fire or the wind, then we wouldn't expect him

4    to put that in his estimate, but if it's a fire or

5    wind claim we would expect him to put it in the

6    estimate.

7    BY MR. TAYLOR:

8        Q.   We've been provided both through the Rule 26

9    disclosures and in response to the subpoena that my

10   office served on your company that you responded to

11   with various documents, and included with that is an

12   estimate to repair the damages or what you perceive to

13   be the damages from the wind as a result of the wind

14   claim; right?

15       A.   Correct.

16       Q.   And an estimate to repair the damages in

17   connection with the fire claim?

18       A.   Correct.

19       Q.   And a list of contents that are claimed as

20   damaged as a result of the fire?

21       A.   Correct.

22       Q.   And a list of contents claimed as damaged as

23   a result of the wind claim, or due to the wind claim?

24       A.   Correct.

25       Q.   Have you prepared any other reports other

1      than those four estimates or inventories?

2          A.   Not that I can think of as I sit here.

3          Q.   Have you prepared any narrative report on --

4      that gives an opinion on what caused the damages?

5          A.    In addition to the estimates, the estimates

6      themselves provide an opinion as to the cause of the

7      damages.

8          Q.   Other than what's contained in the estimates

9      have you prepared any narrative reports in connection

10     with the cause of any of the damages?

11         A.   Not that I can think of as I sit here.  I'm

12     looking through this Rule 26 because sometimes I do a

13     narrative and sometimes I don't, and I don't think I

14     did.

15         Q.   I will tell you in my place the only thing

16     I've ever seen from your company based on what I was

17     provided with the Rule 26 disclosures that came from

18     Mr. Conchin's office as well as what was contained

19     within your file provided with the subpoena are the

20     two estimates and the contents inventories that I've

21     listed off, I did not and have never seen a narrative

22     report relating to the cause of the damages from

23     either of those two claims, so I just want to make

24     sure that I'm not missing something, so did you ever

25     draft a report that contains a narrative giving

1       opinions on the cause of the damages in connection

2       with the fire claim?

3           A.    I don't think I did because I haven't seen

4       one in my file either.

5           Q.    And you've reviewed your file in preparation

6       for your deposition?

7           A.    Correct.

8           Q.    And what about in connection with the wind

9       claim, was there a narrative where gave a report that

10      gives a narrative and provides opinions on what was

11      damaged as a result of wind?

12          A.    Same answer.

13          Q.    That you have not done that?

14          A.    Right.

15          Q.    Have you prepared a report that discusses the

16      claim handling or adjusting conduct of any

17      representatives of Chubb in connection with the fire

18      claim?

19          A.    Not that I can remember.

20          Q.    Have you prepared a report that contains any

21      narrative that discusses the claim adjusting or

22      investigation conduct of Chubb and its representatives

23      in connection with the wind claim?

24          A.    Not that I can remember.

25                MR. CONCHIN:  Let me clarify, his

1      answer of course is correct, but there are various

2      e-mails and correspondence and letters that set forth

3      his opinions about that process that we have produced.

4      BY MR. TAYLOR:

5          Q.    Have you prepared an actual expert report on

6      that issue with regard to the fire claim?

7          A.    I think you've asked that and I answered, not

8      that I can remember as I sit here a formal report on

9      that subject by itself.

10         Q.    Have you prepared a formal report regarding

11     Chubb's conduct as it relates to the appraisal process

12     for the fire claim?

13         A.    Not that I can remember.

14         Q.    Have you prepared a formal report that

15     discusses Chubb's conduct as it relates to the

16     appraisal process in connection with the wind claim?

17         A.    Not that I can remember.

18         Q.    I'm going to show you what's been marked as

19     Defendant's Exhibit 39 for identification.

20               (Reporter marks document as

21                Defendant's Exhibit No. 39 for

22                identification.)

23         Q.    And this appears to be an Appraisal

24     Employment Agreement in connection with the fire claim

25     that occurred in March of 2014; is that right?

```
                                              Page 69
1          A.    Yes.

2          Q.    And have you seen this document before?

3          A.    Yes.

4          Q.    And is it contained within your file?

5          A.    Should be.

6          Q.    And the date that this agreement was signed

7     with Haman, Inc. is January 29, 2015; is that right?

8          A.    Correct.

9          Q.    About ten months after the fire loss?

10         A.    Correct.

11         Q.    The date of fire loss being March 22, 2014;

12    is that right?

13         A.    Correct.

14         Q.    And according to this agreement it's

15    basically saying that The Howarth Group has been

16    employed for the purpose of determining the amount of

17    the loss and presenting the valuation to the appraisal

18    panel and/or the carrier; is that right?

19         A.    This is an appraisal employment agreement.

20         Q.    Are you agreeing with what I just said?

21         A.    No.

22         Q.    The insured hereby employs The Howarth Group

23    for the purpose of determining the amount of the loss

24    and for presenting this valuation to the appraisal

25    panel and slash or the carrier; is that what it says?
```

Page 70

1          A.     You read that accurately.

2          Q.     And then it says THG, that's The Howarth

3     Group; right?

4          A.     Correct.

5          Q.     Is directed to notify the carrier of the

6     insured's invocation of the appraisal provision of the

7     policy and is hereby appointed as the insured's

8     appraiser as required by the policy.

9          A.     You read that correctly.

10          Q.     So if -- is that an instruction, number one,

11     that you're going to serve as my -- Haman is

12     essentially saying that you or your company is going

13     to serve as Haman, Inc.'s appraiser; right?

14          A.     Correct.

15          Q.     And that it is The Howarth Group on behalf of

16     Haman, Inc. that will invoke the appraisal process?

17          A.     No, Haman, Inc. is the only one who can

18     invoke appraisal.  What this is saying by the Haman,

19     Inc.'s representative that she has directed us to

20     notify the carrier that she has invoked appraisal.

21          Q.     Okay.  And if we turn down to paragraph 3,

22     your company is going to be paid $375 per hour plus

23     expenses; is that correct?

24          A.     Correct.

25          Q.     And then the next sentence says:  However,

1    because THG, The Howarth Group, has expressed to the

2    insured the opinion that the amount proposed by the

3    carrier to the insured is inadequate.  Do you see

4    that?

5        A.    You read that correctly.

6        Q.    Did you or someone from The Howarth -- on

7    behalf of The Howarth Group, I should say, express to

8    Haman, Inc. that the amount proposed by the insurance

9    company, Chubb in this case, was inadequate?

10       A.    Yes.

11       Q.    And this was done prior to the time that this

12   appraisal agreement was invoked?

13       A.    Yes.

14       Q.    By the time that this agreement had been

15   signed, that we've marked as Exhibit 39 for

16   identification, had The Howarth Group already

17   determined what it believed was the amount of the

18   damages sustained as a result of the fire?

19       A.    No.

20       Q.    But yet it's expressing to Haman, Inc. that

21   the amount offered by Chubb was not adequate?

22       A.    Correct.

23       Q.    It's already taken that position?

24       A.    Correct.

25       Q.    Before appraisal has even been invoked?

Page 72

```
 1        A.    We don't -- we do not take a claim on to

 2    serve as an appraiser before we have completed our own

 3    evaluation of things and determined that there are

 4    legitimate -- that there is a legitimate disagreement

 5    in our opinion about the amount of the loss between

 6    the policyholder and the insurance company's

 7    valuation.

 8        Q.    So this is all done before you then are

 9    retained to serve as the appraiser?

10        A.    Of course.

11        Q.    And before the appraisal process is invoked?

12        A.    Of course.

13        Q.    The second to last sentence of the third

14    section says:  THG -- again, The Howarth Group --

15    agrees that the total fee charged will not exceed 30

16    percent of the additional settlement awarded to the

17    insured.

18              I'll stop right there for a minute; did I

19    read that correctly?

20        A.    Yes.

21        Q.    So that means essentially you're working on

22    an hourly basis but it's capped based upon a

23    percentage of what the appraisal award is; is that

24    right?

25        A.    Correct.
```

1      Q.     So for example if there is an appraisal award

2      of $100,000 that means that on an hourly basis your

3      fee could not exceed $30,000; is that right?

4      A.     That's correct, and it may -- the only

5      correction I would make to your question is that some

6      of these settle before there's a formal appraisal

7      award, and whatever additional settlement is awarded

8      by whatever method the cap applies to that.

9      Q.     I understand, and we'll get to that in a

10     minute because that's covered later in the clause,

11     right, in this provision?

12     A.     I don't think it is, but let's keep going.

13     Q.     Well, let's say the insurance company has

14     paid $10,000 and the appraisal aware comes back at

15     $100,000, then your fee cannot exceed 30 percent of

16     $90,000; is that what you're trying to say?

17     A.     No, you've got the math right.  There are

18     occasions where once appraisal is invoked insurance

19     companies come back to the site and they want to --

20     they want a chance to reevaluate, understand the

21     differences, and let's come back to the site and they

22     then amend their settlement of the claim, their

23     position, provide that to the policyholder and it

24     settles, everybody agrees, we never went through the

25     formal process, there was never an official appraisal

1      award, that was the only correction I was making to

2      your question.

3          Q.    I understand, so it doesn't necessarily

4      require an actual appraisal award?

5          A.    Correct.

6          Q.    So it could be an appraisal award of $100,000

7      or it could be a settlement of $100,000?

8          A.    It's the new money essentially.

9          Q.    Your fee is capped at 30 percent of that

10     extra $90,000?

11         A.    Correct.

12         Q.    And if the settlement then is -- the

13     insurance company has paid $10,000 and the appraisal

14     award or the settlement is a million dollars then

15     you're capped at 990 -- 30 percent of $990,000; is

16     that right?

17         A.    That's the cap.

18         Q.    Right.

19         A.    That's not my fee, my fee is a based on the

20     hours I spend, but that is the cap, that's the way the

21     math works, correct.

22         Q.    The higher the award the higher the cap can

23     be; is that correct?

24         A.    Yes.

25                      MR. CONCHIN:  Object to form.

Page 75

1      A.    The larger the number the -- 30 percent of a

2      larger number is a larger number.

3      BY MR. TAYLOR:

4      Q.    And then let's go on and cover the rest of

5      the clause, it says:  And additionally should the

6      process produce no additional settlement then no fee

7      will be due.  Right?

8      A.    Right.

9      Q.    So in other words if the insurance company

10     paid $10,000 and the appraisal award or the settlement

11     is at $10,000 you don't get a fee at all?

12     A.    Correct.

13               MR. TAYLOR:  I have just been passed a

14     note by our videographer that we need to take a quick

15     break because I think he probably needs to change to a

16     new file.

17               THE VIDEOGRAPHER:  Going off the record

18     at 11:28.

19               (Discussion off the record at

20                11:28 a.m.)

21               THE VIDEOGRAPHER:  Back on the record

22     at 11:39.

23     BY MR. TAYLOR:

24     Q.    Mr. Howarth, we took a break for the benefit

25     of our videographer here today, and we were talking

Page 76

1    about the appraisal employment agreement that we've

2    marked as Exhibit 39 for identification; is that what

3    you're holding in your lap?

4        A.    Yes.

5        Q.    Very good.  And we had just finished up

6    talking about paragraph 3, and then paragraph 4

7    indicates that the insured, that being Haman, Inc., is

8    that correct?

9        A.    Haman, Inc. d/b/a Knights Inn, says so up at

10   the top there, sure.

11       Q.    And in paragraph 4 when it says the insured

12   that's who you mean is Haman, Inc.?

13       A.    Correct.

14       Q.    Assigns to THG, The Howarth Group, the right

15   to be paid as a joint payee by the carrier on any

16   additional structural payments.  Is that right?

17       A.    Right, our name goes on the check.

18       Q.    So if there's an additional recovery they're

19   either through the appraisal process itself or a

20   settlement before it goes through the appraisal

21   process then The Howarth Group will be listed as a

22   co-payee on any additional checks?

23       A.    Correct.

24       Q.    And then down at the bottom here right above

25   the words The Howarth Group, Inc., there's somebody's

Page 77

1    signature; whose signature is that?

2         A.    Immediately above The Howarth Group, Inc. is

3    Bruce Bodor's, it looks like.

4         Q.    And he has the authority to sign for The

5    Howarth Group, Inc., even though he's not actually an

6    employee of the company?

7         A.    Yes.

8         Q.    And then it says Title:  Claim Consultant?

9         A.    That's what it looks like.

10        Q.    And then he signed off on January 29, 2015,

11   the same date that Haman, Inc. did?

12        A.    Correct.

13        Q.    Was there anyone else on behalf of Haman,

14   Inc. besides Zarin Visram that you personally dealt

15   with?

16        A.    Not that I can remember.

17        Q.    Did you ever have a meeting with Ms. Visram

18   to discuss the claim?

19        A.    I met her, I don't know that -- I don't

20   remember any specific meeting where I needed to

21   discuss the claim with her in person, we had

22   discussions by phone, we communicated otherwise, but I

23   don't remember a meeting where we both came in from

24   out of town to discuss the claim, like you say.

25        Q.    On how many occasions did you have a

Page 78

1      telephone conversation with Ms. Visram?

2          A.    I don't know, I don't remember.

3          Q.    When you're keeping track of your time, I

4      know you said you could look at the documents in order

5      to recreate your time, do you have a record that would

6      indicate the telephone conversations that you had with

7      Ms. Visram and how long they lasted?

8          A.    No, unless there's a follow-up e-mail to it

9      or it's referenced in an e-mail, no.

10         Q.    And you don't know how many times you spoke

11     with her?

12         A.    No, I don't remember.

13         Q.    Is this document that we're looking at marked

14     as Exhibit 39 for identification, this appraisal

15     employment agreement, is this The Howarth Group's

16     standard appraisal employment agreement for a

17     commercial property?

18         A.    This is probably typical of most.  They all

19     get amended a little bit -- or not all of them, I

20     guess a lot of them get amended a little bit in the

21     process of reaching an agreement, but this is

22     reflective of most of them.

23         Q.    Okay.  When you say that they are amended a

24     little bit is that through negotiation with the

25     insured to maybe change a term here and there?

1      A.     Correct.

2      Q.     Have you made any changes to your standard

3   agreement just over time because of things that have

4   come up and you felt like we need to change the

5   language here, make this tighter or take this out?

6      A.     Yes.

7      Q.     What is in this agreement that you've now had

8   to take out that you don't use anymore?

9      A.     I would have to have the one we're using

10  currently to compare.

11     Q.     I would ask also, and I'll put this in the

12  letter, that whatever your current agreement is, that

13  specimen, just provide that to Mr. Conchin, I'd like

14  to be able to see that in order to --

15              MR. CONCHIN:  Well, we may have a

16  relevancy issue about that, we're not trying something

17  currently, we're trying a loss that occurred in '14

18  and '15 -- '14, so we may have a relevancy issue.

19              MR. TAYLOR:  We can discuss that later.

20              MR. CONCHIN:  That's fine.

21              MR. TAYLOR:  I'll put it in the

22  request.

23              MR. CONCHIN:  Okay.  Do I need to put a

24  mike on?  Am I okay?

25              THE VIDEOGRAPHER:  You're good.

Page 80

1          MR. CONCHIN:  Thanks.

2     BY MR. TAYLOR:

3          Q.   Is the $375 per hour that's in the agreement

4     that we've marked as Exhibit 39 for identification, is

5     that your current hourly rate that you charge?

6          A.   I just concluded one at 325, so it varies,

7     but it would be between 325, 375.

8               (Reporter marks document as

9               Defendant's Exhibit No. 40 for

10              identification.)

11         Q.   I'll show you what's been marked as Exhibit

12     40 for identification, and it's a two-page document,

13     first is a letter dated February 25, 2015, from you to

14     Brent Perich at York Risk Services, and the second

15     document is a redacted version of the Appraisal

16     Employment Agreement that we just discussed that

17     previously had been marked as Exhibit 39 for

18     identification; is that correct?

19         A.   Correct.

20         Q.   And this is a letter in connection with the

21     March 22, 2014 fire claim; is that right?

22         A.   Correct.

23         Q.   And in that letter you were sending to Mr.

24     Perich, who you understood to be the independent

25     adjuster assigned by Chubb to investigate the fire

Page 81

1    claim; is that right?

2        A.    Correct.

3        Q.    And you are notifying on behalf of Knights

4    Inn, Haman, Inc., Knights Inn, that there is -- there

5    are differences with the settlement offer presented by

6    Chubb; is that right?

7        A.    This letter isn't written on behalf of

8    Knights Inn, this letter is written on behalf of me

9    and advising him who we are and why we are and

10   essentially that.

11       Q.    And that you feel more money is owed than

12   what's been offered or paid by Chubb; right?

13       A.    It was clear to us that more money was due

14   than what had been paid for this loss as of the

15   writing of this letter by Chubb.

16       Q.    And you stated that?

17       A.    Oh, I haven't read the letter, if it states

18   that it states that, I'll trust you.

19       Q.    Well, it says we have several -- I'm writing

20   to advise you that Haman, Inc., slash, Knight's Inn,

21   have several differences with the settlement offer

22   presented by your company on the above-referenced

23   loss.  Is that what it says?

24       A.    You read that correctly.

25       Q.    And by that do you mean that you feel that

Page 82

1    what Chubb has offered or paid in connection with the

2    fire claim has been inadequate, is that what you're

3    saying?

4        A.    No, the sentence says that I am advising Mr.

5    Perich that Haman, Inc./Knights Inn has differences

6    with the settlement offer.

7        Q.    So you're --

8        A.    I also -- I just told you and have told you

9    previously that I also agreed our company agreed with

10   her that Chubb's evaluation of the loss as of this

11   date was far less than the actual loss sustained.

12       Q.    And then further you're notifying him that on

13   behalf of Haman, Inc./Knights Inn the appraisal

14   provision was being invoked; is that what the purpose

15   of this letter is?

16       A.    I enclosed a copy of the Appraisal Employment

17   Agreement so he could read for himself the things

18   we've already read and clarified, and thereby he knows

19   we have been employed as an appraiser for the

20   appraisal process and I'm asking him to select an

21   appraiser and let me know what their name is.

22       Q.    And you're informing him the appraisal

23   process is being invoked also in this letter; correct?

24       A.    I don't know that I say that in here.

25       Q.    All right.  Well, let me --

Page 83

1          A.     It's on the Appraisal Employment Agreement.

2          Q.     Let me read the second sentence of the

3     letter:  In their effort to resolve these differences

4     about the loss they have decided to invoke the

5     appraisal process of the policy and have employed me

6     to serve as their appraiser.

7               Is the purpose of this letter to put Chubb

8     and its representatives on notice that appraisal is

9     being invoked in connection with the fire claim?

10         A.     Yes, we -- I did notify Brent Perich by

11    virtue of the copy of the Appraisal Employment

12    Agreement as well as what you just read, mostly

13    accurately of the second sentence, that his

14    policyholder has invoked the appraisal provision of

15    the policy and has employed me as their appraiser.

16         Q.     Okay.  You said I was mostly accurate in what

17    I read; what was I not accurate about what I read?

18         A.     You didn't read appraisal provision

19    accurately, you used a different word than provision,

20    but you were close.

21         Q.     The second sentence says:  In their effort to

22    resolve these differences about the loss they have

23    decided to invoke the appraisal provision of the

24    policy and have employed me to serve as their

25    appraiser.

Page 84

```
 1        A.    You got it perfect that time.
 2        Q.    So this letter along with the accompanying
 3   copy of the agreement, the purpose was to inform Chubb
 4   that appraisal under the policy for the fire claim was
 5   being invoked; is that correct?
 6        A.    Correct.
 7        Q.    And you were doing that on behalf of Haman,
 8   Inc. and the Knights Inn?
 9        A.    I'm doing that on behalf of me, I am the
10   appraiser, and I am introducing Mr. Perich to me and
11   explaining to him why I am who I am and why I'm
12   writing him this letter.
13             There are other things that the letter is
14   accomplishing, the insured needs a certified copy of
15   the policy, I'm requesting that.
16        Q.    Sure, and we'll get to that, but I guess I'm
17   -- did somebody on behalf of Haman send a letter to
18   Chubb invoking the appraisal process, or is that what
19   this letter is?
20        A.    The Appraisal Employment Agreement is Haman's
21   written notice to the carrier by her signature that
22   appraisal is being invoked.
23        Q.    Okay.  So the attachment to the letter that
24   you sent, the Appraisal Employment Agreement, a
25   redacted version of which is attached to your February
```

Page 85

1    25, 2015 letter, that -- it's the agreement itself is

2    the notification to Chubb that appraisal has been

3    invoked, that's the demand for appraisal, and that you

4    have been hired as the appraiser; is that what you're

5    saying?

6        A.    Close.

7        Q.    Okay.

8        A.    This is the insured's, Zarin's, Haman, Inc.'s

9    written notice by virtue of her signature that she is

10   invoking the appraisal provision of the policy.

11       Q.    So it's the agreement between your company

12   and her company that is the invocation of the

13   appraisal process; is that what you're saying?

14       A.    Yes, sir, I've said this repeatedly.  Let's

15   read the second sentence again, we did earlier, of

16   paragraph 1:  In this regard, THG is directed to

17   notify the carrier of the insured's invocation of the

18   appraisal provision of the policy and is hereby

19   appointed as the insured's appraiser.  And her

20   signature is at the bottom of this, she's the one who

21   gave that directive and she is the one who invoked

22   appraisal.

23       Q.    So then the whole of what we've marked as

24   Exhibit 40 for identification, the first page being

25   your letter to Mr. Perich --

```
                                              Page 86

 1              MR. TAYLOR:  By the way, Perich is

 2      P-E-R-I-C-H.

 3         Q.    -- dated February 25, 2015, and the attached

 4      redacted Appraiser Employment Agreement, the

 5      combination of those two would serve as the invocation

 6      of the appraisal process in connection with the fire

 7      claim?

 8         A.    I don't think you need the letter to do it, I

 9      think appraisal has been invoked pursuant to the

10      requirements within the policy in writing by virtue of

11      the Appraisal Employment Agreement.

12         Q.    So you believe --

13         A.    And then I sent it to Mr. Perich as I've been

14      asked to do by Zarin with a cover letter saying, hi,

15      I'm the appraiser.

16         Q.    I'm just trying to understand.  So then what

17      you're saying is the second page of Defendant's

18      Exhibit 40 that we marked for identification, the

19      redacted version of the Appraisal Employment Agreement

20      is in fact the invocation of the appraisal process,

21      the demand for appraisal?

22         A.    By Zarin, yes.

23         Q.    In connection with the fire claim?

24         A.    Correct.

25         Q.    Now, in the last paragraph of the letter you
```

1    offer:  If you would like to get a better

2    understanding of the differences that exist, or if you

3    would like to make one last effort to resolve the

4    matter prior to entering the formal appraisal process,

5    please contact me as I would be happy to meet you on

6    site in my role as Haman, Inc., slash, Knights Inn,

7    Zarin Visram's appraiser, to go through the

8    differences and review the items in dispute.  Is that

9    what it says?

10        A.    You read that correctly.

11        Q.    So you are offering to meet out at the site

12   with representatives of Chubb or Mr. Perich in an

13   effort to resolve the fire claim without it formally

14   going to the appraisal process; is that an accurate

15   description of what you're trying to accomplish here,

16   or suggesting?

17        A.    It's simply an offer, it's a courteous offer

18   because of the many times past that carriers have

19   asked for this before we even included this in a cover

20   letter.  Carriers have a right to understand

21   differences before they go into appraisal, and I am

22   being courteous and just saying, look, if you want to

23   better understand the differences I'll meet you at the

24   site, give you a copy of the estimate and we're happy

25   to be cooperative as much so if you have any interest

Page 88

1    in doing that.

2         Q.    You're also offering to attempt to resolve

3    the claim, aren't you, in advance of -- rather than

4    going formally to appraisal; is that not what it says?

5         A.    No, I can't resolve the claim, if -- here's

6    the way this would work, it's the way it always works,

7    if Chubb had said yes and then they get a copy of my

8    estimate, first thing they do is they wait until we

9    get our estimate completed, and then they have any

10   reason to want to meet at the site with me I'm happy

11   to do that, there will be additional communications

12   between us whereby I make it clear I'm not coming to

13   the meeting to negotiate or to try to work this out,

14   that's not my role, I'm only going to be there to

15   answer questions about my loss evaluation, and then if

16   you decide after that there's any reason to increase

17   your offer to your insured you do that, you send it

18   directly to your insured and your insured will decide

19   if that settles it or if they still want to proceed

20   with appraisal.  That's the way it works.

21        Q.    If you would like to get a better

22   understanding of the differences that exist or would

23   like to make one last effort to resolve the matter

24   prior to entering the formal appraisal process, please

25   contact me as I would be happy to meet you on site.

Page 89

1      Is that right?

2           A.    You read that correctly.

3           Q.    The purpose of saying that is to meet out at

4      the site to see if maybe the claim can be resolved

5      before formally going to appraisal; is that right?

6                      MR. CONCHIN:   Object to form.

7      BY MR. TAYLOR:

8           Q.    Is that what the intent is?

9           A.    The --

10          Q.    Is that what the intent of you saying that in

11     your letter?

12          A.    I'm going to answer you when you're finished

13     asking me that same question three times.

14                     MR. CONCHIN:   It's already been asked

15     and answered.

16          A.    Yes, if Chubb wants to understand the

17     differences and then after that they want to make some

18     additional offer to resolve it, we are all for that,

19     and -- but the way I described to you is the way it

20     works.

21               I do not in my role as an appraiser negotiate

22     the settlement, that's not what I do, that's not what

23     I ever do, all I do is talk about the loss and we'll

24     discuss my valuation of the loss, and if the carrier

25     decides they want to, once they know the differences,

Page 90

1    make an additional effort to resolve the matter, which

2    means they are going to increase their settlement

3    offer, that goes straight to the insured and it's the

4    insured who decides whether they are going to settle

5    it.  That's the way it works.

6    BY MR. TAYLOR:

7        Q.    I understand.  But you would convey that

8    information to the insured?

9        A.    What information?

10       Q.    If you were to meet say Mr. Perich out at the

11   site and more money was offered at that point then

12   you're the person who would then convey that directly

13   to Ms. Visram?

14       A.    No, more money is never offered there at that

15   meeting on site, we do a walkthrough, we talk damages,

16   they usually have my estimate in hand, they -- we

17   would point things out, this is why we had this, they

18   want to understand our loss valuation, we provide that

19   information.

20            They go back to their office and they then

21   amend their estimate if they are so inclined or not,

22   and when they are inclined they've been instructed by

23   me whatever amendments you decide to offer send those

24   directly to your policyholder, you're welcome to copy

25   me because they're probably going to call me and say,

Page 91

```
 1      you know, what does this mean, what have they left
 2      out, tell me how much loss they have now added and
 3      that sort of thing, but that's the way it works and
 4      that's the way it would have worked in this case had
 5      they decided to do that.
 6          Q.    And then they could contact then Haman, Inc.
 7      directly or Ms. Visram directly?
 8          A.    Correct.
 9               MR. TAYLOR:  By the way, Zarin is
10      Z-A-R-I-N, Visram is V-I-S-R-A-M.
11          A.    Yes, they would -- they could contact her
12      directly at any time during the appraisal process, all
13      the time.  I'm not in a representative capacity as an
14      appraiser.
15          Q.    So even as a -- well, did you ever respond to
16      communications where the company would communicate
17      with Ms. Visram and then you would provide the
18      response, did you ever do that in this claim?
19          A.    I think so, there were a number of times that
20      Ms. Visram wanted help.  First she wanted to
21      understand why is this happening this way, and then
22      she wanted help communicating, and I'm always happy to
23      do that, sure, but the carrier can -- there is no
24      change in the communications between the carrier and
25      their policyholder, I have not stepped in as an
```

Page 92

1      appraiser in a representative capacity, never do,
2      appraisers don't do that, they don't serve in that
3      capacity.
4          Q.    Their job is to appraise the loss and come to
5      a -- issue an appraisal award?
6          A.    A valuation of the loss, work with an
7      appraisal panel, the appraiser assigned by the carrier
8      and the umpire agreed to by us, and two out of the
9      three of us will finally decide what the actual
10     measure of the loss is, so that's who I work with is
11     the appraisers.
12         Q.    And technically the umpire doesn't really get
13     involved in that, he only gets involved where there's
14     a disagreement between the two appraisers; right?
15         A.    You're correct.
16         Q.    Because any item that the two appraisers
17     agree on the umpire is not involved?
18         A.    Correct, because you've got two already that
19     agree.
20         Q.    If you look at the second page of Defendant's
21     Exhibit 40, which is the redacted version of the
22     Appraisal Employment Agreement, you have redacted
23     almost all of paragraph 3; is that correct?
24         A.    Correct.
25         Q.    In fact the only -- there's only a portion of

Page 93

1        the first sentence that remains; is that right?

2            A.    Everything after the dollar sign.

3            Q.    So the only thing that's left is the insured

4        agrees to pay THG, The Howarth Group, in consideration

5        for its services an hourly rate of dollar sign and

6        then the rest is redacted?

7            A.    Correct.

8            Q.    What was the reason for redacting the rest of

9        section 3?

10           A.    Always have.  In our opinion it's not the

11       insurance company's business what our hourly rate is

12       or the terms of how we handle the expenses, it's just

13       important for them to know appraisal has been invoked,

14       we've been hired, we're billing by the hour.

15           Q.    Does the insurance company have the right to

16       know that The Howarth Group has already expressed to

17       the insured the opinion that the amount proposed by

18       the carrier to the insured is inadequate?

19                 MR. CONCHIN:  Object to form.  You're

20       asking him what the insurance company knows or should

21       know.

22       BY MR. TAYLOR:

23           Q.    You can answer the question.

24           A.    Say that again.

25           Q.    Did the insurance company have the right to

1   know that THG, The Howarth Group, had expressed to the

2   insured the opinion that the amount proposed by the

3   carrier to the insured is inadequate?

4        A.    Does the carrier have a right to know?  Well,

5   they did know, they did know that, that was --

6        Q.    No, no, no, no, no --

7        A.    -- communicated to them clearly.  Hang on,

8   let me finish answering your question.  There's no

9   reason for us to hide the fact that I as an appraiser

10  have an opinion that their evaluation does not measure

11  up to the actual loss amount, and that was clear to

12  them I think probably from day 1.

13       Q.    So the insurance company does have a right to

14  know that you believed that the amount proposed by the

15  insurance carrier was inadequate?

16       A.    Well, sure, they did know.

17       Q.    Why did you redact that portion of paragraph

18  3 then when you sent the agreement in?

19       A.    It's just we redact everything after the

20  dollar sign, it's easier, but we didn't hide that from

21  them, they already know that or they wouldn't have

22  gotten this letter if we didn't agree with their

23  policyholder.

24            MR. TAYLOR:  Excuse me just a minute.

25  Let's go off the record for just a minute.

Page 95

1              THE VIDEOGRAPHER:  Off the record at

2      12:05.

3                  (Discussion off the record at

4                  12:05 p.m.)

5              THE VIDEOGRAPHER:  Back on the record

6      at 12:06.

7      BY MR. TAYLOR:

8          Q.   Mr. Howarth, let me show you what I've marked

9      as Defendant's Exhibit 41 for identification.

10                  (Reporter marks document as

11                  Defendant's Exhibit No. 41 for

12                  identification.)

13         Q.   And this appears to be the Appraisal

14     Employment Agreement that The Howarth Group entered

15     into with Haman, Inc. d/b/a Knights Inn in connection

16     with the wind claim; is that right?

17         A.   Correct.

18         Q.   And it's showing a date of loss for the wind

19     claim of April 28, 2014?

20         A.   Correct.

21         Q.   And the date of this agreement, it was signed

22     on June 15, 2015; is that right?

23         A.   Correct.

24         Q.   Not quite 14 months after the wind storm

25     that's being claimed; is that right?

Page 96

```
 1        A.     Looks like your math is pretty close.

 2        Q.     And is this signed on behalf of The Howarth

 3   Group by Mr. Bodor?

 4        A.     Looks like Bruce Bodor again, yes.

 5        Q.     Just like with regard to the fire claim?

 6        A.     I think so, yeah.

 7        Q.     How is it that this came about, you know,

 8   that you-all were retained in connection with the wind

 9   claim?

10        A.     As I remember it was Arthur Grandinetti who

11   was at the site doing his inspections of the fire loss

12   who noticed what he said was a lot of wind damage,

13   storm damage.  He took some photos of it and it was

14   pretty obvious, yeah, there's missing metal, pieces of

15   roofing missing, bent, hanging, swinging in a variety

16   of places, and he called me to say, you know, have

17   they filed -- is this claim pending, what's the deal,

18   and of course I didn't know, I alerted Bruce, and for

19   all we knew she already had a claim going on that, and

20   so Bruce contacted Zarin, found out the facts that --

21   as I remember she didn't even know about it, and so we

22   encouraged -- well, we advised her, look, you have a

23   lot of wind damage to your building and you should

24   file a claim, so as I remember that was her first

25   notice she had, she did go ahead and file a claim,
```

1      and, you know, she wanted us to handle it, no, we

2      can't, just file the claim, give Chubb a chance to do

3      the right thing, let them come out and value the loss,

4      and they did, they came out and they paid for some

5      damage, but not near enough.

6          Q.    And then they decided to hire you?

7          A.    Yes, once there was a disagreement about the

8      amount of the loss between Knights Inn and Chubb then

9      it was ripe for appraisal, and she decided to take

10     this to appraisal as well.

11         Q.    Well, let's talk about that disagreement.

12     Had an estimate been provided by anyone on behalf of

13     Haman, Inc. to Chubb to indicate that Chubb's estimate

14     of the damages was wrong by the time this contract had

15     been executed that we've marked as Exhibit 41 for

16     identification?

17         A.    I know we hadn't, I don't know that -- as I

18     sit here I don't know that anyone else had.

19         Q.    Did Chubb know there was a disagreement until

20     you got involved?

21         A.    I don't know, I wasn't part of the

22     communications between Zarin and Chubb on the wind

23     loss until Zarin contacts us and says this is not

24     going to work, they are not going to pay for all the

25     damage and can this go to appraisal, and we said yes,

Page 98

1    certainly.

2         Q.    On what date did Mr. Grandinetti inform you

3    that he saw what he believed to be wind damage?

4         A.    I don't remember the date, as I remember from

5    the file he was there the first quarter of 2015, if

6    I've got my dates right, and it was during his

7    inspection -- he was there for the fire then, and it

8    was during his inspection of the fire loss that he saw

9    the wind damage to the building.

10        Q.    With the exception of the parts where there's

11   handwriting on Exhibit 41, is it identical to the

12   agreement that was signed in connection with the fire

13   claim that we've marked as Exhibit 40 for

14   identification -- excuse me, Exhibit 39 for

15   identification.

16        A.    I don't know, it probably is but without

17   putting them side by side under oath comparing every

18   word of every paragraph, I can't say yes to that but

19   it's probably very similar, if not almost identical.

20        Q.    And in this case it says that The Howarth

21   Group is directed to notify the carrier of the

22   insurance invocation of the appraisal process of --

23   appraisal provision of the policy and is hereby

24   appointed as the insurance appraiser as required by

25   the policy.  Is that what it says?

1      A.    Correct.

2      Q.    And then with regard to paragraph 3, same

3   hourly rate, $375 plus expenses, right, per hour?

4      A.    Correct.

5      Q.    And same second sentence:  However, because

6   The Howarth Group has expressed to the insured the

7   opinion that the amount proposed by the carrier to the

8   insured is inadequate, you've notified again Haman,

9   Inc. of your belief.  Is that right?

10     A.    Correct.

11     Q.    Was it you that did that or was it Mr. Bodor

12  that did that or was it somebody else on behalf of The

13  Howarth Group that informed Ms. Visram of The Howarth

14  Group's belief that what the insurance company had

15  either paid or offered was inadequate?

16     A.    For the wind loss?

17     Q.    Yes.

18     A.    Could have been all three of us, Arthur,

19  Bruce or me, I just don't remember as I sit here.

20     Q.    What about with regard to the fire claim?

21     A.    With regard to the fire claim it was -- I

22  don't think Arthur was involved in the fire claim

23  before we got the agreement, it was simply Bruce and

24  myself, might have included Dennis.

25          Now, who talked to her, whether we had a

1    conference call, I can't remember.

2        Q.    How many times have you visited the site?

3        A.    At least two times.

4        Q.    Were you with anybody?

5        A.    One time, no, I was there by myself.  I'm

6    trying to remember.

7        Q.    Let's do it this way, approximately when was

8    the first time you were there at the Knights Inn in

9    Bessemer?

10       A.    I don't remember as I sit here, I can't give

11   you dates.  When I read the earlier depos I think I

12   gave an answer that my first visit was prior to Arthur

13   getting there, but I just can't remember as I sit

14   here.

15       Q.    When Mr. Grandinetti contacted you to say,

16   hey, I see what I think is wind damage out there, do

17   you know whether the hotel, the Knights Inn, was still

18   in operation and that they had guests and people --

19   some people living there on a permanent basis, do you

20   know that?

21       A.    No, not as I sit here, I don't have that

22   knowledge on the top of my head.

23       Q.    In connection with the fire claim, the

24   Appraisal Employment Agreement that we've marked as

25   Exhibit 39 for identification, was signed on January

Page 101

1    29, 2015; right?

2        A.    I trust you, if you've got it in front you, I

3    don't have it in front of me, I think that's the

4    correct date.

5        Q.    How long after that date did you visit the

6    site for the first time?

7        A.    I wish I could tell you what date I was

8    there, I can't remember.

9        Q.    And the date that your company was retained

10   in connection with the wind claim was June 15, 2015,

11   as reflected in the agreement we've marked as Exhibit

12   41 for identification.

13              By this time had you already visited the

14   site?

15       A.    Yes, I'd already visited it once, I think the

16   second time was after -- was more related to the wind

17   claim.

18       Q.    So the first time you visited related to the

19   fire claim?

20       A.    Correct.

21       Q.    So that would put us somewhere between

22   January and June of 2015?

23       A.    Correct.

24       Q.    Sometime in that six-month period?

25       A.    Correct.

Page 102

1      Q.    Who was with you at the time of the first

2    time you visited the Knights Inn in Bessemer sometime

3    during that six-month period in 2015?

4      A.    I think that one was -- I was by myself, it's

5    the second one that I can't remember whether I was

6    there with at the time Arthur or Sarah was there,

7    whether Bruce was there with me, I just can't

8    remember.  They both may have been by myself.

9      Q.    When you visited the first time by yourself

10    between January and June of 2015, how long were you

11    there?

12      A.    It was a one-day trip, so I was there -- I

13    didn't have to spend the night, so I was there for

14    less than a day.

15      Q.    Could you be a little more specific in terms

16    of how many hours were you at the site?

17      A.    I can't.

18      Q.    And that would have been just to inspect the

19    one building in connection with the fire claim?

20      A.    Just the fire, yeah, walking through the

21    units, so it was more than an hour, less than eight.

22      Q.    Okay.  Was it more than four hours?

23      A.    Oh, I can't -- I don't want to get anymore

24    specific than I've give you.

25      Q.    Did you get up on the roof at that time?

1       A.    Not for the fire loss, no, I didn't pay any

2    attention to the roof.  I'm a little ashamed of that,

3    that my own employees noticed the wind damage and I

4    didn't.

5       Q.    Was it -- did you visit the site before Mr.

6    Grandinetti had contacted you about his observation of

7    what he believed to be wind damage?

8       A.    In my -- one of my first two depositions I

9    mentioned as best I remember that I thought I was

10   there before the Grandinettis arrived to do their

11   scoping of that loss, so, no, I wouldn't have known

12   about the call from Arthur when he saw the wind damage

13   at the time I was there for the first time for the

14   fire inspection.

15      Q.    And if Chubb was not notified until the end

16   of March of 2015 about the wind claim would that mean

17   that your visit was sometime between January 2015 and

18   the end of March 2015?

19      A.    It would have been -- I think, yes, I think

20   that's a fair statement, it would be between those

21   dates.

22      Q.    So we've now narrowed it down to a

23   three-month period when you were there?

24      A.    I think that's right.

25      Q.    When you went down to Bessemer to visit did

```
 1     you drive down or fly down?

 2          A.    I don't know.

 3          Q.    If you drove how far a drive is that?

 4          A.    I don't know, I'd have to Mapquest it.

 5          Q.    But your recollection is you went up and back

 6     in the same day?

 7          A.    My visit to the site was -- only took one

 8     day, in other words I didn't spend the night, didn't

 9     require two days to be there, so -- now, whether I was

10     at some other loss nearby that I flew to and then

11     drove to Bessemer, did my inspections, drove back and

12     flew home or how that happened, that kind of thing

13     happens all the time, it is a constant in my business

14     where I am in an area and I've got other losses that I

15     want to go visit, inspect or participate with a

16     marketer to meet with, so -- and I just -- I can't

17     remember the specifics, wish I could, I'd tell you.

18          Q.    Do you feel like you were actually visiting

19     the site for a full day?

20          A.    You keep asking me the same question and I'm

21     going to keep giving you the same answer, I was there

22     more than one hour, less than eight hours.  I'm not

23     going any closer to that.  I'm under oath here, and

24     you can keep pressing me but I'm just not going to

25     start guessing to precise numbers than that.
```

1      Q.    Did you --

2      A.    I'm not trying to be uncooperative, I'm doing

3    the best I can.

4      Q.    Did you make any notes while you were

5    visiting the site or walking the site?

6      A.    Probably not.

7      Q.    Did you take any photographs?

8      A.    No.

9      Q.    So it was just an opportunity for you to

10    eyeball it yourself?

11      A.    Correct.

12      Q.    And nothing more?

13      A.    On the first trip with the fire, correct.

14      Q.    That's what I'm talking about.

15      A.    Correct, that would have been the general

16    gist of it because I know I've got a team coming who's

17    going to do a detailed takeoff, they are going to have

18    questions of me, I need to get an understanding of the

19    loss better than I had, and they are going to take

20    hundreds and hundreds of photographs.

21      Q.    Just so you understand, sometimes I ask these

22    questions because it does spark something, because now

23    we have now been able to narrow your visit was

24    sometime between January and June, now we got it down

25    to between January and March.

1        A.     And that's great, that's great.

2        Q.     So that's why I ask these questions.  I'm not

3    trying to trick you, I'm just trying to find out how

4    long, you know, you were out there, and I'm going to

5    try to ask the questions in a way that might trigger a

6    memory.

7        A.     Sure, no complaints.

8        Q.     Fair enough.  And then you visited a second

9    time after the wind claim was reported and you-all

10   started working on it; is that right?

11       A.     I visited the wind claim after we were

12   employed as appraiser.

13       Q.     Well, you-all were employed on June 15, 2015;

14   approximately how long after that date was your first

15   visit?

16       A.     I don't remember, I only remember being there

17   one time after the wind claim, I wish I could

18   remember.  The picture I have in my mind when you

19   asked me this is of a similar hotel but I'm there with

20   Dory, and Dory and I walked the roofing and I'm sure

21   that's not this Knights Inn because I just don't

22   remember that Dory was ever involved in this one, so

23   that's why -- that's the picture that hit my head, I

24   can see the place, got the mansard roof system with

25   the flat roof in the middle, and I'm just -- I can't

1    pull up that meeting at Knights Inn when I walked the

2    roofing because I don't think that was this one.

3        Q.    You distinctly remember walking the roofing

4    at the Knights Inn at one time, though?

5        A.    Yeah, yeah, I saw the roofing at Knights Inn.

6        Q.    Do you think that either Sarah or Arthur

7    Grandinetti were there when you were walking the

8    roofing?

9        A.    They could have been.

10       Q.    Do you remember if Arthur Grandinetti walked

11   the roofing with you?

12       A.    I can't tell you that when I was there at

13   Knights Inn Arthur or Sarah were there, I wish I

14   could, I wish I could remember it, so I can't even

15   begin to tell you that I remember they walked the roof

16   with me.  If I had that picture -- the problem is the

17   picture I've got in my head is the wrong hotel I'm

18   sure, almost identical in styles and color, because

19   there are a lot of them that look like this, but I'm

20   sure Dory was not at this one.

21       Q.    How did you get up on the roof?

22       A.    I would have gotten up with a ladder, I'm

23   sure.

24       Q.    You would have brought a ladder with you?

25       A.    I don't know that I could have gotten on this

Page 108

1      one with my ladder, so I wish I could tell you, I

2      don't remember.

3          Q.   So you just don't remember whether you were

4      alone or whether somebody was with you?

5          A.   That's correct, I can't remember on that

6      inspection and I can't pull up the picture of that

7      inspection.

8          Q.   Did somebody from Haman, Inc., from the

9      Knights Inn, give you access to the roof?

10         A.   I just can't remember.  Zarin wasn't very

11     good at giving access, and by the time we were engaged

12     in the wind claim I think the manager was no longer

13     working there, so we would have arranged for access

14     either using some ladder available on site, I arrange

15     -- I bring a ladder that I can use, I've got ladders

16     that will fit into my airplane that would have gotten

17     me up there, but I just don't remember, I wish I could

18     remember, I could tell you.

19         Q.   Did you examine all three roofs when you

20     visited?

21         A.   I don't remember.

22         Q.   You remember that you at least went on one

23     roof?

24         A.   Yes.

25         Q.   And how long did you spend looking at that

1    roof?

2        A.    Just like with the fire loss inspection it

3    was a one-day trip, so I'm trying to get a -- what I

4    often do, almost always do, is after I've got an

5    expert's report I want to do my own inspection and own

6    evaluation to make sure that the team my expert

7    brought out has been accurate and thorough and that

8    I'm in agreement with what they are finding, and so if

9    I could remember specifically I could tell you whether

10   or not that was the case here, but I'm talking to you

11   in general.  I just work best from my own opinions.

12       Q.    When you visited the second time and went on

13   at least one roof had the repair estimate that Arthur

14   Grandinetti drafted already been prepared?

15       A.    I don't remember, I wish I knew because if I

16   could picture myself, whether I've got an estimate or

17   not, the probability is that that inspection occurred

18   after I got the FBS report, but again, I'm guessing, I

19   don't remember specifically because that normally is

20   when I want to get back and walk a roof.

21       Q.    After you receive the FBS report?

22       A.    So I can double check my expert's work.

23       Q.    How about with regard to the first visit, did

24   you have either the FBS report or the Grandinetti

25   estimate by the time you visited that one building

Page 110

1     with the fire damage?

2          A.    I say no because of my answer during I think

3     my first deposition of a year or two ago where I

4     remembered being there the first time prior to Arthur

5     and Sarah getting there, and so I didn't have either

6     his report or the FBS report, but I wanted to get a

7     better -- I wanted to gain an understanding of what we

8     had so I could help coach and guide Arthur in his

9     estimating work.

10         Q.    Just referring back to what we marked as

11    Defendant's Exhibit 41 for identification, had The

12    Howarth Group expressed to Haman, Inc. doing business

13    as Knights Inn the opinion that the amount proposed by

14    the carrier to the insured was inadequate by the time

15    this was executed?

16         A.    I'm sorry, say that question again.

17         Q.    Had you, someone on behalf of The Howarth

18    Group, in fact notified someone at Haman, Inc. that

19    the amount paid or proposed by Chubb was inadequate by

20    the time this agreement, marked as Exhibit 41 for

21    identification, was executed?

22         A.    Yes, of course, we do not take on an

23    appraisal job until we have decided that there is loss

24    that's not been properly valued and paid for by the

25    carrier because otherwise appraisal is not important,

1    it's not valid, and if the insured is trying to get

2    someone to do it we're not going to do it because I

3    don't agree, so, yes, we determined after she got the

4    estimates from Chubb they are far less than what they

5    should be for the kind of damage we're seeing on the

6    roofing.

7         Q.    In your opinion?

8         A.    Yes, it's always our opinion, I work from my

9    opinion, not anybody else's.

10        Q.    And with regard to the fee, again, it's

11   capped at 30 percent of the net award, in other words

12   any amount above $34,597 that had already been paid?

13        A.    Correct, that's a cap of the net award,

14   correct.

15        Q.    And of course the higher the award the higher

16   the cap?

17        A.    Yes, but it doesn't change my fee.

18        Q.    I understand.

19        A.    Yeah, the math works like the you say, if the

20   additional settlement goes up 30 percent of that will

21   go up with it but it has no impact on my fee, I'm

22   keeping my time, keeping my hours and will bill them

23   for my time.

24        Q.    Except that for example if the award above

25   34,000 -- if it came in at $44,000, which is a $10,000

```
                                        Page 112
 1      net award or settlement, and if you have $5,000 in
 2      time in it then you don't get that full $5,000; is
 3      that right?
 4           A.    Correct, the cap applies or the hourly rate,
 5      whichever is less.
 6           Q.    And then same as with the regard to the fire
 7      claim, The Howarth Group is going to be -- according
 8      -- by agreement with the Haman -- with Haman, Inc.,
 9      The Howarth Group will be listed as a co-payee on any
10      additional check issued by Chubb in connection with
11      the wind claim?
12           A.    Correct.
13           Q.    Why is Mr. Bodor here signing on behalf of
14      The Howarth Group and why -- well, let me ask it this
15      way, is he going to be entitled to a portion of that
16      20 percent fee that we talked about for the intake?
17           A.    Yes, same as the fire, we've covered that.
18           Q.    Even though this was actually brought to you
19      as a result of a phone call from Mr. Grandinetti?
20           A.    Mr. Grandinetti noticed the damage, Bruce
21      handled the securing of the agreement, Ms. Visram is
22      his client and so they will participate together in
23      the 20 percent.
24           Q.    What's the longest telephone conversation
25      you've had with Ms. Visram in connection with either
```

1      the wind or the fire claim?

2          A.    I have no idea.

3          Q.    An hour, half hour, quarter hour?

4          A.    I have no idea.

5          Q.    You don't keep those records; right?

6          A.    I don't have it to memory, if I kept the

7      records I don't have them in front of me, I don't have

8      that kind of memory over four years.

9          Q.    I'll show you what's -- well, hang on a

10     second.  Mr. Howarth, let me show you what has been

11     marked as Exhibit 42 for identification.

12                    (Reporter marks document as

13                     Defendant's Exhibit No. 42 for

14                     identification.)

15         Q.    And this is a very similar letter to the one

16     that you sent to Mr. Perich, but in connection with

17     the wind claim, and it's addressed to Randy Wilburn,

18     with a date of July 6, 2015; is that correct?

19         A.    Correct.

20         Q.    And attached to the letter is a redacted

21     version of the Appraisal Employment Agreement in

22     connection with the wind claim; is that right?

23         A.    Correct.

24         Q.    And the exact same part of the agreement is

25     redacted as with regard to the fire claim, in other

Page 114

1    words paragraph 3 after the dollar sign?

2         A.    Correct.

3         Q.    And you sent this to Mr. Wilburn at Chubb.

4    Are you aware that Mr. Wilburn is not an employee of

5    Chubb?

6         A.    I don't think I am or was aware of that.

7         Q.    And as directed by Ms. Visram you're

8    notifying Mr. Wilburn that the appraisal provision of

9    the policy has been invoked and that you will serve as

10   the appraiser in connection with the wind claim; is

11   that right?

12        A.    Correct.

13        Q.    And you make the same offer to him that you

14   made to Mr. Perich, Mr. Perich being in connection

15   with the fire claim; right?

16        A.    Correct.

17        Q.    And Mr. Wilburn in connection with the wind

18   claim?

19        A.    Correct.

20        Q.    You made the same offer, that you are willing

21   to meet him at the site in order to provide a better

22   understanding of the differences that exist or if

23   there is any interest in making an effort to resolve

24   the matter before entering the formal appraisal

25   process; is that right?

Page 115

1      A.    You generally are right, same as the previous

2    letter and our discussion on the fire loss.

3      Q.    In fact except for who the letter is

4    addressed to in the RE line the letters are identical,

5    aren't they?

6      A.    Probably.

7      Q.    Did you have an estimate of repair to provide

8    to Mr. Wilburn that outlined the differences between

9    Chubb's estimate of the damages and Haman or The

10   Howarth Group's estimate of the damages as a result of

11   the wind claim?

12     A.    Eventually we did.

13     Q.    No, I'm talking about at the time you sent

14   this letter.

15     A.    No, no, as I remember we didn't have --

16   there's no reason for us to do an estimate on the wind

17   claim until after we've been employed, and that's when

18   Arthur and Sarah went back out to do a valuation of

19   the wind claim, so it would have been well after this

20   letter date that I had our estimate, and we could have

21   then done a spreadsheet to show the differences.  We

22   don't just do an estimate on the differences, we do an

23   estimate on the loss.

24     Q.    Did Haman, Inc. -- well, an estimate -- your

25   estimate of the loss versus someone else's estimate,

1    you put them next to each other you'll be able to tell

2    the differences; right?

3         A.    Correct.

4         Q.    Did Haman, Inc. have any kind of an estimate

5    to provide to Chubb that would indicate what the

6    differences between Chubb's estimate of the damages

7    are and what Haman's estimate of the damages were at

8    the time this letter was sent?

9         A.    Not that I remember.

10        Q.    And with regard to the letter sent to Mr.

11   Perich on February 2015 -- I'm sorry, February 25,

12   2015, in connection with the fire loss, where he's

13   notified that appraisal is -- or has been invoked, did

14   Haman, Inc. have any information to provide to Mr.

15   Perich to indicate where the differences were in the

16   assessment of the loss?

17        A.    At the time of the letter, probably not,

18   which is why we offered the courtesy, insurance

19   companies usually would like to understand that.

20        Q.    So at the time then that the letter to Mr.

21   Perich was sent in February of 2015 there was no

22   information at that time to provide to Chubb that

23   would identify the differences or disagreement over

24   the assessment of the loss; is that right?

25        A.    We didn't have any, we hadn't prepared any

1    estimating yet, that's what we do after we're

2    employed, and we notified Mr. Perich right after we

3    were employed and were getting to work with doing our

4    job of valuing the loss.

5            Now, I don't remember as I sit here that

6    Zarin had anything that she'd shared with them, but at

7    least as far as we're concerned we did not.

8        Q.    And the same question in connection with the

9    wind loss when the July 6, 2015 letter was sent, was

10   any information provided to Mr. Wilburn or anyone else

11   on behalf of Chubb at the time that this letter was

12   sent that would indicate what the difference was

13   between either you or Haman, Inc. and Chubb as to the

14   assessment of the damages?

15       A.    Not -- not anything that I know of from us.

16   What might have happened between her and this

17   gentleman, Mr. Wilburn, prior to our being employed

18   during the course of the claim, I can't speak to that.

19       Q.    Okay.  Well, in connection with the February

20   2015 letter that you sent to Mr. Perich, you indicate

21   that there are several differences with the settlement

22   offer presented by your company, those are your words;

23   right?

24       A.    Right.

25       Q.    And did you have anything to offer to Chubb

Page 118

1      at that time when you sent that letter that identified

2      those differences?

3          A.    I could have added a few more words, there

4      are differences related to the metal, differences

5      related to the flat roof section, the EPDM system,

6      but, no, we don't have anything specific, we're

7      letting him know appraisal has been invoked, it's

8      being invoked because of differences about the amount

9      of loss, and we're just getting started.

10         Q.    So you're basically saying we have a

11     difference but I can't tell you what all those

12     differences are yet --

13                    MR. CONCHIN:   Object to form.

14     BY MR. TAYLOR:

15         Q.    -- because I haven't done my estimate?

16                    MR. CONCHIN:   Object to form.

17     BY MR. TAYLOR:

18         Q.    Is that essentially it?

19         A.    It's not my job as Zarin's appraiser to let

20     her insurance company know what the differences are.

21         Q.    Whose job is it?

22         A.    Unless the insurance company asks or would

23     like for that to happen.  The differences exist before

24     we're employed as an appraiser between Zarin and

25     Chubb.

1    Q.    Had Chubb ever been made aware of any of

2    those differences in connection with the fire claim by

3    the time you demanded appraisal?

4    A.    I've answered that, I've told you I -- what

5    communications went on during this claim process

6    between Zarin and Chubb leading up to Chubb's finally

7    coming up with this estimate that Zarin shared with

8    us, I don't know, you'll have to ask Zarin or ask

9    Chubb because I'm not a part of that process.

10    Q.    Had Chubb been provided with any information

11    either by your company or anyone on behalf of your

12    company or on behalf of Haman, Inc. that indicated

13    what the differences were in connection with the wind

14    claim when you sent the letter dated July 2015?

15    A.    Not from us, I think that's your answer.  It

16    was a long question, I'm trying to follow you.  We had

17    -- I've answered this now two times -- we had not sent

18    anything to Chubb regarding the differences between

19    Zarin and Chubb on the wind claim or between THG and

20    Chubb on the wind claim before the date of this

21    letter.  Did that answer your question?

22    Q.    I think it's the same answer --

23              MR. CONCHIN:  It is.

24    BY MR. TAYLOR:

25    Q.    -- as it relates to the fire claim; is that

Page 120

1    right?

2         A.    Yes, same answer as relates to the fire

3    claim.

4         Q.    I'll show you what's been marked as Exhibit

5    43 for identification.

6                   (Reporter marks document as

7                    Defendant's Exhibit No. 43 for

8                    identification.)

9         Q.    And this is a screen shot that I took of your

10   website probably about a year or so ago; do you

11   recognize this as being at least at one time a part of

12   your website?

13        A.    Looks like it could have been.

14        Q.    And --

15        A.    But I can't vouch for it, and the site gets

16   changed all the time.

17        Q.    I will tell you this what's right here that

18   I'm showing you is not there as of yesterday because I

19   checked again.

20        A.    Okay.

21        Q.    But this was here at least back around 2016,

22   '17, '18, somewhere in that range whenever I got

23   involved.

24        A.    Dennis handles the website, I don't get

25   involved in that.

1      Q.    I understand.  And Our Promise, three decades

2      of experience enables us to guarantee that if we take

3      on your claim as your Tennessee public adjuster,

4      Kentucky public adjuster, Mississippi public adjuster

5      or Alabama insurance appraiser we will increase your

6      settlement or you owe us nothing.  That's what at

7      least at one time the website said; right?

8      A.    I'm going to trust that you -- this is truly

9      something you pulled from our website and trusting

10     your representation of that.

11     Q.    I will state in my place and represent to you

12     that we pulled this off of your website approximately

13     two years ago.

14     A.    Okay.  And relying on your representation of

15     that, I've got no way to prove it, or disprove it,

16     then, yes, you read that accurately.

17     Q.    And then further:  Simply stated, our clients

18     keep 100 percent of what the insurance company

19     initially offers them and we are compensated only on a

20     small percentage of the additional monies we get for

21     them.  Is that right?

22     A.    You read that correctly.

23     Q.    Notwithstanding my representation that I have

24     pulled this off, do you remember this ever being part

25     of your website?

                                                    Page 122

1          A.    I don't, I've had little involvement in the

2     website, but I've looked at it on occasion, pretty

3     rare, and this looks like it could have been on there.

4          Q.    That's your logo, The Howarth Group logo?

5          A.    It is.

6          Q.    Is that your telephone number up at the top,

7     800-647-2236?

8          A.    I think it is, I never dial our 800 number,

9     but I think that's it.

10         Q.    And the web address info,

11    @thehowarthgroup.com?

12         A.    Yeah, that I think goes straight to Dennis.

13         Q.    Just trying to take -- does this look like it

14    was part of your website at least at one time?

15         A.    Look, I'm trusting your representation that

16    you took it from it, that's as far as I'm going to go,

17    and, yeah, it looks like it could have come from our

18    website, the colors are as I remember them.

19         Q.    Now, the two agreements that we've talked

20    about that we marked as Exhibits 39 and 41 for

21    identification, are they still in place?

22         A.    No.

23         Q.    They have been canceled or what have you?

24         A.    Yes.

25         Q.    When were they canceled?

1     A.    As soon as Chubb decided not to allow Ms.

2     Visram and Knights Inn to enjoy their right to

3     appraisal in the policy.

4     Q.    What date was that determined?

5     A.    That will be in the Chubb file, I don't

6     remember as I sit here.

7     Q.    Are you familiar with Chubb's position as it

8     relates to appraisal on the fire claim?

9     A.    Sure, Chubb agreed that appraisal was

10    appropriate, named their appraiser, their appraiser

11    and I agreed to an umpire, we had worked for quite a

12    while and had a meeting date set with the umpire to

13    wrap it up, one more meeting, this thing was over, and

14    Chubb pulled the rug out on us.

15    Q.    I'm talking about do you understand what

16    their position -- what Chubb's position is now.

17    A.    I don't.

18    Q.    You don't know that Chubb agrees that

19    appraisal is appropriate but it just has an objection

20    to you serving as the appraiser?

21                MR. CONCHIN:  Object to form.

22    A.    That was never communicated.

23                MR. CONCHIN:  Object to the form.

24    A.    At any time.

25    BY MR. TAYLOR:

Page 124

1          Q.    That's not been communicated to you?

2                     (Undiscernible crosstalk.)

3                     MR. CONCHIN:  -- the appraisal the

4     entire time.

5          A.    No, that's been concocted since, clearly.

6     BY MR. TAYLOR:

7          Q.    And are you aware that as it relates to the

8     wind claim that it has now resisted appraisal because

9     there are coverage issues that have to be resolved

10    first?

11                    MR. CONCHIN:  Object to the form.

12    BY MR. TAYLOR:

13         Q.    I'm just asking if you're aware of that.

14                    MR. CONCHIN:  You're asking him about

15    legal matters or --

16                    MR. TAYLOR:  I'm just asking if he's

17    aware of that.

18         A.    No, again, with the wind claim they named

19    their appraiser, their appraiser and I agreed to the

20    umpire for the wind claim, we had not -- we had agreed

21    we would handle the fire claim first and then the wind

22    claim second.

23    BY MR. TAYLOR:

24         Q.    And then you were notified by that appraiser

25    that, oops, I made a mistake, I was never retained in

1       connection with the wind claim; right?

2          A.     No.

3          Q.     That's not correct?

4          A.     He notified me he was retained for the wind

5       claim, Mr. Perich notified me he was retained for the

6       wind claim, and --

7          Q.     Mr. Perich notified you with regard to the

8       wind claim?

9          A.     There's an e-mail from Mr. Perich that made

10      it clear that --

11         Q.     On the wind claim?

12         A.     On both claims, all damages that were in

13      dispute, and then Mr. Bushman advised me that Chubb

14      had changed their minds about him being the appraiser

15      on the wind claim.

16         Q.     We'll get to that in a little bit.

17         A.     Well, we're getting to it now because you

18      brought it up.

19         Q.     I know.  Well --

20         A.     So I'm just correcting your --

21         Q.     We'll get there.  When were you formally

22      retained as an expert witness in this litigation?

23         A.     I don't know the exact date but it would have

24      been right after Chubb pulled the rug out from under

25      the appraisal process and Ms. Zarin employed Mr.

Page 126

1          Conchin's office.

2                          MR. TAYLOR:  Object to the

3          responsiveness of the answer.

4                          MR. CONCHIN:  Asked and answered.

5          A.     What are you objecting to?

6      BY MR. TAYLOR:

7          Q.     You didn't answer the question I asked, which

8      was --

9          A.     Okay, I'm sorry.

10         Q.     -- just the date that you were formally

11     retained as an expert witness in this case.

12         A.     Well, and I said -- I did answer that, I said

13     I don't know the date but I tried to help you out with

14     a rough time.  Do you want me to stop doing that?

15         Q.     If you know the date give me the date, if I

16     want more I'll ask you for it.

17         A.     Okay.  I'll stop all commentary, I'll give

18     you just short and sweet.

19         Q.     Is there a written agreement that reflects

20     your retention as an expert in this case?

21         A.     I don't remember.

22         Q.     Is there correspondence between you and maybe

23     Mr. Conchin outlining your retention as an expert and

24     your role and what you'll be providing expert

25     testimony on?

Page 127

1      A.    Could be, I just don't remember.

2      Q.    If there is I'm going to request that as

3  well, if you would please find that, if it exists, and

4  provide that to Mr. Conchin to forward on to me; okay?

5      A.    Sure.  Most of the time it's verbal with

6  frankly all the firms that I've worked with in the

7  past, but occasionally there is something in writing,

8  and if I've got something in this case I'll be glad to

9  send it to you.

10     Q.    What is the hourly rate that you are charging

11 in order to serve as an expert witness in this case?

12     A.    I think it's 225, but it's reflected in the

13 documents.

14     Q.    In which documents, in the --

15     A.    One of the ones we've already looked at.

16     Q.    Okay.  In what we marked as Exhibit 38 for

17 identification?

18     A.    You're asking me to remember exhibit numbers,

19 look, this is -- I don't know, it's in one of the ones

20 we looked at.

21     Q.    At the end of your CV there's an Expert Fee

22 Scheduling Conditions, is that what you're referring

23 to, that page?

24     A.    Yes, sir, if that's the one that says 225; is

25 that what it says?

1       Q.      $225 an hour.

2       A.      Then that's the document that I was just

3    referring to, yes, sir.

4       Q.      And you've not been paid a retainer?

5       A.      No, sir, I don't charge a retainer on these.

6       Q.      And you haven't been paid any amount as of

7    today?

8       A.      I've knot billed any amount as of today.

9       Q.      And according to your testimony earlier you

10   won't be sending a bill until the case is over?

11      A.      That's correct, but I will send a bill when

12   the case is over regardless of the outcome, that's the

13   agreement, I get paid --

14      Q.      Regardless?

15      A.      Regardless.

16      Q.      So there does not have to be an additional

17   recovery by Haman, Inc. in order for you to be paid

18   and receive payment as -- for your services as an

19   expert witness in this case?

20      A.      That's correct.

21      Q.      Was it Mr. Conchin that contacted you to

22   retain you as an expert in this case?

23      A.      Probably.

24      Q.      Or was it somebody else from his office?

25      A.      I just don't remember, I say probably because

Page 129

1    Mr. Conchin is here today and he's been I think the
2    lead attorney on this file from day 1 as best I can
3    remember.
4        Q.    How well do you know Mr. Conchin?
5        A.    I have a great respect for Mr. Conchin as an
6    attorney, as a hard worker.
7        Q.    Are you friends?
8        A.    We don't do things socially, we don't play
9    golf together like I do my golfing friends, but I
10   would consider Mr. Conchin a friend, frankly -- shoot,
11   I consider you a friend.
12       Q.    Well, thank you.
13       A.    We almost went and got tea together.
14       Q.    Almost, then you bailed on me.
15       A.    I did, not a very friendly thing to do, was
16   it?  E-mail was pushing me.
17              MR. TAYLOR:  Why don't we go off the
18   record, it's about one o'clock.
19              THE VIDEOGRAPHER:  Off the record at
20   12:51.
21              (Whereupon, a recess was
22              taken at 12:51 p.m.)
23              THE VIDEOGRAPHER:  Back on the record
24   at 1:51.
25   BY MR. TAYLOR:

Page 130

```
 1        Q.    Mr. Howarth, let me show you what's been
 2     marked as Exhibit 44 for identification.
 3                   (Reporter marks document as
 4                    Defendant's Exhibit No. 44 for
 5                    identification.)
 6        Q.    And this is Haman -- it says LLC but it's
 7     Haman, Inc.'s designation of expert witnesses.  Have
 8     you ever seen this document before?
 9        A.    I think have, just can't remember as I sit
10     here.
11        Q.    Well, the first two pages relate to your
12     testimony or your anticipated expert testimony in this
13     case.
14        A.    Right.
15        Q.    And did you have any role in preparing what
16     is stated here in this expert witness disclosure?
17        A.    I would have, yes.
18        Q.    Could you go through and tell me what part
19     you provided to Mr. Conchin's office to stick into the
20     disclosure?
21        A.    I can't.
22        Q.    I'm sorry?
23        A.    I can't do that, it would be a collaborative,
24     I don't know that there is a part that I can assign to
25     me or a part that I can assign to something, this
```

Page 131

1    would have happened almost a year ago, so I can't do

2    that.

3         Q.    And of course if we go back in addition to

4    what's there with the disclosures then we get to

5    Exhibit A, which relates to your testimony, correct,

6    that's what it says in the disclosure?

7         A.    You're asking me if the disclosure says that

8    Exhibit A relates to my testimony?

9         Q.    Yes.

10        A.    I'll just have to read it unless you want to

11   direct me to somewhere.

12        Q.    Well, if you look starting at the bottom of

13   page 1 to the top of page 2, does Exhibit A, that we

14   previously marked as Exhibit 38 for identification,

15   relate to this disclosure?

16        A.    Yes, looks like it does.

17        Q.    And I pulled Exhibit 38 for you so that you

18   have it in front of you in case you need to refer to

19   it.

20        A.    Okay.

21        Q.    If you look at the second page of Exhibit A,

22   that we've marked as Exhibit 38 for identification, do

23   you see where it shows -- it says right at the top on

24   the first page, Valuation of Loss and Proper Claims

25   Practices, do you see that?

Page 132

1      A.    Yes.

2      Q.    And then further down it says:  This report

3    -- well, that's your signature down at the bottom?

4      A.    Yes.

5      Q.    And then there's a date of April 22, 2019?

6      A.    Yes.

7      Q.    And it says:  This report includes stated

8    opinions that I have regarding the amount of the loss

9    by fire on March 22, 2014, and the amount of the loss

10    by windstorm on 4-28-14 to the Knights Inn owned by

11    Haman, LLC.  Is that what it says?

12      A.    Yes.

13      Q.    Is that referring to the two estimates that

14    were prepared?

15      A.    Yes, the estimates would be included.

16      Q.    Well, I understand.  Is there anymore to your

17    report other than the two estimates as it relates to

18    the damages as a result of the fire and the damages as

19    a result -- you know, in connection with the wind

20    claim?

21                MR. CONCHIN:  The report speaks for

22    itself.  What's your question?

23    BY MR. TAYLOR:

24      Q.    I'm asking if there's anymore to it, is there

25    more to the report as it relates to the damages in

Page 133

1      connection with the fire and the wind claims beyond

2      the estimates.

3          A.    To this report, Exhibit A?

4          Q.    Yes, or anywhere, is there a narrative

5      somewhere that relates to those damages, because all

6      I've been provided with are the two estimates

7      themselves.

8          A.    Is there a narrative from me?

9          Q.    Correct.

10         A.    No, you asked that before, I don't have a

11     narrative, separate narrative other than the two

12     estimates for the actual damage valuation.

13         Q.    Additionally this report includes my stated

14     opinions regarding the claim adjusting conduct of the

15     carrier's representatives.  Do you see that?

16         A.    Yes.

17         Q.    And I think we established earlier today that

18     there is no separate report that addresses that;

19     right?

20         A.    Not that I remember, correct.

21         Q.    And then this report also includes the

22     sources relied upon for my opinions, my

23     qualifications, my past testimony and my fee schedule;

24     right?

25         A.    Correct.

1    Q.    And then in fact your CV, your fee schedule,

2    your past testimony or are all attached and part of

3    what -- this Exhibit A that we've marked as Exhibit 38

4    for identification; right?

5    A.    Correct.

6    Q.    Then the final statement says:  I will of

7    course supplement or expand this opinion statement as

8    I believe becomes necessary on the merits of any

9    additional information that I receive.  Do you see

10   that?

11   A.    I do.

12   Q.    As of this date have you supplemented or

13   expanded your opinion statement in writing?

14   A.    Not to date but there's still a lot of

15   information coming in.  At some point I may be asked

16   to read depositions of other parties, but as of right

17   now I've not supplemented this opinion.

18   Q.    Now, I understand the two estimates for the

19   -- in connection with the fire claim and the wind

20   claim are not attached to this directly, and I have

21   those, okay, so take that out of the equation in

22   connection with my next question; is there anything

23   that's listed here that's missing from Exhibit A, that

24   we've marked as Exhibit 38 for identification?  I know

25   that those two estimates are not attached as --

Page 135

1        A.      Other than those?

2        Q.      Other than those, yes.

3        A.      Not that I can remember unless there's a

4    report that I prepared which stated opinions regarding

5    the claim adjusting conduct of the carrier's

6    representatives, but as I sit here I don't remember

7    that I have one, I didn't see one when I prepared.

8        Q.      And you didn't see it over the last couple of

9    days when you were reviewing your file, you did not

10   see one in there?

11       A.      Correct, but I did not look in -- I have this

12   separate folder that's not a part of the Knights Inn

13   folder, expert reports, and if I had done one Mr.

14   Conchin would have it.

15       Q.      And he of course would have provided it to

16   me?

17       A.      I would think, yeah, for sure.

18       Q.      And if I tell you that I've never received

19   any other reports that would have been authored by you

20   or anyone else with The Howarth Group other than the

21   two estimates, if I tell you that's all that I've

22   gotten from your company or generated by your company,

23   are you aware of anything else?

24       A.      No, as I sit here I'm not, and it may be that

25   I was waiting for -- to get a copy of the claim file

Page 136

```
 1    and be able to read the depositions of the adjusters.
 2                    MR. CONCHIN:  And, Wayne, not to -- I
 3    don't want to interrupt your line of questioning, but
 4    he incorporates Irmiter in Irmiter's reports, I
 5    suppose you're setting that aside, you're not asking
 6    him about whether he --
 7                    MR. TAYLOR:  Well, he didn't prepare
 8    the Irmiter reports.
 9    BY MR. TAYLOR:
10        Q.    Did you prepare any part of the FBS reports?
11                    MR. CONCHIN:  Was your request -- was
12    your question about something he prepared?
13                    MR. TAYLOR:  Yes, it was.
14        A.    Yeah, that's my understanding, it was purely
15    what I prepared.
16                    MR. CONCHIN:  Now, I will say this in
17    fairness, I provided a videotape to Mr. Howarth, the
18    same videotape I provided to you of the premises as of
19    about two weeks ago to supplement his opinion as to --
20    you know, we had a loss estimate at the time but that
21    is not the loss now, it is a 100 percent total loss,
22    destructed building.
23                    MR. TAYLOR:  But that's not a report.
24                    MR. CONCHIN:  No, he has not, but I
25    provided that to him in anticipation that he may need
```

1      to supplement his report concerning the current

2      condition of the premises.

3      BY MR. TAYLOR:

4          Q.    As of today, the date of your deposition, you

5      have not supplemented your estimates or any other

6      report that might be out there; is that right?

7          A.    Correct, not that I remember.

8          Q.    Now, Sarah Grandinetti and Arthur Grandinetti

9      also have been identified as you can see in the

10     disclosure here that we've marked as Exhibit 44 as

11     expert witnesses in this case on behalf of the

12     plaintiff, if you turn to pages I think 4 and 5 of the

13     document, or 3 and 4, sorry; is that right?

14         A.    I see them listed.

15         Q.    Now, are they being paid on their own and

16     separately since they are not any longer affiliated

17     with The Howarth Group, or is all of their time being

18     also billed through The Howarth Group to Mr. Conchin?

19         A.    No, they would be billing Mr. Conchin

20     directly when they are serving as his expert.

21         Q.    So their role as an expert witness -- as

22     expert witnesses in this case is not in conjunction

23     with The Howarth Group; is that correct?

24         A.    I'm not sure what that means legally.  You

25     guys I've learned think -- use words and see things a

Page 138

1       little different than us laymen.  Arthur and Sarah are

2       experts in this case for Mr. Conchin's office, his law

3       firm, who represents Knights Inn, they are not working

4       -- they are not -- he didn't hire them as experts

5       directly through The Howarth Group, he hired them as

6       experts directly with themselves in their capacity as

7       experts.

8            Q.    That was my question, thank you.

9            A.    Good.  I thought that might do it.

10           Q.    And as you can see, Arthur Grandinetti is

11      being offered up as an expert witness on the damages

12      in connection with both the fire and wind claims, do

13      you see that, the cost of the repair, et cetera;

14      right?

15           A.    Looks like that's correct, yes.

16           Q.    And Sarah Grandinetti is being offered as an

17      expert in connection with the contents damages in

18      connection with both the fire claims and the wind

19      claims; is that right?

20           A.    Yes, I see that it does mention the inventory

21      loss.  I don't know since Sarah was an eyewitness to

22      what the damages were, walked the properties, probably

23      is the one taking most of our photographs at the time,

24      whether Mr. Conchin intends for her to answer

25      questions related to her observations of the building

1    losses, I don't know whether that's included or

2    limited by this, but those are facts that may be

3    responsive to your question.

4        Q.    Are you going to be providing or offering any

5    expert testimony in connection with the damages to the

6    contents in this case in connection with either the

7    fire --

8        A.    It's possible.

9        Q.    -- or the wind claim?

10       A.    Yes, it's possible.

11       Q.    Do you have testimony to offer relating to

12   the damage to the contents, the personal property, in

13   connection with the fire claim that is different than

14   what Sarah Grandinetti would be offering?

15       A.    I wouldn't think so.

16       Q.    Are you going to be offering any expert

17   testimony concerning the damages to the buildings as a

18   result of the fire claim that's any different than

19   what Arthur Grandinetti would be offering?

20       A.    I wouldn't expect to, no.

21       Q.    Same question -- well, let me just ask a full

22   question, and are you going to be offering any

23   different testimony than Sarah Grandinetti in

24   connection with the contents damages as it relates to

25   the wind claim?

1      A.    I wouldn't expect to, no.

2      Q.    Are you going to be offering any testimony

3   that is different than Arthur Grandinetti's expected

4   expert testimony in connection with the damages to the

5   buildings as a result of the wind claim?

6      A.    I wouldn't expect to.

7      Q.    Is there any testimony that Arthur

8   Grandinetti and Sarah Grandinetti -- well, let's do it

9   one at a time, is there any testimony that Arthur

10  Grandinetti can provide as an expert witness on

11  damages that's different than your testimony?

12              MR. CONCHIN:  Object to the form.

13     A.    I wouldn't think so but I haven't seen his

14  testimony.  I reserve the right to differ after I see

15  his testimony if I see something that I disagree with,

16  but as of right now I wouldn't expect that to happen.

17  BY MR. TAYLOR:

18     Q.    Your testimony about the damages and Arthur

19  Grandinetti's testimony about the damages to the

20  buildings from the fire claim are based upon the

21  estimate that was prepared and the photographs that

22  exist; right?

23              MR. CONCHIN:  Object to form.

24     A.    Correct, that estimate reflects our opinions

25  of the fire loss to the buildings, correct.

Page 141

1      BY MR. TAYLOR:

2          Q.     And the same question with regard to the wind

3      claim.

4          A.     Correct, the wind estimate reflects our

5      opinions of the damages to the buildings from the wind

6      loss, the tornado loss.

7          Q.     And the contents inventory for the fire claim

8      prepared by Sarah Grandinetti, does that reflect your

9      and her opinions as to the damages to the contents as

10     a result of the fire?

11         A.     Yes.

12         Q.     And the contents inventory that Sarah

13     Grandinetti prepared in connection with the wind

14     claim, does that reflect the opinions that both you

15     and Sarah Grandinetti have concerning the personal

16     property damages from the wind claim?

17         A.     Yes.

18         Q.     The estimate of repair that has been offered

19     as The Howarth Group's assessment of the damages as a

20     result of the fire claim, was that prepared by Arthur

21     Grandinetti?

22         A.     It was prepared by both of us.  Arthur did

23     the actual plugging in of the typing to enter the data

24     into the Xactimate program, but decisions about scope,

25     decisions about how we approach repairs based on the

1    damages that are there, we made together as we

2    typically would do, so we're on the phone, we've got

3    photographs in front of each other, he's involving me,

4    he'll send me an early draft, I'll review it, we amend

5    things, we revise things, so it's a joint effort to

6    get to what was finally produced as our position,

7    essentially my position.

8        Q.    At the time that the estimate of repair in

9    connection with the fire claim was prepared jointly by

10   you and Arthur Grandinetti, did you have any report

11   from Forensic Building Science?

12       A.    We probably didn't have the FBS report when

13   the estimate was started, but before it was finished

14   we had their report and included their assessments,

15   their testing data as a part of the protocol for the

16   scope of repair we included.

17       Q.    So by the time -- so is it your testimony

18   that you had -- and you said FBS, that's Forensic

19   Building Science?

20       A.    Forensic Building Science, yes, sir.

21       Q.    Does that mean you had the Forensic Building

22   Science report by the time you completed the estimate

23   in connection with the -- the damages estimate in

24   connection with the fire claim?

25       A.    The answer is yes, but understand, this

1    process internally -- estimates get completed to a

2    point and then they get revised again and they get

3    revised again, and we have multiple revisions on a

4    loss this size, we could have a dozen revisions.

5           We're trying to make as much progress as we

6    can in the things we know early on because the longer

7    you wait you start forgetting stuff, and so there were

8    a lot of completions, if you understand what I mean,

9    so there isn't just one completion, so the answer to

10   the question is kind of yes and no, and I'm sorry I

11   couldn't answer it without a paragraph.

12      Q.    What is actual cash value, what does that

13   mean?

14      A.    Replacement cost value less depreciation for

15   age and that sort of thing.

16      Q.    So depreciation -- I guess the best -- would

17   obsolescence be included in connection with that as

18   well?

19      A.    Obsolescence could be included in the

20   determination of actual cash value of something.

21      Q.    So --

22      A.    Most of the time obsolescence results in a

23   zero valuation in its truest sense, so.

24      Q.    Depreciation then is mainly based on age?

25      A.    It's based on a lot of things.

Page 144

1        Q.     And condition?

2        A.     It's based on age, condition, yes.

3        Q.     For example just kind of maybe the easiest

4    way to explain it in laymen's terms, I think, and tell

5    me if I'm wrong, a five-year-old washing machine

6    certainly doesn't have the same value as a brand new

7    washing machine --

8        A.     Correct.

9        Q.     Because, number one, it's five years old;

10   right?

11       A.     Right.

12       Q.     And, number two, it's certainly not going to

13   be in the same condition as a brand new washing

14   machine; right?

15       A.     If it's being used during those five years,

16   correct, but even if it's sitting in a warehouse still

17   brand new, never out of the box, that five-year-old

18   washing machine has not appreciated, it has

19   depreciated.

20            That's the way it would apply to contents, it

21   does not apply that way to real property because real

22   property as a whole appreciates over time.

23       Q.     So then would you never apply depreciation to

24   a building to determine actual cash value?

25       A.     In a much different way, the answer to your

1     question is no, you would apply depreciation but on a

2     very limited basis only to those parts of the building

3     that age quickly, roofing, paint, carpeting, and by

4     virtue of that swiftness of aging their age detracts

5     from the overall value of the whole even while it's

6     appreciating, so the proper application of

7     depreciation of real property is very isolated, very

8     limited, and a lot different -- should be a lot

9     different than applying depreciation to personal

10    property or contents.

11         Q.    If I understand what you're saying then you

12    would depreciate components?

13         A.    Correct.

14         Q.    Such as roofing?

15         A.    Correct.

16         Q.    So if you've got a 40-year-old building that

17    has a ten-year-old roof and the roof needs to be

18    replaced you would determine actual cash value by what

19    it would cost to put on a new roof and then some

20    number to determine or to account for the fact that

21    it's ten years old?

22         A.    Right, you're curing betterment, the

23    policyholder, who as a result of a wind loss gets a

24    brand new roof where just the day before the wind loss

25    they had a ten-year-old roof, has experienced

1    betterment by the new roof even to real property, and

2    you apply depreciation to cure the betterment, and the

3    one thing you will want to know is what kind of roof

4    did they have on there, was it a 20-year roof, 50-year

5    roof, five-year roof.

6         Q.    That was going to be my next question, is

7    would that kind of depend on life expectancy of the

8    component?

9         A.    Yes, of the component, not of the building as

10   a whole.

11        Q.    Right.  So you have a roof that's put on ten

12   years ago and it's a 20-year roof and it needs to be

13   replaced, would it be fair to say that the actual cash

14   value then would be whatever the cost to replace that

15   roof is less some percentage in order to account for

16   that ten years old if it's a 20-year roof, maybe it's

17   50 percent, I don't know, that's not my area, but is

18   that kind of the concept?

19        A.    That's the concept.

20        Q.    Did you determine the actual cash value of

21   the damages when the -- when estimating the damages in

22   connection with the fire claim?

23        A.    I don't remember that we did, I can't

24   remember seeing a depreciation schedule.

25        Q.    Did you determine the actual cash value of

Page 147

1    the damages to the building in connection with the

2    wind claim?

3         A.    I can't remember.  We could very easily but I

4    can't remember if we did.

5         Q.    The first time that you -- well, let's go

6    back, your testimony -- you indicated that you'd been

7    out to the Knights Inn in Bessemer twice?

8         A.    At least twice as I remember.

9         Q.    You say at least twice, do you remember more

10   than twice?

11        A.    Unfortunately I don't remember the second one

12   well at all because I have that other location in mind

13   that looks very much like this, but, yes, my earlier

14   testimony is I've been there I know twice.

15        Q.    Did anybody know that you were going to be

16   going the first time you arrived, that we've

17   established was sometime between January and March of

18   2015?

19        A.    Well, I'm sure my wife knew.

20        Q.    I apologize for the unartful question, that's

21   not what I was getting at, and that's my fault because

22   it's my question.  Did anybody from Haman, Inc., Ms.

23   Visram or some other staff member know that you were

24   going to be visiting the site when you visited after

25   the fire in connection with the fire claim between

1    January and March of 2015?

2         A.    Probably.

3         Q.    Do you remember contacting somebody and

4    saying, hey, I'm going to be out there tomorrow or be

5    out there next Thursday or what have you?

6         A.    No, I don't remember the specifics of that

7    trip.

8         Q.    And in that first one did you only inspect

9    the one building where there was fire damage?

10        A.    It was purely related to the fire loss.

11        Q.    And then the second time you said you don't

12   remember much, so in fact as I recall you didn't even

13   remember if you inspected all three roofs or just one

14   of them.

15        A.    I don't remember, if I try to venture a guess

16   I'm just guessing for you.  The probability is with

17   tornado damage buildings within a debris field area

18   once I've been on one of these roofs that's enough for

19   me to evaluate how well my expert has documented,

20   photographed and taken care of his job, and once I'm

21   satisfied I probably wouldn't have gone on the other

22   two, but I'm saying that just because I know what my

23   normal practice is, I can't testify specifically in

24   answer to your question, beyond that anyway.

25        Q.    When you went out the first time in

1       connection with the fire claim for that one building

2       did you go inside every interior or just some of them?

3           A.    Some of them, I wouldn't have gone into every

4       single unit.

5           Q.    How many units did you go into on that first

6       visit?

7           A.    I don't know, but my normal process would be

8       to of course go into the units that are immediately

9       surrounding the source of the fire and then go to the

10      extreme ends and see what I'm observing there, and

11      then move toward the source to see where I start to

12      see evidence of the soot char particulate migration,

13      and so I mean I could have been in eight units, I

14      could have been in 12 units, but that's probably the

15      number that I would have been looking in.

16          Q.    Somewhere between eight and 12 is your best

17      guess?

18          A.    My best guess.

19          Q.    Beyond that you can't give anything more

20      specific?

21          A.    I can't, I wish I could.

22          Q.    When you went out the second time, and I

23      recognize that you've said you just don't remember it

24      very well because you've got a different inspection

25      that appears to be in your mind where your daughter

1      accompanied you and you didn't think she accompanied

2      you at this one --

3          A.    I was just sure she was not with me on this

4      one, that's why I'm -- I'm sorry, I can't be more

5      helpful.

6          Q.    That's okay.  Did you go inside the interiors

7      of each of the three buildings?

8          A.    No, no, I would have no reason to go back in

9      the interior of the fire, and again, I just don't

10     remember, my focus was the roofing and my expert's

11     report, that would have been the reason why I was

12     there because that's something I do just

13     systematically, I've got to check up on the experts

14     I'm hiring to make sure they're doing their job and

15     that they are evaluating and providing protocols that

16     are accurate, at least accurate to what I'm seeing on

17     site.

18         Q.    Kind of like a sampling, you do a sample and

19     say, all right, I've looked at this and I've looked at

20     this, they've done a good job, therefore I've

21     concluded they've done a good job on --

22         A.    That's all I'm trying to do, that's all I'm

23     trying to do, yes, so I'm comfortable that I've got --

24     I don't need a second expert, I've got a report that

25     is true to what I'm seeing, it is -- it's something I

1   can use, and that's all I wanted to do, which is why I

2   don't take photographs, these sort of liaison meetings

3   I find myself in this predicament all the time, I'm

4   not there to photograph, I'm not there to take notes,

5   I'm there to understand, gain an understanding because

6   I'm relying on others to do a lot of the work, they're

7   going to ask me questions when it comes to the fire

8   loss or with an expert's report on a roof situation,

9   I've just got to know that I'm getting a good product,

10  I'm paying thousands of dollars for these expert

11  reports and I need to know it's a good product.

12      Q.   So when you went back out the second time you

13  think it's not likely you went into any of the units

14  that had -- at the building where the fire occurred

15  because you'd already been in some in connection with

16  your inspection on the fire claim; right?

17      A.   Right.

18      Q.   There's another building that has rooms, when

19  you went out the second time in connection with the

20  wind claim did you go inside the interiors of any of

21  those units?

22      A.   Normally I would if -- at the time I'm

23  looking I already will know if I've got interior

24  damage.  This particular location the interior water

25  damage was limited to the interior of the building,

1    unlike the fire loss, which involved a lot of units

2    become impacted.  We've got widespread wind damage but

3    just a few comparatively units that are impacted, but

4    my focus was the roof because, again, that's where my

5    focus is, Arthur can evaluate water damage to the

6    interior, we're talking water damage, so I wanted to

7    -- my reason for being there was to evaluate my

8    expert's report.

9        Q.    How many units did you go inside in that

10   other building?

11       A.    I don't remember, it would not have been my

12   focus, if I went into any I would have gone into just

13   a couple.

14       Q.    How many units were impacted as a result of

15   the wind claim?

16       A.    I'd have to get the estimate and I could

17   count them for you.

18       Q.    Fair enough.  Then the other building is

19   where the office is located, there's I think a

20   restaurant, a bar, a ballroom?

21       A.    Right, that's the building that I'm talking

22   about predominately when I say -- that's probably the

23   building I would have gone up on the roof for, it's

24   kind of the first building you get to.

25       Q.    And did you go inside and walk around the

1    interior of that entire building?

2        A.    No, I would not have gone through the whole

3    building, I'm not there to value or to count or to

4    measure amounts of loss, I've got people I'm relying

5    on for that and they're taking photographs for me, I

6    was there, as I said, to evaluate a roof report.

7        Q.    When it came time to prepare the repair

8    estimates was that based mostly on the photographs,

9    what you remembered when you were out there and your

10   conversations with either Arthur or Sarah Grandinetti?

11       A.    The roof, was that your question?

12       Q.    The buildings in general, just the estimates

13   in general.

14       A.    Well, they differ, from the fire I understood

15   what we had the way this building was constructed, I'm

16   seeing smoke migrating through the building, sadly,

17   but very badly, and so I know we have internal

18   cavities that are full of this smoke and soot that now

19   we've got to open up all over this building, the loss

20   is much more severe than has been valued by Chubb, so

21   I know now what my scope needs to be, I need

22   additional testing from FBS so I know how far in these

23   cavities this contamination has spread, and they use a

24   Eurocell system that will tell me whether or not we've

25   got particulate inside spaces that you can't see,

1        can't get to without pulling drywall off, so on the

2        fire loss I'm relying on my observations, Arthur's

3        observations, photos that are being taken, and my

4        expert's report and his photos for the most part.

5            Q.    Are you -- you know that Tom Irmiter is not a

6        certified industrial hygienist, did you know that?

7            A.    I think, yeah, I think, you don't have to be

8        an industrial hygienist to take good samples and find

9        a good lab that can tell you whether you've got

10       particulate, but to my knowledge he's not, I don't

11       particularly look for an industrial hygienist for this

12       kind of work.

13           Q.    Are you aware that Forensic Building Science

14       doesn't have anyone on its staff that is a certified

15       industrial hygienist?

16           A.    I'm kind of glad they don't, I'm glad they

17       use an outside industrial hygienist when they do.

18       He's a professor at a university, as I understand it.

19           Q.    You're talking about the laboratory that they

20       used?

21           A.    I'm talking about the industrial hygienist

22       that they use who is a professor.

23           Q.    Is that the lab, isn't that -- that professor

24       you're talking about, isn't that his lab that's used

25       to analyze the samples?

                                                    Page 155

1          A.    He may have, I don't know, you probably know

2     more about their internal workings than I do.

3          Q.    Are you aware that the lab used to analyze

4     the samples obtained by Forensic Building Science is

5     not accredited by the American Board of Industrial

6     Hygiene?

7          A.    No.

8          Q.    Are you aware that the testing that this

9     particular laboratory performed on the samples

10    obtained by Forensic Building Science was only done at

11    level 1?

12         A.    That's most often the case, so it's

13    presumptive.

14         Q.    And that's so -- so you understand that

15    that's what was done here is it was level 1

16    presumptive testing only?

17         A.    Yes.

18               (Reporter marks document as

19               Defendant's Exhibit No. 45 for

20               identification.)

21         Q.    I'll show you what's been marked as Exhibit

22    45 for identification, and this is an estimate of

23    repair in connection with the wind claim prepared by

24    Belfor Property Restoration; have you seen this

25    document before?

Page 156

1      A.    Yes.

2      Q.    Did you utilize this document in the

3   preparation of The Howarth Group's estimate of repair

4   for the -- I'm sorry, the fire damage, I misspoke,

5   it's the fire damage.

6      A.    Oh, I thought you said it was fire.

7      Q.    I thought I said --

8      A.    It is the fire damage.

9      Q.    It is the fire damage, yes, did you use this

10  in connection with your preparation of The Howarth

11  Group's estimate of repair in connection with the fire

12  claim?

13     A.    No, I didn't.

14     Q.    Did Mr. Grandinetti?

15     A.    You'll have to ask him, I doubt it.

16     Q.    Did you utilize this estimate prepared by

17  Belfor Property Restoration for any purpose in

18  connection with The Howarth Group's estimation of the

19  fire damages?

20     A.    No, I didn't, be kind of hard to, they left

21  most of the pertinent information out, a lot of top

22  secret stuff they didn't want to share.

23     Q.    Did you do -- did you or anyone else at The

24  Howarth Group perform any kind of a comparison between

25  the Belfor estimate and The Howarth Group's estimate

Page 157

1       in order to identify the differences?

2           A.    Not that I remember.

3           Q.    I'll show you what's been marked as Exhibit

4       46 for identification.

5                   (Reporter marks document as

6                   Defendant's Exhibit No. 46 for

7                   identification.)

8           Q.    And this is an estimate dated June 30, 2014,

9       prepared by Brookstone Restoration at the request of

10      Sheila Allen from the Knights Inn.  Have you seen this

11      document before?

12                  MR. CONCHIN:  Object to the form that

13      it was prepared at the request of Sheila Allen.

14          A.    Yes, I think I've seen this one.

15      BY MR. TAYLOR:

16          Q.    It's certainly addressed to Sheila Allen; is

17      it not?

18                  MR. CONCHIN:  It is, I can address

19      something to anybody, and so could Brookstone.

20      BY MR. TAYLOR:

21          Q.    Did you utilize this estimate prepared by

22      Brookstone Restoration in connection with the -- in

23      connection with the preparation of The Howarth Group's

24      estimate of fire damages?

25          A.    No, I didn't.

1       Q.     Did Mr. Grandinetti?

2       A.     You'll have to ask him, I don't know.

3       Q.     Was a comparison of the Brookstone

4    Restoration estimates and The Howarth Group's estimate

5    of the fire damages ever performed?

6       A.     It would be impossible to do a comparison

7    between the Brookstone and an Xactimate estimate, it's

8    also rather impossible to do a comparison between the

9    Belfor estimate and our estimate, I don't have a recap

10   by category which shows pricing of the trades, I don't

11   have a recap by room which shows the pricing on a room

12   by room basis, and they have hidden all the pricing

13   intentionally in the way they printed this out.  It's

14   impossible to do a comparison frankly.

15          They -- Belfor intentionally kept information

16   away from us, Brookstone doesn't use Xactimate, so

17   it's -- and it's in -- they use a method of estimating

18   that just can't compare to Xactimate on a spreadsheet

19   form.

20      Q.     Did Belfor intentionally hide information or

21   just this is the way they do it, do you know?

22      A.     No, this is not the way they do it, this is

23   the way they were told to do it in this case, and,

24   yes, it was intentionally hidden.  This is rare, I see

25   this one out of --

1      Q.    Did somebody tell you it was intentional?

2      A.    -- 200 times.

3      Q.    Is this a conclusion that you've reached on

4   your own or did somebody tell you it was intentional?

5      A.    It's a conclusion I've reached on my own from

6   my years of experience in the business.  This isn't

7   the default, you've got to intentionally format the

8   program to hide all that information.

9      Q.    When you went up on the roof in connection

10  with the wind claim -- well, let me ask you, did you

11  go up on the roof in connection with the fire claim,

12  the first visit?

13     A.    No.

14     Q.    So all you did was inspect units that first

15  time?

16     A.    Correct.

17     Q.    Second time you went up on the roof you could

18  only remember one; right?

19     A.    Correct.

20     Q.    When you were up there did you notice any

21  evidence of prior repairs?

22     A.    Yes.

23     Q.    Was it indicative that there had been prior

24  leaking of that roof, prior patching?

25     A.    Well, it's indicative that there's

1    maintenance going on, that they are maintaining the

2    roofing, which people do, it's important to do.  I

3    don't conclude that when I see a patch on an EPDM roof

4    that it was because it was leaking, it's just somebody

5    is maintaining the roof, you've got to walk it

6    periodically, and if you see a condition you put a

7    patch on it, it could be a hole, could be a worn spot,

8    who knows, somebody could have dropped a screwdriver

9    that's up there working on equipment.

10          I try not to draw conclusions with zero

11    information, but I see a patch I conclude they're

12    maintaining the roof, as they should.

13    Q.    Did you ask anybody why were the patches that

14    you did see, why were they there?

15    A.    No, I would never ask that, it just doesn't

16    really play into what I'm doing.

17    Q.    Well, would you not want to know whether they

18    had prior leaking problems on the roof?

19    A.    I will ask that question, the leaking

20    problems aren't going to show up on the roof, they're

21    going to show up inside the building, and so those

22    kinds of questions, yes, we would ask, we would ask of

23    maintenance people, we would ask of anybody we could,

24    but as is the case with most hotels, if they find a

25    problem on the roof they patch it, if there was

```
 1      leaking inside they replace the ceiling tiles or they

 2      paint over the stain, so my primary concern when I'm

 3      handling a claim like this is to know if that stain

 4      has been there for a long, long time, is this a

 5      long-term issue that you've been dealing with and

 6      neglecting or has that showed up since the loss,

 7      that's what I'm going to ask really, so the patches on

 8      the roof aren't going to get me anywhere, but those

 9      questions about the stains inside, that kind of helps

10      me get there.

11          Q.    You said that you would ask, did you in this

12      case ask?

13          A.    I didn't do any asking in this case, that was

14      handled by Arthur and Sarah.

15          Q.    So you personally didn't ask any questions

16      about water leaks and prior water leaks and whether

17      there had been any problems in the past; is that

18      right?

19          A.    I wasn't on site, I asked those questions I'm

20      sure of Zarin during one of our early conversations

21      with Bruce, those are questions that Bruce will ask

22      when he sees damage, so we are determined to discover

23      preexisting damages versus damages related to a

24      specific occurrence because we are not going to

25      include preexisting damages in our valuation of the
```

Page 162

1   loss.

2       Q.    Do you remember specifically asking Zarin or

3   anyone else at the Knights Inn about prior water

4   damages?

5       A.    As I sit here I don't remember the content of

6   any of those conversations with her, but those are

7   questions we always ask.

8       Q.    But as you sit here today you don't remember?

9       A.    I can't remember the conversation, no, it's

10  been years.

11      Q.    Do you remember the content of any of your

12  conversations with Ms. Visram?

13      A.    I don't, I would probably be reminded if I

14  pulled all my e-mails back up and started reading

15  through them, but as I sit here I can't remember a

16  specific discussion in a conversation with her.

17      Q.    Well, in order to prepare for your deposition

18  over the past week, I think you indicated eight to ten

19  hours, including your review of correspondence, did

20  you not review those e-mails in order to refresh your

21  recollection so you could come in here and testify

22  today?

23      A.    I did, I read many of them, I scanned through

24  many of them.  If I had known Friday you were going to

25  ask me to do my best to give you specifics about any

Page 163

1      conversation with Zarin then I could have focused on

2      that, but I can assure you over the weekend that's not

3      a subject I was focused on, trying to figure out

4      exactly what Zarin and I might have said in a

5      conversation.

6              There's a lot of information in this claim,

7      I've got huge estimates with a lot of damage, expert's

8      reports, my focus was on other things, and that's the

9      kind of thing I would have just quickly skimmed

10     through so I get to the meat of the process.

11     Q.    So notwithstanding the fact that you spent

12     eight to ten hours reviewing your file, including the

13     correspondence, you don't remember the substance of

14     any of your communications -- excuse me, your

15     conversations with Ms. Visram?

16     A.    Correct, I don't remember exactly what was

17     said in any of the conversations I had with Ms.

18     Visram.

19     Q.    Did the roof drain well?

20     A.    Which one?

21     Q.    The one you inspected.

22     A.    Flat roofs typically don't drain well, but

23     there are mansard roofs that drain fantastically, so I

24     think that answers your question.

25     Q.    I'm not sure I understand that, to be quite

Page 164

1    honest with you.

2        A.    Do you know what a mansard roof is?

3        Q.    I know what a mansard roof is.

4        A.    Okay.

5        Q.    And I call it a mansard too, but I understand

6    it's like six feet high.

7        A.    Well, this is a Polynesian-style mansard

8    system, metal mansard system around these buildings,

9    and those drained fantastically, pretty steep slope on

10   them.  Flat roofs --

11       Q.    Oh, I see what you're saying, because, yeah,

12   they are not quite 90 degrees but they are pretty

13   close.

14       A.    Right.

15       Q.    Okay.

16       A.    Well, some it it's this steep, some of it's

17   not quite as, but the flat roof systems don't drain

18   well at all, never have.

19       Q.    Did this particular flat roof, the EPDM

20   portion of the roof on the roof that you inspected,

21   did it drain well?

22       A.    I would have had to be there during a heavy

23   rainstorm to be able to tell you whether it drained

24   better than average or worse than average, I didn't

25   have a slope meter with me, again, I'm not focused on

1    those kinds of evaluations, but flat roof systems like

2    this one don't drain well, it's just a problem with a

3    flat roof system.

4        Q.    But as it relates to the roof that you went

5    on at Knights Inn you don't know; is that right?

6        A.    I do know, flat roof systems don't drain

7    well, and this was a flat roof system, the EPDM system

8    was a flat roof system.

9        Q.    Other than your communications with Ms.

10   Visram and other than that brief meeting that you

11   testified to where you didn't discuss the claim, that

12   would have been face-to-face, she had described it as

13   when she finished her examination under oath you were

14   out there, you kind of exchanged pleasantries and then

15   you went in to give your testimony; does that sound

16   about right, a face-to-face?

17       A.    With Ms. Visram?

18       Q.    Yeah.

19       A.    And where was this, when was this you say?

20       Q.    When she said she was finishing giving her

21   examination under oath you were out in the waiting

22   area and that she met you at that time.  She said that

23   was the only time that she ever met you personally.

24       A.    She may be right, I don't remember the

25   specifics, I know I've met her, I've talked to her

1    more times than I've met her, but I don't -- I'm glad

2    you reminded me of that.  Was that in Birmingham?

3         Q.    I don't know.

4         A.    Okay.  I can't remember.

5         Q.    Other than your communications with Ms.

6    Visram have you had any communications with anyone on

7    behalf of Haman, Inc., any other employee, contractor,

8    what have you?

9         A.    Not me personally, I don't think I ever spoke

10   to Sheila, if she says in her deposition I did I would

11   recommend you go with her memory instead of mine, but

12   I can't remember as I sit here that I ever spoke to

13   Sheila.

14        Q.    That would be Ms. Allen?

15        A.    I think that's Sheila Allen who was the

16   manager, I'm talking about the lady that was the

17   manager when we were first employed, of Knights Inn, I

18   can't think of anyone else other than Ms. Visram that

19   I spoke to on this matter on the ownership side.

20        Q.    Did you have any conversations with any

21   maintenance people?

22        A.    Me personally?

23        Q.    Yes.

24        A.    I don't remember any.

25                    MR. CONCHIN:  What number was

Page 167

1    Brookstone?

2        A.    46 looks like.

3                    MR. TAYLOR:  We need to take a break.

4                    THE VIDEOGRAPHER:  Off the record at

5    2:43.

6                    (Discussion off the record at

7                    2:43 p.m.)

8                    THE VIDEOGRAPHER:  Back on the record

9    at 2:56.

10   BY MR. TAYLOR:

11       Q.    Mr. Howarth, let me show you what's been

12   marked as Exhibit 47 for identification.

13                   (Reporter marks document as

14                   Defendant's Exhibit No. 47 for

15                   identification.)

16       Q.    I believe that this is The Howarth Group's

17   estimate of damages in connection with the fire claim;

18   is that correct?

19       A.    Correct.

20       Q.    And the total amount of this estimate at

21   replacement cost is $1.1,679,975.33; is that right?

22       A.    Correct.

23       Q.    And if I understand your testimony from

24   earlier today this estimate is a joint product by you

25   and Arthur Grandinetti?

1      A.    True.

2      Q.    Is there any --

3      A.    Now, with assistance from Sarah and from FBS,

4    from the experts, but, yes, we're the two that

5    actually are behind all the line items in this

6    estimate and all the scope that's involved.

7      Q.    Is there any portion of this estimate that is

8    just you or is just Mr. Grandinetti?

9      A.    No.

10      Q.    You couldn't divide it out that way?

11      A.    No.

12      Q.    And was this prepared utilizing the Xactimate

13    software?

14      A.    Yes.

15      Q.    And you used for this particular estimate the

16    price list that was in effect in the Bessemer area for

17    August of 2014?

18      A.    That's what it says.

19      Q.    Was it for the Bessemer area of Alabama also?

20      A.    It's Alabama, if BI is Bessemer, then, yes, I

21    don't know, I don't have those memorized, I'd have to

22    look in the Xactimate program.

23      Q.    And the actual inputting and everything, that

24    was done by Mr. Grandinetti into the computer?

25      A.    This is probably Alabama -- Birmingham is my

Page 169

1    guess, I doubt if Bessemer has its own pricing because

2    it's just below Birmingham.  I'm sorry, ask me that

3    last question again.

4                    MR. TAYLOR:  Can you read that back,

5    please.

6                    (Whereupon, the reporter read

7                    the record as requested.)

8         A.    Yes.

9         Q.    Now, when you say that you had input from

10   Forensic Building Science, what you keep calling FBS,

11   did Forensic Building Science have direct input or you

12   had information from them that you then prepared your

13   estimate from?

14        A.    The latter.

15        Q.    So you didn't get a call from Mr. Irmiter or

16   anyone else at Forensic Building Science or have a

17   discussion that said you need to include X, Y and Z?

18        A.    No, I never sent this to FBS for review or

19   anything like that so they had input into this, we

20   used their report and the information obtained from

21   their testing as a part of our decisionmaking to get

22   to this scope.

23        Q.    And the date that this particular estimate

24   was prepared is February 11, 2015; is that right?

25        A.    No, that's the date that -- that is probably

1      the date that Arthur first went to the parameters

2      sheet and created this cover sheet.

3          Q.    Actually I stand corrected.  It appears that

4      this estimate was completed on March 21, 2015.

5          A.    It was printed on that date.

6          Q.    So it was completed at least by that date?

7          A.    This estimate was printed on March 21, 2015,

8      which means, yes, it was completed on that date or

9      prior.

10          Q.    Sometime between February 11, 2015, and March

11      21, 2015?

12          A.    Maybe.  This date entered date, don't

13      conclude anything on that or be careful about

14      concluding anything, because if he -- if Arthur, or

15      any estimator, decides to use an estimate of a similar

16      hotel and pull it over and change the parameters,

17      change the name, address, and then try to use the --

18      whatever scope there is as a template, that date

19      entered is going to be whenever the previous estimate

20      for the previous hotel was originally started, so you

21      can't go -- you can't use that date very well on

22      Xactimate unfortunately.

23              The print date, that's a much more useable

24      date, it tells you at least when this draft was

25      revised and printed; does that make sense?  I hope.

1       Q.    Is this the estimate that constitutes your

2    report of the damages as a result -- in connection

3    with the fire claim?

4       A.    I believe so.

5       Q.    Has there been an adjustment to this

6    particular estimate since this was prepared?

7       A.    Not to my knowledge, but again, without my --

8    all my digital files, I don't have the dates

9    memorized, but to the best of my knowledge this number

10   looks like it's the number that reflects our position,

11   my position, of the loss from the fire to Knights Inn.

12           If there is another one dated later, you've

13   got it.

14      Q.    Well, I will represent to you that this is

15   the only one that I have, I'm just asking if there are

16   any others.

17      A.    Okay.  I think you've got it.

18      Q.    And would this constitute -- if we refer back

19   to Exhibit 38 for identification, Exhibit A, where it

20   talks about:  My report includes the stated opinions

21   that I have regarding the amount of the loss by fire

22   on March 22, 2014 -- what we've now marked as

23   Defendant's Exhibit 47, is that report of the damages

24   from the fire?

25      A.    Yes.

Page 172

1        Q.    That's what that refers to?

2        A.    Yes.

3        Q.    Have you ever been provided with a report

4    from U.S. Helm?

5        A.    I don't remember, the name sounds familiar

6    but I don't remember seeing a U.S. Helm report with

7    regard to the Knights Inn fire loss.

8        Q.    Have you ever been provided with a report

9    prepared by an industrial hygienist, a certified

10   industrial hygienist, retained by Chubb?

11       A.    Not that I remember.

12       Q.    Would it be fair to say then that in

13   preparing the estimate of repair marked as Exhibit 47

14   for identification, you did not consider any opinions

15   that would have been offered by a certified industrial

16   hygienist hired by Chubb in this case; is that right?

17       A.    I think that's accurate.

18       Q.    In looking at the estimate would it be fair

19   to say that this is strictly a replacement cost

20   estimate?

21       A.    Yes.

22       Q.    And that there is -- and I know that there's

23   a column here for ACV, which stands for actual cash

24   value; right?

25       A.    Correct.

1      Q.    But doesn't appear if we look that

2    depreciation has been applied from replacement cost in

3    order to determine actual cash value; is that correct?

4      A.    Not on this estimate, correct.

5      Q.    Do you have an estimate in connection with

6    the fire damages in which you calculated the actual

7    cash value of the damages?

8      A.    I don't have it written out, I can tell you

9    that depreciation on a loss like this, fire loss like

10   this, with the kind of materials being replaced, is

11   going to run in the 12 percent range.

12     Q.    Have you rendered a report that indicates

13   what the actual cash value of the damages are as a

14   result of the fire in your -- that reflects your

15   opinion of that?

16     A.    I don't remember that we prepared a

17   depreciation schedule on this one, I don't remember

18   seeing one.

19     Q.    If you had prepared a depreciation schedule

20   would you have provided that to Mr. Conchin?

21     A.    We would have intended to, yes, for sure, it

22   would have been in my digital file.

23     Q.    And presumably he would have forwarded it on

24   to me.  I will tell you -- well, and last week you

25   spent eight to ten hours reviewing your file; was

1    there anything in the file that you reviewed in

2    preparation for your deposition that indicated that

3    you had calculated the actual cash value of the loss?

4        A.    I don't remember seeing a depreciation

5    schedule, but my personal depreciation schedule isn't

6    something I would have had to review for the

7    deposition, I prepare them personally, and so the only

8    thing I can do is try to remember if I saw it in this,

9    you know, list of documents that are in my digital

10   file.

11           I'm clicking the things I need to review for

12   the deposition, I'm not clicking all of them because I

13   don't need to review everything, so I'm answering you

14   the best I can without seeing that documents folder

15   contents in front of me.

16       Q.    As you sit here today do you remember

17   reviewing a depreciation schedule prepared in

18   connection with the fire claim?

19       A.    No, that's what I said earlier.

20       Q.    Does the estimate that we've marked as

21   Exhibit 47 for identification reflect that all 80

22   rooms in the building or all 80 units in that building

23   were affected by the fire?

24       A.    I don't remember, I'd have to count the

25   units.

1      Q.    Is the estimate that you're holding that

2   we've marked as Exhibit 47 for identification in

3   connection with the fire claim, is that based upon --

4   is the scope for that estimate based upon the report

5   generated by Forensic Building Science?

6      A.    The report generated by FBS was a part of the

7   information we used to create this estimate, but just

8   a part of it.

9      Q.    Well, is it the Forensic Building Science

10   report that told you that all 80 units in the building

11   were affected by the fire?

12      A.    As I sit here, unless you give me the FBS

13   report to double check, I can't vouch for whether or

14   not that's the case.  If it is then we probably have

15   all 80 units included in the estimate.

16      Q.    Did you review the Forensic Building Science

17   report in connection with the fire claim before your

18   deposition?

19      A.    Yes.

20             (Reporter marks document as

21             Defendant's Exhibit No. 48 for

22             identification.)

23             (Reporter marks document as

24             Defendant's Exhibit No. 49 for

25             identification.)

1      Q.    I'm going to hand you two estimates here, the

2      first one is marked Defendant's Exhibit 48 for

3      identification, and the second one is Defendant's

4      Exhibit 49 for identification, and it's two different

5      estimates, what I believe -- well, let me do it this

6      way, let me hand you Exhibit 48 for identification;

7      could you identify for me whether that is an estimate

8      relating to the wind or the fire claim?  I think it's

9      the wind claim, even though it has the date of loss of

10     the fire.

11                    MR. CONCHIN:  Right, I think you're

12     right.

13     A.    This is wind.

14     BY MR. TAYLOR:

15     Q.    And is that an estimate to repair all of the

16     damages that The Howarth Group determined was damaged

17     by wind in April 2015 -- excuse me, April 2014?

18     A.    This is one of the drafts, I don't see the

19     interior damages here, it looks like interior scope is

20     pending.

21     Q.    Let me show you what I have marked as Exhibit

22     49 for identification, and is that what's included

23     with the estimate that we've marked as Exhibit 48 for

24     identification plus the interior damages?

25     A.    Yeah, Exhibit 48 print date is September 9,

Page 177

1      2015, Exhibit 49's print date is February 7, 2016, so

2      this is -- Exhibit 49 is a more complete reflection of

3      our valuation of the loss from the tornado damage.

4          Q.    Fair enough.  Because the totals on the

5      estimate that we've marked as Exhibit 48 for

6      identification is a little over $1.3 million, and then

7      the estimate that we've marked as Exhibit 49 for

8      identification is a little shy of 1.6 million; is that

9      correct?

10         A.    Correct.

11         Q.    Was the estimate here with a print date of

12     February 7, 2016, was that based upon a scope or a

13     report prepared by some third party so that you knew

14     what to include within the estimate?

15         A.    It included the reading of the protocols of

16     the FBS report for the tornado loss.

17         Q.    Again, FBS being Forensic Building Science?

18         A.    Correct.

19         Q.    So you had the Forensic Building Science

20     report at the time that the estimate that we've marked

21     as Exhibit 49 for identification was prepared?

22         A.    As of February 7 of 2016 I'm pretty sure we

23     did.  I'd need to see the FBS report on the wind to

24     confirm for sure.

25         Q.    Did you move --

Page 178

1      A.    But it would make sense to me that we did.

2      Q.    Did you review the Forensic Building Science

3    report in preparation for your deposition?

4      A.    Yes.

5      Q.    You don't remember if you had the Forensic

6    Building Science report at the time that the estimate

7    that we've marked as Exhibit 49 for identification was

8    completed?

9      A.    Oh, no, I didn't memorize dates on reports

10   for this deposition, never do.  If you've got it let's

11   look at it and I can answer your question, that's

12   easy, this isn't a memory test I'm sure, if you want

13   an accurate answer give me the report and I'll tell

14   you.

15     Q.    So what we've marked as Exhibit 48 for

16   identification is an earlier draft of the estimate

17   that we're talking about that we've marked as Exhibit

18   49 for identification?

19     A.    Yes, Exhibit 48 is an early draft only

20   partial of the tornado damage loss that Exhibit 49 is

21   a more complete and maybe final version of the tornado

22   damage loss.

23     Q.    Who provided the April 28, 2014 date of loss,

24   who made that determination?

25     A.    What I remember is Bruce Bodor, who worked

1        Alabama for us, when he learned about it -- it seems

2        to me that Bruce was the first one to suggest I'll bet

3        this was that April tornado.

4            Q.    Who made that determination?

5            A.    So that would have been the start of it, we

6        would have then talked, we -- I don't remember that I

7        was involved in this conversation with Zarin but maybe

8        I was -- with Zarin to get whatever knowledge she had,

9        and/or anybody else on site if the maintenance people

10       were still available to try to determine that, it was

11       pretty clear from the photos this was a tornado-style

12       event, this metal looked like it had been in a debris

13       field of a tornado, you don't see this kind of debris

14       impact on finished metal roofing from your average

15       super-cell squall line thunderstorm, this looked like

16       -- this building had been just peppered, this metal

17       was scraped, scratched, there were pieces hanging,

18       there were pieces missing, and then when Arthur

19       finally got on the flat part of it there were

20       punctures to the EPDM membrane, which you would expect

21       with all that metal flying around, and so at some

22       point it was concluded, and I think ultimately the

23       final decision was that of FBS, but everybody

24       concurred once we started seeing the damage, this

25       looks look a debris field tornado loss, and sure

Page 180

1    enough, that's what it was.

2        Q.    What's the date that Arthur Grandinetti first

3    contacted you and said he thinks there's wind damage?

4        A.    As I said before, it was sometime in that

5    first quarter of 2015, it was whenever he was there,

6    best I remember, to evaluate the fire loss.

7        Q.    Well, I guess I'm trying to understand, had

8    he been out there for a while already or is it the

9    first time he was out there that he made that

10   determination, do you know?

11       A.    He was out there for days, he and Sarah were

12   there for days to do all the work they had to do to

13   photograph and scope and measure and everything that

14   goes into preparing an estimate on the fire loss, a

15   fire loss of this size, and the best I remember it was

16   while he was there on his first trip.

17            I can't tell you whether they made more than

18   one trip for the fire loss, I just don't remember.

19   They know, they'll probably have that in their

20   records, and he can tell you probably better than I

21   can what the date of that conversation was.

22       Q.    Did you make any notes when he called you?

23       A.    Did I?  No, not that I can remember.

24       Q.    Does the estimate that we've marked as

25   Exhibit 47 for identification in connection with the

Page 181

1    fire loss, does it call for replacement of the roof?

2        A.    Where is 47?

3                    MR. CONCHIN:  I'll get it.

4        A.    Is 47 the fire --

5    BY MR. TAYLOR:

6        Q.    Yes.

7        A.    No, it doesn't.

8        Q.    Does not?

9        A.    If it does it's a huge mistake in there.

10       Q.    Can you just double check real quick, see if

11   that calls for replacement of the roof to that

12   building?

13       A.    You know, there might be some roof, there

14   might be some roofing in here.

15                   MR. CONCHIN:  What was your question,

16   Wayne?

17                   MR. TAYLOR:  I asked if the estimate

18   for the fire claim included replacement of the roof.

19       A.    I don't see any roofing whatsoever in the

20   recap by category, so, no.

21   BY MR. TAYLOR:

22       Q.    And the estimate in connection with the wind

23   claim that calls for replacement of all three roofs?

24       A.    I believe it does.

25       Q.    Was your company provided with information

Page 182

```
 1        from a third source, such as Forensic Building

 2        Science, regarding the scope of the interior water

 3        damages as a result of the tornado, or is that

 4        something that Mr. Grandinetti and/or you determined

 5        on your own?

 6             A.    Most of the time we determine that on our

 7        own, we don't rely on an expert for that.

 8             Q.    What about in this case?

 9             A.    Now, the FBS report may address some interior

10        water damage, but we never, that I can remember, rely

11        on a third party to tell us where there are stains and

12        what rooms, we do those walk-throughs ourselves.

13             Q.    No, no, my question wasn't determining where

14        there were water stains, I'm talking about that if

15        those water stains related to the wind claim.

16             A.    We make that determination ourselves, and we

17        welcome any opinions that our experts have, or we

18        welcome any opinion about that, we do the best we can

19        to avoid preexisting.

20             Q.    Were you ever provided with copies of the

21        Young & Associates estimates of repair in connection

22        with the fire claim, estimate of repair, I should say.

23             A.    I don't remember.

24             Q.    Were you ever provided with the Young &

25        Associates estimate of repair in connection with the
```

1      wind claim?

2          A.    I think I was, I think I remember seeing a

3      Young & Associates estimate on the wind claim,

4      somewhere around 43 grand.  I don't remember seeing

5      one on the fire claim, but if I did you've got it and

6      it was in my file.

7          Q.    You don't remember reviewing it last week

8      when you were preparing for your deposition?

9          A.    I wouldn't have reviewed it, I would not

10     review the Young & Associates estimate in preparation

11     for this deposition.  If you've got a question about

12     it you'll have to produce it to me and I'll be happy

13     to answer your question.

14         Q.    The estimate of repair in connection with the

15     wind claim, this was also done utilizing Xactimate?

16         A.    Yes, ours, yes, ours was.

17         Q.    And in this case we used the price list from

18     January of 2016?

19         A.    That's correct.

20         Q.    For an April 2014 loss?

21         A.    Correct.

22         Q.    Is there a reason why you used a 2016 price

23     list instead of a 2014 price list?

24         A.    I don't know why Arthur did that.  Frankly

25     they both should be updated to current price list

Page 184

1      because this is a replacement cost policy, be

2      important to know what it's going to cost to redo all

3      this at today's prices.

4          Q.    Is it important to know what the price list

5      is on the date of loss?

6          A.    You can't do that, that's not practical.  It

7      probably -- it might have been a good idea to be

8      closer to the date of loss.  What I don't know is

9      whether roofing prices have gone up -- went up or

10     down.  Frankly right now they're at a long-time low,

11     so I don't know who gained any advantage to that.

12         Q.    In any event the price list that was used in

13     connection with the estimate that's been prepared for

14     the wind claim that we've marked as Exhibit 49 for

15     identification is using a price list from January

16     2016?

17         A.    Correct.

18         Q.    And this is strictly a replacement cost

19     estimate; is that right?

20         A.    Correct.

21         Q.    And there is no indication on here that

22     depreciation was applied in order to arrive at the

23     actual cash value of the damages in connection with

24     the wind claim; is that right?

25         A.    Correct.

1      Q.    Did you separately create a schedule of

2    depreciation in order to calculate the actual cash

3    value of the damages?

4      A.    Not that I remember.

5      Q.    When you reviewed the documents in your file

6    last week in preparation for your deposition do you

7    recall seeing that there was even in existence any

8    depreciation schedule or other document that

9    calculated the actual cash value of the damages in

10   connection with the wind claim?

11     A.    I don't remember seeing one.  This would be

12   pretty easy, the depreciation would be 20 percent.

13     Q.    Just across the board?

14     A.    Yeah, I would do it across the board on the

15   roofing.  Most of this is roofing, 18 percent or so is

16   interior.  The interior, lot of painting, so I would

17   just do an across the board.  It's going to fall about

18   20 percent.

19     Q.    But you haven't actually done that

20   calculation yet?

21     A.    I have done it in my head but I don't have a

22   depreciation schedule.  This is a lot easier than --

23   this would take longer to do because you have more

24   line items to actually apply depreciation to.

25     Q.    The roof -- the EPDM roof that was up on the

1    three buildings, we talk about a 50-year roof, a

2    20-year roof, et cetera; what was this roof?

3         A.    I don't know, I don't remember what metal the

4    EPDM was.

5         Q.    Would you need to know the expected life --

6    the life expectancy for the roof in order to be able

7    to calculate depreciation?

8         A.    Because of what I saw on this roof I started

9    with the max in that -- to get to the 20 percent,

10   which is 50 percent, reduced that by 50 percent so

11   we're not depreciating labor, which gets you to 25

12   percent, and then drop that five percent because we

13   have a lot of interior work that's not going to be

14   depreciated, some of the materials wouldn't be

15   depreciable on the interior work, and that's how I got

16   to the 20 percent depreciation.

17        Q.    I'm not sure if I need to ask you about this

18   so I'll ask it this way, we have these contents

19   inventories that I'm holding that Sarah Grandinetti

20   prepared; did you review them for accuracy, are you

21   going to be testifying about contents damages in this

22   case?

23        A.    I reviewed them before they were submitted, I

24   will probably not be the one who is going to be

25   testifying to their accuracy because Sarah is the one

1     who did virtually all the work to compile those lists,

2     but if --

3             MR. TAYLOR:  I am looking to you, and

4     it will save some time if I don't need to question him

5     about the contents inventories if he's not going to be

6     giving any expert testimony on the contents

7     inventories.

8             MR. CONCHIN:  He's the keeper of record

9     as to The Howarth Group, but Sarah would be -- Sarah

10    will testify to the contents more precisely than Mr.

11    Howarth would; is that fair?

12            MR. TAYLOR:  Well, if he's --

13     A.   Yeah, I could talk to you about general

14    totals and that sort of thing.

15            MR. TAYLOR:  I guess I need something a

16    little more specific, Gary, if he's going to -- is he

17    going to provide any expert testimony on the damage to

18    the contents?

19            MR. CONCHIN:  He has, he said he

20    reviewed them, but if you -- you know, Sarah knows

21    more about it.

22            MR. TAYLOR:  I understand that, you

23    know, and Judge Bowdre is not going to let two

24    witnesses get up and testify to the same thing, so,

25    you know, I'm just asking which one is it going to be.

Page 188

1     If it's not going to be him then I can move on to

2     something else.

3                     MR. CONCHIN:  Well, I'm not going to

4     presume what she's going to allow, they have different

5     roles, his was checking, grading the papers, and he

6     has 40 years of experience to do it, I think he's

7     testified he reviewed them, I mean that's -- and he

8     told you that she knows more about it.  I don't know

9     what else we can say.

10    BY MR. TAYLOR:

11        Q.    Do you agree with that?

12        A.    I agree with that.

13        Q.    Sarah Grandinetti is the best person to be

14    asking about the contents inventory and the damages

15    claim and the pricing and the depreciation and

16    anything else that's in here?

17        A.    Yes.

18        Q.    And not that she's necessarily more

19    qualified, but as it relates to this case and the wind

20    claim and the fire claim and the contents damages

21    claim, she would be more qualified than you?

22        A.    She is more knowledgeable about those

23    documents and how all those numbers were arrived at

24    and how the items listed were included than I am.

25                     MR. CONCHIN:  And she's better looking.

Page 189

```
 1          A.     Far better looking, nicer.

 2                     MR. CONCHIN:   Sweeter.

 3          A.     More pleasant to be around.

 4     BY MR. TAYLOR:

 5          Q.     I'll show you what has been marked as Exhibit

 6     50 for identification.

 7                     (Reporter marks document as

 8                     Defendant's Exhibit No. 50 for

 9                     identification.)

10          Q.     This is an e-mail exchange between you and

11     Brent Perich on July 22 and 23, 2015; is that correct?

12          A.     Correct.

13          Q.     And in the Re line it reflects only the March

14     2014 fire loss; is that correct?

15          A.     Whose e-mail are you talking about?

16          Q.     Both of them, it says:  Subject, insured

17     Haman d/b/a Knights Inn slash --

18          A.     Let's pick one so I know what you're talking

19     about and then we can go to the other.  If you're

20     talking about my e-mail at the top it does use the

21     identical subject line that Brent put in only because

22     I hit reply and it just kind of keeps the same deal.

23          Q.     And Mr. Perich's e-mail the subject line

24     reflects only the March 2014 fire loss; correct?

25          A.     The subject line does, yes.
```

1       Q.    Did you know that Mr. Perich had absolutely

2    nothing to do with the wind claim?

3       A.    Mr. Perich was aware of it.

4       Q.    No, that wasn't my question.  Do you know

5    that Mr. Perich had nothing to do with investigating

6    or adjusting the wind claim?

7       A.    I thought he did.

8       Q.    You thought he was the adjuster?

9       A.    I knew he was aware of it.  That's a

10   different story, you said absolutely nothing to do.

11   Now, that's much broader than to say whether he was

12   the front adjuster on it, that's a big difference.

13            This is the e-mail right here that Brent sent

14   me that led me to conclude that he was naming Wade

15   Bushman in conjunction with all disputed building

16   damages, and by this time Mr. Perich knew there was a

17   dispute on the wind and the fire.

18       Q.    All right.

19       A.    So this is why it was clear to me from Brent

20   that Mr. Bushman was the appraiser on both, and then

21   when Mr. Bushman confirmed that and I drafted the DOA

22   document, sent that to him for signature and he signed

23   it, it was clear to me that that's the case.

24       Q.    All right.  Well, let's read this, July 22,

25   from Mr. Perich to you:  Subject:  Insured, colon,

Page 191

1    Haman, Inc. d/b/a Knights Inn, slash, 3-22-14 fire

2    loss, slash, assignment of appraiser.  That's what it

3    says, right, did I say it correctly?

4         A.   You read that perfectly.

5         Q.   Mr. Howarth, in follow-up to my last exchange

6    on July 18 Chubb has elected to proceed with Wade

7    Bushman of Young & Associates as their appraiser in

8    conjunction of disputed building damages.  That's all

9    it says; right?

10        A.   Yeah, but that's --

11        Q.   It doesn't say all building damages, does it,

12   it just says of disputed building damages.

13        A.   It doesn't say of the fire damages, does it,

14   which it should if that's all he's doing.

15        Q.   Well --

16        A.   The disputed building damages as of the date

17   of this writing were the tornado damages and the fire

18   damages.

19        Q.   But the reference line, the subject line,

20   only references the fire loss; correct?

21        A.   Oh, I hear you, that's your focus, my focus

22   is on what the guy actually wrote here.  It's fine --

23   look, when I'm writing in a subject line I just put

24   what little bit I have to, I want to get to the meat

25   of the discussion, and Mr. Bushman confirmed to me he

Page 192

1     was the appraiser on both.

2          Q.    I'm not talking about --

3          A.    And he signed a document that said he was.

4          Q.    Sir, I'm just talking about your

5     communication with Mr. Perich, the subject line only

6     references the fire loss; correct?

7                    MR. CONCHIN:  C'mon, asked and

8     answered.

9          A.    Correct, but the rest of it references both.

10    BY MR. TAYLOR:

11         Q.    In your opinion.

12         A.    In my opinion, yes, sir, that's what I'm here

13    to give you.

14                    MR. CONCHIN:  Yeah.

15                    (Reporter marks document as

16                    Defendant's Exhibit No. 51 for

17                    identification.)

18    BY MR. TAYLOR:

19         Q.    I'll show you what's been marked as Exhibit

20    51 for identification, and this is a series of e-mail

21    exchanges between you and Randy Wilburn starting in

22    August of 2015 and running up through November of

23    2015; is that correct?

24         A.    Correct.

25         Q.    And the subject line on every e-mail in this

Page 193

1    string of e-mails references wind damage; correct?

2         A.    Looks like you're correct.

3         Q.    And it was Mr. Wilburn that you were

4    communicating with as it relates to the wind claim; is

5    that right?

6         A.    In this set of e-mails, yes.

7         Q.    Well, between August and November of 2015;

8    correct?

9         A.    In this set of e-mails, correct.  I don't

10   know if I didn't have -- I had communications with

11   Brent Perich on the wind claim, I don't know whether

12   any occurred between these dates, if they did you

13   haven't copied them in this set of e-mails and I'm not

14   about to testify that they may not have -- that they

15   didn't exist because I just don't remember as I sit

16   her.

17        Q.    Do you have any e-mail communications or

18   exchanges with Mr. Perich where the subject line

19   references the wind claim?

20        A.    I don't remember.

21        Q.    With regard to --

22        A.    But I do have e-mails where what he wrote

23   addresses and includes the wind claim.

24        Q.    With regard to this set of e-mails that we

25   marked as Exhibit 51 for identification, and I'm not

1    asking whether you agree or don't agree, but Mr.

2    Wilburn is expressing his position that appraisal is

3    not yet appropriate; is that right?  I'm not saying

4    that you have to -- I'm not asking you to agree with

5    it, I'm just saying he's just expressing his opinion

6    that appraisal is not appropriate --

7        A.    You're asking --

8        Q.    -- for the wind claim; is that right?

9        A.    I don't know, I haven't read them.

10       Q.    Go ahead.

11       A.    Do you want me to take time to read them?

12       Q.    Sure.

13       A.    Or you could point out the lines to me

14   specifically.  I'm not trying to be difficult, I just

15   -- you've asked me a question, I want to be accurate.

16       Q.    Well, and actually some of these are -- at

17   least one of these started off with an e-mail at the

18   beginning in August of 2015 to Ms. Visram; correct?

19       A.    Yes, the first one at the end of this on the

20   last two pages of this exhibit, it looks like in the

21   third paragraph he says:  Also, we cannot go to

22   appraisal if there is an issue of coverage.

23       Q.    Right.

24       A.    That's false, but --

25       Q.    Well, he does say that, though; right?

Page 195

1      A.    He says that, yes, he does.

2      Q.    And he also indicates he did not receive a

3    response from -- this is to Ms. Visram -- not received

4    a response from you explaining what you disagree with

5    in our estimate, right, he says that in the first

6    paragraph of his e-mail to Ms. Visram?  Middle of the

7    paragraph.

8      A.    Yes, I see that, that's right.

9      Q.    And then you responded to this e-mail in

10   September, indicating that you have completed your

11   evaluation of the loss, you being The Howarth Group;

12   right?

13     A.    The appraiser for Knights Inn, correct.  He's

14   requesting information and we're going to provide it

15   to him.

16     Q.    And you're trying to provide it to them.  And

17   if you turn there's an e-mail from Mr. Wilburn on the

18   second page to you on September 17, 2015, where he's

19   again explaining that they haven't agreed -- that

20   Chubb has not agreed to go to the appraisal process,

21   that the insurance company and the insured must

22   disagree on the amount of the loss, and he says we've

23   not reached that point, that's what he says; right?

24     A.    Yeah, and it goes on to say if at that point

25   we disagree on the amount of the loss and if we have

1    no coverage issues we will then enter the appraisal

2    process, at that point we will hire an appraiser to

3    discuss the claim with you.

4        Q.   Well, I think we're reading from different

5    e-mails, sir, I'm looking at the bottom of page 2.

6        A.   I'm at the bottom of page 3, you've gotten

7    ahead of me.

8        Q.   I was asking you about the bottom of page 2.

9        A.   Okay.

10       Q.   Mr. Howarth, this is a September 17, 2015

11   e-mail to you, right, and it says:  Dear Mr. Howarth,

12   we have not yet entered the appraisal process.  That's

13   what it says; right?

14       A.   That's what he says.

15       Q.   In order to do so the insurance company and

16   the insured must disagree on the amount of the loss.

17   That's what it says; right?

18       A.   That's what he said.

19       Q.   We've not yet reached that point.  I'm

20   working with Ms. Visram to try and agree on the amount

21   of loss.  We also may -- we may also have a coverage

22   issue which cannot be appraised.  That's what he says;

23   right?

24       A.   That's what he said.

25       Q.   And then the last sentence:  I do not know

1     Wade Bushman and I have not hired him as our

2     appraiser.  That's what it says; right?

3         A.    That's what he says.

4         Q.    And then you respond to him on the same day

5     and indicating that Ms. Visram, i.e. Knights Inn,

6     intends to use -- it says my valuation, but

7     essentially The Howarth Group's valuation of the loss

8     as her claim submission; is that right?

9         A.    Yes, Ms. Visram asked us to value her loss

10    and intended to use that as her response to Mr.

11    Wilburn's request for information about the areas of

12    difference.

13        Q.    In fact you specifically state:  She -- being

14    Ms. Visram -- intends to use my valuation, that being

15    The Howarth Group's valuation, of the loss as her

16    claim submission since she hired me as her appraiser

17    for the appraisal process; right?  That's what it

18    says?

19        A.    That's what it says.

20        Q.    And then the final e-mail on November 10 on

21    the first page at the top, it says Mr. Horvath, I

22    think he just misspelled your name, but --

23        A.    I think I ticked him off.

24        Q.    I don't think it was intentional.  He said:

25    Mr. Horvath, as I have previously explained, this

Page 198

1     claim is not appropriate for appraisal at this time.

2     That's what he says, first sentence of that e-mail to

3     you; right?

4          A.   You read his statement accurately.

5                    MR. TAYLOR:  We have to take another

6     break for the videographer.

7                    THE VIDEOGRAPHER:  Off the record at

8     3:39.

9                    (Discussion off the record at

10                    3:39 p.m.)

11                    THE VIDEOGRAPHER:  Back on the record

12    at 3:42.

13    BY MR. TAYLOR:

14         Q.   Mr. Howarth, let me show you what's been

15    marked as Exhibit 52 for identification.

16                    (Reporter marks document as

17                    Defendant's Exhibit No. 52 for

18                    identification.)

19         Q.   And this is a two-page document, the first

20    one being an e-mail from Wade Bushman to you dated

21    January 11, 2016, and the second one being a

22    declaration of appraisers; did you receive this

23    e-mail?

24         A.   I'm sure I did.

25         Q.   And he says:  Good afternoon, Chuck, please

1      see the attached DOA.  I assume that means declaration

2      of appraisers; right?

3          A.     Correct.

4          Q.     Which includes two date of losses, 3-22-14

5      and 4-28-14.  To date, I, Wade Bushman, have only been

6      retained to represent the carrier on the fire loss

7      dated 3-22-14.  I do not know Chubb's intentions on

8      the wind loss dated 4-28-14 regarding appraisal

9      process.  Is that what it says?

10         A.     That's what it says.

11         Q.     And then this is the original declaration of

12     appraisers, right, that was -- the two of you signed?

13         A.     This is the one we both signed with both

14     dates back when he told me he was the appraiser on

15     both losses.

16         Q.     And then he realizes his error and he has

17     forwarded you this e-mail; right?

18         A.     I think he was told to change things because

19     this e-mail is sent just before Chubb pulls the rug

20     out from under both appraisals.

21         Q.     Do you know this or is this just your

22     opinion?

23         A.     Yes, sir, dirty stuff going on behind the

24     scenes.

25         Q.     This is what you think; right?

Page 200

```
 1          A.     Yes, sir.

 2          Q.     It's not what you know?

 3          A.     This is closer to what I know than what I

 4     think.

 5          Q.     Okay.  Do you have any --

 6          A.     Because I had the conversations with Mr.

 7     Bushman, not you.

 8          Q.     Do you have any document that shows that this

 9     was anything other than a mistake?

10          A.     It is my opinion it is other than a mistake

11     based on --

12          Q.     I didn't ask your opinion, I just said do you

13     have any documents --

14          A.     You don't get to interrupt me, you ask the

15     questions, I get to give you the answers.

16          Q.     All right.  Sure.

17          A.     Let me finish and then you can ask a

18     question.  I had the conversations with Mr. Bushman,

19     repeated conversations, we worked through the process

20     of an umpire selection, we both agreed to an umpire

21     and we discussed the need for an umpire who was

22     capable of handling both the wind and the fire loss.

23                 There was no question in Mr. Bushman's mind,

24     he was the appraiser on both, we picked an umpire for

25     both, and there's an e-mail where Mr. Perich
```

1      specifically states he is selected for all disputed

2      damages at this property, which includes both, so,

3      look, I know --

4          Q.   And he uses the word "all" --

5          A.   I know the way this -- I know the way this

6      thing was set up originally, and people on Chubb's

7      side are trying to slip out of an appraisal process

8      improperly, and in my opinion that's what's going on.

9      That's what you're going to get here and you're not

10     going to convince me of anything otherwise.  I'm the

11     guy that had the conversations.

12         Q.   I'm not trying to convince you and change

13     what you think.

14         A.   Well, my opinion is bothering you, I can tell

15     that, but my opinion is valid and it's based on the

16     facts.

17         Q.   Sir, we're allowed to disagree and that's

18     okay and that's fine, I want to know what documents

19     you have that support what you just said.

20         A.   All the e-mails, the declaration of

21     appraisers form, those are documents, they certainly

22     verify with Mr. Bushman's signature on it that he

23     agreed he was the appraiser for both losses.

24         Q.   Did you sign another declaration of

25     appraisers that only listed the fire loss?

Page 202

1      A.    I did at his request.

2      Q.    And you agreed to do that?

3      A.    Well, sure, he was already the appraiser on

4   the fire loss.  The fact that Chubb pulled him out of

5   the wind loss I don't have any control over, so he

6   wouldn't move any further unless we had a DOA form

7   with only the fire loss.

8           I've got a hotel here that's going to pot, we

9   need to get this thing going and nobody is moving,

10  they're playing games with the forms and who's going

11  to be appraiser for this, that and the other, and,

12  sure, I did the form because it's the only way to try

13  to get this poor lady taken care of and the damages to

14  this hotel dealt with.

15     Q.    Let me show you what's been marked as Exhibit

16     53 for identification.

17             (Reporter marks document as

18             Defendant's Exhibit No. 53 for

19             identification.)

20     Q.    This is an e-mail that you sent to Wade

21  Bushman on January 11, 2016, after the e-mail that

22  we've marked as Exhibit 52 for identification; do you

23  recognize that, sir?

24     A.    I don't.

25     Q.    Is that your correct e-mail address?

Page 203

1       A.    It is, it's a weird font, that's why I say --

2     it's not a font I typically use, but let me read it,

3     give me just a moment.

4                    (Whereupon, the witness

5                     reviewed the document.)

6       A.    Yes, I remember writing this.  I don't know

7     how I could improve on the language.  We both thought

8     you were also on the wind loss to start with.  That

9     has changed.

10      Q.    Only the fire loss is in appraisal as I

11    understand it.  Is that what it says?

12      A.    That's right, at this time, January 11, 2016,

13    and he wouldn't move forward and do anything until he

14    got my agreement to a DOA form that only had the fire

15    loss, so, look, I'm happy to do that, it doesn't

16    change the facts of the past, but if it took this to

17    get him to go forward, sure.

18      Q.    So you did send this e-mail to him?

19      A.    That is an -- those are accurate words there,

20    yes, I did.  And you'll notice he didn't contradict

21    this, did he, he didn't write me back saying, wait a

22    minute, wait a minute, I didn't -- you said we both

23    thought I was the appraiser on the wind loss, he never

24    wrote back saying that was incorrect, notice.

25      Q.    Let me show you what's been marked as Exhibit

Page 204

1      54 for identification.

2                     (Reporter marks document as

3                     Defendant's Exhibit No. 54 for

4                     identification.)

5          Q.    It's a declaration of appraisers as well as

6      selection of an umpire signed by the umpire; is that

7      correct?

8          A.    Yes, this is the second one the umpire

9      signed.

10         Q.    Is there one signed by the -- is the first

11     one that showed both dates signed by the umpire?

12         A.    I believe so, yes.

13         Q.    I've got to be honest with you because I

14     haven't seen that, so if you have a copy of that I

15     would certainly love to see that.

16         A.    Yeah, it's in my digital file I'm 90 percent

17     sure.

18                     MR. CONCHIN:  I'm not sure I've ever

19     seen it.

20                     MR. TAYLOR:  I'm not either, so I'm

21     going to put it on the list and we'll just kind of go

22     from there.

23         A.    Yeah, put it on the list, if I'm mistaken

24     I'll admit it.

25     BY MR. TAYLOR:

Page 205

1          Q.    In any event this is the declaration of

2    appraisers that we've marked as Exhibit 54 for

3    identification showing the date of loss of March 22,

4    2014, which is the fire loss; right?

5          A.    Correct.

6          Q.    Signed by both you and Mr. Bushman?

7          A.    Correct.

8          Q.    And we've agreed to Mr. Mullin to serve as

9    the umpire?

10         A.    Correct.

11         Q.    And Mr. Mullin is signing off at that point?

12         A.    Correct.

13         Q.    And somewhere along the line Chubb wanted a

14   proof of loss and some documents and an examination

15   under oath and things subsequently were then put on

16   hold, that's your understanding; right?

17         A.    No, we were -- just before meeting, the three

18   of us with our umpire -- two of us with our umpire,

19   and Chubb, according to Mr. Bushman, told him to shut

20   down the appraisal.

21         Q.    Told him to stop?

22         A.    Told him to do nothing more as the appraiser,

23   he shut -- they shut -- they killed the appraisal.

24   No, there was no explanation as to why.

25         Q.    Okay.  Fair enough.

1      A.    There was no request for an EUO, none of that

2    stuff, all of which they can get while the appraisal

3    goes on of course.  They shut down this lady's right

4    to appraisal and just -- this place has gone to pot

5    now.

6      Q.    So the appraisal process was stopped and you

7    were never provided with an explanation?

8      A.    No.

9      Q.    Okay.

10     A.    Not from Mr. Bushman.  I don't think I got

11   anything from anybody at that point.

12     Q.    I'll show you what's been marked as Exhibit

13   55 for identification.

14              (Reporter marks document as

15              Defendant's Exhibit No. 55 for

16              identification.)

17     Q.    And this is a letter from Ms. Visram to Brent

18   Perich dated February 9, 2015, and have you ever seen

19   this letter before?

20     A.    I don't remember if I have or not.

21     Q.    Well, let me explain why I'm asking, when I

22   took Ms. Visram's deposition about a month ago and I

23   showed her this letter she said that somebody wrote it

24   for her and she just signed it, so I'm trying to find

25   out who actually wrote this letter for her.

1          A.    It should -- I would think that would show up

2     in e-mail, it would certainly show up in my e-mails if

3     I wrote it for her, I would have sent her a draft by

4     e-mail, that's how I do it, so if you didn't see it, I

5     don't remember this, this doesn't look like my

6     wording, but I'm just going from memory.

7          Q.    Is this watermark up in the top left corner,

8     is that something that comes from your company?

9          A.    No, that Purina looking --

10         Q.    Exactly, like Purina Dog Chow.

11         A.    It doesn't -- this is way early on, she's

12    wanting them to only contact her and not her manager,

13    I remember that being an issue, this might have been

14    Bruce that helped her draft this, I'm just guessing

15    for you to help you get to the --

16         Q.    I understand.  When I asked her if she

17    remembered who helped her she didn't remember, she

18    just knew she didn't draft it herself, so I'm trying

19    to find out who would have drafted this for her.

20         A.    Yeah, I don't think I did, my guess is Bruce

21    is the one who did it.

22         Q.    Bruce Bodor?

23         A.    Bruce Bodor, yes, I'm sorry, should have said

24    his whole name, but that's just a guess.

25                   (Reporter marks document as

1                  Defendant's Exhibit No. 56 for

2                  identification.)

3        Q.    Let me show you what's been marked as Exhibit

4        56 for identification, this is another letter from Ms.

5        Visram to Chubb, dated March 17, 2015.

6                       MR. TAYLOR:  Did I say 57?  I meant 56.

7                       THE REPORTER:  56.

8                       MR. TAYLOR:  I said it right?

9                       THE REPORTER:  Uh-huh.

10                      MR. TAYLOR:  I'm getting ahead of

11       myself.

12       Q.    Have you ever seen this letter before?

13       A.    I don't remember seeing it.

14       Q.    Again, when I asked Ms. Visram about it,

15       whether she drafted it or someone else did, she said

16       someone drafted it for her.  Do you know if -- you

17       didn't draft it for her, did you?

18       A.     No, I don't think so, if I did my e-mails

19       would show the draft being sent to her.  I don't know

20       who drafted it for her, I could guess again but I'm

21       not helping you at all.

22                  (Reporter marks document as

23                  Defendant's Exhibit No. 57 for

24                  identification.)

25       Q.    I'll show you what's been marked as Exhibit

1      57 for identification, this is a September 10, 2015

2      letter from Ms. Visram to Brent Perich in connection

3      with the fire loss; have you ever seen this letter

4      before?

5          A.    It doesn't look familiar to me at all, I

6      don't think I've seen this before.

7          Q.    Did you draft this for Ms. Visram to send?

8          A.    I don't think I did, it's not my wording, but

9      if I did it will show up in my e-mails, you would have

10     it so you would know the answer to the question, I

11     don't as I sit here remember.

12         Q.    Okay.  Well, once again, I ask because Ms.

13     Visram, when I showed her this letter at her

14     deposition, testified that someone wrote it for her

15     and she signed it and sent it out.

16         A.    Got you.

17         Q.    So I'm trying to determine or learn who

18     actually drafted this letter on her behalf.

19         A.    It would be whoever she asked to help her,

20     and if she doesn't remember maybe -- I don't know, it

21     could be Sarah, could be Arthur, could be Bruce, I

22     just don't know, or could be -- who knows, family

23     member, I just don't know.

24         Q.    So there's a possibility that either Sarah

25     Grandinetti or Arthur Grandinetti or Bruce Bodor could

1     have drafter this for her but we would have to ask

2     them?

3          A.    Yeah, you'd have to ask them if she doesn't

4     remember, because she would be the one asking for help

5     of someone.  The only reason Sarah comes to mind is

6     because it involves the contents, but I don't know, I

7     don't personally know the answer to the question.

8          Q.    Have you had any discussions with any of the

9     other experts in this case since the lawsuit was

10    filed?  I'll go through the list:  Arthur Grandinetti,

11    have you discussed this case since the lawsuit was

12    filed?

13         A.    Not that I remember.

14         Q.    Sarah Grandinetti?

15         A.    Not that I remember.

16         Q.    Tom Irmiter?

17         A.    Yeah, the only discussion I remember having

18    with Tom was while we were just on break Tom had

19    called me about another matter and I said, hey, I'm in

20    a deposition and your name has come up a time or two,

21    he laughed, which one, I said Knights Inn, he said,

22    oh, okay, well, good luck, have a good day, end of

23    conversation, but other than that I don't remember

24    talking to Tom about his report or anything on this

25    since the suit was filed, other than that conversation

Page 211

1      I told you about just having.

2                   MR. TAYLOR:  Why don't we go off the

3      record for about a couple of minutes, I may be, if I'm

4      not done, pretty close.

5                   MR. CONCHIN:  Sure.

6                   THE VIDEOGRAPHER:  Off the record at

7      3:58.

8                   (Discussion off the record at.

9                   3:58 p.m.)

10                  THE VIDEOGRAPHER:  Back on the record

11     at 4:02.

12                  MR. TAYLOR:  Mr. Howarth, I have come

13     to the end of my questions today, and I thank you for

14     your time.

15        A.    Thank you.

16                  MR. TAYLOR:  And I understand that Mr.

17     Conchin does not have any questions for you today, and

18     so --

19                  MR. CONCHIN:  No, but Chuck wants to

20     ask you some now.

21                  MR. TAYLOR:  I'll bet he does.  Read

22     and sign?

23                  MR. CONCHIN:  Do you want to read and

24     sign?  We'll waive it.

25                  MR. TAYLOR:  So he's going to waive?

Page 212

1          MR. CONCHIN:  Yeah.

2     A.    I'll waive.

3               MR. TAYLOR:  Very good.  Thank you very

4     much for your time.

5               THE VIDEOGRAPHER:  This concludes the

6     deposition.  Going off the record at 4:03.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 213

STATE OF TENNESSEE)
                   )   ss
COUNTY OF DAVIDSON)

     I, CYNTHIA ODOM, Licensed Shorthand Reporter and

Notary Public duly and qualified in and for the State

of Tennessee do hereby certify there came before me

the deponent herein, namely CHARLES W. HOWARTH, who

was by me duly sworn to testify to the truth and

nothing but the truth concerning the matters in this

cause.

     I further certify that the foregoing transcript is

a true and correct transcript of my original

stenographic notes.

     I further certify that I am neither attorney or

counsel for, nor related to or employed by any of the

parties to the action in which this deposition is

taken; and furthermore, that I am not a relative or

employee of any attorney or counsel employed by the

parties hereto or financially interested in the

action.

     IN WITNESS WHEREOF, I have hereunto set my hand

and affixed my Notarial Seal this 8th day of

January, 2020.

                    CYNTHIA ODOM,
                    NOTARY PUBLIC
                    TNLCR#: 487



Page 214

# TRANSCRIPT ORDER FORM

**Case:** _HAMAN, INC.   v.   CHUBB_

**Date Taken:** _1-8-20_

**Witness:** _CHARLES HOWARTH_

**Ordering Counsel's name, address, phone - attach business card if available**

MFL
MOZLEY | FINLAYSON | LOGGINS
LLP
SINCE 1945

1050 CROWN POINTE PARKWAY
SUITE 1500
ATLANTA, GEORGIA 30338
WWW.MFLLAW.COM

WAYNE D. TAYLOR
PARTNER

DIRECT: 404.845.1944
CELL: 404.408.7884
FACSIMILE: 404.250.9355
EMAIL: WTAYLOR@MFLLAW.COM

**Delivery Options:**

Regular (2 weeks) ___✓___

Expedited? _____   Requested delivery date: _____

Exhibit Copies? _____

Video Copies? _____

Rough Draft? _____

Realtime Hookup? _____

I HEREBY ORDER THE SERVICES INDICATED AND ACCEPT RESPONSIBILITY FOR PAYMENT.

_____          _1-8-20_
Ordering Counsel Signature               Date



Page 215

# TRANSCRIPT ORDER FORM

Case: _HAMAN, INC     V.    CHUBB_

Date Taken: _1-8-20_

Witness: _CHARLES HOWARTH_

Ordering Counsel's name,
address, phone - attach
business card if available

**C C & J**   **CONCHIN COLE & JORDAN**

ATTORNEYS AT LAW

**Gary V. Conchin**
**Attorney At Law**

2404 Commerce Court, SW
Huntsville, Alabama 35801
www.alainjurylaw.com

T 256.705.7777
F 256.705.7778
gary@alainjurylaw.com

Delivery Options:

Regular (2 weeks) _✓_

Expedited? _____   Requested delivery date: _____

Exhibit Copies? _✓_

Video Copies? _____

Rough Draft? _____

Realtime Hookup? _____

E-TRAN +
COND. ē XBTS

I HEREBY ORDER THE SERVICES INDICATED AND ACCEPT RESPONSIBILITY
FOR PAYMENT.

_S. V. Conchin_                          _1-8-20_

Ordering Counsel Signature                    Date

12/15

168:23 172:23
173:3,6,13 174:3
184:23 185:2,9
**acv** 172:23
**add** 11:12 61:13
**added** 38:1 91:2
118:3
**addition** 43:15
47:7 57:18 58:18
66:5 131:3
**additional** 72:16
73:7 75:6 76:16
76:18,22 88:11
89:18 90:1 111:20
112:10 121:20
128:16 134:9
153:22
**additionally** 75:5
133:13
**address** 6:17,18
17:20 55:20
122:10 157:18
170:17 182:9
202:25
**addressed** 113:17
115:4 157:16
**addresses** 133:18
193:23
**adequate** 71:21
**adjuster** 22:4 25:1
25:6 31:3,8,16,17
32:6,8 35:18 36:1
36:3 44:11 45:17
80:25 121:3,4,4
190:8,12
**adjuster's** 34:11
**adjusters** 29:10
31:11,22 33:5,7,15
34:5,7,9,22 35:5
35:10 136:1

**adjusting** 31:13
36:5,9 67:16,21
133:14 135:5
190:6
**adjustment** 171:5
**admin** 43:18
**administered** 5:3
**administratively**
44:2
**admit** 204:24
**advance** 88:3
**advantage** 184:11
**advise** 81:20
**advised** 96:22
125:13
**advising** 81:9 82:4
**affiliated** 53:3
137:16
**affiliation** 52:25
53:11
**affixed** 213:22
**afternoon** 198:25
**age** 143:15,24
144:2 145:3,4
**agency** 24:20
**agent** 24:20 25:2,4
25:8 42:2,5,21
**agents** 25:9,12
42:14
**aggregate** 12:20
**aging** 145:4
**ago** 9:12 11:11
15:20 25:18 34:17
35:6 38:4 110:3
120:10 121:13
131:1 136:19
146:12 206:22
**agree** 29:22 92:17
92:19 94:22 111:3
188:11,12 194:1,1
194:4 196:20

**agreed** 82:9,9 92:8
123:9,11 124:19
124:20 195:19,20
200:20 201:23
202:2 205:8
**agreeing** 69:20
**agreement** 2:21,23
4:3 5:6 58:3,13,22
58:24 59:1,3,6,10
59:20 68:24 69:6
69:14,19 71:12,14
76:1 78:15,16,21
79:3,7,12 80:3,16
82:17 83:1,12
84:3,20,24 85:1,11
86:4,11,19 92:22
94:18 95:14,21
98:12 99:23
100:24 101:11
109:8 110:20
112:8,21 113:21
113:24 126:19
128:13 203:14
**agreements**
122:19
**agrees** 72:15 73:24
93:4 123:18
**ahead** 96:25
194:10 196:7
208:10
**airplane** 108:16
**alabama** 1:1,18
2:3 4:6,20 18:13
31:9,10,14 41:8,9
41:11,24,25 42:3
42:14,22 121:5
168:19,20,25
179:1
**alainjurylaw.com**
2:5

**alerted** 96:18
**alexander** 38:22
39:12
**allen** 157:10,13,16
166:14,15
**allow** 63:8,18
123:1 188:4
**allowed** 32:12
201:17
**amend** 73:22
90:21 142:4
**amended** 10:21
78:19,20,23
**amendments**
90:23
**american** 29:19
30:2 155:5
**amount** 14:3 20:8
25:16 48:19 49:18
62:12 64:6 69:16
69:23 71:2,8,17,21
72:5 93:17 94:2
94:11,14 97:8
99:7 110:13,19
111:12 118:8
128:6,8 132:8,9
167:20 171:21
195:22,25 196:16
196:20
**amounts** 153:4
**analysis** 30:9
**analyze** 154:25
155:3
**ann** 18:5 20:9 43:3
43:8,17
**answer** 10:2 12:25
29:15 58:8 67:12
68:1 88:15 89:12
93:23 100:12
104:21 110:2
119:15,21,22

120:2 126:3,7,12
138:24 142:25
143:9,11 144:25
148:24 178:11,13
183:13 209:10
210:7
**answered** 28:2,10
29:12 30:24 68:7
89:15 119:4,17
126:4 192:8
**answering** 30:19
94:8 174:13
**answers** 26:9
163:24 200:15
**anticipated** 130:12
**anticipation**
136:25
**anybody** 11:3 12:5
12:7,9 13:2,8 63:1
63:8 100:4 111:9
147:15,22 157:19
160:13,23 179:9
206:11
**anymore** 33:7
79:8 102:23
132:16,24
**anyway** 148:24
**apologize** 27:9
52:8 147:20
**appear** 173:1
**appearance** 4:23
**appearances** 2:1
**appears** 20:1
68:23 95:13
149:25 170:3
**application** 145:6
**applied** 25:5 173:2
184:22
**applies** 73:8 112:4
**apply** 144:20,21
144:23 145:1

146:2 185:24
**applying** 145:9
**appointed** 70:7
85:19 98:24
**appraisal** 2:21,23
15:13 35:14,15,23
61:19 62:18 63:4
63:5,11,12 64:24
68:11,16,23 69:17
69:19,24 70:6,16
70:18,20 71:12,25
72:11,23 73:1,6,14
73:18,25 74:4,6,13
75:10 76:1,19,20
78:14,16 80:15
82:13,16,20,22
83:1,5,8,11,14,18
83:23 84:4,18,20
84:22,24 85:2,3,10
85:13,18,22 86:6,9
86:11,19,20,21
87:4,14,21 88:4,20
88:24 89:5 91:12
92:5,7,22 93:13
95:13 97:9,10,25
98:22,23 100:24
110:23,25 113:21
114:8,24 116:13
118:7 119:3 123:3
123:8,9,19 124:3,8
125:25 194:2,6,22
195:20 196:1,12
197:17 198:1
199:8 201:7
203:10 205:20,23
206:2,4,6
**appraisals** 61:11
199:20
**appraise** 92:4
**appraised** 196:22

**appraiser** 35:23
36:11 40:13 62:8
70:8,13 72:2,9
82:19,21 83:6,15
83:25 84:10 85:4
85:19 86:4,15
87:7 89:21 91:14
92:1,7 94:9 98:24
106:12 114:10
118:19,24 121:5
123:10,10,20
124:19,19,24
125:14 190:20
191:2,7 192:1
195:13 196:2
197:2,16 199:14
200:24 201:23
202:3,11 203:23
205:22
**appraisers** 3:14,16
64:4,20 92:2,11,14
92:16 198:22
199:2,12 201:21
201:25 204:5
205:2
**appreciate** 14:17
**appreciated**
144:18
**appreciates**
144:22
**appreciating**
145:6
**approach** 141:25
**appropriate**
123:10,19 194:3,6
198:1
**approximately**
6:20 100:7 106:14
121:12
**april** 95:19 132:5
176:17,17 178:23

179:3 183:20
**archives** 42:18
**area** 104:14
146:17 148:17
165:22 168:16,19
**areas** 197:11
**argument** 64:18
**arm** 45:8
**arrange** 108:14
**arranged** 108:13
**arrangement** 16:1
58:7,12
**arrested** 61:24
**arrive** 184:22
**arrived** 48:5
103:10 147:16
188:23
**arthur** 14:5,13
15:7,17,21,24
16:18 52:9,17,17
57:18,25 96:10
99:18,22 100:12
102:6 103:12
107:6,10,13
109:13 110:4,8
115:18 137:8
138:1,10 139:19
140:3,7,9,18
141:20,22 142:10
152:5 153:10
161:14 167:25
170:1,14 179:18
180:2 183:24
209:21,25 210:10
**arthur's** 154:2
**article** 61:15
**arts** 20:22
**ashamed** 103:2
**aside** 136:5
**asked** 16:8,14
28:14 30:24 58:18

60:1 68:7 86:14
87:19 89:14
106:19 126:4,7
133:10 134:15
161:19 181:17
192:7 194:15
197:9 207:16
208:14 209:19
**asking** 10:9 16:25
26:4 28:4,5,8
29:13 60:2,9,13
82:20 89:13 93:20
104:20 124:13,14
124:16 127:18
131:7 132:24
136:5 161:13
162:2 171:15
187:25 188:14
194:1,4,7 196:8
206:21 210:4
**asks** 118:22
**aspect** 61:17
**assessment** 116:16
116:24 117:14
141:19
**assessments**
142:14
**assign** 130:24,25
**assigned** 80:25
92:7
**assignment** 191:2
**assigns** 76:14
**assistance** 54:9
57:18,25 168:3
**assistant** 43:18
**assisted** 54:21
55:3,4 56:1
**assists** 46:9
**associate** 23:2,10
23:18 24:5 30:21

**associated** 29:12
**associates** 27:1
182:21,25 183:3
183:10 191:7
**association** 33:5,6
33:14 34:5,9,22
35:4,10
**assume** 38:20 61:8
199:1
**assumption** 62:7
**assure** 163:2
**atlanta** 2:7
**attached** 84:25
86:3 113:20 134:2
134:20,25 199:1
**attachment** 3:14
84:23
**attempt** 88:2
**attention** 103:2
**attorney** 129:2,6
213:14,18
**august** 168:17
192:22 193:7
194:18
**authored** 135:19
**authority** 25:9,12
25:13 77:4
**available** 108:14
179:10
**avenue** 1:16 4:3
**average** 36:7
164:24,24 179:14
**avoid** 182:19
**award** 72:23 73:1
73:7 74:1,4,6,14
74:22 75:10 92:5
111:11,13,15,24
112:1
**awarded** 72:16
73:7

**aware** 44:17 73:14
114:4,6 119:1
124:7,13,17
135:23 154:13
155:3,8 190:3,9

**b**

**b** 1:3 4:16 46:20
76:9 95:15 189:17
191:1
**bachelor** 20:22,22
20:24 23:19
**bachelor's** 20:13
20:14 24:12
**back** 15:4 22:7
23:1 25:9 27:18
27:21 30:13 46:10
48:23 49:22 50:9
52:15 59:4 73:14
73:19,21 75:21
90:20 95:5 104:5
104:11 109:20
110:10 115:18
120:21 129:23
131:3 147:6 150:8
151:12 162:14
167:8 169:4
171:18 198:11
199:14 203:21,24
211:10
**bad** 63:2,9
**badly** 153:17
**bailed** 129:14
**ballard** 24:21
**ballpark** 16:10,14
16:15,17,21 17:25
**ballparks** 23:8
**ballroom** 152:20
**baptist** 40:3
**bar** 152:20
**based** 62:20 66:16
72:22 74:19

140:20 141:25
143:24,25 144:2
153:8 175:3,4
177:12 200:11
201:15
**basically** 69:15
118:10
**basis** 51:14 54:24
55:2 58:3 72:22
73:2 100:19 145:2
158:12
**beach** 8:8,10
**beginning** 4:4
19:16 194:18
**behalf** 4:5 17:8
31:19 35:18 51:23
70:15 71:7 77:13
81:3,7,8 82:13
84:7,9,17 96:2
97:12 99:12
110:17 112:13
117:11 119:11,12
137:11 166:7
209:18
**belfor** 3:5 155:24
156:17,25 158:9
158:15,20
**belief** 99:9,14
**believe** 17:10 37:4
57:13 86:12 134:8
167:16 171:4
176:5 181:24
204:12
**believed** 71:17
94:14 98:3 103:7
**benefit** 75:24
**bent** 96:15
**bessemer** 100:9
102:2 103:25
104:11 147:7
168:16,19,20

169:1
**best** 18:19 23:17
40:4,8 46:3 47:24
49:1 52:11 55:16
59:5 103:9 105:3
109:11 129:2
143:16 149:16,18
162:25 171:9
174:14 180:6,15
182:18 188:13
**bet** 179:2 211:21
**better** 87:1,23
88:21 105:19
110:7 114:21
164:24 180:20
188:25 189:1
**betterment** 145:22
146:1,2
**beyond** 13:4 133:1
148:24 149:19
**bi** 168:20
**bible** 20:19 21:7
23:20 24:12 25:3
**big** 190:12
**bill** 17:16 37:19,20
37:21 38:1,6,8,10
111:22 128:10,11
**billed** 128:8
137:18
**billing** 93:14
137:19
**bills** 17:8
**birmingham**
166:2 168:25
169:2
**birth** 7:21
**bit** 78:19,20,24
125:16 191:24
**blakeney** 39:20
**bleed** 64:4

**board** 29:19 30:2
34:25 35:1,3,7
155:5 185:13,14
185:17
**bodor** 46:2,6,8,11
46:14,18,21 47:2
47:14,22 48:11,21
49:6,19 50:7,15,18
51:1,25 55:12,17
56:7 96:3,4 99:11
112:13 178:25
207:22,23 209:25
**bodor's** 55:6 77:3
**bonus** 47:5,7,14
47:25 48:7,11,20
49:10,18 50:7,14
50:19
**bonuses** 51:1
**booklets** 23:15
**born** 8:1,10
**bothering** 201:14
**bottom** 17:3 76:24
85:20 131:12
132:3 196:5,6,8
**bowdre** 5:16
187:23
**box** 144:17
**branch** 21:25
**brand** 144:6,13,17
145:24
**break** 6:21,24
14:10 16:4 50:6
75:15,24 167:3
198:6 210:18
**breaks** 7:1
**brent** 2:22 80:14
83:10 189:11,21
190:13,19 193:11
206:17 209:2
**brief** 165:10

**briefly** 13:14
**bring** 46:12 48:1,3
50:19 108:15
**bringing** 50:7
**brings** 47:2,15
49:8
**broader** 190:11
**brookstone** 3:6
157:9,19,22 158:3
158:7,16 167:1
**brought** 6:1 46:21
47:23 49:19 52:1
107:24 109:7
112:18 125:18
**bruce** 46:2,18 49:3
49:12 52:5 77:3
96:4,18,20 99:19
99:23 102:7
112:20 161:21,21
178:25 179:2
207:14,20,22,23
209:21,25
**building** 44:4,6
56:13 57:25 96:23
98:9 102:19
109:25 136:22
138:25 142:11,19
142:20,21 144:24
145:2,16 146:9
147:1 148:9 149:1
151:14,18,25
152:10,18,21,23
152:24 153:1,3,15
153:16,19 154:13
155:4,10 160:21
169:10,11,16
174:22,22 175:5,9
175:10,16 177:17
177:19 178:2,6
179:16 181:12
182:1 190:15

191:8,11,12,16
**buildings** 139:17
140:5,20,25 141:5
148:17 150:7
153:12 164:8
186:1
**burden** 38:1
**bushman** 125:13
190:15,20,21
191:7,25 197:1
198:20 199:5
200:7,18 202:21
205:6,19 206:10
**bushman's** 200:23
201:22
**business** 15:12
17:15 31:2 37:21
37:25 38:5 40:10
41:25 43:17 93:11
104:13 110:12
159:6
**busy** 11:6
**button** 14:23
15:18
**buzz** 21:3

**c**

**c** 86:2
**c&o** 64:12
**c'mon** 192:7
**calculate** 185:2
186:7
**calculated** 49:14
173:6 174:3 185:9
**calculation** 16:12
48:8,13 185:20
**call** 11:22 14:12
45:3 90:25 100:1
103:12 112:19
164:5 169:15
181:1

called  96:16
180:22 210:19
calling  169:10
calls  181:11,23
canceled  122:23
122:25
cap  73:8 74:17,20
74:22 111:13,16
112:4
capable  200:22
capacity  6:3 31:20
31:24 32:5 40:21
42:12 51:8 91:13
92:1,3 138:6
capped  72:22 74:9
74:15 111:11
caption  4:7
car  9:9,9
care  148:20
202:13
careful  170:13
carneal  39:2,3,4,7
39:17,18,19,20
carolina  20:20
carpeting  145:3
carrier  32:7 69:18
69:25 70:5,20
71:3 76:15 84:21
85:17 89:24 91:23
91:24 92:7 93:18
94:3,4,15 98:21
99:7 110:14,25
199:6
carrier's  31:22
133:15 135:5
carriers  87:18,20
case  4:18 5:7,15
5:17 6:4,23 11:13
11:20 12:6,8,10
15:15 27:24 35:21
35:22 37:20,22

38:7,24 39:8,10,12
41:5 45:24 59:8
62:22 64:19 71:9
91:4 98:20 109:10
126:11,20 127:8
127:11 128:10,12
128:19,22 130:13
131:18 137:11,22
138:2 139:6
155:12 158:23
160:24 161:12,13
172:16 175:14
182:8 183:17
186:22 188:19
190:23 210:9,11
cases  36:23 62:11
cash  143:12,20
144:24 145:18
146:13,20,25
172:23 173:3,7,13
174:3 184:23
185:2,9
cassette  23:14
casualty  21:12
23:25 30:21
catastrophe  37:24
category  158:10
181:20
causation  64:1
65:1
cause  1:13 64:13
66:6,10,22 67:1
213:10
caused  64:1,7,15
66:4
cavities  153:18,23
ceiling  161:1
cell  18:21 179:15
central  40:3
certain  25:15

certainly  8:13,13
98:1 144:6,12
157:16 201:21
204:15 207:2
certificate  4:7
24:14,15
certification  24:1
24:7 29:16
certifications
23:21,23
certified  84:14
154:6,14 172:9,15
certify  213:6,11
213:14
cetera  138:13
186:2
chance  73:20 97:2
change  20:1,4,11
53:7 75:15 78:25
79:4 91:24 111:17
170:16,17 199:18
201:12 203:16
changed  10:23
26:16 53:11
120:16 125:14
203:9
changes  79:2
char  149:12
charge  80:5 128:5
charged  72:15
charging  127:10
charles  1:12 2:14
4:2,15 5:5,19 7:14
213:7
chartered  21:11
23:25 30:20
check  5:12 25:14
49:4,7,7,9,15,16
76:17 109:22
112:10 150:13
175:13 181:10

checked  120:19
checking  188:5
checks  76:22
chow  207:10
chubb  1:7 4:16,25
6:1 67:17,22 71:9
71:21 80:25 81:6
81:12,15 82:1
83:7 84:3,18 85:2
87:12 88:7 89:16
97:2,8,13,19,22
103:15 110:19
111:4 112:10
114:3,5 116:5,22
117:11,13,25
118:25 119:1,6,9
119:10,18,19,20
123:1,5,9,14,18
125:13,24 153:20
172:10,16 191:6
195:20 199:19
202:4 205:13,19
208:5
chubb's  68:11,15
82:10 97:13 115:9
116:6 119:6 123:7
123:16 199:7
201:6
chuck  7:18 9:18
27:1 198:25
211:19
civil  1:5,18 4:6 5:9
claim  6:3 9:11
14:20 16:6,6,9,19
25:12,13,15,15
31:21 32:9 35:16
37:24 46:5 47:3
47:15,16,23 48:1,9
48:19 49:2,7,19
50:7,15,16,19
51:24 52:1 55:5

55:14,15 56:6,11
56:12,20,25 57:7
59:17 61:18 64:5
64:22 65:5,14,17
65:23,23 67:2,9,16
67:18,21,23 68:6
68:12,16,24 72:1
73:22 77:8,18,21
77:24 80:21 81:1
82:2 83:9 84:4
86:7,23 87:13
88:3,5 89:4 91:18
95:16,19 96:5,9,17
96:19,24,25 97:2
98:13 99:20,21,22
100:23 101:10,17
101:19 102:19
103:16 106:9,11
106:17 108:12
112:7,11 113:1,17
113:22,25 114:10
114:15,18 115:11
115:17,19 117:18
119:2,5,14,19,20
119:25 120:3
121:3 123:8 124:8
124:18,20,21,22
125:1,5,6,8,11,15
132:20 133:14
134:19,20 135:5
135:25 139:9,13
139:18,25 140:5
140:20 141:3,7,14
141:16,20 142:9
142:24 146:22
147:2,25 149:1
151:16,20 152:15
155:23 156:12
159:10,11 161:3
163:6 165:11
167:17 171:3

174:18 175:3,17
176:8,9 181:18,23
182:15,22 183:1,3
183:5,15 184:14
184:24 185:10
188:15,20,20,21
190:2,6 193:4,11
193:19,23 194:8
196:3 197:8,16
198:1
**claimed** 65:19,22
95:25
**claims** 6:5 11:17
11:25 13:8,24
15:10 19:14 22:4
23:2,10,19 24:5
25:7,9,10,11,13
29:9 30:15,22
31:2,19 35:13
40:11 43:19,24
44:19 45:24 46:22
49:9,10 51:2
53:21 55:1 56:3
57:11,16,22,24,25
58:2,15,21 59:7,14
59:18,21 61:6
62:15,16 66:23
125:12 131:24
133:1 138:12,18
138:19
**clarified** 82:18
**clarify** 67:25
**classes** 30:16
**clause** 73:10 75:5
**clay** 27:5
**clear** 6:7 63:13
81:13 88:12 94:11
125:10 179:11
190:19,23
**clearly** 30:19 94:7
124:5

**clicking** 174:11,12
**client** 15:13 48:6
112:22
**client's** 38:2
**clients** 37:23
121:17
**close** 44:9 83:20
85:6 96:1 164:13
211:4
**closed** 26:12
**closer** 104:23
184:8 200:3
**coach** 110:8
**cocoa** 8:8,10
**coffee** 13:15
**cognizant** 64:22
**cole** 2:2
**collaborative**
130:23
**collection** 8:21,24
9:2
**collections** 10:14
**college** 20:16,19
21:7,8,9 23:20
24:12,22 25:3
**colon** 190:25
**color** 107:18
**colors** 122:18
**column** 172:23
**combination** 86:5
**combined** 12:17
**come** 6:16 47:17
64:5 73:19,21
79:4 92:4 97:3
122:17 162:21
210:20 211:12
**comes** 73:14 151:7
207:8 210:5
**comfortable** 6:16
150:23

**coming** 63:1 88:12
105:16 119:7
134:15
**commencing** 1:17
**commentary**
126:17
**comments** 63:11
**commerce** 2:2
**commercial** 78:17
**communicate** 53:7
91:16
**communicated**
77:22 94:7 123:22
124:1
**communicating**
91:22 193:4
**communication**
192:5
**communications**
18:17 32:7 88:11
91:16,24 97:22
119:5 163:14
165:9 166:5,6
193:10,17
**companies** 53:15
73:19 116:19
**company** 1:7 4:17
8:14,14,17,24
13:20 15:19 22:1
22:21,24 26:7,8,20
35:14 40:15 41:24
42:2,6 44:8 46:7,8
46:15 48:4,6 51:6
53:16 65:10 66:16
70:12,22 71:9
73:13 74:13 75:9
77:6 81:22 82:9
85:11,12 91:16
93:15,20,25 94:13
99:14 101:9
117:22 118:20,22

119:11,12 121:18
135:22,22 181:25
195:21 196:15
207:8
**company's** 55:10
72:6 93:11
**comparatively**
152:3
**compare** 79:10
158:18
**comparing** 98:17
**comparison**
156:24 158:3,6,8
158:14
**compensated**
37:12 47:2 53:24
54:15,16,24
121:19
**compensating**
59:19
**compensation**
16:2 58:23
**compile** 187:1
**complaints** 106:7
**complete** 177:2
178:21
**completed** 22:24
72:2 88:9 142:22
143:1 170:4,6,8
178:8 195:10
**completion** 143:9
**completions** 143:8
**component** 146:8
146:9
**components**
145:12
**computer** 168:24
**concept** 146:18,19
**concern** 161:2
**concerned** 28:9
117:7

**concerning** 63:3
137:1 139:17
141:15 213:9
**concerns** 19:9
**conchin** 2:2,4 4:24
4:24 6:22 7:3,7
9:16,18,22 10:1
13:11 14:11 17:12
18:18 21:2 27:9
27:12,22 37:19
38:1,8 40:24,25
41:8,23 42:7 51:2
52:14 60:6,10,12
60:16,20 62:23
64:3,9,12,16 67:25
74:25 79:13,15,20
79:23 80:1 89:6
89:14 93:19
118:13,16 119:23
123:21,23 124:3
124:11,14 126:4
126:23 127:4
128:21 129:1,4,5
129:10 132:21
135:14 136:2,11
136:16,24 137:18
137:19 138:24
140:12,23 157:12
157:18 166:25
173:20 176:11
181:3,15 187:8,19
188:3,25 189:2
192:7,14 204:18
211:5,17,19,23
212:1
**conchin's** 11:5,8
41:13 66:18 126:1
130:19 138:2
**conclude** 160:3,11
170:13 190:14

**concluded** 80:6
150:21 179:22
**concludes** 212:5
**concluding** 170:14
**conclusion** 159:3,5
**conclusions**
160:10
**concocted** 124:5
**concurred** 179:24
**condition** 137:2
144:1,2,13 160:6
**conditions** 127:22
**conduct** 63:3
67:16,22 68:11,15
133:14 135:5
**conference** 6:23
27:23 62:21 100:1
**confirm** 177:24
**confirmed** 190:21
191:25
**conjunction**
137:22 190:15
191:8
**connection** 6:1,2,5
11:25 12:10 13:7
13:23 14:19 17:9
17:12 25:13 32:18
38:6,11,13 40:11
50:14,15,16 53:20
54:25 56:2,20,24
57:7,10,15,16,21
58:2,14,20 59:16
59:20 65:17 66:9
67:1,8,17,23 68:16
68:24 80:20 82:1
83:9 86:6,23
95:15 96:8 98:12
100:23 101:10
102:19 112:10,25
113:16,22 114:10
114:14,17 116:12

117:8,19 119:2,13
125:1 132:19
133:1 134:19,22
138:12,17,18
139:5,6,13,24
140:4 141:13
142:9,23,24
143:17 146:22
147:1,25 149:1
151:15,19 155:23
156:10,11,18
157:22,23 159:9
159:11 167:17
171:2 173:5
174:18 175:3,17
180:25 181:22
182:21,25 183:14
184:13,23 185:10
209:2
**consider** 43:8
129:10,11 172:14
**consideration** 93:4
**constant** 104:13
**constitute** 171:18
**constitutes** 171:1
**constructed**
153:15
**consultant** 30:11
77:8
**consulting** 35:14
**contact** 87:5 88:25
91:6,11 207:12
**contacted** 96:20
100:15 103:6
128:21 180:3
**contacting** 148:3
**contacts** 97:23
**contained** 13:5
66:8,18 69:4
**contains** 66:25
67:20

contamination
  153:23
content  162:5,11
contents  57:15,21
  57:24 58:1,15
  59:17,17 65:19,22
  66:20 138:17
  139:6,12,24 141:7
  141:9,12 144:20
  145:10 174:15
  186:18,21 187:5,6
  187:10,18 188:14
  188:20 210:6
continued  3:1
contract  63:12
  97:14
contractor  28:21
  28:23 29:1 44:14
  46:12,24 51:10,14
  51:21 52:21 166:7
contractors  13:22
contradict  203:20
control  202:5
conversation
  13:11 78:1 112:24
  162:9,16 163:1,5
  179:7 180:21
  210:23,25
conversational
  13:18
conversations
  78:6 153:10
  161:20 162:6,12
  163:15,17 166:20
  200:6,18,19
  201:11
convey  90:7,12
convictions  61:22
convince  201:10
  201:12

cooperative  87:25
copied  193:13
copies  182:20
copy  82:16 83:11
  84:3,14 87:24
  88:7 90:24 135:25
  204:14
corner  207:7
corporation  26:1
  27:6,7,8 39:8
correct  6:9 8:2,16
  10:18 12:1 15:6
  16:7 17:23 18:7
  20:15,21 21:13,23
  21:24 22:2,6,8
  23:4 25:22 26:19
  33:20 34:6 37:14
  37:17 38:16 42:23
  47:1,13 50:12
  51:22 54:6 55:11
  56:4,9 65:15,18,21
  65:24 67:7 68:1
  69:8,10,13 70:4,14
  70:23,24 71:22,24
  72:25 73:4 74:5
  74:11,21,23 75:12
  76:8,13,23 77:12
  79:1 80:18,19,22
  81:2 82:23 84:5,6
  86:24 91:8 92:15
  92:18,23,24 93:7
  95:17,20,23 99:1,4
  99:10 101:4,20,23
  101:25 105:11,13
  105:15 108:5
  111:13,14 112:4
  112:12 113:18,19
  113:23 114:2,12
  114:16,19 116:3
  125:3 128:11,20
  131:5 133:9,20,25

134:5 135:11
137:7,23 138:15
140:24,25 141:4
144:8,16 145:13
145:15 159:16,19
163:16 167:18,19
167:22 172:25
173:3,4 177:9,10
177:18 183:19,21
184:17,20,25
189:11,12,14,24
191:20 192:6,9,23
192:24 193:1,2,8,9
194:18 195:13
199:3 202:25
204:7 205:5,7,10
205:12 213:12
corrected  170:3
correcting  125:20
correction  73:5
  74:1
correctly  22:10
  70:9 71:5 72:19
  81:24 87:10 89:2
  121:22 191:3
correspondence
  23:12,13 68:2
  126:22 162:19
  163:13
cost  138:13 143:14
  145:19 146:14
  167:21 172:19
  173:2 184:1,2,18
counsel  4:22 5:6
  64:19 213:15,18
count  54:20
  152:17 153:3
  174:24
county  1:15 213:2
couple  135:8
  152:13 211:3

course  23:13 68:1
  72:10,12 96:18
  110:22 111:15
  117:18 131:3
  134:7 135:15
  149:8 206:3
courses  21:9 29:10
  29:14 30:16
court  1:1,14 2:2
  4:19 5:1 6:23
  27:23 62:20,24,25
  63:7,17
courteous  87:17
  87:22
courtesy  116:18
courts  36:21
cover  75:4 86:14
  87:19 170:2
coverage  9:19
  61:18 124:9
  194:22 196:1,21
covered  73:10
  112:17
covers  40:4 52:10
cpcu  22:9,11 23:18
  24:1 32:25
cpcus  32:23
create  175:7 185:1
created  170:2
creating  45:15
credentials  30:9
credit  9:23
criminal  61:22
cross  5:8
crosstalk  124:2
crown  2:6
crs  60:16
cs3838328  1:21
cullman  39:20
cure  146:2

**curing** 145:22
**current** 19:23
  21:22 79:12 80:5
  137:1 183:25
**currently** 17:18
  34:21 53:21 79:10
  79:17
**custom** 1:7 4:17
**customer** 49:14
**cv** 1:6 4:18 6:7
  7:25 19:17,20
  21:20,21 32:21
  36:15,20 61:9,13
  127:21 134:1
**cynthia** 1:14 213:4
  213:24

**d**

**d** 1:3 2:8 4:16
  46:20 76:9 95:15
  189:17 191:1
**damage** 31:18
  35:16 64:15,24,25
  96:12,13,23 97:5
  97:25 98:3,9
  100:16 103:3,7,12
  110:1 111:5
  112:20 133:12
  139:12 148:9,17
  151:24,25 152:2,5
  152:6 156:4,5,8,9
  161:22 163:7
  177:3 178:20,22
  179:24 180:3
  182:10 187:17
  193:1
**damaged** 65:20,22
  67:11 176:16
**damages** 3:7,9,10
  57:15,21 62:4,5,10
  62:12,13 64:1,10
  64:20,21,23 65:12

65:13,16 66:4,7,10
  66:22 67:1 71:18
  90:15 97:14 115:9
  115:10 116:6,7
  117:14 125:12
  132:18,18,25
  133:5 138:11,17
  138:22 139:5,17
  139:24 140:4,11
  140:18,19 141:5,9
  141:16,19 142:1
  142:23 146:21,21
  147:1 156:19
  157:24 158:5
  161:23,23,25
  162:4 167:17
  171:2,23 173:6,7
  173:13 176:16,19
  176:24 182:3
  184:23 185:3,9
  186:21 188:14,20
  190:16 191:8,11
  191:12,13,16,17
  191:18 201:2
  202:13
**data** 141:23
  142:15
**date** 7:21 20:2
  56:20 57:7 69:6
  69:11 77:11 82:11
  95:18,21 98:2,4
  101:4,5,7,9 106:14
  113:18 115:20
  119:20 123:4,12
  125:23 126:10,13
  126:15,15 132:5
  134:12,14 137:4
  169:23,25 170:1,5
  170:6,8,12,12,18
  170:21,23,24
  176:9,25 177:1,11

178:23 180:2,21
  184:5,8 191:16
  199:4,5 205:3
**dated** 80:13 86:3
  119:14 157:8
  171:12 198:20
  199:7,8 206:18
  208:5
**dates** 15:2 23:8
  98:6 100:11
  103:21 171:8
  178:9 193:12
  199:14 204:11
**daughter** 45:1
  149:25
**davidson** 1:15
  213:2
**day** 1:17 7:2 11:6
  14:1,1 38:15
  94:12 102:12,14
  104:6,8,19 109:3
  129:2 145:24
  197:4 210:22
  213:22
**days** 56:16,17
  104:9 135:9
  180:11,12
**deal** 33:22 63:15
  96:17 189:22
**dealing** 161:5
**dealt** 77:14 202:14
**dear** 196:11
**debris** 148:17
  179:12,13,25
**decades** 121:1
**decide** 24:9 88:16
  88:18 90:23 92:9
**decided** 38:4 83:4
  83:23 91:5 97:6,9
  110:23 123:1

**decides** 89:25 90:4
  170:15
**decision** 179:23
**decisionmaking**
  169:21
**decisions** 141:24
  141:25
**declaration** 3:14
  3:16 198:22 199:1
  199:11 201:20,24
  204:5 205:1
**default** 159:7
**defendant** 1:8 2:7
  4:5 8:20
**defendant's** 10:20
  11:1 19:1,4 32:22
  68:19,21 80:9
  86:17 92:20 95:9
  95:11 110:11
  113:13 120:7
  130:4 155:19
  157:6 167:14
  171:23 175:21,24
  176:2,3 189:8
  192:16 198:17
  202:18 204:3
  206:15 208:1,23
**defense** 64:19
**degree** 20:14,14
  20:16 21:5 24:2,6
  24:11,13,15 27:25
  28:1,4,5,11,14
  29:15
**degrees** 23:20,22
  28:3,15 164:12
**demand** 85:3
  86:21
**demanded** 119:3
**dennis** 43:14
  44:22 52:4,6,8
  99:24 120:24

122:12
**depend**  146:7
**deponent**  213:7
**depos**  100:11
**deposed**  39:20,24
  40:2
**deposition**  1:12
  2:19 4:2,15 5:5,6
  5:7 10:22,23
  11:10,12,15,23
  12:16 13:9,12
  18:24 37:8 38:20
  39:9,15 40:6 41:5
  41:20 50:24 59:12
  67:6 110:3 137:4
  162:17 166:10
  174:2,7,12 175:18
  178:3,10 183:8,11
  185:6 206:22
  209:14 210:20
  212:6 213:16
**depositions**  6:8
  11:19 12:5,8 37:5
  37:10 103:8
  134:16 136:1
**depreciable**
  186:15
**depreciate**  145:12
**depreciated**
  144:19 186:14
**depreciating**
  186:11
**depreciation**
  143:14,16,24
  144:23 145:1,7,9
  146:2,24 173:2,9
  173:17,19 174:4,5
  174:17 184:22
  185:2,8,12,22,24
  186:7,16 188:15

**describe**  28:13
  31:16 35:20
**described**  15:16
  89:19 165:12
**description**  2:18
  3:2 87:15
**designation**  3:4
  21:14 22:11 23:3
  23:5,10 24:1,7
  33:2 130:7
**designations**  23:19
  30:22,23 32:12,15
  44:16
**destructed**  136:22
**detailed**  105:17
**determination**
  143:20 178:24
  179:4 180:10
  182:16
**determine**  48:20
  64:23 144:24
  145:18,20 146:20
  146:25 173:3
  179:10 182:6
  209:17
**determined**  48:19
  71:17 72:3 111:3
  123:4 161:22
  176:16 182:4
**determining**  69:16
  69:23 182:13
**detracts**  145:4
**dial**  122:8
**differ**  140:14
  153:14
**difference**  17:3
  117:12 118:11
  190:12 197:12
**differences**  73:21
  81:5,21 82:5 83:3
  83:22 87:2,8,21,23

88:22 89:17,25
  114:22 115:8,21
  115:22 116:2,6,15
  116:23 117:21
  118:2,4,4,8,12,20
  118:23 119:2,13
  119:18 157:1
**different**  48:16
  83:19 138:1
  139:13,18,23
  140:3,11 144:25
  145:8,9 149:24
  176:4 188:4
  190:10 196:4
**difficult**  194:14
**digital**  11:18 12:11
  171:8 173:22
  174:9 204:16
**digits**  5:12
**direct**  2:15 5:21
  131:11 169:11
**directed**  70:5,19
  85:16 98:21 114:7
**directive**  85:21
**directly**  60:10
  88:18 90:12,24
  91:7,7,12 134:20
  137:20 138:5,6
**directors**  34:25
  35:1,3,8
**dirty**  199:23
**disagree**  140:15
  195:4,22,25
  196:16 201:17
**disagreement**  72:4
  92:14 97:7,11,19
  116:23
**disappeared**  34:3
**disciplinary**  32:17
**disclose**  9:3

**disclosed**  6:4
**disclosure**  130:16
  130:20 131:6,7,15
  137:10
**disclosures**  2:20
  19:8 65:9 66:17
  131:4
**discover**  161:22
**discovery**  5:8
**discuss**  30:17
  77:18,21,24 79:19
  89:24 165:11
  196:3
**discussed**  51:15
  80:16 200:21
  210:11
**discusses**  61:17
  67:15,21 68:15
**discussion**  27:16
  75:19 95:3 115:2
  162:16 167:6
  169:17 191:25
  198:9 210:17
  211:8
**discussions**  13:2
  49:1 77:22 210:8
**disease**  60:16
**disprove**  121:15
**dispute**  87:8
  125:13 190:14
**disputed**  190:15
  191:8,12,16 201:1
**disputes**  35:16
**dissolved**  33:16
**distinctly**  107:3
**district**  1:1,1 4:19
  4:20
**divide**  168:10
**division**  1:2 4:21
**doa**  190:21 199:1
  202:6 203:14

**document** 3:5,6,8
3:9,11,15 10:25
12:19 19:3,25
58:6 59:20 68:20
69:2 78:13 80:8
80:12,15 95:10
113:12 120:6
128:2 130:3,8
137:13 155:18,25
156:2 157:5,11
167:13 175:20,23
185:8 189:7
190:22 192:3,15
198:16,19 200:8
202:17 203:5
204:2 206:14
207:25 208:22
**documented**
148:19
**documents** 3:12
3:13 11:18 12:15
13:5 15:16 42:9
53:8 58:9 65:11
78:4 127:13,14
174:9,14 185:5
188:23 200:13
201:18,21 205:14
**dog** 207:10
**doing** 6:16 20:25
37:21 40:10 53:12
54:12 59:5,5
61:10,12,20 84:7,9
88:1 96:11 105:2
110:12 117:3
126:14 150:14
160:16 191:14
**dollar** 93:2,5
94:20 114:1
**dollars** 74:14
151:10

**door** 44:5
**dory** 43:14,22,23
44:5,8,11,18 45:1
106:20,20,22
107:20
**double** 5:12
109:22 175:13
181:10
**doubt** 156:15
169:1
**dozen** 143:4
**draft** 66:25 142:4
170:24 178:16,19
207:3,14,18
208:17,19 209:7
**drafted** 109:14
190:21 207:19
208:15,16,20
209:18
**drafter** 210:1
**drafts** 176:18
**drain** 163:19,22
163:23 164:17,21
165:2,6
**drained** 164:9,23
**draw** 160:10
**drive** 104:1,3
**drop** 186:12
**dropped** 160:8
**drove** 104:3,11,11
**drywall** 154:1
**due** 65:23 75:7
81:13
**dues** 33:2,3 34:12
**duly** 5:20 213:5,8

**e**

**e** 3:12,13,14,15
11:4,16 13:6 14:2
22:1,1 45:25 46:1
68:2 78:8,9 86:2
125:9 129:16

162:14,20 189:10
189:15,20,23
190:13 192:20,25
193:1,6,9,13,17,22
193:24 194:17
195:6,9,17 196:5
196:11 197:20
198:2,20,23
199:17,19 200:25
201:20 202:20,21
202:25 203:18
207:2,2,4 208:18
209:9
**earlier** 41:5 85:15
100:11 128:9
133:17 147:13
167:24 174:19
178:16
**early** 21:16 22:16
22:17 142:4 143:6
161:20 178:19
207:11
**earned** 24:6
**easier** 18:25 94:20
185:22
**easiest** 144:3
**easily** 147:3
**easy** 178:12
185:12
**eat** 7:3,6
**education** 21:8
28:19 29:22
**effect** 168:16
**effort** 83:3,21 87:3
87:13 88:23 90:1
114:23 142:5
**eight** 12:17,17,19
13:1,4 53:2
102:21 104:22
149:13,16 162:18
163:12 173:25

**either** 10:13 13:21
13:22 40:21 44:21
53:12 54:16 66:23
67:4 76:19 99:15
107:6 108:14
109:24 110:5
112:25 117:13
119:11 139:6
153:10 204:20
209:24
**elected** 191:6
**electronic** 61:17
**else's** 12:5,7,9
111:9 115:25
**employed** 35:23
69:16 82:19 83:5
83:15,24 106:12
106:13 115:17
117:2,3,17 118:24
125:25 166:17
213:15,18
**employee** 44:23
46:14,25 51:6,9,11
52:18 77:6 114:4
166:7 213:18
**employees** 13:22
43:5,9,13 51:15,17
103:3
**employment** 2:21
2:23 58:24 68:24
69:19 76:1 78:15
78:16 80:16 82:16
83:1,11 84:20,24
86:4,11,19 92:22
95:14 100:24
113:21
**employs** 32:6
69:22
**enables** 121:2
**enclosed** 82:16

encouraged 96:22
ends 149:10
engage 54:11
engaged 108:11
engineer 28:17
engineering 28:19
enjoy 123:2
enter 141:23 196:1
entered 95:14
170:12,19 196:12
entering 87:4
88:24 114:24
entire 31:21 55:13
124:4 153:1
entitled 1:13 55:5
112:15
epdm 118:5 160:3
164:19 165:7
179:20 185:25
186:4
equation 134:21
equipment 160:9
error 199:16
especially 16:12
esq 2:4,8
essentially 34:3
53:22 70:12 72:21
74:8 81:10 118:18
142:7 197:7
established 133:17
147:17
estimate 3:7,9,10
14:6 44:4 64:17
65:4,6,12,16 87:24
88:8,9 90:16,21
97:12,13 109:13
109:16,25 115:7,9
115:10,16,20,22
115:23,24,25,25
116:4,6,7 118:15
119:7 136:20

140:21,24 141:4
141:18 142:8,13
142:22,23 152:16
155:22 156:3,11
156:16,25,25
157:8,21,24 158:4
158:7,9,9 167:17
167:20,24 168:6,7
168:15 169:13,23
170:4,7,15,19
171:1,6 172:13,18
172:20 173:4,5
174:20 175:1,4,7
175:15 176:7,15
176:23 177:5,7,11
177:14,20 178:6
178:16 180:14,24
181:17,22 182:22
182:25 183:3,10
183:14 184:13,19
195:5
estimates 43:24,25
44:1 45:15 56:1
56:11 57:19 66:1
66:5,5,8,20 111:4
132:13,15,17
133:2,6,12 134:18
134:25 135:21
137:5 143:1 153:8
153:12 158:4
163:7 176:1,5
182:21
estimating 53:6,14
62:16 110:9 117:1
146:21 158:17
estimation 64:6
156:18
estimator 53:9
170:15
et 138:13 186:2

euo 206:1
eurocell 153:24
evaluate 148:19
152:5,7 153:6
180:6
evaluating 150:15
evaluation 72:3
82:10 88:15 94:10
109:6 195:11
evaluations 165:1
event 179:12
184:12 205:1
eventually 115:12
everybody 49:4
73:24 179:23
evidence 149:12
159:21
exact 15:21 26:23
56:17 113:24
125:23
exactly 10:4 14:24
25:17 32:1 57:10
163:4,16 207:10
examination 2:15
5:8,21 165:13,21
205:14
examinations
11:21
examine 108:19
example 73:1
111:24 144:3
exceed 72:15 73:3
73:15
exception 98:10
exchange 189:10
191:5
exchanged 165:14
exchanges 192:21
193:18
excluded 63:21

excuse 34:7 94:24
98:14 163:14
176:17
executed 97:15
110:15,21
exhibit 2:20 10:20
11:1 18:23 19:2,4
19:7,9,10,21 32:22
36:16 52:13 68:19
68:21 71:15 76:2
78:14 80:4,9,11,17
85:24 86:18 92:21
95:9,11 97:15
98:1,13,13,14
100:25 101:11
110:11,20 113:11
113:13 120:4,7
127:16,18 130:2,4
131:5,8,13,14,17
131:21,22 133:3
134:3,3,23,24
137:10 155:19,21
157:3,6 167:12,14
171:19,19,23
172:13 174:21
175:2,21,24 176:2
176:4,6,21,23,25
177:1,2,5,7,21
178:7,15,17,19,20
180:25 184:14
189:5,8 192:16,19
193:25 194:20
198:15,17 202:15
202:18,22 203:25
204:3 205:2
206:12,15 208:1,3
208:23,25
exhibits 2:17 3:1
122:20
exist 33:7 42:19
87:2 88:22 114:22

118:23 140:22
193:15
**existed** 33:10
**existence** 185:7
**exists** 127:3
**expand** 134:7
**expanded** 134:13
**expect** 65:3,5
139:20 140:1,6,16
179:20
**expectancy** 146:7
186:6
**expected** 48:24
140:3 186:5
**expenses** 38:3
70:23 93:12 99:3
**experience** 29:23
29:25 30:15 121:2
159:6 188:6
**experienced**
145:25
**expert** 2:20 3:4
6:4 10:13 19:7
36:13,20 37:3
62:3,11,22 63:9,18
63:22 64:1,13,14
68:5 109:6 125:22
126:11,20,23,24
127:11,21 128:19
128:22 130:7,12
130:16 135:13
137:11,20,21,22
138:11,17 139:5
139:16 140:4,10
148:19 150:24
151:10 182:7
187:6,17
**expert's** 109:5,22
150:10 151:8
152:8 154:4 163:7

**experts** 138:2,4,6
138:7 150:13
168:4 182:17
210:9
**explain** 18:22
35:12 144:4
206:21
**explained** 197:25
**explaining** 84:11
195:4,19
**explanation**
205:24 206:7
**express** 71:7
**expressed** 71:1
93:16 94:1 99:6
110:12
**expressing** 71:20
194:2,5
**extent** 14:16
**extra** 74:10
**extreme** 16:25
17:2 149:10
**eyeball** 105:10
**eyewitness** 138:21

**f**

**face** 165:12,12,16
165:16
**fact** 34:10 86:20
92:25 94:9 110:18
115:3 134:1
145:20 148:12
163:11 197:13
202:4
**facts** 96:20 139:2
201:16 203:16
**fair** 9:5 10:11,11
11:13 17:7 22:15
22:22,25 23:9
24:17 30:20 39:25
41:24 103:20
106:8 146:13

152:18 172:12,18
177:4 187:11
205:25
**fairness** 136:17
**faith** 63:2,9
**fall** 185:17
**falls** 33:24
**false** 194:24
**familiar** 123:7
172:5 209:5
**family** 209:22
**fantastically**
163:23 164:9
**far** 22:7 26:5
82:11 104:3 111:4
117:7 122:16
153:22 189:1
**farm** 22:5,18,19
23:6 24:17,19,25
25:6
**fault** 147:21
**fbs** 12:11 109:18
109:21,24 110:6
136:10 142:12,18
153:22 168:3
169:10,18 175:6
175:12 177:16,17
177:23 179:23
182:9
**february** 80:13
84:25 86:3 116:11
116:11,21 117:19
169:24 170:10
177:1,12,22
206:18
**federal** 5:9 36:20
**fee** 47:5,17,21
54:17,19 55:10
58:4,12,13 72:15
73:3,15 74:9,19,19
75:6,11 111:10,17

111:21 112:16
127:21 133:23
134:1
**feel** 6:16 81:11,25
104:18
**feet** 164:6
**felt** 79:4
**field** 28:1,6,12
29:11 148:17
179:13,25
**figure** 49:2 163:3
**file** 1:5 11:11,18
12:11 13:6 14:3
14:15 15:23 48:16
48:24 49:13 50:1
50:3 54:22 58:10
58:17 59:10 66:19
67:4,5 69:4 75:16
96:24,25 97:2
98:5 123:5 129:2
135:9,25 163:12
173:22,25 174:1
174:10 183:6
185:5 204:16
**filed** 38:12 96:17
210:10,12,25
**files** 36:5 46:9
49:12 53:8 171:8
**filing** 4:8
**final** 31:21 44:22
45:3,4 134:6
178:21 179:23
197:20
**finally** 92:9 119:6
142:6 179:19
**financially** 213:19
**find** 15:19,20
49:21 50:6 58:8
106:3 127:3 151:3
154:8 160:24
206:24 207:19

finding 109:8
fine 79:20 191:22
  201:18
finish 16:11 94:8
  200:17
finished 22:20
  76:5 89:12 142:13
  165:13 179:14
finishing 165:20
finlayson 2:6
fire 6:2 11:17 13:7
  13:23 16:6 40:11
  44:19 45:24 46:22
  47:23 48:1,19
  49:19 50:15 51:1
  51:24 54:25 56:2
  56:11,12,20 57:11
  57:16,22 58:2,15
  58:21 59:7,14,17
  59:21 64:7,10,23
  64:24 65:3,4,17,20
  67:2,17 68:6,12,24
  69:9,11 71:18
  80:21,25 82:2
  83:9 84:4 86:6,23
  87:13 96:5,11
  98:7,8,12 99:20,21
  99:22 100:23
  101:19 102:19,20
  103:1,14 105:13
  109:2 110:1 112:6
  112:17 113:1,25
  114:15 115:2
  116:12 119:2,25
  120:2 123:8
  124:21 132:9,18
  133:1 134:19
  138:12,18 139:7
  139:13,18 140:20
  140:25 141:7,10
  141:20 142:9,24

146:22 147:25,25
148:9,10 149:1,9
150:9 151:7,14,16
152:1 153:14
154:2 156:4,5,6,8
156:9,11,19
157:24 158:5
159:11 167:17
171:3,11,21,24
172:7 173:6,9,14
174:18,23 175:3
175:11,17 176:8
176:10 180:6,14
180:15,18 181:1,4
181:18 182:22
183:5 188:20
189:14,24 190:17
191:1,13,17,20
192:6 199:6
200:22 201:25
202:4,7 203:10,14
205:4 209:3
firm 38:15 41:13
  42:15 138:3
firms 42:13 127:6
first 5:20,23 19:10
  22:23 24:17,19
  64:24 80:13 85:24
  88:8 91:20 93:1
  96:24 98:5 100:8
  100:12 101:6,18
  102:1,9 103:8,13
  105:13 106:14
  109:23 110:3,4
  124:10,21 130:11
  131:24 147:5,16
  148:8,25 149:5
  152:24 159:12,14
  166:17 170:1
  176:2 179:2 180:2
  180:5,9,16 194:19

195:5 197:21
198:2,19 204:10
fit 108:16
five 21:3 36:7,10
  60:23,24 144:5,9
  144:15,17 146:5
  186:12
flat 106:25 118:5
  163:22 164:10,17
  164:19 165:1,3,6,7
  165:8 179:19
flew 104:10,12
florida 8:1 24:20
  26:12 31:7 34:5,9
  34:11
fly 104:1
flying 179:21
focus 150:10 152:4
  152:5,12 163:8
  191:21,21
focused 163:1,3
  164:25
folder 135:12,13
  174:14
follow 78:8 119:16
  191:5
follows 5:20
font 203:1,2
foregoing 213:11
forensic 142:11,18
  142:20,21 154:13
  155:4,10 169:10
  169:11,16 175:5,9
  175:16 177:17,19
  178:2,5 182:1
forgetting 143:7
form 4:10 74:25
  89:6 93:19 118:13
  118:16 123:21,23
  124:11 140:12,23
  157:12 158:19

201:21 202:6,12
203:14
formal 13:25 68:8
  68:10,14 73:6,25
  87:4 88:24 114:24
formalities 4:7
formally 87:13
  88:4 89:5 125:21
  126:10
format 159:7
forms 202:10
forth 68:2
forward 127:4
  203:13,17
forwarded 173:23
  199:17
found 96:20
four 15:19 16:16
  19:17,20 31:11
  37:3 43:7,9,11
  44:24,25 49:8,10
  51:14,18 66:1
  102:22 113:8
fourth 36:14
franklin 1:16 4:4
  25:21 45:12
frankly 127:6
  129:10 158:14
  183:24 184:10
friday 162:24
friend 129:10,11
friendly 129:15
friends 129:7,9
front 47:10,25
  48:11 101:2,3
  113:7 131:18
  142:3 174:15
  190:12
full 7:13 46:17
  47:20 104:19
  112:2 139:21

153:18
**fungi** 29:11
**further** 82:12
121:17 132:2
202:6 213:11,14
**furthermore**
213:17

**g**

**gain** 110:7 151:5
**gained** 184:11
**gallatin** 17:19,24
50:11
**games** 202:10
**gap** 16:25 17:2
**gary** 2:4,5 4:24
21:1 52:12 62:19
63:24 187:16
**general** 28:21,23
28:25 31:17 50:17
58:25 59:3 105:15
109:11 153:12,13
187:13
**generally** 115:1
**generated** 135:22
175:5,6
**gentleman** 117:17
**george** 27:3
**georgia** 2:7
**getting** 14:17 44:9
54:3 100:13 110:5
117:3 118:9
125:17 147:21
151:9 208:10
**gist** 105:16
**give** 11:14 15:18
16:10,13,20,24
24:14 41:3 45:22
48:10 58:4 64:14
87:24 97:2 100:10
102:24 108:9
126:15,17 149:19

162:25 165:15
175:12 178:13
192:13 200:15
203:3
**given** 6:8 11:19,24
13:7 36:24 37:5
39:9,13 49:7,7,8
50:14 51:18 54:18
**gives** 66:4 67:10
**giving** 26:22 48:21
62:21 66:25
104:21 108:11
165:20 187:6
**glad** 9:3 127:8
154:16,16 166:1
**go** 6:10,14,15,18
6:25 7:18 9:3 15:4
15:22 18:17,24
27:10 30:13 32:8
36:25 37:11 38:17
39:23 44:1,3
60:14 75:4 87:7
87:21 90:20 94:25
96:25 97:25
104:15 111:21
122:16 129:17
130:18 131:3
147:5 149:2,5,8,9
150:6,8 151:20
152:9,25 159:11
166:11 170:21
189:19 194:10,21
195:20 203:17
204:21 210:10
211:2
**goes** 9:23 22:7
76:17,20 90:3
111:20 122:12
180:14 195:24
206:3

**going** 9:8 14:10
16:11,16 21:2
25:4 32:7 33:19
37:18,25 39:5
40:1 41:17 48:21
50:24 53:2 58:19
59:11,15 60:4
63:7 64:14 68:18
70:11,12,22 73:12
75:17 87:14 88:4
88:14 89:5,12
90:2,4,25 96:19
97:24,24 104:21
104:23,24 105:17
105:17,19 106:4
111:2 112:7,15
121:8 122:16
127:2 139:4,16,22
140:2 144:12
146:6 147:15,16
147:24 148:4
151:7 160:1,20,21
161:7,8,24 162:24
170:19 173:11
176:1 184:2
185:17 186:13,21
186:24 187:5,16
187:17,23,25
188:1,3,4 195:14
199:23 201:8,9,10
202:8,9,10 204:21
207:6 211:25
212:6
**golf** 129:9
**golfing** 129:9
**good** 6:19 8:9
41:19 76:5 79:25
108:11 138:9
150:20,21 151:9
151:11 154:8,9
184:7 198:25

210:22,22 212:3
**gotten** 14:8 94:22
107:22,25 108:16
135:22 196:6
**grading** 188:5
**graduated** 25:3
**graduating** 21:7
24:22
**grand** 183:4
**grandinetti** 14:6
14:13,14 15:8,8,25
16:18,23 17:5
52:9,10,17 53:3,20
53:24 54:11,12,18
54:23 55:1,25
56:14,19,23 57:6
57:11,14,20 58:13
58:14 59:7,13,16
59:19 96:10 98:2
100:15 103:6
107:7,10 109:14
109:24 112:19,20
137:8,8 138:10,16
139:14,19,23
140:8,8,10 141:8
141:13,15,21
142:10 153:10
156:14 158:1
167:25 168:8,24
180:2 182:4
186:19 188:13
209:25,25 210:10
210:14
**grandinetti's**
52:25 58:21 140:3
140:19
**grandinettis** 16:5
103:10
**great** 106:1,1
129:5

**greenville** 20:20
**grew** 8:7,8,10
**ground** 6:10,13
**group** 3:3 8:14
  13:23 17:7,11
  20:2,3,8 21:23
  25:20,24,25 26:1,3
  26:17,18 35:12,13
  42:6,22,25 43:5,9
  43:16 45:9 46:22
  47:3 49:20 51:18
  51:24 52:2,23
  53:1,4 69:15,22
  70:3,15 71:1,7,16
  72:14 76:14,21,25
  77:2,5 93:4,16
  94:1 95:14 96:3
  98:21 99:6,13
  110:12,18 112:7,9
  112:14 122:4
  135:20 137:17,18
  137:23 138:5
  156:24 176:16
  187:9 195:11
**group's** 3:7,9,10
  35:25 78:15 99:14
  115:10 141:19
  156:3,11,18,25
  157:23 158:4
  167:16 197:7,15
**guarantee** 121:2
**guess** 6:6,17 16:11
  19:20 25:4,20
  26:14 27:25 29:9
  30:13 34:18 37:9
  40:1 41:17 44:22
  53:2 54:15 78:20
  84:16 143:16
  148:15 149:17,18
  169:1 180:7
  187:15 207:20,24

208:20
**guessed** 22:14
  41:20
**guessing** 41:18
  59:5 104:25
  109:18 148:16
  207:14
**guesstimate** 41:4
  47:17
**guesswork** 48:25
**guests** 100:18
**guide** 110:8
**guy** 45:2 191:22
  201:11
**guys** 137:25

**h**

**h** 22:1 86:2
**half** 7:1 36:21
  38:18 113:3
**haman** 1:3 2:20
  4:16,24 6:2 17:8,9
  19:7 40:10,17,22
  44:19 46:21 69:7
  70:11,13,16,17,18
  71:8,20 76:7,9,12
  77:11,13 81:4,20
  82:5,13 84:7,17
  85:8 87:6 91:6
  95:15 97:13 99:8
  108:8 110:12,18
  112:8,8 115:9,24
  116:4,14 117:13
  119:12 128:17
  130:6,7 132:11
  147:22 166:7
  189:17 191:1
**haman's** 84:20
  116:7
**hand** 54:20 90:16
  176:1,6 213:21

**handle** 93:12 97:1
  124:21
**handled** 112:21
  161:14
**handles** 31:18
  120:24
**handling** 25:10
  43:19 61:11,18
  62:15 67:16 161:3
  200:22
**handwriting**
  98:11
**hang** 94:7 113:9
**hanging** 96:15
  179:17
**happen** 118:23
  140:16
**happened** 33:14
  54:14,20 104:12
  117:16 131:1
**happening** 91:21
**happens** 50:17
  104:13
**happy** 87:5,24
  88:10,25 91:22
  183:12 203:15
**hard** 129:6 156:20
**he'll** 49:9 53:9
  142:4
**head** 42:20 48:14
  49:3 56:22 100:22
  106:23 107:17
  185:21
**headquarters**
  25:20,23
**health** 9:8
**hear** 22:9 191:21
**heard** 4:19 29:19
  60:18
**hearing** 4:11

**heavy** 164:22
**held** 28:25 35:8
**helm** 172:4,6
**help** 13:13 14:2
  37:23 91:20,22
  110:8 126:13
  207:15 209:19
  210:4
**helped** 14:6 25:10
  207:14,17
**helpful** 150:5
**helping** 208:21
**helps** 161:9
**hereto** 213:19
**hereunto** 213:21
**hey** 100:16 148:4
  210:19
**hi** 86:14
**hidden** 158:12,24
**hide** 94:9,20
  158:20 159:8
**high** 164:6
**higher** 74:22,22
  111:15,15
**hire** 97:6 138:4
  196:2
**hired** 38:15 40:13
  85:4 93:14 138:5
  172:16 197:1,16
**hiring** 150:14
**history** 11:16 13:6
  46:1
**hit** 106:23 189:22
**hold** 30:4 34:11
  205:16
**holding** 76:3 175:1
  186:19
**hole** 160:7
**holmes** 20:19 21:7
  23:20 24:12 25:3

[home - inclusive]

**home** 50:10
104:12
**honest** 164:1
204:13
**hope** 170:25
**horvath** 197:21,25
**hotel** 100:17
106:19 107:17
170:16,20 202:8
202:14
**hotels** 160:24
**hour** 6:25 7:1,1
17:3 54:1,2,3,5,16
54:24 56:5 59:2
70:22 80:3 93:14
99:3 102:21
104:22 113:3,3,3
128:1
**hourly** 54:19 55:1
58:3 72:22 73:2
80:5 93:5,11 99:3
112:4 127:10
**hours** 12:17,18,19
13:1,4 15:21 16:8
56:14,18 74:20
102:16,22 104:22
111:22 162:19
163:12 173:25
**how's** 45:4
**howard** 22:1
**howarth** 1:12 2:14
3:3,7,9,10 4:2,15
5:5,19,23 7:14
8:14 13:23 17:7
17:11 20:2,3,8
21:23 25:20,24,25
26:1,3,17,17,23,24
26:25 27:1,21
35:12,13,25 42:6
42:22,24 43:5,9,14
43:16,22 45:9

46:22 47:3 49:20
51:18,23 52:1,23
53:1,4 63:1,3,8,25
69:15,22 70:2,15
71:1,6,7,16 72:14
75:24 76:14,21,25
77:2,5 78:15 93:4
93:16 94:1 95:8
95:14 96:2 98:20
99:6,13,13 110:12
110:17 112:7,9,14
113:10 115:10
122:4 130:1
135:20 136:17
137:17,18,23
138:5 141:19
156:3,10,18,24,25
157:23 158:4
167:11,16 176:16
187:9,11 191:5
195:11 196:10,11
197:7,15 198:14
211:12 213:7
**huge** 163:7 181:9
**huh** 13:17 208:9
**hundred** 17:3
**hundreds** 105:20
105:20
**hungry** 7:8
**huntsville** 2:3
**hurting** 37:23
**hygiene** 29:20
155:6
**hygienist** 29:3,6
29:14,17 154:6,8
154:11,15,17,21
172:9,10,16
**hygienists** 29:23
30:2

**i**

**i.e.** 197:5
**idea** 48:9 113:2,4
184:7
**identical** 98:11,19
107:18 115:4
189:21
**identification**
10:21 11:2 19:2,5
19:22 32:22 36:16
68:19,22 71:16
76:2 78:14 80:4
80:10,12,18 85:24
86:18 95:9,12
97:16 98:14,15
100:25 101:12
110:11,21 113:11
113:14 120:5,8
122:21 127:17
130:2,5 131:14,22
134:4,24 155:20
155:22 157:4,7
167:12,15 171:19
172:14 174:21
175:2,22,25 176:3
176:4,6,22,24
177:6,8,21 178:7
178:16,18 180:25
184:15 189:6,9
192:17,20 193:25
198:15,18 202:16
202:19,22 204:1,4
205:3 206:13,16
208:2,4,24 209:1
**identified** 118:1
137:9
**identify** 38:19,21
62:3 116:23 157:1
176:7
**ignore** 64:25

**imagine** 8:12
**immediately** 77:2
149:8
**impact** 111:21
179:14
**impacted** 152:2,3
152:14
**important** 93:13
110:25 160:2
184:2,4
**impossible** 16:16
41:3 158:6,8,14
**improperly** 201:8
**improve** 203:7
**inadequate** 71:3,9
82:2 93:18 94:3
94:15 99:8,15
110:14,19
**inc's** 19:7
**inc.'s** 2:20 70:13
70:19 85:8 130:7
**inclined** 90:21,22
**include** 13:1 38:10
64:17 161:25
169:17 177:14
**included** 31:1 37:7
54:4,8 65:11
87:19 99:24
132:15 139:1
142:14,16 143:17
143:19 175:15
176:22 177:15
181:18 188:24
**includes** 132:7
133:13,21 171:20
193:23 199:4
201:2
**including** 162:19
163:12
**inclusive** 47:8,9

**incorporated**
26:16,17
**incorporates**
136:4
**incorrect**  5:12,16
14:22 203:24
**incorrectly**  34:8
**increase**  88:16
90:2 121:5
**independent**  13:22
46:12,24 51:9,13
51:21 52:20 80:24
**index**  2:12
**indicate**  58:7 78:6
97:13 116:5,15
117:12,20
**indicated**  23:24
58:12 62:7 119:12
147:6 162:18
174:2
**indicates**  49:18
76:7 173:12 195:2
**indicating**  195:10
197:5
**indication**  184:21
**indicative**  159:23
159:25
**individual**  31:18
40:14 46:2 47:22
**individuals**  51:12
**industrial**  29:3,6
29:14,16,20,23
30:2 154:6,8,11,15
154:17,21 155:5
172:9,10,15
**industry**  21:17
24:18
**info**  122:10
**inform**  84:3 98:2
**information**  14:8
15:21 50:25 90:8

90:9,19 116:14,22
117:10 119:10
134:9,15 156:21
158:15,20 159:8
160:11 163:6
169:12,20 175:7
181:25 195:14
197:11
**informed**  99:13
**informing**  82:22
**initial**  7:15
**initially**  46:3 47:5
121:19
**initials**  5:15
**inn**  1:3 4:16 35:24
40:10 48:24 53:10
56:4 76:9 81:4,8
81:20 82:5,13
84:8 87:6 95:15
97:8 100:8,17
102:2 106:21
107:1,4,5,13 108:9
110:13 123:2
132:10 135:12
138:3 147:7
157:10 162:3
165:5 166:17
171:11 172:7
189:17 191:1
195:13 197:5
210:21
**input**  169:9,11,19
**inputting**  168:23
**inside**  149:2 150:6
151:20 152:9,25
153:25 160:21
161:1,9
**inspect**  102:18
104:15 148:8
159:14

**inspected**  148:13
163:21 164:20
**inspecting**  56:10
56:15
**inspection**  56:24
98:7,8 103:14
108:6,7 109:2,5,17
149:24 151:16
**inspections**  43:20
45:15 96:11
104:11
**inspector**  22:4
**instructed**  90:22
**instruction**  70:10
**insurance**  1:7 4:17
9:8,10 21:17
23:22 24:18 31:18
31:19 34:7,9,22
35:4,10,13,15 61:6
61:18 71:8 72:6
73:13,18 74:13
75:9 93:11,15,20
93:25 94:13,15
98:22,24 99:14
116:18 118:20,22
121:5,18 195:21
196:15
**insured**  69:22 71:2
71:3 72:17 76:7
76:11 78:25 84:14
88:17,18,18 90:3,4
90:8 93:3,17,18
94:2,3 99:6,8
110:14 111:1
189:16 190:25
195:21 196:16
**insured's**  70:6,7
85:8,17,19
**intake**  56:8 112:16
**intended**  173:21
197:10

**intends**  138:24
197:6,14
**intent**  37:4 89:8,10
**intentional**  159:1
159:4 197:24
**intentionally**
158:13,15,20,24
159:7
**intentions**  199:7
**interest**  33:16,17
33:18,25 34:2
87:25 114:23
**interested**  33:23
213:19
**interior**  149:2
150:9 151:23,24
151:25 152:6
153:1 176:19,19
176:24 182:2,9
185:16,16 186:13
186:15
**interiors**  150:6
151:20
**internal**  153:17
155:2
**internally**  143:1
**interrupt**  136:3
200:14
**introducing**  84:10
**inventories**  66:1
66:20 186:19
187:5,7
**inventory**  14:9
138:20 141:7,12
188:14
**investigate**  80:25
**investigating**
190:5
**investigation**
67:22

**invocation** 70:6
85:12,17 86:5,20
98:22
**invoice** 15:12
**invoices** 17:11
38:3
**invoke** 70:16,18
83:4,23
**invoked** 70:20
71:12,25 72:11
73:18 82:14,23
83:9,14 84:5,22
85:3,21 86:9
93:13 114:9
116:13 118:7,8
**invoking** 84:18
85:10
**involved** 8:17,24
9:5 23:9 42:16
43:19,23 45:14
48:25 51:24 52:4
52:10 57:15 92:13
92:13,17 97:20
99:22 106:22
120:23,25 152:1
168:6 179:7
**involvement** 6:5
10:12,16 14:19
19:9 44:18,21
45:23 53:19 122:1
**involves** 210:6
**involving** 9:10
142:3
**irmiter** 136:4,8
154:5 169:15
210:16
**irmiter's** 136:4
**isolated** 145:7
**issue** 13:24 45:24
59:8 68:6 79:16
79:18 92:5 161:5

194:22 196:22
207:13
**issued** 112:10
**issues** 8:21 9:2,9
10:14 65:1 124:9
196:1
**item** 92:16
**itemized** 49:13
**items** 87:8 168:5
185:24 188:24

## j

**j.t.** 39:7
**jah** 5:13
**january** 1:17 4:4
4:21 69:7 77:10
100:25 101:22
102:10 103:17
105:24,25 147:17
148:1 183:18
184:15 198:21
202:21 203:12
213:23
**jhe** 1:6 4:18
**jinil** 39:8
**job** 1:21 15:13
21:20 24:17,19
25:6 64:9,23 92:4
110:23 117:4
118:19,21 148:20
150:14,20,21
**jobs** 21:21
**joint** 76:15 142:5
167:24
**jointly** 54:5 142:9
**jordan** 2:2
**jr** 22:1
**judge** 5:16 187:23
**july** 113:18 117:9
119:14 189:11
190:24 191:6

**june** 95:22 101:10
101:22 102:10
105:24 106:13
157:8

## k

**keep** 33:18 73:12
104:20,21,24
113:5 121:18
169:10
**keeper** 187:8
**keeping** 78:3
111:22,22
**keeps** 189:22
**kentucky** 31:6
42:15 121:4
**kept** 13:25 49:25
50:1,3 113:6
158:15
**key** 13:19
**keyes** 26:23,24,25
27:2,3
**killed** 205:23
**killing** 63:5
**kind** 7:10 15:25
27:24 28:7 31:13
38:17 49:5 50:23
104:12 111:5
113:8 116:4
143:10 144:3
146:3,7,18 150:18
152:24 154:12,16
156:20,24 161:9
163:9 165:14
173:10 179:13
189:22 204:21
**kinds** 160:22
165:1
**knew** 55:22 96:19
109:15 147:19
177:13 190:9,16
207:18

**knight's** 81:20
**knights** 1:3 4:16
35:24 40:10 48:23
53:10 56:4 76:9
81:3,4,8 82:5,13
84:8 87:6 95:15
97:8 100:8,17
102:2 106:21
107:1,4,5,13 108:9
110:13 123:2
132:10 135:12
138:3 147:7
157:10 162:3
165:5 166:17
171:11 172:7
189:17 191:1
195:13 197:5
210:21
**knot** 128:8
**know** 7:9,9 8:11
10:8 12:20 14:2
15:20 16:18 17:6
18:14,16 19:22
22:12 24:3,4,11
25:19 29:24,25
37:9 41:14,15
42:8,17,21 46:13
48:10,22 50:20
51:25 52:13 53:18
55:20,20 56:15,16
57:3,4,10 59:4
60:17 62:10 63:23
64:4,18,19,25
77:19 78:2,4,10
82:21,24 89:25
91:1 93:13,16,21
94:1,4,5,5,14,16
94:21 96:7,16,18
96:21 97:1,17,17
97:18,19,21 98:16
100:17,20 104:2,4

105:16 106:4
107:25 117:15
118:7,20 119:8
123:18 125:19,23
126:13,15 127:19
129:4 130:24
132:19 134:24
136:20 138:21
139:1 143:6 146:3
146:17 147:14,15
147:23 148:22
149:7 151:9,11,23
153:17,21,22
154:5,6 155:1,1
158:2,21 160:17
161:3 164:2,3
165:5,6,25 166:3
168:21 172:22
174:9 180:10,19
181:13 183:24
184:2,4,8,11 186:3
186:5 187:20,23
187:25 188:8
189:18 190:1,4
193:10,11 194:9
196:25 199:7,21
200:2,3 201:3,5,5
201:18 203:6
208:16,19 209:10
209:20,22,23
210:6,7
**knowledge**  63:6
100:22 154:10
171:7,9 179:8
**knowledgeable**
188:22
**known**  26:20
103:11 162:24
**knows**  82:18 93:20
160:8 187:20
188:8 209:22

**kob**  5:15

## l

**l**  4:1
**lab**  154:9,23,24
155:3
**labor**  186:11
**laboratory**  154:19
155:9
**ladder**  107:22,24
108:1,14,15
**ladders**  108:15
**lady**  166:16
202:13
**lady's**  206:3
**lane**  17:21
**language**  79:5
203:7
**lap**  76:3
**lapse**  32:12
**large**  23:15
**larger**  75:1,2,2
**lasted**  78:7
**late**  21:16 22:10
22:16
**laughed**  210:21
**law**  42:13,15
138:2
**lawsuit**  6:1 8:18
8:24,25 9:6 19:8
38:12 210:9,11
**lawsuits**  10:12,16
**lawyer**  7:10 42:11
63:1,8
**lay**  6:6 10:13
**laymen**  138:1
**laymen's**  144:4
**lead**  129:2
**leadership**  33:24
**leading**  33:25
119:6

**leaking**  159:24
160:4,18,19 161:1
**leaks**  161:16,16
**learn**  30:15 209:17
**learned**  137:25
179:1
**led**  190:14
**left**  18:24 27:24
36:12 91:1 93:3
156:20 207:7
**legal**  2:11 38:2
124:15
**legally**  137:24
**legitimate**  72:4,4
**length**  20:7
**letter**  2:22,24 3:17
3:18,19 60:13
79:12 80:13,20,23
81:7,8,15,17 82:15
82:23 83:3,7 84:2
84:12,13,17,19,23
85:1,25 86:8,14,25
87:20 89:11 94:22
113:15,20 115:2,3
115:14,20 116:8
116:10,17,20
117:9,11,20 118:1
119:14,21 206:17
206:19,23,25
208:4,12 209:2,3
209:13,18
**letters**  52:4 68:2
115:4
**letting**  118:7
**level**  46:10 155:11
155:15
**liaison**  151:2
**license**  28:25
30:25,25 31:12,13
34:11

**licensed**  1:14
30:11 31:3,8,17
44:11,14 45:17
213:4
**licenses**  30:23
32:11,14
**licensing**  31:10
**life**  146:7 186:5,6
**likes**  7:3
**limited**  64:20
139:2 145:2,8
151:25
**line**  115:4 136:3
168:5 179:15
185:24 189:13,21
189:23,25 191:19
191:19,23 192:5
192:25 193:18
205:13
**lines**  61:19 194:13
**list**  36:23 37:2
39:5 45:2,22
51:25 60:5 62:2
65:19,22 168:16
174:9 183:17,23
183:23,25 184:4
184:12,15 204:21
204:23 210:10
**listed**  21:20,21
28:16 38:19,23,24
62:11 66:21 76:21
112:9 134:23
137:14 188:24
201:25
**listening**  23:16
**lists**  187:1
**litigation**  9:9,10
125:22
**little**  6:25 15:25
78:19,20,24
102:15 103:2

122:1 125:16
138:1 177:6,8
187:16 191:24
**live** 17:18 18:1,12
55:17,18,23
**lived** 17:24 55:22
**lives** 18:6 55:21
**living** 100:19
**llc** 130:6 132:11
**llp** 2:6
**located** 25:21,24
152:19
**location** 147:12
151:24
**loggins** 2:6
**logo** 122:4,4
**long** 11:11 17:24
25:2,17,23 34:17
34:17 44:8 51:5
52:25 78:7 101:5
102:10 106:4,14
108:25 119:16
161:4,4,5 184:10
**longer** 6:25 46:6
108:12 137:16
143:6 185:23
**longest** 112:24
**look** 19:19 50:25
62:2 64:10 78:4
87:22 92:20 96:22
107:19 122:13,15
127:19 131:12,21
135:11 154:11
168:22 173:1
178:11 179:25
191:23 201:3
203:15 207:5
209:5
**looked** 42:8 122:2
127:15,20 150:19
150:19 179:12,15

**looking** 7:25 64:6
66:12 78:13
108:25 149:15
151:23 172:18
187:3 188:25
189:1 196:5 207:9
**looks** 77:3,9 96:1,4
120:13 122:3,17
131:16 138:15
147:13 167:2
171:10 176:19
179:25 193:2
194:20
**loss** 6:2 19:13 44:4
46:11,12 69:9,11
69:17,23 72:5
79:17 81:14,23
82:10,11 83:4,22
88:15 89:23,24
90:18 91:2 92:4,6
92:10 94:11 95:18
96:11 97:3,8,23
98:8 99:16 103:1
103:11 104:10
105:19 109:2
110:23 115:2,23
115:25 116:12,16
116:24 117:4,9
118:9 131:24
132:8,9 136:20,21
136:21 138:21
140:25 141:6,6
143:4 145:23,24
148:10 151:8
152:1 153:4,19
154:2 161:6 162:1
171:11,21 172:7
173:9,9 174:3
176:9 177:3,16
178:20,22,23
179:25 180:6,14

180:15,18 181:1
183:20 184:5,8
189:14,24 191:2
191:20 192:6
195:11,22,25
196:16,21 197:7,9
197:15 199:6,8
200:22 201:25
202:4,5,7 203:8,10
203:15,23 205:3,4
205:14 209:3
**losses** 29:11
104:14 139:1
199:4,15 201:23
**lost** 33:16,17
**lot** 8:3 16:20 29:9
48:25 57:5 59:5
63:24 78:20 96:12
96:23 107:19
134:14 143:8,25
145:8,8 151:6
152:1 156:21
163:6,7 185:16,22
186:13
**love** 204:15
**low** 184:10
**luck** 210:22
**lunch** 7:3,6

**m**

**m** 91:10
**machine** 144:5,7
144:14,18
**mack** 24:21
**madam** 5:1
**maddox** 18:9
**mail** 3:12,13,14,15
11:4,16 13:6 46:1
78:8,9 125:9
129:16 189:10,15
189:20,23 190:13
192:20,25 193:17

194:17 195:6,9,17
196:11 197:20
198:2,20,23
199:17,19 200:25
202:20,21,25
203:18 207:2,4
**mails** 14:2 45:25
68:2 162:14,20
193:1,6,9,13,22,24
196:5 201:20
207:2 208:18
209:9
**main** 53:16
**maintaining** 160:1
160:5,12
**maintenance**
160:1,23 166:21
179:9
**major** 37:24
**majority** 62:8
**making** 74:1
114:23
**manager** 21:25
43:23 108:12
166:16,17 207:12
**manley** 26:23 27:4
27:5
**mansard** 106:24
163:23 164:2,3,5,7
164:8
**mapquest** 104:4
**march** 68:25
69:11 80:21
103:16,18 105:25
132:9 147:17
148:1 170:4,7,10
171:22 189:13,24
205:3 208:5
**marked** 10:20
19:1,21 32:21
36:16 68:18 71:15

76:2 78:13 80:4
80:11,17 85:23
86:18 95:8 97:15
98:13 100:24
101:11 110:10,20
113:11 120:4
122:20 127:16
130:2 131:14,22
134:3,24 137:10
155:21 157:3
167:12 171:22
172:13 174:20
175:2 176:2,21,23
177:5,7,20 178:7
178:15,17 180:24
184:14 189:5
192:19 193:25
198:15 202:15,22
203:25 205:2
206:12 208:3,25
**marketer** 104:16
**marketing** 45:8
46:2,10 47:18
**marks** 10:25 19:3
68:20 80:8 95:10
113:12 120:6
130:3 155:18
157:5 167:13
175:20,23 189:7
192:15 198:16
202:17 204:2
206:14 207:25
208:22
**married** 9:11,19
9:20 20:4,9
**material** 45:25
46:4
**materials** 173:10
186:14
**math** 73:17 74:21
96:1 111:19

**matter** 4:16 14:24
17:9,13 38:7,11,14
40:12 44:18 47:23
87:4 88:23 90:1
114:24 166:19
210:19
**matters** 41:7,13,22
124:15 213:9
**max** 186:9
**mccrory** 26:25
**mean** 11:21 13:16
28:2 31:24 44:10
64:7,8 76:12
81:25 91:1 103:16
142:21 143:8,13
149:13 188:7
**means** 32:5 72:21
73:2 90:2 137:24
170:8 199:1
**meant** 31:25 32:1
32:4,10 208:6
**measure** 92:10
94:10 153:4
180:13
**meat** 163:10
191:24
**mediation** 39:3,19
**meet** 30:1 87:5,11
87:23 88:10,25
89:3 90:10 104:16
114:21
**meeting** 27:23
77:17,20,23 88:13
90:15 107:1
123:12,13 165:10
205:17
**meetings** 151:2
**member** 32:23
33:4,10 34:8,10,21
34:25 35:7 147:23
209:23

**membership**
33:17
**membrane** 179:20
**memorize** 178:9
**memorized** 56:21
57:2 168:21 171:9
**memory** 10:8
50:23 57:1 106:6
113:6,8 166:11
178:12 207:6
**mention** 138:20
**mentioned** 103:9
**merits** 134:8
**met** 5:23 13:8 46:3
77:19 165:22,23
165:25 166:1
**metal** 96:14 118:4
164:8 179:12,14
179:16,21 186:3
**meter** 164:25
**method** 73:8
158:17
**mfllaw.com** 2:9
**microbiologist**
30:6
**middle** 7:15 55:21
55:24 106:25
195:6
**midstream** 63:6
**migrating** 153:16
**migration** 149:12
**mike** 79:24
**million** 74:14
177:6,8
**mind** 106:18
147:12 149:25
200:23 210:5
**minds** 125:14
**mine** 166:11
**minute** 19:19 36:3
72:18 73:10 94:24

94:25 203:22,22
**minutes** 14:11
21:3 211:3
**missing** 66:24
96:14,15 134:23
179:18
**mississippi** 31:6
121:4
**misspelled** 197:22
**misspoke** 156:4
**mistake** 124:25
181:9 200:9,10
**mistaken** 204:23
**mold** 29:11 30:9
30:11,17
**moment** 9:8 203:3
**money** 25:16 74:8
81:11,13 90:11,14
**monies** 121:20
**month** 101:24
102:3 103:23
206:22
**months** 69:9 95:24
**morning** 5:25
13:16,19 44:6
**move** 149:11
177:25 188:1
202:6 203:13
**moved** 26:6,6,7,13
53:22
**moving** 202:9
**mozley** 2:6
**mullin** 205:8,11
**multiple** 45:21
56:17 143:3

**n**

**n** 4:1 22:1 91:10
**name** 5:25 7:13
18:4,8 24:21 26:3
46:17,19 52:14
76:17 82:21

170:17 172:5
197:22 207:24
210:20
**named** 123:10
124:18
**naming** 190:14
**narrative** 66:3,9
66:13,21,25 67:9
67:10,21 133:4,8
133:11,11
**narrow** 105:23
**narrowed** 103:22
**national** 32:23
34:22 35:4,10
**natives** 8:3
**near** 97:5
**nearby** 104:10
**necessarily** 55:12
74:3 188:18
**necessary** 134:8
**need** 6:10,11,15,17
6:21 13:13 18:18
50:9 53:8 59:24
75:14 79:4,23
86:8 105:18
131:18 136:25
150:24 151:11
153:21 167:3
169:17 174:11,13
177:23 186:5,17
187:4,15 200:21
202:9
**needed** 54:9 77:20
**needs** 75:15 84:14
145:17 146:12
153:21
**neglecting** 161:6
**negotiate** 88:13
89:21
**negotiates** 31:21

**negotiation** 78:24
**neither** 213:14
**net** 47:11 111:11
111:13 112:1
**never** 9:9 42:15,16
66:21 73:24,25
90:14 92:1 122:8
123:22 124:25
135:18 144:17,23
160:15 164:18
169:18 178:10
182:10 203:23
206:7
**new** 49:12 74:8
75:16 144:6,13,17
145:19,24 146:1
**newsletter** 61:17
**nice** 24:14
**nicer** 189:1
**nickname** 7:19
**night** 102:13 104:8
**normal** 148:23
149:7
**normally** 109:19
151:22
**north** 1:16 4:3
**northern** 1:1 4:20
**notarial** 213:22
**notary** 1:14 4:12
213:5,24
**note** 75:14
**notes** 105:4 151:4
180:22 213:13
**notice** 2:19 4:7 5:6
5:14 10:21 11:12
83:8 84:21 85:9
96:25 159:20
203:20,24
**noticed** 96:12
103:3 112:20

**notification** 85:2
**notified** 99:8
103:15 110:18
116:13 117:2
124:24 125:4,5,7
**notify** 70:5,20
83:10 85:17 98:21
**notifying** 81:3
82:12 114:8
**notwithstanding**
121:23 163:11
**november** 192:22
193:7 197:20
**number** 4:18
16:13 18:20 41:4
41:19,19 42:13
56:18 70:10 75:1
75:2,2 91:19
122:6,8 144:9,12
145:20 149:15
166:25 171:9,10
**numbers** 36:17
57:2 104:25
127:18 188:23

**o**

**o** 4:1 46:20,20
**o'clock** 6:21 7:8
129:18
**oath** 5:3 11:21
16:13 98:17
104:23 165:13,21
205:15
**object** 74:25 89:6
93:19 118:13,16
123:21,23 124:11
126:2 140:12,23
157:12
**objecting** 126:5
**objection** 123:19
**objections** 4:10

**observation** 103:6
**observations**
138:25 154:2,3
**observing** 149:10
**obsolescence**
143:17,19,22
**obtain** 59:12
**obtained** 30:22
155:4,10 169:20
**obtaining** 23:9
**obvious** 96:14
**obviously** 52:3
64:21
**occasion** 122:2
**occasionally** 127:7
**occasions** 40:21
41:2 73:18 77:25
**occurred** 49:22
68:25 79:17
109:17 151:14
193:12
**occurrence** 161:24
**oddity** 9:14,15
**odom** 1:14 213:4
213:24
**offer** 31:10,11
81:5,21 82:6 87:1
87:17,17 88:17
89:18 90:3,23
114:13,20 117:22
117:25 139:11
**offered** 29:10
63:25 71:21 81:12
82:1 90:11,14
99:15 116:18
138:11,16 141:18
172:15
**offering** 87:11
88:2 139:4,14,16
139:19,22 140:2

**offers** 121:19
**office** 11:5,8,10
  23:16 26:7,8,11
  35:8 43:23 45:11
  50:9,10 65:10
  66:18 90:20 126:1
  128:24 130:19
  138:2 152:19
**offices** 5:24 25:19
  26:12
**official** 73:25
**oh** 8:8,9 14:11
  52:8 60:4 81:17
  102:23 156:6
  164:11 178:9
  191:21 210:22
**okay** 10:7,19 11:5
  12:2 14:10 17:7
  20:3,25 22:13,15
  22:17 23:18 27:10
  29:8 33:4 39:1
  45:4,6 47:22
  50:21 51:3,4
  55:25 57:3 58:10
  59:11,22 60:1,11
  70:21 78:23 79:23
  79:24 83:16 84:23
  85:7 102:22
  117:19 120:20
  121:14 126:9,17
  127:4,16 131:20
  134:21 150:6
  164:4,15 166:4
  171:17 196:9
  200:5 201:18
  205:25 206:9
  209:12 210:22
**old** 7:23 18:10
  144:5,9,17 145:16
  145:17,21,25
  146:16

**once** 32:5 33:2
  48:6 73:18 89:25
  97:7 101:15
  148:18,20 179:24
  209:12
**ones** 25:11 28:15
  38:21 62:3 127:15
  127:19
**ongoing** 59:3
**oops** 124:25
**open** 36:4 46:9
  153:19
**opened** 5:24 26:8
  44:5
**operated** 20:8
**operation** 100:18
**opinion** 31:1 66:4
  66:6 71:2 72:5
  93:10,17 94:2,10
  99:7 110:13 111:7
  111:8,9 134:7,13
  134:17 136:19
  173:15 182:18
  192:11,12 194:5
  199:22 200:10,12
  201:8,14,15
**opinions** 67:1,10
  68:3 109:11 132:8
  133:14,22 135:4
  140:24 141:5,9,14
  171:20 172:14
  182:17
**opportunity** 105:9
**opposed** 36:1
  54:19
**orange** 24:20
**order** 6:21 11:14
  13:8 26:23 48:9
  48:10,20 78:4
  79:14 114:21
  127:11 128:17

146:15 157:1
  162:17,20 173:3
  184:22 185:2
  186:6 196:15
**ordinarily** 50:3
**organization** 33:1
  33:19,23 34:1,15
**origin** 64:13
**original** 9:11
  199:11 213:12
**originally** 10:24
  170:20 201:6
**orlando** 8:7
**outcome** 48:24
  128:12
**outlined** 115:8
**outlining** 126:23
**outside** 41:9
  154:17
**overall** 145:5
**owe** 121:6
**owed** 81:11
**owned** 132:10
**owner** 21:22 43:16
**ownership** 43:2
  166:19

**p**

**p** 4:1 86:2
**p.m.** 95:4 129:22
  167:7 198:10
  211:9
**page** 2:13,18 3:2
  19:10,13,16 36:17
  36:17,19,19,21
  38:18 80:12 85:24
  86:17 92:20
  127:23 131:13,13
  131:21,24 195:18
  196:5,6,8 197:21
  198:19

**pages** 19:17,20,20
  36:14,15,25
  130:11 137:12
  194:20
**paid** 47:4,5 48:3,5
  48:7 49:4,11 50:7
  50:15,19 51:1
  54:1,2,5 55:1 56:5
  56:7,9,19 57:6,10
  57:20,23 70:22
  73:14 74:13 75:10
  76:15 81:12,14
  82:1 97:4 99:15
  110:19,24 111:12
  128:4,6,13,17
  137:15
**paint** 65:2 145:3
  161:2
**painting** 185:16
**palmer** 39:21
**panel** 69:18,25
  92:7
**papers** 188:5
**paragraph** 70:21
  76:6,6,11 85:16
  86:25 92:23 94:17
  98:18 99:2 114:1
  143:11 194:21
  195:6,7
**parameters** 170:1
  170:16
**parkway** 2:6
**part** 53:15 55:5
  56:7 62:4 63:22
  97:21 113:24
  119:9 120:11
  121:24 122:14
  130:18,24,25
  134:2 135:12
  136:10 142:15
  154:4 169:21

175:6,8 179:19
**partial** 36:20 47:6
  178:20
**participate** 104:15
  112:22
**particular** 46:11
  49:25 151:24
  155:9 164:19
  168:15 169:23
  171:6
**particularly**
  154:11
**particulate** 149:12
  153:25 154:10
**parties** 134:16
  213:16,19
**partners** 26:3,15
**partnership** 27:6
**parts** 23:1 98:10
  145:2
**party** 8:18 10:15
  10:17 177:13
  182:11
**passed** 38:3 75:13
**patch** 160:3,7,11
  160:25
**patches** 160:13
  161:7
**patching** 159:24
**pay** 25:14 33:2,3
  47:18 93:4 97:24
  103:1
**payee** 76:15,22
  112:9
**paying** 34:12
  151:10
**payment** 47:6
  128:18
**payments** 59:13
  76:16

**payroll** 15:19,23
  50:4 58:16
**pending** 5:15
  53:21 96:17
  176:20
**people** 8:4 37:23
  47:19 51:14 62:25
  100:18,19 153:4
  160:2,23 166:21
  179:9 201:6
**peppered** 179:16
**perceive** 65:12
**percent** 36:8,12
  43:15 47:4,8,12,19
  47:20 55:6,7,13
  56:7 72:16 73:15
  74:9,15 75:1
  111:11,20 112:16
  112:23 121:18
  136:21 146:17
  173:11 185:12,15
  185:18 186:9,10
  186:10,12,12,16
  204:16
**percentage** 35:25
  36:3,7,10 54:17,18
  55:6,6 58:4 72:23
  121:20 146:15
**perfect** 84:1
**perfectly** 191:4
**perform** 30:18
  156:24
**performed** 48:9
  53:25 155:9 158:5
**performing** 43:20
  45:14 56:24
**perich** 2:22 80:14
  80:24 82:5 83:10
  84:10 85:25 86:1
  86:13 87:12 90:10
  113:16 114:14,14

116:11,15,21
  117:2,20 125:5,7,9
  189:11 190:1,3,5
  190:16,25 192:5
  193:11,18 200:25
  206:18 209:2
**perich's** 189:23
**period** 49:12
  101:24 102:3
  103:23
**periodically** 160:6
**permanent** 100:19
**permitted** 5:9
**person** 42:11 44:5
  77:21 90:12
  188:13
**personal** 139:12
  141:15 145:9
  174:5
**personally** 9:6
  77:14 161:15
  165:23 166:9,22
  174:7 210:7
**pertinent** 156:21
**phone** 77:22
  112:19 142:2
**photograph** 151:4
  180:13
**photographed**
  148:20
**photographing**
  56:10
**photographs**
  57:19 105:7,20
  138:23 140:21
  142:3 151:2 153:5
  153:8
**photos** 96:13
  154:3,4 179:11
**pick** 27:24 189:18

**picked** 200:24
**picture** 106:18,23
  107:16,17 108:6
  109:16
**pieces** 96:14
  179:17,18
**pilot's** 30:25
**place** 10:23 48:22
  66:15 106:24
  121:11 122:21
  206:4
**places** 96:16
**plaintiff** 1:4 2:3
  8:20,22 137:12
**plaintiff's** 3:4
**play** 129:8 160:16
**playing** 202:10
**pleasant** 189:3
**pleasantries**
  165:14
**please** 4:22 5:2
  7:12 46:19 50:25
  58:19 59:12 60:2
  87:5 88:24 127:3
  169:5 198:25
**plugging** 141:23
**plus** 70:22 99:3
  176:24
**point** 15:15 90:11
  90:17 134:15
  143:2 179:22
  194:13 195:23,24
  196:2,19 205:11
  206:11
**pointe** 2:6
**policies** 35:16
**policy** 61:18 70:7
  70:8 83:5,15,24
  84:4,15 85:10,18
  86:10 98:23,25
  114:9 123:3 184:1

**policyholder**
31:20,24,25 32:6,8
35:18 36:11 72:6
73:23 83:14 90:24
91:25 94:23
145:23
**policyholders**
25:11 31:19
**polynesian** 164:7
**poor** 202:13
**port** 24:20
**portion** 55:7 59:17
92:25 94:17
112:15 164:20
168:7
**position** 21:22
24:25 71:23 73:23
123:7,16,16 142:6
142:7 171:10,11
194:2
**possibility** 209:24
**possible** 139:8,10
**possibly** 15:8
**pot** 202:8 206:4
**potentially** 59:19
**practical** 184:6
**practice** 148:23
**practices** 19:14
131:25
**precise** 104:25
**precisely** 187:10
**predicament**
151:3
**predominately**
152:22
**preexisting** 161:23
161:25 182:19
**premises** 136:18
137:2
**prep** 37:15

**preparation** 13:12
13:18 67:5 156:3
156:10 157:23
174:2 178:3
183:10 185:6
**prepare** 11:14
12:15 13:9,14
14:6 44:1,3 136:7
136:10 153:7
162:17 174:7
**prepared** 13:19
56:1 65:25 66:3,9
67:15,20 68:5,10
68:14 109:14
116:25 132:14
135:4,7 136:12,15
140:21 141:8,13
141:20,22 142:9
155:23 156:16
157:9,13,21
168:12 169:12,24
171:6 172:9
173:16,19 174:17
177:13,21 184:13
186:20
**preparing** 12:14
43:24,25 56:1,10
130:15 172:13
180:14 183:8
**present** 2:10
**presented** 60:22
81:5,22 117:22
**presenter** 60:22
**presenting** 69:17
69:24
**presently** 12:8
**preserving** 34:2
**president** 21:22
33:12 34:4,14,16
35:9,9

**press** 14:23
**pressing** 104:24
**presumably**
173:23
**presume** 188:4
**presumptive**
155:13,16
**pretty** 6:7 12:3
16:25 39:23 96:1
96:14 122:2 164:9
164:12 177:22
179:11 185:12
211:4
**previous** 11:19
30:14 41:20 115:1
170:19,20
**previously** 11:10
26:14,15 80:17
82:9 131:14
197:25
**price** 168:16
183:17,22,23,25
184:4,12,15
**prices** 184:3,9
**pricing** 158:10,11
158:12 169:1
188:15
**primarily** 37:22
**primary** 161:2
**print** 170:23
176:25 177:1,11
**printed** 158:13
170:5,7,25
**prior** 11:24 13:6
26:2,22,24,24,25
36:20,24 37:2
62:3 71:11 87:4
88:24 100:12
110:4 117:17
159:21,23,24
160:18 161:16

162:3 170:9
**probability**
109:17 148:16
**probably** 12:17
14:4 24:3 30:3
36:8 37:10 40:2
41:17,19 49:21,24
53:18 61:2 75:15
78:18 90:25 94:12
98:16,19 105:6
115:6 116:17
120:10 128:23,25
138:22 142:12
148:2,21 149:14
152:22 155:1
162:13 168:25
169:25 175:14
180:19,20 184:7
186:24
**problem** 107:16
160:25 165:2
**problems** 160:18
160:20 161:17
**procedure** 1:18
4:6 5:10
**procedures** 62:16
62:17,17
**proceed** 88:19
191:6
**process** 15:14
30:17 35:23 42:3
42:6 50:17 61:19
62:18 63:4,5,11,12
68:3,11,16 70:16
72:11 73:25 75:6
76:19,21 78:21
82:20,23 83:5
84:18 85:13 86:6
86:20 87:4,14
88:24 91:12 98:22
114:25 119:5,9

125:25 143:1
149:7 163:10
195:20 196:2,12
197:17 199:9
200:19 201:7
206:6
**processing** 25:10
**produce** 75:6
183:12
**produced** 58:11
68:3 142:6
**product** 151:9,11
167:24
**profession** 32:19
**professional** 28:17
30:23,25 32:11,14
44:16
**professor** 154:18
154:22,23
**program** 141:24
159:8 168:22
**progress** 143:5
**progressively** 14:1
**projected** 47:20
47:20
**promise** 121:1
**proof** 205:14
**proper** 19:14
62:16,16,17
131:24 145:6
**properly** 110:24
**properties** 38:22
39:12 138:22
**property** 3:5 9:11
21:11 23:25 30:21
31:18 35:16 78:17
139:12 141:16
144:21,22 145:7
145:10 146:1
155:24 156:17
201:2

**proposed** 71:2,8
93:17 94:2,14
99:7 110:13,19
**proposing** 63:10
**protocol** 142:15
**protocols** 150:15
177:15
**prove** 121:15
**provide** 16:4 51:2
60:2 62:11 66:6
73:23 79:13 90:18
91:17 114:21
115:7 116:5,14,22
127:4 140:10
187:17 195:14,16
**provided** 41:4
62:15 65:8 66:17
66:19 97:12
117:10 119:10
130:19 133:6
135:15 136:17,18
136:25 172:3,8
173:20 178:23
181:25 182:20,24
206:7
**provides** 67:10
**providing** 126:24
139:4 150:15
**provision** 35:15
70:6 73:11 82:14
83:14,18,19,23
85:10,18 98:23
114:8
**provisions** 4:6
**public** 1:15 4:12
31:3,8,10,16,17
32:6,8 33:5,7,15
34:5,7,9,11,22
35:4,10,17 36:1,3
36:5,9 44:11
45:17 121:3,4,4

213:5,24
**publication** 61:20
**publications** 61:5
**published** 61:16
**pull** 14:12 42:19
107:1 108:6
170:16
**pulled** 121:9,12,24
123:14 125:24
131:17 162:14
202:4
**pulling** 154:1
**pulls** 199:19
**punctures** 179:20
**punted** 9:18
**purely** 136:14
148:10
**purina** 207:9,10
**purpose** 5:9 69:16
69:23 82:14 83:7
84:3 89:3 156:17
**purposes** 5:8
**pursuant** 1:18 4:5
86:9
**push** 15:18
**pushing** 129:16
**put** 5:17 15:10,21
16:6,8 65:4,5
79:11,21,23 83:7
101:21 116:1
145:19 146:11
160:6 189:21
191:23 204:21,23
205:15
**putting** 98:17

**q**

**qualifications**
133:23
**qualified** 188:19
188:21 213:5

**quantify** 16:22
**quarter** 98:5
113:3 180:5
**question** 4:11
26:10 28:2,8
29:12 30:14,19
48:18 59:25 64:4
64:11 73:5 74:2
89:13 93:23 94:8
104:20 110:16
117:8 119:16,21
126:7 132:22
134:22 136:12
138:8 139:3,21,22
141:2 143:10
145:1 146:6
147:20,22 148:24
153:11 160:19
163:24 169:3
178:11 181:15
182:13 183:11,13
187:4 190:4
194:15 200:18,23
209:10 210:7
**questioning** 136:3
**questions** 88:15
105:18,22 106:2,5
138:25 151:7
160:22 161:9,15
161:19,21 162:7
200:15 211:13,17
**quick** 75:14
181:10
**quickly** 145:3
163:9
**quite** 95:24 123:11
163:25 164:12,17
**quote** 63:2,2

**r**

**r** 46:20 86:2 91:10
91:10
**rainstorm** 164:23
**randy** 2:24 113:17
192:21
**range** 16:22,24
120:22 173:11
**rare** 9:13 39:23
54:23 122:3
158:24
**rate** 59:4 80:5 93:5
93:11 99:3 112:4
127:10
**reach** 18:18,20
**reached** 159:3,5
195:23 196:19
**reaching** 78:21
**read** 11:16,19 70:1
70:9 71:5 72:19
81:17,24 82:17,18
83:2,12,17,17,18
85:15 87:10 89:2
100:11 121:16,22
131:10 134:16
136:1 162:23
169:4,6 190:24
191:4 194:9,11
198:4 203:2
211:21,23
**reading** 4:8
162:14 177:15
196:4
**ready** 13:15
**real** 144:21,21
145:7 146:1
181:10
**realizes** 199:16
**really** 13:10,13
33:23 34:1 38:18
92:12 160:16

161:7
**realm** 62:10
**reason** 7:8 11:12
18:19 24:10 28:7
88:10,16 93:8
94:9 115:16 150:8
150:11 152:7
183:22 210:5
**recall** 58:10
148:12 185:7
**recap** 158:9,11
181:20
**receive** 21:14 23:5
47:11 109:21
128:18 134:9
195:2 198:22
**received** 47:6 48:1
49:19 135:18
195:3
**receives** 47:15
**recess** 129:21
**recognize** 120:11
149:23 202:23
**recollection** 104:5
162:21
**recommend**
166:11
**record** 4:23 5:17
7:13 10:19 19:6
27:11,14,16,18
49:6,17,23,25 50:2
75:17,19,21 78:5
94:25 95:1,3,5
129:18,19,23
167:4,6,8 169:7
187:8 198:7,9,11
211:3,6,8,10 212:6
**records** 13:20 14:2
14:12,16,19,22
15:7,9,17,23 16:4
42:18 50:4 57:9

58:16 59:13 113:5
113:7 180:20
**recovery** 76:18
128:17
**recreate** 15:4,15
78:5
**recreated** 15:9,11
**redact** 94:17,19
**redacted** 80:15
84:25 86:4,19
92:21,22 93:6
113:20,25
**redacting** 93:8
**redo** 184:2
**reduced** 48:15,18
59:21 186:10
**reevaluate** 73:20
**refer** 41:5,19
131:18 171:18
**reference** 191:19
**referenced** 78:9
81:22
**references** 191:20
192:6,9 193:1,19
**referring** 110:10
127:22 128:3
132:13
**refers** 172:1
**reflect** 58:23 141:8
141:14 174:21
**reflected** 101:11
127:12
**reflection** 177:2
**reflective** 78:22
**reflects** 126:19
140:24 141:4
171:10 173:14
189:13,24
**refresh** 10:8
162:20

**refused** 63:17
**regard** 56:12
59:15 68:6 85:16
96:5 99:2,20,21
109:23 111:10
112:6 113:25
116:10 125:7
141:2 172:7
193:21,24
**regarding** 68:10
119:18 132:8
133:14 135:4
171:21 182:2
199:8
**regardless** 128:12
128:14,15
**registered** 42:2,5
42:14,21
**regularly** 61:14
**relate** 61:5 130:11
131:15
**related** 23:22
29:11 62:17
101:16,18 118:4,5
138:25 148:10
161:23 182:15
213:15
**relates** 68:11,15
119:25 120:2
123:8 124:7 131:5
131:8 132:17,25
133:5 139:24
165:4 188:19
193:4
**relating** 66:22
139:11 176:8
**relationship** 42:10
51:13
**relative** 213:17
**relatives** 18:12

relevancy  79:16
79:18
relied  133:22
rely  182:7,10
relying  121:14
151:6 153:4 154:2
remains  93:1
remember  9:1
10:5,10 13:3
17:14 21:15 23:11
23:17 24:16 25:17
34:12 35:6 39:11
40:5,8,19 41:6
44:20 46:3 47:24
48:2 50:22 52:11
55:4,16 57:8 58:5
60:19,20,25 61:2,7
61:12,15,20 67:19
67:24 68:8,13,17
77:16,20,23 78:2
78:12 96:10,21,24
98:4,4 99:19
100:1,6,10,13
101:8 102:5,8
103:9 104:17
106:16,16,18,22
107:3,10,14,15
108:2,3,5,10,17,18
108:21,22 109:9
109:15,19 115:15
116:9 117:5
121:24 122:18
123:6 126:21
127:1,18 128:25
129:3 130:9
133:20 135:3,6
137:7 146:23,24
147:3,4,8,9,11
148:3,6,12,13,15
149:23 150:10
152:11 157:2

159:18 162:2,5,8,9
162:11,15 163:13
163:16 165:24
166:4,12,24 172:5
172:6,11 173:16
173:17 174:4,8,16
174:24 178:5,25
179:6 180:6,15,18
180:23 182:10,23
183:2,4,7 185:4,11
186:3 193:15,20
203:6 206:20
207:5,13,17
208:13 209:11,20
210:4,13,15,17,23
remembered
110:4 153:9
207:17
remembering  39:8
reminded  162:13
166:2
rendered  173:12
repair  56:2 65:12
65:16 109:13
115:7 138:13
141:18 142:8,16
153:7 155:23
156:3,11 172:13
176:15 182:21,22
182:25 183:14
repairs  141:25
159:21
repeated  200:19
repeatedly  85:14
replace  146:14
161:1
replaced  145:18
146:13 173:10
replacement
143:14 167:21
172:19 173:2

181:1,11,18,23
184:1,18
reply  189:22
report  66:3,22,25
67:9,15,20 68:5,8
68:10,14 109:5,18
109:21,24 110:6,6
132:2,7,17,21,25
133:3,13,18,21
135:4 136:23
137:1,6 142:10,12
142:14,22 150:11
150:24 151:8
152:8 153:6 154:4
169:20 171:2,20
171:23 172:3,6,8
173:12 175:4,6,10
175:13,17 177:13
177:16,20,23
178:3,6,13 182:9
210:24
reported  106:9
reporter  1:14 4:11
5:2 10:3,25 19:3
68:20 80:8 95:10
113:12 120:6
130:3 155:18
157:5 167:13
169:6 175:20,23
189:7 192:15
198:16 202:17
204:2 206:14
207:25 208:7,9,22
213:4
reports  12:9,12,12
65:25 66:9 135:13
135:19 136:4,8,10
151:11 163:8
178:9
represent  4:23
5:25 31:25 121:11

171:14 199:6
representation
62:20 121:10,14
121:23 122:15
representative
31:20,23 32:5,9
38:2 70:19 91:13
92:1
representatives
67:17,22 83:8
87:12 133:15
135:6
represented  62:24
represents  138:3
request  79:22
127:2 136:11
157:9,13 197:11
202:1 206:1
requested  169:7
requesting  84:15
195:14
require  74:4 104:9
required  29:10
70:8 98:24
requirements  30:1
86:10
reserve  140:14
reserved  4:11
resisted  124:8
resolution  31:21
resolve  35:16 83:3
83:22 87:3,13
88:2,5,23 89:18
90:1 114:23
resolved  89:4
124:9
respect  129:5
respond  91:15
197:4
responded  65:10
195:9

**response**  6:12
  58:11 59:23,24
  65:9 91:18 195:3
  195:4 197:10
**responsive**  139:3
**responsiveness**
  126:3
**rest**  7:2 75:4 93:6
  93:8 192:9
**restaurant**  152:20
**restoration**  3:5,6
  155:24 156:17
  157:9,22 158:4
**result**  65:13,20,23
  67:11 71:18
  112:19 115:10
  132:18,19 139:18
  140:5 141:10,20
  145:23 152:14
  171:2 173:14
  182:3
**resulting**  64:10
**results**  143:22
**retain**  128:22
**retained**  40:9,15
  40:21 72:9 96:8
  101:9 124:25
  125:4,5,22 126:11
  172:10 199:6
**retainer**  128:4,5
**retention**  126:20
  126:23
**review**  12:5,9,19
  13:4 87:8 142:4
  162:19,20 169:18
  174:6,11,13
  175:16 178:2
  183:10 186:20
**reviewed**  11:17
  12:13 19:25 67:5
  174:1 183:9 185:5

  186:23 187:20
  188:7 203:5
**reviewing**  12:15
  58:10 135:9
  163:12 173:25
  174:17 183:7
**revise**  142:5
**revised**  143:2,3
  170:25
**revisions**  143:3,4
**revoked**  32:15
**right**  6:24 7:12 8:5
  8:11,13,15 12:21
  12:24 15:11 17:17
  19:10,11,12,14,15
  19:17,18 23:8
  26:18 27:21 32:24
  36:4 39:8 40:12
  48:14 52:9 53:6
  53:10,19 55:4,24
  56:3 57:12,17
  62:6,22 64:2
  65:14 67:14 68:25
  69:7,12,18 70:3,13
  72:18,24 73:3,11
  73:17 74:16,18
  75:7,8 76:14,16,17
  76:24 80:21 81:1
  81:6,12 82:25
  87:20 89:1,5
  92:14 93:1,15,25
  94:4,13 95:16,22
  95:25 97:3 98:6
  99:3,9 101:1
  103:24 106:10
  112:3 113:5,22
  114:11,15,25
  115:1 116:2,24
  117:2,23,24 120:1
  120:17 121:7,21
  123:2 125:1,24

  130:14 131:23
  133:19,24 134:4
  134:16 137:6,13
  138:14,19 140:14
  140:16,22 144:10
  144:11,14 145:22
  146:11 150:19
  151:16,17 152:21
  159:18 161:18
  164:14 165:5,16
  165:24 167:21
  169:24 172:16,24
  176:11,12 184:10
  184:19,24 190:13
  190:18,24 191:3,9
  193:5 194:3,8,23
  194:25 195:5,8,12
  195:23 196:11,13
  196:17,23 197:2,8
  197:17 198:3
  199:2,12,17,25
  200:16 203:12
  205:4,16 206:3
  208:8
**ripe**  97:9
**rises**  33:24
**risk**  80:14
**rockledge**  8:10
**role**  35:20,22 53:6
  87:6 88:14 89:21
  126:24 130:15
  137:21
**roles**  188:5
**roof**  65:1 102:25
  103:2 106:24,25
  107:15,21 108:9
  108:23 109:1,13
  109:20 118:5
  145:17,17,19,24
  145:25 146:1,3,4,5
  146:5,11,12,15,16

  151:8 152:4,23
  153:6,11 159:9,11
  159:17,24 160:3,5
  160:12,18,20,25
  161:8 163:19
  164:2,3,17,19,20
  164:20 165:1,3,4,6
  165:7,8 181:1,11
  181:13,18 185:25
  185:25 186:1,2,2,6
  186:8
**roofing**  96:15
  106:20 107:2,3,5,8
  107:11 111:6
  145:3,14 150:10
  160:2 179:14
  181:14,19 184:9
  185:15,15
**roofs**  108:19
  148:13,18 163:22
  163:23 164:10
  181:23
**room**  158:11,11,12
**rooms**  151:18
  174:22 182:12
**rough**  126:14
**rowe**  43:14 44:22
  45:7,8,14,23 46:1
  46:4 51:5 52:8
**rug**  123:14 125:24
  199:19
**rule**  2:20 19:7 65:8
  66:12,17
**rules**  1:18 4:6 5:9
  6:10,13 64:17
**run**  173:11
**running**  192:22
**runs**  45:8

| s | | | |
| --- | --- | --- | --- |

**s** 4:1 22:1 91:10
**sadly** 153:16
**sample** 150:18
**samples** 154:8,25
  155:4,9
**sampling** 30:9,16
  30:17 150:18
**sarah** 14:8,13 15:8
  15:24 52:9 57:14
  58:13 59:16,19
  102:6 107:6,13
  110:5 115:18
  137:8 138:1,16,21
  139:14,23 140:8
  141:8,12,15
  153:10 161:14
  168:3 180:11
  186:19,25 187:9,9
  187:20 188:13
  209:21,24 210:5
  210:14
**satisfied** 148:21
**save** 63:24 187:4
**saw** 7:25 23:24
  65:2 98:3,8
  103:12 107:5
  174:8 186:8
**saying** 11:9 32:2
  69:15 70:12,18
  82:3 85:5,13
  86:14,17 87:22
  89:3,10 118:10
  145:11 148:4,22
  164:11 194:3,5
  203:21,24
**says** 19:10,13 34:4
  34:24 36:19 64:15
  69:25 70:2,25
  72:14 75:5 76:9
  76:11 77:8 81:19

81:23 82:4 83:21
  87:9 88:4 97:23
  98:20,25 127:24
  127:25 130:6
  131:6,7,23 132:2,7
  132:11 134:6
  166:10 168:18
  189:16 191:3,9,12
  194:21 195:1,5,22
  195:23 196:11,13
  196:14,17,22
  197:2,3,6,18,19,21
  198:2,25 199:9,10
  203:11
**scanned** 11:7
  162:23
**scenes** 199:24
**schedule** 133:23
  134:1 146:24
  173:17,19 174:5,5
  174:17 185:1,8,22
**scheduled** 10:24
**scheduling** 27:13
  127:22
**school** 29:14
**science** 28:1,6,12
  142:11,19,20,22
  154:13 155:4,10
  169:10,11,16
  175:5,9,16 177:17
  177:19 178:2,6
  182:2
**scientist** 30:4
**scope** 62:13
  141:24 142:16
  153:21 168:6
  169:22 170:18
  175:4 176:19
  177:12 180:13
  182:2

**scoping** 56:10
  103:11
**scraped** 179:17
**scratched** 179:17
**screen** 3:3 120:9
**screwdriver** 160:8
**seal** 213:22
**second** 19:13
  34:16 40:3 72:13
  80:14 83:2,13,21
  85:15 86:17 92:20
  99:5 101:16 102:5
  106:8 109:12
  113:10 124:22
  131:21 147:11
  148:11 149:22
  150:24 151:12,19
  159:17 176:3
  195:18 198:21
  204:8
**secondly** 64:25
**secret** 156:22
**section** 72:14 93:9
  118:5
**securing** 112:21
**see** 6:15 14:12
  21:11 36:17 39:5
  39:6 45:25 71:3
  79:14 89:4 100:16
  106:24 131:23,25
  133:15 134:9
  135:7,8,10 137:9
  137:14,25 138:10
  138:13,20 140:14
  140:15 149:10,11
  149:12 153:25
  158:24 160:3,6,11
  160:14 164:11
  176:18 177:23
  179:13 181:10,19
  195:8 199:1

204:15 207:4
**seeing** 111:5
  146:24 150:16,25
  153:16 172:6
  173:18 174:4,14
  179:24 183:2,4
  185:7,11 208:13
**seen** 6:7 66:16,21
  67:3 69:2 130:8
  140:13 155:24
  157:10,14 204:14
  204:19 206:18
  208:12 209:3,6
**sees** 161:22
**select** 82:20
**selected** 201:1
**selection** 200:20
  204:6
**seminars** 30:15
  60:23
**send** 38:6 51:3
  53:9 60:4,6,7,9,10
  60:11,12,13 84:17
  88:17 90:23 127:9
  128:11 142:4
  203:18 209:7
**sending** 37:19,20
  38:8 80:23 128:10
**sends** 52:3
**sense** 143:23
  170:25 178:1
**sent** 17:8,11 37:22
  84:24 86:13 94:18
  113:16 114:3
  115:13 116:8,10
  116:21 117:9,12
  117:20 118:1
  119:14,17 169:18
  190:13,22 199:19
  202:20 207:3
  208:19 209:15

sentence  70:25
72:13 82:4 83:2
83:13,21 85:15
93:1 99:5 196:25
198:2
separate  57:24
58:22 59:10
133:11,18 135:12
separately  49:8
50:1 57:20 137:16
185:1
september  176:25
195:10,18 196:10
209:1
series  192:20
serve  14:14 52:20
70:11,13 72:2,9
83:6,24 86:5 92:2
114:9 127:11
205:8
served  5:6 10:22
19:8 65:10
serves  31:23
service  2:11 42:3,5
services  80:14
93:5 128:18
serving  35:17
42:11 51:20
123:20 137:20
set  29:22 68:2
123:12 193:6,9,13
193:24 201:6
213:21
setting  136:5
settle  25:15 49:3
73:6 90:4
settlement  72:16
73:7,22 74:7,12,14
75:6,10 76:20
81:5,21 82:6
89:22 90:2 111:20

112:1 117:21
121:6
settles  73:24 88:19
severe  153:20
share  56:6 156:22
shared  117:6
119:7
shareholder  42:24
she'd  117:6
sheet  13:25 170:2
170:2
sheets  14:5
sheila  157:10,13
157:16 166:10,13
166:15
shoot  129:10
short  126:18
shorthand  213:4
shot  3:3 120:9
show  10:19 18:25
68:18 80:11 95:8
113:9,10 115:21
120:4 130:1
155:21 157:3
160:20,21 167:11
176:21 189:5
192:19 198:14
202:15 203:25
206:12 207:1,2
208:3,19,25 209:9
showed  13:18
161:6 204:11
206:23 209:13
showing  95:18
120:18 205:3
shown  11:3
shows  131:23
158:10,11 200:8
shut  205:19,23,23
206:3

shy  177:8
side  8:11 18:15
98:17,17 166:19
201:7
sign  77:4 93:2,5
94:20 114:1
201:24 211:22,24
signature  77:1,1
84:21 85:9,20
132:3 190:22
201:22
signed  69:6 71:15
77:10 95:21 96:2
98:12 100:25
190:22 192:3
199:12,13 204:6,9
204:10,11 205:6
206:24 209:15
signing  4:8 112:13
205:11
signup  47:5,7,14
48:7,11,20 49:9,18
50:6,14,19,25
similar  98:19
106:19 113:15
170:15
simply  87:17
99:23 121:17
single  149:4
sir  17:18 21:5 28:2
28:13 46:23 59:25
60:1 85:14 127:24
128:3,5 142:20
192:4,12 196:5
199:23 200:1
201:17 202:23
sit  9:1 10:10 20:10
32:13 37:9 42:19
50:5,18 51:19
66:2,11 68:8
97:18 99:19

100:10,13,21
117:5 123:6 130:9
135:6,24 162:5,8
162:15 166:12
174:16 175:12
193:15 209:11
site  14:4 44:1,3
56:14,24 73:19,21
87:6,11,24 88:10
88:25 89:4 90:11
90:15 96:11 100:2
101:6,14 102:16
103:5 104:7,19
105:5,5 108:14
114:21 120:15
147:24 150:17
161:19 179:9
sitting  25:19
144:16
situation  151:8
six  101:24 102:3
164:6
size  143:4 180:15
skimmed  163:9
slash  69:25 81:20
87:6 189:17 191:1
191:2
slip  201:7
slope  164:9,25
small  25:11
121:20
smaller  25:13
smoke  153:16,18
socially  129:8
society  32:23
software  168:13
sole  42:24
somebody  40:17
84:17 99:12 108:4
108:8 128:24
148:3 159:1,4

160:4,8 206:23
somebody's 76:25
son 18:3,6
soon 123:1
soot 30:9,17
  149:12 153:18
sorry 52:8 110:16
  116:11 126:9
  130:22 137:13
  143:10 150:4
  156:4 169:2
  207:23
sort 29:14 36:13
  91:3 143:15 151:2
  187:14
sorts 62:18
sound 165:15
sounds 6:19 32:1
  172:5
source 149:9,11
  182:1
sources 133:22
south 20:20
southern 1:2 4:20
spaces 153:25
spark 105:22
speak 117:18
speaks 132:21
specialized 30:8
specific 59:6 77:20
  102:15,24 118:6
  149:20 161:24
  162:16 187:16
specifically 63:4
  109:9,19 148:23
  162:2 194:14
  197:13 201:1
specifics 104:17
  148:6 162:25
  165:25

specimen 79:13
spell 46:19
spend 12:14 56:14
  61:10 74:20
  102:13 104:8
  108:25
spending 14:3
spent 13:21 14:24
  16:19,23 38:11
  56:23 57:5 163:11
  173:25
split 43:2
splotch 65:2
spoke 78:10 166:9
  166:12,19
spoken 13:8
spot 160:7
spread 153:23
spreadsheet
  115:21 158:18
squall 179:15
ss 213:2
staff 147:23
  154:14
stain 161:2,3
stains 161:9
  182:11,14,15
stand 7:17 170:3
standard 78:16
  79:2
standards 29:23
stands 60:19
  172:23
start 18:23 104:25
  143:7 149:11
  179:5 203:8
started 5:11 22:19
  26:1 106:10 118:9
  142:13 162:14
  170:20 179:24
  186:8 194:17

starting 131:12
  192:21
state 4:22 7:12 8:4
  19:6 22:4,18,19
  23:6 24:17,19,25
  25:6 30:12 31:9
  31:14 36:20 41:8
  41:9,10,23,25 42:3
  42:14,22 45:18
  121:11 197:13
  213:1,5
stated 81:16
  121:17 130:16
  132:7 133:13
  135:4 171:20
statement 103:20
  134:6,7,13 198:4
states 1:1 4:19
  31:5,6,11 45:20,21
  81:17,18 201:1
status 6:22 27:23
  62:21
steep 164:9,16
stenographic
  213:13
stepped 91:25
stick 130:19
stop 32:7 72:18
  126:14,17 205:21
stopped 206:6
storm 95:24 96:13
story 190:10
straight 90:3
  122:12
street 17:20
strictly 55:1
  172:19 184:18
string 3:12,13
  193:1
structural 76:16

stuff 60:20 143:7
  156:22 199:23
  206:2
style 164:7 179:11
styles 107:18
subject 62:15
  64:17 68:9 163:3
  189:16,21,23,25
  190:25 191:19,23
  192:5,25 193:18
submission 197:8
  197:16
submitted 186:23
subpoena 14:15
  58:11 65:9 66:19
subpoenaed 11:11
subsequently
  205:15
substance 163:13
suffered 37:24
suggest 179:2
suggesting 87:16
suit 210:25
suite 2:6
summarizes 12:3
super 179:15
supervisor 46:1
supplement 134:7
  136:19 137:1
supplemented
  134:12,17 137:5
support 201:19
suppose 18:22
  64:18 136:5
sure 6:19 14:9
  15:22 17:1 26:22
  30:18 32:3 39:3
  39:18 66:24 76:10
  84:16 91:23 94:16
  106:7,20 107:18
  107:20,23 109:6

123:9 127:5
135:17 137:24
147:19 150:3,14
161:20 163:25
173:21 177:22,24
178:12 179:25
186:17 194:12
198:24 200:16
202:3,12 203:17
204:17,18 211:5
**surfboard** 8:11
**surrounding**
149:9
**sustained** 71:18
82:11
**sw** 2:2
**swear** 4:12 5:2
**sweet** 126:18
**sweeter** 189:2
**swiftness** 145:4
**swinging** 96:15
**sworn** 5:20 213:8
**system** 106:24
118:5 153:24
164:8,8 165:3,7,7
165:8
**systematically**
150:13
**systems** 164:17
165:1,6

**t**

**t** 4:1,1
**take** 6:21 14:10,11
19:19 29:24 37:11
37:12 72:1 75:14
79:5,8 97:9 105:7
105:19 110:22
121:2 122:13
134:21 151:2,4
154:8 167:3
185:23 194:11

198:5
**taken** 1:13 4:3,21
5:5,7 21:9 29:14
32:18 61:11 71:23
129:22 148:20
154:3 202:13
213:17
**takeoff** 105:17
**talk** 15:24 45:4
49:1 89:23 90:15
97:11 186:1
187:13
**talked** 13:14 99:25
112:16 122:19
165:25 179:6
**talking** 75:25 76:6
105:14 109:10
115:13 123:15
152:6,21 154:19
154:21,24 166:16
178:17 182:14
189:15,18,20
192:2,4 210:24
**talks** 171:20
**tampa** 26:8,11
**tapes** 23:15,16
**taylor** 2:8 4:25,25
5:4,22,25 7:5,11
9:17,20,25 10:4,6
20:25 21:4 27:10
27:20 52:12,16
60:7,8,15,18,21
62:19 63:14,16,24
64:8,11,14 65:7
68:4 75:3,13,23
79:19,21 80:2
86:1 89:7 90:6
91:9 93:22 94:24
95:7 118:14,17
119:24 123:25
124:6,12,16,23

126:2,6 129:17,25
132:23 136:7,9,13
136:23 137:3
140:17 141:1
157:15,20 167:3
167:10 169:4
176:14 181:5,17
181:21 187:3,12
187:15,22 188:10
189:4 192:10,18
198:5,13 204:20
204:25 208:6,8,10
211:2,12,16,21,25
212:3
**tea** 129:13
**team** 105:16 109:6
**technically** 92:12
**telephone** 6:22
18:20 27:22 78:1
78:6 112:24 122:6
**tell** 14:15 37:11
40:1 56:17 57:5
66:15 91:2 101:7
104:17 107:12,15
108:1,18 109:9
116:1 118:11
120:17 130:18
135:18,21 144:4
153:24 154:9
159:1,4 164:23
173:8,24 178:13
180:17,20 182:11
201:14
**telling** 9:21
**tells** 14:23 170:24
**template** 170:18
**ten** 6:20 12:18
13:1,4 17:25 23:1
51:7 53:2 60:23
61:1,2 69:9
145:17,21,25

146:11,16 162:18
163:12 173:25
**tend** 18:23
**tennessee** 1:15,16
2:11 4:4 17:19
25:21,24 26:6
31:6 33:5,6,14
44:12 55:21,24
121:3 213:1,6
**term** 78:25 161:5
**termination** 63:5
**terms** 16:1 93:12
102:15 144:4
**test** 57:1 178:12
**testified** 5:20
37:16 39:7 165:11
188:7 209:14
**testify** 39:24 63:3
63:9,18 64:5,21
148:23 162:21
187:10,24 193:14
213:8
**testifying** 63:2,22
64:20 186:21,25
**testimony** 11:24
13:7 14:18 36:20
36:24 37:3,6,8
38:20,21 39:10,13
50:13 62:3,9,11,15
62:22 64:15
126:25 128:9
130:12,12 131:5,8
133:23 134:2
139:5,11,17,23
140:2,4,7,9,11,14
140:15,18,19
142:17 147:6,14
165:15 167:23
187:6,17
**testing** 142:15
153:22 155:8,16

169:21
tests  23:17
thank  5:4 51:5
  129:12 138:8
  211:13,15 212:3
thanks  80:1
thehowarthgrou...
  122:11
theology  20:14,23
  20:24 23:19
thg  70:2 71:1
  72:14 76:14 85:16
  93:4 94:1 119:19
thing  6:12 16:2
  24:13 32:2 36:13
  45:15 59:15 66:15
  88:8 91:3 93:3
  97:3 104:12
  123:13 129:15
  143:15 146:3
  163:9 174:8
  187:14,24 201:6
  202:9
things  20:11 33:22
  62:18 72:3 79:3
  82:17 84:13 90:17
  129:8 137:25
  142:5,5 143:6,25
  163:8 174:11
  199:18 205:15
think  5:11,13,14
  8:22 9:2,7,7 11:4
  12:7 18:14,16
  20:1,11 21:6,10,15
  22:20,23 23:11,14
  23:15 24:11,11
  25:16 26:1,9 27:7
  30:24 31:11 32:13
  32:20 34:10 39:7
  39:16,18,19 40:4
  41:4,10,12,20 42:4

43:4 44:13 45:21
46:20 49:22 50:2
51:7,11,17 52:10
53:23 54:3,22
55:3 59:4,9 63:7
64:3,16 66:2,11,13
67:3 68:7 73:12
75:15 86:8,9
91:19 94:12 96:6
99:22 100:11,16
101:3,15 102:4
103:19,19,24
107:2,6 108:12
110:2 114:6
119:15,22 122:8,9
122:12 127:12
129:1 130:9
133:17 135:17
137:12,25 139:15
140:13 144:4
150:1 151:13
152:19 154:7,7
157:14 162:18
163:24 166:9,15
166:18 171:17
172:17 176:8,11
179:22 183:2,2
188:6 196:4
197:22,23,24
199:18,25 200:4
201:13 206:10
207:1,20 208:18
209:6,8
thinking  28:9
  55:21
thinks  180:3
third  1:16 4:3
  19:16 36:14 38:24
  72:13 177:13
  182:1,11 194:21

thirst  38:23
thorough  109:7
thought  63:4
  103:9 138:9 156:6
  156:7 190:7,8
  203:7,23
thousands  151:10
three  5:12,14 9:12
  21:21 24:3,4,8,9
  56:13 89:13 92:9
  99:18 103:23
  108:19 121:1
  148:13 150:7
  181:23 186:1
  205:17
throughs  182:12
thunderstorm
  179:15
thursday  148:5
ticked  197:23
tighter  79:5
tiles  161:1
time  5:23 9:7
  12:14,20 13:20,21
  13:25 14:2,3,5,5,8
  14:12,16,18,21,24
  15:9,10,14,17 16:4
  16:5,18,20,23 20:7
  20:8 21:1,18
  23:14 25:18 26:20
  27:8 34:17,24
  37:11,13,15 38:10
  38:13 40:2 47:16
  53:7,10 54:23
  55:22 56:9,23
  57:5 61:10,11
  63:25 71:11,14
  78:3,5 79:3 84:1
  91:12,13 97:14
  100:5,8 101:6,13
  101:16,18 102:1,2

102:6,9,25 103:13
103:13 104:13
106:9,17 107:4
108:11 109:12,25
110:4,14,20
111:22,23 112:2
115:13 116:8,17
116:20,22 117:11
118:1 119:3
120:11,16 121:7
122:14 123:24
124:4 126:14
127:5 136:20
137:17 138:23
140:9 142:8,17,22
143:22 144:22
147:5,16 148:11
148:25 149:22
151:3,12,19,22
153:7 159:15,17
161:4 165:22,23
177:20 178:6
180:9 182:6
184:10 187:4
190:16 194:11
198:1 203:12
210:20 211:14
212:4
times  78:10 87:18
  89:13 91:19 100:2
  100:3 119:17
  159:2 166:1
title  77:8
tnlcr  213:25
today  11:15 16:9
  37:13 50:5,18
  75:25 128:7,8
  129:1 133:17
  137:4 162:8,22
  167:24 174:16
  211:13,17

**today's** 184:3
**told** 12:23 14:21
  82:8,8 119:4
  158:23 175:10
  188:8 199:14,18
  205:19,21,22
  211:1
**tom** 154:5 210:16
  210:18,18,24
**tomorrow** 148:4
**top** 17:3 19:11
  42:20 56:21 76:10
  100:22 122:6
  131:13,23 156:21
  189:20 197:21
  207:7
**topic** 61:5 62:12
  63:19
**tornado** 141:6
  148:17 177:3,16
  178:20,21 179:3
  179:11,13,25
  182:3 191:17
**total** 72:15 136:21
  167:20
**totals** 177:4
  187:14
**town** 77:24
**track** 78:3
**trades** 158:10
**traffic** 61:25
**trainer** 22:4
**training** 29:5 30:1
  30:8,14
**transcript** 213:11
  213:12
**transplants** 8:4
**trial** 37:6,8 38:21
  38:22 39:10,15,21
  39:23 40:2,3

**trials** 40:4
**trick** 106:3
**tried** 126:13
**trigger** 106:5
**trip** 102:12 105:13
  109:3 148:7
  180:16,18
**trips** 14:3
**true** 150:25 168:1
  213:12
**truest** 143:23
**truly** 121:8
**trust** 81:18 101:2
  121:8
**trusting** 121:9
  122:15
**truth** 213:8,9
**try** 6:25 47:18
  88:13 106:5
  148:15 160:10
  170:17 174:8
  179:10 196:20
  202:12
**trying** 34:12 73:16
  79:16,17 86:16
  87:15 100:6 105:2
  106:3,3 109:3
  111:1 119:16
  122:13 143:5
  150:22,23 163:3
  180:7 194:14
  195:16 201:7,12
  206:24 207:18
  209:17
**turn** 19:10 36:14
  51:3 70:21 137:12
  195:17
**twice** 147:7,8,9,10
  147:14
**two** 6:5 11:19
  15:10 25:5 43:11

43:13 44:21 49:4
49:11,12,12,16
59:18 66:20,23
80:12 86:5 92:8
92:14,16,18 100:3
103:8 104:9 110:3
119:17 121:13
122:19 130:11
132:13,17 133:6
133:11 134:18,25
135:21 136:19
144:12 148:22
168:4 176:1,4
187:23 194:20
198:19 199:4,12
205:18 210:20
**type** 6:12 16:2
  24:13 32:17 45:15
  54:11 62:21
**types** 36:1
**typical** 78:18
**typically** 6:25 38:2
  142:2 163:22
  203:2
**typing** 141:23

**u**

**u** 4:1
**u.s.** 172:4,6
**uh** 13:17 208:9
**ultimate** 48:24
**ultimately** 47:4
  49:1 179:22
**umpire** 92:8,12,17
  123:11,12 124:20
  200:20,20,21,24
  204:6,6,8,11 205:9
  205:18,18
**unartful** 147:20
**uncooperative**
  105:2

**understand** 6:11
  6:13,20 18:1 40:9
  48:17 55:25 57:14
  62:19 73:9,20
  74:3 86:16 87:20
  87:23 89:16 90:7
  90:18 91:21
  105:21 111:18
  116:19 121:1
  123:15 132:16
  134:18 142:25
  143:8 145:11
  151:5 154:18
  155:14 163:25
  164:5 167:23
  180:7 187:22
  203:11 207:16
  211:16
**understanding**
  32:25 62:24 63:15
  87:2 88:22 105:18
  110:7 114:22
  136:14 151:5
  205:16
**understood** 29:13
  32:3 80:24 153:14
**underwriter** 21:12
  23:25 30:21
**undiscernible**
  124:2
**unfortunately**
  147:11 170:22
**union** 39:20
**unit** 149:4
**united** 1:1 4:19
**units** 102:21 149:5
  149:8,13,14
  151:13,21 152:1,3
  152:9,14 159:14
  174:22,25 175:10
  175:15

**university** 21:9
28:14,15 154:18
**unusual** 28:4
**update** 20:11
**updated** 183:25
**upstairs** 13:14
**use** 24:8,15 42:14
79:8 108:15
137:25 151:1
153:23 154:17,22
156:9 158:16,17
170:15,17,21
189:20 197:6,10
197:14 203:2
**useable** 170:23
**uses** 201:4
**usually** 90:16
116:19
**utilize** 156:2,16
157:21
**utilizing** 35:15
168:12 183:15

**v**

**v** 2:4 91:10
**valid** 111:1 201:15
**valuation** 19:13
69:17,24 72:7
89:24 90:18 92:6
115:18 131:24
133:12 143:23
161:25 177:3
197:6,7,14,15
**value** 97:3 143:12
143:14,20 144:6
144:24 145:5,18
146:14,20,25
153:3 172:24
173:3,7,13 174:3
184:23 185:3,9
197:9

**valued** 110:24
153:20
**valuing** 117:4
**varies** 80:6
**variety** 96:15
**various** 13:5 65:11
68:1
**vast** 62:8
**venture** 148:15
**verbal** 6:11 59:24
127:5
**verify** 201:22
**version** 80:15
84:25 86:19 92:21
113:21 178:21
**versus** 4:16 39:20
115:25 161:23
**vice** 35:9
**video** 2:11 10:3
**videographer** 4:14
5:1 27:14,18
75:14,17,21,25
79:25 95:1,5
129:19,23 167:4,8
198:6,7,11 211:6
211:10 212:5
**videotape** 1:12
2:19 4:2,15
136:17,18
**violation** 61:25
**virtually** 187:1
**virtue** 34:10 83:11
85:9 86:10 145:4
**visit** 100:12 101:5
103:5,17,25 104:7
104:15 105:23
106:15 109:23
149:6 159:12
**visited** 100:2
101:13,15,18
102:2,9 106:8,11

108:20 109:12,25
147:24
**visiting** 104:18
105:5 147:24
**visram** 40:15,22
77:14,17 78:1,7
90:13 91:7,10,17
91:20 99:13
112:21,25 114:7
123:2 147:23
162:12 163:15,18
165:10,17 166:6
166:18 194:18
195:3,6 196:20
197:5,9,14 206:17
208:5,14 209:2,7
209:13
**visram's** 87:7
206:22
**vouch** 120:15
175:13
**vs** 1:5

**w**

**w** 1:12 2:14 4:2,15
5:19 7:16,17
17:22 22:1 213:7
**wade** 190:14 191:6
197:1 198:20
199:5 202:20
**wait** 88:8 143:7
203:21,22
**waiting** 5:24 13:15
135:25 165:21
**waive** 211:24,25
212:2
**waived** 4:9
**walk** 109:20
152:25 160:5
182:12
**walked** 106:20
107:1,10,15

138:22
**walking** 102:20
105:5 107:3,7
**walkthrough**
90:15
**want** 6:14 16:15
27:24 32:3 36:18
45:3 62:10 66:23
73:19,20 87:22
88:10,19 89:17,25
90:18 102:23
104:15 109:5,20
126:14,16 131:10
136:3 146:3
156:22 160:17
178:12 191:24
194:11,15 201:18
211:23
**wanted** 5:17 12:20
54:9 91:20,20,22
97:1 110:6,7
151:1 152:6
205:13
**wanting** 207:12
**wants** 64:19 89:16
211:19
**warehouse** 144:16
**washing** 144:5,7
144:13,18
**water** 151:24
152:5,6 161:16,16
162:3 182:2,10,14
182:15
**watermark** 207:7
**way** 8:23 15:12,14
16:3 17:15 36:6
37:21,25 38:5
48:23 49:5 50:6
53:4 74:20 86:1
88:6,6,20 89:19,19
90:5 91:3,4,9,21

100:7 106:5
112:15 121:15
144:4,20,21,25
153:15 158:13,21
158:22,23 168:10
176:6 186:18
201:5,5 202:12
207:11
**wayne**  2:8 4:25
5:25 27:9 136:2
181:16
**ways**  59:18
**we've**  19:21 36:15
51:14 65:8 71:15
76:1 80:4 82:18
85:23 93:14 97:15
98:13 100:24
101:11 103:22
112:17 115:17
122:19 127:15
131:22 134:3,24
137:10 142:2
147:16 152:2
153:19,24 171:22
174:20 175:2
176:23 177:5,7,20
178:7,15,17
180:24 184:14
195:22 196:19
202:22 205:2,8
**web**  122:10
**website**  3:3 120:10
120:12,24 121:7,9
121:12,25 122:2
122:14,18
**week**  14:1,1 46:13
162:18 173:24
183:7 185:6
**weekend**  163:2
**weeks**  49:4,11,12
49:16 136:19

**wehnes**  22:1,20,24
**weird**  203:1
**welcome**  90:24
182:17,18
**went**  24:24 73:24
103:25 104:5
108:22 109:12
115:18 119:5
129:13 148:25
149:22 151:12,13
151:19 152:12
159:9,17 165:4,15
170:1 184:9
**west**  7:18
**whatsoever**
181:19
**whereof**  213:21
**whichever**  112:5
**widespread**  152:2
**wife**  9:11 18:3
43:1,3,8,16 44:25
52:3 54:4 147:19
**wife's**  10:1 18:4,15
54:9
**wilburn**  2:24
113:17 114:3,4,8
114:17 115:8
117:10,17 192:21
193:3 194:2
195:17
**wilburn's**  197:11
**wild**  41:18
**willing**  114:20
**wind**  6:3 11:17
13:7,23 16:6,9
40:11 44:19 45:24
46:22 50:16,19
51:2 54:25 55:5
55:14,15 56:2,6,11
56:25 57:7,11,16
57:22 58:2,15,21

59:7,14,17,21
64:23,25 65:3,5,13
65:13,23,23 67:8
67:11,23 68:16
95:16,18,24 96:8
96:12,23 97:22
98:3,9 99:16
100:16 101:10,16
103:3,7,12,16
106:9,11,17
108:12 112:11
113:1,17,22
114:10,17 115:11
115:16,19 117:9
119:13,19,20
124:8,18,20,21
125:1,4,6,8,11,15
132:19 133:1
134:19 138:12,18
139:9,25 140:5
141:2,4,5,13,16
145:23,24 147:2
151:20 152:2,15
155:23 159:10
176:8,9,13,17
177:23 180:3
181:22 182:15
183:1,3,15 184:14
184:24 185:10
188:19 190:2,6,17
193:1,4,11,19,23
194:8 199:8
200:22 202:5
203:8,23
**windstorm**  132:10
**wish**  101:7 104:17
106:17 107:13,14
108:1,17 109:15
149:21
**witness**  1:13 2:13
4:8,12 5:2,3 6:4,6

10:12,13,17 19:24
36:13 63:18,22
125:22 126:11
127:11 128:19
130:16 137:21
138:11 140:10
203:4 213:21
**witnesses**  3:4
130:7 137:11,22
187:24
**word**  24:15 29:24
83:19 98:18 201:4
**wording**  207:6
209:8
**words**  9:23 35:8
75:9 76:25 104:8
111:11 114:1
117:22 118:3
137:25 203:19
**work**  17:12 24:24
25:7 30:18 35:14
35:25 36:2,9,11,13
45:10 53:12,25
54:12 56:20 57:7
57:21,24 58:1,14
58:21 59:1,7,14,16
62:8 63:12 88:6
88:13 92:6,10
97:24 109:11,22
110:9 111:8 117:3
151:6 154:12
180:12 186:13,15
187:1
**worked**  15:2 25:2
25:4,7 40:14,18,25
41:7,12,23 42:13
42:16 44:8 51:5,8
53:8,21 54:4 91:4
123:11 127:6
178:25 200:19

| | y | z |
|---|---|---|

**worker** 129:6
**working** 14:24
  16:19 21:17 22:18
  22:19 72:21
  106:10 108:13
  138:3 160:9
  196:20
**workings** 155:2
**works** 31:19 45:11
  49:5 53:16 74:21
  88:6,20 89:20
  90:5 91:3 111:19
**worn** 160:7
**worse** 164:24
**worth** 48:10,19
**wrap** 123:13
**wrights** 17:21
**write** 25:14 203:21
**writing** 48:15,18
  52:12,14 59:21
  61:15 81:15,19
  84:12 86:10 127:7
  134:13 191:17,23
  203:6
**written** 48:23 58:6
  58:22 61:4,4 81:7
  81:8 84:21 85:9
  126:19 173:8
**wrong** 62:6 97:14
  107:17 144:5
**wrote** 191:22
  193:22 203:24
  206:23,25 207:3
  209:14
**wtaylor** 2:9

### x

**x** 169:17
**xactimate** 64:5
  141:24 158:7,16
  158:18 168:12,22
  170:22 183:15

**y** 169:17
**yeah** 21:2 28:7
  52:3 58:16,25
  59:3 60:7 96:6,14
  102:20 107:5,5
  111:19 122:12,17
  135:17 136:14
  154:7 164:11
  165:18 176:25
  185:14 187:13
  191:10 192:14
  195:24 204:16,23
  207:20 210:3,17
  212:1
**year** 21:5 22:24
  110:3 120:10
  131:1 144:5,17
  145:16,17,25
  146:4,4,5,12,16
  186:1,2
**yearly** 33:2,3
**years** 9:12,17
  15:20 16:16 17:25
  20:5,6 25:5 30:15
  35:6 36:5,7,10
  37:3 38:4 41:18
  42:9 44:9 51:7
  53:2 60:23,24
  61:1,3 113:8
  121:13 144:9,15
  145:21 146:12,16
  159:6 162:10
  188:6
**yesterday** 10:22
  11:4 120:18
**york** 80:14
**young** 182:21,24
  183:3,10 191:7

**z** 91:10 169:17
**zarin** 40:15 46:3
  77:14 86:14,22
  87:7 91:9 96:20
  97:22,23 108:10
  117:6 118:24
  119:6,7,8,19
  125:25 161:20
  162:2 163:1,4
  179:7,8
**zarin's** 85:8
  118:19
**zero** 36:4,8 143:23
  160:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FORINFORMATIONAL  PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

HAMAN, INC. d/b/a KNIGHTS INN,  )
)
Plaintiff,  )
)
)  Civil Action File No.
)  <u>2:18-CV-01534-JHE</u>
)
v.  )
)
CHUBB CUSTOM INSURANCE  )
COMPANY,  )
)
Defendant.  )
)

## <u>AMENDED NOTICE OF VIDEO DEPOSITION OF</u><br><u>CHARLES W. HOWARTH</u>

TO:      Gary V. Conchin                Gregory A. Brockwell
Kenneth B. Cole, Jr.           Jason R. Smith
Megan Phillips                 Brockwell Smith LLC
Conchin, Cole & Jordan       2100 1st Avenue North, Suite 300
2404 Commerce Court SW    Birmingham, Alabama 35203
Huntsville, Alabama 35801    greg@brockwellsmith.com
gary@alainjurylaw.com        jay@brockwellsmith.com
kenny@alainjurylaw.com
megan@alainjurylaw.com

**YOU ARE HEREBY NOTIFIED** that, on **January 8, 2020**, beginning at

**9:00 a.m. C.S.T.** at the offices of **The Howarth Group, 137 3ʳᵈ Avenue North,**

**Franklin, Tennessee 37064**, counsel for defendant Chubb Custom Insurance

Company, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure and


EXHIBIT 37
Deponent CHARLES HOWARTH
Date 1-8-20 Rptr. EN
WWW.DEPOBOOK.COM

the Local Rules of this Court, will take the video deposition upon oral examination

of **CHARLES W. HOWARTH** for purposes of discovery, cross-examination,

preservation of testimony, and all other purposes permitted under the Federal Rules

of Civil Procedure.  The deposition shall be taken before an officer authorized by

law to administer oaths, and will be recorded by stenographic, video and/or audio

recording means.  The deposition will continue from day to day until the examination

is completed.

This 7th day of January, 2020.

*/s/ Wayne D. Taylor*
WAYNE D. TAYLOR
Georgia Bar No. 701275
*Admitted pro hac vice*
MICHELLE A. SHERMAN
Georgia Bar No. 835980
*Admitted pro hac vice*
MOZLEY, FINLAYSON & LOGGINS
LLP
1050 Crown Pointe Parkway
Suite 1500
Atlanta, Georgia 30338
Tel: (404) 256-0700
Fax: (404) 250-9355
wtaylor@mfllaw.com
msherman@mfllaw.com

-and-

MARK D. HESS
Alabama Bar No. ASB-0008-E66M
HAND ARENDALL HARRISON SALE LLC
1801 5th Avenue North
Suite 400

- 2 -

Birmingham, Alabama 35203

Tel: (205) 324-4400
Fax: (205) 322-1163
mhess@handfirm.com

*Attorneys for Defendant*
*Chubb Custom Insurance Company*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HAMAN, INC. d/b/a KNIGHTS INN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action File No. |
| | ) <u>2:18-CV-01534-JHE</u> |
| | ) |
| v. | ) |
| | ) |
| CHUBB CUSTOM INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of **AMENDED NOTICE OF VIDEO DEPOSITION OF CHARLES W. HOWARTH** was electronically mailed to the following counsel of record:

Gary V. Conchin
Kenneth B. Cole, Jr.
Megan Phillips
Conchin, Cole & Jordan
2404 Commerce Court SW
Huntsville, Alabama 35801
gary@alainjurylaw.com
kenny@alainjurylaw.com
megan@alainjurylaw.com

-and-

Gregory A. Brockwell
Jason R. Smith
Brockwell Smith LLC
2100 1st Avenue North, Suite 300
Birmingham, Alabama 35203
greg@brockwellsmith.com
jay@brockwellsmith.com

*Attorneys for Plaintiff Haman, Inc. d/b/a Knights Inc.*

This 7th of January, 2020.

/s/ Wayne D. Taylor
WAYNE D. TAYLOR
Georgia Bar No. 701275
*Admitted pro hac vice*

483827

# EXHIBIT "A"



**π EXHIBIT** 38
Deponent _CHARLES HOWARTH_
Date _1-8-20_ Rptr. _CVC_
WWW.DEPOBOOK.COM



THE
HOWARTH
GROUP
INSURANCE CLAIM CONSULTANTS

# Valuation of Loss and Proper Claims Practices

<u>Insured:</u> Haman, Inc.
<u>Insurance Company:</u> Chubb Custom Insurance Company, Et Al.
<u>Dates of Loss:</u> March 22, 2014 and April 28, 2014
<u>Property:</u> Knights Inn at 1121 9th Ave. SW, Bessemer, AL 35022

This Report includes stated opinions that I have regarding the amount of the loss by fire on 3/22/14 and the amount of the loss by windstorm on 4/28/14 to the Knights Inn owned by Haman, LLC.  Additionally, this report includes my stated opinions regarding the claim adjusting conduct of the carrier's representatives.  This Report also includes the sources relied upon for my opinions, my qualifications, my past testimony and my fee schedule.  I will of course supplement or expand this opinion statement as I believe becomes necessary on the merits of any additional information that I receive.

My prior testimony is listed in the enclosed CV.

Charles (Chuck) W. Howarth                                    4/22/19
chuck@thehowarthgroup.com                                      Date

# Charles W. Howarth, CPCU

1 5 3 8   W r i g h t s   L a n e
Gallatin, TN 37066
(615) 406.0834

**Objective:**     **Insurance Claim Consulting Services For Businesses & Individuals**

---

### SUMMARY OF QUALIFICATIONS

Over Thirty Five (35) years of adjusting property insurance claims for corporations, small
businesses individuals and the Insurance Co. Expert testimony and Adjusting experience
encompasses the full spectrum of the claims process which includes building damage valuation,
business interruption calculation, personal property valuation, good faith claim practices, the
Appraisal process etc. in multiple State and Federal Courts.

| | | |
|---|---|---|
| • Manufacturing | • Retail Stores | • Condominiums |
| • Hotels/Motels | • Multi-level Housing | • Major Corporations |

## OWNER / PRESIDENT

Insurance Claim Consulting / Public Adjusting and Appraisal in the business of assisting
policyholders throughout the South-East United States from Indiana to the Florida Keys,
including the Virgin Islands.  The Corporate office is in the Nashville, Tennessee area.
*The Howarth Group, Inc. 1992-2018*

## BRANCH MANAGER

Managed the Tampa Branch of a large Public Adjusting Company headquartered out of
Jacksonville, Florida. Required the full range of management skills necessary to the
smooth and profitable operation of a fully staffed insurance claims office.
*Howard Wehnes, Jr. & Co., Inc. 1986-1992*

Page-2, C.V.
Charles W. Howarth, CPCU

## STATE FARM Re-INSPECTOR/TRAINER, CLAIMS ADJUSTER

Started out as a property claims adjuster with State Farm Insurance Company and was ultimately promoted to the position of Re-inspector/Trainer for the West Coast of Florida. The responsibilities of the job were to both train property claims adjusters for State Farm Insurance Co. in proper good faith claims handling practices as well as auditing closed claim files to evaluate training needs in my region.

*State Farm Insurance Company 1980-1986*

---

### EDUCATION, SPECIALIZED TRAINING and ACCOMPLISHMENTS

- Holmes Bible College, Greenville, SC – Degree – Theology
- CPCU Degree – (Chartered Property & Casualty Underwriter) The American Institute for Property and Casualty Underwriters, Inc.
- AIC Degree – (Associate in Claims) Insurance Institute of America

### MEMBERSHIPS (Past & Present)

- National Society of CPCU.
- Rule-31 Approved Mediator, Supreme Court of Tennessee
- Past President of Tennessee Association of Public Insurance Adjusters
- Past President of Florida Association of Public Insurance Adjusters
- Past Treasurer of Florida Association of Public Insurance Adjusters
- Member of National Association of Public Insurance Adjusters (NAPIA)
- Board of Directors of National Association of Public Insurance Adjusters

### PERSONAL

Born in Florida
Birthdate: 8-28-54

Married, 40 Years
Four Children, Two Grandsons

Page-3, C.V.
Charles W. Howarth, CPCU

## PRIOR EXPERT TESTIMONY (Partial)

### FEDERAL & STATE COURTS

Greg Ross vs. State Farm Fire & Casualty Company, NO. 3-09-1196, The United States District Court for the Middle District of Tennessee, Nashville Division.

Jerome S. Tannenbaum and Deborah M. Tannenbaum vs. Federal Insurance Company, NO. 3-11-1077, The United States District Court for the Middle District of Tennessee, Nashville Division.

Alexander Properties Group, Inc., et al vs. Commonwealth Insurance Company, Arbitration before the Honorable Charlie Trotter, Nashville, TN

J. T. Carneal dba J. T. Carneal Enterprises and Suzanne Roberts dba Anne's Bridals, LLC vs. Travelers Casualty Insurance of America and Henneberger and Flynn Insurance Agency, Inc. NO. 5-12-CV-174-R, The United Stated District Court for te Western District of KY, Paducah Division.

Jinil Corporation and Arvind Patel, individually and as Agent of Jinil Corporation vs. Western Rivers Corporation; Bolton & Company, Civil Action No. 09-CI-00045, In The McCracken Circuit Court, Division No. 1, Commonwealth of Kentucky.

Cullman Bowling Center, LLC vs. Tower Insurance of New York, Et Al. No. CV-2012-900220, In the Circuit Court of Cullman County, Alabama.

Union Insurance v. Blakeney Palmer. No.: 7:12-CV-04072. In the United States District Court for the Northern District of Alabama, Western Division.

VJ, LLC vs. State Auto Property and Casualty Insurance Company. No. 2:14-cv-02919-SHM-dkv. In the United States District Court for the Western District of Tennessee Western Division.

Robert Sadler and Karen Sadler vs. Auto-Owners Insurance Company. No. 15-CV-7. In The Circuit Court of Decatur County, Tennessee at Decatureville.

Willard Cole and Tammy Cole vs. Auto-Owners Ins. Co. No 5:16-cv-00834-KOB. In The United States District Court For The Northern District of Alabama Northeastern Division.

**Page-4, C.V.**
**Charles W. Howarth, CPCU**


Copper Ridge Owner's Association v. Philadelphia Indemnity Insurance Company. No 3:16-cv-305. In the United
    States District Court For The Western District of North Carolina Charlotte Division.

Haman, Inc. dba Knights Inn v. Chubb Custom Insurance Company. No CV 2016-900146. In the Circuit Court of
    Jefferson County, AL.

Cobblestone Condominium Association, Inc. v. Travelers Casualty Insurance Company of America. No.: 5:16-cv-
    00573-MHH. In the United States District Court for the Northern District of Alabama Northeastern Division.

Hatfield Inn, LLC vs. Eaves Insurance Agency, LLC. No. 15-CI-00071. In The Commonwealth of Kentucky
    Grayson Circuit Court, Div. II.

Central Baptist Church of Albany, GA, Inc. vs. Church Mutual Insurance Company. No. 1:16 cv00231-LJA. In the
    United States District Court Middle District of Georgia Albany Division.

Catlin Syndicate Limited, vs. Ramuji, LLC dba Budget Inn, and Peoples Independent Bank. No. 4:16-CV-01331-
    VEH. In the United States District Court For The Northern District of Alabama Northern Division

**Chuck Howarth, CPCU**
The Howarth Group, Inc.
137 Third Avenue North
Franklin, TN  37064
(615)-550-5500
(615) 406-0834 Cell
Chuck@thehowarthgroup.com

## Expert Fee Schedule and Conditions

| | |
|---|---|
| Hourly Rate for All Time | $225.00 / hour |
| Retainer Required | $          None |
| Expenses | $          Included |

## Principal Sources of Information Relied Upon in Reaching My Opinions and Conclusions

***The Alabama Department of Insurance Regulation Chapter 482-1-125***, and the eleven (11) subchapters of this Regulation that provide Standards for Property/Casualty Insurance Claims in the State of Alabama.

***Unfair Claims Practices and Unfair Claims Settlement Acts of:*** Tennessee, Kentucky and Florida.

***The Chubb Insurance Policy***, the insurance policy #99783420-00 that insured the Knights Inn on the dates of both losses.

***The Brookstone Restoration estimate***, the estimate dated 6/30/145 for the fire loss.

***The Belfor Property Restoration estimate***, the estimate dated 6/27/14 for the fire loss.

***The Forensic Building Science Report***, the report and photos regarding the fire loss that is dated 8/10/15.

***The Forensic Building Science Report***, the report and photos regarding the windstorm loss that is dated 8/20/15.

***The York SLA estimate,*** the estimate dated May 6, 2015 for the windstorm loss.

***The National Weather Service Information***, the information related to the path of the Bessemer Tornado that caused the windstorm damages to Knights Inn in 2014.

**Page-2**

***Claim Communications,*** Inspection reports, estimates, inventories, e-mail communications, photos and correspondence between the parties during the course of these two claims that are included in the our claim files.

***Personal Observations***, during my inspection of the Knights Inn fire and wind damaged building.

-Chuck Howarth, CPCU

# Arthur Grandinetti
**1250 State Route 387**
**Marion, KY 42065**
**(239) 322-0936 (cell)**



**KEYS CLAIMS CONSULTING** *(February 2019 – present)*
**Senior Claims Manager**
**1333 3rd Ave. South (Suite 407)**
**Naples, FL 34102**
**Contact: George Keys, (239) 774-5040**

**Construction Expert/ Estimator / Appraiser**
Managing/Estimating large commercial projects ranging from 600K-200M. Responsible for inspections, valuations, quality control of claims handling, and procedures. Procurement of contractor estimates and take-offs as well as expert reports and testing.

**GRANDINETTI CONSULTING** *(July 2013 – present)*
**President**
**Marion, KY 42064**
**1(800)755-0720**

**Public Adjuster / Appraiser / Estimator / Umpire / Construction Expert**
Arthur Grandinetti has experience with residential, commercial, and industrial applications. He has an extensive knowledge of structure and uses the industry standard in estimating programs: Xactimate. Mr. Grandinetti has used the Xactimate program since 2002. Mr. Grandinetti worked as a restoration contractor in Southwest Florida during some of the area's most severe hurricanes and storms. He has also worked as a construction consultant/contractor for Fortune 500 companies such as Sprint/Nextel and coordinated rehabilitation/restoration services for over 800 units/properties in the Southwest Florida area.

**THE HOWARTH GROUP, INC.** *(April 2011 to November 2018)*
**137 Third Avenue North, Franklin, TN 37064**
**Contact: Chuck Howarth, (615) 550-5500**

**Estimator / Consultant / Appraiser / Construction Expert**
**(taken from company website):**
Arthur Grandinetti is The Howarth Group's senior estimator with "hands on" experience in residential,

commercial and industrial construction.  Prior to his move to Kentucky in 2009 he had a General Contracting firm in Florida and has accumulated almost twenty-five years of experience in new construction and restoration projects.  Couple his construction experience with his intimate knowledge of Xactimate estimating software and you have an extremely valuable, and appreciated, member of The Howarth Group family.

Additionally, Arthur is unique in that he has handled claims for insurance companies as an Independent Adjuster (IA) for two firms out of Florida: AAA Claims Service and Aplin, Peer & Associates.  Being a former IA has given him a rare view and insight as to what goes on behind closed doors in the claims department of many property insurers.

Like his wife, Sarah (one of our Inventory Specialists) he enjoys spending what vacation time he has with their three children at the beach, but more importantly under the water.  He enjoys Scuba diving and has attained three different levels of Scuba certifications plus certifications within Emergency Medical Technology and Diver Medical Technology.


**ZEVULONI & ASSOCIATES**  *(March 2009 to June 2009)*
**West Palm Beach, FL**
**Contact: Avi Zevuloni, (954) 742-8248**

**Public Adjuster & Estimator**

Scoped a select few large, multi-million dollar commercial and residential properties and prepared estimates; Xactimate


**MOLD DOCTORS, U.S.A.**
**Cape Coral, FL** *(August 2008 to January 2009)*

**Estimator and Claims Negotiator / Carpenter**

Scoped claims, prepared estimates, and facilitated in the repairs; Xactimate


**HARRISON CONSTRUCTION OF SOUTHWEST FLORIDA, INC.**
**Cape Coral, FL** *(October 2002 to 2006)*

**Founder & Principal**

Harrison Construction of Southwest Florida, Inc. is a full service residential and commercial construction company specializing in turn-key construction services. Harrison Construction operates nationwide and is also a licensed specialist in the area of catastrophic insurance claim adjusting and repair facilitation.  HCSWF has supported and serviced such clients as:  Sprint Nextel, ReMax, Citizens Insurance, Aplinpeer Insurance, United Casualty Insurance and an exclusive construction rehabilitation relationship with Home Hunters USA.


**AAA claim service** (2004-2006)

**Leader catastrophe claims**
**Supervisor (Randy Oehmig ph. # 352-257-9515)**

Provided full service claim service including structure, content, and additional living expense
Claims written in Xactimate

**Aplin Peer and Associates** (2005-2006)
**Supervisor (Chuck Eagle ph. #239-218-0258)**

Provided day claim service, and catastrophe, including fire, water, vandalism, and misc. occurrences leading to structural damages

**Terry Jefferies (2004-2005)**

**Assistant adjuster to Terry**

Provided full service claim service including structure, content, and addition living expense
Claims written in Xactimate

**REPUBLIC INDUSTRIES – Tulsa, OK** *(April 1999 – September 2002)*

**Subcontractor – Kitchen & Bath**

Provided full service kitchen and bath design and installation services for new construction and remodeling including: demolition, framing, plumbing, venting, electrical, flooring, cabinets, finishes and fixtures.

**CARPET CORNER GALLERY – Tulsa, OK** *(March 1997 – March 1999)*

**Supervisor – Flooring Installation**

Supervised the installation for this full-service flooring company including: Natural wood, engineered wood, ceramic tile, stone, carpet and linoleum.  Responsible for an installation and maintenance staff of thirteen (13) flooring specialists.

**FLOORCRAFTERS, Inc. – Ft. Myers FL** *(January 1995 to January 1997)*

**Sub-Contractor**

Responsible for custom floor design, layout and installation of all types of floor coverings for high end commercial clients.

Most notable: Successfully designed and completed the Dean Street Motel in downtown Ft. Myers, Florida.

**APPRENTICE / JOURNEYMAN** *(September 1990 to December 1995)*

**Apprenticeship with over 15 Subcontractors**

Responsible for all aspects of construction:

- ➢ Flooring Installation
- ➢ Drywall installation and finishing
- ➢ Wall covering and painting

- ➢ Cabinet installation
- ➢ Rough Carpentry
- ➢ Finish Carpentry
- ➢ Finishes including: Installation of fans, sinks, toilets, and other various electrical and plumbing fixtures

██████████████████████████████████████

- **Public Adjuster's License held – KY DOI #737854**
- **10 years CE for Licensing requirements.**
- **Tulsa Community College**
- Emergency Medical Technology (E.M.T)
- Anatomy and physiology
- **Dick Rutkowsky - NOAA**
- Diver Medical Technology (D.M.T)
- Hyperbaric Medicine

██████████████████████████████████████

## Licenses Held:

- ➢ CPR certification
- ➢ Kentucky State Drivers
- ➢ D.M.T
- ➢ E.M.T
- ➢ Advanced Open Water Scuba Diver
- ➢ Mixed-Gas Nitrox Diver
- ➢ Kentucky State Public Adjuster's License
- ➢ **FORMERLY** Alabama State Independent Adjusters License
- ➢ **FORMERLY** Florida State Independent Adjusters License

██████████████████████████████████████

## FEDERAL AND STATE COURT

VJ, LLC vs. State Auto Property and Casualty Insurance Company. No. 2:14-cv-02919-SHM-dkv. In the United States District Court for the Western District of Tennessee Western Division.

Robert Sadler and Karen Sadler vs. Auto-Owners Insurance Company. No. 15-CV-7. In The Circuit Court of Decatur County, Tennessee at Decatureville.

Willard Cole and Tammy Cole vs. Auto-Owners Ins. Co. No 5:16-cv-00834-KOB. In The United States District Court For The Northern District of Alabama Northeastern Division.

Cobblestone Condominium Association, Inc. v. Travelers Casualty Insurance Company of America. No.: 5:16-cv-00573-MHH. In the United States District Court for the Northern District of Alabama Northeastern Division.

List of recommendations and completed Appraisals, available on request.

# Fee schedule for
# Field Estimation, Appraisal, and Expert
# Construction Consulting

## Grandinetti Consulting, Inc.

1250 State Route 387, Marion, KY 42064

239-322-0936

arthur@grandinetticonsulting.com

| Service Type | Description | What is included | Price percentage of Gross Claim Amount | Costs |
|---|---|---|---|---|
| Basic Package | Review & interpretation of Expert reports, Basic estimate & Photo Walkthrough, Digital download of file | Visit to property site (first 25 miles included) 54.5 cents per mile after, Basic photo walkthrough with closeups, Final Estimate (pdf) | $.01 - $100,000 1.7%<br>$100,001 - $300,000 1.3%<br>$300,001 - $1,000,000 1.2%<br>$1,000,001 - $3mil 1.1%<br>$3,000,000 - $5mil 1.0%<br>$5,000,000 + (negotiable)<br>Hourly Rate: $65/hr & 54.5 cents per mile | Expenses incurred, receipts provided |
| Standard Package | Review & interpretation (with opinions) of Expert reports, Sketched (Roof) and notated estimate & Photo Walkthrough, Satellite Imagery (if avail.), Digital download of file | Visit to property site (first 50 miles included) 54.5 cents per mile after, Detailed photo walkthrough with closeups and photo catalog, Final Estimate with sketched roof (pdf and esx file), EagleView report(s) and imagery | $.01 - $100,000 2.0%<br>$100,001 - $300,000 1.6%<br>$300,001 - $1,000,000 1.5%<br>$1,000,001 - $3mil 1.4%<br>$3,000,000 - $5mil 1.3%<br>$5,000,000 + (negotiable)<br>Hourly Rate: $65/hr & 54.5 cents per mile | Expenses incurred, receipts provided |
| Upgraded Package | Review & interpretation (with opinions and annotations/ email review) of Expert reports, (Sketched Roof, footprint & Interiors) notated estimate & Photo Walkthrough, Satellite Imagery (if avail.), Digital download of file, 3D Virtual Tour | Visit to property site (first 100 miles included) 54.5 cents per mile after, Detailed photo walkthrough with closeups and photo catalog, Final Estimate with roof and interior sketch (pdf and esx file), EagleView report(s) and imagery, 3D Virtual Tour - per bid, digital download of completed cataloged folder including all due diligence used and estimate with esx files. | $.01 - $100,000 2.5%<br>$100,001 - $300,000 2.1%<br>$300,001 - $1,000,000 2.0%<br>$1,000,001 - $3mil 1.9%<br>$3,000,000 - $5mil 1.8%<br>$5,000,000 + (negotiable)<br>Hourly Rate: $65/hr & 54.5 cents per mile<br>3D Camera expenses are over and above the percentage rate and are on a per job basis as discussed. | Expenses incurred, receipts provided |

| | | | | |
|---|---|---|---|---|
| Appraisal Rates | | This includes estimate changes, Appraisal meeting, and Umpire meeting - negotiation to closure with award. | $85/hr per hour worked, 54.5 cents per mile | Expenses incurred, receipts provided |
| Expert Construction Consulting/ Testimony | | This includes compilation of all information contained in my files, review of that info. for presentation to opposing counsel, preparation for deposition, and trial if necessary. | $115/hr per hour worked, 54.5 cents per mile | Expenses incurred, receipts provided |

## APPRAISAL EMPLOYMENT AGREEMENT - COMMERCIAL

WHEREAS __HAMAN INC, DBA KNIGHTS INN__ ("Insured") is the owner of a property located at __1121 9TH AVE SW, BESSEMER AL 35022__ which is insured by __CHUBB CUSTOM INS CO__ ("Carrier"); and, that a disagreement has arisen between the Insured and the Carrier regarding the proper valuation of the __FIRE__ loss sustained by the Insured on or about __3/22/2014__; now therefore, the parties agree as follows:

1.  The Insured hereby employs The Howarth Group ("THG") for the purpose of determining the amount of the loss and for presenting this valuation to the appraisal panel and/or the Carrier.  In this regard, THG is directed to notify the Carrier of the Insured's invocation of the appraisal provision of the policy and is hereby appointed as the Insured's appraiser as required by the policy.  THG will present the strongest legitimate claim available for the Insured within the terms of the Agreement, with due consideration to the circumstances of the loss and the customs and practices in the industry.  However, the Insured acknowledges that THG will not act as a mere advocate on their behalf, but will present to the appraiser appointed by the Carrier, as well as to the umpire, its conscientious, impartial and well-considered opinions and will strive to reach common ground consistent with the rights, duties and obligations of both the Insured and the Carrier.

2.  The parties acknowledge that THG and its employees are not attorneys and therefore do not provide legal representation or tender legal advice.

3.  The Insured agrees to pay THG in consideration for its services an hourly rate of $375.00 per hour together with all expenses reasonably incurred in the appraisal.  However, because THG has expressed to the Insured the opinion that the amount proposed by the Carrier to the Insured is inadequate, and because THG agrees that a reasonable limitation of the amount of compensation will be necessary for the Insured to realize a benefit from the appraisal, THG agrees that the total fee charged will not exceed thirty percent (30%) of the additional settlement awarded to the Insured, and additionally, *should the process produce no additional settlement then no fee will be due.*  THG does not make any promise or guarantee that a recovery can or will be obtained.

4.  The Insured assigns to THG the right to be paid as a joint payee by the Carrier on any additional structural payments issued on this loss and agrees to notify THG within three (3) business days of any check from the Carrier (along with a copy of the check) and to pay THG within ten (10) business days of receipt of their invoice.

5.  THG is an independent party and is not affiliated with any insurance company.

6.  This Agreement contains the entire agreement between the parties and there are no oral or written representations, promises, agreements or arrangements between the parties, expressed or implied, other than those set forth in this Agreement.  This Agreement will be interpreted in accordance with the local laws of the State of Tennessee.

7.  Should the Insured default in the payment of THG's fee, interest will accrue on the unpaid balance at the rate of ten percent (10%) per annum and the Insured agrees to pay all costs and expenses associated with THG's effort to collect any unpaid balance.  The parties agree that the sole venue for any dispute arising out of this agreement will be in the courts of Williamson County, TN.

_____     Title: __VP__     Date: __1 29 15__

_____     Title: _____     Date: _____

The Howarth Group, Inc.     Title: __Pete Coulter__     Date: __1/29/15__

π EXHIBIT __39__
Deponent: __CHARLES HOWARTH__
Date __1·8·20__ Rptr __EAR__
WWW.DEPOBOOK.COM

The Howarth Group, Inc.

# THE HOWARTH GROUP
### INSURANCE CLAIM CONSULTANTS

February 25, 2015

Mr. Brent Perich, Adjuster
Chubbs Insurance
York Risk Services Group, Inc.
1117 Perimeter Center W., Ste. W403
Atlanta, GA 30338

RE:     Your Insured          Haman Inc./ Knights Inn
        Location of Loss       112 9th Ave. SW
                               Bessemer, AL 35022
        Date of Loss           3/22/2014
        Policy Number          99783842000
        Claim Number           047514019355

Dear Mr. Perich,

I am writing to advise you that Haman Inc./Knights Inn have several differences with the settlement offer presented by your company on the above referenced loss. In their effort to resolve these differences about the loss they have decided to invoke the Appraisal provision of the policy and have employed me to serve as their appraiser. A copy of my Appraisal Employment Agreement is enclosed which provides the written notice required by the policy. Please select an Appraiser to represent your company in the Appraisal process within the time frame provided for in the Appraisal provision and have him or her contact me directly so that we can get the process under way as soon as possible.

Your insured has asked me to request a certified copy of the policy on their behalf. Please send this copy of the policy directly to Zarin Visram at 3232 Arbor Hill Trace, Hoover, AL 35244 as soon as possible.

If you would like to get a better understanding of the differences that exist or would like to make one last effort to resolve the matter prior to entering the formal Appraisal process please contact me as I would be happy to meet you on site in my role as Haman Inc./Knights Inn, Zarin Visram's appraiser to go through the differences and review the items in dispute. Otherwise, I will anticipate a call from your Appraiser within the next week or so. My cell number is 615-406-0834.

Sincerely,

Chuck Howarth, CPCU
The Howarth Group, Inc.

CH/ah
Enclosure
Cc: Zarin Visram

EXHIBIT 40
Deponent CHARLES HOWARTH
Date 8.20 Rptr ____
WWW.DEPOBOOK.COM

157 Third Ave. North, Franklin, TN 37064
(p) 615.550.5500
800.6452.56
(fx) 615.550.5501
www.TheHowarthGroup.com

The Howarth Group, Inc.

## APPRAISAL EMPLOYMENT AGREEMENT – COMMERCIAL

WHEREAS _MAMMU INC DBA PHENIS INC_ ("Insured") is the owner of a property located at _1131 4th AVE SE, BESSEM AL 35022_ which is insured by _GUILAR CUSTRA INS CO_ ("Carrier"); and, that a disagreement has arisen between the Insured and the Carrier regarding the proper valuation of the _FIRE_ loss sustained by the Insured on or about _3/23/2009_; now therefore, the parties agree as follows:

1. The Insured hereby employs The Howarth Group ("THG") for the purpose of determining the amount of the loss and for presenting this valuation to the appraisal panel and/or the Carrier. In this regard, THG is directed to notify the Carrier of the Insured's invocation of the appraisal provision of the policy and is hereby appointed as the Insured's appraiser as required by the policy. THG will present the strongest legitimate claim available for the Insured within the terms of the Agreement, with due consideration to the circumstances of the loss and the customs and practices in the industry. However, the Insured acknowledges that THG will not act as a mere advocate on their behalf, but will present to the appraiser appointed by the Carrier, as well as to the umpire, its conscientious, impartial and well-considered opinions and will strive to reach common ground consistent with the rights, duties and obligations of both the Insured and the Carrier.

2. The parties acknowledge that THG and its employees are not attorneys and therefore do not provide legal representation or render legal advice.

3. The Insured agrees to pay THG in consideration for its services an hourly rate of $

4. The Insured assigns to THG the right to be paid as a joint payee by the Carrier on any additional structural payments issued on this loss and agrees to notify THG within three (3) business days of any check from the Carrier (along with a copy of the check) and to pay THG within ten (10) business days of receipt of their invoice.

5. THG is an independent party and is not affiliated with any insurance company.

6. This Agreement contains the entire agreement between the parties and there are no oral or written representations, promises, agreements or arrangements between the parties, expressed or implied, other than those set forth in this Agreement. This Agreement will be interpreted in accordance with the local laws of the State of Tennessee.

7. Should the Insured default in the payment of THG's fee, interest will accrue on the unpaid balance at the rate of ten percent (10%) per annum and the Insured agrees to pay all costs and expenses associated with THG's effort to collect any unpaid balance. The parties agree that the sole venue for any dispute arising out of this agreement will be in the courts of Williamson County, TN.

_____   Title: _VP_   Date: _11/29/15_

_____   Title: _____   Date: _____

_____   Title: _Vice Condt___   Date: _11/29/15_
The Howarth Group, Inc

## APPRAISAL EMPLOYMENT AGREEMENT - COMMERCIAL

WHEREAS HAMAN, INC. DBA KNIGHTS INN ("Insured") is the owner of a property located at 1121 9TH AVE SW, BESSEMER, AL 35022 which is insured by CHUBB CUSTOM INS ("Carrier"); and, that a disagreement has arisen between the Insured and the Carrier regarding the proper valuation of the STORM loss sustained by the Insured on or about 4-28-14 ; now therefore, the parties agree as follows:

1. The Insured hereby employs The Howarth Group ("THG") for the purpose of determining the amount of the loss and for presenting this valuation to the appraisal panel and/or the Carrier. In this regard, THG is directed to notify the Carrier of the Insured's invocation of the appraisal provision of the policy and is hereby appointed as the Insured's appraiser as required by the policy. THG will present the strongest legitimate claim available for the Insured within the terms of the Agreement, with due consideration to the circumstances of the loss and the customs and practices in the industry. However, the Insured acknowledges that THG will not act as a mere advocate on their behalf, but will present to the appraiser appointed by the Carrier, as well as to the umpire, its conscientious, impartial and well-considered opinions and will strive to reach common ground consistent with the rights, duties and obligations of both the Insured and the Carrier.

2. The parties acknowledge that THG and its employees are not attorneys and therefore do not provide legal representation or render legal advice.

3. The Insured agrees to pay THG in consideration for its services an hourly rate of $375.00 per hour plus all expenses reasonably incurred in the appraisal. However, because THG has expressed to the Insured the opinion that the amount proposed by the Carrier to the Insured is inadequate, and because THG agrees that a reasonable limitation of the amount of compensation will be necessary for the Insured to realize a benefit from the appraisal, THG agrees that the total hourly fee charged will not exceed thirty percent (30%) of the additional settlement awarded to the Insured, and additionally, *should the process produce no additional settlement then no fee will be due.* THG does not make any promise or guarantee that a recovery can or will be obtained. ABOVE 34,597 ADV 2. N

4. The Insured assigns to THG the right to be paid as a joint payee by the Carrier on any additional structural payments issued on this loss and agrees to notify THG within three (3) business days of any check from the Carrier (along with a copy of the check) and to pay THG within ten (10) business days of receipt of their invoice.

5. THG is an independent party and is not affiliated with any insurance company.

6. This Agreement contains the entire agreement between the parties and there are no oral or written representations, promises, agreements or arrangements between the parties, expressed or implied, other than those set forth in this Agreement. This Agreement will be interpreted in accordance with the local laws of the State of Tennessee.

7. Should the Insured default in the payment of THG's fee, interest will accrue on the unpaid balance at the rate of ten percent (10%) per annum and the Insured agrees to pay all costs and expenses, including reasonable attorney fees, associated with THG's effort to collect any unpaid balance. By executing this Agreement, the Insured specifically agrees that any disputes arising as a result of the Agreement, including collection efforts, shall be governed by and construed in accordance with the laws of the State of Tennessee and furthermore that the proper and sole jurisdiction and venue for any dispute arising out of this Agreement shall be the courts of Williamson County, Tennessee.

Title: V. President          Date: 6/15/15

Title: Claim Consultant      Date: 6/15/15

The Howarth Group, Inc.

EXHIBIT 41
CHARLES
Deponent HOWARTH
Date 1-8-20 Rptr
WWW.DEPOBOOK.COM



**THE HOWARTH GROUP**

INSURANCE CLAIM CONSULTANTS

RECEIVED

JUL 14 2015 U

OSC East

July 6, 2015

Mr. Randy Wilburn, Adjuster
Chubb Custom Insurance Co.
605 Crescent Executive Ct, Ste. 300
Lake Mary, FL 37246

RE:     Your Insured:          Haman Inc. dba Knights Inn
        Location of Loss:       1121 9th Ave, SW
                                Bessemer, AL 35022
        Date of Loss:           4/28/2014
        Policy Number:          9978342000
        Claim Number:           WKFC 5689A9

Dear Mr. Wilburn,

I am writing to advise you that Haman Inc., Knights Inn have several differences with the settlement offer presented by your company on the above referenced loss. In their effort to resolve these differences about the loss they have decided to invoke the Appraisal provision of the policy and have employed me to serve as their appraiser. A copy of my Appraisal Employment Agreement is enclosed which provides the written notice required by the policy. Please select an Appraiser to represent your company in the Appraisal process within the time frame provided for in the Appraisal provision and have him or her contact me directly so that we can get the process under way as soon as possible.

Your insured has asked me to request a certified copy of the policy on their behalf. Please send this copy of the policy directly to Haman Inc., Knights Inn as soon as possible.

If you would like to get a better understanding of the differences that exist or would like to make one last effort to resolve the matter prior to entering the formal Appraisal process please contact me as I would be happy to meet you on site in my role as Haman Inc., Knights Inn's appraiser to go through the differences and review the items in dispute. Otherwise, I will anticipate a call from your Appraiser within the next week or so. My cell number is 615-406-0834 and my email is chuck@thehowarthgroup.com.

Sincerely,

Chuck Howarth, CPCU
The Howarth Group, Inc.

EXHIBIT 42
Deponent CHARLES HOWARTH
Date 1-8-20 Rptr ere
WWW.DEPOBOOK.COM

CH/ah
Enclosure
Cc. Haman Inc., Knights Inn

C007238

## APPRAISAL EMPLOYMENT AGREEMENT - COMMERCIAL

WHEREAS  HAMAN, INC. DBA KNIGHTS'INN  ("Insured") is the owner of a property located at
1121 9TH AVE SW, BESSEMER, AL 35022 which is insured by CHUBB CUSTOM INS
("Carrier"); and, that a disagreement has arisen between the Insured and the Carrier regarding the proper valuation of the
STORM loss sustained by the Insured on or about 4-28-14 ; now therefore, the parties agree as follows:

1. The Insured hereby employs The Howarth Group ("THG") for the purpose of determining the amount of the loss
   and for presenting this valuation to the appraisal panel and/or the Carrier. In this regard, THG is directed to notify
   the Carrier of the Insured's invocation of the appraisal provision of the policy and is hereby appointed as the
   Insured's appraiser as required by the policy. THG will present the strongest legitimate claim available for the Insured
   within the terms of the Agreement, with due consideration to the circumstances of the loss and the customs and
   practices in the industry. However, the Insured acknowledges that THG will not act as a mere advocate on their
   behalf, but will present to the appraiser appointed by the Carrier, as well as to the umpire, its conscientious, impartial
   and well-considered opinions and will strive to reach common ground consistent with the rights, duties and
   obligations of both the Insured and the Carrier.

2. The parties acknowledge that THG and its employees are not attorneys and therefore do not provide legal
   representation or render legal advice.

3. The Insured agrees to pay THG in consideration for its services an hourly rate of $:

4. The Insured assigns to THG the right to be paid as a joint payee by the Carrier on any additional structural payments
   issued on this loss and agrees to notify THG within three (3) business days of any check from the Carrier (along with
   a copy of the check) and to pay THG within ten (10) business days of receipt of their invoice.

5. THG is an independent party and is not affiliated with any insurance company.

6. This Agreement contains the entire agreement between the parties and there are no oral or written representations,
   promises, agreements or arrangements between the parties, expressed or implied, other than those set forth in this
   Agreement. This Agreement will be interpreted in accordance with the local laws of the State of Tennessee.

7. Should the Insured default in the payment of THG's fee, interest will accrue on the unpaid balance at the rate of ten
   percent (10%) per annum and the Insured agrees to pay all costs and expenses, including reasonable attorney fees,
   associated with THG's effort to collect any unpaid balance. By executing this Agreement, the Insured specifically
   agrees that any disputes arising as a result of the Agreement, including collection efforts, shall be governed by and
   construed in accordance with the laws of the State of Tennessee and furthermore that the proper and sole jurisdiction
   and venue for any dispute arising out of this Agreement shall be the courts of Williamson County, Tennessee.

_____   Title: V. President   Date: 6/15/15

_____   Title: _____   Date: 6/15/15
The Howarth Group, Inc.

2/15

C007239



**Call Us Today!** 800.647.2236 | info@thehowarthgroup.com

THE
HOWARTH
GROUP

About Us        Services        Blog        Contact

# Commercial Roofing Insurance Claims

No claim is too big or complicated... click here for more!

## Our Promise

Three decades of experience enables us to guarantee that if we take on your claim as your Tennessee public adjuster, Kentucky public adjuster, Mississippi public adjuster or Alabama insurance appraiser we will increase your settlement or you owe us nothing.

### That's a promise.

Simply stated our clients keep 100% of what the insurance company initially offers them and we are compensated on only a small percentage of the additional monies we get for them.



EXHIBIT 43
CHARLES
Deponent HOWARTH
Date 1-8-20  Rptr. CMC
WWW.DEPOBOOK.COM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**HAMAN, INC.**

     *Plaintiff,*

**v.**

**CHUBB CUSTOM INSURANCE
COMPANY, ET AL.**

     *Defendant.*

**NO. 2:18-CV-01534-KOB**

---

## PLAINTIFF HAMAN, LLC'S
## DESIGNATION OF EXPERT WITNESSES

---

     Comes now the Plaintiff and lists the following expert witnesses pursuant to Fed. R. Civ. P. 26(a)(2)(B).

     1.  Charles "Chuck" Howarth – The Howarth Group, 137 Third Avenue, North, Franklin, Tennessee 37064, telephone (615) 550-5500, facsimile (615) 550-5501.

     Mr. Howarth is an insurance consultant, appraiser and adjuster with over thirty-six (36) years of insurance claims experience.  He is knowledgeable about the specific damages to the Knights Inn that were caused by both the fire loss and the storm loss.  He and Arthur Grandinetti and Sarah Grandinetti performed detailed inspections of the premises at Knights Inn.  Mr. Howarth will testify concerning damage assessments made during inspections made by The Howarth Group as they relate to damage, repair costs, replacement costs and actual cash value.  Mr. Howarth's curriculum vitae, list of prior expert testimony, valuation of



EXHIBIT 44
Deponent HOWARTH
Date 1-8-20 Rptr. Mt
WWW.DEPOBOOK.COM

loss, summary of opinions and hourly rate are attached hereto under Exhibit "A".

Mr. Howarth may also respond to any other testimony provided in his area of expertise, including any testimony that is offered by the Defendant Chubb. The Howarth Group prepared a report of observations of Knights Inn. That report related to the fire loss has been previously produced in this litigation and consists of 225 pages and numerous photos.

The Howarth Group has also prepared a separate wind and roofing damage report dated January 10, 2016, comprising the sum of 52 pages, and numerous photos. That report and photos has also been provided.

Mr. Howarth will base his opinions upon personal inspections and upon inspections of The Howarth Group.

Mr. Howarth has also reviewed the report of Tom Irmiter, Forensic Building Science, Inc., a roofing specialist.

Mr. Howarth is familiar with the reports and photographs provided by the Defendant Chubb.

Mr. Howarth is familiar with the insurance principles and policy terms and conditions and the requirements of good faith. He is particularly familiar with the appraisal process procedures and the policy in question. He is critical of the claims handling and of the appraisal conduct of Chubb and its representatives.

Mr. Howarth has had numerous meetings and interviews with the owner of the Knights Inn.

Mr. Howarth's opinions are based upon his knowledge, skill, expertise, training, education, and review of his firm's work materials, and the work materials of others and any other documents produced or generated in this litigation that were supplied to him. He has been provided with the Bates documents produced by Defendant.   Mr. Howarth has not been provided with any deposition testimony in the case because there have been no depositions taken

2

prior to his designation as an expert.

    2.  Sarah Grandenetti – Sarah assisted Mr. Howarth with the Knights Inn claim.  Her work product is included in the inventory loss estimate.  Her curriculum vitae, valuation of loss, list of prior expert testimony and summary of opinions are provided herewith under Exhibit "B".

    3)  Tom Irmiter, President Forensic Building Science, Inc., 2168 Juliet Avenue, St. Paul, MN 55105, telephone 651-222-6509.

    Mr. Irmiter is a licensed building inspector and appraiser with over forty-three (43) years of experience.  He has investigated literally thousands of storm and fire damage claims.  He inspected the premises of Knights Inn and made a building damage assessment, listed as an initial report, rendered August 20, 2015.  That detailed report has been provided to counsel for Chubb.

    Mr. Irmiter will testify concerning the storm claims and the scope of the damage.

    Mr. Irmiter may respond to any testimony provided in his area of expertise and any other testimony from any other witness concerning his area of expertise, including his review of opinions concerning the testimony of the Defendant's representatives.

    Mr. Irmiter visited the premises, made his own studies, photographs, calculations, observations and reports.  His photographs are attached to his report.

    Mr. Irmiter's opinions are based upon his knowledge, skill, expertise, training, education and actual inspections, inspection reports and work materials of others, and other documents produced and/or generated in this litigation. Mr. Irmiter's resume, expert testimony list and compensation schedule is attached hereto under Tab "C".

4.  Arthur Grandinetti -  Arthur's work product, his evaluation of the losses, is including in The Howarth Group's estimate.  He has personal knowledge of the losses and assisted with the evaluations.  Those reports are referenced in The Howarth disclosures herein.

5.  Plaintiff Haman, LLC reserves the right to call or elicit testimony, by deposition or at trial, from any expert witnesses designated and/or called by Defendant Chubb.  Plaintiff Haman, LLC denies, however, that any such "experts" or other witnesses designated by Defendant Chubb are qualified and/or competent to testify as experts, unless and until, their qualifications to render opinions or testimony are established.

6.  Plaintiff Haman, LLC reserves the right to amend and/or supplement its designation of expert witnesses pursuant to Fed. R. Civ. P. or pursuant to the Court's order with additional experts and/or opinions upon which the Defendant Chubb designates an expert and provides a report and complies with the Fed. R. Civ. P. and this Court's order and/or deposition testimony.  Neither Chuck Howarth or any other Plaintiff experts have been provided with any deposition testimony in the case because there have been no depositions taken prior to this designation as an expert.

DATE: April 30, 2019.

/s/Gary V. Conchin
Gary V. Conchin (ASB 1263-C56G)
Attorney for Haman, Inc.

4

**OF COUNSEL**:

CONCHIN, CLOUD & COLE, LLC
2404 Commerce Court
Huntsville, AL 35801
Phone: 256-705-7777
Fax: 256-705-7778
gary@conchincloudcole.com

/s/ Gregory A. Brockwell
Gregory A. Brockwell (ASB-9949-R49B)

/s/Jason R. Smith
Jason R. Smith (ASB-2692-J50S)

**OF COUNSEL**:

Brockwell Smith LLC
2100 1st Avenue North, Suite 300
Birmingham, Alabama 35203
Phone: (205) 800-8500
greg@brockwellsmith.com
jay@brockwellsmith.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of April 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following: Wayne D. Taylor, Michelle A. Sherman, and Mark D. Hess, and I certify that I have e-mailed and mailed by United States Postal Service the document to the following non-CM/ECF participants:

Wayne D. Taylor
Michelle A. Sherman
MOZLEY, FINLAYSON & LOGGINS LLP
One Premier Plaza, Suite 900 5605 Glenridge Drive
Atlanta, Georgia 30342
Tel: (404) 256-0700
Fax: (404) 250-9355

wtaylor@mfllaw.com
msherman@mfllaw.com

Mark D. Hess
HAND ARENDALL HARRISON SALE LLC
1801 5th Avenue North, Suite 400
Birmingham, Alabama 35203
Tel: (205) 324-4400
Fax: (205) 322-1163
mhess@handarendall.com

/s/Gary V. Conchin
Gary V. Conchin (ASB 1263-C56G)

6

 **BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Client: | Knights Inn | | Home: | (205) 424-9780 |
| Property: | 1121 9th Ave SW | | | |
| | Bessemer, AL 35022 | | | |
| | | | | |
| Operator: | PHIL.HOR | | | |
| | | | | |
| Estimator: | Phil Horne | | Business: | (205) 504-3133 |
| | | | E-mail: | phil.horne@us.belfor.com |

| Type of Estimate: | Fire | | |
| Date Entered: | 5/30/2014 | Date Assigned: | |

| Price List: | ALBI8X_MAY14 |
| Labor Efficiency: | Restoration/Service/Remodel |
| Estimate: | 14-62-KNIGHTS_INN-2 |

We would like to thank you for the opportunity to provide you with this estimate. The total cost for the repairs detailed in the following estimate is **$466,838.73.**

The attached estimate details the specific work to be completed. Additional work outside of that specified in this estimate will be through separate proposal(s) and/or change order(s) detailing the additional/changed scope of work as well as the terms and pricing of those changes. Repairs will be scheduled after a signed copy of this estimate is received.

Progress payments may be billed at 25%, 50%, 75%, and 90% of completion with the balance due upon substantial completion of this scope of work. Change orders will be billed as completed and credits will be applied to the final contract billing.

Unless noted otherwise, the customer is required to provide heat, water and electricity on-site for the duration of this project. The customer is responsible for providing continuous access to the project area during normal business hours, Monday - Friday, 8:00 am - 5:00 pm. Where an item is being replaced, we will be matching the existing item's quality, color, finish, texture or material as close as possible where applicable unless noted otherwise, there is no guaranty either specified or implied on exact matches. This estimate does not include hazardous material testing or abatement unless specifically detailed in the following estimate.

This estimate is valid for 30 days from 6/27/2014. If you have any questions about this estimate, please contact Phil Horne to discuss those questions.

I/we agree to the terms and conditions of this proposal.

_____ Date_____       _____ Date_____
Owner/Authorized signature                  BELFOR Representative



HAMAN, INC. PRODUCTION 1-001342



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**14-62-KNIGHTS_INN-2**

**14-62-KNIGHTS_INN-2**
**DESCRIPTION**                                                                QTY

1. This is an estimate prepared on the basis of visual inspections prior to
   demolition work and subject to ongoing revisions as the job progresses.
2. Provisions for Code, Law and Ordinance may/may not be contained in this estimate.
   Additional items may be requested before or during repairs by city inspections, they
   will be submitted for approval as they arise.
3. NO provisions for damage to driveway or landscape are contained in this estimate.
   BELFOR specifically disclaims any damage to driveway and landscape.
4. All necessary permits will be applied for prior to commencement of work.
5. All required inspections will be obtained at the appropriate intervals.

6. Due to the nature of this fire, there will probably be some electrical wiring and plumbing that is damaged in the party walls
between the units. This will not be determined until demo is done. If damage is found, that will be brought to the attention of the
owner and adjuster immediately.

**Office**

**Receptionist**                                                     Height: 8'
**DESCRIPTION**                                                         QTY

| | | | | |
|---|---|---|---|---|
| 2,002. | Seal/prime then paint the walls and ceiling (2 coats) | | | 952.78 SF |
| 2,003. | Clean the walls and ceiling | | | 952.78 SF |
| 2,004. | Clean the floor | | | 331.44 SF |

*[handwritten annotations: Room Measures 12'x20'9" mw-34"x8" vanity-6'1"x4'11" HH/sink-56"x4'11" Ice/vend-28'4"x14'9" mw-8'6" mw-12']*

*[handwritten: 104-no access 102- no access 103-no access 102- " " 105-" " 104-" " 101-" "]*

*[handwritten: 177-no access 174-no access 173-no access CBS walls. *content manip.]*

*[handwritten: Laundry (12'x26') placed emeter Tache ceiling. Storage-102"x28" Brake Room/maint. 15'x10'2" Rod 4 overhang *poured concrete in rooms may straight]*

*[handwritten: Remember Ext. lights.]*

*[handwritten: *exposed concrete sidewalks. *insurance pre-access does- poured no backups in building]*

**Room 110**

*[handwritten: Corridors = 5' Height = 9' Stairs 15'10"x8'4" 18'8" tall]*

**Bathroom1**                                                         Height: 8'
**DESCRIPTION**                                                         QTY

| | | | | |
|---|---|---|---|---|
| 13. | R&R Suspended ceiling tile - 2' x 2' | | | 26.18 SF |
| 902. | Clean suspended ceiling grid | | | 26.18 SF |
| 14. | R&R Batt insulation - 4" - R11 - paper faced | | | 26.18 SF |
| 903. | Clean wallpaper | | | 82.00 SF |
| 16. | Clean floor - tile | | | 26.18 SF |
| 19. | Clean toilet - Light | | | 1.00 EA |
| 20. | Clean shower | | | 1.00 EA |
| 199. | Seal ceiling joist system for odor | | | 190.18 SF |

*[handwritten: 281- no access 280- chain locked from inside 219- no access 278- chain locked from inside]*

*[handwritten: 277-no access 276-no access 275-no access 273- " " 269- " " 270-" "]*

*[handwritten: 267- no access 264- " " 263- " " 262- " "]*

*[handwritten: 221 - no access 220- " " 219- " " 218- " " 210- " " 209- " "]*

*[handwritten: 208- no access 207- " " 206- " " 205- " " 204- " " 203- " " 202- " "]*

*[handwritten: 201- " " V A/C on Baby there.]*

*[handwritten: 6/27/2014]*

HAMAN, INC. PRODUCTION 1-001343



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Vanity Area1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1.  R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 901.  Clean suspended ceiling grid | 30.21 SF |
| 3.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 5.  Clean wallpaper | 153.44 SF |
| 7.  Clean and deodorize carpet - Light | 30.21 SF |
| 200.  Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 9.  R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 899.  Clean suspended ceiling grid | 247.00 SF |
| 10.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 11.  Clean wallpaper | 497.44 SF |
| 12.  Clean and deodorize carpet - Light | 247.00 SF |
| 21.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 201.  Seal ceiling joist system for odor | 744.44 SF |
| 900.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 17.  Reglaze 1/4" annealed/float glass - 40 sf maximum | 15.00 SF |

## Room 111

| Bathroom | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 22.  R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 23.  R&R Batt insulation - 6" - R19 - paper faced | 26.18 SF |
| 28.  5/8" drywall - hung only (no tape or finish) | 108.18 SF |
| 907.  R&R 1/2" drywall - hung only (no tape or finish) | 82.00 SF |
| 912.  R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 905.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 906.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 909.  R&R Toilet | 1.00 EA |
| 908.  R&R Bathtub | 1.00 EA |
| 910.  R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 911.  R&R Tub/shower faucet | 1.00 EA |
| 914.  R&R Tile floor covering | 26.18 SF |
| 913.  R&R Tile base | 20.50 LF |
| 202.  Seal ceiling joist system for odor | 190.18 SF |

HAMAN, INC. PRODUCTION 1-001344



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Vanity Area/Room | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 30. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 915. Clean suspended ceiling grid | 30.21 SF |
| 31. R&R Batt insulation - 6" - R19 - paper faced | 30.21 SF |
| 32. 5/8" drywall - hung only (no tape or finish) | 153.44 SF |
| 916. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 917. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 90. R&R Carpet | 18.58 SF |
| 918. R&R Carpet pad | 30.21 SF |
| 920. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 35. R&R Countertop - post formed plastic laminate - Standard grade | 6.00 LF |
| 37. Detach & Reset Sink - single | 1.00 EA |
| 203. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 40. R&R Batt insulation - 6" - R19 - paper faced | 247.00 SF |
| 41. 5/8" drywall - hung only (no tape or finish) | 744.44 SF |
| 42. R&R Carpet | 247.00 SF |
| 919. R&R Carpet pad | 247.00 SF |
| 91. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 45. Clean curtains - plain - medium - Full service | 2.00 EA |
| 921. Clean door (per side) | 1.00 EA |
| 922. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 923. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 924. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 204. Seal ceiling joist system for odor | 744.44 SF |

Room 112

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 46. R&R 5/8" drywall - hung, taped, floated, ready for paint | 164.00 SF |
| 47. R&R Batt insulation - 4" - R11 - paper faced | 108.18 SF |
| 48. R&R Suspended ceiling system - Standard grade - 2' x 2' | 26.18 SF |
| 49. R&R Wallpaper - Standard grade | 82.00 SF |
| 51. R&R Tile tub surround - up to 60 SF | 55.00 SF |
| 53. R&R Tile floor covering | 26.18 SF |
| 55. R&R Bathtub | 1.00 EA |
| 56. R&R Tub/shower faucet | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001345



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bathroom1**

| DESCRIPTION | QTY |
|---|---|
| 57. R&R Toilet | 1.00 EA |
| 58. R&R Toilet paper holder | 1.00 EA |
| 81. R&R Interior door unit | 1.00 EA |
| 83. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 85. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 205. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 62. R&R 5/8" drywall - hung, taped, floated, ready for paint | 115.08 SF |
| 63. R&R Batt insulation - 4" - R11 - paper faced | 106.93 SF |
| 64. R&R Suspended ceiling system - Standard grade - 2' x 2' | 30.21 SF |
| 65. R&R Wallpaper - Standard grade | 153.44 SF |
| 927. R&R Wallpaper border | 22.17 LF |
| 86. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 87. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 72. R&R Coat Rack - Commercial - wall mounted | 1.00 LF |
| 73. R&R Carpet | 30.21 SF |
| 928. R&R Carpet pad | 30.21 SF |
| 88. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 206. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 74. R&R 5/8" drywall - hung, taped, floated, ready for paint | 124.36 SF |
| 75. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 76. R&R Suspended ceiling system - Standard grade - 2' x 2' | 247.00 SF |
| 77. R&R Wallpaper - Standard grade | 497.44 SF |
| 926. R&R Wallpaper border | 65.17 LF |
| 79. R&R Carpet | 247.00 SF |
| 925. R&R Carpet pad | 247.00 SF |
| 89. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 80. Clean curtains - plain - medium - Full service | 2.00 EA |
| 92. R&R Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 652. Additional charge for a retrofit exterior door | 1.00 EA |
| 653. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 654. R&R Entrance hardware - card key | 1.00 EA |
| 94. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001346



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bedroom1**

| DESCRIPTION | QTY |
|---|---|
| 95.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 207.  Seal ceiling joist system for odor | 744.44 SF |

### Room 114

**Bathroom1**                                                                    Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 96.  R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 938.  Clean suspended ceiling grid | 26.18 SF |
| 97.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 98.  Clean the walls | 164.00 SF |
| 939.  Clean door (per side) | 1.00 EA |
| 940.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 941.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 99.  Clean floor - tile | 26.18 SF |
| 100.  Clean toilet - Light | 1.00 EA |
| 101.  Clean shower | 1.00 EA |
| 208.  Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                                 Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 102.  R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 934.  Clean suspended ceiling grid | 30.21 SF |
| 103.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 104.  Clean the walls | 153.44 SF |
| 935.  Clean door (per side) | 1.00 EA |
| 936.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 937.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 105.  Clean and deodorize carpet - Light | 30.21 SF |
| 106.  Clean countertop | 18.00 SF |
| 107.  Clean sink | 1.00 EA |
| 108.  Clean sink faucet | 1.00 EA |
| 209.  Seal ceiling joist system for odor | 183.65 SF |

HAMAN, INC. PRODUCTION 1-001347



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

| Bedroom1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 109. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 929. Clean suspended ceiling grid | 247.00 SF |
| 110. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 111. Clean wallpaper | 497.44 SF |
| 930. Clean door (per side) | 1.00 EA |
| 931. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 932. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 112. Clean and deodorize carpet - Light | 247.00 SF |
| 114. Clean curtains - plain - medium - Full service | 2.00 EA |
| 115. Wallpaper Hanger - per hour | 4.00 HR |
| The above line item is to repair the seams in the wallpaper where they are loose. | |
| 178. Contents - move out then reset - Extra large room | 1.00 EA |
| 210. Seal ceiling joist system for odor | 744.44 SF |
| 933. Clean window unit (per side) 41 - 60 SF | 1.00 EA |

**Room 115**

| Bathroom1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 116. R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 117. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 966. R&R 5/8" drywall - hung, taped, ready for texture | 82.00 SF |
| 967. R&R 1/2" acoustic drywall - hung, taped, ready for texture | 82.00 SF |
| 968. R&R Wallpaper | 164.00 SF |
| 969. R&R Wallpaper border | 20.50 LF |
| 974. R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 975. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 976. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 970. R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 971. R&R Bathtub | 1.00 EA |
| 972. R&R Tub/shower faucet | 1.00 EA |
| 973. R&R Toilet | 1.00 EA |
| 977. R&R Tile floor covering | 26.18 SF |
| 978. R&R Tile base | 20.50 LF |
| 211. Seal ceiling joist system for odor | 190.18 SF |
| 996. R&R Bathroom ventilation fan w/light | 1.00 EA |

| Vanity Area1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |

HAMAN, INC. PRODUCTION 1-001348



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315  Tel. - (205) 941-0316  Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Vanity Area1**

| DESCRIPTION | QTY |
|---|---|
| 122. Suspended ceiling system - 2' x 2' | 30.21 SF |
| 123. Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 952. R&R 1/2" acoustic drywall - hung, taped, ready for texture | 153.44 SF |
| 953. R&R Wallpaper | 153.44 SF |
| 954. R&R Wallpaper border | 22.17 LF |
| 955. Clean door (per side) | 1.00 EA |
| 956. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 957. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 958. R&R Carpet | 30.21 SF |
| 959. R&R Carpet pad | 30.21 SF |
| 960. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 129. Countertop - Granite or Marble | 18.00 SF |
| 961. R&R Sink - single | 1.00 EA |
| 962. R&R Sink faucet - Bathroom | 1.00 EA |
| 963. R&R Coat Rack - Commercial - wall mounted | 1.00 LF |
| 964. R&R Mirror - 1/4" plate glass | 11.00 SF |
| 212. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 130. Suspended ceiling system - 2' x 2' | 247.00 SF |
| 131. Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 942. R&R 1/2" acoustic drywall - hung, taped, ready for texture | 124.36 SF |
| 943. R&R Wallpaper | 497.44 SF |
| 944. R&R Wallpaper border | 65.17 LF |
| 945. Clean door (per side) | 1.00 EA |
| 946. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 947. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 948. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 949. R&R Carpet | 247.00 SF |
| 950. R&R Carpet pad | 247.00 SF |
| 951. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 134. Clean curtains - plain - medium - Full service | 2.00 EA |
| 213. Seal ceiling joist system for odor | 744.44 SF |

**Room 116**

14-62-KNIGHTS_INN-2                                    6/27/2014          Page: 8

HAMAN, INC. PRODUCTION 1-001349



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Bathroom1 | Height: 8' |
| --- | --- |
| DESCRIPTION | QTY |
| 136. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 137. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 138. Clean wallpaper | 164.00 SF |
| 985. Clean door (per side) | 1.00 EA |
| 139. Clean floor - tile | 26.18 SF |
| 140. Clean toilet - Light | 1.00 EA |
| 141. Clean shower | 1.00 EA |
| 214. Seal ceiling joist system for odor | 190.18 SF |

| Vanity Area1 | Height: 8' |
| --- | --- |
| DESCRIPTION | QTY |
| 142. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 143. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 144. Clean wallpaper | 153.44 SF |
| 982. Clean door (per side) | 1.00 EA |
| 145. Clean and deodorize carpet - Light | 30.21 SF |
| 146. Clean countertop | 18.00 SF |
| 147. Clean sink | 1.00 EA |
| 148. Clean sink faucet | 1.00 EA |
| 215. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
| --- | --- |
| DESCRIPTION | QTY |
| 149. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 155. Clean suspended ceiling grid | 247.00 SF |
| 150. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 151. Clean wallpaper | 497.44 SF |
| 981. Clean door (per side) | 1.00 EA |
| 152. Clean and deodorize carpet - Light | 247.00 SF |
| 153. Clean curtains - plain - medium - Full service | 2.00 EA |
| 154. Wallpaper Hanger - per hour | 4.00 HR |
| The above line item is to repair the seams in the wallpaper where they are loose. | |
| 177. Contents - move out then reset - Extra large room | 1.00 EA |
| 216. Seal ceiling joist system for odor | 744.44 SF |

Room 117

HAMAN, INC. PRODUCTION 1-001350



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Bathroom1 | Height: 8' |
| --- | --- |
| **DESCRIPTION** | **QTY** |
| 158. Clean wallpaper | 164.00 SF |
| 994. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 995. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 993. Clean door (per side) | 1.00 EA |
| 159. Clean floor - tile | 26.18 SF |
| 160. Clean toilet - Light | 1.00 EA |
| 161. Clean shower | 1.00 EA |

| Vanity Area1 | Height: 8' |
| --- | --- |
| **DESCRIPTION** | **QTY** |
| 164. Clean wallpaper | 153.44 SF |
| 991. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 992. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 990. Clean door (per side) | 1.00 EA |
| 165. Clean and deodorize carpet - Light | 30.21 SF |
| 166. Clean countertop | 18.00 SF |
| 167. Clean sink | 1.00 EA |
| 168. Clean sink faucet | 1.00 EA |

| Bedroom1 | Height: 8' |
| --- | --- |
| **DESCRIPTION** | **QTY** |
| 171. Clean wallpaper | 497.44 SF |
| 172. Clean and deodorize carpet - Light | 247.00 SF |
| 986. Clean door (per side) | 1.00 EA |
| 987. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 988. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 989. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 175. Contents - move out then reset - Extra large room | 1.00 EA |
| 173. Clean curtains - plain - medium - Full service | 2.00 EA |

**Room 118**

| Bathroom1 | Height: 8' |
| --- | --- |
| **DESCRIPTION** | **QTY** |
| 181. Clean wallpaper | 164.00 SF |
| 182. Clean floor - tile | 26.18 SF |

14-62-KNIGHTS_INN-2                     6/27/2014          Page: 10

HAMAN, INC. PRODUCTION 1-001351



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

### CONTINUED - Bathroom1

| DESCRIPTION | QTY |
|---|---|
| 183.  Clean toilet - Light | 1.00 EA |
| 184.  Clean shower | 1.00 EA |
| 1,002.  Clean door (per side) | 1.00 EA |
| 1,003.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,004.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |

**Vanity Area1**                                                                     **Height: 8'**

| DESCRIPTION | QTY |
|---|---|
| 187.  Clean wallpaper | 153.44 SF |
| 188.  Clean and deodorize carpet - Light | 30.21 SF |
| 189.  Clean countertop | 18.00 SF |
| 190.  Clean sink | 1.00 EA |
| 191.  Clean sink faucet | 1.00 EA |

**Bedroom1**                                                                        **Height: 8'**

| DESCRIPTION | QTY |
|---|---|
| 194.  Clean wallpaper | 497.44 SF |
| 196.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 197.  Contents - move out then reset - Extra large room | 1.00 EA |
| 998.  Clean door (per side) | 1.00 EA |
| 999.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,000.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,001.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 195.  Clean and deodorize carpet - Light | 247.00 SF |

### Room 119

**Bathroom1**                                                                        **Height: 8'**

| DESCRIPTION | QTY |
|---|---|
| 225.  Clean wallpaper | 164.00 SF |
| 1,015.  Clean door (per side) | 1.00 EA |
| 1,016.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,017.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |

14-62-KNIGHTS_INN-2                                     6/27/2014          Page: 11

HAMAN, INC. PRODUCTION 1-001352



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax:
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

### CONTINUED - Bathroom1

| DESCRIPTION | QTY |
|---|---|
| 226. Clean floor - tile | 26.18 SF |
| 227. Clean toilet - Light | 1.00 EA |
| 228. Clean shower | 1.00 EA |
| 229. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 232. Clean wallpaper | 153.44 SF |
| 1,008. Clean door (per side) | 1.00 EA |
| 1,009. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,010. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 233. Clean and deodorize carpet - Light | 30.21 SF |
| 234. Clean countertop | 18.00 SF |
| 235. Clean sink | 1.00 EA |
| 236. Clean sink faucet | 1.00 EA |

**Bedroom1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 241. Clean the walls | 497.44 SF |
| 1,005. Clean door (per side) | 1.00 EA |
| 1,006. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,007. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 242. Clean and deodorize carpet - Light | 247.00 SF |
| 1,011. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 243. Clean curtains - plain - medium - Full service | 2.00 EA |
| 244. Wallpaper Hanger - per hour | 4.00 HR |
|     The above line item is to repair the seams in the wallpaper where they are loose. | |
| 245. Contents - move out then reset - Extra large room | 1.00 EA |

### Room 120

**Bathroom1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|

14-62-KNIGHTS_INN-2          6/27/2014      Page: 12

HAMAN, INC. PRODUCTION 1-001353



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

## CONTINUED - Bathroom1

| DESCRIPTION | QTY |
|---|---|
| 1,027.  R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,028.  R&R Batt insulation - 4" - R11 - paper faced | 164.00 SF |
| 249.  Clean wallpaper | 164.00 SF |
| 1,012.  Clean door (per side) | 1.00 EA |
| 1,013.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,014.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 250.  Clean floor - tile | 26.18 SF |
| 251.  Clean toilet - Light | 1.00 EA |
| 252.  Clean shower | 1.00 EA |

**Vanity Area1**                                                          Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 254.  R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 255.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 256.  Clean wallpaper | 153.44 SF |
| 1,024.  Clean door (per side) | 1.00 EA |
| 1,026.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,025.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 257.  Clean and deodorize carpet - Light | 30.21 SF |
| 258.  Clean countertop | 18.00 SF |
| 259.  Clean sink | 1.00 EA |
| 260.  Clean sink faucet | 1.00 EA |

**Bedroom1**                                                              Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,018.  R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 1,019.  R&R Batt insulation - 4" - R11 - paper faced | 497.44 SF |
| 265.  Clean wallpaper | 497.44 SF |
| 1,020.  Clean door (per side) | 1.00 EA |
| 1,021.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,022.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 266.  Clean and deodorize carpet - Light | 247.00 SF |
| 267.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 268.  Wallpaper Hanger - per hour | 4.00 HR |
|       The above line item is to repair the seams in the wallpaper where they are loose. | |
| 269.  Contents - move out then reset - Extra large room | 1.00 EA |
| 1,023.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |

14-62-KNIGHTS_INN-2                                    6/27/2014          Page: 13

HAMAN, INC. PRODUCTION 1-001354



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tél. – (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

Room 121

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 271. R&R Suspended ceiling tile – 2' x 2' | 26.18 SF |
| 272. R&R Batt insulation – 4" – R11 – paper faced | 26.18 SF |
| 273. Clean wallpaper | 164.00 SF |
| 1,035. Clean door (per side) | 1.00 EA |
| 1,036. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,037. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 274. Clean floor - tile | 26.18 SF |
| 275. Clean toilet - Light | 1.00 EA |
| 276. Clean shower | 1.00 EA |
| 277. Seal ceiling joist system for odor | 190.18 SF |

| Vanity Area1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 278. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 279. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 280. Clean wallpaper | 153.44 SF |
| 1,032. Clean door (per side) | 1.00 EA |
| 1,033. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,034. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 281. Clean and deodorize carpet - Light | 30.21 SF |
| 282. Clean countertop | 18.00 SF |
| 283. Clean sink | 1.00 EA |
| 284. Clean sink faucet | 1.00 EA |
| 285. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 286. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 287. Clean suspended ceiling grid | 247.00 SF |
| 288. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 289. Clean wallpaper | 497.44 SF |
| 1,029. Clean door (per side) | 1.00 EA |
| 1,030. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,031. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 290. Clean and deodorize carpet - Light | 247.00 SF |
| 291. Clean curtains - plain - medium - Full service | 2.00 EA |
| 292. Wallpaper Hanger - per hour | 4.00 HR |

6/27/2014

HAMAN, INC. PRODUCTION 1-001355

 **BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. – (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

### CONTINUED - Bedroom1

| DESCRIPTION | QTY |
|---|---|
| The above line item is to repair the seams in the wallpaper where they are loose. | |
| 293. Contents - move out then reset - Extra large room | 1.00 EA |
| 294. Seal ceiling joist system for odor | 744.44 SF |

### Room 162

**Bathroom1**                                                                 Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 295. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,058. Clean suspended ceiling grid | 26.18 SF |
| 296. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,062. R&R Wallpaper | 164.00 SF |
| 1,063. R&R Wallpaper border | 20.50 LF |
| 1,059. Clean door (per side) | 1.00 EA |
| 1,060. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,061. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 298. Clean floor - tile | 26.18 SF |
| 299. Clean toilet - Light | 1.00 EA |
| 300. Clean shower | 1.00 EA |
| 301. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                               Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 302. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,057. Clean suspended ceiling grid | 30.21 SF |
| 303. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,047. R&R Wallpaper | 153.44 SF |
| 1,048. R&R Wallpaper border | 22.17 LF |
| 1,049. Clean door (per side) | 1.00 EA |
| 1,050. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,051. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,052. R&R Carpet | 30.21 SF |
| 1,053. R&R Carpet pad | 30.21 SF |
| 1,054. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,056. R&R Coat Rack - Commercial - wall mounted | 1.00 LF |
| 306. Clean countertop | 18.00 SF |

HAMAN, INC. PRODUCTION 1-001356



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

## CONTINUED - Vanity Area1

| DESCRIPTION | QTY |
|---|---|
| 307. Clean sink | 1.00 EA |
| 308. Clean sink faucet | 1.00 EA |
| 309. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                                   Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 310. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 311. Clean suspended ceiling grid | 247.00 SF |
| 312. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,038. R&R Wallpaper | 497.44 SF |
| 1,039. R&R Wallpaper border | 65.17 LF |
| 1,040. Clean door (per side) | 1.00 EA |
| 1,041. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,042. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,043. R&R Carpet | 247.00 SF |
| 1,044. R&R Carpet pad | 247.00 SF |
| 1,055. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,045. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,046. Clean window-mount/through-wall AC unit - Heavy | 1.00 EA |
| 315. Clean curtains - plain - medium - Full service | 2.00 EA |
| 317. Contents - move out then reset - Extra large room | 1.00 EA |
| 318. Seal ceiling joist system for odor | 744.44 SF |

### Room 163

**Bathroom1**                                                                   Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 319. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,082. Clean suspended ceiling grid | 26.18 SF |
| 320. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,083. R&R Wallpaper | 164.00 SF |
| 1,084. R&R Wallpaper border | 20.50 LF |
| 1,085. Clean door (per side) | 1.00 EA |
| 1,086. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,087. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 322. Clean floor - tile | 26.18 SF |

14-62-KNIGHTS_INN-2                                6/27/2014          Page: 16



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Bathroom1

| DESCRIPTION | QTY |
|---|---|
| 323. Clean toilet - Light | 1.00 EA |
| 324. Clean shower | 1.00 EA |
| 325. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 326. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,073. Clean suspended ceiling grid | 30.21 SF |
| 327. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,074. R&R Wallpaper | 153.44 SF |
| 1,075. R&R Wallpaper border | 22.17 LF |
| 1,076. Clean door (per side) | 1.00 EA |
| 1,077. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,078. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,079. R&R Carpet | 30.21 SF |
| 1,080. R&R Carpet pad | 30.21 SF |
| 1,081. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 330. Clean countertop | 18.00 SF |
| 331. Clean sink | 1.00 EA |
| 332. Clean sink faucet | 1.00 EA |
| 333. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 334. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 335. Clean suspended ceiling grid | 247.00 SF |
| 336. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,064. R&R Wallpaper | 497.44 SF |
| 1,065. R&R Wallpaper border | 65.17 LF |
| 1,066. Clean door (per side) | 1.00 EA |
| 1,067. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,068. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,069. R&R Carpet | 247.00 SF |
| 1,070. R&R Carpet pad | 247.00 SF |
| 1,071. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,072. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 339. Clean curtains - plain - medium - Full service | 2.00 EA |
| 341. Contents - move out then reset - Extra large room | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001358



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315  Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bedroom1**

| DESCRIPTION | QTY |
|---|---|
| 342.  Seal ceiling joist system for odor | 744.44 SF |
| 1,098.  Clean window-mount/through-wall AC unit | 1.00 EA |

**Room 164**

**Bathroom1**  Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 346.  R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,108.  Clean suspended ceiling grid | 26.18 SF |
| 347.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,109.  R&R Wallpaper | 164.00 SF |
| 1,110.  R&R Wallpaper border | 20.50 LF |
| 1,111.  Clean door (per side) | 1.00 EA |
| 1,112.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,113.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 349.  Clean floor - tile | 26.18 SF |
| 350.  Clean toilet - Light | 1.00 EA |
| 351.  Clean shower | 1.00 EA |
| 352.  Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**  Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 353.  R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,099.  Clean suspended ceiling grid | 30.21 SF |
| 354.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,100.  R&R Wallpaper | 153.44 SF |
| 1,101.  R&R Wallpaper border | 22.17 LF |
| 1,102.  Clean door (per side) | 1.00 EA |
| 1,103.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,104.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,105.  R&R Carpet | 30.21 SF |
| 1,106.  R&R Carpet pad | 30.21 SF |
| 1,107.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 357.  Clean countertop | 18.00 SF |
| 358.  Clean sink | 1.00 EA |
| 359.  Clean sink faucet | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001359



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

### CONTINUED - Vanity Area1

| DESCRIPTION | QTY |
|---|---|
| 360. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 361. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 362. Clean suspended ceiling grid | 247.00 SF |
| 363. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,088. R&R Wallpaper | 497.44 SF |
| 1,089. R&R Wallpaper border | 65.17 LF |
| 1,090. Clean door (per side) | 1.00 EA |
| 1,091. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,092. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,093. R&R Carpet | 247.00 SF |
| 1,094. R&R Carpet pad | 247.00 SF |
| 1,095. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,096. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 366. Clean curtains - plain - medium - Full service | 2.00 EA |
| 368. Contents - move out then reset - Extra large room | 1.00 EA |
| 369. Seal ceiling joist system for odor | 744.44 SF |
| 1,097. Clean window-mount/through-wall AC unit | 1.00 EA |

### Room 165

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 370. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,132. Clean suspended ceiling grid | 26.18 SF |
| 371. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,133. R&R Wallpaper | 164.00 SF |
| 1,134. R&R Wallpaper border | 20.50 LF |
| 1,135. Clean door (per side) | 1.00 EA |
| 1,136. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,137. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 373. Clean floor - tile | 26.18 SF |
| 374. Clean toilet - Light | 1.00 EA |
| 375. Clean shower | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001360



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bathroom1**

| DESCRIPTION | QTY |
|---|---|
| 376.  Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                                                   **Height: 8'**

| DESCRIPTION | QTY |
|---|---|
| 377.  R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,123.  Clean suspended ceiling grid | 30.21 SF |
| 378.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,124.  R&R Wallpaper | 153.44 SF |
| 1,125.  R&R Wallpaper border | 22.17 LF |
| 1,126.  Clean door (per side) | 1.00 EA |
| 1,127.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,128.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,129.  R&R Carpet | 30.21 SF |
| 1,130.  R&R Carpet pad | 30.21 SF |
| 1,131.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 381.  Clean countertop | 18.00 SF |
| 382.  Clean sink | 1.00 EA |
| 383.  Clean sink faucet | 1.00 EA |
| 384.  Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                                                         **Height: 8'**

| DESCRIPTION | QTY |
|---|---|
| 385.  R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 386.  Clean suspended ceiling grid | 247.00 SF |
| 387.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,114.  R&R Wallpaper | 497.44 SF |
| 1,115.  R&R Wallpaper border | 65.17 LF |
| 1,116.  Clean door (per side) | 1.00 EA |
| 1,117.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,118.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,119.  R&R Carpet | 247.00 SF |
| 1,120.  R&R Carpet pad | 247.00 SF |
| 1,121.  R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,122.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 390.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 392.  Contents - move out then reset - Extra large room | 1.00 EA |
| 393.  Seal ceiling joist system for odor | 744.44 SF |

HAMAN, INC. PRODUCTION 1-001361



**BELFOR** Property Restoration

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

## Room 166

### Bathroom1

| DESCRIPTION | Height: 8' QTY |
|---|---|
| 394. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,156. Clean suspended ceiling grid | 26.18 SF |
| 395. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,157. R&R Wallpaper | 164.00 SF |
| 1,158. Clean door (per side) | 1.00 EA |
| 1,159. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,160. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 397. Clean floor - tile | 26.18 SF |
| 398. Clean toilet - Light | 1.00 EA |
| 399. Clean shower | 1.00 EA |
| 400. Seal ceiling joist system for odor | 190.18 SF |

### Vanity Area1

| DESCRIPTION | Height: 8' QTY |
|---|---|
| 401. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,148. Clean suspended ceiling grid | 30.21 SF |
| 402. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,149. R&R Wallpaper | 153.44 SF |
| 1,150. Clean door (per side) | 1.00 EA |
| 1,151. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,152. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,153. R&R Carpet | 30.21 SF |
| 1,154. R&R Carpet pad | 30.21 SF |
| 1,155. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 405. Clean countertop | 18.00 SF |
| 406. Clean sink | 1.00 EA |
| 407. Clean sink faucet | 1.00 EA |
| 408. Seal ceiling joist system for odor | 183.65 SF |

### Bedroom1

| DESCRIPTION | Height: 8' QTY |
|---|---|
| 409. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 410. Clean suspended ceiling grid | 247.00 SF |
| 411. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,138. R&R Wallpaper | 497.44 SF |
| 1,139. R&R Wallpaper border | 65.17 LF |
| 1,141. Paint door slab only - 2 coats (per side) | 1.00 EA |

14-62-KNIGHTS_INN-2

HAMAN, INC. PRODUCTION 1-001362



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bedroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,142. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,143. R&R Carpet | 247.00 SF |
| 1,144. R&R Carpet pad | 247.00 SF |
| 1,145. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 414. Clean curtains - plain - medium - Full service | 2.00 EA |
| 416. Contents - move out then reset - Extra large room | 1.00 EA |
| 417. Seal ceiling joist system for odor | 744.44 SF |
| 497. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 494. Additional charge for a retrofit exterior door | 1.00 EA |
| 495. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 496. R&R Door lockset & deadbolt - exterior - programable | 1.00 EA |
| 1,146. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,147. Clean window-mount/through-wall AC unit | 1.00 EA |

**Room 167**

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 418. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,178. Clean suspended ceiling grid | 26.18 SF |
| 419. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,179. R&R Wallpaper | 164.00 SF |
| 1,180. Clean door (per side) | 1.00 EA |
| 1,181. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,182. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 420. Clean the walls | 164.00 SF |
| 421. Clean floor - tile | 26.18 SF |
| 422. Clean toilet - Light | 1.00 EA |
| 423. Clean shower | 1.00 EA |
| 424. Seal ceiling joist system for odor | 190.18 SF |

| Vanity Area1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 425. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,170. Clean suspended ceiling grid | 30.21 SF |
| 426. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |

14-62-KNIGHTS_INN-2                    6/27/2014         Page: 22

HAMAN, INC. PRODUCTION 1-001363



**BELFOR Property Restoration**

205 Citation Court – Homewood, AL 35209
(205) 941-0315 Tel. – (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Vanity Area1**

| DESCRIPTION | QTY |
|---|---|
| 1,171. R&R Wallpaper | 153.44 SF |
| 1,172. Clean door (per side) | 1.00 EA |
| 1,173. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,174. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,175. R&R Carpet | 30.21 SF |
| 1,176. R&R Carpet pad | 30.21 SF |
| 1,177. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 429. Clean countertop | 18.00 SF |
| 430. Clean sink | 1.00 EA |
| 431. Clean sink faucet | 1.00 EA |
| 432. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                                                       Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 433. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 434. Clean suspended ceiling grid | 247.00 SF |
| 435. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,161. R&R Wallpaper | 497.44 SF |
| 1,162. R&R Wallpaper border | 65.17 LF |
| 1,163. Clean door (per side) | 1.00 EA |
| 1,164. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,165. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,166. R&R Carpet | 247.00 SF |
| 1,167. R&R Carpet pad | 247.00 SF |
| 1,168. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 438. Clean curtains - plain - medium - Full service | 2.00 EA |
| 440. Contents - move out then reset - Extra large room | 1.00 EA |
| 441. Seal ceiling joist system for odor | 744.44 SF |
| 1,169. Clean window unit (per side) 41 - 60 SF | 1.00 EA |

**Room 168**

**Bathroom1**                                                                                     Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 442. R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 443. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |

14-62-KNIGHTS_INN-2                                          6/27/2014          Page: 23



**BELFOR Property Restoration**

205 Citation Court – Homewood, AL 35209
(205) 941-0315  Tel. – (205) 941-0316  Fax.
AL License # BC 38777 – Fed ID # 84-1309171

**CONTINUED – Bathroom1**

| DESCRIPTION | QTY |
|---|---|
| 448.  Seal ceiling joist system for odor | 190.18 SF |
| 1,205.  R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,206.  R&R Wallpaper | 164.00 SF |
| 1,207.  R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,208.  R&R Bathtub | 1.00 EA |
| 1,209.  R&R Tub/shower faucet | 1.00 EA |
| 1,210.  R&R Toilet | 1.00 EA |
| 1,211.  R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,212.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,213.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,214.  R&R Ceramic tile base | 20.50 LF |
| 1,215.  R&R Tile floor covering | 26.18 SF |

**Vanity Area1**                                                    Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 449.  R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 450.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,196.  R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,197.  R&R Wallpaper | 153.44 SF |
| 1,198.  R&R Wallpaper border | 22.17 LF |
| 1,199.  Clean door (per side) | 1.00 EA |
| 1,200.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,201.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,202.  R&R Carpet | 30.21 SF |
| 1,203.  R&R Carpet pad | 30.21 SF |
| 1,204.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 453.  Clean countertop | 18.00 SF |
| 454.  Clean sink | 1.00 EA |
| 455.  Clean sink faucet | 1.00 EA |
| 456.  Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                       Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 457.  R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 459.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,183.  R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,184.  R&R Wallpaper | 497.44 SF |
| 1,185.  R&R Wallpaper border | 65.17 LF |

14-62-KNIGHTS_INN-2                            6/27/2014            Page: 24

HAMAN, INC. PRODUCTION 1-001365



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

## CONTINUED - Bedroom1

| DESCRIPTION | QTY |
|---|---|
| 1,186.  Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,187.  Additional charge for a retrofit exterior door | 1.00 EA |
| 1,188.  On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,189.  R&R Entrance hardware - card key | 1.00 EA |
| 1,190.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,191.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,192.  R&R Carpet | 247.00 SF |
| 1,193.  R&R Carpet pad | 247.00 SF |
| 1,194.  R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 462.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 464.  Contents - move out then reset - Extra large room | 1.00 EA |
| 467.  Aluminum window, horiz. slider 12-23 sf | 1.00 EA |
| 1,195.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 465.  Seal ceiling joist system for odor | 744.44 SF |

### Room 169

**Bathroom1**  Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 468.  R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 469.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,241.  R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,242.  R&R Wallpaper | 164.00 SF |
| 1,243.  R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,244.  R&R Bathtub | 1.00 EA |
| 1,245.  Tub/shower faucet | 1.00 EA |
| 1,246.  R&R Toilet | 1.00 EA |
| 1,247.  R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,248.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,249.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,250.  R&R Tile floor covering | 26.18 SF |
| 1,251.  R&R Tile base | 20.50 LF |
| 474.  Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**  Height: 8'

DESCRIPTION  QTY

HAMAN, INC. PRODUCTION 1-001366



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Vanity Area1**

| DESCRIPTION | QTY |
|---|---|
| 475.  R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 476.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 482.  Seal ceiling joist system for odor | 183.65 SF |
| 1,230. R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,231. R&R Wallpaper | 153.44 SF |
| 1,232. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,233. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,234. R&R Mirror - 1/4" plate glass | 11.00 SF |
| 1,235. Countertop - Granite or Marble | 18.00 SF |
| 1,236. R&R Sink - single | 1.00 EA |
| 1,237. R&R Sink faucet - Bathroom | 1.00 EA |
| 1,238. R&R Carpet | 30.21 SF |
| 1,239. R&R Carpet pad | 30.21 SF |
| 1,240. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,328. R&R Coat Rack - Commercial - wall mounted | 1.00 LF |

**Bedroom1**                                                                     Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 484.  R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 486.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,216. R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,217. R&R Wallpaper | 497.44 SF |
| 1,218. R&R Wallpaper border | 65.17 LF |
| 1,219. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,220. Additional charge for a retrofit exterior door | 1.00 EA |
| 1,221. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,222. R&R Door lockset & deadbolt - exterior - programable | 1.00 EA |
| 1,223. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,224. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,225. R&R Carpet | 247.00 SF |
| 1,226. R&R Carpet pad | 247.00 SF |
| 1,227. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,228. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,229. Clean window-mount/through-wall AC unit | 1.00 EA |
| 489.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 491.  Contents - move out then reset - Extra large room | 1.00 EA |
| 492.  Seal ceiling joist system for odor | 744.44 SF |

**Room 170**

HAMAN, INC. PRODUCTION 1-001367



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315  Tel.  -  (205) 941-0316  Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Bathroom1 | Height: 8' |
| --- | --- |
| DESCRIPTION | QTY |
| 1,285.  R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 1,286.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,287.  R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,288.  R&R Wallpaper | 164.00 SF |
| 1,289.  R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,290.  R&R Bathtub | 1.00 EA |
| 1,291.  Tub/shower faucet | 1.00 EA |
| 1,292.  R&R Toilet | 1.00 EA |
| 1,293.  R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,294.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,295.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,296.  R&R Tile floor covering | 26.18 SF |
| 1,297.  R&R Tile base | 20.50 LF |
| 1,298.  Seal ceiling joist system for odor | 190.18 SF |

| Vanity Area1 | Height: 8' |
| --- | --- |
| DESCRIPTION | QTY |
| 1,271.  R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 1,272.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,273.  Seal ceiling joist system for odor | 183.65 SF |
| 1,274.  R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,275.  R&R Wallpaper | 153.44 SF |
| 1,276.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,277.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,278.  R&R Mirror - 1/4" plate glass | 11.00 SF |
| 1,279.  Countertop - Granite or Marble | 18.00 SF |
| 1,280.  R&R Sink - single | 1.00 EA |
| 1,281.  R&R Sink faucet - Bathroom | 1.00 EA |
| 1,282.  R&R Carpet | 30.21 SF |
| 1,283.  R&R Carpet pad | 30.21 SF |
| 1,284.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,327.  R&R Coat Rack - Commercial - wall mounted | 1.00 LF |

| Bedroom1 | Height: 8' |
| --- | --- |
| DESCRIPTION | QTY |
| 1,252.  R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 1,253.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,254.  R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,255.  R&R Wallpaper | 497.44 SF |
| 1,256.  R&R Wallpaper border | 65.17 LF |

14-62-KNIGHTS_INN-2                                        6/27/2014                    Page: 27



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bedroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,257. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,258. Additional charge for a retrofit exterior door | 1.00 EA |
| 1,259. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,260. R&R Door lockset & deadbolt - exterior - programable | 1.00 EA |
| 1,261. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,262. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,263. R&R Carpet | 247.00 SF |
| 1,264. R&R Carpet pad | 247.00 SF |
| 1,265. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,266. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,267. Clean window-mount/through-wall AC unit | 1.00 EA |
| 1,268. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,269. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,270. Seal ceiling joist system for odor | 744.44 SF |

**Room 171**

**Bathroom1**                                                                 Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,329. R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 1,330. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,331. R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,332. R&R Wallpaper | 164.00 SF |
| 1,333. R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,334. R&R Bathtub | 1.00 EA |
| 1,335. Tub/shower faucet | 1.00 EA |
| 1,336. R&R Toilet | 1.00 EA |
| 1,337. R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,338. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,339. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,340. R&R Tile floor covering | 26.18 SF |
| 1,341. R&R Tile base | 20.50 LF |
| 1,342. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                               Height: 8'

| DESCRIPTION | QTY |
|---|---|

HAMAN, INC. PRODUCTION 1-001369



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Vanity Area1

| DESCRIPTION | QTY |
|---|---|
| 1,312.  R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 1,313.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,314.  Seal ceiling joist system for odor | 183.65 SF |
| 1,315.  R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,316.  R&R Wallpaper | 153.44 SF |
| 1,317.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,318.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,319.  R&R Mirror - 1/4" plate glass | 11.00 SF |
| 1,320.  Countertop - Granite or Marble | 18.00 SF |
| 1,321.  R&R Sink - single | 1.00 EA |
| 1,322.  R&R Sink faucet - Bathroom | 1.00 EA |
| 1,323.  R&R Carpet | 30.21 SF |
| 1,324.  R&R Carpet pad | 30.21 SF |
| 1,325.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,326.  R&R Coat Rack - Commercial - wall mounted | 1.00 LF |

**Bedroom1**                                                                    Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 521.  R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 523.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,299.  R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,300.  R&R Wallpaper | 497.44 SF |
| 1,301.  R&R Wallpaper border | 65.17 LF |
| 1,302.  Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,303.  Additional charge for a retrofit exterior door | 1.00 EA |
| 1,304.  On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,305.  R&R Door lockset & deadbolt - exterior - programable | 1.00 EA |
| 1,306.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,307.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,308.  R&R Carpet | 247.00 SF |
| 1,309.  R&R Carpet pad | 247.00 SF |
| 1,310.  R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 526.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 528.  Contents - move out then reset - Extra large room | 1.00 EA |
| 529.  Seal ceiling joist system for odor | 744.44 SF |
| 530.  Aluminum window, horiz. slider 12-23 sf | 1.00 EA |
| 1,311.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001370



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**Bathroom1**                                                      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,378.  R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 1,379.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,380.  R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,381.  R&R Wallpaper | 164.00 SF |
| 1,382.  R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,383.  R&R Bathtub | 1.00 EA |
| 1,384.  Tub/shower faucet | 1.00 EA |
| 1,385.  R&R Toilet | 1.00 EA |
| 1,386.  R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,387.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,388.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,389.  R&R Tile floor covering | 26.18 SF |
| 1,390.  R&R Tile base | 20.50 LF |
| 1,391.  Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                   Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,363.  R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 1,364.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,365.  Seal ceiling joist system for odor | 183.65 SF |
| 1,366.  R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,367.  R&R Wallpaper | 153.44 SF |
| 1,368.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,369.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,370.  R&R Mirror - 1/4" plate glass | 11.00 SF |
| 1,371.  Countertop - Granite or Marble | 18.00 SF |
| 1,372.  R&R Sink - single | 1.00 EA |
| 1,373.  R&R Sink faucet - Bathroom | 1.00 EA |
| 1,374.  R&R Carpet | 30.21 SF |
| 1,375.  R&R Carpet pad | 30.21 SF |
| 1,376.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,377.  R&R Coat Rack - Commercial - wall mounted | 1.00 LF |

**Bedroom1**                                                       Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,343.  R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 1,344.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,345.  R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,346.  R&R Wallpaper | 497.44 SF |
| 1,347.  R&R Wallpaper border | 65.17 LF |

14-62-KNIGHTS_INN-2                              6/27/2014              Page: 30

 **BELFOR** Property Restoration

205 Citation Court – Homewood, AL 35209
(205) 941-0315  Tel. – (205) 941-0316  Fax.
AL License # BC 38777 – Fed ID # 84-1309171

### CONTINUED – Bedroom1

| DESCRIPTION | QTY |
|---|---|
| 1,348. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,349. Additional charge for a retrofit exterior door | 1.00 EA |
| 1,350. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,351. R&R Door lockset & deadbolt - exterior - programable | 1.00 EA |
| 1,352. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,353. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,354. R&R Carpet | 247.00 SF |
| 1,355. R&R Carpet pad | 247.00 SF |
| 1,356. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,357. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,362. Aluminum window, horiz. slider 12-23 sf | 1.00 EA |
| 1,358. Clean window-mount/through-wall AC unit | 1.00 EA |
| 1,359. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,360. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,361. Seal ceiling joist system for odor | 744.44 SF |

### Room 173

**Bathroom1** Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 556. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,405. Clean suspended ceiling grid | 26.18 SF |
| 557. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,406. R&R Wallpaper | 164.00 SF |
| 1,407. Clean door (per side) | 1.00 EA |
| 1,408. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,409. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 559. Clean floor - tile | 26.18 SF |
| 560. Clean toilet - Light | 1.00 EA |
| 561. Clean shower | 1.00 EA |
| 562. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1** Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 563. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,400. Clean suspended ceiling grid | 30.21 SF |

HAMAN, INC. PRODUCTION 1-001372



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

## CONTINUED - Vanity Area1

| DESCRIPTION | QTY |
|---|---|
| 564. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,401. R&R Wallpaper | 153.44 SF |
| 1,402. R&R Carpet | 30.21 SF |
| 1,403. R&R Carpet pad | 30.21 SF |
| 1,404. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 567. Clean countertop | 18.00 SF |
| 568. Clean sink | 1.00 EA |
| 569. Clean sink faucet | 1.00 EA |
| 570. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 571. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 572. Clean suspended ceiling grid | 247.00 SF |
| 573. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,392. R&R Wallpaper | 497.44 SF |
| 1,393. R&R Wallpaper border | 65.17 LF |
| 1,394. Clean door (per side) | 1.00 EA |
| 1,395. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,396. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,397. R&R Carpet | 247.00 SF |
| 1,398. R&R Carpet pad | 247.00 SF |
| 1,399. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 576. Clean curtains - plain - medium - Full service | 2.00 EA |
| 578. Contents - move out then reset - Extra large room | 1.00 EA |
| 579. Seal ceiling joist system for odor | 744.44 SF |

## Room 174

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 580. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,432. Clean suspended ceiling grid | 26.18 SF |
| 581. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,433. R&R Wallpaper | 164.00 SF |
| 1,434. Clean door (per side) | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001373



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bathroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,435.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,436.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 583.  Clean floor - tile | 26.18 SF |
| 584.  Clean toilet - Light | 1.00 EA |
| 585.  Clean shower | 1.00 EA |
| 586.  Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                          Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 587.  R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,424.  Clean suspended ceiling grid | 30.21 SF |
| 588.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,425.  R&R Wallpaper | 153.44 SF |
| 1,426.  Clean door (per side) | 1.00 EA |
| 1,427.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,428.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,429.  R&R Carpet | 30.21 SF |
| 1,430.  R&R Carpet pad | 30.21 SF |
| 1,431.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 591.  Clean countertop | 18.00 SF |
| 592.  Clean sink | 1.00 EA |
| 593.  Clean sink faucet | 1.00 EA |
| 594.  Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                          Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 595.  R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 596.  Clean suspended ceiling grid | 247.00 SF |
| 597.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,410.  R&R Wallpaper | 497.44 SF |
| 1,411.  R&R Wallpaper border | 65.17 LF |
| 1,413.  Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,414.  Additional charge for a retrofit exterior door | 1.00 EA |
| 1,415.  On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,416.  R&R Door lockset & deadbolt - exterior - programable | 1.00 EA |
| 1,417.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,418.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,419.  R&R Carpet | 247.00 SF |

14-62-KNIGHTS_INN-2                                  6/27/2014        Page: 33



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Bedroom1

| DESCRIPTION | QTY |
|---|---|
| 1,420. R&R Carpet pad | 247.00 SF |
| 1,421. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,422. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,423. Clean window-mount/through-wall AC unit | 1.00 EA |
| 600. Clean curtains - plain - medium - Full service | 2.00 EA |
| 602. Contents - move out then reset - Extra large room | 1.00 EA |
| 603. Seal ceiling joist system for odor | 744.44 SF |

### Room 175

**Bathroom1**                                                              Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 604. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,455. Clean suspended ceiling grid | 26.18 SF |
| 605. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,456. R&R Wallpaper | 164.00 SF |
| 1,457. Clean door (per side) | 1.00 EA |
| 1,458. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,459. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 607. Clean floor - tile | 26.18 SF |
| 608. Clean toilet - Light | 1.00 EA |
| 609. Clean shower | 1.00 EA |
| 610. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                              Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 611. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,447. Clean suspended ceiling grid | 30.21 SF |
| 612. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,448. R&R Wallpaper | 153.44 SF |
| 1,449. Clean door (per side) | 1.00 EA |
| 1,450. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,451. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,452. R&R Carpet | 30.21 SF |
| 1,453. R&R Carpet pad | 30.21 SF |
| 1,454. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |

14-62-KNIGHTS_INN-2                                    6/27/2014              Page: 34



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Vanity Area1

| DESCRIPTION | QTY |
|---|---|
| 615. Clean countertop | 18.00 SF |
| 616. Clean sink | 1.00 EA |
| 617. Clean sink faucet | 1.00 EA |
| 618. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 619. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 620. Clean suspended ceiling grid | 247.00 SF |
| 621. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,437. R&R Wallpaper | 497.44 SF |
| 1,438. R&R Wallpaper border | 65.17 LF |
| 1,439. Clean door (per side) | 1.00 EA |
| 1,440. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,441. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,442. R&R Carpet | 247.00 SF |
| 1,443. R&R Carpet pad | 247.00 SF |
| 1,444. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 624. Clean curtains - plain - medium - Full service | 2.00 EA |
| 626. Contents - move out then reset - Extra large room | 1.00 EA |
| 627. Seal ceiling joist system for odor | 744.44 SF |
| 1,445. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,446. Clean window-mount/through-wall AC unit | 1.00 EA |

### Room 176

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 628. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,477. Clean suspended ceiling grid | 26.18 SF |
| 629. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,478. R&R Wallpaper | 164.00 SF |
| 1,479. Clean door (per side) | 1.00 EA |
| 1,480. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,481. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 631. Clean floor - tile | 26.18 SF |

14-62-KNIGHTS_INN-2                                6/27/2014        Page: 35

HAMAN, INC. PRODUCTION 1-001376



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

### CONTINUED - Bathroom1

| DESCRIPTION | QTY |
|---|---|
| 632. Clean toilet - Light | 1.00 EA |
| 633. Clean shower | 1.00 EA |
| 634. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**        Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 635. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,469. Clean suspended ceiling grid | 30.21 SF |
| 636. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,470. R&R Wallpaper | 153.44 SF |
| 1,471. Clean door (per side) | 1.00 EA |
| 1,472. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,473. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,474. R&R Carpet | 30.21 SF |
| 1,475. R&R Carpet pad | 30.21 SF |
| 1,476. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 639. Clean countertop | 18.00 SF |
| 640. Clean sink | 1.00 EA |
| 641. Clean sink faucet | 1.00 EA |
| 642. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**        Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 643. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 644. Clean suspended ceiling grid | 247.00 SF |
| 645. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,460. Wallpaper | 1.00 SF |
| 1,461. R&R Wallpaper border | 65.17 LF |
| 1,462. Clean door (per side) | 1.00 EA |
| 1,463. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,464. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,465. R&R Carpet | 247.00 SF |
| 1,466. R&R Carpet pad | 247.00 SF |
| 1,467. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 648. Clean curtains - plain - medium - Full service | 2.00 EA |
| 650. Contents - move out then reset - Extra large room | 1.00 EA |
| 651. Seal ceiling joist system for odor | 744.44 SF |
| 1,468. Clean window unit (per side) 41 - 60 SF | 1.00 EA |

HAMAN, INC. PRODUCTION 1-001377



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

### Room 262

**Bathroom1**                                                                        Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,511. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,512. Clean suspended ceiling grid | 26.18 SF |
| 1,513. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,514. R&R Wallpaper | 164.00 SF |
| 1,515. Clean door (per side) | 1.00 EA |
| 1,516. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,517. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,518. Clean floor - tile | 26.18 SF |
| 1,519. Clean toilet - Light | 1.00 EA |
| 1,520. Clean shower | 1.00 EA |
| 1,521. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                                        Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,497. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,498. Clean suspended ceiling grid | 30.21 SF |
| 1,499. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,500. R&R Wallpaper | 153.44 SF |
| 1,501. Clean door (per side) | 1.00 EA |
| 1,502. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,503. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,504. R&R Carpet | 30.21 SF |
| 1,505. R&R Carpet pad | 30.21 SF |
| 1,506. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,507. Clean countertop | 18.00 SF |
| 1,508. Clean sink | 1.00 EA |
| 1,509. Clean sink faucet | 1.00 EA |
| 1,510. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                                        Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,482. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 1,483. Clean suspended ceiling grid | 247.00 SF |
| 1,484. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |

14-62-KNIGHTS_INN-2                                    6/27/2014                  Page: 37

HAMAN, INC. PRODUCTION 1-001378



**BELFOR** Property Restoration

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Bedroom1

| DESCRIPTION | QTY |
|---|---|
| 1,485. Wallpaper | 1.00 SF |
| 1,486. R&R Wallpaper border | 65.17 LF |
| 1,487. Clean door (per side) | 1.00 EA |
| 1,488. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,489. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,490. R&R Carpet | 247.00 SF |
| 1,491. R&R Carpet pad | 247.00 SF |
| 1,492. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,493. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,494. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,495. Seal ceiling joist system for odor | 744.44 SF |
| 1,496. Clean window unit (per side) 41 - 60 SF | 1.00 EA |

### Room 263

**Bathroom1**                                               Height: 8'
| DESCRIPTION | QTY |
|---|---|
| 1,544. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,545. Clean suspended ceiling grid | 26.18 SF |
| 1,546. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,547. R&R Wallpaper | 164.00 SF |
| 1,548. Clean door (per side) | 1.00 EA |
| 1,549. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,550. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,551. Clean floor - tile | 26.18 SF |
| 1,552. Clean toilet - Light | 1.00 EA |
| 1,553. Clean shower | 1.00 EA |
| 1,554. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                              Height: 8'
| DESCRIPTION | QTY |
|---|---|
| 1,530. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,531. Clean suspended ceiling grid | 30.21 SF |
| 1,532. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,533. R&R Wallpaper | 153.44 SF |
| 1,534. Clean door (per side) | 1.00 EA |

14-62-KNIGHTS_INN-2                        6/27/2014          Page: 38

HAMAN, INC. PRODUCTION 1-001379



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Vanity Area1**

| DESCRIPTION | QTY |
|---|---|
| 1,535. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,536. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,537. R&R Carpet | 30.21 SF |
| 1,538. R&R Carpet pad | 30.21 SF |
| 1,539. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,540. Clean countertop | 18.00 SF |
| 1,541. Clean sink | 1.00 EA |
| 1,542. Clean sink faucet | 1.00 EA |
| 1,543. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 694. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 695. Clean suspended ceiling grid | 247.00 SF |
| 696. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,522. R&R Wallpaper | 497.44 SF |
| 1,523. R&R Wallpaper border | 65.17 LF |
| 703. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 704. Additional charge for a retrofit exterior door | 1.00 EA |
| 705. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 706. R&R Door lockset & deadbolt - exterior - programable | 1.00 EA |
| 1,524. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,525. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,526. R&R Carpet | 247.00 SF |
| 1,527. R&R Carpet pad | 247.00 SF |
| 1,528. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 699. Clean curtains - plain - medium - Full service | 2.00 EA |
| 701. Contents - move out then reset - Extra large room | 1.00 EA |
| 702. Seal ceiling joist system for odor | 744.44 SF |
| 1,529. Clean window unit (per side) 41 - 60 SF | 1.00 EA |

**Room 264**

**Bathroom1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,584. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |

14-62-KNIGHTS_INN-2      6/27/2014      Page: 39

HAMAN, INC. PRODUCTION 1-001380



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. – (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bathroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,585. Clean suspended ceiling grid | 26.18 SF |
| 1,586. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,587. R&R Wallpaper | 164.00 SF |
| 1,588. Clean door (per side) | 1.00 EA |
| 1,589. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,590. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,591. Clean floor - tile | 26.18 SF |
| 1,592. Clean toilet - Light | 1.00 EA |
| 1,593. Clean shower | 1.00 EA |
| 1,594. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,570. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,571. Clean suspended ceiling grid | 30.21 SF |
| 1,572. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,573. R&R Wallpaper | 153.44 SF |
| 1,574. Clean door (per side) | 1.00 EA |
| 1,575. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,576. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,577. R&R Carpet | 30.21 SF |
| 1,578. R&R Carpet pad | 30.21 SF |
| 1,579. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,580. Clean countertop | 18.00 SF |
| 1,581. Clean sink | 1.00 EA |
| 1,582. Clean sink faucet | 1.00 EA |
| 1,583. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**      Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,555. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 1,556. Clean suspended ceiling grid | 247.00 SF |
| 1,557. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,558. Wallpaper | 1.00 SF |
| 1,559. R&R Wallpaper border | 65.17 LF |
| 1,560. Clean door (per side) | 1.00 EA |
| 1,561. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,562. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |

14-62-KNIGHTS_INN-2      6/27/2014      Page: 40



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bedroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,563. R&R Carpet | 247.00 SF |
| 1,564. R&R Carpet pad | 247.00 SF |
| 1,565. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,566. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,567. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,568. Seal ceiling joist system for odor | 744.44 SF |
| 1,569. Clean window unit (per side) 41 - 60 SF | 1.00 EA |

**Room 265**

**Bathroom1**                                                    Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,624. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,625. Clean suspended ceiling grid | 26.18 SF |
| 1,626. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,627. R&R Wallpaper | 164.00 SF |
| 1,628. Clean door (per side) | 1.00 EA |
| 1,629. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,630. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,631. Clean floor - tile | 26.18 SF |
| 1,632. Clean toilet - Light | 1.00 EA |
| 1,633. Clean shower | 1.00 EA |
| 1,634. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**                                                  Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,610. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,611. Clean suspended ceiling grid | 30.21 SF |
| 1,612. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,613. R&R Wallpaper | 153.44 SF |
| 1,614. Clean door (per side) | 1.00 EA |
| 1,615. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,616. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,617. R&R Carpet | 30.21 SF |
| 1,618. R&R Carpet pad | 30.21 SF |
| 1,619. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |

HAMAN, INC. PRODUCTION 1-001382



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Vanity Area1

| DESCRIPTION | QTY |
|---|---|
| 1,620.  Clean countertop | 18.00 SF |
| 1,621.  Clean sink | 1.00 EA |
| 1,622.  Clean sink faucet | 1.00 EA |
| 1,623.  Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                          Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,595.  R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 1,596.  Clean suspended ceiling grid | 247.00 SF |
| 1,597.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,598.  Wallpaper | 1.00 SF |
| 1,599.  R&R Wallpaper border | 65.17 LF |
| 1,600.  Clean door (per side) | 1.00 EA |
| 1,601.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,602.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,603.  R&R Carpet | 247.00 SF |
| 1,604.  R&R Carpet pad | 247.00 SF |
| 1,605.  R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,606.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,607.  Contents - move out then reset - Extra large room | 1.00 EA |
| 1,608.  Seal ceiling joist system for odor | 744.44 SF |
| 1,609.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |

### Room 266

**Bathroom1**                                                          Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,664.  R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,665.  Clean suspended ceiling grid | 26.18 SF |
| 1,666.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,667.  R&R Wallpaper | 164.00 SF |
| 1,668.  Clean door (per side) | 1.00 EA |
| 1,669.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,670.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,671.  Clean floor - tile | 26.18 SF |
| 1,672.  Clean toilet - Light | 1.00 EA |

14-62-KNIGHTS_INN-2                                    6/27/2014            Page: 42

HAMAN, INC. PRODUCTION 1-001383



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bathroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,673. Clean shower | 1.00 EA |
| 1,674. Seal ceiling joist system for odor | 190.18 SF |

**Vanity Area1**          Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,650. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,651. Clean suspended ceiling grid | 30.21 SF |
| 1,652. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,653. R&R Wallpaper | 153.44 SF |
| 1,654. Clean door (per side) | 1.00 EA |
| 1,655. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,656. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,657. R&R Carpet | 30.21 SF |
| 1,658. R&R Carpet pad | 30.21 SF |
| 1,659. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,660. Clean countertop | 18.00 SF |
| 1,661. Clean sink | 1.00 EA |
| 1,662. Clean sink faucet | 1.00 EA |
| 1,663. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**          Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,635. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 1,636. Clean suspended ceiling grid | 247.00 SF |
| 1,637. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,638. Wallpaper | 1.00 SF |
| 1,639. R&R Wallpaper border | 65.17 LF |
| 1,640. Clean door (per side) | 1.00 EA |
| 1,641. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,642. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,643. R&R Carpet | 247.00 SF |
| 1,644. R&R Carpet pad | 247.00 SF |
| 1,645. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,646. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,647. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,648. Seal ceiling joist system for odor | 744.44 SF |
| 1,649. Clean window unit (per side) 41 - 60 SF | 1.00 EA |

14-62-KNIGHTS_INN-2          6/27/2014          Page: 43

HAMAN, INC. PRODUCTION 1-001384



**BELFOR Property Restoration**

205 Citation Court – Homewood, AL 35209
(205) 941-0315 Tel. – (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

Room 267

| Bathroom1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,704. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,705. Clean suspended ceiling grid | 26.18 SF |
| 1,706. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,707. R&R Wallpaper | 164.00 SF |
| 1,708. Clean door (per side) | 1.00 EA |
| 1,709. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,710. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,711. Clean floor - tile | 26.18 SF |
| 1,712. Clean toilet - Light | 1.00 EA |
| 1,713. Clean shower | 1.00 EA |
| 1,714. Seal ceiling joist system for odor | 190.18 SF |

| Vanity Area1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,690. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,691. Clean suspended ceiling grid | 30.21 SF |
| 1,692. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,693. R&R Wallpaper | 153.44 SF |
| 1,694. Clean door (per side) | 1.00 EA |
| 1,695. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,696. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,697. R&R Carpet | 30.21 SF |
| 1,698. R&R Carpet pad | 30.21 SF |
| 1,699. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,700. Clean countertop | 18.00 LF |
| 1,701. Clean sink | 1.00 EA |
| 1,702. Clean sink faucet | 1.00 EA |
| 1,703. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,675. R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 1,676. Clean suspended ceiling grid | 247.00 SF |
| 1,677. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,678. Wallpaper | 1.00 SF |
| 1,679. R&R Wallpaper border | 65.17 LF |
| 1,680. Clean door (per side) | 1.00 EA |

14-62-KNIGHTS_INN-2                                    6/27/2014          Page: 44



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Bedroom1

| DESCRIPTION | QTY |
|---|---|
| 1,681. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,682. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,683. R&R Carpet | 247.00 SF |
| 1,684. R&R Carpet pad | 247.00 SF |
| 1,685. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,686. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,687. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,688. Seal ceiling joist system for odor | 744.44 SF |
| 1,689. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 498. R&R Aluminum window - hopper/transom, 3-6 sf | 1.00 EA |

### Room 268

**Bathroom1** — Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,758. R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 1,759. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,760. Seal ceiling joist system for odor | 190.18 SF |
| 1,761. R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,762. R&R Wallpaper | 164.00 SF |
| 1,763. R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,764. R&R Bathtub | 1.00 EA |
| 1,765. R&R Tub/shower faucet | 1.00 EA |
| 1,766. R&R Toilet | 1.00 EA |
| 1,767. R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,768. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,769. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,770. R&R Ceramic tile base | 20.50 LF |
| 1,771. R&R Tile floor covering | 26.18 SF |
| 1,822. R&R Bathroom ventilation fan w/light | 1.00 EA |

**Vanity Area1** — Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,743. R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 1,744. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,745. R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |

HAMAN, INC. PRODUCTION 1-001386



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

### CONTINUED - Vanity Area1

| DESCRIPTION | QTY |
|---|---|
| 1,746. R&R Wallpaper | 153.44 SF |
| 1,747. R&R Wallpaper border | 22.17 LF |
| 1,748. Clean door (per side) | 1.00 EA |
| 1,749. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,750. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,751. R&R Carpet | 30.21 SF |
| 1,752. R&R Carpet pad | 30.21 SF |
| 1,753. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,754. Clean countertop | 18.00 SF |
| 1,755. Clean sink | 1.00 EA |
| 1,756. Clean sink faucet | 1.00 EA |
| 1,757. Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 1,724. R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 1,725. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,726. R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,727. R&R Wallpaper | 497.44 SF |
| 1,728. R&R Wallpaper border | 65.17 LF |
| 1,729. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,730. Additional charge for a retrofit exterior door | 1.00 EA |
| 1,731. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,732. R&R Entrance hardware - card key | 1.00 EA |
| 1,733. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,734. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,735. R&R Carpet | 247.00 SF |
| 1,736. R&R Carpet pad | 247.00 SF |
| 1,737. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,738. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,739. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,740. Aluminum window, horiz. slider 12-23 sf | 1.00 EA |
| 1,741. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,742. Seal ceiling joist system for odor | 744.44 SF |

### Room 269

HAMAN, INC. PRODUCTION 1-001387



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax,
AL License # BC 38777 - Fed ID # 84-1309171

**Bathroom1**                                                         Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,806. R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 1,807. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,808. Seal ceiling joist system for odor | 190.18 SF |
| 1,809. R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,810. R&R Wallpaper | 164.00 SF |
| 1,811. R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,812. R&R Bathtub | 1.00 EA |
| 1,813. R&R Tub/shower faucet | 1.00 EA |
| 1,814. R&R Toilet | 1.00 EA |
| 1,815. R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,816. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,817. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,818. R&R Ceramic tile base | 20.50 LF |
| 1,819. R&R Tile floor covering | 26.18 SF |
| 1,820. R&R Bathroom ventilation fan w/light | 1.00 EA |

**Vanity Area1**                                                     Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,791. R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 1,792. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,793. R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,794. R&R Wallpaper | 153.44 SF |
| 1,795. R&R Wallpaper border | 22.17 LF |
| 1,796. Clean door (per side) | 1.00 EA |
| 1,797. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,798. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,799. R&R Carpet | 30.21 SF |
| 1,800. R&R Carpet pad | 30.21 SF |
| 1,801. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,802. Clean countertop | 18.00 SF |
| 1,803. Clean sink | 1.00 EA |
| 1,804. Clean sink faucet | 1.00 EA |
| 1,805. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**                                                         Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,772. R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 1,773. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,774. R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,775. R&R Wallpaper | 497.44 SF |

HAMAN, INC. PRODUCTION 1-001388



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bedroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,776. R&R Wallpaper border | 65.17 LF |
| 1,777. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,778. Additional charge for a retrofit exterior door | 1.00 EA |
| 1,779. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,780. R&R Entrance hardware - card key | 1.00 EA |
| 1,781. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,782. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,783. R&R Carpet | 247.00 SF |
| 1,784. R&R Carpet pad | 247.00 SF |
| 1,785. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,786. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,787. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,788. Aluminum window, horiz. slider 12-23 sf | 1.00 EA |
| 1,789. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,790. Seal ceiling joist system for odor | 744.44 SF |

**Room 270**

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 1,858. R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 1,859. R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,860. Seal ceiling joist system for odor | 190.18 SF |
| 1,861. R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,862. R&R Wallpaper | 164.00 SF |
| 1,863. R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,864. R&R Bathtub | 1.00 EA |
| 1,865. R&R Tub/shower faucet | 1.00 EA |
| 1,866. R&R Toilet | 1.00 EA |
| 1,867. R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,868. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,869. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,870. R&R Ceramic tile base | 20.50 LF |
| 1,871. R&R Tile floor covering | 26.18 SF |
| 1,872. R&R Bathroom ventilation fan w/light | 1.00 EA |

**Vanity Area1**      Height: 8'

14-62-KNIGHTS_INN-2      6/27/2014      Page: 48

HAMAN, INC. PRODUCTION 1-001389



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. – (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| DESCRIPTION | QTY |
|---|---|
| 1,843. R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 1,844. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,845. R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,846. R&R Wallpaper | 153.44 SF |
| 1,847. R&R Wallpaper border | 22.17 LF |
| 1,848. Clean door (per side) | 1.00 EA |
| 1,849. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,850. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,851. R&R Carpet | 30.21 SF |
| 1,852. R&R Carpet pad | 30.21 SF |
| 1,853. R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,854. Clean countertop | 18.00 SF |
| 1,855. Clean sink | 1.00 EA |
| 1,856. Clean sink faucet | 1.00 EA |
| 1,857. Seal ceiling joist system for odor | 183.65 SF |

**Bedroom1**  Height: 8'

| DESCRIPTION | QTY |
|---|---|
| 1,823. R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 1,824. R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,825. R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,826. R&R Wallpaper | 497.44 SF |
| 1,827. R&R Wallpaper border | 65.17 LF |
| 1,828. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,829. Additional charge for a retrofit exterior door | 1.00 EA |
| 1,830. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,831. R&R Entrance hardware - card key | 1.00 EA |
| 1,832. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,833. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,834. R&R Carpet | 247.00 SF |
| 1,835. R&R Carpet pad | 247.00 SF |
| 1,836. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,837. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,838. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,839. Aluminum window, horiz. slider 33-40 sf | 1.00 EA |
| 1,840. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,841. Seal ceiling joist system for odor | 744.44 SF |
| 1,842. R&R AC unit w/sleeve - through-wall/window - 5,000 BTU | 1.00 EA |

Room 271

14-62-KNIGHTS_INN-2

HAMAN, INC. PRODUCTION 1-001390



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315  Tel. - (205) 941-0316  Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Bathroom1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,908.  R&R Suspended ceiling system - 2' x 2' | 26.18 SF |
| 1,909.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,910.  Seal ceiling joist system for odor | 190.18 SF |
| 1,911.  R&R 1/2" drywall - hung, taped, ready for texture | 164.00 SF |
| 1,912.  R&R Wallpaper | 164.00 SF |
| 1,913.  R&R Tile tub surround - up to 60 SF | 1.00 EA |
| 1,914.  R&R Bathtub | 1.00 EA |
| 1,915.  R&R Tub/shower faucet | 1.00 EA |
| 1,916.  R&R Toilet | 1.00 EA |
| 1,917.  R&R Interior door - lauan/mahogany - pre-hung unit | 1.00 EA |
| 1,918.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,919.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,920.  R&R Ceramic tile base | 20.50 LF |
| 1,921.  R&R Tile floor covering | 26.18 SF |
| 1,922.  R&R Bathroom ventilation fan w/light | 1.00 EA |

| Vanity Area1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,893.  R&R Suspended ceiling system - 2' x 2' | 30.21 SF |
| 1,894.  R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,895.  R&R 1/2" drywall - hung, taped, ready for texture | 153.44 SF |
| 1,896.  R&R Wallpaper | 153.44 SF |
| 1,897.  R&R Wallpaper border | 22.17 LF |
| 1,898.  Clean door (per side) | 1.00 EA |
| 1,899.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,900.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,901.  R&R Carpet | 30.21 SF |
| 1,902.  R&R Carpet pad | 30.21 SF |
| 1,903.  R&R Carpet cove (wall wrap) - hemmed - 4" | 18.58 LF |
| 1,904.  Clean countertop | 18.00 SF |
| 1,905.  Clean sink | 1.00 EA |
| 1,906.  Clean sink faucet | 1.00 EA |
| 1,907.  Seal ceiling joist system for odor | 183.65 SF |

| Bedroom1 | Height: 8' |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,873.  R&R Suspended ceiling system - 2' x 2' | 247.00 SF |
| 1,874.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,875.  R&R 1/2" drywall - hung, taped, ready for texture | 497.44 SF |
| 1,876.  R&R Wallpaper | 497.44 SF |

HAMAN, INC. PRODUCTION 1-001391



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. - (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Bedroom1**

| DESCRIPTION | QTY |
|---|---|
| 1,877. R&R Wallpaper border | 65.17 LF |
| 1,878. Exterior door slab - solid core lauan/mah./birch - flush | 1.00 EA |
| 1,879. Additional charge for a retrofit exterior door | 1.00 EA |
| 1,880. On site door prep. for full mortised lockset - Labor only | 1.00 EA |
| 1,881. R&R Entrance hardware - card key | 1.00 EA |
| 1,882. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,883. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,884. R&R Carpet | 247.00 SF |
| 1,885. R&R Carpet pad | 247.00 SF |
| 1,886. R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,887. Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,888. Contents - move out then reset - Extra large room | 1.00 EA |
| 1,890. Clean window unit (per side) 41 - 60 SF | 1.00 EA |
| 1,891. Seal ceiling joist system for odor | 744.44 SF |
| 1,892. R&R AC unit w/sleeve - through-wall/window - 5,000 BTU | 1.00 EA |

**Room 272**

| Vanity Area1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 1,923. R&R Suspended ceiling tile - 2' x 2' | 30.21 SF |
| 1,924. Clean suspended ceiling grid | 30.21 SF |
| 1,925. R&R Batt insulation - 4" - R11 - paper faced | 30.21 SF |
| 1,926. R&R Wallpaper | 153.44 SF |
| 1,927. Clean door (per side) | 1.00 EA |
| 1,928. Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,929. Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,930. Clean floor - tile | 30.21 SF |
| 1,931. Clean toilet - Light | 1.00 EA |
| 1,932. Clean shower | 1.00 EA |
| 1,933. Seal ceiling joist system for odor | 183.65 SF |

| Bathroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 1,934. R&R Suspended ceiling tile - 2' x 2' | 26.18 SF |
| 1,935. Clean suspended ceiling grid | 26.18 SF |

14-62-KNIGHTS_INN-2                          6/27/2014        Page: 51

HAMAN, INC. PRODUCTION 1-001392



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315  Tel.  - (205) 941-0316  Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**BELFOR**

## CONTINUED - Bathroom1

| DESCRIPTION | QTY |
|---|---|
| 1,936.  R&R Batt insulation - 4" - R11 - paper faced | 26.18 SF |
| 1,937.  R&R Wallpaper | 164.00 SF |
| 1,938.  Clean door (per side) | 1.00 EA |
| 1,939.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,940.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,941.  R&R Carpet | 26.18 SF |
| 1,942.  R&R Carpet pad | 26.18 SF |
| 1,943.  R&R Carpet cove (wall wrap) - hemmed - 4" | 20.50 LF |
| 1,944.  Clean countertop | 18.00 SF |
| 1,945.  Clean sink | 1.00 EA |
| 1,946.  Clean sink faucet | 1.00 EA |
| 1,947.  Seal ceiling joist system for odor | 190.18 SF |

| Bedroom1 | Height: 8' |
|---|---|
| DESCRIPTION | QTY |
| 1,948.  R&R Suspended ceiling tile - 2' x 2' | 247.00 SF |
| 1,949.  Clean suspended ceiling grid | 247.00 SF |
| 1,950.  R&R Batt insulation - 4" - R11 - paper faced | 247.00 SF |
| 1,951.  Wallpaper | 1.00 SF |
| 1,952.  R&R Wallpaper border | 65.17 LF |
| 1,953.  Clean door (per side) | 1.00 EA |
| 1,954.  Paint door slab only - 2 coats (per side) | 1.00 EA |
| 1,955.  Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA |
| 1,956.  R&R Carpet | 247.00 SF |
| 1,957.  R&R Carpet pad | 247.00 SF |
| 1,958.  R&R Carpet cove (wall wrap) - hemmed - 4" | 61.58 LF |
| 1,959.  Clean curtains - plain - medium - Full service | 2.00 EA |
| 1,960.  Contents - move out then reset - Extra large room | 1.00 EA |
| 1,961.  Seal ceiling joist system for odor | 744.44 SF |
| 1,962.  Clean window unit (per side) 41 - 60 SF | 1.00 EA |

### Exterior Lower

| Lower | Height: 11' |
|---|---|
| DESCRIPTION | QTY |
| 1,963.  Clean with pressure/chemical spray | 7,729.33 SF |

HAMAN, INC. PRODUCTION 1-001393



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. ~ (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

### CONTINUED - Lower

| DESCRIPTION | QTY |
|---|---|
| 1,964. Seal/prime then paint the walls (2 coats) | 7,729.33 SF |
| 1,965. Mask the surface area per square foot - plastic and tape - 4 mil | 19,908.00 SF |
| The above line item is for masking off all of the doors and windows for exterior painting. | |

### Exterior Lower Soffit

**Soffit**         **Height: 4"**

| DESCRIPTION | QTY |
|---|---|
| 1,966. Clean with pressure/chemical spray | 3,004.03 SF |
| 1,967. Seal/prime then paint the ceiling (2 coats) | 3,004.03 SF |

### Exterior Upper

**Upper**         **Height: 11'**

| DESCRIPTION | QTY |
|---|---|
| 1,968. Clean with pressure/chemical spray | 7,729.33 SF |
| 1,969. Seal/prime then paint the walls (2 coats) | 7,729.33 SF |
| 1,970. Mask the surface area per square foot - plastic and tape - 4 mil | 19,908.00 SF |
| The above line item is for masking off all of the doors and windows for exterior painting. | |
| 1,985. Prime & paint iron handrail, 36" to 42" high | 722.00 LF |

### Exterior Upper Soffit

**Exterior Upper Soffit**

| DESCRIPTION | QTY |
|---|---|
| 1,971. Clean with pressure/chemical spray | 5,384.46 SF |
| 1,972. Seal/prime then paint the ceiling (2 coats) | 5,384.46 SF |

### Stairs

HAMAN, INC. PRODUCTION 1-001394



**BELFOR Property Restoration**

205 Citation Court - Homewood, AL 35209
(205) 941-0315  Tel. - (205) 941-0316  Fax.
AL License # BC 38777 - Fed ID # 84-1309171

| Stairs | Height: 17' |
|---|---|
| Subroom: Stairs2 (1) | Height: 17' |
| Subroom: Landing (2) | Height: 17' |
| **DESCRIPTION** | **QTY** |
| 1,973.  Clean with pressure/chemical spray | 502.35 SF |
| 1,974.  Seal/prime then paint the walls and ceiling (2 coats) | 502.35 SF |

| Stairs1 | Height: 17' |
|---|---|
| Subroom: Landing1 (2) | Height: 17' |
| Subroom: Stairs3 (1) | Height: 17' |
| **DESCRIPTION** | **QTY** |
| 1,975.  Clean with pressure/chemical spray | 502.35 SF |
| 1,976.  Seal/prime then paint the walls and ceiling (2 coats) | 502.35 SF |

| Stairs4 | Height: 17' |
|---|---|
| Subroom: Landing2 (2) | Height: 17' |
| Subroom: Stairs5 (1) | Height: 17' |
| **DESCRIPTION** | **QTY** |
| 1,977.  Clean with pressure/chemical spray | 502.35 SF |
| 1,978.  Seal/prime then paint the walls and ceiling (2 coats) | 502.35 SF |

| Columns | |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,979.  Clean with pressure/chemical spray | 41.00 SF |
| 1,981.  Seal & paint stucco | 15,312.00 SF |

| Structure | |
|---|---|
| **DESCRIPTION** | **QTY** |
| 1,986.  (Material Only) 6" x 6" square wood post (3 BF per LF) | 148.00 LF |
| 1,989.  Carpenter - General Framer - per hour | 48.00 HR |
| 1,990.  R&R Block - 12" x 8" x 16" - for repair to walls and columns | 486.00 SF |
| 1,992.  R&R Stucco finish over concrete block | 384.00 SF |
| 1,994.  R&R Steel joist - 12" CS Series | 26.00 LF |
| 1,996.  R&R Wide Flange Beam - 24 3/8"d. x 9 1/16"w. x 1/2"thick | 13.00 LF |
| 1,997.  R&R Metal decking, 3" 18 gauge - 'B' | 325.00 SF |
| 1,998.  Concrete grade beam | 13.00 CY |

14-62-KNIGHTS_INN-2                                     6/27/2014                    Page: 54

HAMAN, INC. PRODUCTION 1-001395



**BELFOR** Property Restoration

205 Citation Court - Homewood, AL 35209
(205) 941-0315 Tel. – (205) 941-0316 Fax.
AL License # BC 38777 - Fed ID # 84-1309171

**CONTINUED - Structure**

| DESCRIPTION | QTY |
|---|---|
| 2,000. R&R Concrete slab - 4" - finished in place | 910.00 SF |
| 2,001. Concrete pump truck (per hour) | 4.00 HR |

**General**

| DESCRIPTION | QTY |
|---|---|
| 1,982. Permits & fees | 1.00 EA |
| 1,983. Dumpster load - Approx. 30 yards, 5-7 tons of debris | 8.00 EA |
| 1,984. Supervision / Project Management - per hour | 196.00 HR |
| 2,005. (Material Only) Sheathing - plywood - 1/2" CDX | 36.00 SF |
| 2,006. 2" x 4" x 8' #2 & better Fir / Larch (material only) | 48.00 EA |
| 2,007. Carpenter - General Framer - per hour | 32.00 HR |

The above three line items are to build a temporary wall around the two units that were severely damaged while construction is going on.

Grand Total                                      466,838.73

Phil Horne

**Grand Total Areas:**

| | | |
|---|---|---|
| 48,226.67 SF Walls | 57,805.00 SF Ceiling | 106,031.67 SF Walls and Ceiling |
| 58,131.76 SF Floor | 6,459.08 SY Flooring | 8,200.78 LF Floor Perimeter |
| 0.00 SF Long Wall | 0.00 SF Short Wall | 8,465.94 LF Ceil. Perimeter |
| 58,131.76 Floor Area | 59,476.51 Total Area | 47,208.63 Interior Wall Area |
| 47,591.47 Exterior Wall Area | 7,316.39 Exterior Perimeter of Walls | |
| 0.00 Surface Area | 0.00 Number of Squares | 0.00 Total Perimeter Length |
| 0.00 Total Ridge Length | 0.00 Total Hip Length | |

14-62-KNIGHTS_INN-2                                      6/27/2014      Page: 55

HAMAN, INC. PRODUCTION 1-001396

Room 111

Page: 56

N ⇧

6/27/2014

HAMAN, INC. PRODUCTION 1-001397



5' 4"
21' 1"
12' 8"
12'
20' 7"
26' 5"

Area2 (B1)
6' 3"
2"

Vanity Area/Room
5"

Area1 (B1)
Bathroom
5' 5"
2' 4"

Bedroom

Room 110   Page: 57

6/27/2014

HAMAN, INC. PRODUCTION 1-001398



N

Bedroom1

Bathroom1

Vanity Area1

Area3 (B1)

Area4 (B1)

Room 112   Page: 58

N ⇧

6/27/2014

HAMAN, INC. PRODUCTION 1-001399



Room 112

14-62-KNIGHTS_INN-2

Room 114

N

6/27/2014

Page: 59

HAMAN, INC. PRODUCTION 1-001400

5' 4"

21' 1"

12' 8"

20' 7"

Area3(B1)

Vanity Area1

2'

2'

4' 0"

2'

Bedroom1

2' 4"

5' 5"

Area4(B1)

Bathroom1

26' 5"



Room 115

Page: 60

6/27/2014

HAMAN, INC. PRODUCTION 1-001401

N ⇧

Bedroom1

Vanity Area1

Bathroom1

Area5 (B1)

Area4 (B1)

21' 1"

20' 7"

26' 5"

12' 8"

5' 4"

2'

6' 3"

1' 1"

12'

5' 5"

2' 4"

Room 116

Page: 61

6/27/2014

HAMAN, INC. PRODUCTION 1-001402

N ⇧



Room 116

14-62-KNIGHTS_INN-2



N ⇧

Room 272        Page: 62

6/27/2014

HAMAN, INC. PRODUCTION 1-001403

Room 272

14-62-KNIGHTS_INN-2



Room 117

Page: 63

6/27/2014

HAMAN, INC. PRODUCTION 1-001404

Room 117

14-62-KNIGHTS_INN-2

Room 118

Page: 64

N ⇧

6/27/2014

HAMAN, INC. PRODUCTION 1-001405



Room 118

14-62-KNIGHTS_INN-2

Room 119

Page: 65

6/27/2014

N

HAMAN, INC. PRODUCTION 1-001406



Bedroom1

Vanity Area1

Area3 (B1)

Bathroom1

Area4 (B1)

21' 1"

20' 7"

26' 5"

12' 8"

5' 4"

12'

6' 3"

2'

2' 4"

5' 5"

Room 120

Page: 66

N

6/27/2014

HAMAN, INC. PRODUCTION 1-001407



5' 4"

21' 1"

20' 7"

12' 8"

2'

Area3 (B1)
6' 3"

Vanity Area1
4' 0"

12'

Bedroom1

2' 4"

5' 5"

Area4 (B1)
Bathroom1

26' 5"

Room 120

14-62-KNIGHTS_INN-2

Room 121

Page: 67

N

6/27/2014

HAMAN, INC. PRODUCTION 1-001408



5' 4"

21' 1"

20' 7"

12' 8"

2"

6' 3"
Area3 (B1)

Vanity Area1

12'

Bedroom1

2' 4"

5' 5"

Area4 (B1)
Bathroom1

26' 5"

HAMAN, INC. PRODUCTION 1-001409

Page: 68

Room 162

6/27/2014

N



Bedroom1

Vanity Area1

Area3 (B1)
6' 3"

Bathroom1
Area4 (B1)
5' 5"

12' 8"

26' 5"

21' 1"

20' 7"

12'

5' 4"

2' 4"

4' 10"

2'

Room 162

14-62-KNIGHTS_INN-2



N

Room 163   Page: 69

6/27/2014

HAMAN, INC. PRODUCTION 1-001410

Bedroom1

Bathroom1

Vanity Area1

Area3 (B1)

Area4 (B1)

26' 5"

21' 1"

20' 7"

12' 8"

5' 4"

6' 3"

5' 5"

2' 4"

12'

2'

1'



Room 164

6/27/2014

Page: 70

N ⇧

HAMAN, INC. PRODUCTION 1-001411

Room 164

14-62-KNIGHTS_INN-2

Room 165



N

Room 165

Page: 71

6/27/2014

HAMAN, INC. PRODUCTION 1-001412

14-62-KNIGHTS_INN-2



Room 166

N

Room 166

Page: 72

6/27/2014

HAMAN, INC. PRODUCTION 1-001413

14-62-KNIGHTS_INN-2

Room 167



Bedroom1

Vanity Area1

Area3(B1)

Bathroom1

Area4(B1)

N

Room 167

6/27/2014

Page: 73

HAMAN, INC. PRODUCTION 1-001414

14-62-KNIGHTS_INN-2



Room 168

Page: 74

N

6/27/2014

HAMAN, INC. PRODUCTION 1-001415

Bedroom1

Vanity Area1

Bathroom1

Area4 (B1)

5' 4"

21' 1"

20' 7"

12' 8"

12'

26' 5"

2' 4"

5' 5"

Room 168

14-62-KNIGHTS_INN-2

Room 169

6/27/2014

Page: 75

HAMAN, INC. PRODUCTION 1-001416

Bedroom1

Vanity Area1

Bathroom1

Area3 (B1)

Area4 (B1)

12' 8"

26' 5"

21' 1"

20' 7"

5' 4"

2' 4"

14-62-KNIGHTS_INN-2



N

Room 170   Page: 76

6/27/2014

HAMAN, INC. PRODUCTION 1-001417

Bedroom1

Vanity Area1

Bathroom1

Area4 (B1)

21' 1"

20' 7"

12' 8"

26' 5"

5' 4"

Room 170

14-62-KNIGHTS_INN-2



N

Room 171     Page: 77

6/27/2014

HAMAN, INC. PRODUCTION 1-001418

14-62-KNIGHTS_INN-2



Bedroom1

Bathroom1

Vanity Area1

Area3 (B1)

Area4 (B1)

Room 172

6/27/2014

Page: 78

HAMAN, INC. PRODUCTION 1-001419



N

Room 173

Page: 79

6/27/2014

HAMAN, INC. PRODUCTION 1-001420

Room 173

14-62-KNIGHTS_INN-2

Room 174

6/27/2014

Page: 80

HAMAN, INC. PRODUCTION 1-001421





Room 175

6/27/2014

Page: 81

N ⇧

HAMAN, INC. PRODUCTION 1-001422

Room 175

14-62-KNIGHTS_INN-2

HAMAN, INC. PRODUCTION 1-001423

Room 176

Page: 82

6/27/2014

N



Room 176

14-62-KNIGHTS_INN-2

N ⇧

Room 262    Page: 83

6/27/2014

HAMAN, INC. PRODUCTION 1-001424



21' 1"

20' 7"

5' 4"

12' 8"

Area3 (B1)
6' 3"
2'

Vanity Area1
4'
0'

Bedroom1

12'

26' 5"

2' 4"
5' 5"
Area4 (B1)
Bathroom1

Room 262

14-62-KNIGHTS_INN-2



Room 263

6/27/2014        Page: 84

N

Room 263

HAMAN, INC. PRODUCTION 1-001425

14-62-KNIGHTS_INN-2

N ⇑

Room 264    Page: 85

6/27/2014

HAMAN, INC. PRODUCTION 1-001426



Room 264

14-62-KNIGHTS_INN-2

N ⇧

Room 265

Page: 86

6/27/2014

HAMAN, INC. PRODUCTION 1-001427



14-62-KNIGHTS_INN-2



Room 266

Page: 87

N

6/27/2014

HAMAN, INC. PRODUCTION 1-001428

Room 266

14-62-KNIGHTS_INN-2



N ⇑

Room 267    Page: 88

6/27/2014

HAMAN, INC. PRODUCTION 1-001429

Room 267

14-62-KNIGHTS_INN-2



Room 268

N ⇑

6/27/2014

Room 268   Page: 89

HAMAN, INC. PRODUCTION 1-001430

14-62-KNIGHTS_INN-2



N ⇑

Room 269

Page: 90

6/27/2014

HAMAN, INC. PRODUCTION 1-001431

Room 269

14-62-KNIGHTS_INN-2



Room 270

6/27/2014

Page: 91

N ⇧

HAMAN, INC. PRODUCTION 1-001432

Room 270

14-62-KNIGHTS_INN-2



N ⇑

Room 271

6/27/2014        Page: 92

HAMAN, INC. PRODUCTION 1-001433

Room 271

14-62-KNIGHTS_INN-2

Lower

Exterior Lower

N

6/27/2014    Page: 93

HAMAN, INC. PRODUCTION 1-001434

Exterior Lower

14-62-KNIGHTS_INN-2

Exterior Lower Soffit

N

Exterior Lower Soffit

6/27/2014        Page: 94

HAMAN, INC. PRODUCTION 1-001435

14-62-KNIGHTS_INN-2

Exterior Upper

N ⇑

Exterior Upper

6/27/2014       Page: 95

Upper

·HAMAN, INC. PRODUCTION 1-001436

14-62-KNIGHTS_INN-2

N ↑

Exterior Upper Soffit

6/27/2014                    Page: 96

HAMAN, INC. PRODUCTION 1-001437

Exterior Upper Soffit

14-62-KNIGHTS_INN-2



Office

N

Office

Page: 97

6/27/2014

HAMAN, INC. PRODUCTION 1-001438

14-62-KNIGHTS_INN-2





Stairs

N ⇑

Stairs

**Page: 98**

6/27/2014

HAMAN, INC. PRODUCTION 1-001439

14-62"KNIGHTS_INN-2



# BROOKSTONE
## RESTORATION

June 30, 2014

Sheila Allen, Manager
**KNIGHTS INN**
1121 9ᵗʰ Ave.
Bessemer, AL  35023

**RE: FIRE DAMAGE REPAIRS**

Dear Sheila,

**Brookstone Restoration** is pleased to submit for your review and consideration our proposal per the following scope of work for the fire damage repairs.

Scope of Work

1000- General Conditions

- Supervision
- Daily clean up
- Building permit
- Job trailer
- Temporary toilets
- Temporary power
- Brookstone 20' storage container
- Dumpsters for debris removal
- 40' containers to store furniture, total of six (6)
- Small tool rental
- Safety, PP&E and barricades

2000-Demolition

- Furnish and install shoring to hold up walkway in front of room #270 and roof structure on either side of columns that are going to removed in front of room #170.
- Remove elevated concrete floor slab in room #270.
- Remove concrete beam at exterior wall of room #170
- Remove concrete beam between columns in front of room #170
- Remove CMU columns on either side of room #170 from the bottom of the roof deck to 4' o.f.f.
- Remove wrought iron railing in front of room #269, #270 and #271.
- Remove acoustical ceiling tiles in rooms#162,163,164,165,166,167,168,169,171,173,174,175, 176,262,263,264,265,266,267,268,269,270,271

Brookstone Restoration
244 Inverness Center Drive, Suite 200
Birmingham, AL 35242
205-991-7086 o.   205-991-7652 f.
www.brookstonecompanies.com

EXHIBIT _4b_
Deponent _HOWARTH_
Date _1-8-2W_ Rptr _CSW_
WWW.DEPOBOOK.COM

HAMAN, INC. PRODUCTION 1-001338

Page 2

Content Manipulation/cleaning

- Remove all existing furniture in affected rooms and store on site in non climate controlled containers
- Move furniture back once construction is completed
- Clean all furniture prior to placing back into the room
- Clean the following rooms and deodorize, #162,163,164,165,166,167,168,169,171,172,173,174,175,176,262,263,264,265,266,267,268,269, 271

3000-Concrete

- Pour new concrete beam at room #170 at the exterior wall.
- Repair both concrete columns on either side of the exterior wall of room #170
- Pour new concrete beam at the outside of the catwalk in front of room #170
- Place and finish concrete at elevated slab at room #270

4000-Masonry

- Furnish all labor, material, scaffolding to build new CMU concrete filled columns up from 4' o.f.f. in front of room #170
- Remove and repair grout joints in CMU wall on both sides of room #170 that was affected by the extreme heat.

5000-Structural Steel

- Furnish and install new 10" steel bar joists and metal pan on the floor of room #270
- Furnish and install new wrought iron railing, total of (3) 13' sections between columns

Metal framing

- Build new metal stud walls in room #170 and #270

7000-Thermal/Moisture

- Furnish and install new R-19 insulation on top of acoustical ceilings in rooms 162,163,164 165,166,167,168,169,170,171,172,173,174,175,176,262,263,264,265,266,267,268,269,270 271

Brookstone Restoration
244 Inverness Center Drive, Suite 200
Birmingham, AL 35242
205-991-7086 o.   205-991-7652 f.
www.brookstonecompanies.com

HAMAN, INC. PRODUCTION 1-001339

**8000-Doors/Windows**

- Furnish and install (8) new hollow core split jamb interior doors with hardware
- Remove and replace (4) exterior 3068 doors and electronic card reader hardware set
- Replace all broken glass affected by the fire
- Furnish and install new front wall glazing for rooms #170 and #270

**9000-Finishes**

- Furnish and install new drywall in rooms #169, #170, and #270.
- Paint the entire north exterior side of the building including walkways, columns, exterior walls and ceiling in the ice/vending area with two coats of Sherwin Williams SherLastic Elastomeric coating
- Furnish paint and labor to paint the interior of rooms #164,#169, 170, 171, 269,270 with two coats Sherwin Williams eggshell paint
- Furnish and install new acoustical ceilings in rooms 162,163,164,165,166,167,168,169,170,171, 172,173,174,175,176,262,263,264,265,266,267,268,269,270,271
- Furnish and install (2) white 4" x 4' Dial tile tub surrounds
- Furnish and install (2) restroom floors with 2" white octagonal tile
- Furnish and install new carpet, $18 yd allowance installed in rooms affected by the fire and the new rooms 170 and 270.

**10000-Specialties**

- Furnish and install (2) 8' granite counters in the new restrooms of room 170 and 270.
- Furnish and install (2) 36' x 8' x ¼" plate glass mirrors
- Furnish and install (2) chrome shower rods
- Furnish and install (2) chrome towel holders

**15100-Plumbing**

- Install new plumbing, plumbing fixtures to match existing in rooms 170 and 270

**15300- HVAC**

- Furnish and install new window HVAC units to match existing for rooms 170 and 270

**16000-Electrical**

- Rewire completely room 170
- Replace exterior lights that were damaged by the fire at the covered walkways

**Brookstone Restoration**
244 Inverness Center Drive, Suite 200
Birmingham, AL 35242
205-991-7086 o.   205-991-7652 f.
www.brookstonecompanies.com

HAMAN, INC. PRODUCTION 1-001340

**TOTAL PRICE:   $348,942.00**

Exclusions:

- Architectural and engineering drawings
- Window HVAC units except for room 170 and room 270
- Roofing
- After hours work
- Asphalt repairs or stripping
- Concrete stair repairs
- Any clogged up sewer piping due to the fire
- Room accessories, i.e, hand dryers, towel racks, furniture, appliances, and any other normal items that are furnished by the hotel
- Mold remediation
- Wall covering
- Exterior door hardware except for room #166, 170, 171, 174

Respectfully Submitted,
**Brookstone Restoration**

Lisa Marbutt
Key Account Manager

HAMAN, INC. PRODUCTION 1-001341



## The Howarth Group

| | | | | |
|---|---|---|---|---|
| Insured: | Zarin Visram/Haman Inc. dba Knights Inn | | | |
| Property: | 1121 9th Avenue SW. | | | |
| | Bessemer, AL 35022 | | | |

| | | | |
|---|---|---|---|
| Claim Rep.: | Chuck Howarth | Business: | (615) 550-5500 |
| Company: | The Howarth Group | | |
| Business: | 137 Third Ave N. | | |
| | Franklin, TN 37064 | | |

Estimator:  Arthur Grandinetti

| **Claim Number:** | **Policy Number:** | **Type of Loss:** |
|---|---|---|
| Date of Loss:  3/22/2014 | Date Received: | |
| Date Inspected: | Date Entered:  2/11/2015 2:56 PM | |

| | |
|---|---|
| Price List: | ALBI7X_AUG14 |
| | Restoration/Service/Remodel |
| Estimate: | KNIGHTSINN1 |

NOTE: This estimate is in first draft and not intended to be a final appraisal of the damage from the subject loss/losses. The Appraisal process provides for re-inspections and on-site reviews during which unintended mistakes and/or omissions can be discovered and this estimate properly amended. It is not intended that this estimate include Code Upgrades, Lead Abatement or Mold Remediation that may be required during construction and any such costs are intended to remain open for supplement as they are incurred.



EXHIBIT 47
Deponent HOWARTH
Date 1-8-20 Rptr. ESW
WWW.DEPOBOOK.COM

HAMAN, INC. PRODUCTION 1-001113



**The Howarth Group**

KNIGHTSINN1

Exterior



| Front Elevation/Facing the office | | Formula Elevation 303' x 20' x 0" |
| --- | --- | --- |
| 6060.00 SF Walls | | 303.00 LF Floor Perimeter |
| 6060.00 SF Long Wall | | 6060.00 SF Short Wall |
| 303.00 LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
| --- | --- | --- | --- | --- | --- |
| 1. Clean with pressure/chemical spray - Heavy | 10,908.00 SF | 0.35 | 3,817.80 | (0.00) | 3,817.80 |
| Amount includes ceilings, and floors. | | | | | |
| 2. Mask the surface area per square foot - plastic and tape - 4 mil | 2,400.00 SF | 0.17 | 408.00 | (0.00) | 408.00 |
| Masking of the windows, light fixtures, HVACs and doors. | | | | | |
| 3. Clean glazed store front - glass and aluminum | 1,280.00 SF | 0.28 | 358.40 | (0.00) | 358.40 |
| 4. Clean door (per side) | 40.00 EA | 4.61 | 184.40 | (0.00) | 184.40 |
| 5. Clean door hardware | 40.00 EA | 4.26 | 170.40 | (0.00) | 170.40 |
| 6. Paint door slab only - 2 coats (per side) | 40.00 EA | 21.92 | 876.80 | (0.00) | 876.80 |
| 7. Seal & paint stucco | 7,902.00 SF | 1.07 | 8,455.14 | (0.00) | 8,455.14 |
| Amount does NOT include windows, doors, and columns. | | | | | |
| 8. Seal & paint column - two coats | 484.00 LF | 4.14 | 2,003.76 | (0.00) | 2,003.76 |

| Totals: Front Elevation/Facing the office | | | 16,274.70 | 0.00 | 16,274.70 |
| --- | --- | --- | --- | --- | --- |



| Right Elevation | | Formula Elevation 75' x 20' x 0" |
| --- | --- | --- |
| 1500.00 SF Walls | | 75.00 LF Floor Perimeter |
| 1500.00 SF Long Wall | | 1500.00 SF Short Wall |
| 75.00 LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
| --- | --- | --- | --- | --- | --- |
| 9. Clean with pressure/chemical spray - Heavy | 6,348.00 SF | 0.35 | 2,221.80 | (0.00) | 2,221.80 |
| Amount includes ceilings, and floors. | | | | | |
| 10. Seal & paint stucco | 2,440.00 SF | 1.07 | 2,610.80 | (0.00) | 2,610.80 |

KNIGHTSINN1                                                        3/21/2015          Page: 2

HAMAN, INC. PRODUCTION 1-001114



**The Howarth Group**

**CONTINUED - Right Elevation**

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Amount does NOT include windows,doors,brick areas, and columns. | | | | | |
| 11. Seal & paint column - two coats | 88.00 LF | 4.14 | 364.32 | (0.00) | 364.32 |
| **Totals: Right Elevation** | | | **5,196.92** | **0.00** | **5,196.92** |



| Rear Elevation | | | Formula Elevation 303' x 20' x 0" |
|---|---|---|---|
| | 6060.00 SF Walls | | 303.00 LF Floor Perimeter |
| | 6060.00 SF Long Wall | | 6060.00 SF Short Wall |
| | 303.00 LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 12. Dry ice blasting | 3,999.60 SF | 2.71 | 10,838.92 | (0.00) | 10,838.92 |
| Heavily soiled and burned areas. Dry ice blasting does not leave any unnecessary cleaning of soda or sand. | | | | | |
| Note: Per SF of surface area being dry ice blasted. Examples of soiling that require average blasting may include light to medium soiling on surfaces easily cleaned by blasting such as brick and sandstone, or light soiling on hard rock, concrete or similar surfaces. | | | | | |
| 13. Clean with pressure/chemical spray - Very heavy | 10,908.00 SF | 0.54 | 5,890.32 | (0.00) | 5,890.32 |
| Amount includes ceilings, and floors. | | | | | |
| 14. R&R Fascia - 1" x 8" - #1 pine | 303.00 LF | 5.34 | 1,618.02 | (0.00) | 1,618.02 |
| 15. R&R Fascia - 1" x 6" - #1 pine | 303.00 LF | 4.64 | 1,405.92 | (0.00) | 1,405.92 |
| 16. R&R Wrap custom fascia with aluminum (PER LF) | 303.00 LF | 9.67 | 2,930.01 | (0.00) | 2,930.01 |
| 17. R&R Soffit - wood | 2,424.00 SF | 3.82 | 9,259.68 | (0.00) | 9,259.68 |
| 18. R&R Metal lath & stucco | 2,424.00 SF | 4.60 | 11,150.40 | (0.00) | 11,150.40 |
| 19. Stucco Plasterer - per hour | 32.00 HR | 41.09 | 1,314.88 | (0.00) | 1,314.88 |
| Extra time to tie in to existing stucco and for ceiling work only.Crew of at least 2. | | | | | |
| 20. R&R Recessed light fixture | 12.00 EA | 108.41 | 1,300.92 | (0.00) | 1,300.92 |
| 21. R&R Exterior light fixture | 14.00 EA | 83.86 | 1,174.04 | (0.00) | 1,174.04 |
| 22. Mask the surface area per square foot - plastic and tape - 4 mil | 720.00 SF | 0.17 | 122.40 | (0.00) | 122.40 |
| Masking of the windows,light fixtures,HVACs and doors. | | | | | |
| 23. Storefront - aluminum anodized frame - Single pane | 2,560.00 SF | 20.53 | 52,556.80 | (0.00) | 52,556.80 |
| 40 units 64sqft per unit of storefront. | | | | | |

KNIGHTSINN1

HAMAN, INC. PRODUCTION 1-001115



**The Howarth Group**

**CONTINUED - Rear Elevation**

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Includes: Aluminum framing, glass, hardware, and installation labor. | | | | | |
| Excludes: Door frame and glass. | | | | | |
| Quality: Natural aluminum anodized, single pane, tempered glass. | | | | | |
| 24.  Clean door (per side) | 12.00 EA | 4.61 | 55.32 | (0.00) | 55.32 |
| 25.  Clean door hardware | 12.00 EA | 4.26 | 51.12 | (0.00) | 51.12 |
| 26.  Door lockset & deadbolt - exterior - Detach & reset | 12.00 EA | 22.09 | 265.08 | (0.00) | 265.08 |
| 27.  Paint door slab only - 2 coats (per side) | 40.00 EA | 21.92 | 876.80 | (0.00) | 876.80 |
| 28.  R&R Wood door - birch face, fire rated (mineral fiber core) | 28.00 EA | 381.60 | 10,684.80 | (0.00) | 10,684.80 |
| Includes: Door and installation labor.  Labor cost to remove a wood door and to discard in a job-site waste receptacle. Quality: Commercial 3068 wood door slab with birch face, pre-machined for hardware, and up to a 90 minute fire rated mineral fiber core. | | | | | |
| 29.  R&R Lockset - keyed - Medium duty - Commercial grade | 28.00 EA | 128.73 | 3,604.44 | (0.00) | 3,604.44 |
| Quality: Commercial grade with standard finish.Note: Price for installation in a door pre-machined to receive lockset. | | | | | |
| 30.  R&R Door signs - plastic w/metal holder | 40.00 EA | 22.81 | 912.40 | (0.00) | 912.40 |
| 31.  Seal & paint stucco | 7,902.00 SF | 1.07 | 8,455.14 | (0.00) | 8,455.14 |
| Amount does NOT include windows,doors, and columns. | | | | | |
| 32.  Seal & paint column - two coats | 484.00 LF | 4.14 | 2,003.76 | (0.00) | 2,003.76 |
| **Totals:  Rear Elevation** | | | **126,471.17** | **0.00** | **126,471.17** |

| Left Elevation | Formula Elevation 75' x 20' x 0" |
|---|---|
| 1500.00  SF Walls | 75.00  LF Floor Perimeter |
| 1500.00  SF Long Wall | 1500.00  SF Short Wall |
| 75.00  LF Ceil. Perimeter | |



| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 33.  Clean with pressure/chemical spray - Heavy | 6,348.00 SF | 0.35 | 2,221.80 | (0.00) | 2,221.80 |
| Amount includes ceilings, and floors. | | | | | |
| 34.  Seal & paint stucco | 2,440.00 SF | 1.07 | 2,610.80 | (0.00) | 2,610.80 |
| Amount does NOT include windows,doors,brick areas, and columns. | | | | | |

KNIGHTSINN1

HAMAN, INC. PRODUCTION 1-001116



**The Howarth Group**

**CONTINUED - Left Elevation**

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 35. Seal & paint column - two coats | 88.00 LF | 4.14 | 364.32 | (0.00) | 364.32 |
| **Totals: Left Elevation** | | | **5,196.92** | **0.00** | **5,196.92** |

**Ice/Vending**                                                        **LxWxH 28' 4" x 14' 9" x 10'**

655.00 SF Walls                          417.92 SF Ceiling
1072.92 SF Walls & Ceiling               417.92 SF Floor
46.44 SY Flooring                        65.50 LF Floor Perimeter
283.33 SF Long Wall                      147.50 SF Short Wall
65.50 LF Ceil. Perimeter

Missing Wall - Goes to Floor/Ceiling       12' X 10'          Opens into Exterior
Missing Wall - Goes to Floor/Ceiling       8' 8" X 10'        Opens into Exterior

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 36. R&R Exterior light fixture | 4.00 EA | 83.86 | 335.44 | (0.00) | 335.44 |
| 37. R&R Ice/Vending sign - aluminum with wood frame - large* | 1.00 EA | 65.01 | 65.01 | (0.00) | 65.01 |
| 38. Clean with pressure/chemical spray - Very heavy | 1,490.83 SF | 0.54 | 805.05 | (0.00) | 805.05 |
| 39. Mask the surface area per square foot - plastic and tape - 4 mil | 175.00 SF | 0.17 | 29.75 | (0.00) | 29.75 |
| Masking of the windows,light fixtures,HVACs and doors. | | | | | |
| 40. Clean glazed store front - glass and aluminum - Heavy | 120.00 SF | 0.37 | 44.40 | (0.00) | 44.40 |
| 41. Seal & paint stucco | 1,072.92 SF | 1.07 | 1,148.02 | (0.00) | 1,148.02 |
| Amount does NOT include windows,doors, and columns. | | | | | |
| 42. Paint concrete the floor | 417.92 SF | 0.68 | 284.19 | (0.00) | 284.19 |
| 43. Reglaze 1/4" tempered glass - single pane | 50.00 SF | 9.12 | 456.00 | (0.00) | 456.00 |
| Includes: Tempered glass, removing old glass and installation labor. Excludes: Glazing gasket and/or caulking. See items GLS GSKT and MPR CLK* if needed. | | | | | |
| 44. R&R AC unit w/sleeve - through-wall/window - 12,000 BTU | 1.00 EA | 852.51 | 852.51 | (0.00) | 852.51 |
| 45. R&R Fire extinguisher and cabinet, 14" x 27" x 8" | 1.00 EA | 255.06 | 255.06 | (0.00) | 255.06 |

HAMAN, INC. PRODUCTION 1-001117

 **The Howarth Group**

**CONTINUED - Ice/Vending**

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Totals: Ice/Vending | | | 4,275.43 | 0.00 | 4,275.43 |
| Total: Exterior | | | 157,415.14 | 0.00 | 157,415.14 |

**Interior**

**Attic**

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 46.  Seal attic framing (shellac) - up to 5/12 | 3,934.00 SF | 1.05 | 4,130.70 | (0.00) | 4,130.70 |
| Dimensioned using Eagle View. | | | | | |
| Totals: Attic | | | 4,130.70 | 0.00 | 4,130.70 |

**Rear Elevation Bottom Floor Units/Rooms**

**Units/Rooms**

**181**                                                                     LxWxH 20' 9" x 12' x 8'

| | |
|---|---|
| 383.56  SF Walls | 249.00  SF Ceiling |
| 632.56  SF Walls & Ceiling | 249.00  SF Floor |
| 27.67  SY Flooring | 46.83  LF Floor Perimeter |
| 166.00  SF Long Wall | 96.00  SF Short Wall |
| 53.50  LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Missing Wall - Goes to Floor | 3' 4" X 6' 8" | Opens into Exterior |
| Missing Wall - Goes to Floor/Ceiling | 12' X 8' | Opens into Exterior |

HAMAN, INC. PRODUCTION 1-001118



**The Howarth Group**



| Subroom 1:  Vanity Area | LxWxH 6' 1" x 4' 11" x 8' |
|---|---|
| 153.78  SF Walls | 29.91  SF Ceiling |
| 183.69  SF Walls & Ceiling | 29.91  SF Floor |
| 3.32  SY Flooring | 18.67  LF Floor Perimeter |
| 48.67  SF Long Wall | 39.33  SF Short Wall |
| 22.00  LF Ceil. Perimeter | |

**Missing Wall - Goes to Floor**          3' 4" X 6' 8"          Opens into 181

| Subroom 2:  Toilet/Shower Area | LxWxH 5' 6" x 4' 11" x 8' |
|---|---|
| 166.67  SF Walls | 27.04  SF Ceiling |
| 193.71  SF Walls & Ceiling | 27.04  SF Floor |
| 3.00  SY Flooring | 20.83  LF Floor Perimeter |
| 44.00  SF Long Wall | 39.33  SF Short Wall |
| 20.83  LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 47.  Dry ice blasting - Heavy | 305.95 SF | 3.10 | 948.45 | (0.00) | 948.45 |

Includes: Ice blaster, compressor, 100' hose, dry ice (solid CO2), and labor. Note: Per SF of surface area being dry ice blasted. Examples of soiling that require heavy blasting may include medium to heavy soiling on surfaces more easily cleaned by blasting such as brick and sandstone, or medium soiling on hard rock, concrete or similar surfaces.

Used to clean the soot, and loose small debris from the metal ceiling decking, and bar joist system.

| 48.  Paint sheet metal - two coats | 305.95 SF | 0.76 | 232.52 | (0.00) | 232.52 |

Includes: Paint, thinner, and labor. Quality: Oil based or water-oil hybrid paint.

Used to restore finish, and seal.

| 49.  Paint steel truss / bar joist - 8" to 24" | 216.00 LF | 3.49 | 753.84 | (0.00) | 753.84 |

Includes: Paint, thinner, and labor. Excludes: Masking.

Reseal the bar joist.

| 50.  R&R Batt insulation - 4" - R11 - paper faced | 305.95 SF | 0.68 | 208.05 | (0.00) | 208.05 |

Quality: 4" deep with paper facing.  Provides an R11 insulation.

| 51.  Suspended ceiling grid - 2' x 2' | 305.95 SF | 1.28 | 391.62 | (0.00) | 391.62 |

Includes: Suspension eyelets, L channel, main runners, cross T's, suspension wire, and installation labor. Quality: Runners have white or off white finish.

| 52.  R&R Suspended ceiling tile - High grade - 2' x 2' | 305.95 SF | 1.77 | 541.53 | (0.00) | 541.53 |

Quality: 2'x2' panels.  Texture is pronounced with deep grooves and fissures.

| 53.  Clean masonry | 512.00 SF | 0.37 | 189.44 | (0.00) | 189.44 |

Amounts considered wood framing.

| 54.  Seal block with masonry sealer | 512.00 SF | 0.66 | 337.92 | (0.00) | 337.92 |

Amounts considered wood framing.

| 55.  R&R Furring strip - 1" x 2" | 512.00 SF | 1.08 | 552.96 | (0.00) | 552.96 |

HAMAN, INC. PRODUCTION 1-001119