FILED
2020 Aug-20 PM 05:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF ALABAMA

3                      SOUTHERN DIVISION

4

5      _____

                                     )

6      HAMAN, INC. D/b/a KNIGHTS      )

       INN,                          )

7                                     )

                 Plaintiff,           )

8                                     )

            vs.                       )No. 2:18-CV-01534-JHE

9                                     )

       CHUBB CUSTOM INSURANCE         )

10     COMPANY,                       )

                                     )

11               Defendant.           )

       _____)

12

13

14

15          VIDEOTAPED DEPOSITION OF SHEILA ALLEN

16                  Riverside, California

17                 Monday, March 2, 2020

18

19

20

21

22     Reported by:

       RENEE A. PACHECO, RPR, CLR

23     CSR No. 11564

24     Job No. CS3980452

25     PAGES 1 - 184

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF ALABAMA
 3
 4       _____
                                        )
 5       HAMAN, INC. D/b/a KNIGHTS       )
         INN,                           )
 6                                       )
                 Plaintiff,             )
 7                                       )
            vs.                          )No. 2:18-CV-01534-JHE
 8                                       )
         CHUBB CUSTOM INSURANCE          )
 9       COMPANY,                        )
                                         )
10               Defendant.             )
         _____)
11
12
13              Videotaped deposition of SHEILA ALLEN taken on
14       behalf of Defendant, at 2900 Adams Street, Riverside,
15       California, beginning at 9:05 a.m. and ending at
16       1:08 p.m. on Monday, March 2, 2020, before RENEE A.
17       PACHECO, Certified Shorthand Reporter No. 11564, RPR,
18       CLR.
19
20
21
22
23
24
25
```

Page 3

1    APPEARANCES:

2

3    For Plaintiff:

4         FRANKLIN TAYLOR ROUSE CONCHIN CLOUD & COLE, LLC

5         BY:  GARY V. CONCHIN

6         Attorney at Law

7         2404 Commerce Court SW

8         Huntsville, Alabama  35801

9         gary@alainjurylaw.com

10        (Video conference)

11

12   For Defendant:

13        MOZLEY FINLAYSON LOGGINS

14        BY:  WAYNE D. TAYLOR

15        Attorney at Law

16        1050 Crown Pointe Parkway, Suite 1500

17        Atlanta, Georgia  30338

18        (404) 845-1944

19        wtaylor@mfllaw.com

20

21

22

23

24

25

1    APPEARANCES (continued):

2

3    For Defendant:

4         PARSON LEE & JULIANO

5         BY:  DAVID LEE

6         Attorney at Law

7         Post Office Box 661228

8         Birmingham, Alabama  35216-1228

9         (205) 326-6600

10        dlee@pljpc.com

11        (Telephonic)

12

13   Videographer:

14        Tony Nokes

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                        INDEX
2    WITNESS                           EXAMINATION
3    SHEILA ALLEN
4            BY MR. TAYLOR                      8
5            BY MR. CONCHIN                   127
6            BY MR. TAYLOR                    168
7
8
9                      EXHIBITS
10   PLAINTIFF'S                             PAGE
11   Exhibit 1    Photograph                 176
12
     DEFENDANT'S
13
     Exhibit 81   Amended Notice of Deposition    13
14
     Exhibit 82   Subpoena                        13
15
     Exhibit 83   Letter dated September 10,      59
16                2015
17   Exhibit 84   E-mail from Brent Parrish to    55
                  Ms. Allen dated May 13, 2014
18
     Exhibit 85   Contents worksheet              54
19
     Exhibit 86   Letter dated August 9, 2013     78
20
     Exhibit 87   Four-page document dated June  105
21                2014 from a company called
                  Brookstone Restoration
22
     Exhibit 88   Letter from Zarin Visram to    123
23                Brent Parrish dated
                  February 9, 2015
24
25

Page 6

1          Riverside, California, Monday, March 2, 2020

2                          9:05 a.m.

3

4          THE VIDEOGRAPHER:  Good morning.  We're

5     going on the record at 9:05 a.m. on March 2, 2020.

6     Please note that microphones are sensitive and make

7     pick up whispering, private conversations and

8     cellular interference.

9          Please silence or turn off all cell phones

10    or place them away from the microphones as they can

11    cause interference with the deposition audio.

12         Audio and video recording will continue to

13    take place unless all parties agree to go off the

14    record.

15         This is media unit one of the

16    video-recorded deposition of Sheila Allen taken by

17    counsel for defendant in the matter of "Haman, Inc.,

18    dba Knights Inn versus Chubb Custom Insurance

19    Company," filed in the United States District Court

20    of Northern District of Alabama, Southern Division.

21         Case No -- civil action file No.

22    2:18-CV-01534-JHE.

23         This deposition is being held at WPC

24    Executive Services, located at 2900 Adams Street,

25    Riverside, California.

1          My name is Tony Nokes.  I'm the

2     videographer.  The court reporter is Renee Pacheco.

3     We are here from the firm Veritext Legal Solutions.

4          I am not related to any party in this

5     action, nor am I financially interested in the

6     outcome.

7          Counsel and all present in the room and

8     everyone attending remotely will now state their

9     appearance and affiliations for the record.

10          If there are any objections to proceeding,

11     please state them at the time of your appearance

12     beginning with the noticing attorney.

13          MR. TAYLOR:  This is Wayne Taylor.  I'm

14     here on behalf of defendant Chubb Custom Insurance

15     Company.

16          MR. LEE:  David Lee here on behalf of Chubb

17     as well.

18          MR. CONCHIN:  This is Gary Conchin, and I'm

19     here on behalf of the plaintiff, Haman, Inc., dba

20     Knights Inn.

21          THE VIDEOGRAPHER:  Thank you.  We may

22     proceed.  Will the court reporter please swear in

23     the witness.

24          DEPOSITION REPORTER:  Raise your right

25     hand, please.

1        Do you solemnly state the testimony you're

2    about to give will be the truth, the whole truth,

3    and nothing but the truth?

4        THE DEPONENT:  I do.

5        MR. TAYLOR:  This will be the deposition of

6    Ms. Sheila Allen taken by virtue of an amended

7    notice of video deposition.  The deposition is being

8    taken for purposes of discovery, cross-examination,

9    and any other purpose permitted by the federal rules

10   of civil procedure.

11

12                    SHEILA ALLEN,

13   having been administered an oath, was examined and

14   testified as follows:

15

16                    EXAMINATION

17   BY MR. TAYLOR:

18       Q   Ms. Allen, we met just a few moments ago.

19   My name is Wayne Taylor, and I represent Chubb

20   Custom Insurance Company in connection with a

21   lawsuit that was filed by Haman, Inc., doing

22   business as Knights Inn, and we're here just to ask

23   you some basic questions --

24       A   Okay.

25       Q   -- about what you might know concerning two

Page 9

1    insurance claims that have been submitted on behalf

2    of Haman, Inc.  One for fire and then subsequently

3    for damage allegedly as a result of wind.  Okay?

4           Just a -- can I get you to just state your

5    full name, please.

6           A    Sheila Whitehead Allen.

7           Q    And is Whitehead your maiden name?

8           A    Yes.

9           Q    And how old are, you ma'am?

10          A    Are you kidding?  You never ask -- you

11   never ask a woman her age or weight, please.

12          Q    I know.  I'm sorry.  I have to do that.

13          A    65.

14          Q    And your date of birth?

15          A    12-26-54.

16          Q    Very good.

17               Have you ever given a deposition before?

18          A    I have not.

19          Q    Okay.  Well, let me explain.  This is --

20   it's not real formal.  We do have a court reporter

21   that's sitting across the table from me who is

22   taking down your testimony.

23               And because you live out here in California

24   where we are today and the lawsuit is pending in

25   Alabama and you may not be able to attend the trial

1   if this case does to trial, we're also videotaping

2   your testimony.  So we have a videographer in the

3   room.

4          And as you can see, the plaintiff's

5   counsel, Mr. Conchin, is in his office in

6   Huntsville, Alabama and he's participating by Zoom.

7          And then I'm going to be asking you some

8   questions, mainly about your knowledge and about the

9   hotel.  And you just tell me what you know, and if

10  you don't know something, you tell me you don't

11  know, and then when I'm finished, Mr. Conchin will

12  have an opportunity to also ask you some questions.

13  Okay?

14       A    Okay.

15       Q    Very good.

16          One of the most important things about a

17  deposition is we need to have a verbal response.  It

18  is human nature for people to nod their heads or

19  give an "uh-huh" or an "uh-huh," those don't show up

20  on the record very well.

21          So if you do that, I might ask you, "Is

22  that a yes or is that a no?"

23       A    I'm a talker.  You won't have that problem.

24       Q    Okay.  Very good.  Good.  I'm glad to hear

25  that.

1        But if in the event it does happen, I'll

2    just ask you, "Is that a yes or is that a no?"

3        I just want you to know, I'm not trying to

4    be rude.  I'm just trying to make a good record of

5    our conversation today.

6        A    Okay.

7        Q    Fair enough?

8        All right.  If you don't understand one of

9    my questions, by all means let me know.  If you give

10   me an answer, I can only assume you understood my

11   question.

12       I'm in the here to trick you.  I'm just

13   here to ask you what you know and find out what you

14   don't know.  Fair enough?

15       A    Okay.

16       Q    Wonderful.  One of the big things -- and

17   the court reporter will get upset at us if we do

18   this.

19       Please allow me to answer my question

20   completely before you begin your answer, and I will

21   likewise try to let you complete your answer before

22   I ask my next question.

23       A    So we're not interrupting each other.

24       Q    Exactly.

25       Mainly -- while with could carry on a

Page 12

```
 1    conversation like that and it probably wouldn't be a
 2    problem, our court reporter can't get both of us
 3    talking at the same time.
 4         A    I understand.
 5         Q    Fair enough.
 6              This is not a marathon.  I don't think this
 7    is going to be a long deposition anyway, but you
 8    never know.  I don't know what Mr. Conchin has in
 9    store for you.  I only know kind of the area of
10    questioning that I have for you, but it's not a
11    marathon.  Anytime you want to take a break, you
12    just speak up --
13         A    Okay.
14         Q    -- and we will take a break.  All right.
15    Ten minutes, five minutes, however long you feel you
16    need to get fresh air, to use the restroom, whatever
17    it is.  You just speak up and we will take a break.
18         A    Okay.
19         Q    The only thing I ask is that if there's a
20    question on the table, if I've asked you a question,
21    that you first answer the question before we take a
22    break.
23              Fair enough?
24         A    Fair enough.
25         Q    Wonderful.
```

Page 13

1                Okay.  You are here in accordance with an

2       Amended Notice of Deposition which I'm going to mark

3       as Defendant's Exhibit 81 for identification.

4                (Defendant's Exhibit 81 was marked

5                for identification.)

6       BY MR. CONCHIN:

7            Q   I don't know that you've ever seen this

8       document, but I will show it to you.  This is

9       actually a document that was served on Mr. Conchin

10      and the other lawyers in this case, and that's just

11      a notice to the other parties in the case, to all

12      the parties in the case, that your deposition was

13      going to take place today where we are now.  Okay?

14           A   Okay.

15           Q   I would like to show you what I've marked

16      as Defendant's Exhibit 82 for identification.

17               (Defendant's Exhibit 82 was marked

18               for identification.)

19      BY MR. CONCHIN:

20           Q   And this is a subpoena with a cover letter

21      from me that was served upon you that commanded you

22      to be here today.

23               Do you recall receiving this, ma'am?

24           A   I have it right here in front of me.

25           Q   And you brought the original that was

Page 14

1     served on you?

2          A    Yes, sir.

3          Q    Very good.

4               And if you turn to the last two pages of

5     the exhibit, there were some documents that had been

6     requested.  I didn't know if you possessed anything,

7     but I felt like I should ask for you to bring

8     whatever documents you might have in your

9     possession.

10              And we had asked you to bring 12 different

11    categories of documents.

12              Do you have any of the documents that are

13    covered by these 12 categories?

14         A    No.  Because when you leave a business,

15    you're not allowed to take any documents from that

16    business with you.

17         Q    Okay.

18         A    It has to stay there.

19         Q    So in response to the subpoena requesting

20    documents, there are no documents in your

21    possession; is that right?

22         A    No.  I have -- my knowledge is right here

23    from remembering when I worked there.

24         Q    And you were pointing to your head?

25         A    Yes.

Page 15

```
 1          Q    When you said that?
 2          A    Yes.
 3          Q    Thank you, ma'am.  Very good.
 4               Could you please provide me with your
 5     address, your current address?
 6          A    470 Jackson Street, Colton, California
 7     92324.
 8          Q    And today we are in Riverside and is Colton
 9     relatively close to Riverside, California?
10          A    About 25 miles.
11          Q    Okay.  Very good.
12               Are you married?
13          A    Yes.
14          Q    And your husband's name?
15          A    Jim Strohm.
16          Q    Spell Strohm.
17          A    S-T-R-O-H-M.
18          Q    And how long have you been married to
19     Mr. Strohm?
20          A    Two and half years.
21          Q    Were you married previously?
22          A    My husband is deceased.
23          Q    Okay.  And his name was?
24          A    Rickey Goodwin.
25          Q    And how long has Mr. Goodwin been deceased?
```

Page 16

1          A    30 years.

2          Q    Do you have any children?

3          A    I have four sons.

4          Q    What are their names?

5          A    Chris, Jeremy, Casey and Rickey.

6          Q    Okay.  How old is Chris?

7          A    He's 45.

8          Q    And where does Chris live?

9          A    In Alabama.

10         Q    Where in Alabama?

11         A    Troy.

12         Q    Is Chris married?

13         A    No.

14         Q    Does he have any children?

15         A    Three.

16         Q    And are any of those children above the age

17    of 18?

18         A    Yes.

19         Q    Okay.  Where do the children live?

20         A    In Dublin.

21         Q    And how old is Jeremy?

22         A    Jeremy is deceased.

23         Q    I'm sorry.

24              Was Jeremy ever married, or does he have

25    any kids?

Page 17

```
 1          A    No.
 2          Q    And Casey -- do you need a minute?
 3          A    He's --
 4          Q    I'm sorry, ma'am.
 5          A    You caught me off guard with that question
 6     about my son.
 7          Q    I'm sorry.
 8          A    Casey is engaged.  He has three children.
 9          Q    And where does Casey live?
10          A    He lives in Brundidge, Alabama.
11          Q    Where is Brundidge?
12          A    About 20 minutes from Troy.
13          Q    Are his three kids over the age of 18?
14          A    He has four kids.  Two of them are and two
15     of them are seven and eight.
16          Q    Okay.  The two kids that are over 18, where
17     do that live?
18          A    Montgomery.
19          Q    And finally, how old is Rickey?
20          A    He's 30.
21          Q    And if I asked, I apologize, but I didn't
22     write down the answer.  How old is Casey?
23          A    I don't even know how old my kids are.
24     Casey's 36.
25          Q    And Rickey is 30 years old.  Where does he
```

Page 18

1    live?

2         A    Here with me.

3         Q    He's here in California?

4         A    Yes.

5         Q    Does he live in Colton at the Jackson

6    Street address?

7         A    Yes.

8         Q    Does he have any children?

9         A    No.  He's still a child himself.

10        Q    Understood.  I have a 30-year-old myself

11   who actually lives in Los Angeles that I got to see

12   yesterday.  So one of the benefits of being able to

13   come out here and talk to you today was to get to

14   see my son.

15        A    Great.  Great.

16        Q    Who I hadn't seen since August.  So...

17        A    Oh, my goodness.

18        Q    Did you speak with anyone in order to

19   prepare for your deposition today?

20        A    I did not.  These papers is all I have to

21   go by.

22        Q    Okay.  Did you review any records in

23   preparation for your deposition today?

24        A    Yes.

25        Q    What records did you review?

1          A    I think it was just the records where I --
2     I think it was just the records where I had fixed up
3     an estimate myself.
4               DEPOSITION REPORTER:  Do you want to go off
5     the record?
6               MR. TAYLOR:  Off the record.
7               THE VIDEOGRAPHER:  Okay.  We're going off
8     the record.  This is the end of media unit one.  The
9     time is 9:18 a.m.
10              (Recess.)
11              THE VIDEOGRAPHER:  We are going back on the
12    record.  This is the beginning of media unit two.
13    The time is 9:21 a.m.
14    BY MR. TAYLOR:
15         Q    Okay.  Back -- now that we're back on the
16    record.
17              I had asked you if you spoke with anybody
18    in preparation for your deposition and you had
19    answered no.  Then I asked you if you had reviewed
20    any records in preparation to give your deposition
21    today and that's when we had to go off the record.
22              So that's the question on the table right
23    now, ma'am.
24         A    No.
25         Q    So you've not reviewed any records?

Page 20

1          A    All I have is what you sent me the first

2     time and then this second time.

3          Q    The subpoenaed, in other words?

4          A    Yes.

5          Q    Okay.  And the first time, you're talking

6     about the first time we sent you a subpoena and your

7     deposition had to be rescheduled?

8          A    Yes.

9          Q    Got it.  Okay.

10              Have you reviewed any photographs in

11     preparation for your deposition?

12          A    Yes.

13          Q    Okay.  What photographs did you review in

14     preparation?

15          A    It was through an e-mail showing what the

16     hotel looked like before and what it looked like

17     now.

18          Q    And who sent you those photographs?

19          A    Mr. Conchin.

20          Q    When did you get those photographs?

21          A    Probably two months ago.  I'm not sure on

22     the dates now.  I'm not sure on the date.

23          Q    Okay.  So within the last couple of months

24     before --

25          A    Yes.

Page 21

1          Q    -- your deposition was scheduled initially
2     you were sent photographs?  Deposition --
3          A    Yes.  Yes.
4          Q    Very good.
5               And Mr. Conchin or his office sent you some
6     photographs to look at?  That's a "yes"?
7          A    Yes.
8          Q    And how many photographs was it that he
9     sent you?
10         A    I think it wasn't photographs.  It was a
11    videotape showing what the hotel looked like when I
12    was there as manager and showing what it looked like
13    now.
14         Q    And you did not bring that videotape with
15    you?
16         A    No.
17         Q    How long was that videotape?
18         A    About five minutes.
19              MR. CONCHIN:  Wayne, it is the same
20    videotape that we sent to you, the disk, that was
21    taken in November or December.  So...
22              MR. TAYLOR:  Thanks, Gary.
23    BY MR. TAYLOR:
24         Q    Was there any audio on that videotape, or
25    was it silent?

Page 22

1        A    I believe there was audio on it.

2        Q    Okay.  Do you know who was talking?

3        A    No.

4        Q    When was the last time you looked at that

5    video?

6        A    Whenever it was sent to me, and I haven't

7    looked at it again.

8        Q    So when you received it a few months ago is

9    when you looked at it?

10        A    Yes.

11        Q    And since that time you have not looked at

12    it?

13        A    No.

14        Q    And I know that my office has spoken with

15    you a couple of times to get your deposition

16    scheduled.

17        A    Yes.

18        Q    Did you ever talk to anybody in my office

19    about the facts of this case?

20        A    No.

21        Q    Okay.  Could you give me the best telephone

22    number to reach you just in case we do need to reach

23    you?

24        A    909.645.6916.

25        Q    Is that a cell phone?

Page 23

```
 1          A    Yes.

 2          Q    And that's the best number to reach you?

 3          A    Yes.

 4          Q    Wonderful.

 5               Can you tell me a little bit about your

 6     educational background.

 7          A    Okay.  I went to Raleigh College for retail

 8     management.  I've been in the hotel business for

 9     approximately 15 years.

10               And you've got my children's names and

11     everything.  My youngest son is out here and

12     hopefully is being scouted for the L.A. Dodgers.

13     He's very good.

14          Q    Wonderful.

15          A    Very good at playing ball.

16               And I met my husband.  He's a gold

17     prospector, and so is my niece.  I came out here on

18     vacation.  Met her friend and we dated for two

19     years, and then he asked me to marry him, and so

20     here I am in California.

21               I do a lot of work for the homeless.  I

22     feed the homeless.  I go visit the nursing home as

23     a -- through our church.  I go visit the nursing

24     home to visit the elderly people that don't have

25     that, and I definitely am a Days of Our Lives fan.
```

Page 24

1      I go meet those stars in Universal Studio.  And I
2      made very good grades in college.
3              Q    Where is Raleigh College located?
4              A    It was in Troy, Alabama.  That was probably
5      30 years ago.
6              Q    Okay.
7              A    That I --
8              Q    Understood.
9                   And you got a -- what was the degree, a
10     bachelor's degree or?
11             A    Retail management.
12             Q    Is it a bachelor's degree in retail
13     management?
14             A    No.  It's just a retail management.
15             Q    Okay.  What kind of degree is it, though?
16             A    It don't have -- I don't think it has a
17     degree on it.  It was just to learn about businesses
18     and that got me -- lead me to the hotel business
19     which had lead me to running restaurants.
20                  I had a real popular restaurant in
21     Montgomery, Alabama and then moved it to Troy.
22                  And I am very close with my sons.  I'm very
23     organized when -- I take my jobs very serious, and I
24     am a homemaker right now.  I'm retired.
25             Q    How long have you been retired?

Page 25

1          A    For two years.
2          Q    Is the last hotel management job you had
3     with the Knights Inn?
4          A    Yes.
5          Q    And how long were you the -- you were the
6     manager of the Knights Inn; is that right?
7          A    Yes.
8          Q    How long were you the manager of the
9     Knights Inn?
10         A    Let's see, the first time I was the manager
11    for about a year and that was many years ago.  And
12    then I came back and I was probably there for three
13    years.
14         Q    Okay.  From when to when?
15         A    I left in April of 2015.  And so I don't --
16    so I guess I would have been there in 2012.
17         Q    Do you remember when you started in 2012?
18         A    I think in the month of July.
19         Q    And since you left in 2015, you've not
20    managed a hotel?
21         A    No.
22         Q    Have you had a job since you left in 2015?
23         A    Yes.  I ran a restaurant.
24         Q    What restaurant did you run?
25         A    WINGERS.  It served hot wings.

Page 26

1          Q    And where was WINGERS located?

2          A    In Montgomery, Alabama.

3          Q    And what were the dates that you operated

4     or managed WINGERS?

5          A    Oh, geez.  Probably the year of 2016 maybe.

6     I'm not -- I'm not quite sure on all these dates.  I

7     don't keep up with dates like that.

8          Q    How long were you the manager at WINGERS?

9          A    Probably six months.

10         Q    And what was the reason that you left?

11         A    Because it was -- I just found out I was

12    diabetic and it was too far for me to drive.  We

13    opened up at 10 o'clock in the morning and we closed

14    at 10 o'clock at night, and then I was driving two

15    hours a day.

16         Q    So WINGERS was located in Montgomery --

17         A    Yes.

18         Q    -- where were you commuting to?

19         A    Troy.

20         Q    Back and forth to Troy?

21         A    Yes.  And that was just -- I done that and

22    it was just too many hours.  So I moved it to Troy.

23         Q    Very good.  And since you -- so you

24    voluntarily left WINGERS?

25         A    Yes.  Yes.

1        Q    And after WINGERS, have you held a job?

2        A    No.

3        Q    Okay.

4        A    No.

5        Q    When you were the manager at Haman, Inc.

6    between July of 2012 and April of 2015, did you also

7    live in Troy or did you live on-site?

8        A    I lived on site.  That was a requirement.

9        Q    So you lived in one of the units, then, one

10   of the rooms?

11       A    Yes.

12       Q    Which room did you live in?

13       A    150.

14       Q    Was that room one of the rooms of the

15   building where the fire occurred in?

16       A    No.  No.  This room was close to the

17   entrance to the office because I worked nonstop.  I

18   mean, I had to be available 24 hours.

19       Q    Okay.  So there were two buildings that had

20   rooms and one was the restaurant and the office;

21   right?

22       A    Yes.

23       Q    Okay.  So you lived in the other building

24   that was not damaged by fire --

25       A    Yes.

Page 28

1      Q    -- that had rooms?

2      A    Yes.

3      Q    What was the reason that you were no longer

4    the manager -- that you left in April of 2015?

5      A    I had a tragedy in my family, and I needed

6    to go home.

7      Q    Did this have to do with the death of your

8    son?

9      A    Yes.

10      Q    When you say "had to go home," that would

11    have been Troy?

12           And as I understand it, the fire that

13    occurred to the other building that had rooms that

14    you did not live in occurred in March of 2014.

15           Does that sound about right?

16      A    Yes.

17      Q    And did the Knights Inn have any other

18    employees that actually lived on-site at that time?

19      A    Yes.

20      Q    How many employees were living on-site at

21    the time that that happened?

22      A    Let's see, there was Frazier and Helen,

23    they were married.

24      Q    I'm sorry?

25      A    Frazier and Helen, they were married to

```
 1    each other.
 2          Q    What's their last name?
 3          A    I don't know their last name.
 4          Q    Okay.  Who else?
 5          A    And then there was Ms. -- I can't remember
 6    her name.  Ms. Cheryl.
 7          Q    Do you remember Cheryl's last name?
 8          A    Cowin.
 9          Q    Cowin?
10          A    Cowin.
11          Q    Can you spell that, please?
12          A    C-O-W-I-N.
13          Q    Anyone else that lived on-site?
14          A    Yasif Bukhari.
15          Q    Anyone else?
16          A    There was one other maintenance man, his
17    name was KW.  I do not know his last name.
18          Q    KW was a maintenance man?
19          A    Yes.
20          Q    Okay.  And let's go back up.
21               What did Frazier do for the hotel?
22          A    Frazier helped with the laundry and Frazier
23    helped clean the rooms.
24          Q    How about Helen?
25          A    She was a housekeeper.
```

Page 30

1          Q    So she cleaned the rooms?

2          A    Yes.

3          Q    Okay.  And you don't remember their last

4     name?

5          A    You know, I never -- no.  I do not remember

6     their last name.

7          Q    Okay.  That's fine.

8               And Cheryl Cowin, what did she do?

9          A    She was front desk.

10         Q    And Mr. Bukhari?

11         A    He was -- he was like over the maintenance

12    and over the housekeepers and took care of that.

13         Q    He supervised all of them?

14         A    Yes.  He supervised all that and was an

15    excellent employee.

16         Q    And then KW was the maintenance man?

17         A    Yes.

18         Q    He'd fixed things if they became broken.

19    Roof needed to be patched, he could go up and patch

20    the roof, that type of thing?

21         A    I don't think he was into patching the

22    roof, but he was definitely into fixing the

23    plumbing, helping out with door locks, you know,

24    that type of thing.

25              It cost right at $80 to get somebody to

Page 31

1    come out and repair those automatic door locks, and

2    my son had showed him how to rebuild them.  So that

3    was an asset.  He was an asset with that being said.

4         Q    Okay.  Did any of your sons ever live

5    on-site?  Which ones?

6         A    Jeremy.

7         Q    The one that's deceased?

8              And did Jeremy live with you or he had his

9    own room?

10        A    He had his own room.

11        Q    Did Jeremy work for the hotel?

12        A    Yes, he did.

13        Q    What did Jeremy do for the hotel?

14        A    He said he was my boss.

15        Q    Is that accurate?

16        A    He was the one that actually got me the job

17   there to help out.  So he's been there longer than I

18   had.  So, yes, he had seniority over me.

19        Q    What did Jeremy do?

20        A    He did a lot of everything.  All of the

21   marketing, advertising, hiring, firing, you know.

22   Just did all the Internet thing, you know, specials

23   we'd have.

24             When the ball game was in Tuscaloosa,

25   Alabama, he would do ads and stuff like that.  He

Page 32

```
 1    was just a computer person, pretty much.
 2         Q    Gotcha.
 3              Did Jeremy just work for the hotel, or did
 4    he work for maybe broader and this hotel was just
 5    one of the things that he did?
 6         A    This hotel was just one of the things he
 7    did.
 8         Q    Who was he actually employed by?
 9         A    With the hotel?
10         Q    Was he employed by Knights Inn?
11         A    Yes.
12         Q    Was he employed by Haman, Inc.?
13         A    I don't know what Haman, Inc. is.  I
14    mean -- I'm assuming that's Knights Inn?  Haman,
15    Inc. is Knights Inn; correct?
16         Q    Well, I'm assuming so.  Or at least they
17    owned it.
18         A    Ms. Visram hired him.  We met at the hotel
19    I was running in Montgomery.  She was looking for
20    someone and a friend of ours knew her, and she came
21    all the way to Montgomery to have a meeting, and I
22    turned the job down, and my son took it.
23         Q    Got it.
24              How long did Jeremy work for the hotel?
25         A    He's been in the hotel business since he
```

1    was -- right out of college.  I mean, he's just

2    always been fascinated with Wyndham, Worldwide and

3    things like that.  He took a -- he took a liking to

4    Ms. -- Mrs. Visram is why he went to work for her.

5         Q    Okay.  Do you know how long he actually

6    worked for Ms. Visram or for the Knights Inn?

7         A    Let's see, between -- I mean, he worked at

8    the Ramada and the Days and -- probably with her,

9    maybe three years.  Maybe three years.

10        Q    Did Mr. Bukhari actually do the maintenance

11   or he just supervised the maintenance person?

12        A    No.  No.  He was old but he definitely -- I

13   tried to take as much off of him as I could because

14   he was old, but he -- and not any offense to him in

15   that, but he was trying to take on more than he

16   could do.  So I made some adjustments, but he had

17   been there for 30 years, I think.

18        Q    At the Knights Inn?

19        A    Yes.

20        Q    You had testified a little bit ago that you

21   had attended Raleigh College and studied retail

22   management?  That's a "yes"?

23        A    Yes.  That is a yes.

24        Q    Okay.  Did you have any other education

25   after high school besides Raleigh College?

1      A    Just the general studies, psychology, math

2      132, English 101, just your --

3      Q    I'm talking about other than Raleigh

4      College, did you --

5      A    No.  No.  I was going to pursue nursing and

6      it just never fell -- it just never fell through for

7      me.  So I'd have kids and go to college.

8      Q    Before you came to the Knights Inn, where

9      did you work?

10     A    I worked at the -- oh, it has an

11     inground -- inside pool.  InTown Suites, I believe,

12     was the name of it.

13     Q    Where was it located?

14     A    It was located in Montgomery, and I also

15     worked for the Kings Inn in Montgomery, and I was

16     there for four years as the general manager.

17     Q    So the Kings Inn?

18     A    Was before the Knights Inn.

19     Q    Was before.  Okay.

20          And what were the dates that you were the

21     general manager of the Knights -- the Kings Inn?

22     A    I'm not sure.  I think I left in -- I'm

23     just not sure on those dates.  I was there about

24     five years.

25     Q    And then you went to the InTown Suites?

Page 35

1          A    Yes.

2          Q    And how long were you -- what was your

3    position there first?

4          A    I wasn't there very long because the

5    manager -- I was the front desk clerk.  I wasn't

6    there because the manager was just rude, and I can't

7    be around that kind of negativity.

8          Q    Did you leave voluntarily?

9          A    Yes.

10         Q    And you were the manager at the Kings Inn,

11   what was the reason that you left the Kings Inn?

12         A    Because things there were getting kind of

13   rough, and my son was the head of the security

14   there, the cage fighter, the 30 year old.  He was

15   security there.  And I just kept having some

16   problems with the security.

17              And then we had a bar on the inside of the

18   hotel.  And the man that had the bar, he hired

19   security -- it was in the contract -- he hired --

20   that I had put in there.  He hired his own security

21   for the weekends because you got 500 people going in

22   and out of a bar, you know, Thursday, Friday and

23   Saturday.

24              So he hired security to help with the

25   parking lot, security to help with the safety of the

1      hotel.  And I just kept -- I don't know, I just kept

2      having this gut feeling that something was wrong,

3      and I told my son I didn't want him to do security

4      anymore.  It was just a gut feeling, a mother's

5      intuition.  And I have those a lot, and I usually

6      listen to myself.

7              And I quit.  I gave my notice, and I left

8      on a Monday morning with a U-Haul and moved back to

9      Troy.  No, actually, I moved back to Dublin.  I

10     moved to Dublin for the first time, and I got a call

11     that Friday night saying that two people were killed

12     in front of the hotel.

13        Q   Wow.

14        A   And my son would have been in that if I had

15     not left.  So I loved the job.  It was a really good

16     job.  It was a really good job.  I'm not a drinker.

17     So the bar didn't benefit me any except the money

18     for the lease, you know, I could use it.

19        Q   Understood.  And then when you were at the

20     InTown Suites, how long were you there?

21        A   I wasn't there very long.  Maybe five

22     months.

23              So he can hear everything that we're

24     saying?

25        Q   And he can see you.

```
 1        A    Oh, he can see me too?

 2             MR. TAYLOR:  Wave to her, Gary.

 3             MR. CONCHIN:  Yeah.  I can hear everything

 4   and see everything.

 5             THE DEPONENT:  Oh, okay.  Okay.

 6             MR. CONCHIN:  And then when Wayne gets

 7   through then I'll ask questions.  We can take a

 8   break at any time.  All you got to do is tell one of

 9   us.

10             THE DEPONENT:  Okay.

11   BY MR. TAYLOR:

12        Q    Have you ever before today at any time had

13   a conversation with Mr. Conchin about this case?

14        A    Not as much about this case.  He called me

15   and asked me could he give you my phone number, and

16   I told him yes.

17        Q    Is that the only time you've had a

18   conversation with Mr. Conchin before today?

19        A    Pretty much.  Other than the video that --

20   you know, that he sent me.

21        Q    Well, he sent that by e-mail.  After you

22   looked at it, did you call him?

