# EXHIBIT A

FILED
2020 Aug-20 PM 02:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HAMAN, INC. d/b/a KNIGHTS INN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action File No. |
| | ) 2:18-cv-1534-KOB |
| | ) |
| v. | ) |
| | ) |
| CHUBB CUSTOM INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

### HAMAN'S MOTION TO EXCLUDE THE TESTIMONY OF CHUBB'S EXPERT KURT MULDER OR TO LIMIT SAME

Comes now Haman, by and through its counsel of record, and pursuant to Rules 103(d), 401, 402, 403, 702, and 703 of the Federal Rules of Evidence, files this motion to exclude the testimony of Defendant Chubb's roofing expert, Kurt Mulder. Mr. Mulder relies upon unsubstantiated facts and ignores actual fact evidence, as he was directed to do by Defendant. He also relies upon multiple, unsubstantiated assumptions, does not have opinions as to when the damages he assessed occurred, and draws opinions out of thin air. His opinions lack any scientific reliability or sound methodology. He was told to ignore damages and not do an estimate. His opinions are therefore not helpful to the trier of fact and would be confusing. His testimony, as cherry-picked as it would have to be, would be a

1

waste of time. For the reasons contained herein, Mr. Mulder's testimony should be stricken or severely limited.

## TABLE OF CONTENTS

I. INTRODUCTION AND STATEMENT OF FACTS..................................2

II. LEGAL ANALYSIS ........................................................................9

III. CONCLUSION..............................................................................11

### I.     INTRODUCTION AND STATEMENT OF FACTS.

1)     Knight's Inn, owned by Plaintiff Haman ("Haman") was damaged by a wind storm on April 28, 2014. Plaintiff's insurer, Chubb, ("Chubb") evaluated the loss and paid only $34,262.01. Haman hired several experts to estimate the storm damage: roofing consultant, Tom Irmiter, of Forensic Building Sciences in Minnesota and The Howarth Group's ("THG") Chuck Howarth, Arthur Grandinetti and Sarah Grandinetti. Their damage estimate for the structure was $1,595,680.00. Ex. 6. A written, 52-page, appraisal report was provided to Chubb.[1]

2)     The contents claim for the wind loss was $138,032.14. It was never paid. There was an additional wind damage claim to the common area in the

---

[1] All Exhibits referenced herein will be the same as Exhibits referred in Haman's Motion for Partial Summary Judgment on the appraisal count, filed August 20, 2020 (Doc. #88, 89, 90).

amount of $56,850.93 which was never paid. Written estimates were provided to Chubb for all contents and common area losses. Contents losses were estimated by Sarah Grandinetti ("SG"), a qualified personal property appraiser. (See Ex. 7 and 8).

3) Appraisal was invoked on the wind claim July 5, 2015, after Chubb paid none of the documented $138,082.14 content losses. Chubb paid only $34,262.01 of the $1,595,608.00 wind structure loss claim, 2% of the claim. His amount was for replacement of all three roofs.

4) Chubb hired engineer Kurt Mulder, of Engineer Design & Testing (EDT), who first visited the premises seventeen (17) months after the loss. He was hired as an engineer/consultant to evaluate the roof. (Ex. 31, Mulder depo. p. 96). He took photos of the scene. He was directed by Stuart Mintz of York Services, hired by Chubb, but he also met individuals from Young & Associates ("YA") on his second visit and walked with them on the second visit to the site. (Ex. 31, Mulder depo. pp. 77-78). All were paid by Chubb.

5) Mintz gave Mulder the scope of what he was supposed to look for as far as damages. Nothing else. (Ex. 31, Mulder depo. p, 86). He met Mintz on-site but Mintz did not give him any documents. He only told him what he wanted him to do. (Ex. 31, Mulder depo. p. 86). Then, Mintz left.

6) Mintz changed Mulder's scope during the project, apparently in reaction to Mulder's proposed flat fee. Mulder was asked to evaluate what it would cost for him to do a damage estimate, and he provided that to Mintz and Mintz said no to the $5,000 capped charge. (Ex. 31, Mulder depo. p. 99). So, he never finished his evaluation on Buildings 1, 2 or 3. (Ex. 31, Mulder depo. p. 99). He was never asked to determine what was a covered loss or what was not a covered loss. (Ex. 31, Mulder depo. p. 79). He does not know what kind of insurance policies were on the property and never saw a copy of the insurance contract. (Ex. 31, Mulder depo. p. 79). The only thing he reviewed was another EDT engineer Ned Fortenberry's report on the fire loss. (Ex. 31, Mulder depo. p, 80).

