

FILED

2020 Sep-10  PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| HAMAN, INC. d/b/a KNIGHTS INN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action File No. |
| | ) | <u>2:18-cv-1534-KOB</u> |
| | ) | |
| v. | ) | |
| | ) | |
| CHUBB CUSTOM INSURANCE | ) | |
| COMPANY, | ) | |
| Defendant. | ) | |

## <u>HAMAN'S RESPONSE TO CHUBB'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF CHUCK HOWARTH</u>

Gary V. Conchin (ASB-1263-C56G)
Attorney for Plaintiff

CONCHIN COLE & JORDAN
2404 Commerce Court SW
Huntsville, AL  35801
(256) 705-7777 Phone
(256) 705-7778 Facsimile
gary@alainjurylaw.com

Gregory Brockwell, Esq.
Jason R. Smith, Esq.

Attorneys for Plaintiff
2100 1st Avenue, N., Ste. 300
Birmingham, Alabama 35203
greg@brockwellsmith.com
jay@brockwellsmith.com

TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................i

PRELIMINARY STATEMENT ...................................................... 1

 I.  RESPONSE TO CHUBB'S OVERVIEW ................................... 1

II.  HAMAN'S RESPONSE TO CHUBB'S STATEMENT OF
     FACTS ................................................................................ 6

     A.  The Alleged Fire and Wind Losses...................................... 6

     B.  Haman Retained Howarth as its Appraiser ......................... 8

     C.  Haman's Designation of Howarth as a Rule 26 Expert  .................... 9

     D.  Howarth's Deposition Testimony ...................................... 10

         D. (1) – Howarth's Education and Training ..................................... 11

         D. (2) – Howarth's Inspection of Property for Purposes
                  of Determining Causation ................................... 14

         D. (3) – Haman Disagrees with Chubb's Characterization
                  of Narrative Reports .......................................... 15

         D. (4) – Howarth's Damage Estimates, RCV and ACV ................. 16

         D. (4)(a) – Fire Claim ............................................... 17

         D. (4)(b) – Wind Claim ............................................. 17

     III.  HAMAN'S STATEMENT OF ADDITIONAL UNDISPUTED
           FACTS ....................................................................... 18

     IV.  ARGUMENT AND CITATION OF AUTHORITY ........................ 20

      V.  CONCLUSION .................................................................. 29

<u>HAMAN'S RESPONSE TO CHUBB'S MOTION TO EXCLUDE THE</u>
<u>EXPERT TESTIMONY OF CHUCK HOWARTH</u>

Comes now the Plaintiff herein Haman, Inc. d/b/a Knight's Inn ("Haman")

and in response to the Defendant Chubb Custom Insurance Company's ("Chubb")

Motion to Exclude the Testimony of Haman's expert Howarth states as follows:

## PRELIMINARY STATEMENT

Chubb's Motion to Exclude is in unnumbered paragraphs, making it difficult

to respond to. Haman will attempt to respond to headings used by Chubb, and then

provide further arguments showing that Howarth's testimony is fully admissible.

## I.  RESPONSE TO CHUBB'S "OVERVIEW"

Chubb's "overview" states that "the dispute arose when Chubb postponed

the appraisal because the causes of loss were disputed and Howarth was not an

impartial appraiser." Haman agrees that the losses were disputed, but disagrees that

the causes of loss were disputed.  In fact, Chubb paid on both losses, determining

that both fire and wind were covered losses.  Chubb's argument that Chubb backed

out of the appraisal process because Howarth was not an impartial appraiser is

false and created after-the-fact.   The evidence is clear that such a manufactured

reason was dreamed up many months after Chubb's unilateral breach of the

appraisal provision.

Haman does not disagree with the history of the case recitation.  Haman, of

course, disagrees with the attack on Howarth.   He is not disqualified by any

1

alleged partiality or by lack of expertise. While it has become fashionable to attack the method of compensation of the appraiser, there is no legal support for such an argument. It is a red herring, a charlatan argument if there ever was one.

A proper "overview" of the case facts show Chubb accepted Howarth as Haman's appraiser in this matter.  (Doc. #s 90-14; 90-15; 90-16; 90-17; 90-18; 90-19; and 90-51) (Haman MSJ Ex. 10, 11, 12, 13, 14, 15, 20).  Chubb waived any objection to his appraisal role.  Chubb also accepted Dale Mullin as its selected umpire.   (Doc. #90-43 depo. trans. pp. 92, 113) (Haman MSJ Ex. 19, pp. 92, 113). At that point, Chubb had the benefit of The Howarth Group's appraisal estimate. (Doc. #90-3; 90-4 and 90-10). (Haman MSJ Ex. 3, 3A and 6).  There was never a question about his appraisal abilities or that he was a proper appraiser.  Chubb has waived any argument about Howarth's involvement.

At no relevant point did Chubb object to Howarth in any manner.  Howarth provided his written appraisal estimates to Chubb. (Doc. #90-4 and 90-10) (Haman MSJ Ex. 3A fire and 6, wind).  His job was to determine the damages, and do an appraisal for the fire and the wind damages.  You cannot define damages without being cognizant of what the claim is about.  Therefore, the estimates include what caused the damage.  (Doc. #90-20 depo. trans. p. 64, 66). (Haman MSJ Ex. 16, p. 64, 66).

Haman asked Howarth to invoke appraisal and he did so.  (Doc. #90-20, depo trans. p.70). (Haman MSJ Ex. 16, p. 70). (Doc. #90-14 and 90-15). (MSJ Ex. 10, 11).  He offered to meet at the premises before requiring formal appraisal but Chubb did not do so.  Instead, Chubb selected its appraiser, Bushman. (Doc. #s 90-17; 90-18; 90-19 and 90-51). (Haman MSJ, Ex. 13, 14, 15, 20).

