

FILED
2020 Sep-11  PM 02:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HAMAN, INC. d/b/a KNIGHTS INN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action File No. |
| | ) 2:18-CV-01534-KOB |
| | ) |
| v. | ) |
| | ) |
| CHUBB CUSTOM INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

**RESPONSE OF CHUBB CUSTOM INSURANCE IN OPPOSITION TO
HAMAN'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF
CHUBB'S EXPERT KURT D MULDER, P.E.**

Chubb Custom Insurance Company ("Chubb") opposes the motion of Haman, Inc. d/b/a Knights Inn ("Haman") to exclude or limit the testimony of Chubb's expert engineer, Kurt D Mulder, P.E. ("Mulder"), respectfully showing the Court as follows:

Chubb designated Mulder as a causation expert in connection with Haman's wind damage claim. Attached to this response as Exhibit "1" is a copy of Chubb's expert disclosures designating Mulder. Attached to this response as Exhibit "2" is a copy of Mulder's affidavit given in support of Chubb's motion for summary

- 1 -

judgment, and attached to the affidavit is Mulder's expert report, the facts of which are expressly incorporated into this response. *See* [Doc. 105-74].

Haman's motion to exclude the opinions of Mulder erroneously complains that Mulder allegedly ignored the facts, relied upon unsubstantiated facts and assumptions, does not have an opinion regarding when the damages occurred, crafted his opinions "out of thin air," and did not create a damages estimate. *Haman's Motion, p. 1.* As shown below, these allegations either are untrue or, in the case of Mulder's failure to create a repair estimate and his lack of knowledge of when exactly the damages to Haman's roofs occurred, are irrelevant to the admissibility of Mulder's opinions regarding causation. Therefore, Haman's motion should be denied.

## 1.    STATEMENT OF FACTS

### A.    The 2014 Tornado

On April 28, 2014, a tornado passed to the southwest of Haman's property. *Deposition of Haman's expert Thomas J. Irmiter, p. 189, l. 17-25; p. 190, l. 1-3; Attachment 34 to Chubb's motion for summary judgment.* [Doc. 105-34]. According to official data from the National Weather Service ("NWS"), the accuracy of which Haman and its expert do not dispute, Haman's buildings were not in the direct path of the tornado. Instead, the tornado passed to the west of a wooded area south of the property. *Depo. Irmiter, p. 125, l. 24-25; p. 126, l. 1-3; p. 127, l. 2-22; p. 128, l. 12-*

*16; p. 189, l. 17-24; p. 190, l. 1-3; Ex. 34 to depo. Irmiter; Attachments 38 to Chubb's evidentiary submissions.* [Doc. 105-38].

### B.    Haman's Late Notice Of The Loss

On March 24, 2015, eleven months after the tornado, a notice of loss was submitted to Chubb,[1] which stated: "Insured inspected her premise and discovered wind damage to roofs of three buildings. States hotel was in direct path of the windstorm that hit Bessemer on 04-28-2014." *Exhibit 16 to depo. Visram; Attachment 18 to Chubb's evidentiary submissions.* [Doc. 105-18].

### C.    Chubb's Retention Of Mulder As A Causation Expert

In 2015, Chubb through York Risk Services Group, Inc. retained Mulder to investigate the reported storm damage at Haman's property. The scope of Mulder's investigation was to inspect the property, review available information, and determine the cause of the observed damage to the hotel buildings and their roofs and interiors, and evaluate the extent of the damage. *Aff. Mulder, ¶ 7; Exhibit "2" to this response.* On September 30, 2015, Mulder examined Haman's roofs and prepared a roof evaluation report dated October 7, 2015. *Aff. Mulder, ¶ 8. See also, Mulder's expert report, which is attached as an exhibit to his affidavit.*

---

[1] It is ironic that Haman's primary complaint in its motion to exclude Mulder is that Mulder did not determine the exact dates of the damages to Haman's roofs, when it is Haman's late notice of the loss that is the sole reason for the fact that no one documented the condition of the roofs immediately after the tornado and for a year thereafter. Chubb in its motion for summary judgment argues that the late notice precludes Haman from recovering any additional alleged wind damage.

