FILED
2020 Sep-11  PM 03:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HAMAN, INC. d/b/a KNIGHTS INN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action File No. |
| | ) 2:18-cv-1534-KOB |
| | ) |
| v. | ) |
| | ) |
| CHUBB CUSTOM INSURANCE | ) |
| COMPANY, | ) |
| Defendant. | ) |

HAMAN'S RESPONSE TO CHUBB'S MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF THOMAS IRMITER

Gary V. Conchin (ASB-1263-C56G)
Attorney for Plaintiff

CONCHIN COLE & JORDAN
2404 Commerce Court SW
Huntsville, AL  35801
(256) 705-7777 Phone
(256) 705-7778 Facsimile
gary@alainjurylaw.com

Gregory Brockwell, Esq.
Jason R. Smith, Esq.

Attorneys for Plaintiff
2100 1st Avenue, N., Ste. 300
Birmingham, Alabama 35203
greg@brockwellsmith.com
jay@brockwellsmith.com

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... i

I. OVERVIEW ............................................................................... 1

II. HAMAN'S RESPONSE TO CHUBB'S STATEMENT OF FACTS ...... 3

III. ARGUMENT AND CITATION OF AUTHORITY ............................. 5

   A. Standard for Experts....................................................................... 5

   B. Irmiter is Well-Qualified to Render Opinions - Response
      to Chubb's Unnumbered Paragraphs Under B – Irmiter's
      Background ................................................................................ 7

   C. Irmiter's Investigation was Complete and Thorough - Response
      to Chubb, in Various Unnumerbered Paragraphs Listed Under
      Item C - Doc.# 100, pp. 8 –11 ...................................................... 15

   D. Response to Chubb's Criticism of Irmiter's Opinions
      Regarding the Cause of the Damages to the Roofs - Item D........ 24

   E. Haman's Response to Attack on Wind Data - Item E in
      Chubb's Unnumbered Paragraph of Criticism pp.15-16
      of Chubb's - Doc. #101 ................................................................. 26

   F. Haman's Response to Chubb's Criticism of Irmiter's Fire
      Investigation – Item F.................................................................. 27

   G. Haman's Response to Criticism or Damages -Item G
      Unnumbered Paragraph on p. 20, Doc.#101 ................................ 28

   H. Haman's Response to Criticism of Irmiter's Methodology
      Regarding the Fire Claim  - Item H .............................................. 29

   I. Haman's Response to Chubb's Criticisms of Investigation
      Methodology ................................................................................. 29

IV. CONCLUSION .......................................................................... 29

<u>HAMAN'S RESPONSE TO CHUBB'S MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF THOMAS J. IRMITER</u>

Comes now the Plaintiff, herein Haman, Inc. d/b/a Knight's Inn ("Haman")

and in response to the Defendant Chubb Custom Insurance Company's ("Chubb")

Motion to Exclude the Testimony of Haman Expert Thomas J. Irmiter, states as

follows:

## I.      OVERVIEW.

Chubb incorrectly states that Irmiter's testimony revolves around a coverage

dispute involving a tornado that passed through the area and did damage to the

premises.  That suggestion, in the very first paragraph of Chubb's brief, is an

improper initial focus on the issues.  To the contrary, a wind claim was reported

promptly, as soon as it was discovered, investigated, and it was determined there

was a covered loss.  Chubb paid $34,262.01 on the wind loss, determining that

there was damage to the roofing structure.  (Doc. #90-13, Haman MSJ Ex. 9).[1]

At issue is the fact there is a <u>damages </u>dispute.  Haman provided a 52-page

estimate of wind damages, which detailed replacing three (3) roofs in the amount

of $1,595,608.00.  (Doc. #90-10, Ex. 6 Haman MSJ).  Haman also filed a contents

itemization for wind claim damages, 41 pages in length, totaling $138,082.14

---

[1] Chubb erroneously states that the wind claim occurred before the fire
event. The fire occurred March 22, 2014 and the wind occurred April 28, 2014.

(Doc. #90-11, Ex. 7 Haman MSJ), and a common-areas estimate totaling five (5) pages, for the sum of $56,850.93. (Doc. #90-12, Ex. 8, Haman MSJ). Then, Haman made an appraisal demand on July 6, 2015. (Doc. #90-7, Ex. 11 Haman MSJ). So, the dispute is about the extent of the damages.

Mr. Irmiter is well-qualified to testify in this matter. Chubb erroneously described Mr. Irmiter as a residential inspector. Mr. Irmiter, however, primarily inspects commercial buildings, including over 100 large building estimates for $20 million to $30 million dollars each. (Doc. #90-36, Ex. 18, depo. MSJ pp. 56-59, 68). He has a Hague roof certification and has inspected construction defects, including mold sampling, for many years. He is a building code official and knows the building codes. *Id.* p. 259.

Irmiter is a licensed building inspector, umpire and appraiser with over forty-three (43) years of experience. He has investigated literally thousands of storm and fire damage claims, and did a building damage assessment which he rendered August 20, 2015 for the Knight's Inn premises. He visited the premises twice personally, made his own studies, photographs, calculations, observations and report. His opinions are based on his knowledge, skill, expertise, training, education and actual inspections. *Id.* pp. 300, 310. His affidavit is attached as Exhibit A to this response.

