IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HAMAN, INC. d/b/a KNIGHTS INN, ) | |
| ) | |
| Plaintiff, ) | |
| ) Civil Action File No. | |
| ) 2:18-CV-01534-KOB | |
| v. ) | |
| ) | |
| CHUBB CUSTOM INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**REPLY OF CHUBB CUSTOM INSURANCE COMPANY TO HAMAN'S RESPONSE TO CHUBB'S MOTION TO EXCLUDE THE EXPERT OPINION TESTIMONY OF THOMAS IRMITER**

Chubb Custom Insurance Company ("Chubb") respectfully files this reply to the response of plaintiff Haman, Inc. d/b/a Knights Inn ("Haman") to Chubb's motion to exclude the expert opinion testimony of Thomas Irmiter, as follows:

### I.  OVERVIEW

Haman argues incorrectly that this case is solely a damages dispute. If that were true, Haman would have no need to designate Irmiter, Chuck Howarth and Arthur Grandinetti as causation experts. If what Haman now claims is true, Chubb's motions to exclude those individuals from testifying as experts on causation (and to preclude Irmiter from providing expert opinion testimony criticizing the opinions of Chubb's causation experts) should be granted without opposition from Haman.

This Court already has ruled that this is a cause of loss dispute. [Docs. 48 and 49]. Irmiter is one of Haman's alleged causation experts. With regard to the fire damage claim, Irmiter's "Expert Report of Thomas J. Irmiter" contains his opinions regarding the alleged cause of damage to all 80 of the units in one of Haman's buildings. *Exh. 36 to Depo. Irmiter.* The report states in part as follows: "Based upon the site inspection and documentation of the damages … including review of our soot sampling, I have concluded that the property at question … has been damaged by fire and deposition of soot throughout the structure." *Id.; see also Depo. Irmiter; p. 235, l. 15-25.* With regard to the wind damage claim, the first page of the Causation, Scope and Repair Code Submission signed by Irmiter states, "[t]his Report includes the opinions that I have regarding causation, scope of repairs applicable codes for the 2- losses to the Knights Inn owned by Haman, LLC that resulted from the fire loss of March 22, 2014 and the windstorm/hail loss of April 28, 2014." *Exh. 32 to Depo. Irmiter.* [Doc. 100-1, page 379 of 485].

This case also is a damages dispute. Chubb has moved to preclude Irmiter from testifying as a causation expert and a damages expert.

## II.  ARGUMENT AND CITATION OF AUTHORITY

The issue of causation in Haman's supplemental fire damage claim is whether the fire in March 2014 deposited soot inside the hidden spaces in the walls, ceilings and floors of all 80 rooms in Haman's building, so that the effects of the

fire cannot be mitigated by cleaning and repairing the damages for which Chubb already paid, but instead, all 80 rooms must be completely gutted and rebuilt.

The issue of causation in the wind damage claim is whether winds from the tornado that passed to the southwest of Haman's property in April 2014 were strong enough at Haman's property to exceed the design loads of the metal and EPDM roofs and cause structural damage to the roofs, and whether those winds did cause structural damage to the roofs, thereby creating openings in the roofs that allowed rainwater to leak into the interiors of the buildings.

### A. **Irmiter Is Not Qualified As An Expert On Causation**

#### (1) **The Wind Damage Claim**

Haman alleges that "Irmiter has extensive experience. … [He] has been investigating and analyzing damages issues for forty-three years … [and] has averaged investigating over 350 claims per year…." *Response, p. 9.* These are vague assertions that do not obscure the fact that Irmiter, who is a residential building inspector and who owns Forensic Building Science, Inc. ("FBS"), which employs engineers and other specially educated individuals, does not have any education, training or experience as a causation expert in a case of wind damage to the roofs of commercial buildings. At least one court has precluded Irmiter from testifying as an expert in a roof/alleged windstorm damage case, ***Church v. Church Mut. Ins. Co.,*** No. 13 C 1625, 2016 WL 772787, at *3 (N.D. Ill. Feb. 29, 2016),

*aff'd sub nom.*, **Olivet Baptist Church v. Church Mut. Ins. Co.,** 672 F. App'x 607 (7th Cir. 2017), which Chubb discussed in its memorandum in support of its motion to exclude Irmiter, at pages 24 and 25.