23        A    No.

24        Q    Did he call you?

25        A    No.
```

Page 38

```
 1        Q   Did you speak about the video after he sent
 2   it to you?
 3        A   No.  Because I already knew what the hotel
 4   looked like when I was there.  I was shocked,
 5   however, was it looked now.
 6        Q   Understood.
 7            And as part of your compensation at the
 8   Knights Inn, I take it you were given a room to live
 9   in?
10        A   Yes.
11        Q   Okay.  And then you also were compensated
12   in addition to that?
13            In other words, you received a salary or
14   something along those lines, some form of
15   compensation?
16        A   Actually -- actually, I wasn't compensated
17   for the room.  That came out of our pay.  We had to
18   pay for our own room.
19        Q   Okay.  But you were required to live
20   on-site?
21        A   Yes.
22        Q   Okay.  And what was your compensation to be
23   the general manager at the Knights Inn when you were
24   there?
25        A   I would rather not discuss money-wise.
```

1          Q    Well, can you tell me this:  Were you paid

2     a straight salary, or were you paid on a percentage

3     of revenues?

4          A    No.  Salary.

5          Q    And how would you describe your duties as

6     if general manager?

7          A    I don't have all day, Mr. Taylor.  I threw

8     myself into that job 100 percent because it was a

9     challenge, and I like challenges.

10              It needed some upgrades.  Like I put new

11     curtains and so forth, had the carpet cleaned.

12              The fire marshall and I became really good

13     friends.  I was up to all the fire marshall codes.

14     Everything he would give me to do, I had it done.

15              And he would definitely be a character

16     reference for me because I did everything that he

17     asked.

18              I made out the schedules.  I worked with

19     the housekeepers.  If one was out, I would fill in.

20     If a front desk clerk -- I'd work a double shift.

21     There were a lot of duties as a general manager.  To

22     oversee the whole hotel pretty much.

23          Q    Were you responsible for hiring and firing?

24          A    Yes.

25          Q    And the employees that were living on-site

1    at the time the fire occurred in March of --

2         A    Was Frazier, Cheryl, Ms. Helen, that was

3    her name.   Ms. Helen and --

4         Q    Cheryl?

5         A    Yasif Bukhari.

6         Q    Right.   Did you hire Frazier and Helen or

7    were they already there --

8         A    I hired them all.   I replaced every

9    employee there when I got there because of things

10   that were -- they were not doing or things they were

11   doing.

12        Q    Okay.   Except for Mr. Bukhari who was

13   already there?

14        A    Except for Mr. Bukhari.

15        Q    Because he was there for 30 years?

16        A    He fed me a lot.   I don't know what kind of

17   food it was either.

18        Q    Fair enough.

19             Did a gentleman by the name of Kenneth

20   Parker ever work at the hotel?

21        A    Yes.

22        Q    Does that name sound familiar?

23        A    Yes.

24        Q    Okay.   Was he living there at the time of

25   the fire because you did not list him originally?

Page 41

```
 1          A    Yes, I did.  KW.  I gave you his name, KW.
 2     The maintenance man.
 3          Q    Oh, that's Kenneth Parker?
 4          A    Yes.  That's KW.
 5          Q    And you hired him?
 6          A    Yes, I did.
 7          Q    Okay.  And did the -- which buildings did
 8     the employees that lived on-site at the time, did
 9     they all live in the other building where the fired
10     occurred or did any of them live in the same
11     building where you lived?
12          A    KW lived in the building that I lived in.
13     He fixed up one of the rooms that I had blocked off.
14     He repaired it, fixed it him up himself because he
15     wanted to stay over there.
16          Q    And then the others lived in the --
17          A    Yes.
18          Q    -- building where the fire occurred?
19          A    Yes.
20          Q    So the employees that lived on-site, was
21     the cost of the room deducted from their salaries
22     also --
23          A    Absolutely.
24          Q    -- or just yours?
25          A    Absolutely.
```

Page 42

```
 1          Q    Okay.  So they would all -- whatever
 2     compensation they were paid, the cost of the room
 3     was then deducted?
 4          A    Yeah.
 5          Q    On all of them?
 6          A    Yes.
 7          Q    Okay.  How long was Mr. Parker an employee
 8     of Knights Inn?
 9          A    He was probably there about -- about a
10     year.
11          Q    And he was there at the time of the fire?
12          A    Yes.
13          Q    Okay.  Do you know how long after the fire
14     it was before he left the Knights Inn?
15          A    I don't know.  When I left, he was still
16     there.
17          Q    Oh.  So he was still there in April 2015
18     when you left?
19          A    Yes.
20          Q    When you left the Knights Inn employment in
21     April 2015, is that the last time you were there?
22          A    Yes.  Yes, it was.
23          Q    Okay.  You've never been back since?
24          A    No.
25          Q    Who was responsible for handling the
```

Page 43

1    finances at Knights Inn?  In other words, running

2    reports, making the deposit, that type of thing?

3         A    Well, the front desk kind of ran itself, as

4    far as your night audit.  That had to be turned in,

5    the front desk clerk closed it out, the one that

6    worked at midnight.

7              The night audit, as far as making financial

8    decisions, I did that after approval from Ms. V.

9         Q    Who prepared financial statements, those

10   types of things, for the owner to look at?

11        A    Yasif wrote the checks out.  I wasn't -- I

12   didn't have access to the checking account.  He

13   would -- she would write out the checks.  He would

14   get ready what he needed, or he would have

15   permission to pay for it with a check.

16        Q    He dealt with Ms. Visram directly on that?

17        A    Yes.  He had permission to write out a

18   check for what we needed when we ordered bathroom

19   tissue, sheets, that -- cleaning supplies, that sort

20   of thing.

21        Q    Did you have check-writing authority?

22        A    No, I did not.

23        Q    Did Ms. Cowin have check-writing authority?

24        A    No.

25        Q    Was she the night person that did the

Page 44

1      auditing?

2          A    No.   Whoever worked did the night audit.

3      It runs itself.  The computer runs it.  You close it

4      out and it runs itself, and you just put it in an

5      envelope.

6              Everything that was done for business that

7      day goes in an envelope, and it is saved, and then

8      all the money is in a safe that -- I didn't have

9      access to the safe either.

10         Q    Who made the deposits?

11         A    Yasif Bukhari.

12         Q    Okay.  And the records that were put into

13     an envelope when the audit -- the night audit was

14     done, who was that given to?

15         A    It was given to me and I filed it, but it

16     would have to first be taken to Ms. V. for her to --

17     for her to look at the credit card statement and

18     the -- I would usually go over it and find any

19     mistake before I took it to her and try to correct

20     it, but it had better match up.  Everything -- she

21     was accurate on her accounting abilities.

22         Q    Okay.  And how often did Ms. Visram come

23     and visit the Knights Inn?

24         A    At least twice a week.

25         Q    And how long would she stay when she would

1    come?

2         A    Just to pick up the night audits or to walk

3    around and see that everything was in order.  She

4    was really -- really surprised at all of the

5    upgrades, you know, that I had made there that

6    didn't -- it wasn't very expensive, but it was very

7    more elegant looking than it was before.  She was

8    impressed.

9              She would come and check it out and look,

10   or I would show her what I had done.

11        Q    Were there records kept of all the

12   improvements that were made?

13        A    I don't think we kept records because it

14   was just something as me, into decorating, did.  You

15   know, like new curtains for the Knights Inn.

16   Knights Inn curtains go over to the Studio Inn, you

17   know.  Upgraded one and then upgraded another one

18   with the leftover materials.

19        Q    I see.  And when the curtains were

20   purchased, was that done with Ms. Visram's

21   permission?

22        A    I do not know when the curtains were

23   purchased.  I was cleaning out stuff, per the fire

24   marshal, that any rooms that had -- looked like

25   they'd be a fire hazard, he wanted it cleaned out.

Page 46

```
 1          So I was going through this room, and I
 2    found brand-new stacks of new curtains and shower
 3    curtains.  They were brand-new.  So I took the
 4    brand-new curtains and put them in the Knights Inn
 5    and took the old curtains from -- well, they weren't
 6    really old but took the old curtains from the
 7    Knights Inn and redid the Studio Inn.
 8          Q   Just so that I can get an idea.  The
 9    building where the fire occurred, was that the
10    Knights Inn or was that the Studio Inn?
11          A   That was the Studio Inn.
12          Q   I see.
13          A   That was where I -- a lot of the revenue
14    came from.  I used that for weekly rooms.
15          Q   The Studio Inn?
16          A   For work crews, yes.
17          Q   I see.
18          So that was more long-term residents, so to
19    speak?
20          A   No.  It would be work crews that would come
21    and leave.  You know, they needed a place to stay
22    while they were working, and they would stay there
23    for a month.
24          Q   Right.  That's what I was meaning.
25          A   Yes.  Yes.
```

Page 47

1      Q    Gotcha.

2      A    And the fire marshal said that, you know, I

3   had to shut down that hotel.  I had to block it off

4   because the main thing that he wanted to be fixed

5   was the steel beams.  He said that was a hazardous

6   and liability for the hotel.

7      Q    When was this?

8      A    This was right after the fire.

9      Q    Oh, after the fire?

10     A    Yeah.  After the fire.  I mean, I had to

11   get those steel beams repaired.  So I got somebody

12   to come out there and give an estimate and --

13   without any money to repair them with, I couldn't

14   repair them because it was very expensive.

15          And so the fire marshal come back and said,

16   "Sheila, I'm going to have to shut it down until you

17   get this fixed."

18     Q    Who was the company that you got a bid to

19   fix the steel beams from?

20     A    You know, I dealt with so many people, a

21   lot of them shady, a lot of them overpriced.

22   Brentbriar, Brentwood.  I'm not -- I'm not real --

23   they were just supposed to come out there and look

24   at the steel beams.

25          That was a hazard.  Those beams were burned

1    up above the room that caught on fire and on the

2    balcony.  They had to be repaired, and he shut me

3    down because I didn't have the money to repair them.

4         Q    Okay.  We'll talk about the fire loss in

5    just a minute.

6              Did the Knights Inn have an accountant

7    where all the financial records were sent so that

8    financial statements could be created?

9         A    Not that I'm aware of.  I don't know the

10   extent of what she had with an accountant.  I do

11   know that she had an accountant; but, you know, once

12   I did the night audit, I was done with it.  She took

13   it from there, but I do know she had an accountant.

14        Q    Very good.  I apologize.  I do -- I just

15   have to ask this question.

16             Have you ever been convicted of a felony?

17        A    Absolutely not.

18        Q    Have you ever been arrested for anything

19   other than a traffic violation?

20        A    No.  I haven't even been arrested for a

21   traffic violation.

22        Q    Fair enough.

23             Are you taking any medication that affect

24   your memory in any way?

25        A    Absolutely not.

Page 49

1        Q    Very good.

2             So as I understand it, then, what I'm

3    calling in general as the Knights Inn is really

4    three buildings; right?

5        A    Studio Inn, Knights Inn and then the office

6    and the ballroom.

7        Q    And then there was a restaurant and bar in

8    there as well?

9        A    Yeah.  In the back of the -- we had that

10   shut off.  That was my storage room, pretty much.

11       Q    Very good.

12            So where the office was located, that was a

13   ballroom and an office and a bar, there were no

14   rooms there?

15       A    No.  And my office was in there as well.

16       Q    Got that.  And that's where all the records

17   were kept?

18       A    That's where the records were kept.  That's

19   where I stayed most of the time.  That's the front

20   desk.  We had filing cabinets.  You know, we could

21   only keep so much before we had to box them up.

22       Q    And then when you boxed up the records,

23   where would you move them to?

24       A    We had a storage room for all the records.

25       Q    And was that storage room in the same

Page 50

1    building or was it in a different building?

2         A    It was in the Studio Inn building.

3         Q    So would the night audit records be

4    provided to Ms. Visram and after she looked at them

5    she would give them back, or would she keep them?

6         A    She would give them back, and then I would

7    store them in the filing cabinet or where -- you

8    know, that piles up really fast, but you have to

9    keep them.

10             She wanted to keep the records for at least

11   two -- two or three years.

12        Q    Okay.  Were the records also computerized?

13   Were they backed up in a computer?

14        A    Yes.  Yes.

15        Q    Okay.  And when you would run a backup,

16   what would you do with the backup?  Where would that

17   go?

18        A    To Ms. Visram.

19        Q    So she would have had all the backups then?

20        A    No.  I'm not saying that she would have had

21   all of the backups, but when we did backups, it just

22   automatically did it.  We didn't have anything to --

23   you know, like a chip to put in the computer or

24   whatever.  It just automatically backed them up and

25   stored in the computer itself.

1    Q    Okay.  How many rooms -- well, we got

2    the -- what I'm calling the office building, but

3    it's the office, the ballroom, et cetera, that we

4    just discussed, and it did not have any rooms.

5         And then there is the Knights Inn --

6    building which you're calling the Knights Inn

7    building.  How many rooms did that have?

8    A    Well, let's see, I think there was 20 on

9    one side, 20 on another side, 20 up top.  I'd say

10   80.

11   Q    How about the Studio Inn?

12   A    I don't know if they had the same amount or

13   not.  I'm trying to visualize it.  I'm not sure if

14   they had the same amount.  Maybe 60, maybe.  I don't

15   want to tell you something and me not be for sure.

16   I'm just not sure how many rooms were in the Studio

17   Inn.

18   Q    Very good.  And during 2014, what were your

19   average occupancy rates for the Studio Inn?

20   A    We rented them by the week.  The weekly

21   rooms for -- that we rented by the week, and then we

22   did have people, if they didn't have enough money

23   for the Knights Inn, I would let them get a room

24   over there for like $50.

25   Q    What was the occupancy rate over there?

1        A    It was weekly.  We had a lot of weekly

2    things.  So the occupancy was pretty good over

3    there.

4        Q    What was the percentage?  Would you have to

5    look at the records in order to know that?

6        A    No.  I would say probably 20 to 25 tenants

7    over there and -- plus the employees.

8        Q    And during 2014, what were the occupancy

9    rates for the Knights Inn building?

10        A    That was a -- those were really nice rooms.

11    We had upgraded a lot over there so -- let's see.

12    We had the front side, which was always rented.  So

13    that's like 20 rooms.  Probably 30 a week.

14    Sometimes we would have people book the whole hotel.

15        Q    I'm looking for an average, though.  So on

16    average, 30 rooms a week?

17        A    Give or take.

18        Q    Okay.  Fair enough.  During 2013 and 2014

19    before the fire, had you received any complaints

20    from any of the guests about leaks or other problems

21    with any of the rooms?

22        A    No.  We had -- you're talking about prior

23    to the fire?

24        Q    Yes.  Any complaints?

25        A    No.  We did not have any complaints.

Page 53

1        Q    Ever?

2        A    I mean, we had complaints about the

3    customer service or the maids or something like

4    that.  We would have complaints about a sink being

5    stopped up or -- you know, we had several

6    complaints, but I don't ever remember one of it

7    being leaking or smelling or mildew or mold or

8    anything like that.  We pretty much had to stay on

9    top of that.

10           The health department -- I was in good

11    standing with them, and they would -- you know,

12    they'd make me correct it or threaten to shut it

13    down if I didn't correct it.  So we kept all that up

14    to standards.

15        Q    And as I understand it, after the fire

16    occurred, you were the point of contact with a

17    representative hired by Chubb, his name was Brent

18    Parrish.

19           Do you remember that name?

20        A    I do.

21        Q    Do you remember dealing with him?

22        A    Yes, I do.

23        Q    Okay.  And do you recall that as part of

24    the investigation of the claim that Mr. Parrish

25    asked you to prepare a contents inventory of the

Page 54

1    rooms that were damaged as a result of the fire?

2         A   I did the best I could.  That wasn't my

3    expertise, but I did put like lamps, curtains,

4    drapes or, you know, beds, furniture, you know,

5    things like that.

6         Q   Okay.  Do you -- had you heard about or

7    been told by anyone that Ms. Visram was not pleased

8    with the job that you did in connection with the

9    contents inventory?

10        A   No, I have not.  I know that with Brent

11   Parrish -- I wasn't aware that she had said that,

12   but with Brent I couldn't get -- you know, I just

13   couldn't get them to pay off -- he was having to go

14   through people.

15             I needed money to start preparing that

16   hotel.  Getting it back in order.  And I was just on

17   the phone with him constantly until finally

18   Ms. Visram just took it over.

19        Q   Okay.  Well, we'll talk about when

20   Ms. Visram took it over, but let me show you what I

21   have marked first -- I'm a little out of order and I

22   apologize -- as Exhibit 85 for identification.

23             (Defendant's Exhibit 85 was marked

24             for identification.)

25   ///

Page 55

1    BY MR. TAYLOR:

2        Q    And ask if you've ever seen that document

3    before?

4        A    Oh, yeah.  This was a rough to give him

5    some kind of idea of the stuff, you know, like the

6    comforters and the sheets, the curtains, lamp

7    shades, anything that was -- that was going to have

8    to be replaced, contents only, with the smell of

9    fire.

10           I mean, I didn't realize that one room

11   could make the whole thing smell like smoke.  I

12   wasn't aware of that, but that was just -- just to

13   get something started.

14           This probably is not a 100 percent on my

15   job.  I did this after hours and just -- I wasn't

16   going with the furniture.  I was just going with the

17   comforters, the sheets, stuff like that.

18           (Defendant's Exhibit 84 was marked

19           for identification.)

20   BY MR. TAYLOR:

21       Q    Okay.  Let me show you what's been marked

22   as Exhibit 84 for identification.  You can hold onto

23   that because we may refer to it again.

24           And this appears to be --

25           MR. CONCHIN:  Wayne, would you just

1    generally describe what you're -- the exhibit.  I

2    can probably find it here if I know what to look

3    for.

4           MR. TAYLOR:  Defendant's Exhibit 85 that I

5    marked for identification is the contents worksheet

6    that was prepared by Ms. Allen.

7           MR. CONCHIN:  Okay.  Thank you.

8           MR. TAYLOR:  And then the -- what I've

9    marked as Defendant's Exhibit 84 for identification

10   is the e-mail from Brent Parrish to Ms. Allen dated

11   May 13, 2014.

12          MR. CONCHIN:  All right.  Gotcha.

13   BY MR. TAYLOR:

14      Q   Have you had a chance to look at what I've

15   marked as Exhibit 84 for identification, ma'am?

16      A   Yes.  I'm looking at it, and this is

17   something that I gave him just to get the ball

18   rolling.

19      Q   Okay.

20      A   This was nothing to do with the ceiling,

21   the carpet, none of that.

22      Q   Okay.  Well, I just want to ask you if you

23   received this e-mail.  It was addressed to you; is

24   that correct?

25      A   We were doing a lot of talking, Brent

Page 57

1    Parrish and I --

2         Q    Ma'am -- ma'am, I don't mean to be rude.  I

3    need you to answer the question that I've asked.

4              Is that the e-mail that he sent you?

5         A    I'm not sure.

6         Q    Okay.  On the last page there's a contents

7    worksheet, and he says in the e-mail that he gave

8    this to you to work as a specimen; is that right?

9         A    That is correct.

10        Q    And then when we look at Exhibit 85 that

11   we've marked for identification --

12        A    Yes.

13        Q    -- we've got kind of a room-by-room

14   contents inventory based on the form that he sent

15   you; is that right?

16        A    That is correct.

17        Q    And then you prepared this document that's

18   been marked as Exhibit 85 for identification?

19        A    Just to get something started and to show

20   him the contents of how badly everything smelt like

21   smoke.  That's what I gave him.

22        Q    Ma'am, did you prepare this document that's

23   been marked as Exhibit 85?

24        A    Yes, I do.  But it is not an accurate of

25   what we really needed.  I mean, that's not my

Page 58

1    expertise.

2         Q    I understand.  But you prepared this?

3         A    Yes, I did.  Momentarily so we could get

4    something started.

5         Q    And then you sent this back to Mr. Parrish?

6         A    I think I faxed it back to him.

7         Q    Okay.  And is there a cover e-mail that

8    says, "Hey, here it is, but it's not complete."

9              Did you ever tell him that in your e-mail?

10        A    Oh, I'm sure I did.  I'm sure --

11        Q    In an e-mail or in writing?

12        A    On the phone, most likely.

13        Q    Okay.  Did you do it in writing?

14        A    No, I did not.  I mean, not that I

15   remember.  I could have but not that I remember

16   unless you have a cover sheet.  I don't have access

17   to anything there.  You can't --

18        Q    Well, I will tell you, I haven't seen one,

19   that's why I'm asking if you remember doing it in

20   writing.  No?  Okay.

21             Let me show you what's been -- is that a

22   no?  I need a verbal response.

23        A    You got to understand.  You got to be

24   patient with me because you're asking me questions

25   of things that happened a long time ago.

Page 59

1          Q   I understand.  I understand.  But I do need

2     you to answer the questions I'm asking.  So that's

3     part of it.

4               Let me show you what I've marked as

5     Exhibit 83 for identification.

6               (Defendant's Exhibit 83 was marked

7               for identification.)

8     BY MR. TAYLOR:

9          Q   This is a letter dated September 10, 2015

10    from Ms. Visram to Glen Parrish.

11              Have you ever seen this letter before?

12         A   This is pretty much correct except -- I

13    mean, I didn't know she felt that way, but my -- my

14    forms that I filled out, they weren't accurate

15    enough.  It was just momentarily.

16         Q   Okay.  So when you say that this is pretty

17    much accurate.  The second sentence (as read):

18                   "The first list" -- which

19              we've now marked as Exhibit 85 for

20              identification -- "was a partial

21              list that was hastily prepared by my

22              manager at the time, Sheila."

23              So you're saying that's basically correct?

24         A   I don't think it was hastily done.

25         Q   Okay.

Page 60

1        A    It was done after hours on my own time.

2        Q    Then -- on your own time.  Okay.

3             Were you paid on an hourly basis?

4        A    No.

5        Q    Or were you salaried?

6        A    Salary.

7        Q    But the month, by the week?

8        A    By the week.

9        Q    Okay.  And then the next sentence after

10   that, it says (as read):

11                     "I was having problems with

12             Sheila in many areas and found that

13             she did not take the time to do a

14             proper list of our damage contents."

15             Is that statement accurate?

16        A    As far as damaged contents, she's talking

17   about carpet, roofs and stuff like that, you know.

18   I didn't -- I only did the contents, but I never

19   hastily did anything.  I always took my time.  So

20   that part is not correct.

21        Q    So you disagree with Ms. Visram that you

22   hastily prepared the document?

23        A    I didn't hastily prepare it.  I took my

24   time the best I could with the contents.

25        Q    And then said she was having problems with

1      you in many areas?

2           A    I was a good manager.  The best manager

3      that hotel has ever had.

4           Q    So you disagree with Ms. Visram?

5           A    I disagree with her on that.

6           Q    Okay.  And that (as read):

7                          "She did not take the time

8                to do a proper list of our damage

9                contents."

10          A    That depends on what she thought was

11     damaged contents.  I didn't go with walls and

12     ceilings and stuff like that.  I only did the

13     curtains, the bed wear, and shades, you know, for

14     the lamps and stuff like that.

15          Q    And the furniture?

16          A    I didn't do any of the furniture.  I only

17     did like the contents of what was smelling like

18     smoke the most.  I only did that.  So she has a

19     point there.  I didn't -- I mean, I -- this is what

20     I prepared.

21          Q    So you don't know what kind of problems

22     that Ms. Visram was having with you that she's

23     referencing in this letter?

24          A    She didn't have any problems with me.

25          Q    Okay.  Any idea why she would have said

Page 62

1    this then?

2        A    Maybe she thought that I wasn't getting

3    things done fast enough for Brent, but I couldn't if

4    I didn't have any money to get them started with.

5    That would be my only assumption of that.

6        Q    Did you ask Ms. Visram to provide you any

7    money to be able to do some of this stuff?

8        A    Well, the insurance wasn't paying.  So she

9    didn't have it to give me.  Of course I did.

10       Q    Okay.  You did ask her?

11       A    Yes.  And of course we were waiting on the

12   insurance.  I couldn't do anything without any

13   money.

14       Q    Was there any discussion about going to a

15   bank and borrowing the money until the insurance

16   company made payment?

17       A    No.  No.

18       Q    And then the next sentence after that (as

19   read):

20                    "Many of the rooms were

21            smoke damaged as well as water

22            damage and the contents in them were

23            damaged at the same time."

24            Do you agree with that statement?

25       A    On where the fire was at?

 1        Q    Yes.

 2        A    They were smoke damaged most definitely.

 3        Q    And that's what you included on the

 4   contents inventory.  Anything that you could smell

 5   with smoke damage --

 6        A    Yes.

 7        Q    -- you listed it; right?

 8        A    I did.

 9        Q    Okay.  And then the next sentence says (as

10   read):

11                      "Sheila overlooked many of

12             them."

13        Do you agree with that or disagree with

14   that?

15        A    She could be right.  I might have

16   overlooked them, but I was just doing for Brent the

17   contents, you know, like Room 112, what I needed

18   replaced.

19        And I assumed from him it was just the

20   curtains and the comforters and stuff.  We weren't

21   talking about carpet and walls and ceiling tiles.

22        Q    Okay.  When you set those aside, if you

23   take walls and carpet and tile and put that aside,

24   do you feel that you did a complete contents

25   inventory of each of the rooms?

Page 64

1        A    I did.  But that's just the curtains and --

2    understand, that's just the curtains and the drapes

3    and the bed wear, the comforters and so forth.

4        Q    And when you did that, you felt it was

5    complete?

6        A    No.  I knew it wasn't complete.  I knew we

7    wasn't even getting started where we needed to be.

8        Q    No.  I'm talking about what you put down

9    was complete?

10       A    What I put down was just a partial --

11   something to get started where I could get money to

12   start repairing this hotel.  We were losing money

13   because the fire marshal had blocked it off.

14       Q    Ma'am, I think we're like two ships passing

15   in the night.  I'm talking about just contents.

16            MR. CONCHIN:  Hold on now.  Hold on.

17   You've asked her the same question four or five

18   times.

19            MR. TAYLOR:  I know.

20            MR. CONCHIN:  Just let her answer.

21            MR. TAYLOR:  Thank you.  And she is

22   answering.

23            MR. CONCHIN:  Don't cut her off.  Let her

24   finish her answer.

25            MR. TAYLOR:  I didn't cut her off.

Page 65

1          MR. CONCHIN:  You just did.

2          MR. TAYLOR:  I did not, Gary.  She had

3     stopped.

4     BY MR. TAYLOR:

5          Q   I'm talking about just the contents.  I'm

6     not talking about the walls.  I'm not talking about

7     the carpet.  I'm not talking about tile.

8          A   We're just talking about --

9          Q   About the contents.

10         A   The sheets and the comforters is pretty

11    much what -- what I've covered on here and lamp

12    shades.

13         Q   And curtains?

14         A   And drapes.

15         Q   Okay.

16         A   Yeah.  And that was to Brent, and that was

17    to get us started.  We had to start somewhere.  I

18    was losing money.

19         Q   And you included mattresses if they were

20    damaged; right?

21         A   I did not include the mattresses.

22         Q   If you look at the second page of what

23    we've we marked as --

24         A   I mean, if they're not on every page,

25    pretty much all of them were the same thing.  If

1    they're not, then that means that that mattress

2    was --

3         Q   So if you listed a mattress in one room,

4    that meant it was damaged; right?

5         A   Yes.

6         Q   And if another room does not have the

7    mattress listed, did that mean, in your estimation,

8    it was not damaged?

9         A   That's what I would assume.  I wouldn't

10   just overlook it.

11        Q   Okay.  And you also would have included

12   dressers and TV stands and tables?

13        A   It did not -- I did not do any of that.

14        Q   Well, if you look at the fourth page,

15   ma'am.  Room 169, you list the dresser.

16        A   169 was very adjacent to the room that the

17   fire was at.

18        Q   I understand, but you listed the dresser on

19   there, didn't you?

20        A   Whatever I listed on here is what I thought

21   at the time was damaged.

22        Q   Right.  So you would -- so if you thought

23   that furniture was damaged, you listed it; right?

24   Dresser --

25        A   If I thought it was.  The reason the

Page 67

```
 1      dresser is on this one, it was right adjacent to the
 2      room on the back, you know, where the fire was at.
 3      So there would have had to be a reason that I put
 4      that there.
 5           Q    So you did put down furniture if you
 6      thought it was damaged?
 7           A    I did, but then -- I'm not an expertise in
 8      that.  I'm just going by what I needed to get
 9      repaired the fastest and the quickest.
10           Q    I understand.  But the point is -- and you
11      did the best that you could?
12           A    Yes, I did, with what I had to work with.
13           Q    Right.  And you went in there and you went
14      into a room, and if you felt it was damaged, you
15      would put it down.
16                And I'm not talking about the carpet or the
17      tile or the walls, I'm just talking about contents
18      items.  If you thought it was damaged, you put it
19      down; right?
20           A    Yes.
21           Q    Okay.  That would include furniture if you
22      thought it was damaged, because there are some rooms
23      here where you listed furniture; right?
24           A    Yes.  You got to understand, this is from a
25      long time ago.  So...
```

Page 68

1          Q    I understand.

2               Are you okay?  We've been going for a

3     little bit over an hour.  Would you like to take a

4     break?

5          A    Can I have an orange juice?

6          Q    Absolutely.  Why don't we take a

7     five-minute break.

8          A    Okay.  That would be great.

9               THE VIDEOGRAPHER:  We're going off the

10    record.  This is the end of media unit two.  The

11    time is 10:18 a.m.

12               (Recess.)

13               THE VIDEOGRAPHER:  We're going back on the

14    record.  This is the beginning of media unit three.

15    The time is 10:29 a.m.

16    BY MR. TAYLOR:

17          Q    All right.  Ms. Allen, when repairs needed

18    to be made, you know, if there was an issue with a

19    leak or whatever, would that have to go through you

20    or would that just go to Mr. Bukhari who then would

21    deal with Ms. Visram?

22          A    Both.

23          Q    Okay.  Did you yourself ever make periodic

24    repairs?

25          A    Yes.

Page 69

1        Q    Excuse me.  I said that wrong.

2             But you did make periodic repairs yourself?

3        A    Yes.

4        Q    What kind of repairs would you perform?

5        A    If we had some -- just say the maintenance

6   in the grounds, you know, that needed to be redone.

7   Just -- I mean, I know this sounds silly, but like

8   to save on money and make things look better -- my

9   father used to take me out into the woods with a

10  wheelbarrow and get pine straw.

11            So we would go and get pine straw, come

12  back and do the flower beds and upgrade them and

13  make them look so much better.  Just that little --

14       Q    So you might do some landscaping or

15  whatever on your own?

16       A    Yes.  Yes.  And pressure washing.  I mean,

17  I know how to do all that.  I was raised with four

18  brothers.  I knew how to pressure wash the sidewalk

19  and just do things that when they were really,

20  really busy.  Like it would be periodically cleaning

21  the windows the maids were to keep them clean

22  inside.  The maintenance was to keep them

23  clean outside.

24       Q    And you would do that, or you would do the

25  inspection just to make --

Page 70

```
 1         A    I would help.
 2         Q    Okay.  You would help.
 3              So would you actually make any repairs of
 4    any damage?
 5         A    You know, I did so much there.  That's a
 6    good question.  I think I would always put KW or
 7    Yasif on it.  Yasif was really good.
 8         Q    Would you -- how frequently would you
 9    perform an inspection like walk the grounds to --
10         A    Absolutely.
11         Q    How often?
12         A    Every week.
13         Q    Once a week?
14         A    Once a week.
15         Q    Okay.  Would that include going up on the
16    roofs to check those, or did you just walk the
17    grounds?
18         A    No.  I'm scared of heights.  So I didn't go
19    up on the roof.
20         Q    This once-a-week inspection that you did,
21    was it just walking the grounds, or did you actually
22    go inside rooms?
23         A    Go inside rooms.  We have to to make
24    sure -- you know, check up under the beds, make sure
25    the -- make sure that we don't have leaks.  Make
```

Page 71

1    sure that there's nothing up under the bed.

2             If they come in there, the health

3    department, with a white glove and you got dust on

4    the headboards, you're going to get wrote up.  So I

5    made sure all of those things were good.  No bad.  I

6    even -- I take that back.

7             I did do some repairs as far as the

8    bathtubs.  If we had a bathtub that was maybe

9    showing a little age, I knew how to repair those

10   myself.  My brother taught me because he was

11   maintenance at another hotel.

12        Q    When you would do your weekly inspections,

13   would you go into every single room of the hotel?

14        A    I would pick about 10 rooms or 15 to go in.

15        Q    So you'd do a spot check?

16        A    Pretty much.  But it still got done, but

17   the housekeepers would report to me.  I had a list

18   that I drew up a spreadsheet for that they were to

19   write down everything that they done.

20             And I had -- behind that sheet I had a

21   maintenance report of anything that they found that

22   needed maintenance that they would turn that in with

23   their report, and therefore I would turn it in to KW

24   and Yasif.

25        Q    And in the entire three or so years that

Page 72

1    you were -- or approximately three years that you

2    were with the Knights Inn, had there ever been the

3    report -- or had there ever been a roof leak, even a

4    small leak?  Had there ever been one?

5         A    I never recall a leak.

6         Q    Okay.  So are you saying it didn't happen

7    or you just don't recall it?

8         A    Both.  I don't recall it, and I'm sure that

9    if it had happened, I would be notified and we would

10   repair it.

11        Seems like one time I mentioned -- Yasif

12   mentioned something to me, it was just one small

13   area and we replaced a ceiling tile with it.

14        Q    Okay.  And that's all you can remember as

15   you sit here today?

16        A    Yes.  As far as the roof leaking?

17        Q    Yeah.

18        A    Yes.

19        Q    So other than that one ceiling tile that

20   had to be replaced, you don't recall during your

21   entire time whether there were any prior roof leaks?

22        A    Yasif took care of all that, but if there

23   were roof leaks, I would have been notified of it,

24   and I would have went to Ms. Visram with it.

25        Q    Okay.

1        MR. CONCHIN:  What was the question?  Was

2   it before the fire, before the wind?  What was the

3   time frame?

4        MR. TAYLOR:  The entire time she was there.

5        MR. CONCHIN:  Oh, okay.  I think she may

6   have misunderstood.

7        MR. TAYLOR:  Well, that was my question,

8   Gary.

9        MR. CONCHIN:  Yeah.  Thanks.

10  BY MR. TAYLOR:

11     Q   Was there any outside service that the

12  Knights Inn would hire -- and when I say "Knights

13  Inn," I mean the whole thing, not just the one

14  building.

15       I know you refer to the two buildings

16  differently, but when I say it, unless I'm referring

17  to the building itself, which I just mean the whole

18  complex.  All three buildings.

19     A   Okay.

20     Q   Did the Knights Inn ever bring in an

21  outside company during your entire time as a manager

22  to conduct inspections?

23       Let's do this.  Before the fire occurred,

24  did you ever -- was a third -- an outside

25  third-party service ever brought in?

1      A    Absolutely.  I don't know their names, but

2   this man and woman came out and done a thorough

3   inspection before the fire.

4      Q    You don't remember their name?

5      A    It was a man and a woman.  I want to say

6   they were a team.  Maybe a husband and wife.  I'm

7   not sure.

8      Q    Before the fire?

9      A    Before the fire.  They came out and done a

10  complete inspection because it was time for our

11  insurance and stuff to be renewed.

12     Q    A man and woman who were husband and wife?

13     A    I'm assuming they were husband and wife.

14  They acted like it.  Or they were very close

15  colleagues.

16     Q    Okay.  Do you recall who sent them?

17     A    Chubb Insurance.

18     Q    You think Chubb sent them?

19     A    Or whoever we had our insurance with.

20     Q    Maybe the insurance agent?

21     A    All I know is they came and did an

22  inspection, and they don't ever let you know.  They

23  just catch you off guard, but we passed with flying

24  colors, because I kept that hotel up better than --

25  better than most people would have took the time and

1    effort to put in it as I did.

2         Q    And you don't remember their names?

3         A    If I tried to remember every contractor and

4    every person's name that came in and out, I would

5    have to keep a book, but no, I do not -- I just

6    remember it was a man and a woman.

7         Q    And you're not positive of who actually

8    sent them?

9         A    Whoever we had our insurance company --

10   whoever we had our insurance with because we had to

11   pass inspection so that they would renew our

12   insurance.

13        Q    Okay.  Well, let me ask it this way.

14             Was it somebody that Chubb, who was the

15   insurer, sent?  Was it somebody that the agent sent?

16   Was it some third party that came out?  Do you know

17   any of that?

18        A    I would say it was Chubb who we had our

19   insurance with.

20        Q    Okay.  So you think it was Chubb that sent

21   them out?

22        A    Yes.

23        Q    But you don't remember their names?

24        A    No.

25        Q    Do you remember where they came from?

Page 76

1     A   The insurance company.

2     Q   No.  No.  Where they came from

3 geographically.

4     A   From whoever our insurance agent was is who

5 sent them because our insurance was due and we had

6 to pass inspection before we could get the

7 insurance.

8     Q   Ma'am, we're --

9     A   Well, you're trying to put words in my

10 mouth.  I feel like --

11     Q   No, I'm not.  When I say do you know where

12 they came from, I meant like whether they come

13 Birmingham.  Did they come from Montgomery, do you

14 know?

15     A   Their mother's womb.

16     Q   Do you know where they came from?

17     A   I'm going stick with I think they came from

18 whoever we had our insurance with.  It had to be

19 with Chubb Insurance because -- Wayne, let me

20 finish.

21     Because in order to have the insurance for

22 the hotel, you have to pass an inspection.

23     Q   Okay.  That's fair.  My question, though,

24 is do you know where they came from, i.e., did they

25 come from Atlanta?  Did they come from Birmingham?

Page 77

```
 1     Did they come from Montgomery?  Where were they
 2     from, not who sent them?
 3          A    Specifically, since you've narrowed it down
 4     where understand it, I do not know, and they did not
 5     tell me.
 6          Q    Okay.
 7          A    They just were there for an inspection so
 8     that we could review our insurance.
 9          Q    How long -- when -- approximately when was
10     this?
11          A    Maybe in February before the fire.
12          Q    So about a month before the fire?
13          A    Yes.
14          Q    So that would have been February of 2014
15     you think they might have come out?
16          A    I'm assuming, give or take a month, you
17     know, but it was before the fire.
18          Q    Okay.  Any other inspections by some
19     outside third party of the hotel from the time you
20     were hired on as the general manager up until the
21     time of the fire?
22          A    What kind of inspections?
23          Q    Any kind of inspection of the buildings,
24     the interiors?
25          A    The fire marshal, Michael Brannon, and he
```

Page 78

1    gave me a list of things to do, and he will verify

2    with you every two weeks he would come back and

3    every two weeks I would have it taken care of.

4    After I left, I do not know what happened.

5         Q    Let me show you what has been marked as

6    Exhibit 86 for identification.

7              (Defendant's Exhibit 86 was marked

8              for identification.)

9    BY MR. TAYLOR:

10        Q    And this is a letter dated August 9, 2013

11   to the Knights Inn from the City of Bessemer Fire

12   Department, Chief Michael --

13        A    Brannon.

14        Q    -- Brannon.

15             Do you recall seeing this letter before?

16             Actually, I want to point out, on the front

17   page it does say "Attention Sheila."

18        A    This is a follow-up letter when he first

19   came out and told me the things that needed done,

20   and I asked him could he work with me on giving me a

21   list and let me have it done in two weeks.

22             So this is a follow-up.  This is what he

23   had -- this is specifically what he asked me to do.

24   I had to get new fire extinguishers in locked -- in

25   a glass container.

1           There was -- whatever's in here is what he

2      asked me to do.  As a follow-up letter, he sent this

3      to me to see if I was going to work with him and do

4      it.

5           When he came back out, I had everything

6      done, and then he gave me another list.  And that's

7      how I worked with him.

8           Q   Okay.  So you did receive this letter?

9           A   Yes.  I did receive this letter as a

10     follow-up to our agreement.

11          Q   And he listed 11 things that needed to be

12     taken care of in this letter?

13          A   Over a period of time.  Over a period of

14     time.  Every two weeks he would come back out and

15     every two weeks I would have it -- what he put on

16     the list.

17          Q   This letter, though, had 11 items in it; is

18     that right?

19          A   I remember doing the fire extinguishers

20     first.  I remember doing that first.

21          Q   What about the electrical?  Was that taken

22     care of?

23          A   Outlets and switches are missing.  Yes,

24     that was taken care of.

25          Q   Okay.  And there were three items on there

Page 80

```
 1     under "Electrical" that needed to be taken care of.
 2     And that got taken care of right away?
 3          A    Yasif took care of that.
 4          Q    Okay.  But you made sure it got done?
 5          A    I made sure it got done.  Because he made
 6     it quite clear, if I didn't get it done, he'd shut
 7     me down.
 8          Q    Okay.  And then the next item is under
 9     "Egress," there were two items.  Were both of those
10     taken care of right away?
11          A    Where are you looking at?
12          Q    The second page.
13          A    Okay.  Yes.  Yes.  I bought all new exit
14     lights and put those up.
15          Q    So that was all done right away?
16          A    Yeah.  Because I remember how expensive
17     they were.  Every two weeks -- mind you, now, keep
18     that in mind -- he would give me things to do.  I
19     did the fire extinguishers.  He'd come back two more
20     weeks, did the exit lights.  Come back in two more
21     weeks, he would have another list.  And we were up
22     to standards with him.
23               He was completely satisfied with the
24     working relationship that we had because I did what
25     he asked me to do.
```

Page 81

1      Q    Okay.  Let's go back to the first page and

2    review.  So we got -- you had to buy some new fire

3    extinguishers; right?

4      A    Yeah.

5      Q    And then you -- they needed to be

6    unobstructed.  In other words, access that was

7    unobstructed; right?  That was Item No. 2 on this

8    letter; right?

9      A    Yes.  We had to put them in a glass case

10   with a key.

11     Q    Okay.  And there had to be signs marking

12   where they were located?

13     A    Yes.

14     Q    And you took care of that?

15     A    Yes.

16     Q    And then he indicated where they could be

17   located on --

18     A    Well, they had to be a maximum distance.

19     Q    Right.  And you made sure that no fire

20   extinguisher was more than 75 feet from the next

21   one; is that right?

22     A    Yasif took care of that, but I made sure he

23   understood that the fire marshal's request was very

24   stern.

25     Q    Very good.  And then under "Electrical" it

Page 82

```
 1    says the second floor storage room has improper
 2    wiring.
 3              That was taken care of?
 4        A    Yasif took care of that, and I'm sure
 5    Mr. Brannon checked it when he came back because I
 6    remember him -- I just remember him saying a remark
 7    about the electrical.
 8        Q    And then outlets and switches are missing
 9    covers in different areas.
10              You took care of that?
11        A    Yes.
12        Q    And then the breaker panels and several of
13    the rooms have gaps or improper covers.
14              Was that taken care of?
15        A    That would have been something that Yasif
16    would have taken care of, but if it wasn't taken
17    care of, when Mr. Brannon came back in two weeks, he
18    would have let me know, and I would have made sure
19    myself specifically that it got done.
20              But Yasif was very, very good.  He was very
21    dedicated to helping me keep everything up.
22              And then, like I said, he wanted new exit
23    lights.  Some or our exits lights weren't working.
24    They were exit lights but they weren't on.
25        Q    Like the emergency lights?
```

Page 83

```
 1        A    Yes.