7) He was not aware that Chubb had done an insurance evaluation inspection of the Knight's Inn property the month before the wind event, which proved the roof was satisfactory shape. Ex. 33. He would have been interested in seeing that. (Ex. 31, Mulder depo. p. 81). There was also a valuation report done after both claims. (See Ex. 34).

8) He did not talk to the maintenance manager, Bukhari, or to the owner, Ms. Visram. (Ex. 31, Mulder depo. p. 82). He did not even talk to the resident manager, or one of the maintenance workers doing repairs, Ken. (Ex. 31, Mulder depo. p. 8).

4

9) He did not review a Chubb SEA electrical evaluation report or the industrial hygienist reports. (Ex. 31, Mulder depo. p. 84). He looked at the roof, but he could not tell what type of construction was under the exterior roof. (Ex. 31, Mulder depo. p. 85). He noted heavy leaking at the ballroom right of building A. Building B had noticeable water under the roofing. (Ex. 31, Mulder depo. pp. 94, 95).

10) Mulder's pictures, taken on his first visit to the scene, were taken seventeen (17) months after the storm. (Ex. 31, Mulder depo. p. 105). Hundreds, if not thousands, of pictures of the scene were taken by other Chubb witnesses before his visit.

11) The photos show obvious wind damage to the cap coping, potential damage to the rest of the metal roof, and interior damages. (Ex. 31, Mulder depo. p. 108). He is aware the tornado touched down in that area. He measured the wind speed at Knight's Inn at 68 miles per hour.

12) In evaluating the roof, he saw separated seams, openings in the roof, and determined the seams were possible sources for interior water intrusion. **But, he does not know the timeframe the seams separated.** (Ex. 31, Mulder depo. pp. 113, 114). He saw quite a bit of damage to copings, but **does not know when they occurred.** He saw patching and caulking around some seams, **but does not know when they occurred, before or after the storm.** He saw fasteners undone

5

and bent metal and patching, **but does not know when those damages occurred.** (Ex. 31, Mulder depo. pp. 117, 118).

13) There were copings that should have been fastened that were not, and some bent, separated seams and a lot of punctures, indicating flying debris. (Ex. 31, Mulder depo. pp. 148, 149). He saw evidence of sealant or glue or caulk being used to repair, **but does not know if they were made after the storm.** (Ex. 31, Mulder depo. p. 151). He saw pock marks and holes; and saw that where the coping had come loose, it had damaged portions of the roof, **but did not know when that damage occurred.** (Ex. 31, Mulder depo. p. 118, 119). He saw numerous places where the roofing membrane was punctured, **but doesn't know when that occurred, either.** (Ex. 31, Mulder depo. p. 122). He found seams had been partially unsealed, leading to water intrusion and wet ceiling tiles from multiple aspects, but **does not know when this occurred.** (Ex. 31, Mulder depo. p. 126). He observed wet ceiling tiles, but says lining them up with specific roof seams was impossible. (Ex. 31, Mulder depo. p. 127). He observed saturated roofs. He took core samples. You could feel water in the membrane. (Ex. 31, Mulder depo. p. 128). He does **not know when the ceiling tiles became stained or missing.** (Ex. 31, Mulder depo. p. 162).

14) As to the multiple membrane patches, **he does not know, or didn't even ask, when they were made.** (Ex. 31, Mulder depo. p. 165). The majority of

the core samples were saturated. (Ex. 31, Mulder depo. pp. 168, 171). Importantly, he had the ability to do a repair estimate. He gave a capped quote for work, since he had a background in the construction industry. (Ex. 31, Mulder depo. p. 180). Chubb rejected his quote and would not pay him to do an estimate.

15) The damages that Mulder saw were similar on all three (3) buildings. (Ex. 31, Mulder depo. p. 119). Even though he did not know when the damage or repairs were done in the seventeen months (17) months since the storm, **he did not ask anyone at the facility about that**. He did not ask for repair bills. (Ex. 31, Mulder depo. p. 121).

16) Overall, the roof looked in bad shape. (Ex. 31, Mulder depo. p. 124). If the roofs belonged to him, he would want all three (3) roofs replaced. (Ex. 31, Mulder depo. p. 137). But, he was not allowed to do an estimate.