The Howarth Group (hereinafter "THG") supplied appraisal estimates, the earliest one being February 11, 2015 (Doc. #90-14); (Haman MSJ, Ex. 3A). All throughout the spring of 2015, summer of 2015, winter of 2015, and through February 1, 2016, when both appraisers (Howarth and Bushman) agreed on an umpire, Chubb never questioned Howarth. When umpire Mullin accepted the appointment, it had been almost twenty-three (23) months since the fire loss, and there was obviously no objection to Howarth's serving as an appraiser. He had forwarded his Appraisal Employment Agreement to one of Chubb's appraisers, Brent Perich, on February 25, 2015. There was never a request for an examination under oath.  They could have done that while the appraisal was going on. (Doc.#90-20, p. 206; Howarth Ex. 16, p. 206). Subsequently Chubb selected an umpire and began the appraisal.  The dispute thereafter was to be decided by the impartial umpire agreed to.   The appraisal provision controlled the duties of the parties as follows:

### 2. Appraisal

If we and you disagree on the value of the
property or the amount of loss, either may
make written demand for an appraisal of the
loss. In this event, each party will select a competent
and impartial appraiser. The two appraisers
will select an umpire. If they cannot
agree, either may request that selection be
made by a judge of a court having jurisdiction.
The appraisers will state separately the value
of the property and amount of loss. If they fail
to agree, they will submit their differences to
the umpire. A decision agreed to by any two
will **be** binding. Each party will:
**a.** Pay its chosen appraiser; and
**b.** Bear the other expenses of the appraisal
and umpire equally.

If there is an appraisal, we will still retain our
right to deny the claim. (emphasis added).

Mr. Howarth had personal knowledge of the condition of the premises. He had visited the premises on the fire claim and on the wind claim.   (Doc. #90-20 depo trans. p. 101). (Haman MSJ Ex. 16, p. 101).  His detailed reports stated opinions concerning the fire and wind losses. (Doc. #90-20 depo. trans. p. 132). (Haman MSJ Ex. 16, p. 132).

Mr. Howarth continued correspondence and communication with Bushman and Perich during the summer of 2015, the fall of 2015, the appraisers met at the scene May 7, 2015 prior to the scheduled umpire meeting, and even had communications with Chubb's Wilburn in July of 2015 to discuss the appraisal provisions.  (Doc. #90-20 depo. trans. p. 113). (Haman MSJ Ex. 16, p. 113).

4

Howarth worked with Chubb representatives and received correspondence stating Chubb had elected to proceed with Bushman as its appraiser in conjunction with "disputed building damages."  The disputed building damages as of the date of that document were the fire and wind damages.   (Doc. #90-20 depo. trans. p. 191). (Haman MSJ Ex. 16, p. 191).   He and Bushman discussed handling both claims and there was no question Bushman had been selected appraiser on both. (Doc. #90-20 depo trans p. 200). (Haman MSJ Ex. 16, p. 200).

At no point during any of these activities did Chubb raise any question of Howarth's "partiality." It is too late to raise it now.

Chubb's policy requires that each party select a competent appraiser when there is a disagreement on the **value of the property or amount of loss**.   The two appraisers are to state separately the value of the property and amount of loss (Doc. # 90-1, p. 14). (Ex. 1, p. 14).   Howarth was a very experienced appraiser.  Chubb's Bushman was not. This was his first appraisal. (Doc. # 90-43 depo. trans. pp. 53, 55). (Haman MSJ Ex. 19, p. 53, 55).   Likewise, Chubb's other appraiser, Perich had never handled an appraisal. (Doc. 90-53 depo. trans. pp. 50, 155). (Haman MSJ Ex. 22, Perich pp. 50, 155).

Howarth's forty (40) years of experience in handling insurance claims certainly qualified him to appraise this loss under Chubb's appraisal provision.

He has assessed building damages and causes in the way that all qualified appraisers do. The Chubb policy <u>requires</u> such an appraiser.

Howarth will not be asked to testify as to bad faith. He will be asked to testify to the unique appraisal facts and shenanigans he saw with Chubb.

Chubb's argument about actual cash value (ACV) damages is nonsensical. The policy requires **Chubb** to determine ACV, not Haman. (Doc. # 90-1, p. **15**). Further, the policy is a replacement cost value (RCV) policy.   The ACV provision is replaced by an RCV provision.  (Doc.#90-1, p. **18**).

## II.  HAMAN'S RESPONSE TO CHUBB'S STATEMENT OF FACTS.

### A.  THE ALLEGED FIRE AND WIND LOSSES.

There are no "alleged fire and wind losses" in this case.  There are only covered, admitted, fire and wind losses with disputed values for both.

Haman agrees, in principle, with the timing of the notice of the fire loss and wind losses.   The fire was reported immediately.  The wind loss was reported promptly, immediately after Arthur Grandinetti, a contractor associated by THG, examined the roof during his investigation of the fire loss and noticed wind damage.  (Doc. #90-20 depo. trans. p. 96, l. 7-25; p. 97, l. 1-6; p. 98, l. 2-9). (Haman MSJ Ex. 16, p. 96, l. 7-25; p. 97, l. 1-6; p. 98, l.  2-9). (Doc.# 90-29 depo. trans. pp. 58-59). (Haman MSJ Ex. 17, pp. 58-59).  AG had a roofing contractor with him to inspect the roofs and saw areas that were "tore up" and leaking all over

the place.   He noticed metal on the roof was free and flapping, and noticed wind damage.  He took pictures.  (Doc. #90-29 depo. trans. pp. 66-68). (Haman MSJ Ex. 17, pp. 66-68).  He then inspected all of the roofs.  (Doc.# 90-29 depo. trans. p. 85).  (Haman MSJ Ex. 17, p. 85).  His roofing estimate called for a complete replacement of all three (3) roofs.  (Doc.#90-29 depo. trans. p. 150; Haman MSJ Ex, 6). On all areas of damage, he would have identified the wind damage. AG used his experience and consulted with Mr. Howarth.  He also would have consulted with the roofing expert, Forensic Building Sciences' Mr. Irmiter, and the contractor that he had with him.  (Doc. #90-29 depo. trans. pp. 121-123). (Haman MSJ Ex. 17, pp. 121-123).