Chubb's Rule 26(a)(2) Expert Disclosures in this case state as follows: "Mr. Mulder is expected to testify as an expert regarding his inspection and evaluation of the claimed wind damages to plaintiff's property that purportedly occurred on or about April 28, 2014. Mr. Mulder also is expected to testify regarding the cause of the claimed damages to plaintiff's property." *See Chubb's Expert Disclosures, Exhibit "1" to this response.*

Mulder in his affidavit averred:

I am qualified by virtue of my education, training and experience to testify as an expert regarding the ability of residential and commercial structures and roof systems to withstand wind, and the cause and extent of damage to structures and roof systems from wind and other weather and temperature elements, construction defects, improper maintenance and repair, and wear, tear, deterioration, biological growth, rot, and other causes. Specifically with regard to this case, I am qualified to testify as an expert regarding the causes of the conditions on the roofs of Haman's hotel buildings and the damage in the interiors of the buildings, and whether these conditions and damages were caused by winds from the tornado in 2014 and rain water leaking through the roofs through openings in the roofs caused by wind.

*Aff. Mulder, ¶ 6.*

## D.   Haman's Motion Misrepresents Mulder's Deposition Testimony

Haman's motion to exclude Mulder contains several serious misrepresentations about Mulder's deposition testimony, with which Haman attempts to give the false impression that Mulder did not have all of the information he needed in order to undertake his analysis of whether winds damaged Haman's

roofs and his analysis of the cause of the water leakage into the interiors of the buildings.

For example, Haman alleges incorrectly: "So, he never finished his evaluation on Buildings 1, 2 or 3. (Ex. 31, Mulder depo. p. 99)." *Haman's Motion, p. 4, ¶ 6.* On the contrary, Mulder did <u>not</u> testify that he "never finished his evaluation of buildings 1, 2 or 3." He merely testified that he did not look at the <u>repair cost</u> evaluation of those buildings <u>done by The Howarth Group, THG, which is Haman's expert</u>. *Depo. Mulder, p. 99, l. 7-19.* The discussion progressed as follows: "Q. … Did you ever look at building one evaluation by THG and dissect it? A. No. Q. Two? A. No. Q. Three? A. No". *Id., p. 99, l. 12-19.* Mulder explained that he provided Chubb's representatives with a cost estimate for his proposed work to evaluate THG's repair estimate, but he was told not to perform that evaluation. *Id., p. 96, l. 12-23; p. 97, l. 1-23; p. 98, l. 1-23; p. 99, l. 1-20.* Mulder testified: "I didn't actually go through the estimate [referring to THG's repair estimate] and evaluate it. At the beginning I was asked to, but later in the process, we stepped back from that due to a cost standpoint of what my time would be. So I had not evaluated this estimate for what it contains." *Id., p. 98, l. 7-13.* Chubb has not designated Mulder as a damages expert; consequently, that Mulder did not undertake to evaluate THG's repair cost estimates is completely irrelevant to the admissibility of Mulder's expert opinions regarding causation.

Haman also alleges incorrectly that Mulder "was not aware that Chubb had done an insurance evaluation inspection of the Knights Inn property the month before the wind event, which proved the roof was satisfactory shape. Ex. 33. He would have been interested in seeing that. (Ex. 31, Mulder depo. p. 81). There was also a valuation report done after both claims. (See Ex. 34)." *Haman's Motion, p. 4, ¶ 7.* The fact is that, Mulder was <u>not</u> asked if he would have been interested in seeing an insurance inspection that determined that the roof was in satisfactory shape; instead, Mulder was asked if he would have been interested in seeing a report that rated the roof and stated its age. *Depo. Mulder, p. 81, l. 15-20.* In any event, Mulder made his own independent determination regarding the age of the roof and its condition. *See Mulder's expert report.*