## II.  HAMAN'S RESPONSE TO CHUBB'S STATEMENT OF FACTS.

Chubb's Statement of Facts is difficult to respond to since it contains unnumbered paragraphs.   Haman will attempt to respond to the consecutive paragraphs of Chubb's brief. Chubb's Statement of Facts is on page 3, II.

The Statement of Facts is primarily agreed to, except that Chubb erroneously states that Haman submitted a sworn proof of loss in the amount of $466,838.73 before adjustment (Doc. #38-1).   The sworn proof of loss was prepared by Chubb and its adjusters and was signed by Haman only because Chubb required that it be signed prior to partial payment.   Chubb's allegation that "Haman revised its claim upward subsequently" is plainly wrong.

Chubb prepared this partial proof of loss and knew it was only a partial payment. (Doc.#90-53, pp. 81, 82 Perich depo.).   Haman presented its initial estimate of the fire loss, a 225-page appraisal estimate document, on February 11, 2015, in response to Chubb's payment, after eight (8) months, in November, 2014. (Doc. #90-2, 90-3, 90-4 - Haman MSJ Ex. 2, 3, 3A).

Haman primarily agrees with the stated testimony of Mr. Irmiter, referred to on page 4 of Chubb's brief (Doc. # 101), except there is a suggestion that damages could not occur to structures that were not hit directly by the tornado, which is, of course, erroneous.   The damage was revealed from actual inspections, and there was damage to the premises and to surrounding properties.

3

Even Mulder, Chubb's roofing engineer, has testified that his examination and photos showed obvious wind damage to the cap coping, potential damage to the rest of the metal roof and interior damages and he was aware that the tornado touched down in that area.   Mulder measured the wind speed at Knights Inn at 68 miles per hour.  (Ex 31 MSJ, Mulder depo. p. 108; Doc. #90-78, p. 108).   He was able to discern this even though his pictures, taken on his first visit to the scene, were taken some seventeen (17) months after the storm.  *Id.* at 105.

Further, Irmiter and his group, Forensic Building Sciences, conducted inspections on June 15, 2015, July 7, 2015, and then again on April 24, 2019. Irmiter is a trained weather spotter for NOAA and has been taught to utilize NOAA's website and severe weather inventory data.  (Ex. 18, Haman MSJ, Irmiter depo. at p. 54; Doc.#90-36, p. 54).   Irmiter provided weather data to support his opinions.

The weather data showed that the Knights Inn is on the edge of the tornado, not in the actual path.  It was .15 miles from center of the tornado.   *Id.* at p.123, Ex. 34, referencing a document from the National Weather Service website). Irmiter accessed NOAA prior to his deposition and noticed a mesocyclone showing 20 instances of mesocyclone signatures on both sides of the Knight's Inn. These are tornado signatures. *Id.* at p. 129.  He saw other signatures that were consistent

4

with the damage seen.  The winds were likely in excess of 80 miles per hour.  The

wind exceeded the design load for both the roof and the metal.  *Id.* at pp. 130-131.

The fully adhered EPDM membrane on the Knight's Inn was no longer fully

adhered, and no longer glued down.  That is classic wind damage consistent with a

storm.  He also saw wind damage at the seams.  He has years of experience with

this product.  He put on the first EPDM roofs that were commercially available.

*Id.* at pp. 134-135.  The roof was severely damaged by the weather. *Id.* at p. 136.

## III.    ARGUMENT AND CITATION OF AUTHORITY

### A.    STANDARD FOR EXPERTS.

Rule 702 governs the admissibility of expert testimony and evidence.

*Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).   The Federal Rules

of Evidence codify the principles articulated in a series of cases beginning with *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).  These

cases hold that trial judges should admit expert testimony if they first determine that the

proffered opinions are reliable.   This reliability determination has three (3) basic

components: 1) the expert must base the opinions upon sufficient facts or data; 2) the

expert must ground the opinion in reliable principles and methods; 3) the expert must

apply those principles and methods to the facts of the case in a reliable manner.

Rule 702 states as follows:

A witness who is qualified as an expert by knowledge, skill, experience,
training, or education may testify in the form of an opinion or otherwise if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert,* the United States Supreme Court made it clear that Rule 702 is meant to ensure that evidence presented by and through an expert is both reliable and relevant. *McCreles v. Global Upholstery Co.*, 500 F.Supp.2d 1350, 1353 (N.D. Ala. 2007). The *Daubert* principles apply to all expert testimony, whether based in scientific, technical, or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-149 (1999).

Further, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question,…the trial judge must determine whether the testimony had 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592) (alteration adopted). *Daubert* imposes on the trial court the duty to act as a "gate-keeper" under Rule 702 by ensuring that expert testimony is both reliable and relevant before being admitted. *Haney v. Eaton Elec., Inc.*, 528 F.Supp.2d 1262, 1266 (N.D. Ala. 2007).

Reliability of expert testimony sometimes comes down to "helpfulness." An expert may disclose his opinions to the jury if the probative value substantially outweighs any prejudicial effect.   See Rule 703 F.R of Evid.

As discussed below, Chubb's Motion to Exclude is in unnumbered paragraphs, making it difficult to respond to. Haman will attempt to respond and will reference headings used by Chubb.