Irmiter's affidavit discusses his opinion that the tornado of April 28, 2014 allegedly damaged Haman's roofs and caused openings that allowed rainwater to leak into the buildings' interiors. Irmiter fails to explain how he has the expertise to link winds from the 2014 tornado to the damage observed on those roofs, or how he is qualified as an expert to testify that the specific conditions he observed on the roofs were caused by wind, and more specifically, by wind from the 2014 tornado. Irmiter avers: "Based upon my training, education and experience both in the field of construction, inspections and building codes I can testify to a reasonable degree of certainty as to the wind speed, the design of the building at the time of the storm based on the age and effect on the components and cladding by the wind produced by the tornado." *Aff. Irmiter. ¶ 13, top of page 11*. This conclusory allegation begs the question: How is a residential building inspector who possessed a building contractor's license approximately 20 years ago that was revoked because he was accused of fraud qualified to testify as an expert that winds from a specific event caused the damage to the roofs that he observed for the first time one year later? Haman and Irmiter have not answered this question, but instead, merely declared it to be so. Unlike a licensed professional engineer who is educated and trained in

these subjects, it is not obvious that a former building contractor (whose license was revoked) or a residential building inspector has any such knowledge. Irmiter fails to explain specifically how his background provided him with this knowledge.

Haman has not met its burden under Rule 702 and ***Daubert*** of proving Irmiter qualified as an expert regarding the cause of damages observed on Haman's roofs.

### (2) The Supplemental Fire Damage Claim

Irmiter avers that "[f]or the damage caused by cross-contamination from the fire I used my experience designing and constructing buildings and deconstructing buildings to determine air flow patterns within the interior of the structure affected by the fire." *Aff. Irmiter, ¶ 13, p. 10 of 21*. Irmiter never has designed a commercial building! People who design commercial buildings are licensed architects and engineers. Irmiter is neither. There is no evidence that Irmiter ever constructed or demolished a hotel or other commercial building, or that he has any education, training and experience with "air flow patterns." Haman states that Irmiter has "extensive experience in documenting mold," *Response, p. 9,* and he "had a general contractor's license for 16 years." *Id., p 10*. Mold has nothing to do with the issues in Haman's disputed fire damage claim, and Irmiter's building contractor's license was revoked when he was accused of fraud.

Irmiter is licensed only as a <u>residential</u> building inspector in Minnesota. *Depo. Irmiter, p. 37, l. 5-19.* [Doc. 100-1]. He is familiar with the residential

building codes and authorized by the State of Minnesota to enforce the codes' minimum requirements. *Id., p. 38, l. 14-16.* Business Dictionary defines a building inspector as a "[q]ualified professional delegated by a government agency to do building control. Building inspectors have the power to halt construction work on a site if it does not meet the prescribed standards. In several jurisdictions, building inspectors are exempt from liabilities arising from errors and omissions." http://www.businessdictionary.com/definition/building-inspector.html. The United States Bureau of Labor Statistics states that "[c]onstruction and building inspectors ensure that construction meets building codes and ordinances, zoning regulations, and contract specifications." See, https://www.bls.gov/ooh/construction-and-extraction/construction-and-buildinginspectors.htmt. Under these definitions, Irmiter's work as a residential building inspector does not qualify him as an expert on the causes of fire or wind damage to Haman's buildings.

Irmiter testified that soot is "a health and safety issue. I have a code of ethics as a building code official. This is a carcinogenic material. It's a health and safety issue. It needs to be removed." *Depo. Irmiter, p. 265, l. 13-17.* That may be so, but it has nothing to do with whether Irmiter is qualified as a causation expert on the issue of whether microscopic particles of soot from a fire entered the hidden spaces of the floors, walls and ceilings of all 80 rooms of Haman's buildings. In light of the definition of a building inspector, discussed above, Irmiter is not so qualified.

Irmiter's affidavit discusses his company, Forensic Building Sciences, Inc. ("FBS"), which employed an engineer, Brian Johnson, P.E., who primarily authored the Causation Report signed by Irmiter. (This was discussed in detail in Chubb's memorandum in support of its motion to exclude Irmiter). In his affidavit attached to Haman's response, Irmiter avers, "I and my team at FBS perform forensic investigations to determine building failure causation of all kinds, including determining whether storm events have caused damage to buildings…." *Aff. Irmiter, ¶ 5; see also ¶6.* Irmiter avers that "[t]his joint report was prepared with several others in my group, such as engineer Brian Johnson, and Environmental Scientists Adam Piero, Ryan Neirengarten and Jim Irmiter." *Id., pp. 13-14 of 21.* As discussed in detail in Chubb's motion to exclude Irmiter, he cannot simply bootstrap the opinions of others as his own and testify to them as an expert. That FBS and its professional engineer(s) and other employees may have consulted on causation issues does not mean that Irmiter, who is a residential building inspector and the owner of FBS, is qualified to provide expert opinion testimony regarding all of the subjects within the ken of the professionals he employs.[1]

---

[1] Haman also argues irrelevantly that Irmiter has extensive experience collecting samples; *response, p. 10;* however, Irmiter did not take the samples in this case. Irmiter's son Jim Irmiter and Adam Piero took the samples.