 2        Q    Okay.  That's under "Egress"; right?

 3        A    Yes.

 4        Q    That's the first item that we're talking

 5   about?

 6        A    Yes.  And I did get those fixed.

 7        Q    Okay.  And then the second item under

 8   "Egress," (as read):

 9                    "Improper locking devices

10            in the exit doors in the banquet

11            area and the rear area of the

12            lobby."

13        Do you see that under Item 2?

14        A    I'm looking.  I don't remember doing that.

15   Unless Yasif took care of it where the lounge was

16   and the banquet room to do with the locks.  I

17   wouldn't -- I don't remember specifically him giving

18   me something of that to do.

19        Q    And then, finally, we've got three items

20   under "Storage."

21            Were all of those taken care of?

22        A    Yes.  We even had to move the lawn mowers

23   and everything outside.

24        Q    Because they were kept in the office and in

25   the lobby?
```

Page 84

1          A    In the lounge that we use -- I told you we

2     used that as a storage room.  He did not want them

3     inside.  So we put them outside in a storage

4     building that we cleaned out and had -- we kept --

5     started keeping all that in there.

6          Q    Okay.

7          A    But the reason we kept it stored, we just

8     didn't want to leave it out, you know, for theft

9     purposes.

10          Q    And then there was a -- also there's a

11     portable propane tank that he saw that had to be

12     taken outside.  That went into that same storage

13     area?

14          A    Yes.

15          Q    And then he just generally says (as read):

16                    "The storage of other

17          materials throughout the property is

18          improper."

19          Under Item 3.  That was all corrected?

20          A    Yes.  He made sure.  It was a room he found

21     that -- it wasn't my room of storage, it was Ms. V's

22     because she like to keep all her records and stuff

23     like that in it, but I had to tell her we had to do

24     away with that.  And so we cleaned it out and he

25     reinspected that.

1      Q   Okay.  Other than the fire department

2   coming out and the man and woman that you think were

3   from the insurance company that came out --

4      A   No.  I know they were from the insurance

5   company.

6      Q   Okay.  The man and woman that were from the

7   insurance company and then the fire department

8   coming out, did Haman hire anyone to come out?  And

9   when I say "Haman," that's the Knights Inn,

10   Ms. Visram.

11         Did Knights Inn hire anyone to come out and

12   conduct any inspections of the property?

13      A   After the fire or before the fire?

14      Q   Before the fire.

15      A   No.  We would have no reason to do that.

16   The fire marshal was pretty much in charge.

17      Q   Okay.  So you don't recall that -- Knights

18   Inn ever hiring anyone?

19      A   I know that it didn't happen because I was

20   there 24/7, and the fire marshal is the first one

21   that I started working with.  He's the one that gave

22   me the list of everything that I needed to do.

23      Q   Before the fire, were you aware of any

24   other insurance claims that had ever been submitted

25   in connection with damage to the property?

Page 86

```
 1        A    No, sir.
 2        Q    Did Mr. Parker report to you or did he
 3   report to Mr. Bukhari?
 4        A    Both.
 5        Q    So if you became aware of something, rather
 6   than having Mr. Bukhari handle it, you would just go
 7   directly to Mr. Parker?
 8        A    Yes.
 9        Q    Did Mr. Parker perform regular inspections
10   to make sure that everything was in order, or did he
11   just respond to maintenance calls?
12        A    No.  He done his own inspections to make
13   sure everything was going like it should be or any
14   new problems that we had or whatever.
15        Q    Do you know where Mr. Parker is now?
16        A    I have no clue.
17        Q    Do you know where he came from?
18        A    I have -- that, I don't know.
19        Q    How long after you became the general
20   manager did you hire Mr. Parker?
21        A    It wasn't very long because the maintenance
22   person that we had wasn't working out for me.  So I
23   was doing interviews for maintenance, and he
24   responded.
25             And most of the employees that I would
```

Page 87

```
 1     hire -- I didn't have a whole lot of money to do
 2     advertising -- was they would walk through the door,
 3     and I would get them to fill out a résumé and then I
 4     would talk with them, and I would either hire them
 5     or not.
 6          And he was -- he responded to something, a
 7     flyer, maybe, I put out or something, because with
 8     our marketing, we would do flyers, and I believe he
 9     responded to one of those and his qualifications
10     were good.
11          Q   Okay.  And then Mr. Parker was still there
12     by the time you had left?
13          A   Yes.
14          Q   When I say "left," I meant left employment
15     of the Knights Inn; is that right?
16          A   Yes.
17          Q   Whenever there was any kind of maintenance
18     work to be performed or any repairs that needed to
19     be performed, would there be any paperwork that was
20     generated to document it?
21          A   Yes.  Well, like I told you, on the back of
22     the sheet of the housekeepers, they would -- if they
23     found anything wrong with maintenance, they would
24     attach it to the back of their housekeeping sheet
25     which was turned into me.
```

Page 88

1            I therefore turned it into maintenance.

2      Maintenance repaired it.  Told me what all they did

3      and turned it back into me, and I kept them in a

4      file.

5            Q   And then once it got too full in the office

6      in the file cabinet, those would be put into boxes

7      and moved to the Studio Inn?

8                 THE VIDEOGRAPHER:  Counsel.

9                 THE DEPONENT:  No.

10                MR. TAYLOR:  Gary, I don't know -- well,

11     let's -- both of you have lost the audio.  Okay.

12     They both lost because I just got a text also

13     from --

14                THE VIDEOGRAPHER:  Maybe we can go off the

15     record.

16                MR. TAYLOR:  Yeah.  Let's go off the

17     record.

18                THE VIDEOGRAPHER:  We're going off the

19     record.  This is the end of media unit three.  The

20     time is 10:52 a.m.

21                (Recess.)

22                THE VIDEOGRAPHER:  We're going back on the

23     record.  This is the beginning of media unit four.

24     The time is 11:00 a.m.

25                ///

1    BY MR. TAYLOR:

2        Q   Ms. Allen, during your time as the general

3    manager at the Knights Inn, were you aware of any

4    repairs that were made to the roofs during your

5    tenure, even patch repairs?

6        A   My understanding, it was a new roof.  I

7    shouldn't have had any problems with it, or it

8    wasn't that old.

9        Q   Okay.  So you're not aware of any prior

10   repairs?

11       A   I'm not aware of any prior repairs done to

12   the roof.  I just overheard Ms. V. talking to

13   somebody once, you know, that the roof wasn't

14   that -- that the roof wasn't that old.  It wasn't

15   out of warranty or something.

16           You know, I'm not really sure.  Like I

17   said, I'm scared of heights.  I didn't keep up with

18   the roof.  Yasif was doing all of that.  Unless

19   there was a leak internally, then I would let him

20   know, and he would take it from there.

21       Q   Were you working on the day that the fire

22   occurred, which I believe was March 22nd, 2014?

23       A   Yes.

24       Q   Okay.  Where were you?

25       A   I was at Mrs. Visram's house.  I was -- she

Page 90

1      doesn't drive, and I was to take her to Atlanta.

2      That was part of my job was to take her to doctor's

3      appointments and drive her where she needed to go.

4              So I was to take her to Atlanta, Georgia

5      the next morning.

6          Q    Had you all left to go to Atlanta --

7          A    No.

8          Q    Let me finish my question before you

9      answer.

10             Had you left for Atlanta by the time you

11     learned about the fire?

12         A    No.

13         Q    Okay.  I take it, then, you did not drive

14     to Atlanta?

15         A    No.

16         Q    What did you as soon as you were notified

17     about the fire?

18         A    I came straight back to the hotel and

19     started, you know, getting everybody out of the way,

20     making sure everybody was safe and watching them put

21     the fire out, pretty much.

22         Q    What time of day was it that you were

23     called about the fire?

24         A    It was at nighttime, actually.

25         Q    Had you already gone to bed?

Page 91

```
 1        A    I'm going to say anywhere between 10:00 and
 2     12:00, maybe.
 3        Q    In the evening?
 4        A    At nighttime, p.m.
 5        Q    And you were supposed to be leaving for
 6     Atlanta the following morning?
 7             That's a "yes"?
 8        A    Yes.  Yes, sir.
 9        Q    Got it.  Thank you.
10             Do you know what time the fire actually
11     occurred?
12        A    Again, I think between 10:00 and midnight.
13     Let's just go with 9:30.
14        Q    So you think you were called that quickly
15     after it occurred?
16        A    Yes.  I mean, they were calling me, telling
17     me what happened.  That was their job.
18        Q    Who called you?
19        A    Whoever was working the front desk would
20     have been the person to call me because they would
21     have been the person that saw everything going on
22     with the fire trucks and everything, and I don't
23     remember who was working that night or who called
24     me.
25        Q    Okay.  Who called the fire department?
```

1         A    I don't know that either.  I never even
2    knew -- I never even knew how the fire got started.
3    Nobody ever even gave me an answer to how the fire
4    got started.
5         Q    That was my next question.
6              What caused the fire?
7         A    I don't know.
8         Q    Okay.
9         A    Michael's thing was he thought maybe it was
10   just a homeless person or somebody that had
11   vandalized a room or whatever.  That was his theory.
12        Q    Michael?
13        A    Brannon.  Squatters.  I never heard that
14   word before, but that's what he called them.
15        Q    Did you have squatters?
16        A    No.  That's why I didn't know what it was
17   when he mentioned that to me.
18        Q    Do you know what a squatter is now?
19        A    Yes.  We -- we had security at the hotel.
20   My son did security there.  He's 6, 3 and 240
21   pounds, and he was good friends with all the police
22   officers there.  They wanted him to become a police
23   officer.
24             But he did -- at nighttime we had security.
25   Pretty much we could take care of it during the day,

Page 93

1    but he did security there.
2        Q    Which son was it that security?
3        A    The one that's 30 years old.  He was
4    younger then.  He did security.  And turned in a
5    report every night.  If he went by a room, for
6    example -- he made sure that there were no
7    suspicious people on the property, but if he went by
8    a room that was on a list that he had to go by and
9    the lights were on and the curtains were pulled when
10   they're not supposed to be.
11           See, all the rooms that aren't rented, the
12   curtains stay open.  So if he went by a room, he
13   would knock on the door and ask for their receipt.
14   So then you got a front desk person giving a friend
15   a night.
16           He would bring them down.  We would call
17   the police and take it from there.  So he did -- he
18   did a good job doing security.
19       Q    And that was Rickey?
20       A    Yes.
21       Q    Did you conduct -- so when you got the
22   call, did you immediately drive back?
23       A    Yes.  Right then.
24       Q    And did you -- I guess the following
25   morning, did you walk all of the units of the

Page 94

1    building where the fire occurred to take a look at

2    the damage?

3        A    I went in the room itself, as far as -- you

4    know, I didn't know the severity of the damage.  So

5    I didn't do that myself.  I told Ms. V., you know,

6    and I talked to Michael Brannon, but I honestly had

7    never been in a situation like that, and I didn't

8    know what the hazardous of it was to do that.

9            So I let Ms. V. know and that's when she

10   sent the insurance adjuster out there, and that's

11   where we started with, I think, Brent Parrish.

12       Q    In what room did the fire start?

13       A    It was middle ways of the back side of the

14   hotel.  You know, that's been so long ago.  I can't

15   give you on accurate number of the room because it

16   was on the back side, and I didn't -- I mean, if you

17   gave me numbers to pick from, I'm sure I can tell

18   you, but at this point, no, I don't know the number

19   of the room.  It's been a long time ago.

20       Q    Okay.  I know you couldn't remember how

21   many rooms -- this was to the Studio Inn building;

22   right?

23       A    Yes.

24       Q    And I know you don't remember exactly how

25   many rooms the Studio Inn building had, but did you

Page 95

1       go ultimately into every room in the Studio Inn any

2       time after the fire to determine whether it was

3       damaged by fire?

4           A    I did what Brent Parrish asked me to do.

5       That's when I went in and -- the contents and made

6       up the spreadsheet that he sent me, and I did what

7       he had asked me to do.

8           Q    Did you go into every single room --

9           A    Every single room.

10          Q    -- in the Studio Inn?

11          A    Every single room.

12          Q    So you went into every single room of the

13      Studio Inn in order to prepare the contents

14      inventory that we have marked as Exhibit 85 for

15      identification?

16          A    As to the rooms that I thought were

17      damaged.

18          Q    Okay.

19          A    I mean, I didn't know it was going to

20      affect every room over there.  I thought, you know,

21      that just maybe the rooms next to it and the room,

22      you know, upstairs and downstairs, but I had no clue

23      that smoke could travel like that and do that much

24      damage.

25          Q    Who told you that that happened?

Page 96

1    A    The -- when I sent Brent back that, then

2    Ms. V. took it over and she had someone else come

3    out there.

4        Q    Do you recall who that was?

5        A    Well, it was still with our -- I guess our

6    insurance company.  The insurance company that we

7    were using is the one that said that we had smoke

8    damage.  I had just done the contents.  He said --

9    he's the one that said that we had -- and it was a

10   he -- that we had smoke damage in the majority of

11   the hotel.

12       Q    Okay.  Do you remember this person's name?

13       A    It was with the insurance company that we

14   had.

15       Q    Do you remember his name?

16       A    All I know is my conversations was with

17   Brent Parrish.  So whoever he sent out there, if not

18   himself.  He might have been the one that came out

19   there.  I'm not sure.

20       Q    Okay.  And they're the ones that told you

21   that smoke had damaged most or all of the rooms in

22   the building?

23       A    That, quote, "There's a lot of smoke

24   damage."

25       Q    Okay.  Can you describe this person for me?

1         A    Tall, maybe skinny, brownish/black hair.

2         Q    When you say "tall," how tall are we

3    talking about?  I mean, your son Rickey, you said,

4    was six foot three?

5         A    Yeah.  He wasn't -- wasn't quite that.

6         Q    So was he six foot three?  Was he --

7         A    Maybe he's six foot one.

8         Q    So shorter than your son.  Do you remember

9    where he came from geographically?

10             Did he come from Atlanta, Birmingham?  Did

11   he come from Nashville, Tennessee; do you know?

12        A    He come from the headquarters of Chubb

13   Insurance adjuster.

14        Q    Do you know where that is?  Are you

15   guessing or do you know?

16        A    No.  It was in -- it was -- it was close

17   enough we kept in touch with each other on a

18   daily -- pretty much on a daily basis, Brent and I.

19        Q    I'm not talking about Brent.  I'm talking

20   about the person you talked to out there that told

21   you about the smoke damage.  Where did he come from?

22        A    Well, it's not, Mr. Taylor walked up and

23   said I'm so-and-so.  I'm from this address or

24   whatever.  They just say, you know, "I'm here to" --

25   you know, I'm -- their name, and "I'm here to do an

1  estimate on your fire damage."

2      Q   Was it one of the people that was hired to

3  do an estimate?

4      A   It wasn't from us.  It was from the

5  insurance company that we had.  I wouldn't just get

6  somebody to come out there and give an estimate.

7          My job was to report it to the insurance

8  company, to Ms. V., and then the insurance company,

9  and let them take it from there.

10     Q   Did this person give you a business card?

11     A   I'm sure he probably did.

12     Q   What would you have done -- when people

13  come out to do an inspection, they give you a

14  business card, what would you do with them?

15     A   I would keep them on my desk in a little

16  card thing that I had, but I was one on one with

17  Brent.  So it possibly was maybe somebody he sent.

18     Q   Okay.

19     A   If not him himself, but I don't ever

20  remember meeting him in person.  I just remember

21  talking with him and you saw the fax going back and

22  forth.

23     Q   Did you ever meet with a man -- have you

24  ever heard of a company called Forensic Building

25  Science?  Is that a yes or a no?  I need you a

Page 99

1    verbal response.  I'm sorry.

2        A    I'm concentrating.  I'm thinking -- you got

3    me -- Forensic Files is one of my favorite movies.

4    You got me thrown off a minute.

5             No.  Nobody ever talked to me from that

6    business.

7        Q    How about The Howard Group?

8        A    No.

9        Q    How about Young & Associates?

10       A    No.

11       Q    How about Belfor?

12       A    Belfor?  No.  I mean, Mrs. Visram took it

13   over after Brent and I -- we couldn't -- we couldn't

14   get on the same page, you know.  I needed money, and

15   he wasn't doing it fast enough for me.

16            My hotel was going under, and then it got

17   shut down which caused me a lot of money damage.  I

18   had to let some -- a lot of revenue, you know -- and

19   I remember having to let employees go that I didn't

20   want to let go, but I have not talked with anyone

21   after Ms. Visram took it over.

22       Q    Was the hotel still operating when you left

23   the employ of Knights Inn?

24       A    Oh, absolutely.

25       Q    So it's still going on.  It hadn't been

Page 100

1    shut down by anybody?

2         A    No.  Just -- I mean, the Studio Inn had

3    been shut down.

4         Q    Right.  Because of the fire?

5         A    But my hands were tied.  I could not get

6    any money.  I could not get any money to fix

7    anything with.

8         Q    But the Knights Inn building was still

9    operational?

10        A    The Knights Inn building was still

11   operational.

12        Q    Okay.  And you left in February or --

13   excuse me, April 2015?

14        A    Yes.

15        Q    So at least through April 2015, the Knights

16   Inn building was still operational?

17        A    Everything was -- everything was --

18   everything was operational.  I do remember telling

19   Yasif before -- I do remember telling Yasif before I

20   left that I had a leak in the office right up over

21   where my computer was at.

22             And that was very dangerous because it if

23   let -- if it shorted out my system, then I would

24   have been in a lot of trouble with losing all the

25   records and everything.  And maybe that's the time

1      he replaced the ceiling tile.

2          Q   Okay.  How long was that before you left in

3      April 2015 that this occurred?

4          A   This happened in -- it happened the week I

5      left.

6          Q   Okay.  So right before you left, there was

7      a leak in your office?

8          A   In the lobby.  In the lobby.

9          Q   Okay.  Is that the first report of a leak

10     in that building was the week that you left?

11         A   That's the first report that I made.

12         Q   Are you aware of any other leaks in that

13     building before you left?

14         A   No.  Honestly, Mr. Taylor -- and I don't

15     like bring it up again -- my thoughts were, you

16     know, getting home to any family, and I had to

17     leave.  And I loved my job.  I had to leave.

18         Q   I understand.

19             Have you ever dealt with or met a person --

20     well, let me ask it this way.  Have you heard the

21     name Arthur Grandinetti?

22         A   No.

23         Q   Have you met Arthur Grandinetti?

24         A   No.

25         Q   Have you heard the name Sarah Grandinetti?

Page 102

1          A    No.  I mean, Sarah comes up but --

2          Q    I take it that means you never met Sarah

3     Grandinetti?

4          A    Seems like I saw Sarah --

5          Q    There was the same Sarah in one of the

6     letters, but other than that --

7          A    No.  Those two -- those last names would

8     have stuck with me --

9          Q    Okay.

10         A    -- as being like an Italian name or

11    something.

12         Q    So you don't recall ever meeting somebody

13    with --

14         A    I do not recall anybody with that last

15    name.

16         Q    Do you ever recall meeting them?

17         A    Maybe that was the man and woman that came

18    out.  Maybe that was their -- maybe they didn't give

19    me their last name.

20         Q    Okay.  Do you remember their first names,

21    the two that you said came out from the insurance

22    company?

23         A    I'm sorry.  It's just been a long time.

24    I'm not good with names that long ago.  I just know

25    that everybody was like, oh, "They're here for

Page 103

1      inspection."  I said, "And I'm not worry because I
2      kept the hotel up to standards."
3          Q    Gotcha.
4               What let me ask you a little bit about the
5      Knights Inn.  Had there been any reports of leaks in
6      the Knights Inn building up to the time that you
7      left in April 2015?
8          A    I reported the leak in the -- I reported
9      the leak in the lobby.  Of course I can't have a
10     leak in the lobby.  And that was within -- within
11     the two weeks that I was getting ready to leave.  I
12     already knew that I was ready to leave.  I just
13     couldn't take it there anymore due to the tragedy in
14     my family.
15              So I want to say -- I didn't see it, but I
16     want to say that I heard Yasif say that he had
17     repaired -- during the same time that I found the
18     leak in the office, that he had repaired one in the
19     ballroom.
20         Q    Okay.  So other than you think a repair to
21     a leak in the ballroom and then the leak in the
22     office around the time that you left in April 2015,
23     are you aware of any other leaks in that building,
24     what I'll call "the office building," up until the
25     time that you left?

Page 104

1     A    No, sir.  What happened after I left, I

2    don't know, but with those leaks, it was important.

3    It was there in the lobby.

4     Q    I know.  I'm talking up until the lime you

5    left.  Other than those two leaks that you've

6    identified, had you identified any over leaks?

7     A    No.

8     Q    Were you aware of any other leaks in that

9    building --

10     A    No.

11     Q    -- up until the time you left?

12     A    No.

13     Q    What about in the Knights Inn building?

14    The build where you lived, where you had your

15    room --

16     A    No.

17     Q    -- were you aware of any leaks in that

18    building up until the time that you left in April

19    2015?

20     A    No.  That's where -- that's where my

21    inspection comes in that I would do myself with the

22    rooms and the housekeepers and the maintenance.  If

23    there was anything like that going on, I would have

24    been notified.

25     Q    So up until the time that you left, were

1    you aware of any roof damage --
2         A    No.
3         Q    -- to any of the buildings other than maybe
4    what was caused by fire?
5         A    They would never say to me that -- I mean,
6    Brent never mentioned that the roof was damaged from
7    the fire.
8         Q    Okay.  Fair enough.
9              Are you aware of any roof damage to any of
10   the three buildings as of the time that you left in
11   April 2015?
12        A    No.
13        Q    Ms. Allen, let me show you what I have
14   marked as Defendant's Exhibit 87 for identification.
15   It's a four-page document dated June 2014 from a
16   company called Brookstone Restoration.
17             (Defendant's Exhibit 87 was marked
18             for identification.)
19   BY MR. TAYLOR:
20        Q    And I recall -- well, first of all, have
21   you ever seen this document before?
22        A    This is the people that I had come out and
23   give me an estimate of the structure.
24        Q    So this is --
25        A    I never authorized them to do any of this.

1    It was to only fix the structure to keep me from

2    being shut down by the fire marshal.

3         Q   Okay.  You did not ask for --

4         A   No.  I did not --

5         Q   This is just an estimate.  This is just

6    estimate.

7         A   No.  I guess they done that on their own

8    saying they wanted that job, and all I wanted them

9    to do is to come out there and do the structure

10   because the fire marshal made it clear if I didn't

11   get it done, I was going to get shut down.

12        Q   Okay.  Have you ever seen this document

13   before, this estimate?

14        A   You know, this wouldn't even coincide with

15   anything I had going on.  I mean, they may have

16   taken it upon themselves to do an estimate, but all

17   I had them come out there and do was the structure.

18        Q   An estimate to repair the structure?

19        A   Yes.  That was it.  That was it.  Just the

20   structure only because that's the first thing the

21   fire marshal told me to do.

22        Q   Okay.  And this estimate, it's dated June

23   30, 2014; right?

24            Is that what it says on the front?

25        A   Yes.

1      Q   And you were still the manager of the hotel

2   at that time?

3      A   Yes.

4      Q   And then this is addressed to you; is that

5   right?

6      A   Yeah.  All that's correct.

7      Q   Okay.  And this company -- Brookstone

8   Restoration, this company, that was called by you?

9      A   For the structural damage.

10     Q   I understand.  I'm just trying to

11  understand whether you called this company out or

12  did the insurance company call this company out?

13     A   I want to say that I did for the structural

14  damage only, nothing -- nothing else, just -- that

15  was my main priority to get the structure repaired

16  to keep the hotel open.

17     Q   Okay.  And how do you define structure?

18  What does that mean to you when you say that?

19     A   The steel beams that hold the hotel

20  together that are on the ceiling and they're on the

21  walls.  The steel beams.  And, see, we had steel

22  beams running across in front of the hotel.

23         You know, like out front, every door you

24  walk out where there's steel beams, but these steel

25  beams that were up there, it was going to cave.

Page 108

```
1              And that's what Michael Brannon told me to

2       get repaired first because that was very, very

3       hazardous.

4              And so that's what I called them out for,

5       and then they come back with all of this.  There was

6       a miscommunication somewhere.

7              They were just to give me an estimate on

8       the structure and start repairs -- and start repairs

9       on that, but then again, I'm having to refer this to

10      Ms. V., and I need money for it.

11         Q    I understand.  So this estimate that you

12      gave is broader than what you actually asked them to

13      do; is that what you're saying?

14         A    Yeah.  I mean, I just needed the structural

15      damage from them.  I did not ask them for any of

16      this.  Just the structural damage.

17         Q    Okay.  And I'm glad you pointed that out,

18      because I got to be honest with you, when I look at

19      what this is, to me this is all structural damage,

20      but what you mean by "structural damage," you mean

21      just the steel?

22         A    Just the steel.  Because it could collapse

23      on somebody and we would have a possible death if

24      that had happened.

25         Q    Do you remember receiving this estimate
```

Page 109

1      that's from Brookstone Restoration?

2          A    I do not remember receiving this.  I don't

3      even remember them getting back with me with

4      anything to do with the structure.  I mean, I don't

5      remember them getting back with me at all.

6          Q    Okay.  But it is addressed to you, isn't

7      it?

8          A    It is, but that don't mean I always get all

9      my mail either from there.

10         Q    And on the back page they've given you an

11     estimate to repair all of the exterior fire damages

12     in the amount of just under $349,000.

13              Is that what that says?

14         A    That is what that says, but I never -- I

15     never approved anything or got any of this from them

16     at all.  I mean, we didn't have any mold.

17         Q    There was no mold in the fire damaged

18     building?

19         A    No.  I didn't have any mold over there.

20     The health department would have probably shut me

21     down if I had.

22              Anytime I had any complaint from a guest

23     that come to me, I always took care of it.  If they

24     went to the health department, he would come to me

25     and I would take care of it, but I don't remember --

1        I don't remember having any mold.  I don't know

2        where he come up with that.

3                All of this, it looks good on paper but --

4        and it seems like it's detailed, but they were only

5        out there for the steel beams.

6            Q    Okay.  So you called them, asked them to

7        give you an estimate to repair the steel beams, and

8        what they did is they gave you an estimate that was

9        more than the steel beams, more than you asked for?

10           A    Yeah.  Yeah.  They didn't even put an

11       estimate here on the steel beams that I see.

12           Q    Well, if you look on the second page,

13       "structural steel."

14               Do you see that?  "Metal framing."

15               Do you see that about halfway down the

16       second page?

17           A    I believe 270 was above the room that

18       started.  So that would have probably been 170,

19       maybe.  That's what I wanted him -- that's what I

20       gave -- that's what I wanted him to come out and

21       give me an estimate on.

22           Q    So you wanted an estimate that's what's

23       called here 5000-structural steel and then the next

24       item, "metal framing."

25               Those are the two things you wanted the

1    estimate for?

2         A    Yes.

3         Q    And everything else was more than what you

4    asked for?

5         A    I didn't ask for any of that because I

6    wasn't authorized to the insurance company.  Ms. V.

7    and the insurance company was going to take it from

8    there.

9         Q    Let me show you -- actually, bear with me a

10   minute.

11             I'm not going to mark this at this point.

12   I want to just ask you if you ever -- here's an

13   estimate here from a company called BBMK

14   Contracting.

15             Have you ever heard of them before?

16        A    It wouldn't be anybody that I hired.

17        Q    Okay.  So have you ever seen that estimate

18   before that I just handed you?

19        A    I don't even know what it is or who it's

20   from.

21        Q    Okay.  So you've never heard of that

22   company?

23        A    No.

24        Q    Thank you.

25        A    Not while I was there.  That don't have my

Page 112

```
1    name addressed to it, does it?

2         Q    No, it does not, ma'am.

3         A    Okay.  Thank you.

4         Q    Do you know how BBMK ended up out on the

5    property?

6         A    No.

7         Q    Okay.

8         A    I mean, I'm just -- the name doesn't sound

9    familiar.  Can you break it down like -- BB, what

10   that stands for?

11        Q    Well, ma'am, I would if I could, but I

12   think that is actually the name of the company is

13   BBMK Contracting.  So...

14        A    I don't remember anybody coming there while

15   I was there.  Like I said, Mr. Taylor, at a point

16   when I could not get any progress going with Brent

17   Parrish, Ms. V. took it over.

18             That's why I guess she said in that letter

19   she didn't feel like I was doing enough, and I was

20   harassing the man to death.

21        Q    When you called Brookstone Restoration to

22   come out, how did you find them?

23        A    Seems like they were referred to me by

24   somebody that knew about the fire and they referred

25   theirself.  Just came through the doors.
```

1      Q    Okay.  Wasn't recommended by Mr. Parrish,

2    was it?

3      A    Well, no.  Mr. Parrish -- the reason I say

4    no is because he was interested in the fire damage,

5    not realizing that the fire marshal was focusing on

6    the steel beams.  You understand?

7          So I don't -- I don't think he did.  I

8    didn't and he didn't either.

9      Q    Other than the bid for the steel beams and

10    the metal framing that you wanted Brookstone

11    Restoration to provide to you, did you solicit any

12    other estimates or bids to repair the damages as a

13    result of the fire?

14      A    I had been talking to some people about it.

15    I was trying to get a friend of mine to come out of

16    Troy, Alabama to do it, but he said the job was too

17    big for him to do.

18          I had started trying myself just to work on

19    it little as I could, room by room, until, you know,

20    I just I ran out of money.  I couldn't do anything

21    without any money.

22          But as far as having somebody come on the

23    site for me to give an estimate, no, I did not.

24      Q    Have you ever seen an estimate of repair of

25    the fire damage prepared by an Arthur Grandinetti?

Page 114

1          A    No.

2          Q    Have you ever seen any contents inventories

3    for the fire damage prepared by Sarah Grandinetti?

4          A    No.

5               Is that the two people that would have been

6    on the property that day checking the inspection

7    part?

8          Q    I can't answer that, ma'am, because I don't

9    know the answer to that.

10         A    Okay.

11         Q    I suspect not, but I really don't know one

12   way or the other.

13              Did you ask Mr. Parker to perform any

14   repairs of the fire damages?

15         A    Yes.

16         Q    Was that part and parcel of his work, his

17   salaried work, as the maintenance man --

18         A    No.

19         Q    -- or was this going to be extra --

20         A    Totally --

21              DEPOSITION REPORTER:  If you can wait --

22   you keep cutting him off at the end of his

23   questions.  So if you could just take a pause before

24   you start answering, it would --

25              THE DEPONENT:  Well, he's a fast talker.