17) His original assignment was to compare and contrast Haman's FBS roofing report, but he didn't do that. (Ex. 31, Mulder depo. p. 129). Stuart Mintz changed his scope and told him not to do the things he asked him to do in an October email, due to the $5,000 it would cost to complete. (Ex. 31, Mulder depo. p. 130). Mulder verified that, under the 2009 International Building Code, if you have water underneath your roofing, then you cannot re-roof it. **You have to remove all saturated layers**. (Ex. 31, Mulder depo. p. 183). This, therefore, is

the measure of damages in the instant case. The replacement cost for the three (3) are therefore the relevant damages at issue.

18) However, he did not do an estimate to remove all of the roofing. Only Haman's THG and Haman's Irmiter did. He stopped short of issuing the estimate, as he was instructed by Mintz. (Ex. 31, Mulder depo. p. 194). He thinks Lehman was also instructed not to issue an estimate, but doesn't know why. (Ex. 31, Mulder depo. p. 195).

19) In summary, he was instructed to document pictures of the wind damages, but was told not to do an estimate. He documented the wind damage and verified all sorts of damage. However, he **could neither tell when the damage occurred,** nor when repairs to the premises occurred. His testimony concerning causation and damages is, therefore, useless, and he simply has no testimony about cost estimates.

20) Mulder, like many other Chubb witnesses, was qualified to give an estimate, but was not allowed to do so. His scope was changed and limited by Chubb's orchestrator, Mintz.

21) Mulder is a engineer. He could have issued a definitive report and priced out damages, but he did not. Therefore, he has no testimony bearing on the damages issue in this case. Liability is clear, and the only dispute in this case is the amount of damages. Chubb prevented Mulder from estimating damages, so

Mulder has no testimony to add that can be helpful to the trier of fact. At most, various pictures he took could be used.

## II.   LEGAL ANALYSIS – STANDARD OF REVIEW

22)   Rule 702 governs the admissibility of expert testimony and evidence. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329,1335 (11th Cir. 2010). Rule 702 provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

23)   In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court made it clear Rule 702 is meant to ensure expert evidence is both reliable and relevant. *McCreles v. Global Upholstery Co.*,

9

500 F. Supp. 2d 1350, 1353 (N.D. Ala. 2007). The *Daubert* principles apply to all expert testimony, whether based on scientific, technical, or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999). Thus, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony had 'a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592) (alteration adopted). *Daubert* imposes on a trial court the duty to act as a "gate-keeper," under Rule 702, by ensuring that expert testimony is reliable and relevant before being admitted. *Haney v. Eaton Elec., Inc.*, 528 F. Supp. 2d 1262, 1266 (N.D. Ala. 2007).

24) In the Eleventh Circuit, determining the admissibility of expert testimony requires a "rigorous three-part inquiry" in which the Court determines whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F. 3d 1244, 1260 (11th Cir. 2004) (*en banc*) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F. 3d 548, 562 (11th Cir. 1992)).

10

25) The burden of establishing that expert testimony meets these three elements rests with the proponent of the expert testimony. The Court possesses broad discretion when assessing the reliability of expert testimony and when determining how to assess the reliability of a proffered opinion. *Id.* at 1264.

### III. CONCLUSION.

26) Any cost opinions that Mulder might have now, or at trial, would be prohibited. He has never given any cost estimates previously. He did say the IBC required the roofs to be replaced but he did no cost estimate for that. His opinions are not even relevant evidence. *See, McCreles v. Global Upholstery Co., supra.* The opinions he does have are just unsupported. His opinions would not aid a Court or the jury in this case because they, having no rational or scientific basis, would be offered by Defendants to confuse the fact finders. *See, United States v. Frazier, supra.*

27) Rule 702, Fed. R. Evid., provides that a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

(a) The expert's scientific, technical or other specialized knowledge would help the trier of fact to understand the evidence or to determine a fact at issue;

(b) The testimony is based on sufficient facts or data;

11

(c) The testimony is a product of reliable principles and methods; and

(d) The expert has reliably applied the principles or methods to the facts of the case.

28) Chubb intentionally hired Mulder to be a bit player. He did not account for the obvious alternative explanations provided by eye-witness testimony because Mulder did not speak to any these eye witnesses. The Court may limit or exclude testimony based upon reliability standards or Rule 702. *Michael's v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000), *cert. denied*, 531 U.S. 926, 121 S. Ct. 303 (2000).