Chubb's engineer, Mulder, determined that the wind speed at the facility was 68 miles per hour.  (Doc. # 90-78 depo. trans. pp. 13, 109). (Haman MSJ Ex. 31, pp. 13, 109).  He saw heavy water leaking, and water under the roofing, bent fastenings and lots of punctures in the roof.  (Doc. #90-78 depo. trans. p. 149). (Haman MSJ Ex. 31, p. 149).   Mulder observed separated roofing seams, water intrusions, missing metal roof copings, fasteners undone, bent metal, and air bubbles noting moisture underneath.  (Doc. #90-78 depo. trans. pp. 113-118). (Haman MSJ Ex. 31, pp. 113-118).  He verified the condition that all three (3) roofs were in, and if they were his roofs, he would want them replaced.  (Doc.# 90-78 depo. trans. p. 137). (Haman MSJ Ex. 31, p. 137).  Under the 2009 IBC Code

you must remove all saturated layers.   These layers were saturated.  (Doc. #90-78 depo. trans. p. 183). (Haman MSJ Ex. 31, p. 183).

Haman's building consultant and estimator, Tom Irmiter of Minnesota, a Hague roofing certified expert, visited the scene twice.  His team spent a total of ten (10) hours on the roofs and he observed damage from the roof lifting up and going back down and other damage.  (Doc. #90-36 depo. trans. pp. 147, 157, 158). (Haman MSJ Ex. 18, pp. 147, 157, 158).  Irmiter has investigated literally thousands of storm and fire damage claims.  (Doc. #90-36 depo. trans. p. 118). (Haman MSJ Ex. 18, p. 118). He has served as an umpire and appraiser.  (Doc.#90-42) (Haman MSJ Ex. 18B).  He had special training in causation analysis, pitch and flat roof inspection, building codes, water intrusion studies and forensic sampling.  He ran a construction company for sixteen years. He thought the damage was consistent with winds in excess of 80 miles per hour.  (Doc. #90-36 depo. trans. pp. 129, 130). (Haman MSJ Ex. 18, pp. 129, 130). He has NOAA training and experience.

## B.  HAMAN RETAINED HOWARTH AS ITS APPRAISER.

Haman cannot agree with Chubb's erroneous assertions about Mr. Howarth's compensation agreement. Haman can agree that Mr. Howarth was hired by Haman under a written appraisal agreement that stated he would determine the amount of the loss and present the valuation appraisal to the panel and/or the

carrier. Chubb's assertion of a new, never before introduced creature of its imagination, called "capped contingency fee" is disputed. Haman disagrees that the use of Howarth as an appraiser had anything to do with Chubb's conduct or refusal to abide by the appraisal agreement.   There is no such evidence.

Mr. Howarth's fee arrangement is hourly.  He puts a cap on the fee, as most clients want a cap on their total invoice. Chubb's own expert witnesses testified these sorts of "fees with caps" are not unusual at all.   Several testified they, too, have put a cap on fees.  (Doc. #90-43 depo. trans. p. 70). (Haman MSJ Ex. 19, Bushman depo. p. 70). (Doc. #90-78 depo. trans. p. 131). (Haman MSJ, Ex. 31, Mulder depo. p. 131).  (Doc. #90-53 depos. trans. pp. 55, 56). (Haman MSJ, Ex. 22, Perich, depo. pp. 55, 56). Chubb's Wilburn and Lehman also work on a flat fee basis. Wilburn stated that York Services, his employer, gets paid a flat fee per claim for his work.  (Doc. #90-82 depo. trans. p. 37) (Haman MSJ, Ex. 32, Wilburn depo.  p. 37). Mulder proposed a capped fee in this very case.  (Doc. #90-78, p. 99); (Haman MSJ Ex. 31, p. 99).

## C.   HAMAN'S DESIGNATION OF HOWARTH AS A RULE 26 EXPERT.

Haman stipulates to the recitation of the Rule 26 report.  This Court has already found the Rule 26 disclosures were adequate. (Doc. #84, Memorandum Opinion).

Haman agrees that the Rule 26 report referenced a 225-page fire loss estimate and a 52-page wind loss estimate. Both had been in Chubb's possession since 2015. The estimates themselves were for disputed building damages. An estimator cannot determine damages without being cognizant about what the claim is about.  Therefore, Howarth's estimates do provide an opinion as to causation. (Doc. #90-20 depo. trans. pp. 64, 66). (Haman MSJ Ex. 16, pp. 64, 66). The parties anticipated that the appraisers would determine all damages, since that's what the policy dictates. (Doc. #90-1, p. 14) (Haman MSJ Ex. 1, p. 14). His hourly rate was $350.00 per hour for his appraisal work.  (Doc. #90-20 depo. trans. pp. 69-70). (Haman MSJ, Ex. 16, pp. 69-70).

Chubb's additional averment that Howarth's estimates did not contain an ACV of Haman's damages is a non-sequitur.  There is no requirement in the policy that an insured determine an ACV value.   That is an obligation for the insurer. (Doc. # 90-1, p. 16). (See Ex. 1, p. 16).  Further, the policy contains Replacement Cost Coverage, replacing ACV in the policy. (Doc. #. 90-1, p. 19). (Haman MSJ Ex. 1, policy p. 19). ACV was, however, provided. (See page 16 herein).

### D.  HOWARTH'S DEPOSTION TESTIMONY

Howarth is qualified to testify regarding the loss from wind and fire based upon his experience and training.  Haman disagrees that Howarth proposes to testify to bad faith conduct.  Howarth will testify to the appraisal process set out in

the insurance contract in question and testify to appraisal facts and the processes followed in this case, including his communication and correspondence with agents of Chubb.