Haman then claims erroneously: "He looked at the roof, but he could not tell what type of construction was under the exterior roof. (Ex. 31, Mulder depo. p. 85)." *Haman's Motion, p. 5, ¶ 9.* This is a gross misrepresentation of Mulder's deposition testimony. He was asked only if <u>the Google Earth photos that he reviewed</u> showed what type of construction was under the roof, and he testified they did not. *Depo. Mulder, p. 84, l. 10-23; p. 85, l. 1-12.* Haman's counsel could have asked, but did not ask, Mulder about his expert report, which sets forth in detail the type of construction of the roofs, including its layers, and notes that some portions of the roofs are metal. With regard to the layered, built-up EPDM portions of the roofs,

Mulder's report states: "Two cores were taken in the EPDM roofing, reference Appendix I for the core locations. Core A and Core B were an approximate 31/2 inches deep, and were comprised of an approximate 2 inches of lightweight concrete (LWC), a layer of built-up roofing, an approximate 1 inch of fiberboard, and a layer of roofing underlayment (Figures Al 9 and A20)." *Mulder report, p. 6.* Thus, Mulder did, in fact, determine "what type of construction is under the exterior roof."

Haman next asserts incorrectly: "Even though he did not know when the damage or repairs were done in the seventeen months (17) months since the storm, he did not ask anyone at the facility about that. He did not ask for repair bills. (Ex. 31, Mulder depo. p. 121)." *Haman's Motion, p. 7, ¶ 15.* These citations to page 121 of Mulder's deposition transcript are incorrect and misleading. The discussion concerned vandalism to the air conditioning units on the roofs of Haman's buildings, when it may have occurred, and how much it cost to repair. The transcript of the last half of page 120 and all of page 121 of Mulder's deposition reads verbatim as follows:

Page 120

Line

16   Q. When you were there, were the air
17   conditioning units, were they there in full
18   or were they -- was some vandalism or parts
19   missing? What did you observe?
20   A. Two of the rear units on building
21   A had been partially dismantled and the

22      core was removed.
23      Q. All right. Do you know when that

Page 121

Line

1       was done?
2       A. No.
3       Q. You don't know if that was done
4       during the interim of the 17 months,
5       whatever, before you got there?
6       A. No.
7       Q. All right. Did you ask anybody
8       at the facility?
9       A. No.
10      Q. Did any of the maintenance
11      personnel, Mr. Marter go up on the roof
12      with you?
13      A. For a short period of time.
14      Q. Did they basically get you up
15      there, show you the ladder, get you up
16      there?
17      A. Pretty much.
18      Q. Did you look at any repair bills
19      from Yellowhammer[2] or any other repair folks
20      that had been on the roof?
21      A. No.
22      Q. Did you ask for those?
23      A. No.

*Depo. Mulder, p. 120, l. 16-23; p. 121, l. 1-23*. With regard to the vandalized HVAC

units, Mulder's expert report states: "HVAC units, at both the left and right sides of

the roof, had been vandalized and the copper coils removed (Figure A21). The

---

[2] Referring to the company that repaired the vandalized HVAC units.

vandalizing of the HVAC unit at the right side created an opening into the HVAC duct system (Figure A22)." *Mulder report, p. 7.* In his affidavit in support of Chubb's motion for summary judgment, Mulder discussed the vandalized HVAC units as follows:

> I observed that HVAC units at the left and right sides of the flat roofs had been vandalized, which at one location created an opening into the HVAC duct system. This condition would allow rainwater to penetrate into the duct system and into the interior of the building. A portion of the water intrusion at the right side of the ballroom at the facility was the result of water leakage caused by openings in the roof created by vandalism of the HVAC units.

*Aff. Mulder, ¶ 17; Exhibit "2" to this response.*

> The metal roofing at Building A, in which the office and restrooms were located, was scraped and punctured below the roof access ramp. The HVAC units had missing coils, which likely were stolen by vandals and removed through the access ramp. The damage to the metal roofing on Building A is most likely the result of vandalism activities, and not the result of wind.

*Id., ¶ 18.* Haman's misrepresentation of Mulder's deposition testimony, rather than challenge its merits, is reason alone for this Court to deny the motion to exclude Mulder.