**B.    MR. IRMITER IS WELL-QUALIFIED TO RENDER OPINIONS (REPONSE TO CHUBB'S UNNUMBERED PARAGRAPHS UNDER  B – IRIMITER'S BACKGROUND).**

1.    <u>Mr. Irmiter is qualified to render his opinions.</u>

Pages 5 through 7 of Chubb's brief focus on Irmiter's background. Primarily, these pages focus on what Irmiter is not, not what he is.  When the actual relevant facts are considered, there can be no dispute he is qualified.

To determine whether the qualification requirement is met, "courts generally look to evidence of the witness's education and experience" and determine whether such qualifications and expertise sufficiently "fit" with "the subject matter of the witness's proposed testimony." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F.Supp.2d 1348, 1367 (M.D. Ga. 2010) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

Application of this standard varies depending on whether the subject matter is rooted in science or some technical or other specialized area of knowledge. For

Chubb to argue that Irmiter, and the other expert witnesses of Haman, are not scientists or engineers, is simply an old, bad argument. Licensure and certification in a particular discipline is not a per se requirement, and never has been. The experience of the expert is just as important. *Pipitone Biomatrix, Inc.*, 288 Fed. 3d 239, 247 (5th Cir. 2002).

Specialized knowledge in a field, based upon a factual basis, data, principles, methods and their application are to be considered in deciding whether or not the witness has "a reliable basis in the knowledge and experience of the relevant discipline." *Kuhmo Tire,* 526 U.S. at 149, 119 S. Ct. at 1174 (*quoting Daubert,* 509 U.S. at 592). Experience provides a sufficient basis for the Court to find such an expert qualified.

The Rule 702 Advisory Committee Notes also explain, "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." FED. R. EVID. 702. advisory committee's note (2000 amends.).

Here, Irmiter has extensive experience.  There is no aspect of the Irmiter testimony that would mislead the jury since it is based upon personal knowledge, inspections, knowledge, training and expertise.

Irmiter has been investigating and analyzing damages issues for forty-three (43) years.  There is no question his testimony would be helpful and reliable because of years of experience, and it would certainly assist the jury. Irmiter visited the premises and rendered a report.  He provided approximately 500 photos with the report and took other photos in April 2019.  *Id.* p. 19, 20, 24.   His Rule 26 report and his curriculum vitae, are provided as Doc. #90-40; 90-41-90-42.  Irmiter has averaged investigating over 350 claims per year, including multi-storied structures. *Id.* at p. 120.

Further, Irmiter is the owner of Forensic Building Sciences which actually was responsible for the report in this case.  FBS has 26 employees, operations in the United States and Puerto Rico.  *Id.* at pp. 65, 67.

Irmiter has extensive experience in documenting mold and sampling in the field.  He is WCI certified since 2002.  *Id.* at p. 29, 30.  He has taken engineering courses and written a 25-page dissertation on mold and water intrusion. *Id.* at p. 33. Mr. Irmiter inspects commercial buildings for code enforcement issues and has worked for the City of Minneapolis and for Birmingham. He is a certified vinyl

9

installer and had a general contractor's license for 16 years. *Id.* at p. 56, 59. He is a NOAA severe weather spotter. *Id.* at p. 55.

Mr. Irmiter has worked with and assisted industrial hygienists for over 30 years. He has been collecting samples for over 24 years and worked with some of the best-known hygienists in the country doing concurrent sampling. *Id.* at p. 256.

Mr. Irmiter is familiar with mold sampling procedures as provided by the American Industrial Hygienist Association and as a building code official. *Id.* at p. 259. Two of his employees with FBS have degrees in environmental science. *Id.* at p. 64, 65. One of the employees working with him was Brian Johnson, P.E. He has completed HAGUE roof certification and has inspected construction defects, done moisture probing, infrared, and gathered mold samples.

2.   The personal attacks on Mr. Irmiter are irrelevant.

In short, Mr. Irmiter's credentials are virtually unassailable. Chubb, therefore, resorts to character assassination. The first attack, quite frankly, is offensive. Chubb's attempts to smear Mr. Irmiter with a 19-year-old affidavit from a domestic case is petty and impermissible.

Chubb's next attempt to attack Mr. Irmiter's character through a summary suspension order from a general contract business, as related to a failed Minnesota residential building project from 19 years ago, is also a failed attempt at character

assassination.[2] The only reason that Chubb knows about these two matters is

because Mr. Irmiter testified in response to questions.  That does not make the

information relevant and it is certainly excludable pursuant to the Federal Rules of

Evidence.

Mr. Irmiter had a general contractor's license from 1984 to 2000. His firm

purchased another business called "House of Dreams, Inc."  His family

construction business, an eighty-one-year old business, filed for bankruptcy related

to the House of Dreams, Inc. House of Dreams had built ten (10) Eifs/stucco

houses and had all sorts of major water intrusions.  Irmiter did not know that when

he purchased the business. He did not build the houses. There were all sorts of

problems with that business, including licensing agreements and warranty

agreements. The sellers had not placed monies in escrow to pay the subcontractors

and they liened the project, something that had never happened before. There was

$3 million dollars' worth of problems and immediately they were upside down and

went out of business in less than six (6) months.