Because Haman has failed to meet its burden of proving that Irmiter is qualified under Rule 702 and *Daubert* to testify as an expert on the subjects on which he proposes to testify, his expert opinions must be excluded.

### B. Irmiter's Opinions Are Not Based Upon Sufficient Facts Or A Reliable Methodology

#### (1) The Wind Damage Claim

Haman asserts that Irmiter testified he saw tornado "signatures" on the NOAA website that allegedly were "consistent with the damage seen" on Haman's roofs and that "[t]he winds were likely in excess of 80 miles per hour. The wind exceeded the design load for both the roof and the metal." Haman goes on to recite Irmiter's opinion that the roofs were damaged by wind. *Response, p. 4-5*. Merely citing Irmiter's opinions on these subjects does not supply the necessary facts and scientific methodology to sustain the opinions. These are merely conclusory allegations and the "ipse dixit" of the purported expert. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." **Gen. Elec. Co. v. Joiner,** 522 U.S. 136, 146 (1997); *see also* **McDowell v. Brown,** 392 F.3d 1283, 1301–02 (11th Cir.2004) ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions...."); **Allpattah Servs. v. Exxon Corp.,** 61 F. Supp. 2d 1335, 1340 (S.D. Fla. 1999) ("The expert's 'self-proclaimed' accuracy is insufficient").

Haman discusses at length how Irmiter and his team went up onto the roofs, photographed them, and concluded that "[t]his looks like wind damage" (a determination that Irmiter is not qualified to make or propound in court as an expert). Then, as discussed in Chubb's memorandum of law, Irmiter reasoned backward and determined that winds from the tornado in 2014 must have been strong enough to exceed the wind design loads for the metal and EPDM roofs, thereby damaging them. This was not the only improper methodology; Irmiter failed to explain how he was able to ascribe the particular damages present on these roofs to wind rather than to age-related deterioration, wear and tear, improper repair and maintenance and vandalism, as opined by Chubb's expert engineer, Kurt D. Mulder, P.E. *See* [Doc. 105-74].

Irmiter claims he applied the principle of the Bernoulli effect to the parapet walls on Haman's flat roofs to arrive at his opinion that the relatively low wind speeds likely present at the property on the day the tornado passed nearby – 68 mph – allegedly were sufficient to damage roofs designed to withstand 90 mph winds. *See Aff. Mulder, ¶ 22*. Irmiter averred that "[t]here was a 6 to 7 feet tall parapet wall that impacted the wind on these roofs. The effect it caused is called the Bernoulli effect." *Aff. Irmiter, p. 16 of 21*. In fact, the Bernoulli effect is a theorem of fluid dynamics, from which is derived the Venturi effect, which can apply to wind moving through a tunnel. The on-line dictionary Britannica explains:

> … Bernoulli's theorem implies, therefore, that if the fluid flows horizontally so that no change in gravitational potential energy occurs, then a decrease in fluid pressure is associated with an increase in fluid velocity. If the fluid is flowing through a horizontal pipe of varying cross-sectional area, for example, the fluid speeds up in constricted areas so that the pressure the fluid exerts is least where the cross section is smallest. This phenomenon is sometimes called the Venturi effect, after the Italian scientist G.B. Venturi (1746–1822), who first noted the effects of constricted channels on fluid flow.

https://www.britannica.com/science/Bernoullis-theorem. The Venturi effect, which Irmiter attempted to describe, works as follows:

> When several tall buildings are constructed in proximity, there is a so-called Venturi effect which describes a wind created by air is squeezed through a narrow space known as "channeling." The fluid flow through the group may be significantly deformed and have a much more complex feature than isolated tall buildings, ...

https://www.sciencedirect.com/topics/engineering/venturieffect#:~:text=When%20several%20tall%20buildings%20are,feature%20than%20isolated%20tall%20buildings%2C. At his deposition Irmiter tried to explain the Bernoulli/Venturi effect:

> Q. Will the parapet walls in any way change how the wind impacts the roof?
>
> A. Sure. Absolutely. It's called a Bernoulli effect. … In this case, it certainly could have had an effect of creating a bit of a wind tunnel with that large slope down inside there creating more suction on the roof. Without the parapets, the wind would roll across the roof. Here it could have a tendency to come down and then suck back up again.