```
 1            DEPOSITION REPORTER:  So are you.  So I'm
 2    not going to be able to get both of you at the same
 3    time.  Thank you.
 4            THE DEPONENT:  Well, maybe we can just end
 5    this right now and then you don't have to hear me
 6    speak at all.  How about that?
 7    BY MR. TAYLOR:
 8        Q   I would love to, ma'am, but unfortunately
 9    your testimony is important to the case --
10        A   Okay.
11        Q   -- we do need to get it finished.
12            So the work that Mr. Parker was going to do
13    was going to be extra in addition to his normal
14    maintenance duties and he would be paid extra?
15        A   Yes.
16        Q   Okay.  And was Mr. Parker actually hired to
17    do some repair work of the fire?
18        A   No.  It was just between me and him.  I
19    asked him could he do what I needed done and I would
20    pay him a certain amount.  I don't even remember
21    what that was.
22            He put new -- I bought the carpet.  I
23    bought the new ceiling tiles.  I bought the paint.
24    Took some furniture out of the Knights Inn, and we
25    got up to three rooms before I couldn't even afford
```

1    him anymore.

2           I mean, because I was having to buy the

3    materials.  He was just doing the labor.  But I knew

4    what we needed from there.

5           Q    So he had repaired three of the rooms?

6           A    Uh-huh.

7           Q    That's a "yes"?

8           A    Yes, sir.

9           Q    What -- what three rooms did Mr. Parker

10   repair?

11          A    It was on the top floor.  I don't know

12   what -- let's see, if that was 170 -- if you're at

13   the top of the stairs at the Studio Inn, you're

14   going be -- we started with the first three that

15   way.  We was going to start upstairs and come down

16   this way.  Those were the ones that were -- I had

17   picked out that we would start working on.

18          Q    Okay.  And Mr. Parker performed that?

19          A    Yes, he did.

20          Q    And then you paid him for his labor?

21          A    And I fired him for his labor as well.

22          Q    Okay.

23          A    Not fired him off the property but fired

24   him from that job because it wasn't -- I'm -- was

25   raised with four brothers.  So I'm very smart when I

1    know you're trying to not do what I've asked you to

2    do.

3        Q   So with these three units that Mr. Parker

4    was to repair or did repair, you felt he did not do

5    an adequate job?

6        A   He it did an excellent job on the first two

7    but the third one he just wasn't -- he wasn't -- if

8    I went -- I couldn't find him when he was supposed

9    to be working on it.  And it wasn't -- he wasn't

10   getting it done fast enough.

11           So I just -- after that third room was

12   finished, then we didn't do anymore.  Plus, I was

13   out of money paying him.

14       Q   Okay.  And when you say you were paying

15   him, were you paying him out of funds from the

16   Knights Inn?

17       A   Yes.

18       Q   And how much did you pay Mr. Parker to do

19   those three rooms?

20       A   I don't remember.

21       Q   Okay.  Was he being paid by the hour or for

22   the job?

23       A   Probably I would have paid him for the job

24   since I was furnishing all the materials, the paint,

25   the ceiling tiles, the carpet, and he had nothing to

1   do with the furniture and that came from the Knights

2   Inn, the furniture did.

3          So I don't exactly -- I don't exactly

4   remember.  That was just something between me and

5   him where I was trying to cut corners to get some of

6   the rooms back together.

7     Q   Would there have been -- was some

8   documentation created that would indicate what

9   Mr. Parker was supposed to do and how much he was

10   going to be paid?

11     A   I'm sure I documented it.  Where it's at, I

12   cannot tell you because I don't have access to

13   anything that I had there.

14     Q   Okay.  Did you have a written agreement

15   with Mr. Parker?

16     A   Yes.

17     Q   There was a written contract?

18     A   Yes.  Not a contract.  It was just -- I

19   agree to do this off hours, you know, and --

20     Q   Where is a copy of this agreement?  Was it

21   put in a file?

22     A   It would have been in my office in my

23   employee -- where I kept notes on all the employees

24   that worked there.

25     Q   Would it have been in a separate file for

1     Mr. Parker specifically?

2          A    No.  It would have been in his file.

3          Q    In Mr. Parker's file?

4          A    Uh-huh.

5          Q    That's a "yes"?

6          A    Yes.  Uh-huh.  That means yes.

7          Q    And it was just an agreement to say for him

8     to do -- he was going to be paid "X" number of

9     dollars per room.  Is that the way it was?

10         A    Yeah.  I believe that's the way I set it up

11    to try and get something started.  I mean, I was

12    trying to get -- I was just trying to get the hotel

13    back up and running.  I needed it desperately.

14         Q    I understand.

15         A    It put us in a financial bind.

16         Q    Okay.  Are the three rooms up on the second

17    floor the only three rooms that Mr. Parker worked

18    on?

19         A    That is correct.

20         Q    That is the only repair of fire damage --

21         A    That is the only thing he did.

22         Q    Who are Duncan Contractors?  Have you ever

23    heard that name?

24         A    Yes.  That's my friend out of Troy that

25    said that the estimate would be entirely too

```
1     expensive for him -- too big of a deal for him to
2     do.  He was already obligated to other things
3     locally.
4          Q   Okay.  And what is -- so it's Mr. Duncan.
5     Is that your friend?
6          A   It's -- yes.
7          Q   Okay.  Does he have a first name?
8          A   Wayne.
9          Q   Wayne.  I like that name.
10         A   He's still in business.
11         Q   All right.
12             So did Wayne Duncan ever give you an
13    estimate or he just said, "I can't do it.  It's too
14    big"?
15         A   "I can't do it, Sheila.  It's too much a --
16    I don't want it to cost us our friendship.  It's too
17    big a job for me.  I'm obligated here with my
18    regular customers."
19             And he just didn't want to take it on.  He
20    didn't want to leave his family.
21         Q   Understand.
22             Do you recall approximately when after the
23    fire it was that Mr. Parker started the repair on
24    the first of the three rooms that he worked on?
25         A   Well, it was shortly after the fire
```

Page 121

1   before the fire marshal shut me down because of the
2   steel structure.
3       Q    Any idea approximately when that was?
4       A    Maybe -- it would have had to have been a
5   week after that because after two weeks I believe is
6   when the fire marshal come in and shut me down
7   because of the steel structure.
8       Q    So initially were you the designated
9   contact person for the Knights Inn for the insurance
10  company to deal with in terms of the fire damage
11  claim?
12      A    Up until Ms. V. took it over.  I mean, that
13  letter -- I guess she -- I'm sorry, I'm just still
14  having trouble dealing with that letter that she
15  said about me.
16      Q    Did that letter upset you?
17      A    Yes.  That letter upset me.
18      Q    You didn't know she felt that way about
19  you?
20      A    No, I didn't.
21      Q    Okay.
22      A    I mean, maybe that was her way around
23  trying to smooth out everything.  I did all I could
24  do with the insurance company, and then that's when
25  she felt like I wasn't getting anywhere, and she

Page 122

1      didn't get anywhere either.

2          Q    Have you seen any estimates of repair

3      prepared by The Howard Group?

4          A    I don't even know who they are.  Anything

5      that happened after I left -- and I left in April --

6      anything that happened after that, I have no

7      knowledge of it.

8          Q    That took care of that, didn't it?

9               Are you familiar with a company called

10     Yellowhammer Roofing?

11         A    No, I am not.

12         Q    Have you ever had any dealings with

13     Yellowhammer Roofing at the Knights Inn?

14         A    No.

15              MR. TAYLOR:  Gary, David, I think we've

16     been going for quite some time.  It's about 20

17     minutes to noon.  Do you want to take about another

18     five-minute break?

19              MR. CONCHIN:  Whatever.  Whatever you all

20     want to do.  Whatever Ms. Allen wants to do.

21              Can you tell me, for planning purposes,

22     Wayne, where you are in the -- as far as your

23     pursuit?

24              MR. TAYLOR:  Can we go off the record?

25              MR. CONCHIN:  Yeah.

1              MR. TAYLOR:  Go off record.

2              THE VIDEOGRAPHER:  Okay.  We're going off

3      the record.  This is the end of media unit four.

4      The time is 11:40 a.m.

5              (Recess.)

6              THE VIDEOGRAPHER:  We are going back on the

7      record.  This is the beginning of media unit five.

8      The time is 11:52 a.m.

9      BY MR. TAYLOR:

10         Q   Ms. Allen, before we took a break, you had

11     mentioned that Ms. Visram had taken over handling of

12     the fire claim.  And I wanted to show you what has

13     been marked as exhibit -- Defendant's Exhibit 88 --

14         A   It's not another letter about me, is it?

15         Q   -- for identification.

16             It's a letter from Zarin Visram to Brent

17     Parrish dated February 9, 2015.

18             (Defendant's Exhibit 88 was marked

19             for identification.)

20     BY MR. TAYLOR:

21         Q   Have you ever seen this letter before?

22         A   I haven't seen it, but that is what we had

23     agreed upon, that she would take over.

24             But I didn't know I was just completely

25     excluded from all of it.

1      Q   Okay.  Well and in the letter, the second
2    sentence Ms. Visram is telling Mr. Parrish (as
3    read):
4                    "It is my instruction to
5             you and to the insurance company
6             that all communication, both written
7             and oral, on the above-referenced
8             claim be with me only."
9             That's what that says; right?
10     A   Uh-huh.
11     Q   Is that a "yes"?
12     A   That is a yes.
13     Q   And then the next sentence says (as read):
14                    "No contact is to be made
15            with, quote, on-site management,
16            close quote, including contractors
17            or anyone else regarding this
18            claim."
19            That's what it says; right?
20     A   Yeah.  It definitely says that.
21     Q   Okay.  And this took place -- this letter
22    was sent in February of 2015, approximately three
23    months before you left the Knights Inn; is that
24    right?
25          A   I mean, we had agreed that -- I didn't know

Page 125

1    all -- I didn't know all of this was going on

2    between her and them.  I mean, I feel like I've been

3    slandered here.

4         She had agreed -- we had agreed that she

5    would take over that because I just couldn't get --

6    I couldn't get things going, and she was the owner.

7    So...

8         Q   Okay.  So that was the reason -- this

9    happened back in February of 2015, about three

10   months before you left.  Does that sound about

11   right?

12        A   I mean, I couldn't -- I just couldn't get

13   anything done with the insurance company, and she

14   agreed that she -- that she would just deal with

15   him.

16        And I think he came to that conclusion,

17   too, you know, that he would just deal with her

18   instead of me.

19        Q   Mr. Parrish you mean?

20        A   Yes.

21        Q   Okay.  Do you recall Mr. Parrish requesting

22   any documentation in connection with any contractors

23   or individuals that were engaged to do repair work

24   of the fire damages such as Mr. Parker or Duncan

25   Contractors?

1           Do you recall --

2       A   I couldn't provide him with any of that.

3   Wayne wasn't interested.  He didn't want to come up

4   there and I didn't -- KW couldn't do -- you know, he

5   wouldn't do all of them anyway.  He couldn't do all

6   of them.

7           So I never gave him back anything.  I just

8   let him and Ms. V. go on with it.  Because there's

9   nothing I could give him.  The people I trusted to

10  do it -- because I'm not from Birmingham.

11      Q   So you just felt that you didn't have any

12  documentation -- despite Mr. Parrish's request, you

13  didn't have any documentation to give him about

14  those repairs?

15      A   Mrs. Visram was going to take care of that.

16  I couldn't do it.

17      Q   Got it.  Thank you.

18          Gary, at this time I'm going to pass the

19  witness subject to asking further questions,

20  depending on what you ask her.

21          Thank you.  Ms. Allen, thank you so much

22  for your time.

23      A   May I have a copy of that and the other

24  letter that you showed me, please.

25  ///

Page 127

1                          EXAMINATION

2      BY MR. CONCHIN:

3          Q    Ma'am, thank you for your patience.

4               Let me ask some questions here.  Hopefully

5      they'll help us understand what was going on when

6      you were there, what you tried to do, what you knew,

7      what you didn't know about.

8               And please clarify at the end of the

9      deposition -- in case we show this to a jury in case

10     you're not able to come back here for this trial, it

11     will be tried in Birmingham, then I wanted the jury

12     to get a clear picture, okay, of what your job was

13     and how you saw it and what you did for us.

14              So please feel free, if I don't do a good

15     job of asking you that, to -- to let me know that

16     and then I'll provide you time to -- at the end --

17     to summarize your involvement.

18              So let me start off with this.  If Chubb

19     tries to paint a picture of this business that you

20     worked so hard at for three years as dying before

21     the fire, would that be true, please, ma'am?

22              MR. TAYLOR:  Object to the form of the

23     question.

24              MR. CONCHIN:  You can answer.

25              MR. TAYLOR:  Ma'am, just because I put an

1    objection on the record, you can still answer the

2    question.  We're just preserving this for the court.

3            THE DEPONENT:  No.  That hotel was

4    operational.  Both hotels were operational and

5    revenue was good.

6    BY MR. CONCHIN:

7        Q   And now if Chubb tries to paint a picture

8    of that it was some rat hole, that it wasn't clean

9    or doing a good job for the public, would that be

10   true?

11       A   Do I look like a person that --

12           MR. TAYLOR:  Object to -- object the form

13   of the question.

14           Go ahead.

15           THE DEPONENT:  Do I look like a person that

16   would live in a rat-infested hotel?

17   BY MR. CONCHIN:

18       Q   No, ma'am, you don't.  And that's why I ask

19   you.

20           You lived there for three years, did you

21   not, please, ma'am?

22       A   Yes.  And we did not have any rats or

23   roaches or red -- bed bugs.  We had an exterminator

24   come from Montgomery every month to spray every

25   room.

1          Q    You had motel experience even before this

2     one year and then three years, you knew how to run a

3     motel, did you not?

4          A    I knew exactly how to run a hotel and how

5     to be a CRS person.  I'm very good at that.

6          Q    And you had education in that regard about

7     management, did you not?

8          A    Yes.

9          Q    You feel like you worked well with the

10    hotel staff?

11         A    Absolutely.

12         Q    Do you feel like they were -- you mentioned

13    all these folks that worked there, were they

14    competent?  Were they good?

15              And asked this way:  If they were not, did

16    you let them go?

17         A    Yes.

18         Q    And so you mentioned an inspection and I --

19    let me ask you this.  I think I know what you got

20    reference to.  I'm sorry, I'm not there to show you

21    this document, but let me work through this and try

22    to describe it.

23              I am looking at a document that is -- for

24    reference purposes for the lawyers, it is Welborne

25    1330 Bates stamped to 1351.  It is a -- it is

Page 130

1      entitled "WKFC Underwriting Managers Inspection Form

2      for Chubb Custom Insurance Company" and tells the

3      underwriter's name, and then it says, "Ordered by

4      Ivy," and I'm not sure like Tech Shi, S-H-I.  Then

5      it says for Richmond & Associates, and then there's

6      a lady name Jennifer Akler.

7              This is an inspection that was done, you

8      mentioned, maybe two weeks before the fire.  This --

9      in fact, this inspection does say 3-12-2014 where

10     they came in and inspected the motel and gave you a

11     clear final.

12             Is that what you had reference to, please,

13     ma'am?

14          A   Yes, sir, it is.

15             MR. TAYLOR:  Objection to the form of the

16     question.

17             Go ahead.

18             THE DEPONENT:  Yes, sir, it is.

19     BY MR. CONCHIN:

20          Q   All right.

21             And that wasn't unusual, the insurance

22     company, Chubb in this case, would have the property

23     inspected from time to time.  Is that fair?

24          A   Yes.  We would have to have the property

25     inspected or we could not get insurance with them if

Page 131

1     it didn't pass.

2          Q    Okay.  This one says -- for example, I'm

3     just going to look at a couple of things and ask you

4     about it.

5               It says roofs are nine years old.  It says

6     the motel building has 80 units.  And this is

7     talking about building two, not the Studio.

8               It says the building motel has 80 units,

9     housekeeping, laundry, self-service laundry.  50 of

10    the 80 units are rentable, the other 30 are being

11    renovated with new TVs, carpets, walls, tiles, and

12    tubs.

13              Does that ring a bell?

14              MR. TAYLOR:  Object to the form of the

15    question.

16              You can answer.

17              THE DEPONENT:  Yes.  We did buy some new

18    flat screens.

19    BY MR. CONCHIN:

20         Q    Okay.  And it says -- as far as

21    percentages, percentage total area of vacant

22    portion, and it says 31 percent, meaning 69 percent

23    occupied.

24              Is that about fair, please, ma'am?

25              MR. TAYLOR:  Object to the form of the

Page 132

```
 1    question.
 2    BY MR. CONCHIN:
 3         Q   Less than two weeks before this fire?
 4             MR. TAYLOR:  Object to the form of the
 5    question.
 6             MR. CONCHIN:  Wayne, I'll give you a
 7    standing question to every question I got if you
 8    want it.
 9             MR. TAYLOR:  That won't be necessary, Gary.
10             MR. CONCHIN:  Okay.
11    BY MR. CONCHIN:
12         Q   So does that sound about fair, 69 percent
13    occupancy before the fire?
14         A   Yes.
15             MR. TAYLOR:  Object to the form of the
16    question.  She's quicker than I am.
17    BY MR. CONCHIN:
18         Q   Okay.  It talks about storage.  Mr. Taylor
19    asked you about file storage.  (As read):
20                        "General manager said they
21              would lease -- general manager says
22              kitchen has been closed since 1998.
23              Hotel files and storage are kept
24              there."
25              Did you keep some files and storage in the
```

Page 133

1      closed kitchen area or the closed bar/restaurant

2      area?

3          A    Kept them in the bar.

4          Q    Okay.

5          A    Not the kitchen.

6          Q    Okay.  It says the front desk is staffed

7      24/7.

8               Did you staff the front desk 24/7?

9          A    Absolutely.

10         Q    It goes through -- and I'm talking about

11     this, you know, two weeks before the fire here.

12     Again, they go through and they look at the

13     sidewalks; the security liability; air conditioning;

14     parking lot; elevators -- well, emergency lighting,

15     elevator not applicable; exit signs; clubhouse;

16     fitness rooms; plumbing; electrical; carpentry;

17     smoke detectors; illuminated signs; premises

18     liability, potential issues; and bottom line, gave a

19     clear final and said okay.

20              Do you remember that?

21              MR. TAYLOR:  Object to the form of the

22     question.

23              THE DEPONENT:  I remember some of what the

24     fire marshal, Michael Brannon, and I went over, but

25     I can't say that all of that I remember.

1    BY MR. CONCHIN:

2         Q    Okay.  All right.

3         A    I mean, that's a lot to take in.

4         Q    Yes, ma'am.

5              And just to be clear, that was from the

6    inspection report.  The date of the survey, I said,

7    was 3-12-14, and that was right before the fire, was

8    it not?

9         A    Yes.  Because the fire was in March, and

10   the inspection was in March.

11        Q    Okay.

12        A    With a man and a woman.

13        Q    All right.

14             Now -- and in addition to you living there,

15   you had family live there too, did you not, please,

16   ma'am?

17        A    My son did security.  So he lived on the

18   property.

19        Q    All right.

20             Was it a good motel as far as you saw while

21   you were there while you were helping operate the

22   facility?

23             And I say "good" from a cleanliness and

24   from a profit standards.

25        A    I changed up a lot of things when I came in

1    to improve the profits of the hotel, the revenue.

2    And I upgraded a lot of things and did a lot of

3    things that the other general managers had not done.

4            One thing, making sure I did what the fire

5    marshal said.

6        Q   Okay.  As far as when you left, were you

7    okay with the repairs and things you'd done with the

8    fire marshal, as far as your understanding?

9        A   Yes.  I'd done everything he asked me to

10   do.

11       Q   All right.

12           Now, you mentioned a while ago a guy that

13   said there's a lot of smoke damage and you described

14   him, dark, maybe dark brown hair.

15           Let me show you -- there was an adjuster

16   named Wade Bushman who did appraisal work in this

17   case.  I'm going to show you a picture of him, and

18   if Wayne can put it in front of you.

19           Did you ever see that guy out there, to

20   your knowledge?  Is this the guy you talked about

21   that said that there was, quote, a lot of smoke

22   damage, unquote?

23       A   That does look like him.

24       Q   All right.

25           And assuming he was one of the original

```
 1    adjusters -- let me ask it this way.
 2              Did one of those original adjusters on
 3    behalf of Chubb tell you that there was a lot of
 4    smoke damage?
 5              MR. TAYLOR:  Object to the form of the
 6    question.
 7    BY MR. CONCHIN:
 8         Q   I believe you testified, when Mr. Taylor
 9    asked you, that one of the early Chubb people said,
10    quote, there's a lot of smoke damage, unquote.
11              Is that your recollection?
12         A   Yes.  I think it was that person you just
13    showed me.  I think it was him that said that.
14         Q   Okay.  We have now learned that this was
15    his very first appraisal adventure.  I can represent
16    that to you.
17              Did you know that this guy was working on
18    this, this was his very first appraisal adventure
19    that he was trying to do for the -- for the Knights
20    Inn?
21              MR. TAYLOR:  Object to the form of the
22    question.
23              THE DEPONENT:  I did not know that.
24    BY MR. CONCHIN:
25         Q   Did he ever tell you -- he never told you
```

1    that?

2         A    No.  Not that I recall.

3         Q    Did he ever tell you he was buddies with,

4    going to ball games, buddy-buddy with, Brent

5    Parrish, the guy that you were having to deal with

6    most of the time?

7              MR. TAYLOR:  Object to the form of the

8    question.

9              THE DEPONENT:  Yes.

10   BY MR. CONCHIN:

11        Q    Did -- could you characterize your ability

12   to communicate with Mr. Parrish.  Can you just

13   describe that for us, please, ma'am.

14        A    I liked him a lot.  I really liked working

15   with him.  But whoever was over his head calling the

16   shots, he couldn't do nothing for me, you know.

17             I mean -- and I just pressuring him and

18   pressuring him, you know.  So we just agreed to let

19   Ms. V. handle it from there on out because I could

20   not get anything done.

21        Q    Okay.  Would it surprise you to know that

22   Chubb is taking a position in this lawsuit that no

23   one at Knights Inn, including you, ever gave them

24   any information about loss of business and loss of

25   revenue?

1     A   Yes.  I expressed that to Brent several

2    times when the fire marshal shut me down.  I needed

3    money to get -- I quote again -- the steel

4    structures repaired.  And it cost me.  I had to have

5    the hotel shut down.

6     Q  Well, did you know what a proof of loss

7    form was?  I mean, did they ever come to you -- any

8    of these Chubb folks, Brent or anybody -- and say,

9    "Here's a proof of loss form I need you to sign to

10   get some money"?

11    A   No.  No.  No.  I didn't have the authority

12   to do that, but Brent did send me -- did me up a

13   spreadsheet and he sent that to me for me to do the

14   best I could do with the contents only.  He was

15   trying to help the best he could.

16    Q  Okay.  Now -- and you don't know who was

17   over him who had the money strings?

18    A   No.  I just know that I -- just that our

19   hotel was getting shut down, and we did not have the

20   funds from the insurance company to keep it open and

21   get repairs done as needed.

22    Q  Now, did you agree with the fire marshal

23   that the structure, the concrete part, the

24   structural part in that area, was dangerous and it

25   needed to be --

```
 1        A    He -- he showed me how dangerous that it
 2    was.  So, therefore, I took steps to try to get it
 3    fixed, but I didn't move forward any, and so when
 4    the fire marshal came back out, he taped the hotel
 5    off and said nobody over there.  The employees had
 6    to move out from over there.
 7        Q    And --
 8             MR. TAYLOR:  Are you talking about the
 9    Studio Inn, or are you --
10             THE DEPONENT:  Yes.
11             MR. TAYLOR:  Okay.
12             THE DEPONENT:  The Studio Inn.
13             MR. TAYLOR:  Thank you.
14    BY MR. CONCHIN:
15        Q    Okay.  Just to explain.  At that time was
16    everybody moved out of the Studio Inn?
17        A    No.
18        Q    Let me ask it this way.  Did you have --
19    did anybody still have offices in or rooms that you
20    all were trying to use in the Studio Inn?
21        A    Just the employees were there and they --
22    you know, I had to -- I had to move them over to
23    that after the fire.  They stayed there for about a
24    week, and then I had to make preparations for rooms
25    to put them in.
```

1        Q    Okay.  Now, just to explain to give us a

2   visual here, the structural problems that they --

3   that you and the fire department were concerned

4   about, did that involve the section between the

5   first and second floor?

6            Did any of that involve the potential for

7   the second floor to collapse?

8        A    It was the steel beams in the room and the

9   room above it, and the steel beams on the outside,

10  you know, like the railings that were made of steel

11  on the outside.

12       Q    Yes, ma'am.  Okay.

13           Where the traffic flow would go?

14       A    Yes.  And it -- he shut me down because I

15  could not get that fixed.

16       Q    Okay.  So back to this loss of income.

17           If Chubb is taking the position that no

18  claim was ever filed for business -- for what we

19  call business interruption or loss of income -- and

20  I'll represent to you that that is their position in

21  this lawsuit -- did you provide any information that

22  was requested about rooms or -- unused rooms, loss

23  of income, to Mr. Parrish whatever he request- --

24       A    Yes, I did.  Because I was concerned about

25  the loss of income, but that just got overlooked and

1      we never -- we didn't discuss it, before I left,

2      again.

3          Q    Okay.  Was it clear to anybody with a set

4      of eyes to walk around that you had rooms that were

5      not being rented because of the fire?

6          A    Because of the fire, it really looked bad

7      from the road.  You understand?

8               I'm not going to rent too many rooms, you

9      know, based on them unless they're regular

10     customers.  When they see that fire and police tape

11     and all around it, it's going to be hard.  It looked

12     really bad from the road.

13         Q    And did you explain that?  Did you talk to

14     Mr. Parrish about that?

15         A    We talked so much, you know, I'm sure that

16     I probably did.  We talked so much.  I don't know if

17     that was -- I'm sure I probably mentioned that to

18     him.

19         Q    Did he ask you for any documents, anything

20     in the nature saying, well, show me your lost rents.

21     Give me an idea about how much rent you're losing,

22     anything of that nature?

23         A    Yes, he did.

24         Q    All right.  Did you -- did you ever deny

25     him access to any information that he asked for,

Page 142

1    please, ma'am?

2         A    I just roughly like did an estimate,

3    probably wasn't very accurate because I had so much

4    going on with the rooms, and he was trying to get me

5    something going on, you know, with the contents

6    where I could -- we could start -- he was just as

7    eager.

8              In all fairness, he was just as eager to

9    help me get the hotel -- we had been talking so

10   much, he was just as eager to help me get the hotel

11   up and running again.

12             I mean, the documents that he -- that he

13   wanted, I believe Ms. V. took care of that, if she

14   took care of it.  A lot of documents that he

15   requested, if I didn't do it, it probably didn't get

16   done.

17        Q    If you would have had the money to fix

18   everything that occurred from this fire -- let's

19   talk about just the fire only.

20             If you would have had that money within 60

21   to 90 days, could you have had this thing up and

22   running and salvageable, please, ma'am?

23        A    Sure.

24        Q    Let's talk about the wind then -- claim

25   then.

Page 143

1          We took -- you remember Mr. Bukhari, would

2     he be more familiar with the roof repairs and the

3     things going on with the roof and replacement of

4     ceiling tiles?  Would he be more --

5          A    Yeah.  Because I had my hands full just

6     running the hotel with the front desk and all that.

7     I mean, I -- he was over maintenance and

8     housekeeping.

9          Q    That's why I -- assuming that he testified

10    -- and his deposition was taken like yours -- and he

11    said close to the time of the fire, maybe a little

12    after, the windstorm was the very next month after

13    the fire.  And he started seeing a larger amount of

14    leaks, and it was all he could do to replace the

15    ceiling tiles after that.

16          Do you remember that?

17          A    I --

18          MR. TAYLOR:  Object to the form of the

19    question.

20          You can answer.

21          THE DEPONENT:  I remember telling him that

22    it was leaking in the office, you know.  That -- as

23    far as what else he had going on, I know nothing

24    about that.

25    ///

Page 144

1    BY MR. CONCHIN:

2         Q    He testified also that over the years there

3    may have been a few leaks, but there was a -- after

4    the tornado, he didn't really equate it to all the

5    roofing leaks until later on.

6              So let me ask you this.  Were you there,

7    living there, when the tornado and the windstorm

8    came through?

9         A    Yes, I was.  My son was spending the

10   weekend with me.

11        Q    Okay.  Did you all -- did you sustain wind

12   damage at the motel?

13        A    All I know is it sounded like a freight

14   train was coming through the hotel.

15             As far as busting any windows or coming

16   through the hotel, it did not.  But I do know,

17   looking on the news, it got everything around us,

18   the hospital, the apartments, the golf course --

19        Q    All right.

20        A    -- bushes and stuff.

21        Q    Did anybody go -- did Brent Parrish or

22   anybody from Chubb go up on that roof, to your

23   knowledge, after the tornado -- after the windstorm,

24   since they're out there anyway looking at the fire,

25   did any of them go up there and come back and say,

1     "Ma'am, you got bad damage on the roof"?

2             MR. TAYLOR:  Object to the form of the

3     question.

4             THE DEPONENT:  I did not -- I wasn't even

5     aware they came out there.  I was probably gone at

6     that time.

7     BY MR. CONCHIN:

8        Q    All right.

9             Did anybody from Chubb ever tell you that

10    you had significant roof damage also?

11       A    No.

12       Q    Did you provide -- you and Mr. Bukhari --

13    if anyone from Chubb wanted to get access to the

14    roof or anything about the motel after the fire or

15    after the windstorm, did you provide access?

16       A    Well, if they needed to, yeah.  I mean,

17    sure, if they thought we had damage to the roof.

18       Q    Would you have expected -- if Chubb

19    representative saw wind damage to the roof, would

20    you have expected them to report to you when you

21    were the general manager?

22       A    Yes.

23       Q    Okay.  Now -- okay.  Let's talk about the

24    fire.

25             Was there -- you may have already answered

Page 146

1     this question already indirectly, but let me be more

2     specific.

3              Was there a delay in paying for the fire

4     damaged building from the fire of March 22nd, 2014?

5          A    Yes.  That was a problem that I couldn't

6     resolve while I was there, and she took it over.  I

7     don't know the outcome of that.  I'm going to assume

8     that's why we're here.

9          Q    All right.

10             Assume for me -- I'll represent to you it's

11    true -- that the large -- larger fire damage

12    check -- there was an initial amount paid, okay,

13    close after the fire, but then the evaluation check

14    on the fire was seven months later.

15             Was there some damage that occurred to the

16    motel and to the motel business during that

17    seven-month period of time, please, ma'am?

18         A    Well, you got to remember, the fire

19    happened in March, and I left in April.  But we had

20    fire damage, no doubt about it.  And the hotel got

21    shut down because of the fire damage.

22         Q    I'm sorry.

23         A    The hotel got shut down because of the fire

24    damage while I was there.

25         Q    It took till October of 2014 to pay the

1    lump sum on the fire damage.  Was there -- was that

2    too late, please, ma'am, to do any good with regard

3    to fixing up the problems that you had by then?

4              MR. TAYLOR:  Object to the form of the

5    question.

6              THE DEPONENT:  That would be the end of the

7    hotel, period.  That's my opinion.

8    BY MR. CONCHIN:

9         Q    All right.

10             Did the delay damage your ability to make

11   the repairs?

12             MR. TAYLOR:  Object to the form of the

13   question.

14             THE DEPONENT:  I could not make any repairs

15   with no money.  These repairs were major.

16   BY MR. CONCHIN:

17        Q    Did the delay damage Knights Inn's ability

18   to keep business afloat?

19             MR. TAYLOR:  Object to the form of the

20   question.

21             THE DEPONENT:  Could you repeat that

22   question again.

23   BY MR. CONCHIN:

24        Q    Yes, ma'am.

25             Did the delay in payment damage the Knights

Page 148

1    Inn's ability to keep business afloat?

2         A    It did.

3         Q    Did the delay seem unreasonable to you as

4    the general manager, as property manager?

5              MR. TAYLOR:  Object to the form of the

6    question.

7              THE DEPONENT:  I've never heard of an

8    insurance company taking that long to pay for

9    something that's very visible.

10   BY MR. CONCHIN:

11        Q    At some point did the delay appear to you

12   to be intentional?

13             MR. TAYLOR:  Object to the form of the

14   question.

15             THE DEPONENT:  I was there, sir, when the

16   fire happened, but I only stayed a month after that.

17   So I don't know what is going on after I left in

18   April.

19   BY MR. CONCHIN:

20        Q    All right.

21             I'm looking at a -- some notes about visits

22   on the premises after the fire.  So let me ask you

23   about that.

24             In your opinion, should a safety fence have

25   been put up to keep people out from the fire damaged

Page 149

1    area?

2           MR. TAYLOR:  Object to the form of the

3    question.

4           Go ahead.

5           THE DEPONENT:  Where you going to get the

6    money to put it up at from?

7    BY MR. CONCHIN:

8       Q   Well, that was going to be my question.

9           Your knowledge, did Chubb ever pay for

10   putting a divider or a safety fencing up at least

11   while you were there?

12      A   No.

13      Q   Did they ever pay for security or

14   protection or did you all have to pay for your own?

15      A   I have no knowledge of that.

16      Q   Have you ever seen a -- ever see a new

17   company, Security Engineers or Pinkerton or anybody

18   else out there that Chubb paid for during this fire

19   damaged area?

20      A   No, sir.

21      Q   Okay.  By the time seven months had passed

22   in the fire damaged building, did you start to have

23   a mold or mildew or additional damage problem, in

24   your opinion?

25      A   Sir, that would normally be what happens if

Page 150

```
 1    you have a roof to leak, it is going to cause mold

 2    and mildew; but, again, I was not there seven months

 3    later.  I left in April.

 4         Q    Okay.

 5         A    The health department will shut you down if

 6    you have mold and mildew in the rooms.

 7         Q    As long as you were there, you were trying

 8    to fight this -- trying to fight them closing you

 9    all down, you were in compliance with everything

10    requested of you, as far as you know?

11         A    Yes.

12         Q    Now, the wind damage claim, if the wind --

13    if Chubb has determined, as others have, that the

14    storm -- and I'm not trying to trick you, it's a

15    storm date, okay, April 28th, 2014.  Okay.

16              Do you know the type of damage -- have you

17    ever seen any charts or anything, the type of damage

18    that was -- that was discovered on the roof after

19    the windstorm?

20         A    Sir, I was not there to be aware of any of

21    that.  The fire happened in March.  The tornado

22    happened in April, and I left in April.  The only

23    thing I can tell you different was I had a leak in

24    the office.

25         Q    All right.
```

1          A    Now, I don't know anything about a roof.

2          Q    And you didn't have that leak in the office

3     before the storm, did you, please, ma'am?

4          A    No.   That happened before I did leave.   It

5     was a leak in the office over the computer.

6          Q    Okay.   And Mr. Bukhari, would he be the one

7     that was trying to attend to that, please?

8          A    Yes.   He or KW.

9          Q    When Chubb -- let me change forces here.

10              When Chubb initially investigated,

11    Mr. Parrish, out there, were all of your records

12    available to look at that had anything to do with

13    the business operation, as far as you know, please,

14    ma'am?

15         A    Yes.   My night audit gives everything.

16         Q    Now, at some point -- and I'm not sure

17    when, I'm trying to describe it.

18              At some point the fire marshal had said get

19    rid of some records, paper records.   When was that

20    in time?

21              If the fire occurred March 22nd, 2014 and

22    the storm was April 28, 2014, can you put a time

23    frame on that when the fire marshal had asked you to

24    get rid of some paper records?

25         A    He has a copy of the letter when the fire

1    marshal came out there.  And the letter that he sent

2    me is when he told me, you know, get rid of all that

3    records and stuff back there.  Get rid -- it was

4    boxed up -- things that were over five years old.

5    They would have been -- they weren't of any use.

6         So we had to get rid of them, per the fire

7    marshal.  It was a fire hazard to have that many

8    papers in one room.

9         Q    All right.  I understand that.

10        So for a period of time there night audit

11   records, accounting-type information, sales

12   receipts, all those kind of things, for a period of

13   time they would be kept in the office in what we

14   call the Studio building.  Is that fair?

15        A    Repeat the question.  I'm not sure I

16   quite --

17        Q    So where records would go, generally, night

18   audit records, rent, repairs, housekeeping, records

19   like that, were they kept in the -- what we call the

20   Studio building?

21        A    Yes.  After I filled up Yasif's office to

22   the ceiling with what I had, the records.  We had no

23   other place to store them but the Studio Inn.

24        Q    All right.

25        And that's the building -- is that the

Page 153

1     building that caught fire?

2          A    Yes, it is.  But those papers there didn't

3     have anything to do with the fire.

4          Q    Okay.  I understand.  I understand.

5               But as far as access to your records and

6     stuff, do you know if any of those records were

7     burned or if the fire department water -- if any of

8     those records were damaged?

9          A    Not to my knowledge.

10         Q    Okay.  So for a period of time, they would

11    have been available for a review by anybody wanting

12    to look at them.  Fair enough?

13         A    Fair enough.

14              They would have most likely been in the

15    office, up front in Yasif's office.

16         Q    Okay.  Did anybody with Chubb ever come to

17    you and talk to you about a problem with smoke in

18    the expansion joints?  I'm using that language

19    specifically.

20         A    What is an expansion joint?

21         Q    Smoke and soot.

22         A    What is an expansion?  What is an

23    expansion?

24         Q    Well, there's an issue here in this lawsuit

25    about the dividers between rooms and about smoke

1   getting in there between that and going everywhere.

2          So I'm just asking -- you may not know

3   anything about this.  They might not have talked to

4   you, but my question was did anybody from Chubb,

5   Mr. Parrish or anybody else, ever come to you and

6   talk to you specifically about smoke and soot issues

7   in those expansion joints between the rooms?

8          A   Not that I remember.

9          Q   Okay.  Fair enough.  Okay.

10         How about this business location, ma'am?

11  Was it a good business location?

12         A   Yes.

13         Q   Is it right across from the civic center?

14         A   It is.  And it was close -- right down at

15  the red light was Walmart and the shopping center

16  there and fast food places up the road.

17         So it was a real good location for

18  truckers.  Plenty of space for them to park and get

19  fast food.

20         Q   When you were there was this -- before the

21  fire, was this a clean family-type atmosphere that

22  you matter at that particular motel?

23         A   I was the general manager.  I made sure of

24  that.

25         Q   Occupancy rate good?  You know, cleanliness