29) Mulder cannot rely upon his own artificially limited observations to give any helpful opinions. The trial court must scrutinize the specific facts relied upon by the expert to make sure that the expert's testimony is reasonable and has probative value in helping the jury evaluate the opinion in the particular case. The more an expert relies on inadmissible facts that the Court finds to be untrustworthy, the less likely it is that the reliance is reasonable. Fed. R. Evid., 703.

30) When an expert seeks to base an opinion on facts either perceived by him personally or already introduced into evidence, the trial judge must determine, pursuant to Rule 104(a), both that (1) facts that are relied upon by an expert are the kinds of facts or data experts in the field rely upon; (2) that such reliance is

reasonable. *Advent Systems, Ltd. v. Unisys Corp.*, 925 F.2d 670, 682 (3rd Cir. 1991).

31) Note that the first sentence of Rule 703 states that "[A]n expert may base an opinion on **facts or data** in the case that the expert has been made aware of or personally observed." Only to the extent that evidence has probative value and will assist the jury in evaluating the expert's opinion, should otherwise inadmissible facts or data be admissible. *Turner v. Burlington Northern Santa Fe R. Co.*, 338 F.3d 1058, 1062 (9th Cir. 2003).

32) **Federal Rule of Evidence 403 provides another avenue for the Court to disallow such contrived testimony that is not based on facts in evidence. The Court is allowed to exclude evidence if it confuses the issues or misleads the jury or is a waste of time.**

33) This Court's preliminary assessment of whether the reasoning or methodology underlying Mulder's testimony is scientifically or reasonably valid can only lead to one conclusion. It is not. Fed. R. Evid. 702; *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). The *Daubert* requirement asks a district judge to first determine if evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist. *Id.* Here, Mulder's opinions, controlled and artificially limited as they were by Chubb, cannot aid any resolution of this case. They are not scientific.

34) Mulder's entire testimony should be disallowed, and he should be stricken as a witness. At most, his pictures should be allowed as evidence because they truly depict something. Chubb hired Mulder to opine that the roof had "installation problems," but Chubb so limited him in his opinions that his testimony is useless. He doesn't know when or how the roof damages occurred, and was not interested in talking to any witnesses to find out.

35) Mulder was asked to go document the scene, and he did go and take pictures. Then, he was prevented from giving any estimates or detailed repair costs, although he offered to do so.

36) The opinions that Mulder may have had are unreliable. He did not know when the storm damage occurred, or whether the defects he saw occurred after storm damage, as a result of, or before. He did not know when the repairs were made, nor did he inquire and try to find out when they were made.

37) By artificially limiting Mulder's field of operation, Chubb made his testimony unreliable and of little, if any, use. His testimony has no probative value and would be a waste of time.

WHEREFORE, PREMISES CONSIDERED, Haman moves to strike Mulder's testimony, in whole, or in part. Haman requests such other and further relief as the Court seems proper and just.

/s/Gary V. Conchin
Gary V. Conchin (ASB-1263-C56G)
Attorneys for Plaintiff

Gregory Brockwell, Esq.
Jason R. Smith, Esq.
2100 1st Avenue, N., Ste. 300
Birmingham, Alabama 35203
greg@brockwellsmith.com
jay@brockwellsmith.com

CONCHIN COLE & JORDAN
2404 Commerce Court SW
Huntsville, AL 35801
(256) 705-7777 Phone
(256) 705-7778 Facsimile
E-mail: gary@alainjurylaw.com

## CERTIFICATE OF SERVICE

I certify that I have on the 20th day of August 2020, served a true and correct copy of the foregoing to counsel for all parties in this matter via electronic mail.

Michelle A. Sherman, Esq.
Wayne D. Taylor, Esq.
MOZLEY, FINLAYSON
& LOGGINS, LLP
1050 Crown Pointe Parkway, Ste. 1500
Atlanta, Georgia 30338
msherman@mfllaw.com
wtaylor@mfllaw.com

Mark Hess, Esq.
HAND, ARENDALL
2001 Park Place, N., Ste. 1200
Birmingham, Alabama 35203
mhess@handarendall.com

David A. Lee, Esq.
PARSONS, LEE & JULIANO, P.C.
600 Vestavia Parkway, Ste. 300
Birmingham, Alabama 35216
dlee@pljpc.com

/s/Gary V. Conchin
Gary V. Conchin (ASB-1263-C56G)

15