## D. (1) - HOWARTH'S EDUCATION AND TRAINING.

Mr. Howarth is a Chartered Property and Casualty Underwriter (CPCU). (Doc. # 90-20 depo. trans. p. 21). (Haman MSJ Ex. 16, Howarth depo. p. 21). He also holds an AIC degree (Associate in Claims) from the Insurance Institute of America. He is a Rule 31 Approved Mediator, Supreme Court of Tennessee. (Doc.#90-28).

Howarth has worked in the insurance industry approximately forty (40) years. He was a reinspector/trainer and claims adjuster for State Farm from 1980-1986. (Doc.#90-20 depo. trans. p. 22). (Haman MSJ Ex. 16 p. 22).  He began his current independent consulting business in 2007. Previously, he worked in the appraisal and public adjusting business in Tampa, Florida and then, in Nashville, Tennessee in 1995. (Doc. #90-20 depo. trans. p. 26). (Haman MSJ Ex. 16, p. 26). He has attended seminars and learned about protocol for an analysis of mold and soot. (Doc. #90-20 depo. trans. p. 30). (Haman MSJ Ex.16, p. 30).  He is a licensed public adjuster in Tennessee, Kentucky, Mississippi and Florida.  Alabama does not offer licensing for public adjusters so he works as an appraiser or expert here. (Doc. #90-20 depo. trans. p. 31). (Haman MSJ Ex. 31, p. 31).

Howarth served as past president of both the Tennessee Association of
Public Adjusters and the Florida Association of Public Adjusters.  He is a member
and Board Member of the National Association of Public Adjusters. (Doc. # 90-20
depo. trans. pp. 33-34). (Haman MSJ Ex. 16, pp. 33, 34).

Howarth was employed as an appraiser by Knight's Inn.  He has a staff and
employs independent contractors to assist him. Two of those, Arthur Grandinetti
and Sarah Grandinetti, worked on the Knight's Inn claim. (Doc.# 90-20 depo.
trans. pp. 52, 53).  (Haman MSJ Ex. 16, pp. 52, 53).   They were associated with
THG for about eight to ten years.  Arthur assisted in preparing the estimate of
repair in connection with the fire and wind claims for Knight's Inn.  (Doc. # 90-20
depo. trans. p. 56).  (Haman MSJ Ex. 16, p. 56).  Sarah prepared all of the content
estimates.  (Doc. #90-07; 90-8; 90-11 and 90-12).  (Haman MSJ Ex. 4, 4A, 7)

An estimator cannot testify to damages without knowing what caused the
loss. Therefore, Howarth's estimates do provide an opinion as to causation and he
has put them in writing. (Doc.# 90-20 depo. trans. pp. 64, 66).  (Haman MSJ Ex.
12, pp. 64, 66). Mr. Howarth examined the fire premises before agreeing to
perform an appraisal of the property. His opinion was there was more money due.

Howarth wrote to Perich, who had been hired by Chubb, advising there were
several differences with the settlement amounts paid to Haman, and Haman was
invoking the appraisal provision of Chubb's insurance policy to settlement the

12

dispute difference. (Doc.# 90-20 depo. trans. pp. 80-82, 84; 90-14; 90-15). (Haman MSJ Ex. 16, pp. 80, 81, 82, 84). Ex. 10, 11). He offered to meet with Chubb's representative at the site to go through the differences and review the items in dispute.  (Doc. # 90-20 depo. trans. pp. 87-89).  (Haman MSJ Ex. 16, pp. 87-89).

Mr. Howarth's opinions are based on personal knowledge. His first visit in January 2015, was after Chubb paid what it was going to pay on the fire claim, in November 2014, some eight (8) months after the fire.  The first visit related to the fire claim and then his second visit concerned the roof claim.  He walked through some of the rooms on the fire claim visit and assigned a team to come in to do the detail work, and take photos. He needed to get an understanding of the loss. (Doc. #90-20, p. 105). (Haman MSJ Ex. 16, p. 105).

His normal process is to go in rooms near the fire source, then go to the extreme ends away, then work back towards the source, where he saw evidence of soot migration.  (Doc.#90-20, p. 149). When he visited for the wind claim, he got on the roof, walked the roofs and inspected one of three roofs.  This inspection occurred after he had received the roofing damage report from Forensic Building Sciences, so he wanted to double check his expert's work.  (Doc. # 90-20, depo. trans.  pp. 108, 109).  (Haman MSJ Ex. 16, pp. 108, 109).  Once he had been on the roof, he could evaluate how well his roof expert had done.  He always systematically checks on the experts he hires and makes sure they are doing their

job and following protocol.  *Id.* at p. 150.  He has to know he is getting a good

product from the expert.  *Id.* at p. 150.  He evaluates their reports. *Id.* at p. 152).

The THG estimates on the wind claim were prepared by Howarth and

Grandinetti working together.  They made decisions about scope, repairs, and

damages. They reviewed the pictures with each other and made drafts and

revisions. They had the Irmiter FBS report. (Doc.#90-20 pp. 141-143). They made

multiple revisions on a loss this size. (Doc.#90-23 p. 142).

A Contents Inventory of Sarah Grandinetti on the fire and wind claims

reflect her opinions. Howarth reviewed her estimates. Their contents inventories

reflect the opinions they both had as to contents. (Doc.#90-20 pp. 140, 141).

### D. (2) – HOWARTH'S INSPECTION OF PROPERTY FOR PURPOSES OF DETERMINING CAUSATION

Haman disagrees that Howarth did not inspect for purposes of determining

the causes of the losses. (Howarth Affidavit, Ex. A hereto).  His opinions were

based on personal knowledge and visits to the scene. His reports were buttressed

by seasoned, experienced evaluations of Arthur Grandinetti, with hundreds of

hours, and at least twelve (12) days, at the premises.   (Doc. #90-29 depo. trans. pp.

185, 188). (Haman MSJ Ex. 17, pp. 185, 188). They reviewed the information

together before the estimate was completed. (Doc. #90-29 depo. trans. pp. 94, 102,

124, 187).  (Haman MSJ Ex. 17, AG pp. 94, 102, 124, 187).  They also met at the

scene and went over all aspects of the claim.  Doc. #90-29 depo. trans. p. 59).
(Haman MSJ Ex. 17 AG, p. 59).