### E.    Haman's Motion Relies Upon Irrelevant Deposition Testimony

Haman's motion dwells upon Mulder's answers to questions by Haman's counsel seeking information wholly irrelevant to the admissibility of Mulder's expert opinion that (1) winds did not damage the roofs of Haman's buildings (other than some minor wind damage to the metal copings, for which Chubb already paid); and (2) interior water damages were caused by rainwater leaking through

dilapidated, poorly maintained and badly repaired roofs. For example, Haman alleges irrelevantly: "He was never asked to determine what was a covered loss or what was not a covered loss. (Ex. 31, Mulder depo. p. 79). He does not know what kind of insurance policies were on the property and never was given a copy of the insurance contract. (Ex. 31, Mulder depo. p. 79)." *Haman's Motion, p. 4, ¶ 6.* The Chubb policy's coverage provisions have no bearing on Mulder's opinions; thus, Mulder's lack of familiarity with the Chubb policy provisions is not grounds for excluding his opinions regarding causation.

Haman alleges: "He did not talk to the maintenance manager, Bukhari, or to the owner, Ms. Visram. (Ex. 31, Mulder depo. p. 82). He did not even talk to the resident manager, or one of the maintenance workers doing repairs, Ken. (Ex. 31, Mulder depo. p. 8(sic))." *Haman's Motion, p. 4, ¶ 8.* This is disingenuous; Burkari testified that he did not inspect the building after the tornado to determine the damages and he did not recall when the tornado occurred. *Depo. Burkari, p. 67, l. 7-2; p. 68, l. 1-2.* [Doc. 105-41]. Visram testified that she never inspected the property. *Depo. Visram, p. 45, l. 23; p. 46, l. 1-4; p. 67, l. 23; p. 68, l. 1-5.* [Doc. 105-2]. Haman fails to explain why Mulder, a licensed professional engineer and forensic expert, should have talked to maintenance workers making repairs or what they might have told Mulder that would have affected his conclusions and opinions regarding the cause of damage to the roofs.

Moreover, the discussion at pages 82-83 of Mulder's deposition, cited by Haman in its motion, concerns only the <u>age</u> of the roofs, not repairs to the roofs, and concerns whether Mulder talked to the specific individuals identified by Haman's counsel to determine the <u>age</u> of the roofs. Mulder testified that he determined the age of the roofs by asking one of the maintenance personnel and reviewing Google Earth imagery. *Depo. Mulder, p. 80. L. 10-23; p. 81, l. 1-2.* Mulder's expert report states: "According to the maintenance staff, the facility had been reroofed in the early 1990s. Historical aerial photographs of the facility, from Google Earth, were reviewed as part of the examination." *Mulder report, p. 3.* Mulder's report attaches copies of Google Earth photos of the roofs dated 2006, 2010 (before the 2014 storm) and 2015. *Id.* Based upon this information, Mulder concluded: "Therefore, the metal roofing at the facility was installed between June 4, 2006 and September 4, 2010." *Mulder report, p. 16.* Also based upon this information, Mulder concluded: "Therefore, the EPDM roofing predated the metal roofing, and was the roofing reported to be installed in the 1990s." *Id.* Mulder's conclusion was correct; the owner, Visram, testified that the [EPDM] roofs were replaced in 1997 or 1998. *Depo. Visram, p. 90, l. 19-23; p. 91, l. 1-4.* Haman's motion does not provide any reason why Mulder's opinions regarding the ages of the various portions of the roofs do not meet the standards for admissibility of expert opinion testimony under Rule 702 and

Daubert. Chubb has proven that Mulder's opinions regarding the age of the roofs are

based upon sufficient facts and a reliable methodology.

Haman next alleges:

> In evaluating the roof, he saw separated seams, openings in the roof, and
> determined the seams were possible sources for interior water intrusion. But,
> he does not know the timeframe the seams separated. (Ex. 31, Mulder depo.
> pp. 113, 114). He saw quite a bit of damage to copings, but does not know
> when they occurred. He saw patching and caulking around some seams, but
> does not know when they occurred, before or after the storm. He saw fasteners
> undone and bent metal and patching, but does not know when those damages
> occurred. (Ex. 31, Mulder depo. pp. 117, 118).