His lack of insurance for these losses triggered an administrative action to

take his license. Prior to that, they had 75 employees and he was a licensed general

---

[2] Chubb has tried this before, quite unsuccessfully.  See court rulings from Minnesota, Ex. B
hereto; U.S. District Court for the Northern District of Texas, Ex. C hereto; Plaintiff's response
to collateral attack in the *Box Factory, Inc. v. Verlan Fire Ins. Co.* – 4:15-CV-861A, Northern
District of Texas (2016), Ex. D hereto.

contractor to do commercial and residential. *Id.* at pp. 59-64. This has nothing to do with his experience, or the issues that he has testified to in this case. He has not attempted to retake the general contractor's licensing exam. That does not take away from experience and expertise. This same licensing authority sanctioned his sitting for and passing the 40-hour class/exam to be a licensed code official. See Exhibit A Affidavit of Thomas Irmiter.

Indeed, this attack is impermissible under Rule 404(a)(1). It would also be highly improper to allow such attack pursuant to Rule 403, Fed. R. Evid. It certainly has no probative value and if it did have any value, it would be outweighed by danger of unfair prejudice, confusing the issues, misleading the jury, undue delay or wasting time. Collaterally attacking witness Irmiter, based upon a remote prior business failure, is not relevant, Fed. R. Evid. 402, and has no tendency to make a fact more or less probable related to our case. It is not of consequence in determining the action. Fed. R. Evid. 401.

Weighing probative value against unfair prejudice means value with respect to a material fact. *Ballou v. Henri Studios, Inc.,* 650 Fed. 2d 1147, 1154 (5th Cir. 1981). Something is unfairly prejudicial if it causes a jury to base its decision on something other than the established propositions in the case. Even in Title VII cases, involving probable cause, courts do not allow EEOC determinations to give undue weight and prejudice to a proceeding rather than requiring the evidence to

support actual probable cause. *Williams v. Nashville Network,* 132 Fed. 3d 1123, 1129 (6th Cir. 1997). Evidence is routinely excluded for wasting time if it has scant probative value. *Stathos v. Bowden*, 728 F. 2d 15, 19 (1st Cir. 1994).

Notably, this mode of attack has been tried by Chubb before, and it has failed. See ruling by Judge William R. Howard, Minnesota state court district judge, February 18, 2010, attached hereto as Ex. B. See also Order of U.S. District Judge John McBride, Fort Worth, Texas, December 21, 2016, denying Defendant's Motion to Strike Irmiter and engineer, Johnson. See also Plaintiff's counsel's brief in support of their testimony being allowed. These documents are attached hereto as Exhibits C and D. The character attack on Irmiter, based upon a 19-year-old business failure, is now even more improper due to its remoteness. See Exhibit A, Irmiter Affidavit.

### 3.   Mr. Irmiter has the personal knowledge to state the opinions.

Chubb argues that Irmiter is not qualified because, they say, he is basing his opinions on others. Chubb's "bootstrapping" argument is inapplicable to our facts.

Irmiter visited the property twice. He has personal knowledge. Even if his opinions were based totally on one of his group's observations, if the facts and data relied upon by Irmiter are the kinds of facts and data that experts in this particular field rely upon and such reliance is reasonable, they can provide proper evidence. *Advent Systems Limited v. Unisys Corp.*, 925 Fed. 2d 670, 682 (3d Cir. 1991).

The use by Howarth and Grandinetti of the expert information supplied by Forensic Building Sciences' Tom Irmiter is entirely proper.

**"The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonable rely on other expert's opinions and findings."** *In re Wright Med. Tech. Inc.*, 127 F.Supp.3d 1306, 1320 (N.D. Ga. 2015). **An expert, however, "may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon."** *In re Polypropylene Carpet*, 93 F.Supp.2d 1348, 1357 (N.D. Ga. 2000). In other words, the expert may review and interpret another expert's opinion in forming his own conclusions so long as that is the normal practice in his field. *See id*; *Deutz Corp. v. City Light & Power, Inc.*, No. 05–3113, 2009 WL 2986415, at *5–6 (N.D. Ga. Mar. 21, 2009); *United States v. Batchelor–Robjohns*, No. 03–20164, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005). See also, *United States v. Winston,* 372 Fed.Appx. 17, 20 (11th Cir.2010) (allowing an expert witness's testimony that was based in part on an opinion of a non-testifying expert, noting that "an expert witness may base his testimony on inadmissible information so long as such information is 'regularly relied upon by experts in his field.'").

In short, Irmiter's opinions are stated in his reports.  He prepared them from personal observations and meeting with team members.  It is customary for him to do so.

Finally, Chubb cites *Church Mutual Ins. Co., No. 13 C,* 1625 W.L. 772787, at *3 (N.D. Ill. Feb. 29, 2016) for the proposition that Irmiter's causation opinions in the case fell outside of his credentials.  Actually, the Court's holding in that case was contrary to the facts.  It stated that Irmiter's inclusion of field reports and case images from a NOAA weather report showing the path of a tornado, along with several views of Google maps and historical weather records, was not proper where there is no relationship to his area of expertise.   Although that is simply not true, that is what the Court held.  The Court further referenced his area of expertise as "on-site inspections and evaluations, and preparing project-specific repair scopes."  Note that Chubb's Mulder also reviewed NOAA data and determined that the wind speeds in the area were 68 miles per hour.  (Haman MSJ Ex. 31, Mulder p. 108).

## C. MR. IRMITER'S INVESTIGATION WAS COMPLETE AND THOROUGH (RESPONSE TO CHUBB, IN VARIOUS UNNUMBERED PARAGRAPHS LISTED UNDER ITEM C DOC.# 100, PP. 8 –11

Chubb criticizes Irmiter's investigation.  His investigation was proper under the circumstances and was much more thorough than those of Mulder or some of Chubb's experts.   Indeed, the investigation was incredibly detailed.