*Depo. Irmiter, p. 193, l. 6-21.* Under cross-examination, Irmiter conceded that it was possible the parapet walls would have the opposite effect – *i.e.,* they would keep the winds above the parapets. It could be either one, Irmiter said; he would

have to measure it, which he said he did not do. *Id., p.194, 1-25; p. 195, 1-16*. Chubb's expert Mulder, a licensed professional engineer, explained: "The majority of the EPDM roofing was surrounded by a parapet wall, which testing has shown significantly reduces wind uplift on the roofing." *Aff. Mulder, ¶ 45*.

Irmiter's testimony about the Bernoulli effect is an example of what happens when a person who is not educated or trained in scientific principles, such as Irmiter, attempts to explain and apply those principles to a set of facts. Here, Irmiter was attempting to prove that his opinions regarding the alleged wind damage to the roofs rest upon accurately applied scientific principles. He failed miserably.

Irmiter also averred that "[t]here is a whole area where the roof was scraped and bent where branches went across it." *Aff. Irmiter, p. 14 of 21*. However, Irmiter failed to document any branches lying on Haman's roofs. No doubt this is because there were none. Irmiter's photos show the roofs completely bare of any branches, limbs or leaves. [Doc. 100-1, pp. 454-455, 461-467 of 485]. The 6 to 7 foot-high parapet walls would have prevented any branches that flew through the air and over the tops of the parapet walls, landing on the roofs, from continuing across the roofs and falling to the ground. If branches had scraped across the roofs of the buildings, they would have been there when Irmiter performed his inspection. Irmiter's deposition and affidavit testimony reveal that, while he is willing to espouse almost

any theory in support of his pre-conceived conclusions, he cannot provide the factual basis necessary to sustain the application of the theory to the true facts.

Irmiter's affidavit contains another example of Irmiter improperly reasoning from a pre-determined conclusion in order to opine the facts needed to support the conclusion. (This faulty methodology was discussed in detail in Chubb's memorandum in support of its motion to exclude Irmiter). Irmiter averred:

> Based on my training as a NOAA weather spotter, and ability to read and interpret weather data and information, <u>and the damage to the building</u>, the winds at Knights Inn were likely in excess of 80 miles per hour. <u>As a result</u> the fully adhered EPDM membrane was no longer fully adhered or glued down. This is consistent with classic wind damage consistent with a storm.

*Aff. Irmiter, p. 8 of 21.* Here again Irmiter opines improperly that, because there was wind damage to the roofs allegedly evidenced by part of the membrane no longer fully adhering to the roof, the winds at Knights Inn must have exceeded 80 miles per hour. Irmiter uses the conclusion – alleged wind damage to the roofs – to derive the facts – the winds exceeded the design load of the roofs. All that the facts actually show is that the roofing membrane no longer was fully attached to the roof structure.

Chubb's expert licensed professional engineer Mulder examined the EPDM membrane and averred: "I observed and photographed multiple locations on the flat portions of the roofs that were holding water over membrane lap seams. I observed the sealant at the lap seams to be cracked and weathered." *Aff. Mulder, ¶ 11.* Mulder averred: "The EPDM roofing at the Knights Inn was twenty to twenty-five years

old (in 2015), which indicated the EPDM roofing system was at the end of its service life. *Id., ¶ 25*. "When an EPDM roofing system reaches or nears the end of its service life, the adhesives and sealants used in the installation of the roofing deteriorate. This results in the separation of lap patches, seam tape, and other materials used to connect and secure the roofing materials. As the lap seams of the roofing material separate, water intrudes into the interior of the building." *Id., ¶ 26*. "The conditions I observed on the flat EPDM roofs of the Knights Inn indicate that the majority of the water intrusion into the buildings' interiors was the result of the roofing system having reached the end of its service life, and was not the result of damage to the roof caused by wind." *Id., ¶ 27*.

Irmiter's twenty-one page affidavit attempts to overwhelm the Court with all that he and his team did during their inspection of the roofs; however, the inescapable fact is that all Irmiter really did is document the deteriorated condition of the roofs. Irmiter failed to document sufficient facts or identify a reliable methodology that support his opinions regarding the alleged cause of the damages observed on the roofs. Irmiter's wind damage testimony must be excluded.