```
 1    good?
 2         A    Yes.
 3              MR. TAYLOR:  Object to the form of the
 4    question.
 5              MR. CONCHIN:  Okay.  Wayne, you objected to
 6    a compound question.  So I'll stop, and I'll ask two
 7    questions.
 8    BY MR. CONCHIN:
 9         Q    Was the occupancy rate good?
10         A    Yes.
11              MR. TAYLOR:  Object to the form of the
12    question.
13    BY MR. CONCHIN:
14         Q    Was the cleanliness good?
15         A    Yes.
16         Q    Now, you mentioned also housekeepers keep a
17    list -- kept a list of any issues they wanted.
18    Explain that, please, ma'am.
19         A    Okay.  Ask me the question again.
20         Q    Yeah.  Housekeepers, did they keep a list
21    of anything that needed to be fixed or cleaned or
22    special attention?
23         A    Yes.  They had a sheet attached to their
24    housekeeping list that they would attach to it for
25    maintenance, and I would turn it in to maintenance.
```

Page 156

1      Q    All right.

2           And did you -- was it part of your job to

3      make sure that that got done?

4      A    Yes.

5      Q    We have seen some records in this case

6      relating to curtains, okay, and being taken off,

7      cleaned.  That's the best way I know how to explain

8      it.

9           Did you have any involvement in taking

10     down, removal, sending out curtains for cleaning?

11     A    Yes.  Brent told me -- Brent Parrish told

12     me to get all of the curtains and comforters and

13     stuff that were salvageable and he would send

14     someone out there.  That he knew a company and he

15     would send someone out there to pick them up.

16          However, I called him back a week later,

17     and I had that done for them to come out there.  I

18     put all of the bad stuff that wasn't salvageable

19     outside in garbage bags and left all of the -- and

20     maintenance was going to put them in the garbage.

21     And all of the good stuff that we could -- I felt

22     like could be used with dry cleaning and so forth

23     was inside the room for them to pick it up.

24          I did not know they were on the premises to

25     pick them up.  They, however, got the ones in the

1    room and the bags outside that were not cleanable,

2    in error.  They didn't -- they didn't talk to me,

3    you know.

4            I had no knowledge that they were going

5    to -- until everything was gone and they sent the

6    bill, I just assumed that the housekeeper,

7    maintenance, put the garbage bags that I had outside

8    into the garbage where it was supposed to go.

9            I did not know, until we got a bill for

10   $13,000, they dry cleaned shower curtains.  Now come

11   on.  Shower curtains?  I mean, it was -- I could

12   have bought all new stuff for what they charged me

13   to dry clean all of that, and I never heard of dry

14   cleaning curtains.

15       Q   You never authorized it -- you never

16   directed them to do that at all?

17       A   I gave the okay with Brent for the company

18   that he knew that he was going to send out there to

19   pick it up.  They never notified me exactly when

20   they were coming.  All I told him is I would have

21   them bagged up and in a room.

22           And they just assumed that the bags outside

23   was what they were to clean.  They assumed.  They

24   did not even come into the office or talk to me.

25       Q   Let me ask you about Ms. Visram's ability

Page 158

1    to deal with this loss.  Okay.  Let me ask it this

2    way.

3              Did you know her husband, please, ma'am?

4         A    Yes, I did.

5         Q    Would it be fair to state that he primarily

6    ran the motel?  He had more to do with running the

7    motel than she did before his sickness?

8         A    He had more knowledge than what she did.

9         Q    And during his sickness, did she -- did she

10   stay with him a lot and just --

11        A    Pretty much -- pretty much the whole time,

12   sir.

13        Q    And did you take on that burden -- did you

14   basically do both jobs?

15        A    Yes.

16        Q    Okay.  And then after he passed, what would

17   you -- how would you describe her ability to

18   manage -- let me ask it this way.  Being kind.

19             Did you have to really help her run the

20   motel after he passed away?  Did you have to spend

21   more time helping run it?

22        A    I totally ran the whole -- the whole hotel.

23   Mr. V. done the driving.  She is not capable of

24   driving.  So I had to drive her to every doctor's

25   appointment, drive her to church or do everything.

Page 159

1    It was like taking on two jobs but not getting paid

2    any more money either.

3           I basically -- the hotel was in under my

4    care 100 percent.

5           But that brings me to a question that I

6    have for you, Mr. Conchin.

7       Q    Yes.

8       A    Okay.  On September the 10th, 2015, are you

9    aware of that letter that Mrs. Visram's -- Haman,

10   dba Knights Inn, sent to Brent Parrish, are you

11   aware of that letter that she sent to him about me?

12      Q    I got that letter, and it looks to me like

13   this is sent a year and a half after the fire, if

14   it's the same letter.  Yes, ma'am.  I have it in

15   front of me.

16          And so let me ask you this.  A year and a

17   half after the fire was -- were you pretty

18   frustrated in addition to obviously she was

19   frustrated?

20          MR. TAYLOR:  Object to the form of the

21   question.

22          THE DEPONENT:  Yes.  I was frustrated.  She

23   was frustrated.  I can't make things happen.  I

24   can't do better with the hotel if we're losing

25   business.  It wasn't my fault.  I didn't cause the

```
 1    fire.
 2    BY MR. CONCHIN:
 3         Q   Do you know -- is it your opinion that
 4    Chubb, when they started -- when they kept trying to
 5    deal with her directly, were trying to cut you out
 6    of this communication?
 7         A   I was aware of that.  I mean, have a letter
 8    here where she says, basically, that I'm
 9    incompetent.  Am I not correct?
10         Q   Well, let's -- yes, ma'am, but let me move
11    past that.
12             Were you aware that at one point she had
13    requested Chubb to deal directly with The Howard
14    Group, these individuals who had come down to try
15    and make an assessment of the loss?
16         A   I don't know about The Howard Group, and I
17    don't know what she did after I -- Brent and I
18    decided that he and her would work it out.
19         Q   Did you know that repeated requests by The
20    Howard Group that Chubb deal with them directly,
21    that they refused to honor that and kept dealing
22    with Ms. Visram?
23             MR. TAYLOR:  Object to the form of the
24    question.
25             THE DEPONENT:  I wasn't aware of anything
```

1   that happened after April of 2015.

2   BY MR. CONCHIN:

3       Q   Did you have an understanding or feeling

4   that this same thing was going on with you, they

5   were trying to bypass you and deal with Ms. Visram?

6           MR. TAYLOR:  Object to the form of the

7   question.

8           THE DEPONENT:  I think it was just as much

9   her wanting to bypass me because there were too

10  many -- "I'll call you back.  Let me get with her.

11  I'll call you back," and too many things going on

12  that I couldn't keep up with it.

13          It was probably better that she dealt

14  directly with them because she had all of the

15  authority.  She was the owner.

16  BY MR. CONCHIN:

17      Q   Okay.  So let me make sure of the timing.

18  That's all I want to do, and then I think I'm

19  cleared.

20          I thought that -- okay.  Let's go back to

21  the fire, March 22nd, 2014.

22          And I was under the understanding you were

23  there a long while after that trying to -- months

24  after that trying to deal with the fire and the

25  consequences of the fire and then that you -- and

Page 162

1     along that same time, April 28th, 2014, the storm,

2     you were there after that and that you worked

3     through all these things till the end of that year

4     and then you left April or so the next year.

5          Do I have my dates wrong?

6     A    You have your dates wrong.

7     Q    I'm sorry.

8     A    The fire happened in March.  The tornado

9     happened in April, and I left in April -- the last

10    day or the first day of May or whatever, but I left

11    from there somewhere between -- pretty much at the

12    end of April is what I want to say.  So I have no

13    knowledge of the roof.

14    Q    Okay.  But until you left, did you make

15    yourself available to Mr. Parrish or anybody else

16    that Chubb wanted to to access to ask questions

17    until you left?

18    A    Well, my thing is that I left in April of

19    2015; correct?

20    Q    '15.

21    A    Okay.

22    Q    '15.

23    A    This is where --

24    Q    That's where -- let me stop you there.

25         That's where I'm a little confused.  I was

1   thinking you were there for months and months and

2   months after the fire also.

3        A    No.   This letter is dated -- where she's

4   wanting all contact to still be with her, I don't

5   know why they would be trying to be contact me.

6   This is in September and I left in April.

7        Q    That's a year and half later after the fire

8   when they're writing this letter -- when she's

9   writing this letter.

10           Now -- so I'm trying to get the time frame

11   right in my mind.  Let me ask it this way.  Were you

12   there when the fire department came out and did an

13   investigation after the fire?

14        A    Yes.

15        Q    Were you there when they ended up closing

16   the motel down because the fire -- the fire area

17   couldn't be fixed?

18        A    Yes.  Because of the structural damage.

19        Q    Okay.  Now, when did you -- when you left

20   there -- and, again, this could be me just

21   misunderstanding the dates, Ms. Allen.  I'm trying

22   to -- I wish -- I wasn't there.

23           This is first time you and I have met;

24   correct?

25        A    Correct.

1        Q    Bear with me.  There was an estimate for --

2    you got some folks in there, Brookstone was asked

3    and they write a letter in June of 2014 where you

4    asked them to just look at the structural issue.

5    Okay.  So that's like three months after the fire

6    and you're still there then, are you not?

7        A    Hold on a minute, Mr. -- hold on.

8             MR. TAYLOR:  Gary, I'm thinking she may

9    need a break.  I mean, you can see her.

10            THE DEPONENT:  I do need a break.

11            MR. CONCHIN:  Okay.  All right.

12            THE VIDEOGRAPHER:  Okay.  We're going off

13   the record.  This is the end of media unit five.

14   The time is 12:43 p.m.

15            (Recess.)

16            THE VIDEOGRAPHER:  We are going back on

17   record.  This is the beginning of media unit six.

18   The time is 12:49 p.m.

19   BY MR. CONCHIN:

20       Q    Okay.  Ms. Allen, I was trying to get in my

21   mind the time frame.  And when Mr. Taylor started

22   asking questions, I believe you told him that you

23   left April of 2015.  And that would have been --

24   that seemed logical because you got this

25   correspondence and meeting with -- where Brookstone

Page 165

1    came out in June of 2014.

2          You got -- you were there a while and you

3    saw KT or whatever his name was, KW, you directed

4    him to do some work.  There were -- you had your son

5    doing security.  You all had to move where you were

6    operating out of the fire building to another

7    building, moved the employees.

8          So I'm thinking all along that that took a

9    year or so you were there and left in April of 2015,

10   and I think that's what you answered to Mr. Taylor's

11   question.

12         And I'm just making sure -- and I realize

13   it's been a long process.  Okay.  And we may have

14   mixed you up unintentionally.  So --

15       A    Okay.

16       Q    I'm just trying to come back and make sure

17   we're on the same page.  So you're dealing with --

18   you're dealing with Brent Parrish, all these things

19   that occurred, and I'm thinking you left April of

20   2015, but can you tell me, am I totally off base?

21       A    We're not on the same page.  So let me go

22   back and look at the -- at this because I -- please

23   bear with me and understand, talking about this

24   hotel and bringing up the death of my son, that's

25   just kind of breathtaking.

1      Q   I'm sorry.  It's been about six years, too,

2  and I apologize.

3          Do you remember when --

4      A   Listen, the fire happened in 2014, and I

5  left in 2015.

6      Q   Yes, ma'am.

7      A   And I wouldn't have known that until I

8  looked at this letter dated September so -- but that

9  still doesn't change any -- that still doesn't

10  change any of the questions you've asked.

11          Mrs. Visram's took it over and left me out

12  of it.

13      Q   Absolutely.  Okay.  And that doesn't change

14  any of your testimony.  Your testimony has been

15  truthful.  It doesn't change anything about the

16  questions I've asked you.  Fair enough?

17      A   Fair enough.

18      Q   Okay.  I just -- I thought that was right

19  and maybe some of these questions confused you and

20  didn't mean to.

21          So, now, if I understand it, you haven't

22  been back to the premises, but you have seen the

23  video of the of the condition of the premises now?

24      A   It's devastating.  I mean, it -- it really

25  is.  I mean, my opinion is this is this woman's

1    career.  She loves that hotel.  After her husband

2    died, that was her passion.  And her daughter is

3    Shazi Visram, and she told me -- she just told me

4    she wanted her mother to keep running that hotel as

5    long as she was able to, you know, and thanked me

6    for the work I had done.

7              But to see it like this, it's over for her.

8    She's -- that hotel is done with.  It's over from

9    your video.

10        Q    Did you -- when you were with Ms. Visram,

11   did you talk to her about her desire to keep it

12   going because of her husband -- because of the

13   length of time they had run it?

14             MR. TAYLOR:  Object to the form of the

15   question.

16             THE DEPONENT:  The hotel was everything to

17   her.  That was her whole life, period.  I mean, we

18   would butt heads every now and then, but the hotel

19   was up and running and my understanding, it just

20   kept depreciating and depreciating until it's not --

21   she's not going to ever to have enough money to

22   build that hotel back again based on your video.

23   BY MR. CONCHIN:

24        Q    Okay.  Thank you, Ms. Allen.  Thank you

25   very much for your patience with us.

Page 168

1        MR. TAYLOR:  I've got just a couple more

2   questions.

3        THE DEPONENT:  Okay.

4        MR. TAYLOR:  Hopefully we'll be done in

5   five minutes.  Okay?

6        THE DEPONENT:  Okay.

7

8              FURTHER EXAMINATION

9   BY MR. TAYLOR:

10       Q   Do you remember when Mr. Conchin put on the

11   screen the picture of Mr. Bushman that you said you

12   think was the man that told you about the smoke

13   damage?

14       A   Yes.  I mean, I wasn't 100 percent, but

15   that looked like him.  That was the description I

16   gave and that was the picture he showed me.

17       Q   You're not sure that it's him, but it could

18   have been?

19       A   I can't say that I'm 100 percent sure, but

20   the reason I think it's him, because I thought he

21   had such pretty white teeth, you know, and he was a

22   clean-cut guy.

23       Q   How long after the fire was it that you --

24   that Mr. Bushman told you this?  Or the person who

25   told you about the smoke damage, how long after the

1    fire was that?

2         A    I think they were on it pretty promptly.

3    Around maybe May.

4         Q    So somebody within two or three months of

5    the fire?

6         A    Yeah.  They were work -- Brent was working

7    on it and even -- Brent was working on it, and he

8    even told me he would see about getting a partial

9    payment out.

10        Q    But I'm talking about Mr. Bushman, the

11   person whose picture was put up there.  How long --

12   if that's the person that did it, how long after the

13   fire was that?

14        A    It could haven't more than two months.  It

15   was within a two-month frame.

16        Q    Okay.  Now, if I were to tell you that

17   Mr. Bushman did not get involved in this claim until

18   much, much longer than that, like nine months to a

19   year after that, is it possible that then it was

20   somebody else?  That you're mistaken about who told

21   you that?

22             MR. CONCHIN:  Object to the form.

23             THE DEPONENT:  He has a twin.  I don't know

24   but that kind of -- I gave a description of him, and

25   he showed me the picture.  So I just -- I could be

Page 170

1    wrong.  I'm not going to sit here and say, oh, no,

2    no, no, that's him.  No, I can't be sure.

3    BY MR. TAYLOR:

4        Q    The questions that Mr. Conchin asked you

5    about the business interruption loss, what

6    documents, what financial records, of the hotel did

7    you provide to Mr. Parrish?

8        A    We wanted to figure out how much we were --

9    we were having to go back through the night audits

10   and look at what we were making versus what we

11   weren't making.  Would have been the night audits

12   and -- I'm almost positive that I gave Brent -- you

13   can just double ask him if I did not give him -- and

14   it would have been on a fax form.  I would have give

15   him something showing that we were losing money by

16   not renting that hotel.

17       Q    And if Mr. Parrish were to say that he

18   didn't get any documents relating to the night

19   audits or any other financial documents in

20   connection with the performance of the hotel, could

21   you be mistaken?

22       A    No.  I would say he needs -- he needs to

23   check it and make sure.  Because I did everything

24   that he was asking me to do.

25       Q    I understand.

1          If those documents are not in his file,

2     could you be mistaken?

3          A    They would be in my files if they were

4     there.

5          Q    I understand.

6          Well -- and so if you had sent him a fax,

7     there would be documentation indicating you sent him

8     a fax; right?

9          A    Right.

10         Q    But -- so if -- maybe we can check those

11    files, but we can also maybe check Mr. Parrish's

12    files -- right? -- and see if he has them in there?

13         A    But I'm assuming that Mr. Parrish's -- once

14    Ms. Visram took over, he could not have nothing else

15    to do with me.  Based on your letter that you showed

16    me, he could not have nothing else to do with me.

17         So, therefore, he might not have

18    acknowledged what I had set up.  He was going to let

19    her do it.

20         Q    Okay.  Can you -- and we can ask Ms. Visram

21    these questions, too, but I need to know what

22    documents you actually sent to -- give me a

23    description or what it's called.

24         A    I sent a copy of those, the spreadsheets --

25              MR. CONCHIN:  Object to the form.  You keep

1    saying "sent."  Her testimony is she provided access

2    to it.

3            MR. TAYLOR:  I don't think she said she

4    provided access.

5            MR. CONCHIN:  She sure did.

6            MR. TAYLOR:  I think she said she provided

7    -- well, no.  You said -- you said could he have

8    access.  You didn't ask if she gave him access.

9            MR. CONCHIN:  I did.  I asked if she had

10   ever prevented him from accessing anything and

11   everything about it.

12           MR. TAYLOR:  All right.  Let's cover that.

13           MR. CONCHIN:  So let's go ahead and go

14   forward.

15           MR. TAYLOR:  That's fine.  Because I'd like

16   for Ms. Allen to be able to leave here.

17   BY MR. TAYLOR:

18       Q   Did you ever tell Mr. Parrish, in response

19   to a request for documentation, that, hey, these are

20   the documents over here.  Come over here and look at

21   them?

22       A   I never met him in person.  I don't believe

23   he ever came on the property.

24       Q   Mr. Parrish?

25       A   Mr. Parrish.  We talked on the phone.  I

1    believe the whole time we talked over the phone.

2         Q    So you never met him?

3         A    Not to my knowledge.

4         Q    Okay.  Did you tell Mr. Parrish that any

5    documentation he wants, he can come over and this is

6    where they are?  Did you ever tell him that?

7         A    Not in those words.  I said anything in the

8    office you have access to.

9         Q    Okay.

10        A    And I would --

11        Q    Did you ever send him any documents?

12        A    I did send him those spreadsheets that you

13   showed me.

14        Q    A contents inventory sheet.

15        A    Yes.  Yes.  And I sent him a loss of

16   income -- proof of loss of income based on my night

17   audits.

18        Q    Okay.  So you sent him a doc- -- you didn't

19   send --

20        A    I would have done it fax.  I would not have

21   done it by mail.  I sent it per fax.

22        Q    Okay.  So you created a spreadsheet based

23   on the night audits?

24        A    I sent him going and showing what we were

25   making every month versus zero income.  That's what

1    I showed him.

2         Q    Okay.  So you sent him that.  Did you ever

3    send him any of the night audits?

4         A    I sent him the last sheet of the night

5    audit.

6         Q    The back sheet?

7         A    The back sheet, which is the total showing.

8    That's all he needed to know.  He didn't need any of

9    the other.

10        Q    Did you send him any other financial

11   documents?

12        A    I didn't -- I didn't have anything to send

13   him.  I mean, I didn't have anything to send him.

14        Q    That's fair.  Okay.  That's fine.

15             With regard to the tornado that came

16   through, the big -- there were two signs, there's

17   like the big sign that's kind of high up, was that

18   sign damaged during the tornado?

19        A    I don't recall that being damaged.

20        Q    Okay.  And then there's another sign that's

21   closer, kind of ground level?

22        A    Ground level was damaged.

23        Q    That sign was damaged --

24        A    Yes.

25        Q    -- as a result of the tornado?  Okay.

1          Were there any trees -- I guess the way

2     I've seen the property, the tree -- you've got the

3     road and then three sides of the property where the

4     hotel is located is surrounded by trees; right?

5          Trees kind of line the property three

6     sides; right?

7     A    Yeah.  I think there was a lot of branches,

8     but I don't remember seeing any struck down because

9     that would have been something I would have had to

10    have a chainsaw and get -- my son was up there

11    visiting that weekend, he could have took care of

12    that.  So I don't remember seeing any of that.

13    Q    So you didn't have to hire any crews or

14    didn't have any crews that came out to the property

15    and removed any -- any broken trees or down trees or

16    broken branches as a result of that?

17    A    Just a lot of debris.

18    Q    Just blown debris?

19    A    Debris.

20    Q    What kind of debris?

21    A    Well, I don't know if it was from our hotel

22    or somebody else's property, to be honest.

23    Q    Okay.  Fair enough.

24         Let me check my notes a minute here.

25         MR. CONCHIN:  While we're waiting, Court

1    Reporter, Renee, I will send you -- I'm going to

2    mark this picture of Mr. Bushman as Plaintiff's

3    Exhibit 1, and I will send it to you by e-mail.  The

4    one we've been referring to a couple of times.

5              DEPOSITION REPORTER:  Okay.

6              (Plaintiff's Exhibit 1 was marked

7              for identification.)

8    BY MR. TAYLOR:

9         Q    One last question.  Were there any broken

10   windows at the hotel --

11        A    No.

12        Q    -- as a result of the tornado?

13        A    We didn't have -- we didn't have any broken

14   windows not -- not on the front side, and I walked

15   the property.  I don't recall seeing any broken

16   windows.

17        Q    From the street level, did you see any

18   damage to the roof?

19        A    Like I said, I'm scared of heights.  So I

20   didn't get up there.  This tornado came off -- the

21   tornado came off the interstate.  It sounded like --

22   we had to get all -- everybody out and get them in

23   what we thought was a safe room or put everybody in

24   their bathtubs.

25              The way this tornado hit was it come off

Page 177

```
 1        the interstate, and when it hit, it did not come
 2        through our hotel like it should have.  It came on
 3        top of the hotel and landed.
 4             Q    Went over it?
 5             A    Went over it like -- over the top of it.
 6        Now, I don't know if that done the roof damage, and
 7        then it landed back down and -- it's the strangest
 8        thing, and then it landed back down and hit the golf
 9        course right next to us, the hospital and an
10        apartment complex.  Except it went through the walls
11        and all with them.
12             Q    So when the tornado was near the property,
13        it was over the property, not along the property?
14             A    No.  No.  No.  It wasn't high up over the
15        property.  We were lucky that we didn't -- it didn't
16        take the building.  It was just like -- probably the
17        roof level, but I never -- I just never comprehended
18        that it damaged the roof until he said something
19        about it.
20             Q    Today?
21             A    Today.  I never -- I just didn't -- I just
22        didn't put that together with the roof, I guess.
23             Q    Didn't know about any damage until
24        Mr. Conchin said something today from the tornado?
25             A    No.  I mean, I knew that we had a leak in
```

1    the roof because -- we had a leak in the roof

2    because it was over my computer.

3         Q    But that was discovered two weeks before

4    you left your employment -- right? -- in April of

5    2015.  Okay.  Is that right?

6         A    No.  That would have been -- that would

7    have been April 2014.

8         Q    I thought you said you left your employment

9    with Knights Inn in April 2015?

10        A    I did.

11        Q    Okay.  And you said that you -- you

12   discovered that leak was --

13        A    The tornado did not happen until April 2014

14   and the fire didn't happen until March 2014.

15        Q    And then you left Knights Inn in April

16   2015?

17        A    Yes.  That's what I just --

18        Q    Your testimony -- your testimony earlier

19   today was that you didn't have the leak in your

20   office until two weeks before you left the Knights

21   Inn, which would have been April 2015.

22        A    It was -- it was before I left that we had

23   the -- it was before I left that the leak was over

24   my computer.

25        Q    Right.

1      A    But these dates have kind of just gotten me

2  confused based on the letter that you gave me dated

3  on the 15th, and I'm wondering why would they still

4  be talking to her on the 15th, because 2014 is when

5  my son passed away.

6           So that's a year I kind of just don't like

7  to think about.

8           Is that not right, Mr. Conchin?  Is that

9  what you said, 2000- -- you're the one that

10 corrected me on the dates.

11     Q    He can't answer your question, ma'am.

12     A    Oh, okay.

13          MR. CONCHIN:  Yes, ma'am.

14          THE DEPONENT:  I'm talking about with the

15 dates.

16          MR. TAYLOR:  I understand.

17          THE DEPONENT:  Based on the letter you gave

18 me based on what he was saying because he --

19 BY MR. TAYLOR:

20     Q    So the first time you heard of any roof

21 damage as possibly being connected to the tornado

22 was today when Mr. Conchin was asking you questions;

23 is that right?

24     A    No.  It was before I had -- before I had

25 left.  I didn't have any -- I didn't have anything

1    to do with the roof.  Yasif was over the roof.

2    Anything to do with --

3        Q   Right.  I'm saying the first time you knew

4    that there might be any issues with the roof --

5        A   The first time --

6        Q   -- was today?

7        A   The first time that I had an issue with the

8    roof is before I left.  It was leaking over my

9    computer.

10       Q   About two weeks before you left the Knights

11   Inn?

12       A   Yes.

13       Q   Okay.

14       A   Now, Yasif and Ms. Visram and Brent Parrish

15   would have been taking care of the roof.

16       Q   Very good.  Well, thank you very much for

17   your time.

18           Gary, anything else?

19           MR. CONCHIN:  Ma'am, thank you for your

20   patience.

21           MR. TAYLOR:  Thank you very much for your

22   time.

23           MR. CONCHIN:  Ms. Allen, thank you very

24   much.

25           MR. TAYLOR:  Oh, wait a minute.  Hang on.

Page 181

1    Hang on.  Hang on.

2              Ms. Allen, you have the right -- and I

3    can't advise you and Mr. Conchin can't advise you,

4    but you have the right to review your transcript,

5    make sure there are no inaccuracies in your

6    testimony.

7              And the court reporter would explain all

8    that to you, or you can waive that right.

9              We can't tell you one way or the other, but

10   we do have to at least let you know you have the

11   right to review your transcript and then sign --

12   note any corrections, and sign the transcript in

13   front a notary --

14             THE DEPONENT:  So it's like to read over

15   everything we've been over, but not a printed out

16   thing?

17             MR. TAYLOR:  Well, it would be printed out

18   probably for you to do, or you can say I don't want

19   to do that.  But that's up to you.  I can't advise

20   you one way or the other.

21             THE DEPONENT:  I can take -- if you can

22   print it out, I will take a copy of it.

23             MR. TAYLOR:  The court reporter here,

24   Renee, is who -- or somebody from her office will

25   probably be in touch with you.

Page 182

1          Mr. Conchin and I will not be involved in

2     that aspect of it.

3               THE DEPONENT:  Okay.

4               MR. TAYLOR:  Okay?

5               THE DEPONENT:  Okay.

6               MR. TAYLOR:  Great.  Thank you very much

7     for your time.

8               MR. CONCHIN:  Renee, I would like a travel

9     transcript and an electronic and then a copy of all

10    the exhibits, of course, with the travel transcript.

11              THE VIDEOGRAPHER:  All right.  We're going

12    off the record at 1:08 p.m., and this concludes

13    today's testimony given by Sheila Allen.

14              The total number of media used was six and

15    will be retained by Veritext Legal Solutions.

16              (Whereupon the deposition was

17              concluded at 1:08 p.m.)

18    ///

19    ///

20

21

22

23

24

25

1

2

3

4

5

6

7

8          I, SHEILA ALLEN, do hereby declare under

9     penalty of perjury that I have read the foregoing

10    transcript; that I have made any corrections as

11    appear noted, in ink, initialed by me, or attached

12    hereto; that my testimony as contained herein, as

13    corrected, is true and correct.

14          EXECUTED this _____ day of _____,

15    _____, at _____, _____.

                    (City)                  (State)

16

17

18

19          _____

            SHEILA ALLEN

20

21

22

23

24

25

Page 184

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, Registered

3     Professional Reporter, Certified Live Note Reporter,

4     do hereby certify:

5          That the foregoing proceedings were taken

6     before me at the time and place herein set forth;

7     that any witnesses in the foregoing proceedings,

8     prior to testifying, were duly sworn; that a record

9     of the proceedings was made by me using machine

10    shorthand which was thereafter transcribed under my

11    direction; that the foregoing transcript is a true

12    record of the testimony given.

13         Further, that if the foregoing pertains to

14    the original transcript of a deposition in a Federal

15    Case, before completion of the proceedings, review

16    of the transcript [ x ] was [  ] was not requested.

17    I further certify I am neither financially

18    interested in the action nor a relative or employee

19    of any attorney or party to this action.

20         IN WITNESS WHEREOF, I have this date

21    subscribed my name.

22    Dated: March 20, 2020

23

24         RENEE A. PACHECO

      CSR No. 11564 RPR, CLR

25

```
                                                      Page 185

 1    Sheila Allen

 2    470 Jackson Street, Colton, CA 92324

 3                            March 20, 2020

 4    RE:    Haman Inc. v. Chubb Custom Insurance Company

 5          3/2/2020, Sheila Allen (#3980452)

 6          The above-referenced transcript is available for

 7    review.

 8          Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12          The witness should sign the Acknowledgment of