Grandinetti inspected the interiors and exteriors. Doc. #90-29 depo. trans.
pp. 65-66). (Haman MSJ Ex. 17, pp. 65-66).  He spent hundreds of hours on his
inspection and estimates.   They both reviewed the FBS Irmiter building reports.
Doc. #90-29 depo. trans. pp. 104, 122, 188, 189). (Haman MSJ Ex. 17, pp. 104,
122, 188, 189). He makes sure the damages they see are not pre-existing before the
specific event.  (Doc. #90-20 p. 161).  Grandinetti and Howarth used the
Xactomate price list in effect for Bessemer for August 2014, the year of the fire
and wind loss. (Doc.#90-20 p. 165).

The wind estimates are complete valuation of the loss and included the FBS
protocol. *Id.* at p. 177. When Howarth visited the scene for the roofing claim it was
clear the damage was from a tornado-style event.  He also had the photos.  You do
not see this type of damage from an average thunderstorm.  The building had been
peppered, scratched, scraped and punctured. *Id.* at 179.

### D. (3) - HAMAN DISAGREES WITH CHUBB'S CHARACTERIZATION OF NARRATIVE REPORTS.

This again is the Rule 26 argument.  Howarth has testified that his reports
did contain his opinions.   Chubb has had those reports for over four (4) years.
They had his reports before they deposed him thrice. The Court has already ruled

on this matter. (Doc. #84, Memorandum Opinion). Chubb makes the same

argument for the fire and wind claim, and Haman responds to both as stated.

### D. (4) – HOWARTH'S DAMAGE ESTIMATES, RCV AND ACV.

Haman agrees the initial estimates of The Howarth Group are for RCV.

Haman disagrees that there is any obligation whatsoever in this policy requiring

the <u>insured</u> to list an ACV value.   Additionally, as set out elsewhere herein, Chubb

refused to pay an amount sufficient to make the needed repairs so Haman could not

do the repairs.   This is a replacement cost policy.   The policy states, Valuation

Section, "we will determine the value" and the "we" is Chubb.   Haman bought

replacement cost coverage, so the loss is to be valued at replacement costs.   That

provision replaces the "actual cash value" mentioned in the policy. (Doc.# 90-1, p.

18) (Ex. 1, p, 18).   Everything starts with RCV valuation since that is what they

purchased.   All claims calculations therefore start with the RCV number.   See Ex.

A hereto, Affidavit of Chuck Howarth).

Howarth supplied ACV calculations at the request of Chubb.   Doc. #90-20

depo. trans. pp. 185, 186).   (Haman MSJ Ex. 16 Howarth depo. pp. 185, 186).

Lastly, and totally in disposition of Chubb's flimsy argument, the **proof of loss**

**documents for the fire and wind losses provided, plain as day, ACV figures.**

Doc. #90-3; 90-9). (Haman MSJ, Ex. 3, 5).

Chubb's infatuation with the ACV issue is misplaced.  Under the policy, it is Chubb's obligation to determine an ACV value.  It had a bevy of expert witnesses that could do that. It does not take a lot of common sense to figure out that if an RCV figure is higher, and disputed, an ACV figure will likewise be disputed.  As Judge Leigh Clark infamously used to pontificate to his tort law students, "that is a simple matter that we can illustrate by use of the term *a fortiori*.[1]

### D. (4)(a) – FIRE CLAIM.

Chubb makes no new argument here.  Haman incorporates its response hereinabove as to what Howarth did to evaluate the fire claim.

### D. (4)(b) - WIND CLAIM.

Chubb makes no new argument here.  Haman incorporates its response hereinabove. No significant repairs had been made since the fire or the storm dates. Therefore, his valuations were proper under the circumstances. Grandinetti testified that when he worked on the estimates, he intended them to be completely at pre-loss condition, which means restoring the premises to its condition before the fire.  (Doc.#90-29 p. 183). (Ex. 17, p. 183).[2]

---

[1] Judge Leigh M. Clark, circa 1975.

[2] Again, this is a replacement cost policy, not an ACV policy. (Doc.#90-1, p. 19).

17

### III.    HAMAN'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS.

1)    The issue of the wind claim arose because Arthur Grandinetti (AG) was inspecting the fire loss site and noticed a lot of wind damage. The wind claim was timely filed. Chubb evaluated the loss and paid for some damage, waiving any timelines argument. (Doc. #90-20 depo. trans. pp. 96, 97).  (Haman MSJ Ex. 16, Howarth depo. pp. 96, 97).

2)    Because of the huge differences, Haman invoked appraisal February 25, 2015 for the fire claim. (Doc.#90-14). (Haman MSJ Ex. 10).

3)     Once there was a disagreement about the amount being paid on the wind claim, Haman asked for appraisal.  (Doc. # 90-15; 90-20 depo. trans. pp. 96, 97). (Haman MSJ Ex. 11; Ex. 16, pp. 96, 97).   Appraisal was demanded on the wind claim July 6, 2015.  (Doc. #90-15). (Haman MSJ Ex. 11).

4)    When appraisal was invoked, Chubb appointed Bushman the appraiser on both wind and fire claims.  Bushman confirmed that when he drafted the Declaration of Appraisal document (Doc. #90-16). (Haman MSJ Ex. 12) and sent it to Howarth for his signature.  (Doc. #90-17). (Haman MSJ Ex. 13).  An email, of July 22, 2015, from Perich to Howarth, also identified Bushman as Chubb's appraiser for the fire loss.  (Doc. # 90-18). (Haman MSJ Ex. 14).