*Haman's Motion, p. 5, ¶ 12.* Haman has failed to show why it allegedly is important

for Mulder to know exactly when the seams in the roof opened up and exactly when

the patching and caulking was done. Haman has not shown how that information

possibly is relevant to Mulder's opinion that winds did not cause the seams in the

roof to open. Mulder explained in his expert report how he ruled out wind as the

cause of the roof damage:

> According to Figure 1609, Basic Wind Speed (3-second gust) in the 2009 IBC,
> the basic wind speed to be used for design and installation of roofing materials
> is 90 mph. According to the 2009 IBC, the roofing materials at the facility
> should be able to withstand a 90 mph basic wind speed. According to the
> storm survey conducted by the Roof Evaluation NWS, the winds at the facility
> reached an estimated 65 to 85 mph, which is below the wind speed required
> by code.

*Mulder's report, pp. 14-15.* Mulder's expert report explains that the cracked seams

and the patching and caulking in the EPDM roofs indicate a roofing system that has

reached the end of its service life, rather than damage caused by wind. He wrote:

- 12 -

> When an EPDM roofing system reaches or nears the end of its service life, the adhesives and sealants used in the installation of the roofing deteriorate. The sealants and adhesives used at the lap seams of the roofing and base flashing were observed to be cracked and deteriorated. Cracked and deteriorated sealants and adhesives result in the separation of lap seams, patches, seam tape, etc. As the lap seams of the roofing have separated, water has intruded into the interior of the facility. The majority of the water intrusion observed at the facility, under the EPDM portion of the roofing, is the result of the roofing system having reached the end of its service life, and is not the result of a storm.

*Mulder report, p. 17.* Mulder's expert report and his affidavit testimony on this subject, *see Aff. Mulder, ¶¶ 11-13, 25-27, 33,* prove that his opinions regarding the cause of damage to the roofs are based upon sufficient facts and a reliable methodology. Mulder's opinions are not undermined by his lack of knowledge as to exactly when the roof began, essentially, to come apart at the seams.

Regarding the damage to the metal coping on the roofs and the undone fasteners, Mulder determined "[t]he displacement of the coping at the facility has been occurring for an extended period of time." *Mulder report, p. 16.* His report states in part as follows:

> Portions of the coping at the facility were damaged and or displaced. Portions of the coping did not have face fasteners and lacked fasteners at the top. The installation instructions published by multiple manufactures of raised rib metal panels were reviewed as part of this examination. One set of the reviewed installation instructions are included as Appendix VII. In the details of the installation instructions, flat pieces of trim metal that overlap the metal panels, such as the coping, should be fastened every 18 inches along the face. Portions of the fasteners at the coping face were spaced 27 inches or greater. Portions of the coping faces did not have fasteners. These conditions are construction defects and result in the coping having a lowered capacity to resist wind uplift. In Appendix IV, the arrow delineates a piece of coping that

is coming off of Building A, on September 4, 2010. This predates the 2014
tornado by an approximate four years. Referencing Figures D1 and D2, two
months after the tornado, the metal copings shown missing/displaced in
Figures Cl and C11, are intact. This indicates the coping was displaced at a
later date. The displacement of the coping at the facility has been occurring
for an extended period of time. According to the NWS storm survey, the winds
at the facility did not reach the 90 mph design wind required by code. The
displacement and damage observed to portions of the coping at the facility
were the result of a lowered capacity to resist wind uplift caused by
construction defects, and are not the result of the tornado or high winds. Since
the coping did have a lowered capacity to resist wind uplift, and the coping
was blown off by a below design level wind, the wind is considered a
contributing factor to the displacement of portions of the coping.