15

As an initial matter, Mr. Irmiter used methodology generally recognized in the industry. He has considerable general contracting and construction background and can do all of the work involved in this rebuild. He follows ASTM-E2128 which is a recognized reliable methodology, accepted standard in the industry. No one can contradict that. *Id.* at pp. 299, 300. See Irmiter affidavit, Ex. D.

Any claim that Mr. Irmiter's investigation was somehow deficient is ludicrous. Irmiter first visited the site on June 15, 2015 for scoping inspections. He got on all three roofs and went through the interior of the buildings. *Id.* at p. 80. He again visited on April 24, 2019. *Id.* at p. 83. He was hired to look at causation for the wind claim and do a smoke, particulate matter analysis for the fire claim. *Id.* at p. 99. His team spent a total 10 hours on the roofs. *Id.* at p. 147. He observed damage consistent with roofs lifting up and going back down.

There were also wind-driven debris strikes that looked new, consistent with the storm event. *Id.* at p. 157, 158. He has investigated literally thousands of storm and fire damage claims. *Id.* at p. 118. He gathered data and included it in his report. He reviewed Mesocyclone data from the tornadoes of April 28, 2014 showing 20 instances on both sides of the Knight's Inn and a tornado signature.

There is other damage on either side of the hotel consistent with winds in excess of 80 miles per hour and damage. *Id.* at p. 129, 130. The wind exceeded the design load for both the roof and the metal. *Id.* at p. 131. He saw classic wind

damage in numerous places.  *Id.* at p. 135.   He can testify to the reasonable degree

of building science, building codes and wind-load requirements.  *Id.* at p. 145.

Irmiter looked at the design of the Knight's Inn and the pattern of the smoke

and soot damage on the exterior.  He determined particulates were within the

building, so he acquired bulk sampling and swab sampling.  *Id.* at p. 236.  He has

been qualified in federal district courts to testify on both mold and its affects and

soot and their effects as carcinogens.  *Id.* at p. 240.  He determined soot in the

open cell CMU block and the unit separation walls would require complete

demolition of these walls to remove the soot.

The demising walls have one to two inches of air space between them loaded

with soot.  Irmiter drilled into the CMU and the core was also hollow, loaded with

soot.   It is a health and safety issue, and this is carcinogenic material that has to be

removed.  He does not know a way to remove it without taking the wall down."

These observations were on the fire building.  *Id.* at p. 264, 265.

Irmiter reviewed the SEA electrical report from Chubb.  He was equally

concerned about the wiring as set forth in that report.   *Id.* at p. 267. Bath fan

appliance ducts should be removed from many of the rooms. Particulate matter got

into the housing and the units are not air-tight.  *Id.* at p. 282. Standard protocol

would be that you should not have different molds inside a unit any higher than the

17

exterior. Here, at Knight's Inn, mold content was higher than standard protocol in every one of the units, which tells him there was a significant water intrusion issue.

When consulting with his industrial hygienist, he was told "if it was a dorm, I would have shut it down." *Id.* at p. 291. He pulled open areas, looked inside, and found smoke and soot damage inside the cavities between each room. He took photos. The samples came back with heavy levels.[3]

Particulate matters from the smoke and soot cause the need to tear down and replace the walls because there is not a way to get in there and clean them. *Id.* at p. 293, 294. All walls and ceilings, AC units, cavity installations, carpet, ceiling tiles, concrete slab, and exposed framing should be remediated and repaired. His samples also indicated wiring damage. *Id.* at p. 296, 297.

Based upon his background and experience, he used methodology generally recognized in the industry. There is nothing on this project that is a repair or rebuild he could not do himself. He has the knowledge and skillset. ASTME 2128 is a recognized and reliable methodology he follows. He had sufficient facts and data to arrive at his opinions. *Id.* at p. 299-300.

The entire building needs to be brought up to code and the windows and doors would have to be replaced. The International Building Code applies to

---

[3] Chubb's hygienist, Sumner, did not do this. He did not open and test the expansion joints. (Ex. 39, p. 71, 74, filed as Exhibits to Haman's Motion to Strike Sumner, Doc. #113. He also did not test HVAC units or connections. (Ex. 39, p. 62).

Bessemer. Irmiter reviewed the THG estimate for scope and appropriateness and agrees with it. If anything, it is a little deficient. (*Id.* p. 304-306).

He was personally involved, and his team also investigated. This joint report was prepared with several others in his group, such as engineer Brian Johnson, Adam Peiro, Ryan Neirengarten and Jim Irmiter. All these individuals have degrees in Environmental Science with training in sampling and he was involved in reviewing all of their reports. *Id.* at p. 73.

His team spent a total of ten (10) hours on the roofs. *Id.* at p. 147. They saw areas on the metal roof where debris strikes had occurred, crimping located on parts of the roof you could not walk on, and that is consistent with roof reacting and recovering, lifting up and going back down, causing crimping. The windborne debris strikes looked new, consistent with the April 28, 2014 storm event. There is a whole area where it was scraped and bent. *Id.* at pp. 157, 158.

Mr. Irmiter explained how the roofs were constructed, a blue mansard roof over the top. *Id.* at p. 159. He established the protocols at his visiton June 15, 2015, and was retained for both fire and wind claims. The roofs showed displacement through the interiors, and water damage.