### (2) The Fire Damage Claim

Irmiter intends to testify as an expert at trial that <u>all</u> of the walls, floors and ceilings in all 80 rooms in Haman's building must be demolished and rebuilt in order to remove alleged soot from the fire. However (because he is not educated,

trained or experienced as a fire investigator, industrial hygienist, engineer, or other professional or scientist), Irmiter is unable to point to any scientific materials that will substantiate any of his opinions. Irmiter's opinions on causation have no basis other than his "ipse dixit." This is evidenced in part by his testimony as follows:

> Q. -- and it states [referring to the FBS Causation Report], "Soot in the open cell CMU block and the unit separation walls will require complete demolition of these walls to remove the soot." That's what it says, right?
>
> A.      That's what it says, yeah.
>
> Q.      Can you reference any standard or professional organization that recommends CMU removal without evidence of structural damage?
>
> A.      How else are you going to get the soot out of there?
>
> Q.      That wasn't my question, sir. My question is: Can you reference any standard professional organization that recommends CMU removal without evidence of structural damage?
>
> MR. CONCHIN: Object to the form, assumes there is such an animal.
>
> THE WITNESS: I don't know that there is. What I'm saying is that the demising walls have an air space between them of about an inch and a half to two inches. It's loaded with soot on either side of the cause and origin location[2] in particular. So how the hell are you going to get that out of there?
>
> BY MR. TAYLOR:
>
> Q.      I'm asking is there –

---

[2] Referring to the rooms immediately adjacent to where the fire started.

> A. We also drilled into the CMU, physically drilled into it. In the core, it's hollow CMU. It's loaded with soot based on Mr. Carlson's analysis. How are we going to get that out of there?
>
> Q. My question is: Do you know of any reference -- or do you know of any standard, I should say, or any professional organization that actually recommends CMU removal when there is no evidence of structural damage? Do you know of any?
>
> A. No. It's a health and safety issue. I have a code of ethics as a building code official. This is a carcinogenic material. It's a health and safety issue. It needs to be removed. If you can figure out a way to remove it without taking the walls down, God bless ya.

*Depo. Irmiter, p. 264, l. 2-24.* This discussion concerned the rooms adjacent to the fire, for which Chubb already paid. This illustrates how Haman and Irmiter have conflated the fire and soot damages to the rooms near the origin of the fire with the alleged soot in the interstitial spaces in the other 80 rooms of the building, which is what the disputed supplemental fire damage claim concerns. That soot from the fire got into the rooms immediately adjacent to the fire (no one disputes this) does not mean that all 80 of the rooms were damaged by soot from the fire and must be gutted and rebuilt. This is not a reliable methodology.

## IV. **CONCLUSION**

For the reasons and on the grounds argued above and in Chubb's motion and supporting memorandum of law, this Court should enter an order precluding Thomas Irmiter from testifying as an expert on any subject matter in this case.

This 25th day of September, 2020.

*/s/ Wayne D. Taylor*
WAYNE D. TAYLOR
Georgia Bar No. 701275
*Admitted pro hac vice*
MICHELLE A. SHERMAN
Georgia Bar No. 835980
*Admitted pro hac vice*
MOZLEY, FINLAYSON & LOGGINS LLP
1050 Crown Pointe Parkway
Suite 1500
Atlanta, Georgia 30338
Tel: (404) 256-0700
Fax: (404) 250-9355
wtaylor@mfllaw.com
msherman@mfllaw.com

-and-

MARK D. HESS
Alabama Bar No. ASB-0008-E66M
HAND ARENDALL HARRISON SALE LLC
1801 5th Avenue North, Suite 400
Birmingham, Alabama 35203
Tel: (205) 324-4400
Fax: (205) 322-1163
mhess@handfirm.com

-and-

DAVID A. LEE
Alabama Bar No. ASB-3165-E47D
PARSONS, LEE & JULIANO, P.C.
600 Vestavia Parkway, Suite 300
Birmingham, AL 35216
Tel: 205-326-6600

Fax: 205-324-7097
dlee@pljpc.com

*Attorneys for Defendant*
*Chubb Custom Insurance Company*

#496520

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 25th day of September, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following: <u>Gary V. Conchin, Kenneth B. Cole, Jr., Gregory A. Brockwell, and Jason R. Smith</u>, and I certify that I have e-mailed and mailed by United States Postal Service the document to the following non-CM/ECF participants:

      N/A

                                                  */s/ Wayne D. Taylor*
                                                  WAYNE D. TAYLOR
                                                  Georgia Bar No. 701275
                                                  *Admitted pro hac vice*

#496616