13    Deponent and Errata and return to:

14

15                     erratas-cs@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19       If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25
```

1   Haman Inc. v. Chubb Custom Insurance Company

2   Sheila Allen (#3980452)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____     _____

24  Sheila Allen                         Date

25

Page 187

1    Haman Inc. v. Chubb Custom Insurance Company

2    Sheila Allen (#3980452)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Sheila Allen, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Sheila Allen                         Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

**[& - 88]**                                                                 Page 1

| & |
| --- |

**&**   3:4 4:4 99:9
130:5

| 0 |
| --- |

**01534**   1:8 2:7 6:22

| 1 |
| --- |

**1**   1:25 5:11 176:3
176:6
**10**   5:15 26:13,14
59:9 71:14
**100**   39:8 55:14
159:4 168:14,19
**101**   34:2
**105**   5:20
**1050**   3:16
**10:00**   91:1,12
**10:18**   68:11
**10:29**   68:15
**10:52**   88:20
**10th**   159:8
**11**   79:11,17
**112**   63:17
**11564**   1:23 2:17
184:24
**11:00**   88:24
**11:40**   123:4
**11:52**   123:8
**12**   14:10,13
**12-26-54**   9:15
**123**   5:22
**127**   5:5
**12:00**   91:2
**12:43**   164:14
**12:49**   164:18
**13**   5:13,14,17
56:11
**13,000**   157:10
**132**   34:2
**1330**   129:25

**1351**   129:25
**15**   23:9 71:14
162:20,22
**150**   27:13
**1500**   3:16
**15th**   179:3,4
**168**   5:6
**169**   66:15,16
**170**   110:18 116:12
**176**   5:11
**18**   16:17 17:13,16
**184**   1:25
**1998**   132:22
**1:08**   2:16 182:12
182:17

| 2 |
| --- |

**2**   1:17 2:16 6:1,5
81:7 83:13
**20**   17:12 51:8,9,9
52:6,13 122:16
184:22 185:3
187:15
**2000**   179:9
**2012**   25:16,17 27:6
**2013**   5:19 52:18
78:10
**2014**   5:17,21 28:14
51:18 52:8,18
56:11 77:14 89:22
105:15 106:23
146:4,25 150:15
151:21,22 161:21
162:1 164:3 165:1
166:4 178:7,13,14
179:4
**2015**   5:16,23 25:15
25:19,22 27:6
28:4 42:17,21
59:9 100:13,15
101:3 103:7,22
104:19 105:11

123:17 124:22
125:9 159:8 161:1
162:19 164:23
165:9,20 166:5
178:5,9,16,21
**2016**   26:5
**2020**   1:17 2:16 6:1
6:5 184:22 185:3
**205**   4:9
**22nd**   89:22 146:4
151:21 161:21
**24**   27:18
**24/7**   85:20 133:7,8
**240**   92:20
**2404**   3:7
**25**   15:10 52:6
**270**   110:17
**28**   151:22
**28th**   150:15 162:1
**2900**   2:14 6:24
**2:18**   1:8 2:7 6:22

| 3 |
| --- |

**3**   84:19 92:20
**3-12-14**   134:7
**3-12-2014**   130:9
**3/2/2020**   185:5
**30**   16:1 17:20,25
18:10 24:5 33:17
35:14 40:15 52:13
52:16 93:3 106:23
131:10 185:17
**30338**   3:17
**31**   131:22
**326-6600**   4:9
**349,000**   109:12
**35216-1228**   4:8
**35801**   3:8
**36**   17:24
**3980452**   185:5
186:2 187:2

| 4 |
| --- |

**404**   3:18
**45**   16:7
**470**   15:6 185:2

| 5 |
| --- |

**50**   51:24 131:9
**500**   35:21
**5000**   110:23
**54**   5:18
**55**   5:17
**59**   5:15

| 6 |
| --- |

**6**   92:20
**60**   51:14 142:20
**65**   9:13
**661228**   4:7
**69**   131:22 132:12

| 7 |
| --- |

**7317**   184:23
**75**   81:20
**78**   5:19

| 8 |
| --- |

**8**   5:4
**80**   30:25 51:10
131:6,8,10
**81**   5:13 13:3,4
**82**   5:14 13:16,17
**83**   5:15 59:5,6
**84**   5:17 55:18,22
56:9,15
**845-1944**   3:18
**85**   5:18 54:22,23
56:4 57:10,18,23
59:19 95:14
**86**   5:19 78:6,7
**87**   5:20 105:14,17
**88**   5:22 123:13,18

**9**

**9** 5:19,23 78:10
123:17
**90** 142:21
**909.645.6916.**
22:24
**92324** 15:7 185:2
**9:05** 2:15 6:2,5
**9:18** 19:9
**9:21** 19:13
**9:30** 91:13

**a**

**a.m.** 2:15 6:2,5
19:9,13 68:11,15
88:20,24 123:4,8
**abilities** 44:21
**ability** 137:11
147:10,17 148:1
157:25 158:17
**able** 9:25 18:12
62:7 115:2 127:10
167:5 172:16
**absolutely** 41:23
41:25 48:17,25
68:6 70:10 74:1
99:24 129:11
133:9 166:13
**access** 43:12 44:9
58:16 81:6 118:12
141:25 145:13,15
153:5 162:16
172:1,4,8,8 173:8
**accessing** 172:10
**account** 43:12
**accountant** 48:6
48:10,11,13
**accounting** 44:21
152:11
**accuracy** 185:9

**accurate** 31:15
44:21 57:24 59:14
59:17 60:15 94:15
142:3
**acknowledged**
171:18
**acknowledgement**
187:3
**acknowledgment**
185:12
**acted** 74:14
**action** 6:21 7:5
184:18,19
**adams** 2:14 6:24
**addition** 38:12
115:13 134:14
159:18
**additional** 149:23
**additions** 187:6
**address** 15:5,5
18:6 97:23
**addressed** 56:23
107:4 109:6 112:1
**adequate** 117:5
**adjacent** 66:16
67:1
**adjuster** 94:10
97:13 135:15
**adjusters** 136:1,2
**adjustments** 33:16
**administered** 8:13
**ads** 31:25
**adventure** 136:15
136:18
**advertising** 31:21
87:2
**advise** 181:3,3,19
**affect** 48:23 95:20
**affiliations** 7:9
**afford** 115:25

**afloat** 147:18
148:1
**age** 9:11 16:16
17:13 71:9
**agent** 74:20 75:15
76:4
**ago** 8:18 20:21
22:8 24:5 25:11
33:20 58:25 67:25
94:14,19 102:24
135:12
**agree** 6:13 62:24
63:13 118:19
138:22
**agreed** 123:23
124:25 125:4,4,14
137:18
**agreement** 79:10
118:14,20 119:7
**ahead** 128:14
130:17 149:4
172:13
**air** 12:16 133:13
**akler** 130:6
**alabama** 1:2 2:2
3:8 4:8 6:20 9:25
10:6 16:9,10
17:10 24:4,21
26:2 31:25 113:16
**alainjurylaw.com**
3:9
**allegedly** 9:3
**allen** 1:15 2:13 5:3
5:17 6:16 8:6,12
8:18 9:6 56:6,10
68:17 89:2 105:13
122:20 123:10
126:21 163:21
164:20 167:24
172:16 180:23
181:2 182:13

183:8,19 185:1,5
186:2,24 187:2,4
187:12
**allotted** 185:20
**allow** 11:19
**allowed** 14:15
**amended** 5:13 8:6
13:2
**amount** 51:12,14
109:12 115:20
143:13 146:12
**angeles** 18:11
**answer** 11:10,19
11:20,21 12:21
17:22 57:3 59:2
64:20,24 90:9
92:3 114:8,9
127:24 128:1
131:16 143:20
179:11
**answered** 19:19
145:25 165:10
**answering** 64:22
114:24
**anybody** 19:17
22:18 100:1
102:14 111:16
112:14 138:8
139:19 141:3
144:21,22 145:9
149:17 153:11,16
154:4,5 162:15
**anymore** 36:4
103:13 116:1
117:12
**anytime** 12:11
109:22
**anyway** 12:7
126:5 144:24
**apartment** 177:10

**apartments**
144:18
**apologize** 17:21
48:14 54:22 166:2
**appear** 148:11
183:11
**appearance** 7:9,11
**appearances** 3:1
4:1
**appears** 55:24
**appended** 187:7
**applicable** 133:15
185:8
**appointment**
158:25
**appointments**
90:3
**appraisal** 135:16
136:15,18
**approval** 43:8
**approved** 109:15
**approximately**
23:9 72:1 77:9
120:22 121:3
124:22
**april** 25:15 27:6
28:4 42:17,21
100:13,15 101:3
103:7,22 104:18
105:11 122:5
146:19 148:18
150:3,15,22,22
151:22 161:1
162:1,4,9,9,12,18
163:6 164:23
165:9,19 178:4,7,9
178:13,15,21
**area** 12:9 72:13
83:11,11 84:13
131:21 133:1,2
138:24 149:1,19

163:16
**areas** 60:12 61:1
82:9
**arrested** 48:18,20
**arthur** 101:21,23
113:25
**aside** 63:22,23
**asked** 12:20 14:10
17:21 19:17,19
23:19 37:15 39:17
53:25 57:3 64:17
78:20,23 79:2
80:25 95:4,7
108:12 110:6,9
111:4 115:19
117:1 129:15
132:19 135:9
136:9 141:25
151:23 164:2,4
166:10,16 170:4
172:9
**asking** 10:7 58:19
58:24 59:2 126:19
127:15 154:2
164:22 170:24
179:22
**aspect** 182:2
**assessment** 160:15
**asset** 31:3,3
**associates** 99:9
130:5
**assume** 11:10 66:9
146:7,10
**assumed** 63:19
157:6,22,23
**assuming** 32:14,16
74:13 77:16
135:25 143:9
171:13
**assumption** 62:5

**atlanta** 3:17 76:25
90:1,4,6,10,14
91:6 97:10
**atmosphere**
154:21
**attach** 87:24
155:24
**attached** 155:23
183:11 185:11
**attend** 9:25 151:7
**attended** 33:21
**attending** 7:8
**attention** 78:17
155:22
**attorney** 3:6,15
4:6 7:12 184:19
**audio** 6:11,12
21:24 22:1 88:11
**audit** 43:4,7 44:2
44:13,13 48:12
50:3 151:15
152:10,18 174:5
**auditing** 44:1
**audits** 45:2 170:9
170:11,19 173:17
173:23 174:3
**august** 5:19 18:16
78:10
**authority** 43:21,23
138:11 161:15
**authorized** 105:25
111:6 157:15
**automatic** 31:1
**automatically**
50:22,24
**available** 27:18
151:12 153:11
162:15 185:6
**average** 51:19
52:15,16

**aware** 48:9 54:11
55:12 85:23 86:5
89:3,9,11 101:12
103:23 104:8,17
105:1,9 145:5
150:20 159:9,11
160:7,12,25

**b**

**b** 1:6 2:5
**bachelor's** 24:10
24:12
**back** 19:11,15,15
25:12 26:20 29:20
36:8,9 42:23
47:15 49:9 50:5,6
54:16 58:5,6 67:2
68:13 69:12 71:6
78:2 79:5,14
80:19,20 81:1
82:5,17 87:21,24
88:3,22 90:18
93:22 94:13,16
96:1 98:21 108:5
109:3,5,10 118:6
119:13 123:6
125:9 126:7
127:10 139:4
140:16 144:25
152:3 156:16
161:10,11,20
164:16 165:16,22
166:22 167:22
170:9 174:6,7
177:7,8
**backed** 50:13,24
**background** 23:6
**backup** 50:15,16
**backups** 50:19,21
50:21
**bad** 71:5 141:6,12
145:1 156:18

**badly** 57:20
**bagged** 157:21
**bags** 156:19 157:1
157:7,22
**balcony** 48:2
**ball** 23:15 31:24
56:17 137:4
**ballroom** 49:6,13
51:3 103:19,21
**bank** 62:15
**banquet** 83:10,16
**bar** 35:17,18,22
36:17 49:7,13
133:1,3
**base** 165:20
**based** 57:14 141:9
167:22 171:15
173:16,22 179:2
179:17,18
**basic** 8:23
**basically** 59:23
158:14 159:3
160:8
**basis** 60:3 97:18
**bates** 129:25
**bathroom** 43:18
**bathtub** 71:8
**bathtubs** 71:8
176:24
**bb** 112:9
**bbmk** 111:13
112:4,13
**beams** 47:5,11,19
47:24,25 107:19
107:21,22,24,25
110:5,7,9,11 113:6
113:9 140:8,9
**bear** 111:9 164:1
165:23
**bed** 61:13 64:3
71:1 90:25 128:23

**beds** 54:4 69:12
70:24
**beginning** 2:15
7:12 19:12 68:14
88:23 123:7
164:17
**behalf** 2:14 7:14
7:16,19 9:1 136:3
**belfor** 99:11,12
**believe** 22:1 34:11
87:8 89:22 110:17
119:10 121:5
136:8 142:13
164:22 172:22
173:1
**bell** 131:13
**benefit** 36:17
**benefits** 18:12
**bessemer** 78:11
**best** 22:21 23:2
54:2 60:24 61:2
67:11 138:14,15
156:7
**better** 44:20 69:8
69:13 74:24,25
159:24 161:13
**bid** 47:18 113:9
**bids** 113:12
**big** 11:16 113:17
120:1,14,17
174:16,17
**bill** 157:6,9
**bind** 119:15
**birmingham** 4:8
76:13,25 97:10
126:10 127:11
**birth** 9:14
**bit** 23:5 33:20 68:3
103:4
**black** 97:1

**block** 47:3
**blocked** 41:13
64:13
**blown** 175:18
**book** 52:14 75:5
**borrowing** 62:15
**boss** 31:14
**bottom** 133:18
**bought** 80:13
115:22,23,23
157:12
**box** 4:7 49:21
**boxed** 49:22 152:4
**boxes** 88:6
**branches** 175:7,16
**brand** 46:2,3,4
**brannon** 77:25
78:13,14 82:5,17
92:13 94:6 108:1
133:24
**break** 12:11,14,17
12:22 37:8 68:4,7
112:9 122:18
123:10 164:9,10
**breaker** 82:12
**breathtaking**
165:25
**brent** 5:17,23
53:17 54:10,12
56:10,25 62:3
63:16 65:16 94:11
95:4 96:1,17
97:18,19 98:17
99:13 105:6
112:16 123:16
137:4 138:1,8,12
144:21 156:11,11
157:17 159:10
160:17 165:18
169:6,7 170:12
180:14

**brentbriar** 47:22
**brentwood** 47:22
**bring** 14:7,10
21:14 73:20 93:16
101:15
**bringing** 165:24
**brings** 159:5
**broader** 32:4
108:12
**broken** 30:18
175:15,16 176:9
176:13,15
**brookstone** 5:21
105:16 107:7
109:1 112:21
113:10 164:2,25
**brother** 71:10
**brothers** 69:18
116:25
**brought** 13:25
73:25
**brown** 135:14
**brownish** 97:1
**brundidge** 17:10
17:11
**buddies** 137:3
**buddy** 137:4,4
**bugs** 128:23
**build** 104:14
167:22
**building** 27:15,23
28:13 41:9,11,12
41:18 46:9 50:1,1
50:2 51:2,6,7 52:9
73:14,17 84:4
94:1,21,25 96:22
98:24 100:8,10,16
101:10,13 103:6
103:23,24 104:9
104:13,18 109:18
131:6,7,8 146:4

149:22 152:14,20
152:25 153:1
165:6,7 177:16
**buildings** 27:19
41:7 49:4 73:15
73:18 77:23 105:3
105:10
**bukhari** 29:14
30:10 33:10 40:5
40:12,14 44:11
68:20 86:3,6
143:1 145:12
151:6
**burden** 158:13
**burned** 47:25
153:7
**bushes** 144:20
**bushman** 135:16
168:11,24 169:10
169:17 176:2
**business** 8:22
14:14,16 23:8
24:18 32:25 44:6
98:10,14 99:6
120:10 127:19
137:24 140:18,19
146:16 147:18
148:1 151:13
154:10,11 159:25
170:5
**businesses** 24:17
**busting** 144:15
**busy** 69:20
**butt** 167:18
**buy** 81:2 116:2
131:17
**bypass** 161:5,9

**c**

**c** 29:12
**ca** 185:2

**cabinet** 50:7 88:6
**cabinets** 49:20
**cage** 35:14
**california** 1:16
2:15 6:1,25 9:23
15:6,9 18:3 23:20
184:2
**call** 36:10 37:22,24
91:20 93:16,22
103:24 107:12
140:19 152:14,19
161:10,11
**called** 5:21 37:14
90:23 91:14,18,23
91:25 92:14 98:24
105:16 107:8,11
108:4 110:6,23
111:13 112:21
122:9 156:16
171:23
**calling** 49:3 51:2,6
91:16 137:15
**calls** 86:11
**capable** 158:23
**card** 44:17 98:10
98:14,16
**care** 30:12 72:22
78:3 79:12,22,24
80:1,2,3,10 81:14
81:22 82:3,4,10,14
82:16,17 83:15,21
92:25 109:23,25
122:8 126:15
142:13,14 159:4
175:11 180:15
**career** 167:1
**carpentry** 133:16
**carpet** 39:11 56:21
60:17 63:21,23
65:7 67:16 115:22
117:25

**carpenter** 131:11
**carry** 11:25
**case** 6:21 10:1
13:10,11,12 22:19
22:22 37:13,14
81:9 115:9 127:9
127:9 130:22
135:17 156:5
184:15
**casey** 16:5 17:2,8
17:9,22
**casey's** 17:24
**catch** 74:23
**categories** 14:11
14:13
**caught** 17:5 48:1
153:1
**cause** 6:11 150:1
159:25
**caused** 92:6 99:17
105:4
**cave** 107:25
**ceiling** 56:20
63:21 72:13,19
101:1 107:20
115:23 117:25
143:4,15 152:22
**ceilings** 61:12
**cell** 6:9 22:25
**cellular** 6:8
**center** 154:13,15
**certain** 115:20
**certified** 2:17
184:1,3
**certify** 184:4,17
**cetera** 51:3
**chainsaw** 175:10
**challenge** 39:9
**challenges** 39:9
**chance** 56:14

**change** 151:9
166:9,10,13,15
186:4,7,10,13,16
186:19
**changed** 134:25
**changes** 185:10
187:6
**character** 39:15
**characterize**
137:11
**charge** 85:16
**charged** 157:12
**charts** 150:17
**check** 43:15,18,21
43:23 45:9 70:16
70:24 71:15
146:12,13 170:23
171:10,11 175:24
**checked** 82:5
**checking** 43:12
114:6
**checks** 43:11,13
**cheryl** 29:6 30:8
40:2,4
**cheryl's** 29:7
**chief** 78:12
**child** 18:9
**children** 16:2,14
16:16,19 17:8
18:8
**children's** 23:10
**chip** 50:23
**chris** 16:5,6,8,12
**chubb** 1:9 2:8 6:18
7:14,16 8:19
53:17 74:17,18
75:14,18,20 76:19
97:12 127:18
128:7 130:2,22
136:3,9 137:22
138:8 140:17

144:22 145:9,13
145:18 149:9,18
150:13 151:9,10
153:16 154:4
160:4,13,20
162:16 185:4
186:1 187:1
**church** 23:23
158:25
**city** 78:11 183:15
**civic** 154:13
**civil** 6:21 8:10
**claim** 53:24
121:11 123:12
124:8,18 140:18
142:24 150:12
169:17
**claims** 9:1 85:24
**clarify** 127:8
**clean** 29:23 69:21
69:23 128:8
154:21 157:13,23
168:22
**cleanable** 157:1
**cleaned** 30:1 39:11
45:25 84:4,24
155:21 156:7
157:10
**cleaning** 43:19
45:23 69:20
156:10,22 157:14
**cleanliness** 134:23
154:25 155:14
**clear** 80:6 106:10
127:12 130:11
133:19 134:5
141:3
**cleared** 161:19
**clerk** 35:5 39:20
43:5

**close** 15:9 24:22
27:16 44:3 74:14
97:16 124:16
143:11 146:13
154:14
**closed** 26:13 43:5
132:22 133:1,1
**closer** 174:21
**closing** 150:8
163:15
**cloud** 3:4
**clr** 1:22 2:18
184:24
**clubhouse** 133:15
**clue** 86:16 95:22
**codes** 39:13
**coincide** 106:14
**cole** 3:4
**collapse** 108:22
140:7
**colleagues** 74:15
**college** 23:7 24:2,3
33:1,21,25 34:4,7
**colors** 74:24
**colton** 15:6,8 18:5
185:2
**come** 18:13 31:1
44:22 45:1,9
46:20 47:12,15,23
69:11 71:2 76:12
76:13,25,25 77:1
77:15 78:2 79:14
80:19,20 85:8,11
96:2 97:10,11,12
97:21 98:6,13
105:22 106:9,17
108:5 109:23,24
110:2,20 112:22
113:15,22 116:15
121:6 126:3
127:10 128:24

138:7 144:25
153:16 154:5
156:17 157:10,24
160:14 165:16
172:20 173:5
176:25 177:1
**comes** 102:1
104:21
**comforters** 55:6
55:17 63:20 64:3
65:10 156:12
**coming** 85:2,8
112:14 144:14,15
157:20
**commanded** 13:21
**commerce** 3:7
**communicate**
137:12
**communication**
124:6 160:6
**commuting** 26:18
**company** 1:10 2:9
5:21 6:19 7:15
8:20 47:18 62:16
73:21 75:9 76:1
85:3,5,7 96:6,6,13
98:5,8,8,24 102:22
105:16 107:7,8,11
107:12,12 111:6,7
111:13,22 112:12
121:10,24 122:9
124:5 125:13
130:2,22 138:20
148:8 149:17
156:14 157:17
185:4 186:1 187:1
**compensated**
38:11,16
**compensation**
38:7,15,22 42:2

**competent** 129:14
**complaint** 109:22
**complaints** 52:19
52:24,25 53:2,4,6
**complete** 11:21
58:8 63:24 64:5,6
64:9 74:10 187:8
**completed** 185:17
**completely** 11:20
80:23 123:24
**completion** 184:15
**complex** 73:18
177:10
**compliance** 150:9
**compound** 155:6
**comprehended**
177:17
**computer** 32:1
44:3 50:13,23,25
100:21 151:5
178:2,24 180:9
**computerized**
50:12
**concentrating**
99:2
**concerned** 140:3
140:24
**concerning** 8:25
**conchin** 3:4,5 5:5
7:18,18 10:5,11
12:8 13:6,9,19
20:19 21:5,19
37:3,6,13,18 55:25
56:7,12 64:16,20
64:23 65:1 73:1,5
73:9 122:19,25
127:2,24 128:6,17
130:19 131:19
132:2,6,10,11,17
134:1 136:7,24
137:10 139:14

144:1 145:7 147:8
147:16,23 148:10
148:19 149:7
155:5,8,13 159:6
160:2 161:2,16
164:11,19 167:23
168:10 169:22
170:4 171:25
172:5,9,13 175:25
177:24 179:8,13
179:22 180:19,23
181:3 182:1,8
**concluded** 182:17
**concludes** 182:12
**conclusion** 125:16
**concrete** 138:23
**condition** 166:23
**conditioning**
  133:13
**conduct** 73:22
  85:12 93:21
**conference** 3:10
**confused** 162:25
  166:19 179:2
**connected** 179:21
**connection** 8:20
  54:8 85:25 125:22
  170:20
**consequences**
  161:25
**constantly** 54:17
**contact** 53:16
  121:9 124:14
  163:4,5
**contained** 183:12
**container** 78:25
**contents** 5:18
  53:25 54:9 55:8
  56:5 57:6,14,20
  60:14,16,18,24
  61:9,11,17 62:22

63:4,17,24 64:15
65:5,9 67:17 95:5
95:13 96:8 114:2
138:14 142:5
173:14
**continue** 6:12
**continued** 4:1
**contract** 35:19
  118:17,18
**contracting**
  111:14 112:13
**contractor** 75:3
**contractors**
  119:22 124:16
  125:22,25
**conversation** 11:5
  12:1 37:13,18
**conversations** 6:7
  96:16
**convicted** 48:16
**copy** 118:20
  126:23 151:25
  171:24 181:22
  182:9
**corners** 118:5
**correct** 32:15
  44:19 53:12,13
  56:24 57:9,16
  59:12,23 60:20
  107:6 119:19
  160:9 162:19
  163:24,25 183:13
  187:8
**corrected** 84:19
  179:10 183:13
**corrections** 181:12
  183:10 187:6
**correspondence**
  164:25
**cost** 30:25 41:21
  42:2 120:16 138:4

**counsel** 6:17 7:7
  10:5 88:8
**couple** 20:23
  22:15 131:3 168:1
  176:4
**course** 62:9,11
  103:9 144:18
  177:9 182:10
**court** 1:1 2:1 3:7
  6:19 7:2,22 9:20
  11:17 12:2 128:2
  175:25 181:7,23
**cover** 13:20 58:7
  58:16 172:12
**covered** 14:13
  65:11
**covers** 82:9,13
**cowin** 29:8,9,10
  30:8 43:23
**created** 48:8 118:8
  173:22
**credit** 44:17
**crews** 46:16,20
  175:13,14
**cross** 8:8
**crown** 3:16
**crs** 129:5
**cs** 185:15
**cs3980452** 1:24
**csr** 1:23 184:24
**current** 15:5
**curtains** 39:11
  45:15,16,19,22
  46:2,3,4,5,6 54:3
  55:6 61:13 63:20
  64:1,2 65:13 93:9
  93:12 156:6,10,12
  157:10,11,14
**custom** 1:9 2:8
  6:18 7:14 8:20
  130:2 185:4 186:1

187:1
**customer** 53:3
**customers** 120:18
  141:10
**cut** 64:23,25 118:5
  160:5 168:22
**cutting** 114:22
**cv** 1:8 2:7 6:22

**d**

**d** 1:6 2:5 3:14
**daily** 97:18,18
**damage** 9:3 60:14
  61:8 62:22 63:5
  70:4 85:25 94:2,4
  95:24 96:8,10,24
  97:21 98:1 99:17
  105:1,9 107:9,14
  108:15,16,19,20
  113:4,25 114:3
  119:20 121:10
  135:13,22 136:4
  136:10 144:12
  145:1,10,17,19
  146:11,15,20,21
  146:24 147:1,10
  147:17,25 149:23
  150:12,16,17
  163:18 168:13,25
  176:18 177:6,23
  179:21
**damaged** 27:24
  54:1 60:16 61:11
  62:21,23 63:2
  65:20 66:4,8,21,23
  67:6,14,18,22 95:3
  95:17 96:21 105:6
  109:17 146:4
  148:25 149:19,22
  153:8 174:18,19
  174:22,23 177:18

**damages** 109:11 113:12 114:14 125:24
**dangerous** 100:22 138:24 139:1
**dark** 135:14,14
**date** 9:14 20:22 134:6 150:15 184:20 186:24 187:12
**dated** 5:15,17,19 5:20,23 23:18 56:10 59:9 78:10 105:15 106:22 123:17 163:3 166:8 179:2 184:22
**dates** 20:22 26:3,6 26:7 34:20,23 162:5,6 163:21 179:1,10,15
**daughter** 167:2
**david** 4:5 7:16 122:15
**day** 26:15 39:7 44:7 89:21 90:22 92:25 114:6 162:10,10 183:14 187:15
**days** 23:25 33:8 142:21 185:17
**dba** 6:18 7:19 159:10
**deal** 68:21 120:1 121:10 125:14,17 137:5 158:1 160:5 160:13,20 161:5 161:24
**dealing** 53:21 121:14 160:21 165:17,18

**dealings** 122:12
**dealt** 43:16 47:20 101:19 161:13
**death** 28:7 108:23 112:20 165:24
**debris** 175:17,18 175:19,20
**deceased** 15:22,25 16:22 31:7
**december** 21:21
**decided** 160:18
**decisions** 43:8
**declare** 183:8 187:4
**decorating** 45:14
**dedicated** 82:21
**deducted** 41:21 42:3
**deemed** 187:6
**defendant** 1:11 2:10,14 3:12 4:3 6:17 7:14
**defendant's** 5:12 13:3,4,16,17 54:23 55:18 56:4,9 59:6 78:7 105:14,17 123:13,18
**define** 107:17
**definitely** 23:25 30:22 33:12 39:15 63:2 124:20
**degree** 24:9,10,12 24:15,17
**delay** 146:3 147:10,17,25 148:3,11
**deny** 141:24
**department** 53:10 71:3 78:12 85:1,7 91:25 109:20,24 140:3 150:5 153:7

163:12
**depending** 126:20
**depends** 61:10
**deponent** 8:4 37:5 37:10 88:9 114:25 115:4 128:3,15 130:18 131:17 133:23 136:23 137:9 139:10,12 143:21 145:4 147:6,14,21 148:7 148:15 149:5 159:22 160:25 161:8 164:10 167:16 168:3,6 169:23 179:14,17 181:14,21 182:3,5 185:13 187:3
**deposit** 43:2
**deposition** 1:15 2:13 5:13 6:11,16 6:23 7:24 8:5,7,7 9:17 10:17 12:7 13:2,12 18:19,23 19:4,18,20 20:7,11 21:1,2 22:15 114:21 115:1 127:9 143:10 176:5 182:16 184:14
**deposits** 44:10
**depreciating** 167:20,20
**describe** 39:5 56:1 96:25 129:22 137:13 151:17 158:17
**described** 135:13
**description** 168:15 169:24 171:23

**designated** 121:8
**desire** 167:11
**desk** 30:9 35:5 39:20 43:3,5 49:20 91:19 93:14 98:15 133:6,8 143:6
**desperately** 119:13
**despite** 126:12
**detailed** 110:4
**detectors** 133:17
**determine** 95:2
**determined** 150:13
**devastating** 166:24
**devices** 83:9
**diabetic** 26:12
**died** 167:2
**different** 14:10 50:1 82:9 150:23
**differently** 73:16
**directed** 157:16 165:3
**direction** 184:11
**directly** 43:16 86:7 160:5,13,20 161:14
**disagree** 60:21 61:4,5 63:13
**discovered** 150:18 178:3,12
**discovery** 8:8
**discuss** 38:25 141:1
**discussed** 51:4
**discussion** 62:14
**disk** 21:20
**distance** 81:18

**district** 1:1,2 2:1,2 6:19,20
**divider** 149:10
**dividers** 153:25
**division** 1:3 6:20
**dlee** 4:10
**doc** 173:18
**doctor's** 90:2 158:24
**document** 5:20 13:8,9 55:2 57:17 57:22 60:22 87:20 105:15,21 106:12 129:21,23
**documentation** 118:8 125:22 126:12,13 171:7 172:19 173:5
**documented** 118:11
**documents** 14:5,8 14:11,12,15,20,20 141:19 142:12,14 170:6,18,19 171:1 171:22 172:20 173:11 174:11
**dodgers** 23:12
**doing** 8:21 40:10 40:11 56:25 58:19 63:16 79:19,20 83:14 86:23 89:18 93:18 99:15 112:19 116:3 128:9 165:5
**dollars** 119:9
**door** 30:23 31:1 87:2 93:13 107:23
**doors** 83:10 112:25
**double** 39:20 170:13

**doubt** 146:20
**downstairs** 95:22
**drapes** 54:4 64:2 65:14
**dresser** 66:15,18 66:24 67:1
**dressers** 66:12
**drew** 71:18
**drinker** 36:16
**drive** 26:12 90:1,3 90:13 93:22 158:24,25
**driving** 26:14 158:23,24
**dry** 156:22 157:10 157:13,13
**dublin** 16:20 36:9 36:10
**due** 76:5 103:13
**duly** 184:8
**duncan** 119:22 120:4,12 125:24
**dust** 71:3
**duties** 39:5,21 115:14
**dying** 127:20

### e

**e** 5:17 20:15 37:21 56:10,23 57:4,7 58:7,9,11 176:3 186:3,3,3
**eager** 142:7,8,10
**earlier** 178:18
**early** 136:9
**education** 33:24 129:6
**educational** 23:6
**effort** 75:1
**egress** 80:9 83:2,8
**eight** 17:15

**either** 40:17 44:9 87:4 92:1 109:9 113:8 122:1 159:2
**elderly** 23:24
**electrical** 79:21 80:1 81:25 82:7 133:16
**electronic** 182:9
**elegant** 45:7
**elevator** 133:15
**elevators** 133:14
**else's** 175:22
**emergency** 82:25 133:14
**employ** 99:23
**employed** 32:8,10 32:12
**employee** 30:15 40:9 42:7 118:23 184:18
**employees** 28:18 28:20 39:25 41:8 41:20 52:7 86:25 99:19 118:23 139:5,21 165:7
**employment** 42:20 87:14 178:4,8
**ended** 112:4 163:15
**engaged** 17:8 125:23
**engineers** 149:17
**english** 34:2
**entire** 71:25 72:21 73:4,21
**entirely** 119:25
**entitled** 130:1
**entrance** 27:17
**envelope** 44:5,7,13
**equate** 144:4

**errata** 185:11,13 185:17
**erratas** 185:15
**error** 157:2
**estimate** 19:3 47:12 98:1,3,6 105:23 106:5,6,13 106:16,18,22 108:7,11,25 109:11 110:7,8,11 110:21,22 111:1 111:13,17 113:23 113:24 119:25 120:13 142:2 164:1
**estimates** 113:12 122:2
**estimation** 66:7
**et** 51:3
**evaluation** 146:13
**evening** 91:3
**event** 11:1
**everybody** 90:19 90:20 102:25 139:16 176:22,23
**exactly** 11:24 94:24 118:3,3 129:4 157:19
**examination** 5:2 8:8,16 127:1 168:8
**examined** 8:13
**example** 93:6 131:2
**excellent** 30:15 117:6
**excluded** 123:25
**excuse** 69:1 100:13
**executed** 183:14

executive 6:24
exhibit 5:11,13,14
  5:15,17,18,19,20
  5:22 13:3,4,16,17
  14:5 54:22,23
  55:18,22 56:1,4,9
  56:15 57:10,18,23
  59:5,6,19 78:6,7
  95:14 105:14,17
  123:13,13,18
  176:3,6
exhibits 5:9
  182:10
exit 80:13,20
  82:22,24 83:10
  133:15
exits 82:23
expansion 153:18
  153:20,22,23
  154:7
expected 145:18
  145:20
expensive 45:6
  47:14 80:16 120:1
experience 129:1
expertise 54:3
  58:1 67:7
explain 9:19
  139:15 140:1
  141:13 155:18
  156:7 181:7
expressed 138:1
extent 48:10
exterior 109:11
exterminator
  128:23
extinguisher
  81:20
extinguishers
  78:24 79:19 80:19
  81:3

extra 114:19
  115:13,14
eyes 141:4

**f**

facility 134:22
fact 130:9
facts 22:19
fails 185:19
fair 11:7,14 12:5
  12:23,24 40:18
  48:22 52:18 76:23
  105:8 130:23
  131:24 132:12
  152:14 153:12,13
  154:9 158:5
  166:16,17 174:14
  175:23
fairness 142:8
familiar 40:22
  112:9 122:9 143:2
family 28:5 101:16
  103:14 120:20
  134:15 154:21
fan 23:25
far 26:12 43:4,7
  60:16 71:7 72:16
  94:3 113:22
  122:22 131:20
  134:20 135:6,8
  143:23 144:15
  150:10 151:13
  153:5
fascinated 33:2
fast 50:8 62:3
  99:15 114:25
  117:10 154:16,19
fastest 67:9
father 69:9
fault 159:25
favorite 99:3

fax 98:21 170:14
  171:6,8 173:20,21
faxed 58:6
february 5:23
  77:11,14 100:12
  123:17 124:22
  125:9
fed 40:16
federal 8:9 184:14
feed 23:22
feel 12:15 63:24
  76:10 112:19
  125:2 127:14
  129:9,12
feeling 36:2,4
  161:3
feet 81:20
fell 34:6,6
felony 48:16
felt 14:7 59:13
  64:4 67:14 117:4
  121:18,25 126:11
  156:21
fence 148:24
fencing 149:10
fight 150:8,8
fighter 35:14
figure 170:8
file 6:21 88:4,6
  118:21,25 119:2,3
  132:19 171:1
filed 6:19 8:21
  44:15 140:18
files 99:3 132:23
  132:25 171:3,11
  171:12
filing 49:20 50:7
fill 39:19 87:3
filled 59:14 152:21
final 130:11
  133:19

finally 17:19 54:17
  83:19
finances 43:1
financial 43:7,9
  48:7,8 119:15
  170:6,19 174:10
financially 7:5
  184:17
find 11:13 44:18
  56:2 112:22 117:8
fine 30:7 172:15
  174:14
finish 64:24 76:20
  90:8
finished 10:11
  115:11 117:12
finlayson 3:13
fire 9:2 27:15,24
  28:12 39:12,13
  40:1,25 41:18
  42:11,13 45:23,25
  46:9 47:2,8,9,10
  47:15 48:1,4
  52:19,23 53:15
  54:1 55:9 62:25
  64:13 66:17 67:2
  73:2,23 74:3,8,9
  77:11,12,17,21,25
  78:11,24 79:19
  80:19 81:2,19,23
  85:1,7,13,13,14,16
  85:20,23 89:21
  90:11,17,21,23
  91:10,22,25 92:2,3
  92:6 94:1,12 95:2
  95:3 98:1 100:4
  105:4,7 106:2,10
  106:21 109:11,17
  112:24 113:4,5,13
  113:25 114:3,14
  115:17 119:20

120:23,25 121:1,6
121:10 123:12
125:24 127:21
130:8 132:3,13
133:11,24 134:7,9
135:4,8 138:2,22
139:4,23 140:3
141:5,6,10 142:18
142:19 143:11,13
144:24 145:14,24
146:3,4,11,13,14
146:18,20,21,23
147:1 148:16,22
148:25 149:18,22
150:21 151:18,21
151:23,25 152:6,7
153:1,3,7 154:21
159:13,17 160:1
161:21,24,25
162:8 163:2,7,12
163:13,16,16
164:5 165:6 166:4
168:23 169:1,5,13
178:14
**fired**  41:9 116:21
116:23,23
**firing**  31:21 39:23
**firm**  7:3
**first**  12:21 20:1,5
20:6 25:10 35:3
36:10 44:16 54:21
59:18 78:18 79:20
79:20 81:1 83:4
85:20 101:9,11
102:20 105:20
106:20 108:2
116:14 117:6
120:7,24 136:15
136:18 140:5
162:10 163:23
179:20 180:3,5,7

**fitness**  133:16
**five**  12:15 21:18
34:24 36:21 64:17
68:7 122:18 123:7
152:4 164:13
168:5
**fix**  47:19 100:6
106:1 142:17
**fixed**  19:2 30:18
41:13,14 47:4,17
83:6 139:3 140:15
155:21 163:17
**fixing**  30:22 147:3
**flat**  131:18
**floor**  82:1 116:11
119:17 140:5,7
**flow**  140:13
**flower**  69:12
**flyer**  87:7
**flyers**  87:8
**flying**  74:23
**focusing**  113:5
**folks**  129:13 138:8
164:2