5)    Bushman participated in the umpire selection process, and on July 23 agreed to Mullin as umpire, stating, "I would be comfortable accepting Dale

Mullin as the selected umpire."   (Doc.#90-43 depo. trans. p. 113). (Haman MSJ Ex. 19, Bushman depo. p. 113).  Mullin was a qualified lawyer, contractor, and umpire.[3]

6)     Haman filed a proof of loss for the structure showing the RCV loss at $1,679,975.33, ACV of $1,478,378.29.  (Doc.#90-3). (Haman MSJ Ex. 3). Previously, a 225-page estimate was provided to Chubb by THG in February 2015. (Doc.#90-4). (Haman MSJ Ex. 3A).

7)     Haman filed a proof of loss for fire contents, (Doc.#90-7; Haman MSJ Ex. 4), and a 43-page detailed estimate for fire contents of $139,451.32. (Doc.#90-8). (Haman MSJ Ex. 4A).

8)     Haman filed a proof of loss for the wind claim with RCV and ACV values, on April 8, 2016.  (Doc.#90-9). (Haman MSJ Ex. 5).  Prior to that, in January 2016, Haman provided a 52-page estimate for $1,595,608.00. (Doc.# 90-10). (Haman MSJ Ex. 6). Chubb paid $34,262.01 on the wind loss claim.

9)     Haman provided Chubb a 41-page wind contents itemization for $138,082.14.  (Doc.#90-11). (Haman MSJ Ex 7). No payment was made

10)     Haman provided Chubb a 5-page common area wind estimate for $56,850.93. (Doc.#90-12). (Haman MSJ Ex. 8).  Chubb made no payments.

---

[3] Dale Mullin curriculum vitae, Exhibit 30.

11)    Bushman **admits it was his duty as the appointed appraiser, to work through any differences between the parties**. (Doc.#90-43 depo. trans. p. 134). (Haman MSJ Ex. 19 Bushman depo. p. 134). Perich told him to stop the appraisal process.  He was not given a reason. (Doc. #90-43 depo. trans. p. 142). (Haman MSJ Ex. 19, Bushman depo. p. 142).[4]

12)    Chubb refused to consider the expansion joint issue or submit it to the umpire.  Chubb aborted the appraisal process before it even met with the umpire. We had a date scheduled.   That was just completely improper.  (Doc. #90-29 depo. trans. pp. 183, 184). (Haman MSJ Ex. 17, AG depo. pp. 183, 184).

13)    **The parties were 23 months into the claim and there was never an objection raised to Howarth's impartiality.**

## IV.    ARGUMENT AND CITATION OF AUTHORITY.

1)    Haman does not disagree with the case citations setting forth *Daubert* standards and the Court's gatekeeping functions.  Haman obviously disagrees with Chubb's assertions, in its unnumbered paragraphs, that Howarth is not qualified to testify on the issues of causation. As this Court has noted, Haman contends that the storm caused the damages, while Chubb contends that age and poor maintenance caused some of the damages. Therefore, there is a FACTUAL DISAGREEMENT

---

[4] On the date of his 9:00 a.m. deposition in Nashville, Haman's counsel received via Dropbox to his office in Huntsville at 7:00 a.m., 8,013 pages. (Ex. 19, Bushman depo. p. 146; Ex. 21).

over the amount of loss that Chubb has to pay.  Howarth, Grandinetti, and Irmiter have all testified from personal knowledge that smoke and soot damage from the fire caused damage to all the rooms in the building.

2)      Howarth's credentials speak for themselves. The issue should be about whether he has the adjusting and claims experience to determine losses and the cause of losses.  The better reasoned cases hold that appraisers, in performing their duty, and determining the cause of losses, must determine which damages were caused by a covered event so that they can estimate the cost of repair and subtract that amount from a non-covered event.  *See, Kendall Lakes Townhome Developers, Inc. vs. Agricultural Excess & Surplus Lines Ins. Co., 916 So.2d 12, 15 (Fla. App. 3, Dist. 2005)*; *CIGNA Insurance Co. v. Didimoi Property Holdings, N.V.*, 110 F. Supp. 2d 259, 264 (D. Del. 2000); and *Spearman Ind., Inc. V. St. Paul Fire & Marine Ins. Co.*, 109 F. Supp. 2d 905 (N.D. Ill. 2002).   Determining the cause of damages is inherent to the appraiser's duty.  Further, it is not proper to conflate value and extent of damages claims into a position of legal causation or coverage.  *Cole v. Owners Ins. Co.,* 326 Fed. Supp 3d 1307, 1323 (N.D. Ala. 2018); *Rogers v. State Farm Fire & Cas. Co.*, 984 So. 2d 382, 392 (Ala. 2007).

3)      The policy in question provided for appraisers to determine the amount of the loss.  It requires that the appraisers will state separately the value of the property and the amount of the loss.  (See Doc. #90-1, p. 14). (Haman MSJ Ex.

1, Policy, p. 14). Haman has an absolute right, under the doctrine of reasonable expectations, to have this policy construed as written and in its favor. *Aetna Cas. & Surety Co. v. Chapman*, 200 So. 425 (Ala. 1941).

4)    Chubb badly miscites *Carneal v. Travelers* case (Chubb brief p. 22) in an attempt show Howarth was "disqualified."  Chubb's argument admits, however, that "Howarth does not appear to offer an opinion as to the cause of loss" in that case. Mr. Howarth did not offer an opinion to the cause of the loss, as that was not his obligation in that case.  In actuality, the bad faith claim in the case was resolved by motion.  Contrary to Chubb's assertion, Howarth did testify in the case as to damages.  The Kentucky judge construing Kentucky law, did not allow testimony of bad faith, and granted partial summary judgment. The rest of the case was tried. The case is attached as Exhibit "B" to this brief so this Court can see for itself. The quote from Chubb's brief does not appear in this case.

5)    Mr. Howarth explained he has been doing appraisals in Alabama for twenty (20) plus years.  (Doc. #90-69 depo. trans. p. 11; Doc.# 90-69). (Haman MSJ Ex. 25, p. 11).   There has never been an occasion where anyone from THG has been disqualified as an appraiser in Alabama.  (Doc. # 90-69 depo. trans., p. 12). (Haman MSJ Ex. 25, p. 12).