*Expert report, p. 16.* (Emphasis added). Thus, Mulder concluded that the fasteners

and metal coping were defectively installed, allowing below design level winds to

displace the coping, which had been occurring over an extended period of time. He

concluded, however, that wind was a contributing factor to displacement of the

coping. *Id.* Chubb paid for the displaced coping. [Doc. 38-14, page 2 of 10; Doc. 38-

11, pages 76-78 of 89].

Haman in its motion fails to articulate why Mulder's lack of knowledge of

exactly when the metal fasteners became damaged and the coping became displaced

requires his opinions on causation to be excluded. Haman's argument makes no

sense since Mulder concluded that winds were a contributing factor to the

displacement of the coping and Chubb paid for that damage. In any event, Chubb

has shown that Mulder's opinions regarding the cause of the displacement of the

metal coping and fasteners are based upon sufficient facts and a reliable

methodology and these opinions are therefore admissible as expert opinion testimony under Rule 72 and Daubert.

Haman then asserts irrelevantly:

… He saw evidence of sealant or glue or caulk being used to repair, but does not know if they were made after the storm. (Ex. 31, Mulder depo. p. 151). He saw pock marks and holes; and saw that where the coping had come loose, it had damaged portions of the roof, but did not know when that damage occurred. (Ex. 31, Mulder depo. p. 118, 119). He saw numerous places where the roofing membrane was punctured, but doesn't know when that occurred, either. (Ex. 31, Mulder depo. p. 122). He found seams had been partially unsealed, leading to water intrusion and wet ceiling tiles from multiple aspects, but does not know when this occurred. (Ex. 31, Mulder depo. p. 126).

*Motion, p. 6, ¶ 13.* Mulder's findings and conclusions regarding these conditions on Haman's roofs include the following:

Numerous types of sealants were observed to have been used in attempts to seal the separated lap joints, penetrations, etc. The sealants observed were cracked and would allow water to intrude at these locations. The cracked sealant observed at the facility, used to patch seams and penetrations, is a maintenance issue and not the result of a storm. A punctured EPDM patch was observed at Building A. Scuff marks or scratches were not observed in the EPDM roofing adjacent to the patch, which would indicate damage from wind borne debris or foot traffic. Portions of the patches observed had bubbles. Bubbles occur in roofing when moisture is trapped underneath, vaporizes and expands, stretching the roofing upward in a bubble. This expansion can overcome the roofing/patches ability to expand and the roofing/patch can tear in response. The tear in the EPDM patch on Building B is the result of moisture trapped underneath the patch, stretching and tearing the patch.

*Mulder report, p. 18.* In his affidavit, Mulder averred:

I observed numerous types of sealants that had been used in attempts to seal the separated lap joints and roof penetrations on the EPDM roofing. The sealants were cracked due to age, indicating the sealant had been applied at an

> extended period of time in the past. This condition would allow water to intrude at these locations. This is a maintenance issue and not the result of wind.

*Aff. Mulder, ¶ 33.* Thus, Mulder described the facts from which he concluded that these conditions on the roofs of Haman's buildings are the result of causes other than wind. Haman has failed to show why Mulder's lack of knowledge about exactly when these damages occurred (in fact, they occurred over time as a result of the ongoing conditions of improper maintenance and lack of maintenance, according to Mulder) requires his opinions to be excluded.

Haman finally claims:

> … He observed wet ceiling tiles, but says lining them up with specific roof seams was impossible. (Ex. 31, Mulder depo. p. 127). He observed saturated roofs. He took core samples. You could feel water in the membrane. (Ex. 31, Mulder depo. p. 128). He does not know when the ceiling tiles became stained or missing. (Ex. 31, Mulder depo. p. 162). As to the multiple membrane patches, he does not know, or didn't even ask, when they were made. (Ex. 31, Mulder depo. p. 165). The majority of the core samples were saturated. (Ex. 31, Mulder depo. pp. 168, 171).

*Motion, p. 6, ¶ 13.* Most of these assertions are repetitive of the allegations addressed above. Haman has failed to show that Mulder's lack of knowledge about exactly when these conditions of deterioration began to manifest on Haman's roofs should require the exclusion of Mulder's opinions.