He looked at cause and origin, the location of the fire, the collateral damage on the exterior from the soot and smoke. He went into some of the units. He was there to familiarize himself. *Id.* at pp. 76,78, 80, 84.

Engineer Johnson helped prepare the report, but Irmiter would have reviewed it. The roof repair options would have primarily been Irmiter's. *Id.* at p.14. Irmiter personally got on all three (3) roofs at the Knights Inn when he initially visited on June 15, 2015. He went through hallways, opened doors and looked in. *Id.* at p. 144. He has testified to a reasonable degree of building site certainty and can reference building codes, engineering specifications within those codes, and the ASCE wind load requirements within the code. *Id.* at p. 145.

Irmiter is familiar with ASTM-E2128, which is a building inspection protocol used for diagnosing water intrusion and damage to buildings. It is a 75-page document which lays out an inspection protocol and he followed it. *Id.* at p.163. He observed patching at seams, but did not see evidence of new patching and did not see any ponding issues. *Id.* at pp. 171-173. His opinion was the installation of the EPDM was done in a workmanlike manner. It was consistent with EPDM roofs he has installed and inspected. *Id.* at pp. 173.

On Google Earth pictures, after the tornado, he saw replaced roofs on other properties in line with the Knight's Inn. *Id.* at p.176. There were large areas of trees down to the east and south of the property and trees down on the adjoining golf course. The wind appears to have gone around the backside of the hotel. *Id.* at pp. 186, 187. He saw the seams were broken and opened completely and he lifted them up. Id. at p. 200.

20

His opinion is the EPDM was properly glued down previously.  There was glue on it that held it down. *Id.* at p. 190.  But, there is ballooning on the roof which typically happens when you have wind.  There was a 6-7 feet tall parapet wall that impacted the wind on these roofs. This is called the Bernouli effect. *Id.* at pp. 76,78, 80, 84, 193.  He disagrees with Chubb's Mulder, who said there were installation problems with the roof.  **Irmiter would have expected to have seen the roof showing wrinkling and fatigue and he did not see this. The peeling of seams is not typically attributed to lack of maintenance. He did not see any improper installation on the roof.** *Id.* at pp. 199, 200.

His group took core samples to do saturation tests.  There was the metal roof, then the sub-roof, 2 inches of lightweight insulating concrete.  He explained how these core cuts were taken. *Id.* at p. 203-208.  The core cuts in all three (3) buildings showed six (6) layers which would all have to have water to get through them to go into the interior.  All of the core cuts were wet, proving the water got through all six (6) layers of material. *Id.* at pp. 216, 217.

As to the core samples and lab results, Irmiter discussed the location of the samples with his assistants looking at the design of the building, and the pattern of smoke and soot damage on the exterior building.  They did bulk sampling and some swab samplings. *Id.* at p. 236.  There are several levels of sampling, 1-4. Level 1 is presumptive and sufficient. *Id.* at p. 238.

Mr. Irmiter sent these samples off to industrial hygienist Neal Carlson and verified the process. He is familiar with Carlson and helped him burn 2,000 different types of wood to develop mold comparison slides. *Id.* at p. 239. Irmiter has been qualified in both federal and state courts to testify on both mold and its effects, soot and its effect as a carcinogen. *Id.* at p. 240.

Irmiter's team member son, Jim Irmiter, has a degree in Environmental Sciences from the University of Colorado. Irmiter testified in the largest pharmaceutical disaster case in the United States, working with the CDC and the federal government. He found toxic Exophiala at the site when the CDC could not find it. *Id.* at pp. 76,78, 80, 84, 241. He recommended Level 1 testing in the Knight's Inn case, and noted that his Level 1 and Chubb's Level 4, which uses a higher level of microscopes, both were presumptive. *Id.* at p. 243. The problem with Level 4 sampling is the longer you wait from the time of the fire to take your samples, the more the results will be weakened. He explained why. Chubb claims to have done Level 4 testing in this case but it did not. It did Level 3. Level 3 is no better than Level 1 for this sampling. *Id.* at p. 248. Irmiter had given a presentation about compounding center findings to the American Industrial Hygienist Association based on his experiences. *Id.* at p. 251. He has worked with some of the best-known hygienists in the country, doing concurrent sampling. No one has ever questioned the methodology of samples he has taken. *Id.* at p. 256.

His air sampling was taken with Air-O-Cell sets and calibrated pumps.  He owns six of the pumps and calibrate them regularly, take samples and sends them to the lab.   He is aware of sampling procedures of the American Hygienist Association.  As a building code official, he knows the codes. *Id.* at p. 259.  During his testing, he was doing a soot inspection, but soot and mold were contained in the analyses that he received back from his samples. *Id.* at p. 260.

His samples were obtained according to recognized professional standards. His report concluded that based on the amount of soot he saw, electrical components that would have been affected were significant.  He took samples from approximately twenty (20) rooms and two (2) expansion joints.   The particulate matter got into the housing and the air movement systems. *Id.* at pp. 281, 282.  His test results showed higher in every unit, which tells him there is a significant water intrusion issue.  His hygienist consultant stated that "if this was a dorm, I would have to shut it down." *Id.* at pp. 290, 291.