**follow**  78:18,22
79:2,10
**following**  91:6
93:24
**follows**  8:14
**food**  40:17 154:16
154:19
**foot**  97:4,6,7
**forces**  151:9
**foregoing**  183:9
184:5,7,11,13
187:5
**forensic**  98:24
99:3
**form**  38:14 57:14
127:22 128:12
130:1,15 131:14

131:25 132:4,15
133:21 136:5,21
137:7 138:7,9
143:18 145:2
147:4,12,19 148:5
148:13 149:2
155:3,11 159:20
160:23 161:6
167:14 169:22
170:14 171:25
**formal**  9:20
**forms**  59:14
**forth**  26:20 39:11
64:3 98:22 156:22
184:6
**forward**  139:3
172:14
**found**  26:11 46:2
60:12 71:21 84:20
87:23 103:17
**four**  5:20 16:3
17:14 34:16 64:17
69:17 88:23
105:15 116:25
123:3
**fourth**  66:14
**frame**  73:3 151:23
163:10 164:21
169:15
**framing**  110:14,24
113:10
**franklin**  3:4
**frazier**  28:22,25
29:21,22,22 40:2,6
**free**  127:14
**freight**  144:13
**frequently**  70:8
**fresh**  12:16
**friday**  35:22 36:11
**friend**  23:18 32:20
93:14 113:15

119:24 120:5
**friends**  39:13
92:21
**friendship**  120:16
**front**  13:24 30:9
35:5 36:12 39:20
43:3,5 49:19
52:12 78:16 91:19
93:14 106:24
107:22,23 133:6,8
135:18 143:6
153:15 159:15
176:14 181:13
**frustrated**  159:18
159:19,22,23
**full**  9:5 88:5 143:5
**funds**  117:15
138:20
**furnishing**  117:24
**furniture**  54:4
55:16 61:15,16
66:23 67:5,21,23
115:24 118:1,2
**further**  126:19
168:8 184:13,17

|  g  |
| --- |

**game**  31:24
**games**  137:4
**gaps**  82:13
**garbage**  156:19,20
157:7,8
**gary**  3:5,9 7:18
21:22 37:2 65:2
73:8 88:10 122:15
126:18 132:9
164:8 180:18
**geez**  26:5
**general**  34:1,16,21
38:23 39:6,21
49:3 77:20 86:19
89:2 132:20,21

135:3 145:21
148:4 154:23
**generally** 56:1
84:15 152:17
**generated** 87:20
**gentleman** 40:19
**geographically**
76:3 97:9
**georgia** 3:17 90:4
**getting** 35:12
54:16 62:2 64:7
90:19 101:16
103:11 109:3,5
117:10 121:25
138:19 154:1
159:1 169:8
**give** 8:2 10:19 11:9
19:20 22:21 37:15
39:14 47:12 50:5
50:6 52:17 55:4
62:9 77:16 80:18
94:15 98:6,10,13
102:18 105:23
108:7 110:7,21
113:23 120:12
126:9,13 132:6
140:1 141:21
170:13,14 171:22
**given** 9:17 38:8
44:14,15 109:10
182:13 184:12
187:9
**gives** 151:15
**giving** 78:20 83:17
93:14
**glad** 10:24 108:17
**glass** 78:25 81:9
**glen** 59:10
**glove** 71:3
**go** 6:13 18:21 19:4
19:21 23:22,23

24:1 28:6,10
29:20 30:19 34:7
44:18 45:16 50:17
54:13 61:11 68:19
68:20 69:11 70:18
70:22,23 71:13,14
81:1 86:6 88:14
88:16 90:3,6
91:13 93:8 95:1,8
99:19,20 122:24
123:1 126:8
128:14 129:16
130:17 133:12
140:13 144:21,22
144:25 149:4
152:17 157:8
161:20 165:21
170:9 172:13,13
**goes** 44:7 133:10
**going** 6:5 10:7
12:7 13:2,13 19:7
19:11 34:5 35:21
46:1 47:16 55:7
55:16,16 62:14
67:8 68:2,9,13
70:15 71:4 76:17
79:3 86:13 88:18
88:22 91:1,21
95:19 98:21 99:16
99:25 104:23
106:11,15 107:25
111:7,11 112:16
114:19 115:2,12
115:13 116:14,15
118:10 119:8
122:16 123:2,6
125:1,6 126:15,18
127:5 131:3
135:17 137:4
141:8,11 142:4,5
143:3,23 146:7

148:17 149:5,8
150:1 154:1
156:20 157:4,18
161:4,11 164:12
164:16 167:12,21
170:1 171:18
173:24 176:1
182:11
**gold** 23:16
**golf** 144:18 177:8
**good** 6:4 9:16
10:15,24,24 11:4
14:3 15:3,11 21:4
23:13,15 24:2
26:23 36:15,16
39:12 48:14 49:1
49:11 51:18 52:2
53:10 61:2 70:6,7
71:5 81:25 82:20
87:10 92:21 93:18
102:24 110:3
127:14 128:5,9
129:5,14 134:20
134:23 147:2
154:11,17,25
155:1,9,14 156:21
180:16
**goodness** 18:17
**goodwin** 15:24,25
**gotcha** 32:2 47:1
56:12 103:3
**gotten** 179:1
**grades** 24:2
**grandinetti** 101:21
101:23,25 102:3
113:25 114:3
**great** 18:15,15
68:8 182:6
**ground** 174:21,22
**grounds** 69:6 70:9
70:17,21

**group** 99:7 122:3
160:14,16,20
**guard** 17:5 74:23
**guess** 25:16 93:24
96:5 106:7 112:18
121:13 175:1
177:22
**guessing** 97:15
**guest** 109:22
**guests** 52:20
**gut** 36:2,4
**guy** 135:12,19,20
136:17 137:5
168:22

**h**

**h** 15:17 130:4
186:3
**hair** 97:1 135:14
**half** 15:20 159:13
159:17 163:7
**halfway** 110:15
**haman** 1:6 2:5
6:17 7:19 8:21 9:2
27:5 32:12,13,14
85:8,9 159:9
185:4 186:1 187:1
**hand** 7:25
**handed** 111:18
**handle** 86:6
137:19
**handling** 42:25
123:11
**hands** 100:5 143:5
**hang** 180:25 181:1
181:1
**happen** 11:1 72:6
85:19 159:23
178:13,14
**happened** 28:21
58:25 72:9 78:4
91:17 95:25 101:4

101:4 104:1
108:24 122:5,6
125:9 146:19
148:16 150:21,22
151:4 161:1 162:8
162:9 166:4
**happens** 149:25
**harassing** 112:20
**hard** 127:20
141:11
**hastily** 59:21,24
60:19,22,23
**haul** 36:8
**hazard** 45:25
47:25 152:7
**hazardous** 47:5
94:8 108:3
**head** 14:24 35:13
137:15
**headboards** 71:4
**headquarters**
97:12
**heads** 10:18
167:18
**health** 53:10 71:2
109:20,24 150:5
**hear** 10:24 36:23
37:3 115:5
**heard** 54:6 92:13
98:24 101:20,25
103:16 111:15,21
119:23 148:7
157:13 179:20
**heights** 70:18
89:17 176:19
**held** 6:23 27:1
**helen** 28:22,25
29:24 40:2,3,6
**help** 31:17 35:24
35:25 70:1,2
127:5 138:15

**142**:9,10 158:19
**helped** 29:22,23
**helping** 30:23
82:21 134:21
158:21
**hereto** 183:12
187:7
**hey** 58:8 172:19
**high** 33:25 174:17
177:14
**hire** 40:6 73:12
85:8,11 86:20
87:1,4 175:13
**hired** 32:18 35:18
35:19,20,24 40:8
41:5 53:17 77:20
98:2 111:16
115:16
**hiring** 31:21 39:23
85:18
**hit** 176:25 177:1,8
**hold** 55:22 64:16
64:16 107:19
164:7,7
**hole** 128:8
**home** 23:22,24
28:6,10 101:16
**homeless** 23:21,22
92:10
**homemaker** 24:24
**honest** 108:18
175:22
**honestly** 94:6
101:14
**honor** 160:21
**hopefully** 23:12
127:4 168:4
**hospital** 144:18
177:9
**hot** 25:25

**hotel** 10:9 20:16
21:11 23:8 24:18
25:2,20 29:21
31:11,13 32:3,4,6
32:9,18,24,25
35:18 36:1,12
38:3 39:22 40:20
47:3,6 52:14
54:16 61:3 64:12
71:11,13 74:24
76:22 77:19 90:18
92:19 94:14 96:11
99:16,22 103:2
107:1,16,19,22
119:12 128:3,16
129:4,10 132:23
135:1 138:5,19
139:4 142:9,10
143:6 144:14,16
146:20,23 147:7
158:22 159:3,24
165:24 167:1,4,8
167:16,18,22
170:6,16,20 175:4
175:21 176:10
177:2,3
**hotels** 128:4
**hour** 68:3 117:21
**hourly** 60:3
**hours** 26:15,22
27:18 55:15 60:1
118:19
**house** 89:25
**housekeeper**
29:25 157:6
**housekeepers**
30:12 39:19 71:17
87:22 104:22
155:16,20
**housekeeping**
87:24 131:9 143:8

152:18 155:24
**howard** 99:7
122:3 160:13,16
160:20
**huh** 10:19,19
116:6 119:4,6
124:10
**human** 10:18
**huntsville** 3:8 10:6
**husband** 15:22
23:16 74:6,12,13
158:3 167:1,12
**husband's** 15:14

**i**

**i.e.** 76:24
**idea** 46:8 55:5
61:25 121:3
141:21
**identification** 13:3
13:5,16,18 54:22
54:24 55:19,22
56:5,9,15 57:11,18
59:5,7,20 78:6,8
95:15 105:14,18
123:15,19 176:7
**identified** 104:6,6
**illuminated**
133:17
**immediately** 93:22
**important** 10:16
104:2 115:9
**impressed** 45:8
**improper** 82:1,13
83:9 84:18
**improve** 135:1
**improvements**
45:12
**inaccuracies** 181:5
**include** 65:21
67:21 70:15

**included** 63:3
65:19 66:11
**including** 124:16
137:23
**income** 140:16,19
140:23,25 173:16
173:16,25
**incompetent** 160:9
**index** 5:1
**indicate** 118:8
**indicated** 81:16
**indicating** 171:7
**indirectly** 146:1
**individuals** 125:23
160:14
**infested** 128:16
**information**
137:24 140:21
141:25 152:11
**inground** 34:11
**initial** 146:12
**initialed** 183:11
**initially** 21:1
121:8 151:10
**ink** 183:11
**inn** 1:6 2:5 6:18
7:20 8:22 25:3,6,9
28:17 32:10,14,15
33:6,18 34:8,15,17
34:18,21 35:10,11
38:8,23 42:8,14,20
43:1 44:23 45:15
45:16,16 46:4,7,7
46:10,10,11,15
48:6 49:3,5,5 50:2
51:5,6,11,17,19,23
52:9 72:5 73:12
73:13,20 78:11
85:9,11,18 87:15
88:7 89:3 94:21
94:25 95:1,10,13

99:23 100:2,8,10
100:16 103:5,6
104:13 115:24
116:13 117:16
118:2 121:9
122:13 124:23
136:20 137:23
139:9,12,16,20
152:23 159:10
178:9,15,21
180:11
**inn's** 147:17 148:1
**inside** 34:11 35:17
69:22 70:22,23
84:3 156:23
**inspected** 130:10
130:23,25
**inspection** 69:25
70:9,20 74:3,10,22
75:11 76:6,22
77:7,23 98:13
103:1 104:21
114:6 129:18
130:1,7,9 134:6,10
**inspections** 71:12
73:22 77:18,22
85:12 86:9,12
**instruction** 124:4
**insurance** 1:9 2:8
6:18 7:14 8:20 9:1
62:8,12,15 74:11
74:17,19,20 75:9
75:10,12,19 76:1,4
76:5,7,18,19,21
77:8 85:3,4,7,24
94:10 96:6,6,13
97:13 98:5,7,8
102:21 107:12
111:6,7 121:9,24
124:5 125:13
130:2,21,25

138:20 148:8
185:4 186:1 187:1
**insurer** 75:15
**intentional** 148:12
**interested** 7:5
113:4 126:3
184:18
**interference** 6:8
6:11
**interiors** 77:24
**internally** 89:19
**internet** 31:22
**interrupting** 11:23
**interruption**
140:19 170:5
**interstate** 176:21
177:1
**interviews** 86:23
**intown** 34:11,25
36:20
**intuition** 36:5
**inventories** 114:2
**inventory** 53:25
54:9 57:14 63:4
63:25 95:14
173:14
**investigated**
151:10
**investigation**
53:24 163:13
**involve** 140:4,6
**involved** 169:17
182:1
**involvement**
127:17 156:9
**issue** 68:18 153:24
164:4 180:7
**issues** 133:18
154:6 155:17
180:4

**italian** 102:10
**item** 80:8 81:7
83:4,7,13 84:19
110:24
**items** 67:18 79:17
79:25 80:9 83:19
**ivy** 130:4

**j**

**jackson** 15:6 18:5
185:2
**jennifer** 130:6
**jeremy** 16:5,21,22
16:24 31:6,8,11,13
31:19 32:3,24
**jhe** 1:8 2:7 6:22
**jim** 15:15
**job** 1:24 25:2,22
27:1 31:16 32:22
36:15,16,16 39:8
54:8 55:15 90:2
91:17 93:18 98:7
101:17 106:8
113:16 116:24
117:5,6,22,23
120:17 127:12,15
128:9 156:2
**jobs** 24:23 158:14
159:1
**joint** 153:20
**joints** 153:18
154:7
**juice** 68:5
**juliano** 4:4
**july** 25:18 27:6
**june** 5:20 105:15
106:22 164:3
165:1
**jury** 127:9,11

**k**

**keep** 26:7 49:21
50:5,9,10 69:21,22
75:5 80:17 82:21
84:22 89:17 98:15
106:1 107:16
114:22 132:25
138:20 147:18
148:1,25 155:16
155:20 161:12
167:4,11 171:25
**keeping** 84:5
**kenneth** 40:19
41:3
**kept** 35:15 36:1,1
45:11,13 49:17,18
53:13 74:24 83:24
84:4,7 88:3 97:17
103:2 118:23
132:23 133:3
152:13,19 155:17
160:4,21 167:20
**key** 81:10
**kidding** 9:10
**kids** 16:25 17:13
17:14,16,23 34:7
**killed** 36:11
**kind** 12:9 24:15
35:7,12 40:16
43:3 55:5 57:13
61:21 69:4 77:22
77:23 87:17
152:12 158:18
165:25 169:24
174:17,21 175:5
175:20 179:1,6
**kings** 34:15,17,21
35:10,11
**kitchen** 132:22
133:1,5

**knew** 32:20 38:3
64:6,6 69:18 71:9
92:2,2 103:12
112:24 116:3
127:6 129:2,4
156:14 157:18
177:25 180:3
**knights** 1:6 2:5
6:18 7:20 8:22
25:3,6,9 28:17
32:10,14,15 33:6
33:18 34:8,18,21
38:8,23 42:8,14,20
43:1 44:23 45:15
45:16 46:4,7,10
48:6 49:3,5 51:5,6
51:23 52:9 72:2
73:12,12,20 78:11
85:9,11,17 87:15
89:3 99:23 100:8
100:10,15 103:5,6
104:13 115:24
117:16 118:1
121:9 122:13
124:23 136:19
137:23 147:17,25
159:10 178:9,15
178:20 180:10
**knock** 93:13
**know** 8:25 9:12
10:9,10,11 11:3,9
11:13,14 12:8,8,9
13:7 14:6 17:23
22:2,14 29:3,17
30:5,23 31:21,22
32:13 33:5 35:22
36:1,18 37:20
40:16 42:13,15
45:5,15,17,22
46:21 47:2,20
48:9,11,11,13

49:20 50:8,23
51:12 52:5 53:5
53:11 54:4,4,10,12
55:5 56:2 59:13
60:17 61:13,21
63:17 64:19 67:2
68:18 69:6,7,17
70:5,24 73:15
74:1,21,22 75:16
76:11,14,16,24
77:4,17 78:4
82:18 84:8 85:4
85:19 86:15,17,18
88:10 89:13,16,20
90:19 91:10 92:1
92:7,16,18 94:4,4
94:5,8,9,14,18,20
94:24 95:19,20,22
96:16 97:11,14,15
97:24,25 99:14,18
101:16 102:24
104:2,4 106:14
107:23 110:1
111:19 112:4
113:19 114:9,11
116:11 117:1
118:19 121:18
122:4 123:24
124:25 125:1,17
126:4 127:7,15
129:19 133:11
136:17,23 137:16
137:18,21 138:6
138:16,18 139:22
140:10 141:9,15
141:16 142:5
143:22,23 144:13
144:16 146:7
148:17 150:10,16
151:1,13 152:2
153:6 154:2,25

156:7,24 157:3,9
158:3 160:3,16,17
160:19 163:5
167:5 168:21
169:23 171:21
174:8 175:21
177:6,23 181:10
**knowledge** 10:8
14:22 122:7
135:20 144:23
149:9,15 153:9
157:4 158:8
162:13 173:3
**known** 166:7
**kt** 165:3
**kw** 29:17,18 30:16
41:1,1,4,12 70:6
71:23 126:4 151:8
165:3

**l**

**l.a.** 23:12
**labor** 116:3,20,21
**lady** 130:6
**lamp** 55:6 65:11
**lamps** 54:3 61:14
**landed** 177:3,7,8
**landscaping** 69:14
**language** 153:18
**large** 146:11
**larger** 143:13
146:11
**late** 147:2
**laundry** 29:22
131:9,9
**law** 3:6,15 4:6
**lawn** 83:22
**lawsuit** 8:21 9:24
137:22 140:21
153:24
**lawyers** 13:10
129:24

**lead** 24:18,19
**leak** 68:19 72:3,4
  72:5 89:19 100:20
  101:7,9 103:8,9,10
  103:18,21,21
  150:1,23 151:2,5
  177:25 178:1,12
  178:19,23
**leaking** 53:7 72:16
  143:22 180:8
**leaks** 52:20 70:25
  72:21,23 101:12
  103:5,23 104:2,5,6
  104:8,17 143:14
  144:3,5
**learn** 24:17
**learned** 90:11
  136:14
**lease** 36:18 132:21
**leave** 14:14 35:8
  46:21 84:8 101:17
  101:17 103:11,12
  120:20 151:4
  172:16
**leaving** 91:5
**lee** 4:4,5 7:16,16
**left** 25:15,19,22
  26:10,24 28:4
  34:22 35:11 36:7
  36:15 42:14,15,18
  42:20 78:4 87:12
  87:14,14 90:6,10
  99:22 100:12,20
  101:2,5,6,10,13
  103:7,22,25 104:1
  104:5,11,18,25
  105:10 122:5,5
  124:23 125:10
  135:6 141:1
  146:19 148:17
  150:3,22 156:19

162:4,9,10,14,17
162:18 163:6,19
164:23 165:9,19
166:5,11 178:4,8
178:15,20,22,23
179:25 180:8,10
**leftover** 45:18
**legal** 7:3 182:15
  185:23
**length** 167:13
**letter** 5:15,19,22
  13:20 59:9,11
  61:23 78:10,15,18
  79:2,8,9,12,17
  81:8 112:18
  121:13,14,16,17
  123:14,16,21
  124:1,21 126:24
  151:25 152:1
  159:9,11,12,14
  160:7 163:3,8,9
  164:3 166:8
  171:15 179:2,17
**letters** 102:6
**level** 174:21,22
  176:17 177:17
**liability** 47:6
  133:13,18
**life** 167:17
**light** 154:15
**lighting** 133:14
**lights** 80:14,20
  82:23,23,24,25
  93:9
**liked** 137:14,14
**likewise** 11:21
**liking** 33:3
**lime** 104:4
**line** 133:18 175:5
  186:4,7,10,13,16
  186:19

**lines** 38:14
**list** 40:25 59:18,21
  60:14 61:8 66:15
  71:17 78:1,21
  79:6,16 80:21
  85:22 93:8 155:17
  155:17,20,24
**listed** 63:7 66:3,7
  66:18,20,23 67:23
  79:11
**listen** 36:6 166:4
**little** 23:5 33:20
  54:21 68:3 69:13
  71:9 98:15 103:4
  113:19 143:11
  162:25
**live** 9:23 16:8,19
  17:9,17 18:1,5
  27:7,7,12 28:14
  31:4,8 38:8,19
  41:9,10 128:16
  134:15 184:3
**lived** 27:8,9,23
  28:18 29:13 41:8
  41:11,12,12,16,20
  104:14 128:20
  134:17
**lives** 17:10 18:11
  23:25
**living** 28:20 39:25
  40:24 134:14
  144:7
**llc** 3:4
**lobby** 83:12,25
  101:8,8 103:9,10
  104:3
**locally** 120:3
**located** 6:24 24:3
  26:1,16 34:13,14
  49:12 81:12,17
  175:4

**location** 154:10,11
  154:17
**locked** 78:24
**locking** 83:9
**locks** 30:23 31:1
  83:16
**loggins** 3:13
**logical** 164:24
**long** 12:7,15 15:18
  15:25 21:17 24:25
  25:5,8 26:8 32:24
  33:5 35:2,4 36:20
  36:21 42:7,13
  44:25 46:18 58:25
  67:25 77:9 86:19
  86:21 94:14,19
  101:2 102:23,24
  148:8 150:7
  161:23 165:13
  167:5 168:23,25
  169:11,12
**longer** 28:3 31:17
  169:18
**look** 21:6 43:10
  44:17 45:9 47:23
  52:5 56:2,14
  57:10 65:22 66:14
  69:8,13 94:1
  108:18 110:12
  128:11,15 131:3
  133:12 135:23
  151:12 153:12
  164:4 165:22
  170:10 172:20
**looked** 20:16,16
  21:11,12 22:4,7,9
  22:11 37:22 38:4
  38:5 45:24 50:4
  141:6,11 166:8
  168:15

**looking**  32:19 45:7
  52:15 56:16 80:11
  83:14 129:23
  144:17,24 148:21
**looks**  110:3 159:12
**los**  18:11
**losing**  64:12 65:18
  100:24 141:21
  159:24 170:15
**loss**  48:4 137:24
  137:24 138:6,9
  140:16,19,22,25
  158:1 160:15
  170:5 173:15,16
**lost**  88:11,12
  141:20
**lot**  23:21 31:20
  35:25 36:5 39:21
  40:16 46:13 47:21
  47:21 52:1,11
  56:25 87:1 96:23
  99:17,18 100:24
  133:14 134:3,25
  135:2,2,13,21
  136:3,10 137:14
  142:14 158:10
  175:7,17
**lounge**  83:15 84:1
**love**  115:8
**loved**  36:15
  101:17
**loves**  167:1
**lucky**  177:15
**lump**  147:1

**m**

**m**  15:17
**ma'am**  9:9 13:23
  15:3 17:4 19:23
  56:15 57:2,22
  64:14 66:15 76:8
  112:2,11 114:8

115:8 127:3,21,25
  128:18,21 130:13
  131:24 134:4,16
  137:13 140:12
  142:1,22 145:1
  146:17 147:2,24
  151:3,14 154:10
  155:18 158:3
  159:14 160:10
  166:6 179:11,13
  180:19
**machine**  184:9
**maiden**  9:7
**maids**  53:3 69:21
**mail**  5:17 20:15
  37:21 56:10,23
  57:4,7 58:7,9,11
  109:9 173:21
  176:3
**main**  47:4 107:15
**maintenance**
  29:16,18 30:11,16
  33:10,11 41:2
  69:5,22 71:11,21
  71:22 86:11,21,23
  87:17,23 88:1,2
  104:22 114:17
  115:14 143:7
  155:25,25 156:20
  157:7
**major**  147:15
**majority**  96:10
**making**  43:2,7
  90:20 135:4
  165:12 170:10,11
  173:25
**man**  29:16,18
  30:16 35:18 41:2
  74:2,5,12 75:6
  85:2,6 98:23
  102:17 112:20

114:17 134:12
  168:12
**manage**  158:18
**managed**  25:20
  26:4
**management**  23:8
  24:11,13,14 25:2
  33:22 124:15
  129:7
**manager**  21:12
  25:6,8,10 26:8
  27:5 28:4 34:16
  34:21 35:5,6,10
  38:23 39:6,21
  59:22 61:2,2
  73:21 77:20 86:20
  89:3 107:1 132:20
  132:21 145:21
  148:4,4 154:23
**managers**  130:1
  135:3
**marathon**  12:6,11
**march**  1:17 2:16
  6:1,5 28:14 40:1
  89:22 134:9,10
  146:4,19 150:21
  151:21 161:21
  162:8 178:14
  184:22 185:3
**mark**  13:2 111:11
  176:2
**marked**  13:4,15
  13:17 54:21,23
  55:18,21 56:5,9,15
  57:11,18,23 59:4,6
  59:19 65:23 78:5
  78:7 95:14 105:14
  105:17 123:13,18
  176:6
**marketing**  31:21
  87:8

**marking**  81:11
**married**  15:12,18
  15:21 16:12,24
  28:23,25
**marry**  23:19
**marshal**  45:24
  47:2,15 64:13
  77:25 85:16,20
  106:2,10,21 113:5
  121:1,6 133:24
  135:5,8 138:2,22
  139:4 151:18,23
  152:1,7
**marshal's**  81:23
**marshall**  39:12,13
**match**  44:20
**materials**  45:18
  84:17 116:3
  117:24
**math**  34:1
**matter**  6:17
  154:22
**mattress**  66:1,3,7
**mattresses**  65:19
  65:21
**maximum**  81:18
**mean**  27:18 32:14
  33:1,7 47:10 53:2
  55:10 57:2,25
  58:14 59:13 61:19
  65:24 66:7 69:7
  69:16 73:13,17
  91:16 94:16 95:19
  97:3 99:12 100:2
  102:1 105:5
  106:15 107:18
  108:14,20,20
  109:4,8,16 112:8
  116:2 119:11
  121:12,22 124:25
  125:2,12,19 134:3

137:17 138:7
142:12 143:7
145:16 157:11
160:7 164:9
166:20,24,25
167:17 168:14
174:13 177:25
**meaning** 46:24
131:22
**means** 11:9 66:1
102:2 119:6
**meant** 66:4 76:12
87:14
**media** 6:15 19:8
19:12 68:10,14
88:19,23 123:3,7
164:13,17 182:14
**medication** 48:23
**meet** 24:1 98:23
**meeting** 32:21
98:20 102:12,16
164:25
**memory** 48:24
**mentioned** 72:11
72:12 92:17 105:6
123:11 129:12,18
130:8 135:12
141:17 155:16
**met** 8:18 23:16,18
32:18 101:19,23
102:2 163:23
172:22 173:2
**metal** 110:14,24
113:10
**mfllaw.com** 3:19
**michael** 77:25
78:12 92:12 94:6
108:1 133:24
**michael's** 92:9
**microphones** 6:6
6:10

**middle** 94:13
**midnight** 43:6
91:12
**mildew** 53:7
149:23 150:2,6
**miles** 15:10
**mind** 80:17,18
163:11 164:21
**mine** 113:15
**minute** 17:2 48:5
68:7 99:4 111:10
122:18 164:7
175:24 180:25
**minutes** 12:15,15
17:12 21:18
122:17 168:5
**miscommunicati...**
108:6
**missing** 79:23 82:8
**mistake** 44:19
**mistaken** 169:20
170:21 171:2
**misunderstanding**
163:21
**misunderstood**
73:6
**mixed** 165:14
**mold** 53:7 109:16
109:17,19 110:1
149:23 150:1,6
**momentarily** 58:3
59:15
**moments** 8:18
**monday** 1:17 2:16
6:1 36:8
**money** 36:17
38:25 44:8 47:13
48:3 51:22 54:15
62:4,7,13,15 64:11
64:12 65:18 69:8
87:1 99:14,17

100:6,6 108:10
113:20,21 117:13
138:3,10,17
142:17,20 147:15
149:6 159:2
167:21 170:15
**montgomery**
17:18 24:21 26:2
26:16 32:19,21
34:14,15 76:13
77:1 128:24
**month** 25:18
46:23 60:7 77:12
77:16 128:24
143:12 146:17
148:16 169:15
173:25
**months** 20:21,23
22:8 26:9 36:22
124:23 125:10
146:14 149:21
150:2 161:23
163:1,1,2 164:5
169:4,14,18
**morning** 6:4 26:13
36:8 90:5 91:6
93:25
**motel** 129:1,3
130:10 131:6,8
134:20 144:12
145:14 146:16,16
154:22 158:6,7,20
163:16
**mother** 167:4
**mother's** 36:4
76:15
**mouth** 76:10
**move** 49:23 83:22
139:3,6,22 160:10
165:5

**moved** 24:21
26:22 36:8,9,10
88:7 139:16 165:7
**movies** 99:3
**mowers** 83:22
**mozley** 3:13

**n**

**n** 29:12
**name** 7:1 8:19 9:5
9:7 15:14,23 29:2
29:3,6,7,17,17
30:4,6 34:12 40:3
40:19,22 41:1
53:17,19 74:4
75:4 96:12,15
97:25 101:21,25
102:10,15,19
112:1,8,12 119:23
120:7,9 130:3,6
165:3 184:21
**named** 135:16
**names** 16:4 23:10
74:1 75:2,23
102:7,20,24
**narrowed** 77:3
**nashville** 97:11
**nature** 10:18
141:20,22
**near** 177:12
**necessary** 132:9
187:6
**need** 10:17 12:16
17:2 22:22 57:3
58:22 59:1 98:25
108:10 115:11
138:9 164:9,10
171:21 174:8
**needed** 28:5 30:19
39:10 43:14,18
46:21 54:15 57:25
63:17 64:7 67:8

68:17 69:6 71:22
78:19 79:11 80:1
81:5 85:22 87:18
90:3 99:14 108:14
115:19 116:4
119:13 138:2,21
138:25 145:16
155:21 174:8
**needs** 170:22,22
**negativity** 35:7
**neither** 184:17
**never** 9:10,11 12:8
30:5 34:6,6 42:23
60:18 72:5 92:1,2
92:13 94:7 102:2
105:5,6,25 109:14
109:15 111:21
126:7 136:25
141:1 148:7
157:13,15,15,19
172:22 173:2
177:17,17,21
**new** 39:10 45:15
46:2,2,3,4 78:24
80:13 81:2 82:22
86:14 89:6 115:22
115:23 131:11,17
149:16 157:12
**news** 144:17
**nice** 52:10
**niece** 23:17
**night** 26:14 36:11
43:4,7,25 44:2,13
45:2 48:12 50:3
64:15 91:23 93:5
93:15 151:15
152:10,17 170:9
170:11,18 173:16
173:23 174:3,4
**nighttime** 90:24
91:4 92:24

**nine** 131:5 169:18
**nod** 10:18
**nokes** 4:14 7:1
**nonstop** 27:17
**noon** 122:17
**normal** 115:13
**normally** 149:25
**northern** 1:2 2:2
6:20
**notary** 181:13
187:13,19
**note** 6:6 181:12
184:3 185:10
**noted** 183:11
187:7
**notes** 118:23
148:21 175:24
**notice** 5:13 8:7
13:2,11 36:7
**noticing** 7:12
**notified** 72:9,23
90:16 104:24
157:19
**november** 21:21
**number** 22:22
23:2 37:15 94:15
94:18 119:8
182:14
**numbers** 94:17
**nursing** 23:22,23
34:5

---

**o**

**o** 15:17 29:12
**o'clock** 26:13,14
**oath** 8:13
**object** 127:22
128:12,12 131:14
131:25 132:4,15
133:21 136:5,21
137:7 143:18
145:2 147:4,12,19

148:5,13 149:2
155:3,11 159:20
160:23 161:6
167:14 169:22
171:25
**objected** 155:5
**objection** 128:1
130:15
**objections** 7:10
**obligated** 120:2,17
**obviously** 159:18
**occupancy** 51:19
51:25 52:2,8
132:13 154:25
155:9
**occupied** 131:23
**occurred** 27:15
28:13,14 40:1
41:10,18 46:9
53:16 73:23 89:22
91:11,15 94:1
101:3 142:18
146:15 151:21
165:19
**october** 146:25
**offense** 33:14
**office** 4:7 10:5
21:5 22:14,18
27:17,20 49:5,12
49:13,15 51:2,3
83:24 88:5 100:20
101:7 103:18,22
103:24 118:22
143:22 150:24
151:2,5 152:13,21
153:15,15 157:24
173:8 178:20
181:24
**officer** 92:23
**officers** 92:22

**offices** 139:19
**oh** 18:17 26:5
34:10 37:1,5 41:3
42:17 47:9 55:4
58:10 73:5 99:24
102:25 170:1
179:12 180:25
**okay** 8:24 9:3,19
10:13,14,24 11:6
11:15 12:13,18
13:1,13,14 14:17
15:11,23 16:6,19
17:16 18:22 19:7
19:15 20:5,9,13,23
22:2,21 23:7 24:6
24:15 25:14 27:3
27:19,23 29:4,20
30:3,7 31:4 33:5
33:24 34:19 37:5
37:5,10 38:11,19
38:22 40:12,24
41:7 42:1,7,13,23
44:12,22 48:4
50:12,15 51:1
52:18 53:23 54:6
54:19 55:21 56:7
56:19,22 57:6
58:7,13,20 59:16
59:25 60:2,9 61:6
61:25 62:10 63:9
63:22 65:15 66:11
67:21 68:2,8,23
70:2,15 72:6,14,25
73:5,19 74:16
75:13,20 76:23
77:6,18 79:8,25
80:4,8,13 81:1,11
83:2,7 84:6 85:1,6
85:17 87:11 88:11
89:9,24 90:13
91:25 92:8 94:20

95:18 96:12,20,25
98:18 100:12
101:2,6,9 102:9,20
103:20 105:8
106:3,12,22 107:7
107:17 108:17
109:6 110:6
111:17,21 112:3,7
113:1 114:10
115:10,16 116:18
116:22 117:14,21
118:14 119:16
120:4,7 121:21
123:2 124:1,21
125:8,21 127:12
131:2,20 132:10
132:18 133:4,6,19
134:2,11 135:6,7
136:14 137:21
138:16 139:11,15
140:1,12,16 141:3
144:11 145:23,23
146:12 149:21
150:4,15,15 151:6
153:4,10,16 154:9
154:9 155:5,19
156:6 157:17
158:1,16 159:8
161:17,20 162:14
162:21 163:19
164:5,11,12,20
165:13,15 166:13
166:18 167:24
168:3,5,6 169:16
171:20 173:4,9,18
173:22 174:2,14
174:20,25 175:23
176:5 178:5,11
179:12 180:13
182:3,4,5

**old**  9:9 16:6,21
17:19,22,23,25
18:10 33:12,14
35:14 46:5,6,6
89:8,14 93:3
131:5 152:4
**once**  48:11 70:13
70:14,20 88:5
89:13 171:13
**ones**  31:5 96:20
116:16 156:25
**open**  93:12 107:16
138:20
**opened**  26:13
**operate**  134:21
**operated**  26:3
**operating**  99:22
165:6
**operation**  151:13
**operational**  100:9
100:11,16,18
128:4,4
**opinion**  147:7
148:24 149:24
160:3 166:25
**opportunity**  10:12
**oral**  124:7
**orange**  68:5
**order**  18:18 45:3
52:5 54:16,21
76:21 86:10 95:13
**ordered**  43:18
130:3
**organized**  24:23
**original**  13:25
135:25 136:2
184:14
**originally**  40:25
**outcome**  7:6 146:7
**outlets**  79:23 82:8

**outside**  69:23
73:11,21,24 77:19
83:23 84:3,12
140:9,11 156:19
157:1,7,22
**overheard**  89:12
**overlook**  66:10
**overlooked**  63:11
63:16 140:25
**overpriced**  47:21
**oversee**  39:22
**owned**  32:17
**owner**  43:10 125:6
161:15

**p**

**p.m.**  2:16 91:4
164:14,18 182:12
182:17
**pacheco**  1:22 2:17
7:2 184:24
**page**  5:10,20 57:6
65:22,24 66:14
78:17 80:12 81:1
99:14 105:15
109:10 110:12,16
165:17,21 186:4,7
186:10,13,16,19
**pages**  1:25 14:4
**paid**  39:1,2 42:2
60:3 115:14
116:20 117:21,23
118:10 119:8
146:12 149:18
159:1
**paint**  115:23
117:24 127:19
128:7
**panels**  82:12
**paper**  110:3
151:19,24

**papers**  18:20
152:8 153:2
**paperwork**  87:19
**parcel**  114:16
**park**  154:18
**parker**  40:20 41:3
42:7 86:2,7,9,15
86:20 87:11
114:13 115:12,16
116:9,18 117:3,18
118:9,15 119:1,17
120:23 125:24
**parker's**  119:3
**parking**  35:25
133:14
**parkway**  3:16
**parrish**  5:17,23
53:18,24 54:11
56:10 57:1 58:5
59:10 94:11 95:4
96:17 112:17
113:1,3 123:17
124:2 125:19,21
137:5,12 140:23
141:14 144:21
151:11 154:5
156:11 159:10
162:15 165:18
170:7,17 172:18
172:24,25 173:4
180:14
**parrish's**  126:12
171:11,13
**parson**  4:4
**part**  38:7 53:23
59:3 60:20 90:2
114:7,16 138:23
138:24 156:2
**partial**  59:20
64:10 169:8

participating 10:6
particular 154:22
parties 6:13 13:11
  13:12
party 7:4 73:25
  75:16 77:19
  184:19
pass 75:11 76:6,22
  126:18 131:1
passed 74:23
  149:21 158:16,20
  179:5
passing 64:14
passion 167:2
patch 30:19 89:5
patched 30:19
patching 30:21
patience 127:3
  167:25 180:20
patient 58:24
pause 114:23
pay 38:17,18
  43:15 54:13
  115:20 117:18
  146:25 148:8
  149:9,13,14
paying 62:8
  117:13,14,15
  146:3
payment 62:16
  147:25 169:9
penalty 183:9
pending 9:24
people 10:18
  23:24 35:21 36:11
  47:20 51:22 52:14
  54:14 74:25 93:7
  98:2,12 105:22
  113:14 114:5
  126:9 136:9
  148:25

percent 39:8 55:14
  131:22,22 132:12
  159:4 168:14,19
percentage 39:2
  52:4 131:21
percentages
  131:21
perform 69:4 70:9
  86:9 114:13
performance
  170:20
performed 87:18
  87:19 116:18
period 79:13,13
  146:17 147:7
  152:10,12 153:10
  167:17
periodic 68:23
  69:2
periodically 69:20
perjury 183:9
permission 43:15
  43:17 45:21
permitted 8:9
person 32:1 33:11
  43:25 86:22 91:20
  91:21 92:10 93:14
  96:25 97:20 98:10
  98:20 101:19
  121:9 128:11,15
  129:5 136:12
  168:24 169:11,12
  172:22
person's 75:4
  96:12
pertains 184:13
phone 22:25 37:15
  54:17 58:12
  172:25 173:1
phones 6:9

photograph 5:11
photographs
  20:10,13,18,20
  21:2,6,8,10
pick 6:7 45:2
  71:14 94:17
  156:15,23,25
  157:19
picked 116:17
picture 127:12,19
  128:7 135:17
  168:11,16 169:11
  169:25 176:2
piles 50:8
pine 69:10,11
pinkerton 149:17
place 6:10,13
  13:13 46:21
  124:21 152:23
  184:6
places 154:16
plaintiff 1:7 2:6
  3:3 7:19
plaintiff's 5:10
  10:4 176:2,6
planning 122:21
playing 23:15
please 6:6,9 7:11
  7:22,25 9:5,11
  11:19 15:4 29:11
  126:24 127:8,14
  127:21 128:21
  130:12 131:24
  134:15 137:13
  142:1,22 146:17
  147:2 151:3,7,13
  155:18 158:3
  165:22
pleased 54:7
plenty 154:18

pljpc.com 4:10
plumbing 30:23
  133:16
plus 52:7 117:12
point 53:16 61:19
  67:10 78:16 94:18
  111:11 112:15
  148:11 151:16,18
  160:12
pointe 3:16
pointed 108:17
pointing 14:24
police 92:21,22
  93:17 141:10
pool 34:11
popular 24:20
portable 84:11
portion 131:22
position 35:3
  137:22 140:17,20
positive 75:7
  170:12
possessed 14:6
possession 14:9,21
possible 108:23
  169:19
possibly 98:17
  179:21
post 4:7
potential 133:18
  140:6
pounds 92:21
premises 133:17
  148:22 156:24