6)    Howarth is qualified and his opinions are reliable.  Rule 702(b)-(d) codifies the principles articulated in a series of cases beginning with Daubert v.

Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).  These

cases hold that trial judges should admit expert testimony if they first determine

that the proffered opinions are reliable.   This reliability determination has three (3)

basic components: 1) the expert must base the opinions upon sufficient facts or

data; 2) the expert must ground the opinion in reliable principles and methods; 3)

the expert must apply those principles and methods to the facts of the case in a

reliable manner.  An expert's value as a witness must derive from his ability to

apply his expertise to the facts and inferences from them.  *United States v.*

*Palacios*, 677 F.3d 234, 243 (4th Cir. 2012), *cert. denied* 568 U.S. 834. S. Ct. 124

(2012).

7)   To determine whether the qualification requirement is met, **"courts**

**generally look to evidence of the witness's education and experience" and**

**determine whether such qualifications and expertise sufficiently "fit" with**

**"the subject matter of the witness's proposed testimony."** *In re Mentor Corp.*

*ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F.Supp.2d 1348, 1367 (M.D.

Ga. 2010) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

8)   Experience provides a sufficient basis for the Court to find such an

expert qualified. "Experts may satisfy the 'qualifications' prong in various ways.

While scientific training or education may provide possible means

to qualify, experience in a field may offer another path to expert status." *Nature's*

*Way Marine, LLC v. Everclear of Ohio, Ltd.*, No. 12-316-CG-M, 2014 WL 5817535 at *2 (S.D. Ala. Nov. 10, 2014); *see also Vaughn v. Hyster Co., Inc.*, No. 4:09-CV-570-VEH, 2010 WL 9936530 at *4 (N.D. Ala. Dec. 3, 2010). The Rule 702 Advisory Committee Notes also explain, "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." FED. R. EVID 702. advisory committee's note (2000 amends.).

9)      For Chubb to argue that Howarth and the other expert witnesses of Haman are not scientists or engineers is simply an old, bad argument. Licensure and certification in a particular discipline is not a per se requirement, and never has been. Reliability of expert testimony sometimes comes down to "helpfulness." An expert may disclose his opinions to the jury if the probative value substantially outweighs any prejudicial effect. See Rule 703 FED. R. of EVID. The experience of the expert is just as important. *Pipitone Biomatrix, Inc.*, 288 F. 3d 239, 247 (5th Cir. 2002).

10)     Howarth has been adjusting claims and analyzing damages issues for forty (40) years. There is no question that his testimony, including the explanation

of the application of the Xactimate process, used by all of Chubb's witnesses in this very case, would be helpful and reliable because of his years of experience using the system, and it would certainly assist the jury. There is no aspect of the Howarth testimony that would mislead the jury since it is based upon personal knowledge, inspections, knowledge, training and expertise.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999), the Court discussed the judge's gatekeeping as it relates to potentially non-scientific evidence.   Specialized knowledge in a field, based upon a factual basis, data, principles, methods and their application are to be considered in deciding whether or not the witness has "a reliable basis in the knowledge and experience of the relevant discipline."  526 U.S. at 149, 119 S. Ct. at 1174 (*quoting Daubert,* 509 U.S. at 592).  Howarth's testimony has been accepted in the Northern District by Honorable David R. Proctor, Honorable Madeline Haikala of this Court and by this very court in *Cole vs. Owners Ins. Co.,* 326 F. Supp. 3d 1307, 1325 (N.D. Ala. 2018).

     11)    Chubb's argument that Howarth in some way "bootstrapped" opinions is simply not supported by the facts.   Howarth's opinions are stated in his estimates. He did the estimates on personal observations and meeting with members of his team.  It is customary for him to do so. Arthur Grandinetti and Sarah Grandinetti were part of the THG team.  They worked together on these estimates for hundreds of hours and at least a dozen days. Howarth then visited

twice. Then, Irmiter visited twice. They all have personal knowledge. Chubb's "bootstrapping" argument is inapplicable to our facts.  Even if their opinions were based totally on one of their group's observations, if the facts and data relied upon by the experts are the kinds of facts and data that experts in this particular appraisal field rely upon and such reliance is reasonable, they can provide proper evidence. *Advent Systems Limited v. Unisys Corp.*, 925 F. 2d 670, 682 (3d Cir. 1991).

12)    The use by Howarth and Grandinetti, of the expert information supplied by Forensic Building Sciences' Tom Irmiter, is entirely proper. **"The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonable rely on other expert's opinions and findings."** *In re Wright Med. Tech. Inc.*, 127 F.Supp.3d 1306, 1320 (N.D. Ga. 2015). **An expert, however, "may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon."** *In re Polypropylene Carpet*, 93 F.Supp.2d 1348, 1357 (N.D. Ga. 2000). In other words, the expert may review and interpret another expert's opinion in forming his own conclusions so long as that is the normal practice in his field. *See id*; *Deutz Corp. v. City Light & Power, Inc.*, No. 05–3113, 2009 WL 2986415, at *5–6 (N.D. Ga. Mar. 21, 2009); *United States v. Batchelor–Robjohns*, No. 03– 20164, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005). *See also,* United States

*v. Winston,* 372 Fed.Appx. 17, 20 (11th Cir.2010) (allowing an expert witness's testimony that was based in part on an opinion of a non-testifying expert, noting that "an expert witness may base his testimony on inadmissible information so long as such information is 'regularly relied upon by experts in his field.'").