Mulder's affidavit ends with a succinct discussion of how he excluded wind as a cause of the damage to Haman's roofs. He averred:

I accessed the National Weather Service (NWS) Weather Forecast Office website (http://www.srh.noaa.gov) and learned that, on April 28, 2014, a tornado occurred in Bessemer, Alabama. According to the NWS, the tornado ranged between a level EF-0 to a level EF-2. An EF-0 level tornado has windspeed of between 65 and 85 mph for a 3-second gust.

*Aff. Mulder, ¶ 39.*

According to the NWS website, the damage survey report closest to the Knights Inn reported EF-0 level damage occurred 0.1 mile southeast of the facility.

*Id., ¶ 40.*

During my inspection of the Knights Inn property, I did not observe any downed trees or large branches, which if present would have indicated that high winds occurred at that location.

*Id., ¶ 41.*

The signs advertising the Knights Inn (one large sign and a smaller sign) were attached to their posts and did not show any obvious damage, which if present would have indicated that high winds occurred at that location. See Figure D2 attached to my report.

*Id., ¶ 42.*

Google Earth historical and aerial photos taken on September 4, 2010 (Appendix IV to my report) show that a piece of coping was coming off the roof of Building A. This pre-dated the 2014 tornado by approximately four years, and establishes that this damage to the roof pre-existed the tornado.

*Id., ¶ 43.*

These photographs of displaced coping on the roofs of the Knights Inn as early as 2010 show that the displacement has been occurring for an extended period of time.

Id., ¶ 44.

If the Knights Inn had experienced high winds, the metal roofing panels and EPDM roofing would have experienced uplift. Damage to the roofing from uplift would have been indicated by the lifted or curled back roofing. I did not observe this condition at the Knights Inn. The majority of the EPDM roofing was surrounded by a parapet wall, which testing has shown significantly reduces wind uplift on the roofing.

*Id., ¶ 45.*

In my opinion to a reasonable degree of engineering certainty, the roofing at the Knights Inn was not damaged by a tornado or high winds. An improper installation of the metal coping has resulted in portions of the coping displacing. Further, the EPDM roofing has reached the end of its service life, which has resulted in deteriorated sealants and adhesives, which has caused separated lap seams throughout the roofing. Portions of the metal roofing panels were installed in an improper manner, which created openings into the roof system. In addition, the roofs have not been properly maintained and repaired, which has allowed water to seep in to the interiors of the buildings through openings in the roof caused by deterioration.

*Id., ¶ 46.*

In summary, the EPDM roofing system failed due to age, the improper installation of the metal roofing panels, and improper maintenance and repair. This has resulted in the water intrusion into the buildings' interiors.

*Id., ¶ 47.*

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Standard For Admissibility Of Expert Opinion Testimony

Federal Rule of Evidence 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

- 18 -

reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A district court must engage in a three part inquiry to determine the admissibility of expert testimony under Fed. R. Evid. 702. Specifically, the court must consider whether:

> The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998) (*citing Daubert,* 509 U.S. at 589); *see also Maiz v. Virani,* 253 F.3d 641, 665 (11th Cir. 2001) (same). While the district court must ensure that speculative, unreliable expert testimony does not reach the jury, "it is not the district court's role to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois, UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir.2003); *Maiz,* 253 F.3d at 666 (*quoting Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1311 (11th Cir.1999)). "A district court's gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" *Maiz,* 253 F.3d at 666 (quoting *Allison,* 184 F.3d at 1311). Quite the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence." *Daubert,* 509 U.S. at 596, 113 S. Ct. at 2798. In determining the reliability of a particular scientific expert opinion, the court must consider, to the extent possible: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech.,* 326 F.3d at 1341 (11th Cir.2003) (*citing McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir.2002)). With respect to the third reliability criterion of Rule 702, errors in an expert's application of a reliable method generally implicate credibility rather than reliability. *See Quiet Tech.,* 326 F.3d at 1345-46 (using incorrect numbers in a reliable formula is not grounds for exclusion under Daubert).