Irmiter is the only expert in this case that pulled open the cavities, looked inside the cavities of the expansion joints, visibly found soot and smoke inside the cavities, between each room, and took photos and samples.  The samples came back with heavy levels.  The smoke had traveled down these open areas.  The particulate matters from the smoke and soot caused the need to tear down and replace the walls because there is not a way to get in there and clean them. *Id.* at

23

pp. 293, 294.  Irmiter agreed with removal of all walls and ceiling finishes and AC

units within the affected rooms, cavity installation, carpet, ceiling tiles, concrete

slab, exposed framings.  Concrete slab and exposed framings should be

remediated.  *Id.* at p. 296.

The foundation and exterior walls are probably salvageable but the entire

building has to be brought up to code, windows and doors and everything.  He has

been a code expert for thirty-four (34) years.  The International Building Code

applies to this Bessemer location.  *Id.* at pp. 305-206.  If there is a rebuild or repair

the everything has to be brought current to the International Building Code.

### D.   RESPONSE TO CHUBB'S CRITICISM OF IRMITER'S OPINIONS REGARDING THE CAUSE OF THE DAMAGES TO THE ROOFS UNDER ITEM D.

Chubb criticized Irmiter's opinions regarding the cause of the damage to the

roofs in unnumbered paragraphs on pages 12 and 13 of Doc.# 101.

Irmiter's report speaks for itself.  The causation reports were signed by

Irmiter and clearly state as follows:

> The report includes the opinions that I have regarding the causation,
> scope of repairs, applicable codes for the two (2) losses to the Knights
> Inn owned by Haman that resulted from the fire loss of March 22,
> 2014 and storm/hail loss of April 28, 2014.

Chubb Ex. 32 – Irmiter's deposition ("Causation Report").  Irmiter's opinions are

based on his field examinations and are very detailed.  His field reports are dated

and signed on August 20, 2015.

24

There being no valid criticism of his causation opinion, Chubb then criticizes Irmiter's involvement in drafting a report concerning causation.

Chubb criticizes the fact that Irmiter did not draft all of the field reports. Certain sections were drafted by an engineer with his team, Johnson, but Irmiter testified that he and Johnson worked together and he reviewed all of Johnson's work. Johnson certified to a reasonable degree of engineering certainty the storm event caused damage to both the metal roof and the EPDM roof. Chubb obviously does not like that testimony because it is harmful, but Irmiter based his opinions on personal knowledge and his inspections.

As previously discussed, Mr. Irmiter and his team spent a total of ten (10) hours on the roofs and he spent twenty (20) minutes each on all of the roofs. (Haman's MJS Ex. 18, p. 102, 103, 135, 147, 157, 158, 165, 166, 169, 170-173, 180, 190-193, 199-201).   He sat down and reviewed the narrative and he and Johnson created the language, side by side. (Haman's MSJ - Ex. 18 p. 114).   He supervised core cuts and followed their result (Haman's MSJ - Ex. 18, p. 208-210, 215). He also looked at the design of the building and the pattern of smoke and soot damage on the exterior, considered the expansion joint and bulk sampling and some swab sampling.  (Haman's MSJ - Ex. 18, p. 236).   He went in units himself and was on the roofs himself.  (Haman's MSJ - Ex. 18 p. 262).  **Irmiter is the only witness in the case that peeled back and looked inside the expansion joints and**

**found soot and smoke damage inside the cavities between each room.** He took

photos to document everything.  (Haman's MSJ - Ex. 18, p. 293, 294).

The remainder of the criticisms of the causation opinions require little

discussion.  First, in D(2) of Chubb's unnumbered paragraphs, pages 14 and 15 of

Doc.# 101, Chubb argues that it objects to Irmiter's plans to testify "to a

reasonable degree of building science certainty."   Chubb cites no authority which

would prevent such testimony. Engineer Johnson was part of the FBS group that

did the opinion and causation study on Knights Inn.

Finally, in D(3), unnumbered paragraphs, its attacks Haman's Amended

Expert Disclosures as somehow inadequate. Page 15, Doc. # 101.   The Court has

ruled on this issue.  (See Doc.# 84, Memorandum Opinion).

### E.   HAMAN'S RESPONSE TO ATTACK ON WIND DATA (ITEM E IN CHUBB'S UNNUMBERED PARAGRAPH OF CRITICISM PAGES 15-16 OF CHUBB'S DOC. #101)

Item E, pages 15 through 16 of Doc. #101 is simply a bogus statement.

Chubb suggests that there was no wind data obtained for the date of the storm.

Chubb criticizes Irmiter for not performing any calculations of wind speed.  Why

would they need to do that when NOAA information was available?  The NOAA

report that he consulted allowed him to conclude that the winds were likely in

excess of 80 miles per hour.  (Haman's MSJ - Ex. 18, p. 130, 134).  More

importantly, he actually physically examined the roofs.

**F.   HAMAN'S RESPONSE TO CHUBB'S
       CRITICISM OF IRMITER'S FIRE INVESTIGATION (ITEM F)**

       1.    <u>Mr. Irmiter's investigation was adequate.</u>

Chubb's unnumbered paragraphs under Item F, page 17 of Doc.#101

criticize Irmiter's investigation of the fire claim.   His investigation and actual

physical presence at the scene have been discussed several times hereinabove.

       2.    <u>The criticism of "Level 1 of presumptive tests" is unfounded.</u>

Chubb's criticism of Level 1 of presumptive test results is weak.  Irmiter has

testified that Level 1 presumptive tests means that a substance may be present but

the Level 1 testing in this matter was appropriate.