  166:22,23
preparation 18:23
  19:18,20 20:11,14
preparations
  139:24
prepare 18:19
  53:25 57:22 60:23

95:13
**prepared** 43:9
  56:6 57:17 58:2
  59:21 60:22 61:20
  113:25 114:3
  122:3
**preparing** 54:15
**present** 7:7
**preserving** 128:2
**pressure** 69:16,18
**pressuring** 137:17
  137:18
**pretty** 32:1 37:19
  39:22 49:10 52:2
  53:8 59:12,16
  65:10,25 71:16
  85:16 90:21 92:25
  97:18 158:11,11
  159:17 162:11
  168:21 169:2
**prevented** 172:10
**previously** 15:21
**primarily** 158:5
**print** 181:22
**printed** 181:15,17
**prior** 52:22 72:21
  89:9,11 184:8
**priority** 107:15
**private** 6:7
**probably** 12:1
  20:21 24:4 25:12
  26:5,9 33:8 42:9
  52:6,13 55:14
  56:2 98:11 109:20
  110:18 117:23
  141:16,17 142:3
  142:15 145:5
  161:13 177:16
  181:18,25
**problem** 10:23
  12:2 146:5 149:23

153:17
**problems** 35:16
  52:20 60:11,25
  61:21,24 86:14
  89:7 140:2 147:3
**procedure** 8:10
**proceed** 7:22
**proceeding** 7:10
**proceedings** 184:5
  184:7,9,15
**process** 165:13
**professional** 184:3
**profit** 134:24
**profits** 135:1
**progress** 112:16
**promptly** 169:2
**proof** 138:6,9
  173:16
**propane** 84:11
**proper** 60:14 61:8
**property** 84:17
  85:12,25 93:7
  112:5 114:6
  116:23 130:22,24
  134:18 148:4
  172:23 175:2,3,5
  175:14,22 176:15
  177:12,13,13,15
**prospector** 23:17
**protection** 149:14
**provide** 15:4 62:6
  113:11 126:2
  127:16 140:21
  145:12,15 170:7
**provided** 50:4
  172:1,4,6
**psychology** 34:1
**public** 128:9
  187:19
**pulled** 93:9

**purchased** 45:20
  45:23
**purpose** 8:9
**purposes** 8:8 84:9
  122:21 129:24
**pursue** 34:5
**pursuit** 122:23
**put** 35:20 39:10
  44:4,12 46:4
  50:23 54:3 63:23
  64:8,10 67:3,5,15
  67:18 70:6 75:1
  76:9 79:15 80:14
  81:9 84:3 87:7
  88:6 90:20 110:10
  115:22 118:21
  119:15 127:25
  135:18 139:25
  148:25 149:6
  151:22 156:18,20
  157:7 168:10
  169:11 176:23
  177:22
**putting** 149:10

**q**

**qualifications** 87:9
**question** 11:11,19
  11:22 12:20,20,21
  17:5 19:22 48:15
  57:3 64:17 70:6
  73:1,7 76:23 90:8
  92:5 127:23 128:2
  128:13 130:16
  131:15 132:1,5,7,7
  132:16 133:22
  136:6,22 137:8
  143:19 145:3
  146:1 147:5,13,20
  147:22 148:6,14
  149:3,8 152:15
  154:4 155:4,6,12

155:19 159:5,21
  160:24 161:7
  165:11 167:15
  176:9 179:11
**questioning** 12:10
**questions** 8:23
  10:8,12 11:9 37:7
  58:24 59:2 114:23
  126:19 127:4
  155:7 162:16
  164:22 166:10,16
  166:19 168:2
  170:4 171:21
  179:22
**quicker** 132:16
**quickest** 67:9
**quickly** 91:14
**quit** 36:7
**quite** 26:6 80:6
  97:5 122:16
  152:16
**quote** 96:23
  124:15,16 135:21
  136:10 138:3

**r**

**r** 15:17 186:3,3
**railings** 140:10
**raise** 7:24
**raised** 69:17
  116:25
**raleigh** 23:7 24:3
  33:21,25 34:3
**ramada** 33:8
**ran** 25:23 43:3
  113:20 158:6,22
**rat** 128:8,16
**rate** 51:25 154:25
  155:9
**rates** 51:19 52:9
**rats** 128:22

**reach** 22:22,22
  23:2
**read** 59:17 60:10
  61:6 62:19 63:10
  83:8 84:15 124:3
  124:13 132:19
  181:14 183:9
  185:9 187:5
**ready** 43:14
  103:11,12
**real** 9:20 24:20
  47:22 154:17
**realize** 55:10
  165:12
**realizing** 113:5
**really** 36:15,16
  39:12 45:4,4 46:6
  49:3 50:8 52:10
  57:25 69:19,20
  70:7 89:16 114:11
  137:14 141:6,12
  144:4 158:19
  166:24
**rear** 83:11
**reason** 26:10 28:3
  35:11 66:25 67:3
  84:7 85:15 113:3
  125:8 168:20
  185:11 186:6,9,12
  186:15,18,21
**rebuild** 31:2
**recall** 13:23 53:23
  72:5,7,8,20 74:16
  78:15 85:17 96:4
  102:12,14,16
  105:20 120:22
  125:21 126:1
  137:2 174:19
  176:15
**receipt** 93:13
  185:18

**receipts** 152:12
**receive** 79:8,9
**received** 22:8
  38:13 52:19 56:23
**receiving** 13:23
  108:25 109:2
**recess** 19:10 68:12
  88:21 123:5
  164:15
**recollection**
  136:11
**recommended**
  113:1
**record** 6:5,14 7:9
  10:20 11:4 19:5,6
  19:8,12,16,21
  68:10,14 88:15,17
  88:19,23 122:24
  123:1,3,7 128:1
  164:13,17 182:12
  184:8,12
**recorded** 6:16
**recording** 6:12
**records** 18:22,25
  19:1,2,20,25 44:12
  45:11,13 48:7
  49:16,18,22,24
  50:3,10,12 52:5
  84:22 100:25
  151:11,19,19,24
  152:3,11,17,18,18
  152:22 153:5,6,8
  156:5 170:6
**red** 128:23 154:15
**redid** 46:7
**redone** 69:6
**refer** 55:23 73:15
  108:9
**reference** 39:16
  129:20,24 130:12

**referenced** 124:7
  185:6
**referencing** 61:23
**referred** 112:23
  112:24
**referring** 73:16
  176:4
**refused** 160:21
**regard** 129:6
  147:2 174:15
**regarding** 124:17
**registered** 184:2
**regular** 86:9
  120:18 141:9
**reinspected** 84:25
**related** 7:4
**relating** 156:6
  170:18
**relationship** 80:24
**relative** 184:18
**relatively** 15:9
**remark** 82:6
**remember** 25:17
  29:5,7 30:3,5 53:6
  53:19,21 58:15,15
  58:19 72:14 74:4
  75:2,3,6,23,25
  79:19,20 80:16
  82:6,6 83:14,17
  91:23 94:20,24
  96:12,15 97:8
  98:20,20 99:19
  100:18,19 102:20
  108:25 109:2,3,5
  109:25 110:1
  112:14 115:20
  117:20 118:4
  133:20,23,25
  143:1,16,21
  146:18 154:8
  166:3 168:10

  175:8,12
**remembering**
  14:23
**remotely** 7:8
**removal** 156:10
**removed** 175:15
**renee** 1:22 2:16
  7:2 176:1 181:24
  182:8 184:24
**renew** 75:11
**renewed** 74:11
**renovated** 131:11
**rent** 141:8,21
  152:18
**rentable** 131:10
**rented** 51:20,21
  52:12 93:11 141:5
**renting** 170:16
**rents** 141:20
**repair** 31:1 47:13
  47:14 48:3 71:9
  72:10 103:20
  106:18 109:11
  110:7 113:12,24
  115:17 116:10
  117:4,4 119:20
  120:23 122:2
  125:23
**repaired** 41:14
  47:11 48:2 67:9
  88:2 103:17,18
  107:15 108:2
  116:5 138:4
**repairing** 64:12
**repairs** 68:17,24
  69:2,4 70:3 71:7
  87:18 89:4,5,10,11
  108:8,8 114:14
  126:14 135:7
  138:21 143:2
  147:11,14,15

152:18
repeat 147:21
  152:15
repeated 160:19
replace 143:14
replaced 40:8 55:8
  63:18 72:13,20
  101:1
replacement 143:3
report 71:17,21,23
  72:3 86:2,3 93:5
  98:7 101:9,11
  134:6 145:20
reported 1:22
  103:8,8
reporter 2:17 7:2
  7:22,24 9:20
  11:17 12:2 19:4
  114:21 115:1
  176:1,5 181:7,23
  184:2,3,3
reports 43:2 103:5
represent 8:19
  136:15 140:20
  146:10
representative
  53:17 145:19
request 81:23
  126:12 140:23
  172:19
requested 14:6
  140:22 142:15
  150:10 160:13
  184:16
requesting 14:19
  125:21
requests 160:19
required 38:19
  187:13
requirement 27:8

rescheduled 20:7
residents 46:18
resolve 146:6
respond 86:11
responded 86:24
  87:6,9
response 10:17
  14:19 58:22 99:1
  172:18
responsible 39:23
  42:25
restaurant 24:20
  25:23,24 27:20
  49:7 133:1
restaurants 24:19
restoration 5:21
  105:16 107:8
  109:1 112:21
  113:11
restroom 12:16
result 9:3 54:1
  113:13 174:25
  175:16 176:12
retail 23:7 24:11
  24:12,14 33:21
retained 182:15
retired 24:24,25
return 185:13,17
revenue 46:13
  99:18 128:5 135:1
  137:25
revenues 39:3
review 18:22,25
  20:13 77:8 81:2
  153:11 181:4,11
  184:15 185:7
reviewed 19:19,25
  20:10
richmond 130:5
rickey 15:24 16:5
  17:19,25 93:19

97:3
rid 151:19,24
  152:2,3,6
right 7:24 11:8
  12:14 13:24 14:21
  14:22 19:22 24:24
  25:6 27:21 28:15
  30:25 33:1 40:6
  46:24 47:8 49:4
  56:12 57:8,15
  63:7,15 65:20
  66:4,22,23 67:1,13
  67:19,23 68:17
  79:18 80:2,10,15
  81:3,7,8,19,21
  83:2 87:15 93:23
  94:22 100:4,20
  101:6 106:23
  107:5 115:5
  120:11 124:9,19
  124:24 125:11
  130:20 134:2,7,13
  134:19 135:11,24
  141:24 144:19
  145:8 146:9 147:9
  148:20 150:25
  152:9,24 154:13
  154:14 156:1
  163:11 164:11
  166:18 171:8,9,12
  172:12 175:4,6
  177:9 178:4,5,25
  179:8,23 180:3
  181:2,4,8,11
  182:11
ring 131:13
riverside 1:16
  2:14 6:1,25 15:8,9
roaches 128:23
road 141:7,12
  154:16 175:3

rolling 56:18
roof 30:19,20,22
  70:19 72:3,16,21
  72:23 89:6,12,13
  89:14,18 105:1,6,9
  143:2,3 144:22
  145:1,10,14,17,19
  150:1,18 151:1
  162:13 176:18
  177:6,17,18,22
  178:1,1 179:20
  180:1,1,4,8,15
roofing 122:10,13
  144:5
roofs 60:17 70:16
  89:4 131:5
room 7:7 10:3
  27:12,14,16 31:9
  31:10 38:8,17,18
  41:21 42:2 46:1
  48:1 49:10,24,25
  51:23 55:10 57:13
  57:13 63:17 66:3
  66:6,15,16 67:2,14
  71:13 82:1 83:16
  84:2,20,21 92:11
  93:5,8,12 94:3,12
  94:15,19 95:1,8,9
  95:11,12,20,21
  104:15 110:17
  113:19,19 117:11
  119:9 128:25
  140:8,9 152:8
  156:23 157:1,21
  176:23
rooms 27:10,14,20
  28:1,13 29:23
  30:1 41:13 45:24
  46:14 49:14 51:1
  51:4,7,16,21 52:10
  52:13,16,21 54:1

62:20 63:25 67:22
70:22,23 71:14
82:13 93:11 94:21
94:25 95:16,21
96:21 104:22
115:25 116:5,9
117:19 118:6
119:16,17 120:24
133:16 139:19,24
140:22,22 141:4,8
142:4 150:6
153:25 154:7
**rough** 35:13 55:4
**roughly** 142:2
**rouse** 3:4
**rpr** 1:22 2:17
184:24
**rude** 11:4 35:6
57:2
**rules** 8:9
**run** 25:24 50:15
129:2,4 158:19,21
167:13
**running** 24:19
32:19 43:1 107:22
119:13 142:11,22
143:6 158:6 167:4
167:19
**runs** 44:3,3,4
**résumé** 87:3

**s**

**s** 15:17 130:4
186:3
**safe** 44:8,9 90:20
176:23
**safety** 35:25
148:24 149:10
**salaried** 60:5
114:17
**salaries** 41:21

**salary** 38:13 39:2
39:4 60:6
**sales** 152:11
**salvageable**
142:22 156:13,18
**sarah** 101:25
102:1,2,4,5 114:3
**satisfied** 80:23
**saturday** 35:23
**save** 69:8
**saved** 44:7
**saw** 84:11 91:21
98:21 102:4
127:13 134:20
145:19 165:3
**saying** 36:11,24
50:20 59:23 72:6
82:6 106:8 108:13
141:20 172:1
179:18 180:3
**says** 57:7 58:8
60:10 63:9 82:1
84:15 106:24
109:13,14 124:9
124:13,19,20
130:3,5 131:2,5,5
131:8,20,22
132:21 133:6
160:8
**scared** 70:18
89:17 176:19
**scheduled** 21:1
22:16
**schedules** 39:18
**school** 33:25
**science** 98:25
**scouted** 23:12
**screen** 168:11
**screens** 131:18
**second** 20:2 59:17
65:22 80:12 82:1

83:7 110:12,16
119:16 124:1
140:5,7
**section** 140:4
**security** 35:13,15
35:16,19,20,24,25
36:3 92:19,20,24
93:1,2,4,18 133:13
134:17 149:13,17
165:5
**see** 10:4 18:11,14
25:10 28:22 33:7
36:25 37:1,4 45:3
45:19 46:12,17
51:8 52:11 79:3
83:13 93:11
103:15 107:21
110:11,14,15
116:12 135:19
141:10 149:16
164:9 167:7 169:8
171:12 176:17
**seeing** 78:15
143:13 175:8,12
176:15
**seen** 13:7 18:16
55:2 58:18 59:11
105:21 106:12
111:17 113:24
114:2 122:2
123:21,22 149:16
150:17 156:5
166:22 175:2
**self** 131:9
**send** 138:12
156:13,15 157:18
173:11,12,19
174:3,10,12,13
176:1,3
**sending** 156:10

**seniority** 31:18
**sensitive** 6:6
**sent** 20:1,6,18 21:2
21:5,9,20 22:6
37:20,21 38:1
48:7 57:4,14 58:5
74:16,18 75:8,15
75:15,20 76:5
77:2 79:2 94:10
95:6 96:1,17
98:17 124:22
138:13 152:1
157:5 159:10,11
159:13 171:6,7,22
171:24 172:1
173:15,18,21,24
174:2,4
**sentence** 59:17
60:9 62:18 63:9
124:2,13
**separate** 118:25
**september** 5:15
59:9 159:8 163:6
166:8
**serious** 24:23
**served** 13:9,21
14:1 25:25
**service** 53:3 73:11
73:25 131:9
**services** 6:24
**set** 63:22 119:10
141:3 171:18
184:6
**seven** 17:15
146:14,17 149:21
150:2
**severity** 94:4
**shades** 55:7 61:13
65:12
**shady** 47:21

**shazi** 167:3
**sheet** 58:16 71:20
  87:22,24 155:23
  173:14 174:4,6,7
  185:11
**sheets** 43:19 55:6
  55:17 65:10
**sheila** 1:15 2:13
  5:3 6:16 8:6,12
  9:6 47:16 59:22
  60:12 63:11 78:17
  120:15 182:13
  183:8,19 185:1,5
  186:2,24 187:2,4
  187:12
**shi** 130:4
**shift** 39:20
**ships** 64:14
**shocked** 38:4
**shopping** 154:15
**shorted** 100:23
**shorter** 97:8
**shorthand** 2:17
  184:1,10
**shortly** 120:25
**shots** 137:16
**show** 10:19 13:8
  13:15 45:10 54:20
  55:21 57:19 58:21
  59:4 78:5 105:13
  111:9 123:12
  127:9 129:20
  135:15,17 141:20
**showed** 31:2
  126:24 136:13
  139:1 168:16
  169:25 171:15
  173:13 174:1
**shower** 46:2
  157:10,11

**showing** 20:15
  21:11,12 71:9
  170:15 173:24
  174:7
**shut** 47:3,16 48:2
  49:10 53:12 80:6
  99:17 100:1,3
  106:2,11 109:20
  121:1,6 138:2,5,19
  140:14 146:21,23
  150:5
**sickness** 158:7,9
**side** 51:9,9 52:12
  94:13,16 176:14
**sides** 175:3,6
**sidewalk** 69:18
**sidewalks** 133:13
**sign** 138:9 174:17
  174:18,20,23
  181:11,12 185:12
**signature** 184:23
**signed** 185:20
**significant** 145:10
**signs** 81:11 133:15
  133:17 174:16
**silence** 6:9
**silent** 21:25
**silly** 69:7
**single** 71:13 95:8,9
  95:11,12
**sink** 53:4
**sir** 14:2 86:1 91:8
  104:1 116:8
  130:14,18 148:15
  149:20,25 150:20
  158:12
**sit** 72:15 170:1
**site** 27:7,8 28:18
  28:20 29:13 31:5
  38:20 39:25 41:8
  41:20 113:23

  124:15
**sitting** 9:21
**situation** 94:7
**six** 26:9 97:4,6,7
  164:17 166:1
  182:14
**skinny** 97:1
**slandered** 125:3
**small** 72:4,12
**smart** 116:25
**smell** 55:8,11 63:4
**smelling** 53:7
  61:17
**smelt** 57:20
**smoke** 55:11 57:21
  61:18 62:21 63:2
  63:5 95:23 96:7
  96:10,21,23 97:21
  133:17 135:13,21
  136:4,10 153:17
  153:21,25 154:6
  168:12,25
**smooth** 121:23
**solemnly** 8:1
**solicit** 113:11
**solutions** 7:3
  182:15 185:23
**somebody** 30:25
  47:11 75:14,15
  89:13 92:10 98:6
  98:17 102:12
  108:23 112:24
  113:22 169:4,20
  175:22 181:24
**son** 17:6 18:14
  23:11 28:8 31:2
  32:22 35:13 36:3
  36:14 92:20 93:2
  97:3,8 134:17
  144:9 165:4,24
  175:10 179:5

**sons** 16:3 24:22
  31:4
**soon** 90:16
**soot** 153:21 154:6
**sorry** 9:12 16:23
  17:4,7 28:24 99:1
  102:23 121:13
  129:20 146:22
  162:7 166:1
**sort** 43:19
**sound** 28:15 40:22
  112:8 125:10
  132:12
**sounded** 144:13
  176:21
**sounds** 69:7
**southern** 1:3 6:20
**space** 154:18
**speak** 12:12,17
  18:18 38:1 46:19
  115:6
**special** 155:22
**specials** 31:22
**specific** 146:2
**specifically** 77:3
  78:23 82:19 83:17
  119:1 153:19
  154:6
**specimen** 57:8
**spell** 15:16 29:11
**spend** 158:20
**spending** 144:9
**spoke** 19:17
**spoken** 22:14
**spot** 71:15
**spray** 128:24
**spreadsheet** 71:18
  95:6 138:13
  173:22
**spreadsheets**
  171:24 173:12

squatter 92:18
squatters 92:13,15
stacks 46:2
staff 129:10 133:8
staffed 133:6
stairs 116:13
stamped 129:25
standards 53:14
  80:22 103:2
  134:24
standing 53:11
  132:7
stands 66:12
  112:10
stars 24:1
start 54:15 64:12
  65:17 94:12 108:8
  108:8 114:24
  116:15,17 127:18
  142:6 149:22
started 25:17
  55:13 57:19 58:4
  62:4 64:7,11
  65:17 84:5 85:21
  90:19 92:2,4
  94:11 110:18
  113:18 116:14
  119:11 120:23
  143:13 160:4
  164:21
state 7:8,11 8:1
  9:4 158:5 183:15
  184:2
statement 44:17
  60:15 62:24
statements 43:9
  48:8
states 1:1 2:1 6:19
stay 14:18 41:15
  44:25 46:21,22
  53:8 93:12 158:10

stayed 49:19
  139:23 148:16
steel 47:5,11,19,24
  107:19,21,21,24
  107:24 108:21,22
  110:5,7,9,11,13,23
  113:6,9 121:2,7
  138:3 140:8,9,10
steps 139:2
stern 81:24
stick 76:17
stop 155:6 162:24
stopped 53:5 65:3
storage 49:10,24
  49:25 82:1 83:20
  84:2,3,12,16,21
  132:18,19,23,25
store 12:9 50:7
  152:23
stored 50:25 84:7
storm 150:14,15
  151:3,22 162:1
straight 39:2
  90:18
strangest 177:7
straw 69:10,11
street 2:14 6:24
  15:6 18:6 176:17
  185:2
strings 138:17
strohm 15:15,16
  15:19
struck 175:8
structural 107:9
  107:13 108:14,16
  108:19,20 110:13
  110:23 138:24
  140:2 163:18
  164:4
structure 105:23
  106:1,9,17,18,20

107:15,17 108:8
  109:4 121:2,7
  138:23
structures 138:4
stuck 102:8
studied 33:21
studies 34:1
studio 24:1 45:16
  46:7,10,11,15 49:5
  50:2 51:11,16,19
  88:7 94:21,25
  95:1,10,13 100:2
  116:13 131:7
  139:9,12,16,20
  152:14,20,23
stuff 31:25 45:23
  55:5,17 60:17
  61:12,14 62:7
  63:20 74:11 84:22
  144:20 152:3
  153:6 156:13,18
  156:21 157:12
subject 126:19
submitted 9:1
  85:24
subpoena 5:14
  13:20 14:19 20:6
subpoenaed 20:3
subscribed 184:21
  187:14
subsequently 9:2
suite 3:16
suites 34:11,25
  36:20
sum 147:1
summarize 127:17
supervised 30:13
  30:14 33:11
supplies 43:19
supposed 47:23
  91:5 93:10 117:8

118:9 157:8
sure 20:21,22 26:6
  34:22,23 51:13,15
  51:16 57:5 58:10
  58:10 70:24,24,25
  71:1,5 72:8 74:7
  80:4,5 81:19,22
  82:4,18 84:20
  86:10,13 89:16
  90:20 93:6 94:17
  96:19 98:11
  118:11 130:4
  135:4 141:15,17
  142:23 145:17
  151:16 152:15
  154:23 156:3
  161:17 165:12,16
  168:17,19 170:2
  170:23 172:5
  181:5
surprise 137:21
surprised 45:4
surrounded 175:4
survey 134:6
suspect 114:11
suspicious 93:7
sustain 144:11
sw 3:7
swear 7:22
switches 79:23
  82:8
sworn 184:8
  187:14
system 100:23

t

t 15:17 186:3,3
table 9:21 12:20
  19:22
tables 66:12
take 6:13 12:11,14
  12:17,21 13:13

14:15 24:23 33:13
33:15 37:7 38:8
52:17 60:13 61:7
63:23 68:3,6 69:9
71:6 77:16 89:20
90:1,2,4,13 92:25
93:17 94:1 98:9
102:2 103:13
109:25 111:7
114:23 120:19
122:17 123:23
125:5 126:15
134:3 158:13
177:16 181:21,22
**taken** 2:13 6:16
8:6,8 21:21 44:16
78:3 79:12,21,24
80:1,2,10 82:3,14
82:16,16 83:21
84:12 106:16
123:11 143:10
156:6 184:5
**talk** 18:13 22:18
48:4 54:19 87:4
141:13 142:19,24
145:23 153:17
154:6 157:2,24
167:11
**talked** 94:6 97:20
99:5,20 135:20
141:15,16 154:3
172:25 173:1
**talker** 10:23
114:25
**talking** 12:3 20:5
22:2 34:3 52:22
56:25 60:16 63:21
64:8,15 65:5,6,6,7
65:8 67:16,17
83:4 89:12 97:3
97:19,19 98:21

104:4 113:14
131:7 133:10
139:8 142:9
165:23 169:10
179:4,14
**talks** 132:18
**tall** 97:1,2,2
**tank** 84:11
**tape** 141:10
**taped** 139:4
**taught** 71:10
**taylor** 3:4,14 5:4,6
7:13,13 8:5,17,19
19:6,14 21:22,23
37:2,11 39:7 55:1
55:20 56:4,8,13
59:8 64:19,21,25
65:2,4 68:16 73:4
73:7,10 78:9
88:10,16 89:1
97:22 101:14
105:19 112:15
115:7 122:15,24
123:1,9,20 127:22
127:25 128:12
130:15 131:14,25
132:4,9,15,18
133:21 136:5,8,21
137:7 139:8,11,13
143:18 145:2
147:4,12,19 148:5
148:13 149:2
155:3,11 159:20
160:23 161:6
164:8,21 167:14
168:1,4,9 170:3
172:3,6,12,15,17
176:8 179:16,19
180:21,25 181:17
181:23 182:4,6

**taylor's** 165:10
**team** 74:6
**tech** 130:4
**teeth** 168:21
**telephone** 22:21
**telephonic** 4:11
**tell** 10:9,10 23:5
37:8 39:1 51:15
58:9,18 77:5
84:23 94:17
118:12 122:21
136:3,25 137:3
145:9 150:23
165:20 169:16
172:18 173:4,6
181:9
**telling** 91:16
100:18,19 124:2
143:21
**tells** 130:2
**ten** 12:15
**tenants** 52:6
**tennessee** 97:11
**tenure** 89:5
**term** 46:18
**terms** 121:10
**testified** 8:14
33:20 136:8 143:9
144:2
**testifying** 184:8
**testimony** 8:1 9:22
10:2 115:9 166:14
166:14 172:1
178:18,18 181:6
182:13 183:12
184:12 185:9,18
187:8
**text** 88:12
**thank** 7:21 15:3
56:7 64:21 91:9
111:24 112:3

115:3 126:17,21
126:21 127:3
139:13 167:24,24
180:16,19,21,23
182:6
**thanked** 167:5
**thanks** 21:22 73:9
**theft** 84:8
**theirself** 112:25
**theory** 92:11
**thing** 12:19 30:20
30:24 31:22 43:2
43:20 47:4 55:11
65:25 73:13 92:9
98:16 106:20
119:21 135:4
142:21 150:23
161:4 162:18
177:8 181:16
**things** 10:16 11:16
30:18 32:5,6 33:3
35:12 40:9,10
43:10 52:2 54:5
58:25 62:3 69:8
69:19 71:5 78:1
78:19 79:11 80:18
110:25 120:2
125:6 131:3
134:25 135:2,3,7
143:3 152:4,12
159:23 161:11
162:3 165:18
**think** 12:6 19:1,2
21:10 24:16 25:18
30:21 33:17 34:22
45:13 51:8 58:6
59:24 64:14 70:6
73:5 74:18 75:20
76:17 77:15 85:2
91:12,14 94:11
103:20 112:12

113:7 122:15
125:16 129:19
136:12,13 161:8
161:18 165:10
168:12,20 169:2
172:3,6 175:7
179:7
**thinking** 99:2
163:1 164:8 165:8
165:19
**third** 73:24,25
75:16 77:19 117:7
117:11
**thorough** 74:2
**thought** 61:10
62:2 66:20,22,25
67:6,18,22 92:9
95:16,20 145:17
161:20 166:18
168:20 176:23
178:8
**thoughts** 101:15
**threaten** 53:12
**three** 16:15 17:8
17:13 25:12 33:9
33:9 49:4 50:11
68:14 71:25 72:1
73:18 79:25 83:19
88:19 97:4,6
105:10 115:25
116:5,9,14 117:3
117:19 119:16,17
120:24 124:22
125:9 127:20
128:20 129:2
164:5 169:4 175:3
175:5
**threw** 39:7
**thrown** 99:4
**thursday** 35:22

**tied** 100:5
**tile** 63:23 65:7
67:17 72:13,19
101:1
**tiles** 63:21 115:23
117:25 131:11
143:4,15
**till** 146:25 162:3
**time** 7:11 12:3
19:9,13 20:2,2,5,6
22:4,11 25:10
28:18,21 36:10
37:8,12,17 40:1,24
41:8 42:11,21
49:19 58:25 59:22
60:1,2,13,19,24
61:7 62:23 66:21
67:25 68:11,15
72:11,21 73:3,4,21
74:10,25 77:19,21
79:13,14 87:12
88:20,24 89:2
90:10,22 91:10
94:19 95:2 100:25
102:23 103:6,17
103:22,25 104:11
104:18,25 105:10
107:2 115:3
122:16 123:4,8
126:18,22 127:16
130:23,23 137:6
139:15 143:11
145:6 146:17
149:21 151:20,22
152:10,13 153:10
158:11,21 162:1
163:10,23 164:14
164:18,21 167:13
173:1 179:20
180:3,5,7,17,22
182:7 184:6

185:19
**timeframe** 185:8
**times** 22:15 64:18
138:2 176:4
**timing** 161:17
**tissue** 43:19
**today** 9:24 11:5
13:13,22 15:8
18:13,19,23 19:21
37:12,18 72:15
177:20,21,24
178:19 179:22
180:6
**today's** 182:13
**told** 36:3 37:16
54:7 78:19 84:1
87:21 88:2 94:5
95:25 96:20 97:20
106:21 108:1
136:25 152:2
156:11,11 157:20
164:22 167:3,3
168:12,24,25
169:8,20
**tony** 4:14 7:1
**top** 51:9 53:9
116:11,13 177:3,5
**tornado** 144:4,7
144:23 150:21
162:8 174:15,18
174:25 176:12,20
176:21,25 177:12
177:24 178:13
179:21
**total** 131:21 174:7
182:14
**totally** 114:20
158:22 165:20
**touch** 97:17
181:25

**traffic** 48:19,21
140:13
**tragedy** 28:5
103:13
**train** 144:14
**transcribed**
184:10
**transcript** 181:4
181:11,12 182:9
182:10 183:10
184:11,14,16
185:6,20 187:5,8
**travel** 95:23 182:8
182:10
**tree** 175:2
**trees** 175:1,4,5,15
175:15
**trial** 9:25 10:1
127:10
**trick** 11:12 150:14
**tried** 33:13 75:3
127:6,11
**tries** 127:19 128:7
**trouble** 100:24
121:14
**troy** 16:11 17:12
24:4,21 26:19,20
26:22 27:7 28:11
36:9 113:16
119:24
**truckers** 154:18
**trucks** 91:22
**true** 127:21
128:10 146:11
183:13 184:11
187:8
**trusted** 126:9
**truth** 8:2,2,3
**truthful** 166:15
**try** 11:21 44:19
119:11 129:21

139:2 160:14
**trying** 11:3,4
33:15 51:13 76:9
107:10 113:15,18
117:1 118:5
119:12,12 121:23
136:19 138:15
139:20 142:4
150:7,8,14 151:7
151:17 160:4,5
161:5,23,24 163:5
163:10,21 164:20
165:16
**tubs** 131:12
**turn** 6:9 14:4
71:22,23 155:25
**turned** 32:22 43:4
87:25 88:1,3 93:4
**tuscaloosa** 31:24
**tv** 66:12
**tvs** 131:11
**twice** 44:24
**twin** 169:23
**two** 8:25 14:4
15:20 17:14,14,16
19:12 20:21 23:18
25:1 26:14 27:19
36:11 50:11,11
64:14 68:10 73:15
78:2,3,21 79:14,15
80:9,17,19,20
82:17 102:7,21
103:11 104:5
110:25 114:5
117:6 121:5 130:8
131:7 132:3
133:11 155:6
159:1 169:4,14,15
174:16 178:3,20
180:10

**type** 30:20,24 43:2
150:16,17 152:11
154:21
**types** 43:10

**u**

**u** 36:8
**uh** 10:19,19 116:6
119:4,6 124:10
**ultimately** 95:1
**undersigned** 184:1
**understand** 11:8
12:4 28:12 49:2
53:15 58:2,23
59:1,1 64:2 66:18
67:10,24 68:1
77:4 101:18
107:10,11 108:11
113:6 119:14
120:21 127:5
141:7 152:9 153:4
153:4 165:23
166:21 170:25
171:5 179:16
**understanding**
89:6 135:8 161:3
161:22 167:19
**understood** 11:10
18:10 24:8 36:19
38:6 81:23
**underwriter's**
130:3
**underwriting**
130:1
**unfortunately**
115:8
**unintentionally**
165:14
**unit** 6:15 19:8,12
68:10,14 88:19,23
123:3,7 164:13,17

**united** 1:1 2:1 6:19
**units** 27:9 93:25
117:3 131:6,8,10
**universal** 24:1
**unobstructed** 81:6
81:7
**unquote** 135:22
136:10
**unreasonable**
148:3
**unused** 140:22
**unusual** 130:21
**upgrade** 69:12
**upgraded** 45:17
45:17 52:11 135:2
**upgrades** 39:10
45:5
**upset** 11:17
121:16,17
**upstairs** 95:22
116:15
**use** 12:16 36:18
84:1 139:20 152:5
**usually** 36:5 44:18

**v**

**v** 3:5 43:8 44:16
89:12 94:5,9 96:2
98:8 108:10 111:6
112:17 121:12
126:8 137:19
142:13 158:23
185:4 186:1 187:1
**v's** 84:21
**vacant** 131:21
**vacation** 23:18
**vandalized** 92:11
**verbal** 10:17 58:22
99:1
**verify** 78:1 185:9
**veritext** 7:3
182:15 185:23

**veritext.com**
185:15
**versus** 6:18 170:10
173:25
**video** 3:10 6:12,16
8:7 22:5 37:19
38:1 166:23 167:9
167:22
**videographer** 4:13
6:4 7:2,21 10:2
19:7,11 68:9,13
88:8,14,18,22
123:2,6 164:12,16
182:11
**videotape** 21:11
21:14,17,20,24
**videotaped** 1:15
2:13
**videotaping** 10:1
**violation** 48:19,21
**virtue** 8:6
**visible** 148:9
**visit** 23:22,23,24
44:23
**visiting** 175:11
**visits** 148:21
**visram** 5:22 32:18
33:4,6 43:16
44:22 50:4,18
54:7,18,20 59:10
60:21 61:4,22
62:6 68:21 72:24
85:10 99:12,21
123:11,16 124:2
126:15 160:22
161:5 167:3,10
171:14,20 180:14
**visram's** 45:20
89:25 157:25
159:9 166:11

**visual** 140:2
**visualize** 51:13
**voluntarily** 26:24
35:8
**vs** 1:8 2:7

**w**

**w** 29:12
**wade** 135:16
**wait** 114:21
180:25
**waiting** 62:11
175:25
**waive** 181:8
**walk** 45:2 70:9,16
87:2 93:25 107:24
141:4
**walked** 97:22
176:14
**walking** 70:21
**walls** 61:11 63:21
63:23 65:6 67:17
107:21 131:11
177:10
**walmart** 154:15
**want** 11:3 12:11
19:4 36:3 51:15
56:22 74:5 78:16
84:2,8 99:20
103:15,16 107:13
111:12 120:16,19
120:20 122:17,20
126:3 132:8
161:18 162:12
181:18
**wanted** 41:15
45:25 47:4 50:10
82:22 92:22 106:8
106:8 110:19,20
110:22,25 113:10
123:12 127:11
142:13 145:13

155:17 162:16
167:4 170:8
**wanting** 153:11
161:9 163:4
**wants** 122:20
173:5
**warranty** 89:15
**wash** 69:18
**washing** 69:16
**watching** 90:20
**water** 62:21 153:7
**wave** 37:2
**way** 32:21 48:24
59:13 75:13 90:19
101:20 114:12
116:15,16 119:9
119:10 121:18,22
129:15 136:1
139:18 156:7
158:2,18 163:11
175:1 176:25
181:9,20
**wayne** 3:14 7:13
8:19 21:19 37:6
55:25 76:19 120:8
120:9,12 122:22
126:3 132:6
135:18 155:5
**ways** 94:13
**we've** 57:11,13
59:19 65:23 68:2
83:19 122:15
176:4 181:15
**wear** 61:13 64:3
**week** 44:24 51:20
51:21 52:13,16
60:7,8 70:12,13,14
70:20 101:4,10
121:5 139:24
156:16

**weekend** 144:10
175:11
**weekends** 35:21
**weekly** 46:14
51:20 52:1,1
71:12
**weeks** 78:2,3,21
79:14,15 80:17,20
80:21 82:17
103:11 121:5
130:8 132:3
133:11 178:3,20
180:10
**weight** 9:11
**welborne** 129:24
**went** 23:7 33:4
34:25 67:13,13
72:24 84:12 93:5
93:7,12 94:3 95:5
95:12 109:24
117:8 133:24
177:4,5,10
**whatever's** 79:1
**wheelbarrow**
69:10
**whereof** 184:20
**whispering** 6:7
**white** 71:3 168:21
**whitehead** 9:6,7
**wife** 74:6,12,13
**wind** 9:3 73:2
142:24 144:11
145:19 150:12,12
**windows** 69:21
144:15 176:10,14
176:16
**windstorm** 143:12
144:7,23 145:15
150:19
**wingers** 25:25
26:1,4,8,16,24

27:1
**wings** 25:25
**wiring** 82:2
**wise** 38:25
**wish** 163:22
**witness** 5:2 7:23
126:19 184:20
185:8,10,12,19
**witnesses** 184:7
**wkfc** 130:1
**woman** 9:11 74:2
74:5,12 75:6 85:2
85:6 102:17
134:12
**woman's** 166:25
**womb** 76:15
**wonderful** 11:16
12:25 23:4,14
**wondering** 179:3
**woods** 69:9
**word** 92:14
**words** 20:3 38:13
43:1 76:9 81:6
173:7
**work** 23:21 31:11
32:3,4,24 33:4
34:9 39:20 40:20
46:16,20 57:8
67:12 78:20 79:3
87:18 113:18
114:16,17 115:12
115:17 125:23
129:21 135:16
160:18 165:4
167:6 169:6
**worked** 14:23
27:17 33:6,7
34:10,15 39:18
43:6 44:2 79:7
118:24 119:17
120:24 127:20

129:9,13 162:2
**working** 46:22
  80:24 82:23 85:21
  86:22 89:21 91:19
  91:23 116:17
  117:9 136:17
  137:14 169:6,7
**worksheet** 5:18
  56:5 57:7
**worldwide** 33:2
**worry** 103:1
**wow** 36:13
**wpc** 6:23
**write** 17:22 43:13
  43:17 71:19 164:3
**writing** 43:21,23
  58:11,13,20 163:8
  163:9
**written** 118:14,17
  124:6
**wrong** 36:2 69:1
  87:23 162:5,6
  170:1
**wrote** 43:11 71:4
**wtaylor** 3:19
**wyndham** 33:2

| x |
| --- |

**x** 119:8 184:16

| y |
| --- |

**yasif** 29:14 40:5
  43:11 44:11 70:7
  70:7 71:24 72:11
  72:22 80:3 81:22
  82:4,15,20 83:15
  89:18 100:19,19
  103:16 180:1,14
**yasif's** 152:21
  153:15
**yeah** 37:3 42:4
  47:10 49:9 55:4

65:16 72:17 73:9
  80:16 81:4 88:16
  97:5 107:6 108:14
  110:10,10 119:10
  122:25 124:20
  143:5 145:16
  155:20 169:6
  175:7
**year** 18:10 25:11
  26:5 35:14 42:10
  129:2 159:13,16
  162:3,4 163:7
  165:9 169:19
  179:6
**years** 15:20 16:1
  17:25 23:9,19
  24:5 25:1,11,13
  33:9,9,17 34:16,24
  40:15 50:11 71:25
  72:1 93:3 127:20
  128:20 129:2
  131:5 144:2 152:4
  166:1
**yellowhammer**
  122:10,13
**yesterday** 18:12
**young** 99:9
**younger** 93:4
**youngest** 23:11

| z |
| --- |

**zarin** 5:22 123:16
**zero** 173:25
**zoom** 10:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FORINFORMATIONAL  PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.