13)    If anyone had the right to object to an appraiser, it would have been Haman. The two appraisers appointed by Chubb had never been involved as appraisers in the appraisal process before.  (Doc.# 90-43 depo. trans. pp. 53-55; 90-53 depo. trans. p. 50, 122) (Haman MSJ Ex. 19, pp. 53-55; Ex. 22, p. 50, 122). Their rookie status probably led to this debacle. This is the type of nebulous, non-productive, invasive, charlatan, run-around conduct foreseen as possible bad conduct in *Rogers v. State Farm,* and as noted in this Court's prior rulings. (Doc.#48).  As the Alabama Supreme Court noted in *Rogers*, there is a danger that "value disputes would permit parties to 'approach every disagreement on extended damages as a causation, coverage[s] or liability issue' so that 'either party could defeat the other party's request by labeling a disagreement as a coverage dispute.'" *Rogers*, 984 So. 2d at 391.    See also, *Cole v. Owners Ins. Co.,* 326 F.Supp.3d 1307, 1323 (N.D. Ala. 2018).   Many other better-reasoned cases follow this same analysis and make the same conclusions.  *Spearman Ind., Inc. V. St. Paul Fire & Marine Ins. Co.*, 109 F.Supp.2d 905 (N.D. Ill. 2002).  They must determine if particular items were damaged by the covered event to appraise those damages.

27

Otherwise, there would be no reason to appraise those damages to begin with. *See, CIGNA Insurance Co. v. Didimoi Property Holdings, N.V.*, 110 F.Supp.2d 259, 264 (D. Del. 2000); *Kendall Lakes Townhome Developers, Inc. vs. Agricultural Excess & Surplus Lines Ins. Co.*, 916 So.2d 12, 15 (Fla. App. 3, Dist. 2005), where the court held that an appraiser, in performing his duty, has to determine which damages were caused by a covered event to estimate the cost of repair and subtract that amount from a non-covered event.  When the insurer enters the process, it has a contractual obligation to complete it.  *Cobblestone Condo. Assn v. Travelers Cas. Ins. Co. of Am.*, 377 F.Supp.3d 1291 (N.D. Ala. 2019).

14)    Chubb argues that the matter of bad faith is not something Howarth should be able to testify to, as bad faith is a question for the jury, *citing Carneal v. Travelers Cas. Ins. Am.,* 2013 W.L. 5939879, W.D. Ky. Nov. 5, 2013; *Tardiff v. GEICO Indem. Co*., 481 F. Appx. 584 (11th Cir. 2012); *Phillips v. Harris*, 643 So. 2d 974 (Ala. 1994). This is not disputed by Haman.   The jury will determine what is or what is not bad faith from the facts.  But that does not prevent Howarth from testifying to facts, nor does it prevent Grandinetti from testifying to facts which might support a determination of bad faith.  Those facts, in this case, involve the actual conduct of Chubb's numerous individuals.  Mr. Howarth had direct dealings with Bushman and Perich, as well as Wilburn.  Many of their conversations were the subject of e-mails and written agreements.  Their conversations and written

agreements, such as the Declaration of Appraisers and the Umpire selections are relevant. (Doc. #s 90-14 thru 90-19, 90-51 and 90-72). (Haman MSJ Ex. 10-15, 20, 28). Concerning Chubb's argument that Howarth should not be allowed to testify to bad faith, Haman agrees that "each courtroom comes equipped with a 'legal agent', called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." That does not prevent Howarth or Grandinetti from testifying to facts and documents which may aid the Court or jury in determining whether bad faith was committed under prevailing case law. *See Chavers v. National Fire Sec. & Cas. Co.*, 451 So.2d (Ala. 1981); *National Fire Sec. & Cas. Co. v. Bowden*, 417 So.2d 179, 183 (Ala. 1982); *Lillie M. Austin v. Auto Owners Ins. Co.*, 2012 W.L. 3101693 at *2 (S.D. Ala. July 30, 2012).

15)    This Haman loss is the most basic loss there is in the insurance world. There is no question of coverage and the carrier has already issued some payment on the estimate. There is just a dispute over how much. (Doc. #90-69, depo. trans. pp. 26, 93). (Haman MSJ Ex. 25, pp. 26, 93).

## V.    CONCLUSION.

It is ironic that for many, many years, it was insurers that saw fit to invoke the appraisal provisions of their policies. However, that has changed. There is now almost always an organized campaign involving the insurer strenuously objecting to any expert offering opinions that support either (1) the appraisal

process; or (2) the request for additional or full payments under the policy coverages. Chubb abused the process here.

The appraisal process is over.  It was killed by Chubb.  Howarth's testimony now is as an expert.  He is subject to cross-examination, going to the weight, not admissibility, of his opinions.  *Jones. Vs. Otis Elevator Co.*, 861 Fed. 655, 663 (11th Cir. 1988).  The motion to exclude should be denied.

Respectfully submitted,

/s/Gary V. Conchin

Gary V. Conchin (ASB-1263-C56G)
Attorneys for Plaintiff

Gregory Brockwell, Esq.                CONCHIN COLE & JORDAN
Jason R. Smith, Esq.                   2404 Commerce Court SW
2100 1st Avenue, N., Ste. 300          Huntsville, AL  35801
Birmingham, Alabama 35203             (256) 705-7777 Phone
greg@brockwellsmith.com                (256) 705-7778 Facsimile
jay@brockwellsmith.com                 E-mail: gary@alainjurylaw.com

## CERTIFICATE OF SERVICE

I certify that I have on the 10th day of September, 2020, served a true and correct copy of the foregoing to counsel for all parties in this matter via electronic mail.

Michelle A. Sherman, Esq.             Mark Hess, Esq.
Wayne D. Taylor, Esq.                  HAND, ARENDALL
MOZLEY, FINLAYSON                      2001 Park Place, N., Ste. 1200
& LOGGINS, LLP                         Birmingham, Alabama 35203
1050 Crown Pointe Parkway, Ste. 1500  mhess@handarendall.com
Atlanta, Georgia 30338
msherman@mfllaw.com
wtaylor@mfllaw.com

David A. Lee, Esq.
PARSONS, LEE & JULIANO, P.C.
600 Vestavia Parkway, Ste. 300
Birmingham, Alabama 35216
dlee@pljpc.com

/s/Gary V. Conchin
Gary V. Conchin (ASB-1263-C56G)