## B. Mulder's Opinions Are Admissible Under Rule 702 And Daubert Because They Are Based Upon Sufficient Facts And A Reliable Methodology

Chubb in its discussion above regarding Haman's challenges to Mulder's expert opinions on causation has met its burden of proving that Mulder's opinions are based upon sufficient facts and are the product of a reliable methodology. Mulder's expert report and his affidavit provide detailed facts detected by Mulder from his examination of Haman's roofs and his study of the official weather data, reliable Google Earth aerial maps of the premises, and written materials regarding roof construction materials and methods. Mulder's methodology consists of

applying his knowledge of engineering and scientific principles to these facts and arriving at sound opinions regarding the causes of the damages and conditions observed on Haman's roofs. Mulder's opinion excluding wind as a factor in the damage to the roofs (except the minor wind damage to some of the metal coping), and his opinion that water leaked through the roofs through openings caused by factors other than wind, is admissible in evidence as expert opinion testimony under Rule 702 and Daubert. Any alleged inconsistencies or gaps in Mulder's testimony and analysis (and Chubb contends there are none) go to the weight of his testimony, not its admissibility, and are properly the subject of cross-examination, not exclusion of Mulder's opinions.

## III.   <u>CONCLUSION</u>

For the reasons and on the grounds argued above and based upon the evidence in Kurt Mulder's expert report, affidavit and deposition testimony, Haman's motion to exclude or limit the expert opinion testimony of Chubb's expert Kurt D Mulder, P.E., should be denied.

This 11th day of September, 2020.

/s/ Wayne D. Taylor
11WAYNE D. TAYLOR
Georgia Bar No. 701275
*Admitted pro hac vice*
MICHELLE A. SHERMAN
Georgia Bar No. 835980
*Admitted pro hac vice*
MOZLEY, FINLAYSON & LOGGINS LLP

1050 Crown Pointe Parkway
Suite 1500
Atlanta, Georgia 30338
Tel: (404) 256-0700
Fax: (404) 250-9355
wtaylor@mfllaw.com
msherman@mfllaw.com

-and-

MARK D. HESS
Alabama Bar No. ASB-0008-E66M
HAND ARENDALL HARRISON SALE
LLC
1801 5th Avenue North, Suite 400
Birmingham, Alabama 35203
Tel: (205) 324-4400
Fax: (205) 322-1163
mhess@handfirm.com

-and-

DAVID A. LEE
Alabama Bar No. ASB-3165-E47D
PARSONS, LEE & JULIANO, P.C.
600 Vestavia Parkway, Suite 300
Birmingham, AL 35216
Tel: 205-326-6600
Fax: 205-324-7097
dlee@pljpc.com

*Attorneys for Defendant*
*Chubb Custom Insurance Company*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HAMAN, INC. d/b/a KNIGHTS INN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action File No. |
| | ) 2:18-CV-01534-KOB |
| | ) |
| v. | ) |
| | ) |
| CHUBB CUSTOM INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the **RESPONSE OF CHUBB CUSTOM INSURANCE IN OPPOSITION TO HAMAN'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF CHUBB'S EXPERT KURT D MULDER, P.E.**

was electronically mailed to the following counsel of record:

Gary V. Conchin
Kenneth B. Cole, Jr.
Franklin Taylor Rouse
Conchin, Cloud & Cole, LLC
2404 Commerce Court SW
Huntsville, Alabama 35801
gary@alainjurylaw.com
kenny@alainjurylaw.com

-and-

Gregory A. Brockwell
Jason R. Smith
Brockwell Smith LLC
2100 1st Avenue North, Suite 300
Birmingham, Alabama 35203
greg@brockwellsmith.com
jay@brockwellsmith.com

*Attorneys for Plaintiff Haman, Inc. d/b/a Knights Inc.*

This 11th day of September, 2020.

*/s/ Wayne D. Taylor*
WAYNE D. TAYLOR
Georgia Bar No. 701275
*Admitted pro hac vice*

#495327