Mr. Irmiter looked at the design of the building and smoke and soot damage

to the exterior before deciding what type of sampling to take.  (Haman's MSJ - Ex.

18, pp. 235, 237).   He is familiar with the lab that he sent the tests to. He made

sure of chain of custody. He has been qualified in federal and state courts to testify

on both mold and its effects and soot and its effects as a carcinogen. He directed

the air sampling protocol.  (Haman's MSJ – Ex. 18 pp. 240-243).

There was no reason to do anything other than Level 1 testing in Knights Inn

case.  Other levels of higher microscope bases were not necessary here.  (Haman's

MSJ Ex. 18 - pp. 242-243).

The samples Chubb relies upon are not valid, as there are problems with the sampling that Chubb took in. The longer you wait from the time of the fire the more your results will be weakened. Level 3, which is what Chubb did in the Knight's Inn case, is no better than Level 1 in this situation. They are all presumptive. (Haman's MSJ Ex. 18 - p. 248). Irmiter had personal knowledge concerning the issues he was dealing with here, and chose what lab sampling to use based upon his experience.

3.     The alleged failure to consider other causes is specious.

Chubb criticizes on page 19, Doc. #101 that Irmiter did not rule out other possible causes. (See Doc.# 101). Chubb suggests that Irmiter's opinions are not valid because he did not see a charcoal grill or did not see evidence of candles or cigarettes at the scene. Seriously? If they were not there to observe then how would Irmiter be on notice to consider same? Evidently, Chubb is discussing a situation that occurred after the motel was abandoned and vagrants were living in the rooms, smoking or lighting fires or candles.

**G.     HAMAN'S RESPONSE TO CRITICISM OR DAMAGES (ITEM G UNNUMBERED PARAGRAPH ON PAGE 20, DOC.#101-).**

Chubb criticizes Irmiter reports on his findings that relate to damage to all eighty (80) of the units. The report states, in part, as follows:

> Based upon the soot inspection and documentation of the damages . . . including review of our <u>soot sampling</u>. I have concluded that the

28

property at question. . . . has been damaged by fire and distribution of soot throughout the structure.  <u>Based on sample results</u>, and the construction of the building, it is my opinion that fire caused substantial damage to the building through the distribution of carcinogenic soot into hidden wall, ceiling and floor cavities.  This soot is still viable in the ambient air <u>based upon our sampling results</u>.

Chubb in actuality states no real criticism.  There is no need to respond.

### H.   HAMAN'S RESPONSE TO CRITICIM OF IRMITER'S METHODLOGY REGARDING THE FIRE CLAIM (ITEM H).

Chubb in Item H, on page 21 of its Brief supporting its motion to exclude Irmiter, Doc. #101, criticizes Irmiter's methodology.  Again, Chubb criticizes Irmiter for not considering cigarette smoke and relying upon his Level 1 test results. Without repeating, Irmiter testified that his Level 1 was perfect for that circumstance.

### I.   HAMANS RESPONSE TO CHUBB'S CRITICISMS OF INVESTIGATION METHODOLOGY.

In unnumbered paragraphs of Chubb's criticisms of Irmiter's report, Chubb just argues that its expert, Kurt Mulder, has a different opinion.  This is of course no basis to exclude. Chubb makes no other argument.

### IV.  CONCLUSION

An expert's value as a witness must derive from his ability to apply his expertise to the facts and inferences from them.  *United States v. Palacios*, 677 Fed. 3d 234, 243 (4th Cir. 2012), *cert. denied* 568 U.S. 834, S. Ct. 124 (2012).

He is subject to cross-examination, going to the weight, not admissibility, of his

opinions. *Jones. Vs. Otis Elevator Co.*, 861 Fed. 655, 663 (11th Cir. 1988).

/s/Gary V. Conchin
Gary V. Conchin (ASB-1263-C56G)
Attorneys for Plaintiff

Gregory Brockwell, Esq.            CONCHIN COLE & JORDAN
Jason R. Smith, Esq.               2404 Commerce Court SW
2100 1st Avenue, N., Ste. 300      Huntsville, AL  35801
Birmingham, Alabama 35203          (256) 705-7777 Phone
greg@brockwellsmith.com            (256) 705-7778 Facsimile
jay@brockwellsmith.com             E-mail: gary@alainjurylaw.com

## CERTIFICATE OF SERVICE

I certify that I have on the 11th day of September, 2020, served a true and correct copy of the foregoing to counsel for all parties in this matter via electronic mail.

Michelle A. Sherman, Esq.            Mark Hess, Esq.
Wayne D. Taylor, Esq.                HAND, ARENDALL
MOZLEY, FINLAYSON                    2001 Park Place, N., Ste. 1200
& LOGGINS, LLP                       Birmingham, Alabama 35203
1050 Crown Pointe Parkway, Ste. 1500 mhess@handarendall.com
Atlanta, Georgia 30338
msherman@mfllaw.com
wtaylor@mfllaw.com

David A. Lee, Esq.
PARSONS, LEE & JULIANO, P.C.
600 Vestavia Parkway, Ste. 300
Birmingham, Alabama 35216
dlee@pljpc.com

/s/Gary V. Conchin
Gary V. Conchin (ASB-1263-C56G)
